Exhibit B



# Department of Toxic Substances Control



**Linda S. Adams**
Acting Secretary for
Environmental Protection

Leonard E. Robinson
Acting Director
8800 Cal Center Drive
Sacramento, California 95826-3200

**Edmund G. Brown Jr.**
Governor

March 17, 2011

Mr. David Van Over
216 F Street #108
Davis, California 95616

Mr. Don Dobbas
Jim Dobbas, Incorporated
P.O. Box 177
Newcastle, California 95658

Continental Rail, Inc.
3218 Nacodoches Road, #8
San Antonio, Texas 78217

NOTICE OF ISSUANCE OF IMMINENT OR SUBSTANTIAL ENDANGERMENT
ORDER AND REMEDIAL ACTION ORDER (I/SE ORDER) FOR FORMER WICKES
FOREST INDUSTRIES SITE, ELMIRA, CALIFORNIA, SOLANO COUNTY

Dear  Mr. Van Over, Mr. Dobbas and Continental Rail, Inc.:

The purpose of this letter is to provide notification that the Department of Toxic
Substances Control (DTSC) is issuing an Imminent and Substantial Endangerment
Order (I/SE Order) for the former Wickes Forest Industries Site at 147 A Street (the
Property), Elmira, California, due to hazardous substances releases on the site. This
I/SE Order applies to the Property and the areal extent of contamination that resulted
from activities on the Property (hereinafter, the "Site"). Elevated levels of arsenic and
hexavalent chromium in surface and sub-surface soil on the Property are continuing to
act as a persistent source to groundwater contamination and represent a significant
threat to human health and the environment.

DTSC has enclosed a copy of the I/SE Order for your records. The Order is final and
effective five days from the date of mailing, which is the date of this cover letter
transmitting the Order to you.

Any legal representatives acting on behalf of you with regard to this letter or the I/SE
Order should contact Ms. Marilee Hanson, with DTSC's Office of Legal Counsel  at
(916) 327-0979 or e-mail mhanson@dtsc.ca.gov.

⊛ Printed on Recycled Paper

Mr. David Van Over
Mr. Don Dobbas
Continental Rail, Inc.
March 17, 2011
Page 2


If you have any questions or comments on this letter, please feel free to contact
Mr. MacNicholl at (916) 255-3713 or e-mail at pmacnich@dtsc.ca.gov.

Sincerely,

Charles Ridenour, P.E.
Performance Manager
Cleanup Program – Sacramento Office

Enclosure

cc:     Ms. Marilee Hanson
        Staff Counsel III
        Office of Legal Counsel
        Department of Toxic Substances Control
        1011 "I" Street, 23rd Floor
        P.O. Box 806
        Sacramento, California 95812-0806

        Mr. Richard Hume, P.E.
        Supervising Hazardous Substances Engineer
        Cleanup Program – Sacramento Office
        Department of Toxic Substances Control
        8800 Cal Center Drive
        Sacramento, California 95826

        Mr. Peter MacNicholl, P.E.
        Project Manager
        Cleanup Program – Sacramento Office
        Department of Toxic Substances Control
        8800 Cal Center Drive
        Sacramento, California 95826

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of: ) | Docket No. I/SE 10/11 - 008 |
| ) | |
| Wickes Forest Industries Site ) | |
| 147 A Street ) | IMMINENT OR SUBSTANTIAL |
| Elmira, California 95625 ) | ENDANGERMENT |
| ) | DETERMINATION ORDER |
| ) | AND REMEDIAL ACTION ORDER |
| Respondents: ) | |
| Mr. David Van Over ) | |
| 216 F Street #108 ) | |
| Davis, California 95616 ) | |
| ) | |
| Jim Dobbas, Inc. ) | Health and Safety Code |
| P.O. Box 177 ) | Sections |
| Newcastle, California 95658 ) | 25355.5(a)(1)(B), |
| ) | 25358.3(a), 58009 and 58010 |
| Continental Rail, Inc. ) | |
| 3218 Nacodoches Road, #8 ) | |
| San Antonio, Texas 78217 ) | |

## I. INTRODUCTION

1.1    Parties.  The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent or Substantial Endangerment Determination and Order and Remedial Action Order (Order) to Jim Dobbas Inc. (Dobbas), a California Corporation, Continental Rail, Inc., a corporation (Continental Rail), and David Van Over, an individual  (Van Over) (Respondents).

1.2    Property/Site.  This Order applies to the property located at 147 A Street, Elmira, Solano County, California 95625, which consists of 7.5 acres and is identified by Assessor's Parcel Number(s) 142-010-130, 142-010-140, and 142-042-010 (the Property).  A legal description of the Property is attached as Exhibit A.  This Order applies to the Property and the areal extent of contamination that resulted from activities on the Property (hereinafter, the "Site").  The Property is frequently referred to as the "Wickes Forest Industries Site."

1.3    Jurisdiction.  This Order is issued by DTSC to Respondents pursuant to DTSC's authority under Health and Safety Code  sections 25358.3(a), 25355.5(a)(1)(B), 58009 and 58010.

Health and Safety Code section 25358.3(a) authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance. The order may include, but is not limited to, requiring specific dates by which the nature and extent of a release shall be determined and the site adequately characterized, a Remedial Action Plan (RAP) prepared and submitted to DTSC for approval, and a removal or remedial action completed.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically enjoined upon any person, officer, or board, by any law of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II.  FINDINGS OF FACT

DTSC hereby finds:

2.1     Liability of Respondents.  Respondents are responsible parties or liable persons as defined in Health and Safety Code section 25323.5.  Dobbas and Continental Rail both owned undivided fifty percent (50%) interests in the Property from April 1, 1997 until approximately February 15, 2011.  Van Over purchased the Property from Dobbas and Continental Rail on or around February 15, 2011, with knowledge that environmental contamination exists at the Site.

2.2     Property/Site History.

2.2.1  The Property is a former wood treatment facility located on approximately 7.5 acres near the intersection of A Street and Holdener Road in Elmira, California. Pacific Wood Preserving (a domestic corporation, dissolved effective September 11, 1980) operated a wood treatment facility at the Property until September 1979.  The Wickes Corporation (Wickes), the predecessor to Collins and Aikman Products Company (CAPCO), purchased the Property from Pacific Wood Preserving and then operated the wood treatment facility at the Property until August 1982.  Operations at the Property included treating lumber with preservative solutions containing arsenic,

chromium, and copper. Investigations have shown that the Site soils have been affected by these inorganic metals. Groundwater beneath the Site has also been contaminated by chromium, copper, and arsenic. The Central Valley Regional Water Quality Control Board (CVRWQCB) and DTSC conceptually approved a Remedial Action Plan (RAP) on September 19, 1983, submitted by Wickes, which proposed storm water management and treatment measures for the Site. On February 26, 1984, DTSC issued to Wickes an Order and Schedule of Compliance pursuant to Health and Safety Code section 25187. The Order adopted and incorporated a Settlement Agreement and Schedule of Compliance addressing soil, surface water, and ground water contamination at the Site. The CVRWQCB has also issued a series of Waste Discharge Requirements (WDRs) over the years to Wickes and CAPCO, including the last WDR Order No. R5-2005-0022, which was issued to CAPCO on June 4, 2004.

Respondents Dobbas and Continental Rail purchased the Property from CAPCO in April 1997. Respondent Van Over purchased the Property from Dobbas and Continental Rail on or about February 15, 2011.

2.2.2  To address groundwater contamination, a subsurface french drain system 200 feet long with a single recovery well was installed along with an ion-exchange treatment system so effluent could be discharged to the ditch adjacent to Holdener Road and A Street under the 1983 RAP. In 1987, an additional extraction well was connected to the system to prevent the migration of affected ground water further off-site. This system was confined to the southern portion of the Property. In 1992, the groundwater extraction and treatment system (GWETS) was modified significantly. Seven (7) additional extraction wells were installed (five (5) off-Property) and the ion-exchange treatment system was replaced with an electrochemical treatment system that removes chromium, arsenic, and copper from ground water by co-precipitating the metal ions with ferric hydroxide particles. Treated water was then discharged to the ditch along Holdener Road and A Street under a National Pollutant Discharge Elimination System (NPDES) permit from the CVRWQCB.

2.2.3  Initial soil investigations conducted during the early 1980s were centered on the southern portion of the Property where the manufacturing process took place. In 1983, contaminated soil was excavated from the truck loading pad, and the drying pad for treated wood was sealed with a low permeability asphalt cap under a RAP approved by DTSC on September 19, 1983. Soils inside the metal sided building situated over the process area were capped in 1991 with shot-crete to prevent rainwater from further transporting the constituents of concern to ground water. Two additional RAPs were completed to address contamination at the Site. The RAP approved by DTSC on September 9, 1993 addressed the soil contamination, storm water control, and ground water treatment in the southern portion of the Site. On February 25, 1994, DTSC approved a RAP concentrating on soil in the northern portion of the Site (the "1994 RAP"). The implementation of the 1994 RAP included: (i) excavating 2,100 cubic yards of off-Property soil from drainage ditches and placing it on the Property in an area to be capped with asphalt; (ii) excavation of 89 cubic yards of soil from the railroad drainage

ditch and disposing of it at the Chemwaste Kettleman Hills facility in Kettleman City, California; (iii) regrading the Property; (iv) installing an asphalt cap in all areas of the Property that were not previously sealed; and (v) installing a positive drainage system to prevent storm water intrusion under the cap.  On January 5, 1996, DTSC approved the Operation and Maintenance Plan dated October 1995 (the "O&M Plan"), which required, among other things, maintenance of the cap and operation of the GWETS.

2.2.4   On October 27, 1995, CAPCO recorded in Solano County a Covenant to Restrict Use of Property-Environmental Restriction, which was entered into between CAPCO and DTSC (the "Covenant").  The Covenant, among other things, disclosed that the Property was contaminated with hazardous substances, banned uses that would disturb the cap, and restricted the Property's use to non-residential purposes without prior written approval from DTSC.  On February 26, 1996, CAPCO and DTSC entered into an Operation and Maintenance Agreement, Docket Number 95/96-038 (the "O&M Agreement") in which CAPCO agreed to maintain the cap and operate the GWETS pursuant to the O&M Plan.  Respondents Dobbas and Continental Rail purchased the Property from CAPCO on April 1, 1997, after the Covenant for the Property had been recorded and the O&M Agreement was in place.  Also on April 1, 1997 an "Access and Remediation Agreement" was recorded which was signed by Respondent Dobbas, in which Dobbas agreed to provide access to the Property for CAPCO's remediation activities.  Dobbas subsequently apparently provided access to the Property to CAPCO's contractors to conduct O&M activities, including operating the GWETS.  On May 17, 2005, CAPCO filed a voluntary Chapter 11 bankruptcy petition in United States Bankruptcy Court, Eastern District of Michigan (Detroit), Case Number 05-55927-SWR.  In August, 2005, CAPCO ceased operating the GWETS.  On March 7, 2006, DTSC directed CAPCO to resume operating the GWETS.  On March 22, 2006, CAPCO refused to comply.

From July 24, 2006 through September 28, 2006, DTSC negotiated with Dobbas and Continental Rail regarding the continuation of O&M activities at the Site.  Respondents refused to conduct O&M activities such as restarting and repairing the GWETS.  DTSC issued an Imminent and Substantial Endangerment Determination on November 13, 2006.  On January 19, 2007, DTSC contracted with Kleinfelder Inc. to resume operation of the GWETS, groundwater monitoring and reporting and maintenance of the asphalt cap.  On December 3, 2007, Dobbas agreed to perform certain repairs at the Site, which included limited maintenance of the asphalt cap and repair of the roof drainage system for the building over the source area.  On May 9, 2007, DTSC and Dobbas entered into an Access Agreement.

On February 14, 2008, DTSC contracted with URS Corporation to investigate soils in the source area of the Site.  Results of the 2008 URS soil investigation confirmed that elevated levels of arsenic and hexavalent chromium in soil were continuing to act as a persistent source to groundwater contamination.  In August 2009, URS on behalf of DTSC prepared a draft Removal Action Work Plan (2010 RAW) to remediate groundwater at the Site.  The 2010 RAW identifies demolition of the GWETS, contaminated soil excavation, confirmation sampling, off-site disposal, backfilling,

reporting, and long-term groundwater monitoring to assess the performance of the remedial action.

In February and March 2010, DTSC staff conducted Site inspections and noticed numerous cracks in the asphalt cap, including blockage and disrepair to the drain and gutter systems. Site inspections also revealed that the lock on the main gate was removed, allowing unsecured access to the Site. In April 2010, DTSC conducted surface water sampling of accumulated stormwater inside the Site's source area. Analytical data showed dissolved arsenic at 720 µg/L and 1200 µg/L due to contact with the remaining contaminated soil. Hexavalent chromium concentrations in the storm water measured 14 µg/L and 21 µg/L, including 30 µg/L and 15 µg/L reported for total chromium.

DTSC finalized the Wickes Forest Industries 2010 RAW in July of 2010. On November 22, 2010, DTSC recorded a lien in the amount of $833,347.98 against Dobbas' undivided fifty percent interest in the Property, which reflected the amount of funds DTSC had spent to clean up and mitigate impacts from the Site since December 2006.

Reports about the Site are available on DTSC's website at http://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=48240001 and are otherwise publically available.

2.3    Hazardous Substances Found at the Property.  The Property has been used as a wood preparation, treatment, and storage area. Wood preserving solutions used at the Property contained copper, chromium, and arsenic. Property investigations conducted in 1982 showed that Site soil and ground water have been contaminated with chromium, copper, and arsenic. Samples of groundwater taken in June 1984, as listed in the June 1984 Monthly Monitoring and Progress Report/Wickes Forest Industries Elmira Site, had concentrations of 120 mg/L or parts per million (ppm) of hexavalent chromium and .22 mg/L (ppm) of arsenic. Groundwater samples taken by Kleinfelder Inc. between September 11 and 13, 2007 had a maximum on-Property concentration of 1700 µg/L (ppb) in monitoring well E-6 and a maximum off-Property concentration of 74 µg/L (ppb) in monitoring well E-18A for hexavalent chromium. Analytical groundwater data from February 10, 2010, reported maximum hexavalent chromium concentrations in groundwater of 1500 µg/L and 93 µg/L in both on-site and off-site groundwater, respectively. Maximum concentrations of arsenic in groundwater measured 650 µg/L on-site compared to 190 µg/L in off-site groundwater. Storm water runoff from the leaking gutter on the source area building has allowed rainwater to pond and collect in the two existing sumps. Surface water samples taken from the accumulated storm water in April 2010, identified dissolved arsenic at 720 µg/L and 1200 µg/L due to contact with the remaining contaminated soil. Hexavalent chromium concentrations in the storm water run-off measured 14 µg/L and 21 µg/L, including 30 µg/L and 15 µg/L reported for total chromium.

Near surface soil samples taken by LFR Levine and Fricke in 1991 to support the 1994 RAP showed elevated concentrations of arsenic and hexavalent chromium in the source area ranging from 52 to 70,000 mg/kg and 0.2 to 190 mg/kg (ppm), respectively. URS' 2008 soil investigation at the Site sampled the original locations from the 1991 remedial investigation, but focused efforts on deeper intervals to satisfy the data gaps. URS' 2008 fieldwork effort sampled soil at three depth intervals of 0.5, 2.5, and 5 feet below ground surface. The sampling effort was conducted to further characterize the vertical extent of contaminants remaining and augment the 1991 dataset with newer analytical data. The 2008 analytical soil data produced arsenic concentrations ranging from 4.7 mg/kg to 610 mg/kg, with hexavalent chromium levels spanning 0.05 mg/kg to 17 mg/kg. Fieldwork efforts show that contaminant concentrations are the highest in surface soil and attenuate with depth, indicating that surface releases likely contaminated the Site.

Soil cleanup goals identified in the 2010 RAW specify 13 mg/kg for arsenic (background), the target compound at the site. Due to the similar distribution patterns of arsenic and chromium in the soil, the cleanup will allow for the remediation of chromium concurrent with the removal of arsenic contaminated soil. The 2010 RAW presents a groundwater cleanup goal of 10 µg/L for both arsenic and hexavalent chromium, including 50 µg/L for total chromium. If new cleanup standards are promulgated by State or federal agencies, those new standards may be applicable at the Site.

2.4   Health Effects.

2.4.1  Arsenic. Acute ingestion of arsenic may lead to a burning sensation in the mouth, nausea and vomiting. Chronic exposure to arsenic is associated with a persistent metallic taste in the mouth, hyperkeratosis, anemia, and peripheral nerve disease, and may increase the risk of developing skin cancer, aplastic anemia and leukemia.

2.4.2  Chromium. Chronic inhalation of Chromium (VI) compounds has been associated with the development of lung disease, including cancer in humans.

2.4.3  Copper. Acute inhalation of copper fumes or dust can result in a reversible influenza-like syndrome. Chronic ingestion of high levels of copper has been reported to cause hemolysis, fibrosis, and cirrhosis of the liver, nervous system damage and kidney dysfunction.

2.5   Routes of Exposure. Potential routes of exposure at the Site for hazardous substances that may affect public health or the environment, factoring the protectiveness of the asphalt cap, include direct contact with contaminated soil, air routes for dust, contact with contaminated surface storm water in the source area, consumption of food irrigated with contaminated groundwater, migration of hazardous substances to groundwater, and migration of hazardous substances in soil and surface runoff from rain into surface water bodies. If the drinking water source is impacted, direct exposure could be through bathing or drinking the water or breathing vapors while

using the water.  Ecological habitat receptors may be more sensitive to hazardous substances concentrations than are human receptors.

     2.6    <u>Public Health and/or Environmental Risk</u>.  The Property is limited to non-residential use by a Covenant recorded with Solano County on October 27, 1995 that will remain in effect until its termination is approved in writing by DTSC.  Adjacent properties are used for commercial and residential purposes.  Nearby residences use down-gradient irrigation water drawn from the contaminated aquifer to grow produce for personal consumption.  Additional remedial actions are necessary at the Site to address the existing soil contamination.  Remedial actions including contaminated soil removal, will eliminate human exposure pathways, protect the environment, restore the beneficial uses of the aquifer, and remediate the persistent source of groundwater contamination for both on-site and off-site aquifers.  Without mitigating the persistent source of groundwater contamination, domestic irrigation wells and potential drinking water already impacted by contaminants, would likely reach concentrations that would exceed federal standards and present an acute risk to human health. Inspection and maintenance of the asphalt cap and storm water drainage systems are necessary to prevent direct contact with contaminated soil, eliminate exposure pathways due to contaminated surface storm water, help mitigate infiltration and flushing of contaminated soils with surface water, and to reduce hydraulic influences therefore aiding in the capture of the groundwater plume and helping to achieve the remedial action objectives established for the Site.

## III.  CONCLUSIONS OF LAW

     3.1    Respondents are responsible parties as defined by Health and Safety Code section 25323.5.

     3.2    Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

     3.3    There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site, as defined in Health and Safety Code section 25320.

     3.4    The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment.

     3.5    Response action is necessary to abate a public nuisance and/or to protect and preserve the public health.

## IV.  DETERMINATION

     4.1    DTSC issued an Imminent or Substantial Endangerment Determination for the Site on November 13, 2006, thereby determining that response actions are necessary at the Site due to the release of a hazardous substance.

4.2     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site due to the unauthorized cessation of the approved remedy.

## V. ORDER

Based on the foregoing FINDINGS, CONCLUSIONS, AND DETERMINATION, IT IS HEREBY ORDERED THAT Respondents conduct the following response actions in the manner specified herein, and in accordance with a schedule specified by DTSC as follows:  All response actions taken pursuant to this Order shall be consistent with the requirements of Chapter 6.8 (commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations.

5.1     Groundwater Monitoring.  Respondents shall immediately restore groundwater monitoring in accordance with the approved O&M Plan for the Site dated October 16, 1995 and the Final Sampling and Analysis Plan for Groundwater Monitoring dated April 2009, prepared by URS Corporation.

5.2     Groundwater Remediation.   Respondents shall take all necessary steps to implement the 2010 RAW and meet its remedial action objectives, including any additional steps necessary to remediate groundwater and restore its beneficial uses.

5.3     Land Use Covenant.  The Respondents shall comply with the Covenant recorded with Solano County on October 27, 1995.

5.4     Operation and Maintenance (O&M).  Respondents shall conduct all operation and maintenance activities for the approved Site remedies including the asphalt cap and shall comply with the O&M Plan approved by DTSC for the Site dated October 16, 1995 as part of the 1993 and 1994 RAPs.  Within thirty (30) days of the effective date of this Order, Respondents shall submit to DTSC for approval an O&M Plan implementation schedule.  The schedule shall propose that Respondents initiate the following within sixty (60) days from the effective date of the Order: a) a routine inspection and necessary maintenance program for the Cap and storm water drainage system; and b) groundwater monitoring activities.  Respondents shall implement section Section G, subsection 6.0, of the O&M Plan specifying the work necessary and maintenance schedule for the asphalt cap fieldwork efforts.

5.5     Five-Year Review.  The remedial action shall be reviewed and reevaluated after a period of five (5) years from the completion of construction and startup, and every five (5) years thereafter.  The last comprehensive five year review for the Site was completed on July 27, 2001; a five year review for the asphalt cap only was completed on March 1, 2005.  The 2001 five year review determined that the current ground water pump and treat system would likely be unsuccessful in meeting the

remedial action objectives and proposed an alternative technology. The 2010 RAW specifies demolition of the GWETS due the unsuccessful system performance, required access to remaining soil contamination, and the necessity to remove impacted soil acting as continuing source to groundwater contamination.

As a result of any review performed under this Section, Respondents may be required to perform additional Work or to modify Work previously performed.

5.6     Stop Work Order.  In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondents to stop further implementation of this Order for such period of time needed to abate the endangerment. In the event that DTSC determines that any Site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondents to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate. Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.7     Emergency Response Action/Notification.  In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager.  Respondents shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order.  Within seven (7) days of the onset of such an event, Respondents shall furnish a report to DTSC, signed by Respondents' Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto.  In the event that Respondents fail to take appropriate response and DTSC takes the action instead, Respondents shall be liable to DTSC for all costs of the response action.  Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.8     Discontinuation of Remedial Technology.  Any remedial technology employed in implementation of any DTSC approved RAP or RAW shall be left in place and operated by Respondents until and except to the extent that DTSC authorizes Respondents in writing to discontinue, move or modify some or all of the remedial technology because Respondents have met the criteria specified in the approved RAP or RAW for its discontinuance, or because the modifications would better achieve the goals of the approved RAP or RAW.

5.9     Financial Assurance.  Respondents shall demonstrate to DTSC and maintain financial assurance for operation and maintenance and monitoring. Respondents shall demonstrate financial assurance within sixty (60) days of the

effective date of the Order and shall maintain it throughout the period of time necessary to complete all required operation and maintenance activities. The financial assurance mechanisms shall meet the requirements of Health and Safety Code section 25355.2. All financial assurance mechanisms are subject to the review and approval of DTSC.

## VI. GENERAL PROVISIONS

6.1     Project Coordinator. Within fourteen (14) days from the date the Order is signed by DTSC, Respondents shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from DTSC. Respondents shall promptly notify DTSC of any change in the identity of the Project Coordinator. Respondents shall obtain approval from DTSC thirty (30) days before the new Project Coordinator performs any work under this Order.

6.2     Project Engineer/Geologist. The work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or a registered geologist in the State of California, with expertise in hazardous substance site cleanups. Within fourteen (14) calendar days from the date this Order is signed by DTSC, Respondents shall submit: a) The name and address of the project engineer or geologist chosen by Respondent; and b) in order to demonstrate expertise in hazardous substance cleanup, the resumé of the engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work. Respondents shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist. Respondents shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3     Monthly Summary Reports. Within sixty (60) days from the date this Order is signed by DTSC, and on a monthly basis thereafter, Respondents shall submit a Monthly Summary Report of its activities under the provisions of this Order. The report shall be received by DTSC by the fifteenth (15th) day of each month and shall describe:

  (a)  Specific actions taken by or on behalf of Respondents during the previous calendar month;
  (b)  Actions expected to be undertaken during the current calendar month;
  (c)  All planned activities for the next month;
  (d)  Any requirements under this Order that were not completed;
  (e)  Any problems or anticipated problems in complying with this Order; and
  (f)  All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4    Quality Assurance/Quality Control (QA/QC). All sampling and analysis conducted by Respondents under this Order shall be performed in accordance with QA/QC procedures submitted by Respondent and approved by DTSC pursuant to this Order.

6.5    Submittals. All submittals and notifications from Respondents required by this Order shall be sent simultaneously to:

> Charles Ridenour, P.E.
> Performance Manager
> Cleanup Program – Sacramento Office
> Attention: Peter MacNicholl, P.E.
> Project Manager (two copies)
> Department of Toxic Substances Control
> 8800 Cal Center Drive
> Sacramento, California 95826

6.6    Communications. All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondents in writing by the Cleanup Program Performance Manager, or his/her designee. No informal advice, guidance, suggestions or comments by DTSC regarding reports, plans, specifications, schedules or any other writings by Respondents shall be construed to relieve Respondents of the obligation to obtain such formal approvals as may be required.

6.7    DTSC Review and Approval.

(a)    All response actions taken pursuant to this Order shall be subject to the approval of DTSC. Respondents shall submit all deliverables required by this Order to DTSC. Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b)    If DTSC determines that any report, plan, schedule or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

    (1)  Modify the document as deemed necessary and approve the document as modified; or

    (2)  Return comments to Respondents with recommended changes and a date by which Respondents must submit to DTSC a revised document incorporating the recommended changes.

(c)    Any modifications, comments or other directives issued pursuant to (a) above, are incorporated into this Order. Any noncompliance with these modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8   Compliance with Applicable Laws.  Nothing in this Order shall relieve Respondents from complying with all other applicable laws and regulations, including but not limited to compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board.  Respondents shall conform all actions required by this Order with all applicable federal, state and local laws and regulations.

6.9   Respondent Liabilities.  Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current or future operations of Respondents.  Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site.  Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment and recovering the cost thereof.  Notwithstanding compliance with the terms of this Order, Respondents may be required to take further actions as are necessary to protect public health and the environment.

6.10   Site Access.  Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC.  Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law.  DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to: inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site; reviewing the progress of Respondents in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondents.

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondents, Respondents shall use best efforts to secure from such persons access for Respondents, as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order.  To the extent that any portion of the Site is controlled by tenants of Respondents, Respondents shall use best efforts to secure from such tenants, access for Respondents, as well as for DTSC, its representatives, and contractors, as necessary to effectuate this Order.  For purposes of this Section, "best efforts" includes the payment of reasonable sums of money in consideration of access.  If any access required to complete the Work is not obtained within sixty (60) days of the effective date of this Order, or within forty-five (45) days of the date DTSC notifies Respondents in writing that additional access beyond that previously secured is necessary, Respondents shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondents have taken to attempt to obtain access.  DTSC may, as it deems appropriate, assist Respondents in obtaining access.  Respondents shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

Respondents shall grant access to any persons who need access for the purpose of conducting activities pursuant to this Order or for activities deemed necessary by DTSC to meet the objectives of this Order and/or the O&M Plan.

6.11   Sampling, Data and Document Availability.   Respondents shall permit DTSC and its authorized representatives to inspect and shall provide copies of all sampling, testing, monitoring or other data including technical records and contractual documents generated by Respondents, or on Respondents' behalf in any way whether or not such information or data was developed pursuant to this Order.   Respondents shall submit all such data upon the request of DTSC.   Copies shall be provided within (7) days of receipt of DTSC's written request.   For Final reports, Respondents shall submit one hard (paper) copy and one electronic copy with all applicable signatures and certification stamps as a text-readable Portable Document Formatted (pdf) file Adobe Acrobat or Microsoft Word formatted file. Respondents shall inform DTSC at least (7) days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondents pursuant to this Order.   Respondents shall maintain a central depository of the data, reports, and other documents prepared pursuant to this Order.

6.12   Record Retention.   All such data, reports and other documents shall be preserved by Respondents for a minimum of ten years after the conclusion of all activities under this Order.   If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondents shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction.   Respondents shall notify DTSC in writing at least six months prior to destroying any documents prepared pursuant to this Order.

6.13   Government Liabilities.   The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondents, or related parties specified in Section 6.25, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondents or its agents in carrying out activities pursuant to this Order.

6.14   Additional Actions.   By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.15   Extension Requests.   If Respondents are unable to perform any activity or submit any document within the time required under this Order, Respondents may, prior to expiration of the time, request an extension of the time in writing.   The extension request shall include a justification for the delay.   All such requests shall be in advance of the date on which the activity or document is due.

6.16   Extension Approvals.   If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing.   Respondents shall comply with the new schedule incorporated in this Order.

shall comply with the new schedule incorporated in this Order.

6.17   Liability for Costs. Respondents are liable for all of DTSC's costs that have been incurred in taking response actions at the Site (including costs of overseeing response actions performed by Respondents and costs to be incurred in the future.

6.18   Payment of Costs. DTSC may bill Respondents for costs incurred in taking response actions at the Site prior to the effective date of this Order. DTSC will bill Respondents quarterly for its response costs incurred after the effective date of this Order. Respondents shall pay DTSC within sixty (60) days of receipt of any DTSC billing. Any billing not paid within sixty (60) days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1. All payments made by Respondents pursuant to this Order shall be by cashier's or certified check made payable to this "DTSC," and shall bear on the face the project code of the Site (Site # 100164) and the Docket number of this Order. Payments shall be sent to:

> Department of Toxic Substances Control
> Accounting/Cashier
> 1001 I Street, 21st Floor
> P.O. Box 806
> Sacramento, California 95812-0806

A photocopy of all payment checks shall also be sent to the person designated by DTSC to receive submittals under this Order.

6.19   Severability. The requirements of this Order are severable, and Respondents shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

6.20   Incorporation of Plans, Schedules and Reports. All plans, schedules, reports, specifications and other documents that are submitted by Respondents pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondents. Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

6.21   Modifications. DTSC reserves the right to unilaterally modify this Order. Any modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

6.22   Time Periods. Unless otherwise specified, time periods begin from the effective date of this Order and "days" means calendar days.

6.23   Termination and Satisfaction. Except for Respondents' obligations under Sections 5.4 Operation and Maintenance (O&M), 5.5 Five-Year Review, 5.9 Financial Assurance, 6.12 Record Retention, 6.17 Liability for Costs, and 6.18 Payment of Costs, Respondents' obligations under this Order shall terminate and be deemed satisfied upon Respondents' receipt of written notice from DTSC that Respondents have

6.24  Calendar of Tasks and Schedules.  This Section is merely for the convenience of listing in one location the submittals required by this Order.  If there is a conflict between the date for a scheduled submittal within this Section and the date within the Section describing the specific requirement, the latter shall govern.

Calendar of Tasks and Schedules

| | TASK | SCHEDULE |
|---|---|---|
| 1. | Identify Project Coordinator; Section 6.1; | Within fourteen (14) days from the effective date of this Order. |
| 2. | Identify Project Engineer/Geologist; Section 6.2; | Within fourteen (14) days from the effective date of this Order. |
| 3. | Submit Monthly Summary Reports; Section 6.3; | Within sixty (60) days from the effective date of this Order. |
| 4. | Submit groundwater level measurements Section 5.1; | First Monday of specified month. |
| 5. | Groundwater sampling results; Section 5.1; | Quarterly basis. |
| 6. | Submit O&M Workplan Schedule; Section 5.4; | Within thirty (30) days of DTSC's request. |
| 7. | Submit and initiate O&M Workplan; Section 5.4; | Within sixty (60) days from the effective date of this order. |
| 8. | Submit Emergency Response Action Report; Section 5.7; | Within seven (7) days of a emergency response action. |
| 9. | Provide copies of sampling, data, and documentation; Section 6.11; | Within seven (7) days of receipt of DTSC's request. |
| 10. | Maintain central depository of data, reports, documentation; Section 6.12; and | Maintain central depository for a minimum of ten years after conclusion of all activities conducted pursuant to this Order. |
| 11. | Provide prior written notice to DTSC before destroying any documentation prepared pursuant to this Order; Section 6.12. | At least six months prior to destroying any documents. |

6.25   <u>Parties Bound</u>.  This Order applies to and is binding upon Respondents, and their officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including but not limited to, individuals, partners, and subsidiary and parent corporations.  Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants that are retained to conduct any work performed under this Order, within fifteen (15) days after the effective date of this Order or the date of retaining their services, whichever is later. Respondents shall condition any such contracts upon satisfactory compliance with this Order.  Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Order and for ensuring that its subsidiaries, employees, contractors, consultants, subcontractors, agents and attorneys comply with this Order.

6.26   <u>Change in Ownership</u>.  No change in ownership or corporate or partnership status relating to the Property shall in any way alter Respondents' responsibility under this Order.  No conveyance of title, easement, or other interest in the Site, or a portion of the Property, shall affect Respondents' obligations under this Order.  Unless DTSC agrees that such obligations may be transferred to a third party, Respondents shall be responsible for and liable for any failure to carry out all activities required of Respondents by the terms and conditions of this Order, regardless of Respondents' use of employees, agents, contractors, or consultants to perform any such tasks.  Respondents shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred.

## VII.  <u>NOTICE OF INTENT TO COMPLY</u>

7.0   Not later than seven (7) days after the effective date of this Order, Respondents shall provide written notice, in accordance with paragraph 6.5 Submittals of this Order, stating whether or not Respondents will comply with the terms of this Order.  If Respondents do not unequivocally commit to perform all of the requirements of this Order, they, or each so refusing, shall be deemed to have violated this Order and to have failed or refused to comply with this Order.  Respondents' written notice shall describe, using facts that exist on or prior to the effective date of this Order, any "sufficient cause" defenses asserted by Respondents under Health and Safety Code sections 25358.3(a) and 25355.5(a)(1)(B) or CERCLA section 107(c)(3), 42 U.S.C. section 9607(c)(3).

## VIII.  <u>EFFECTIVE DATE</u>

8.0   This Order is final and effective five days from the date of mailing, which is the date of the cover letter transmitting the Order to you.

## IX.  <u>PENALTIES FOR NONCOMPLIANCE</u>

9.0   Each Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive

damages up to three times the amount of any costs incurred by DTSC as a result of Respondent's(s') failure to comply, pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c).  Health and Safety Code section 25359.4.5 provides that a responsible party who complies with this Order, or with another order or agreement concerning the same response actions required by this Order, may seek treble damages from responsible parties who fail or refuse to comply with this Order without sufficient cause.


DATE OF ISSUANCE: 3/16/11

Charles Ridenour, P.E.
Performance Manager
Cleanup Program – Sacramento Office
Department of Toxic Substances Control

EXHIBIT "A"

The land referred to herein is in the State of California, County of Solano, unincorporated area, and is described as follows:

PARCEL ONE

Beginning at the southeast corner of the Northwest One Quarter of Section Nineteen (19) Township Six (6) North Range One (1) East, Mount Diablo Base and Meridian, running thence north along the Quarter Section line to the southeasterly boundary of the right of way of the Southern Pacific Railroad; thence southwesterly along the southeasterly line of the right of way of the Southern Pacific Railroad Company to the Quarter Section line running east and west through said Section Nineteen (19); thence east and along said Quarter Section line to the place of beginning.

EXCEPTING THEREFROM, however, all that certain real property as conveyed by Eleanor B. Allison to Southern Pacific Railroad Company, a corporation, by Deed dated May 10, 1916, and recorded May 23, 1916 in Liber "226" of Deeds, Page 104, thereof, and described as follows:  Beginning at the point of intersection of the southeasterly right of way line of the Southern Pacific Railroad Company's railroad (as it now exists across said Northwest Quarter of Section 19) with the east line of the Northwest Quarter of Section 19, Township 6 North Range 1 East, Mount Diablo Base and Meridian, thence southwesterly along said southeasterly right of way line of the Southern Pacific Railroad Company, a distance of 506 feet to a point; thence at a right angle southeasterly 15 feet to a point, thence at a right angle northeasterly parallel to said right of way line 265 feet to a point, thence at a right angle southeasterly 15 feet to a point, thence at right angle northeasterly parallel to said right of way line 200 feet to a point, thence at a right angle northeasterly parallel to said right of way line 200 feet to a point on the east line of said Northwest Quarter of Section 19, thence north along said east line of the Northwest Quarter of Section 19, a distance of 50.7 feet to the point of beginning.

PARCEL TWO

Beginning at the intersection of the northerly line of Edwards Street and the westerly line of "A" Street extended northerly, thence running westerly and along the northerly line of Edwards Street, One Hundred Forty (140) feet, more or less, to the intersection of the easterly line of the right of way of the Southern Pacific Railroad Company, thence northerly and along the easterly line of the right of way of the Southern Pacific Railroad Company, One Hundred Ninety-One (191) feet more or less to the southerly line of County Road Number Two Hundred Forty-Six (246) sometimes also know as Binghampton Street, thence easterly and along the southerly line of County Road Number 246, to the intersection of the westerly line of a Street, extended northerly, thence southerly and along the westerly line of a Street, extended northerly to the northerly line of Edwards Street and the place of beginning.  All as said streets herein referred to are laid down and designated on that certain Map entitled: "Plan of

1 of 2

Resurvey of Portion of Vaca Station, Property of W.C. Farmer, situated on South West One Quarter (S.W. ¼) of Section Nineteen (19) Township VI North Range 1 East Solano County," surveyed by E.H. Marshall, Deputy County Surveyor, April 8, 1870 and now appearing of record in Volume "1" of Maps, Page 44 thereof, Solano County Records.

PARCEL THREE

Beginning at the point of intersection of the westerly line of "A" Street, extended northerly, and the northerly line of County Road Number 246 (Holdener Road, formerly shown as Binghampton Street) in Elmira Townsite, Solano County, California, which point bears north 0°22' 08" west, 30 feet and south 89°55' 06" west, 397.80 feet from the southeast corner of the Northwest One-Quarter of Section 19, T6N, R1E, M.D.B & M., thence, from said point of beginning, along the northerly line of the aforementioned Binghampton Street south 89°55' 06" west, 171.67 feet to the easterly right-of-way line of the Southern Pacific Railroad and thence along said easterly right-of-way line south 34° 52' 51" west, 73.21 feet to the southerly line of said Binghampton Street, thence, along said southerly line, north 89°55' 06" east, 171.67 feet to the westerly line of the aforementioned "A" Street, thence along the prolongation of said westerly line of "A" Street, north 34°52" 51" east, 73.21 feet to the point of beginning.

A.P.N. 142-010-130, 142-010-140 and 142-042-010