# EXHIBIT A

BEFORE THE
DEPARTMENT OF HEALTH SERVICES
STATE OF CALIFORNIA

In Re:                          )
Wickes Forest Industries        )              ORDER
A Division of The Wickes        )               AND
Corporation,                    )        SCHEDULE OF COMPLIANCE
Elmira Facility                 )

The attached Settlement Agreement and Schedule of Compliance is
hereby adopted by the Department of Health Services as an Order
and Schedule of Compliance pursuant to Health and Safety Code
Section 25187.

This Order shall become effective on   2/26/84   .

IT IS SO ORDERED on this 26th day of   February   .


_____
(Signature)

BEFORE THE
DEPARTMENT OF HEALTH SERVICES
AND
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD,
CENTRAL VALLEY REGION
STATE OF CALIFORNIA

In Re:                          )
                                )
Wickes Forest Industries,       )        SETTLEMENT AGREEMENT
A Division of The Wickes        )              AND
Corporation,                    )        SCHEDULE OF COMPLIANCE
Elmira Facility                 )
_____)

I

The State Department of Health Services (Department) alleges that The Wickes Corporation (Wickes) has violated, and is in violation of, specific provisions of the Hazardous Waste Control Laws (Act) and regulations adopted thereunder, as set forth more fully in Paragraph VII as a result of its alleged disposal of hazardous waste at its facility in Elmira, California (Site).

II

The California Regional Water Quality Control Board, Central Valley Region, (Board) alleges that Wickes' waste discharges at the Site have violated the Porter-Cologne Water Quality Control Act and regulations and orders adopted thereunder. The Board issued Cleanup and Abatement Orders on June 6, 1982 and October 4, 1982 after finding that on-Site soils were contaminated (in part by a toxic spill on November 7, 1980) and are threatening surface and ground waters in Elmira. The Board alleges that Wickes is in violation of the October 4, 1982 Order.

III

The Settlement Agreement (Agreement) and Schedule of Compliance (Order) have been agreed to by Wickes, the Department and the Board to resolve the matters found and alleged in Paragraphs II and VII without civil litigation and to facilitate implementation of the measures described herein.

IV

Wickes, the Department and the Board admit and agree that the Department and the Board have jurisdiction over these matters and the parties.

V

This Agreement and Order apply to and are binding upon the parties, their successors and assigns.

Wickes Forest Industries
Elmira Facility

-2-

## VI

For the purposes of this Agreement and Order, Wickes agrees to waive any right to a hearing prior to issuance of the Order or to the reimbursement agreed to in Paragraph VIII of this Agreement. Wickes has denied all of the allegations in Paragraphs I, II, and VII. Any payments or actions by Wickes pursuant to this Agreement are not to be construed as an admission of guilt or liability. By means of this Agreement the Department and the Board make no finding of fact or conclusion of law that resolves issues of culpability or guilt on the part of Wickes.

## VII

The Department alleges that Wickes has violated, or is in violation of, the Act and regulations adopted thereunder for the following reasons:

1. Wickes has disposed of hazardous waste on-site without a permit or an Interim Status Document (ISD) for such disposal [Health and Safety Code, Sections 25142, 25154, 25189 and 25201 and Title 22, California Administrative Code (22 CAC), Sections 66387 and 66490].

2. As a result of its disposal of hazardous wastes, Wickes has committed the additional following violations of regulations adopted pursuant to the Act:

   a. As a producer of hazardous waste, Wickes did not take steps to ensure that its waste was taken to a facility permitted by the Department (22 CAC, Section 66505).

   b. Wickes did not operate, design or equip the facility to prevent discharge of hazardous wastes and to prevent hazards to public health, personal safety and wildlife [22 CAC, Sections 66525(a) and 66530(e)].

3. Wickes has not complied with closure requirements in Health and Safety Code, Section 25159.6 and 40 CFR 265.111 through 265.114.

4. Wickes has not complied with post-closure plan requirements in Health and Safety Code, Section 25159.6 and 40 CFR 265.118.

5. Wickes has not complied with financial assurance requirements in Health and Safety Code, Section 25159.6 and 40 CFR, Subpart H.

The Department is not aware of any fact regarding the Site which would constitute additional violations of the Act or regulations adopted thereunder.

## VIII

Wickes agrees to reimburse the Department $2,500 as full settlement for all resources previously expended on this matter and to contribute $10,000 to the Board's Cleanup and Abatement account. Payment will occur within sixty (60) days after execution of this Agreement. Such payment shall in no event be construed as a fine or penalty.

Wickes Forest Industries                                                          -3-
Elmira Facility

IX

Wickes has conducted sampling and analyses to define the extent of soil and surface and ground water contamination on and off the Site.  In a letter dated 9 September 1983, Wickes submitted a "Remedial Action Plan" (Plan):

1. The Department and the Board approve the stormwater management, the ground water treatment and contaminated soils removal and containment elements of the Plan, as amended by Wickes' letter to the Board dated 29 September 1983 and any subsequent amendments agreed to in writing by the parties.

2. Wickes shall implement the Plan and subsequent amendments agreed to in writing by the parties in compliance with the terms herein and shall complete corrective measures, other than the ground water treatment system, on-going treatment, maintenance and monitoring activities, within sixty (60) days from the date of this Agreement.  Wickes shall complete the ground water treatment system within ninety (90) days from the date of this Agreement.

3. Wickes shall submit a Post-Closure Care Plan (PCCP) and a proposed financial assurance mechanism for post closure care to the Department for approval that meets the requirements of 40 CFR 265.118 within 60 days after the date of this agreement.  Wickes shall implement the approved PCCP in compliance with the terms therein.

4. Wickes shall provide to the Department and the Board within thirty (30) days from the approval of the PCCP acceptable financial assurance documentation for post-closure care.

5. Wickes shall propose deed restrictions for the Department's approval.  The restrictions shall limit the type and manner of future uses of the site and ensure the continued integrity of treatment and control facilities. The proposed restrictions shall be submitted within 60 days of the date of this Agreement.

6. Wickes shall record the approved deed restrictions within 30 days of the date of their approval.  The deed restrictions may be removed upon written agreement of the parties.

7. Wickes shall comply with the Board's Monitoring and Reporting Program (MRP).  The attached MRP is approved by the Board.

Wickes Forest Industries                                                    -4-
Elmira Facility

## X

The goals of the Plan discussed in Paragraph IX are:

1. Elimination of human and animal contact with contaminated soils at the Site within 60 days of the date of this Agreement.

2. Elimination of the migration of contaminated ground water away from the Site within 270 days of the date of this Agreement.

3. Elimination of off-Site contamination in ground water in approximately 5 years.*

4. Elimination of on-Site contamination in ground water in 5 to 10 years.*

   * The goals are based on current drinking water standards.  Stricter standards may require review and revision of the time estimates.

## XI

Whenever the remaining elements of the Plan are submitted to the Department and the Board pursuant to this Agreement and Order, the Department and the Board shall review them and either approve them or request modifications within 15 working days of their receipt.  If the Department or Board requests modifications to Wickes' submission, Wickes shall respond thereto within 15 working days of the receipt of the request.

## XII

If, for any reason, Wickes is unable to perform any activity or submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Agreement and approved by the Department and Board, Wickes may request, in writing, an extension of the time specified.  The extension request shall include a justification for the delay.

## XIII

If the Department and the Board reasonably determine that good cause exists for an extension, they will grant the request and specify in writing a new schedule.  Wickes shall comply with the new schedule.  No penalty shall be imposed or paid pursuant to Paragraph XIV for any time period included within an extension granted under this paragraph.  Extensions may be granted retroactively.  Wickes shall notify the Board or Department as soon as possible and in no event later than 24 hours of its knowledge of non-compliance.

Wickes Forest Industries                                                  -5-
Elmira Facility

The Department and Board will find that good cause exists for an extension if the
delay is caused by factors totally beyond Wickes' reasonable control despite
Wickes' best efforts to comply.

### XIV

In the event that Wickes fails to perform work on pad sealing, roof con-
struction, stormwater diversions, soil removal, french drain trench for the
treatment system, or ground water treatment system within the times specified in
the Order Wickes shall pay a civil penalty of $2,500 to the Department and a
contribution of $2,500 to the Board's Cleanup and Abatement account for each day
of non-compliance.  If Wickes fails to submit other documents or perform other
activities within the time specified in the Order Wickes shall pay civil penalties
of $250 to the Department and a contribution of $250 to the Board's Cleanup and
Abatement Account for each day of each item of non-compliance. The provisions of
this paragraph do not apply if Wickes establishes that the failure to comply with
a deadline is due solely to an Act of God.

The Department and the Board will allow additional days for performance of
work on pad sealing, stormwater diversions, soil removal, and the french drain
trenches if the following rainfall occurs.  For each day rainfall exceeds 0.20",
Wickes will be granted an extension of 1 day.  For each day rainfall equals or
exceeds 0.50", Wickes will be granted an extension of 1 additional day per each
0.50" increment of rain.  For example, if rainfall equals 3.00" on a given day,
Wickes shall be entitled to an extension of 7 days.  Rainfall measurements for the
site shall be those recorded by the United States Weather Service at the Vacaville
Station.

### XV

If, through the discovery of new facts or otherwise, Wickes, the Department
or the Board believes corrective measures are inadequate or unnecessary to achieve
goals discussed in Paragraph X; or if the Department and Board do not approve
elements submitted pursuant to Paragraph IX or modifications submitted pursuant to
Paragraph XI; or do not approve removal of deed restrictions; the parties shall
seek agreement.  If agreement is not reached within 45 days, or if the Department
or Board believes that Wickes is not in compliance with this Agreement, any of the
parties may seek judicial relief.

In the case of any proposed changes in the MRP, the Board shall provide notice to
Wickes and the Department 30 days before amending it.  The MRP shall be amended
only by written agreement of the parties or by action of the Board at a Board
Meeting.

The Department may amend the PCCP to reflect changes in the MRP or changes in
applicable federal or state laws or regulations.  The Department will provide 30
days notice to Wickes and the Board before amending the PCCP.

Wickes Forest Industries
Elmira Facility

-6-

## XVI

In consideration of Wickes' performance under this Agreement, the Department and Board hereby convenant not to seek civil or criminal penalties, fines or similar sanctions against Wickes, its parent, subsidiary or affiliated companies on matters alleged in Paragraphs I, II, & VII.

## XVII

Except as specifically provided in Paragraph XVI, nothing in this Agreement or Order shall be construed to prevent or limit the Department or the Board, as part of any judicial relief pursuant to paragraph XV, from taking any additional action authorized by law in regard to those matters alleged in Paragraphs I, II and VII, including, but not limited to removal, remedial, or cost recovery actions pursuant to the Hazardous Substances Act, Health and Safety Code, Section 25300, et seq., or to the Porter-Cologne Water Quality Control Act.

## XVIII

In consideration of Wickes' performance under this agreement, the Board rescinds the Cleanup and Abatement Orders dated October 4, 1982 and June 6, 1982.

## XIX

Wherever notification or submission of documents are required under this Agreement, they shall be addressed to: Enforcement Coordinator, Toxic Substances Control Division, 714/744 P Street, Sacramento, CA 95816; Executive Officer, Regional Board, 3201 S Street, Sacramento, CA 95816 and to the General Counsel, Wickes Companies Inc. 3340 Ocean Park Boulevard, Santa Monica, California 90405. If these persons or addresses change, the affected party shall immediately notify the other parties.

## XX

Wickes, the Department and the Board hereby consent to this Agreement and the issuance of the Order by their duly authorized representative and stipulate that without the necessity of a hearing or findings of fact and conclusions of law the Director of the Department of Health Services or his duly authorized representative may enter an order binding on the parties in accordance with this Settlement Agreement and Order.

Wickes Forest Industries
Elmira Facility                                                              -7-

2/26/84
_____                    _____
Date                                               Peter Rank
                                                   Director
                                                   Department of Health Services
                                                   State of California

Feb. 15, 1984
_____                    _____
DATE                                               William H. Crooks, Executive Officer
                                                   California Regional Water
                                                      Quality Control Board
                                                   Central Valley Region

Feb 9, 1984
_____                    _____
DATE                                               VICE PRESIDENT
                                                   The Wickes Corporation



*C5a*

**Wickes Companies, Inc.**
Corporate Offices

FEDERAL EXPRESS

September 9, 1983

Ms. Karen O'Haire
Regional Water Quality Control Board
3201 S Street
Sacramento, California 95816

Re: Wickes Forest Industries Facility, Elmira, California

Dear Karen:

The following remedial action proposal has been approved by
Wickes management and is submitted to the California Regional
Water Quality Control Board ("CRWQCB") and the Department of
Health Services ("DOHS") pursuant to the schedule agreed upon at
our meeting on August 5, 1983:

1.    Stormwater Management:

    a.  Construct lined diversion ditches along northwestern
        and southwestern edges of property;

    b.  Construct corrugated metal pipe culvert at northern
        corner of drying pad;

    c.  Route roof downspouts from office building into back
        ditch;

    d.  Roof process area to prevent direct rainfall into this
        area.

2.    Ground-water Removal and Treatment:

    a.  Construct subsurface drainage system 200 feet long, 15
        feet deep and 18 inches wide.  A recovery well will be
        located at the midpoint of the drainage system and
        will contain a submersible sump fitted with PVC piping
        to deliver water to an on site storage tank and treat-
        ment system.

    b.  Construct a treatment plant utilizing an ion-exchange
        system with both cation and anion adsorber columns.

OFFICIAL FILE COPY
TOXIC SUBSTANCES CONTROL DIVISION
CENTRAL FILE UNIT

3340 Ocean Park Boulevard, Suite 2000 • P.O. Box 4056 • Santa Monica, California 90405 • (213) 452-0161

Ms. Karen O'Haire
September 9, 1983
Page Two


3.      Soil Contamination:

        a.   Remove soil in truck loading pad area;

        b.   Seal drying pad with textile fabric and 4 inch thick
             layer of asphaltic concrete;

        c.   Fence process area.

4.      Monitoring:

        a.   Visual   inspection   of   sealed   pad,   fencing   and
             stormwater management construction;

        b.   Sampling of effluent from water treatment system;

        c.   Sampling of selected on-site and off-site wells;

        d.   Repairs as necessary.

Details of the above proposal are set forth in the enclosed "Pro-
posed Remedial Action Plan, Wickes Elmira Facility" prepared by
Woodward-Clyde Consultants in conjunction with Levine-Fricke En-
gineering Consultants.  The figures referred to in such document
are being express mailed to you directly by Woodward-Clyde.  The
information requested in your letter to me dated August 29, 1983
is contained in a letter dated September 9, 1983 which is being
sent directly to you by Jim Levine of Levine-Fricke.

The schedule agreed to at our meeting on August 5, 1983, calls
for the following events:

        9-19    Approval of plan by RWQCB and DOHS.

        9-19    Resin bench test results.

        10-10   Completion of french drain and stormwater trench;
                draw up design and specifications for fabrication;
                selection of vendors completed.

        11-7    Construction of treatment plant on site.

        11-21   Start up testing completed.

If you have any questions on Wickes' proposed plan, please call
me or Bob Tuch immediately so that we can maintain this schedule.

Ms. Karen O'Haire
September 9, 1983
Page Three

It is our understanding that at such time as it is demonstrated that the proposed plan is effecting a continuing reduction in levels of copper, chromium and arsenic in the ground water, and is preventing contamination of surface water and direct contact with contaminated soils, that the staff of the CRWQCB will promptly recommend to the Board that the pending Clean-Up and Abatement Order be dismissed with prejudice.

Very truly yours,

Jeannette Meier Zacker
Associate Counsel

JMZ:cs
enclosure
cc:   Larry Pearson, CRWQCB
      Gary Reents, DOHS
      Steve Debuskey
      Robert Tuch



*C5a*

RECEIVED
SEP 2 9 1983
JEANNETTE M. ZACKER

September 29, 1983                                **Via Federal Express**

Regional Water Quality Control
  Board
Central Valley Region
3201 S Street
Sacramento, CA 95816

Attn:  Ms. Karen O'Haire

RE:    Proposed Remedial Action Plan/Wickes Forest Industries
       Facility/Elmire, California

Dear Ms. O'Haire:

The purpose of this letter is to provide additional information
to the California Regional Water Quality Control Board ("CRWQCB")
and the Department of Health Service ("DOHS") in regard to the
above referenced remedial action plan proposed on behalf of
Wickes Forest Industries on September 9, 1983, in accordance with
understandings reached in the course of telephone conferences
which occurred on September 27 and 28, 1983 between Larry Pearson
and Gary Varney of the CRWQCB, Gary Reents of DOHS, James Levine
of Levine-Fricke Engineering Consultants, Albert Ridley of
Woodard-Clyde Consultants, you, and myself.

As I stated in my letter to you of September 22, 1983 and reiter-
ated verbally on September 27, Wickes is ready to proceed with
the commencement of immediate construction activities pertaining
to the french drain and storm water diversion ditches outlined in
the remedial action plan as soon as I receive authorized written
approval on behalf of the CRWQCB and DOHS in regard to the
primary elements of the remedial action plan submitted on Septem-
ber 9, 1983. Specifically, I request approval by CRWQCB and DOHS
of the following elements of our previously submitted remedial
action plan: (i) storm water management, (ii) ground-water re-
moval and treatment, (iii) soil contamination containment and
control, and (iv) monitoring program. Based on our prior conver-
sations, it is agreeable to Wickes if the approval by the CRWQCB
and DOHS of the foregoing elements of the remedial action plan is
conditioned upon the subsequent and mutually agreeable negotia-
tion of appropriate deed restrictions on the subject property,
implementation by Wickes of a financial assurance program which
would reasonably underwrite the ability of the company to comply
with the primary monetary obligations undertaken by it pursuant
to the proposed plan, and final refinement of the monitoring
process.

The following information is provided in response to the issues
raised by the CRWQCB and DOHS in the course of the telephone con-
ferences referenced above:

OFFICIAL FILE COPY
TOXIC SUBSTANCES CONTROL DIVISION
CENTRAL FILE UNIT

3340 Ocean Park Boulevard, Suite 2000  ●  P.O. Box 4056  ●  Santa Monica, California 90405  ●  (213) 452-0161

1.  <u>Possible effects of high ground-water encountering contami-
    nated soils under the drying pad.</u>

    As previously stated, although the possibility that ground-
    water may contact shallow contaminated soils beneath the
    concrete drying pad cannot be ruled out entirely, we do not
    believe there is a significant basis to conclude there will
    be a resulting leaching or ground-water contamination prob-
    lem.  However, notwithstanding this, and in order to provide
    an engineering option in case this unlikely event does oc-
    cur, Wickes intends to construct a seven foot deep subsur-
    face drainage trench along the northeast edge of the drying
    pad.  This trench will include a recovery well similar to
    that proposed for the southeast side of the property.  The
    purpose of this trench will be to allow, if necessary, main-
    tenance of the ground-water table below the elevation of
    contaminated soils underlying the concrete drying pad.
    Ground-water levels will be controlled by the use of elec-
    trodes placed at adjustable elevations in the recovery well.
    We are proposing to construct this trench as part of the
    remedial action plan previously submitted.  This trench is
    proposed as a safeguard measure to be implemented only if a
    significant leaching problem is confirmed by monitoring of
    well E-4 or evidence of surface water contamination is de-
    tected in the "A" street ditch resulting from leaching under
    the pad.

2.  <u>Injection at the sump near well E-6</u>

    To aid in flushing residual contaminants from the sump area
    near well E-6, we are proposing injection of clean water
    into this area.  This injection will commence when draw-down
    of the ground-water has been effected by the subdrain sys-
    tem.  We would advise the CRWQCB and the DOHS in advance of
    the implementation of these measures.

3.  <u>Monitoring Program.</u>

    Wells E-17 and E-18 were not included in the proposed
    ground-water monitoring program as initially submitted.
    These wells were intended to be included in the monitorng
    program and we hereby amend the remedial action plan to in-
    clude them in the previously submitted ground-water monitor-
    ing scheme.

- 2 -

4.  <u>Financial Assurance Program for Future Operations, Main-
    tenance, and Monitoring</u>

    Wickes is pursuing the development of a financial assurance
    program either in the form of a performance or other type of
    bond or through the substantial prepayment of expenses and
    costs involved in the remedial action plan. Whichever route
    is followed, the primary intent of Wickes is to insure that
    adequate financial resources will exist endependently of our
    company to provide for successful implementation and main-
    tenance of the remedial action plan.

5.  <u>Proposal for Deed Restriction on Future Use and Sale of the
    Property.</u>

    As previously discussed, we are in agreement with you on the
    need for the negotiation of appropriate deed restrictions
    affecting the future use and sale of the subject property.
    We are in conceptual agreement with the restrictions set
    forth in Article III of the draft Covenant and Agreement
    which accompanied your correspondence of September 19, 1983.
    We intend to negotiate in good faith with the DOHS and
    CRWQCB in regard to the specific terms and conditions of the
    covenants and restrictions which will be imposed on the El-
    mira property.

I trust the foregoing satisfactorily responds to your remaining
questions concerning the remedial action plan as proposed by
Wickes. If this is the case, please provide the above-mentioned
written approval of the DOHS and CRWQCB as soon as possible.

Very truly yours,

Robert I. Tuch
Associate Counsel

RIT/sg

cc:  Al Ridley
     Steve Dubuskey
     Jim Levine
     Jeannette Zacker

- 3 -

PROPOSED REMEDIAL ACTION PLAN
WICKES ELMIRA FACILITY
Elmira, California

INTRODUCTION

The herein proposed remedial action plan for the Wickes Elmira facility, developed by Woodward-Clyde Consultants and Levine-Fricke, Inc., is intended to respond to directives from the California Department of Health Services (DOHS) and the Regional Water Quality Control Board, Central Valley Region (CRWQCB). These agencies have required Wickes to develop and submit a proposed remedial action plan to mitigate potential human health hazards associated with residual contamination at the Elmira wood-treating facility. The herein proposed remedial action plan has been developed based upon the results of Phase I and Phase II soil and ground-water investigations performed at the site. Reports for these investigations are dated April 19, 1983 and August 19, 1983, respectively. Additional data and interpretations concerning relevant site conditions are contained in our response to questions from the CRWQCB dated July 28, 1983.

The CRWQCB and DOHS are concerned about potential human exposure to copper, chromium (hexavalent and trivalent), and arsenic; heavy metals that have been identified in soil and ground-water at the site. In developing this remedial action plan, our approach has been to analyze the data on site conditions, to identify the potential pathways of human exposure in different areas of the site, and to develop engineering measures which will interfere with or eliminate the exposure pathways. The potential exposure pathways identified at the site include:

   o   direct contact with contaminated soils, ground water,
       and surface water;

   o   inhalation of soil particles (dust) from wind-blown
       contaminated soils; and

   o   drinking of contaminated ground water potentially
       pumped from the shallow (less than 20 feet deep )
       zone.

The Phase I and II studies described above provided sufficient data with which to identify areas of the site where these potential exposure pathways are present and areas where the potential exposure would be similar to background conditions. Specific engineering measures were then developed to reduce the potential exposures where they would be above background or more established criteria (i.e. drinking water standards).

SITE CONDITIONS

Although site conditions are fully described in the Phase I and
Phase II reports (see Reference), a brief description of the site
is provided, highlighting those areas with potential exposure
problems.  For this discussion it is useful to view the site as
composed of several operating areas:

    o   The process area — including the storage tanks, the
        pressure cylinders, associated piping and controls,
        two collection sumps, and an office building.  This is
        the area where chemicals were stored and mixed, and
        where wood was treated.  Sumps were used to collect
        drippage and rainwater for use as make-up water for
        treating solutions.

    o   The drip pad or drying pad area — comprised of a con-
        crete slab area (approx. 120 ft. by 180 ft. in plan
        dimensions) adjacent to the process area.  This area
        was used to collect the drippage from newly-treated
        lumber.  Drippage and direct rainfall onto this area
        flowed to the sumps in the process area.

    o   An unpaved storage yard — located northeast of the
        drying pad.  This area as well as a smaller unpaved
        area southwest of the process area was used for wood
        storage before treating and after initial drying on
        the drip pad.  The smaller area southwest of the pro-
        cess area is leased from Southern Pacific Railroad.

    o   A truck loading pad — located at the southern corner
        of the process area.  This 40 ft. by 15 ft. concrete
        area was used for parking tank trucks while they un-
        loaded shipments of treating chemicals.

Laboratory analyses results of soil and ground-water samples from
exploratory borings in the northeastern and southwestern unpaved
storage yards show relatively low concentrations of copper, ar-
senic, and chromium that are in the range of background con-
centrations measured in the site vicinity.  These data suggest
that potential human exposures to these metals from either direct
contact with soils or inhalation of dust would be in the same
range as would occur in uncontaminted off-site areas, and thus
require no remedial actions.

Laboratory analyses results of ground-water samples collected
from Phase I wells in the process area indicated significantly
elevated concentrations of chromium and arsenic in the shallow
ground water in this area.  Phase II monitoring wells indicate
that this ground-water contamination is confined to relatively
shallow depths (less than 40 feet deep).  No off-site contamina-
tion has been detected in the shallow Phase II monitoring wells.

- 2 -

Analysis of soil samples from on-site and off-site borings in the area of ground-water contamination show esentially background concentrations of copper, chromium, and arsenic. Where concentrations in soils were higher than background (E-6), the predominance of hexavalent chromium suggests that the vast majority of contamination measured in these soil samples occurs as contaminated pore water. These results suggest that an appropriate remedial strategy for this area would be to install a shallow ground water collection system to prevent subsequent off-site migration of contaminated shallow ground water and to retrieve that which may have already moved off-site. These actions will greatly reduce the potential for shallow ground water to be extracted by local domestic wells and subsequently ingested by residents. Since direct contact with or inhalation of contaminated soils is not considered an important pathway of exposure for residual subsurface contamination in the process area, no soil removal here is considered necessary. Recommended actions to reduce the potential for direct contact with remaining process equipment on-site are described later in this plan.

Laboratory analyses of soil samples from the drying pad area indicate concentrations of copper, chromium, and arsenic above background levels generally to depths of approximately 2 feet below the bottom of the slab and at least 3 feet in two areas. Ground-water analyses results from samples beneath the pad indicate concentrations generally below drinking water criteria. These results indicate that although the concrete surface covering the pad may preclude short-term exposures, the direct contact and inhalation exposure pathways may be important. The ground-water ingestion pathway appears insignificant here as long as infiltration through contaminated underlying soils is minimized. Sealing the surface of the pad is a measure being considered which would interfere with the direct contact and inhalation pathways.

Laboratory analyses results from borings in the truck loading pad indicate that the soil contamination extends to less than 2 feet deep in one end of the pad and greater than 2 feet deep in the other. Potential exposure from direct contact with or inhalation of the contaminated soils appears to be presently precluded by the presence of an overlying concrete pad, however, excavation of contaminated soils is being considered here as a long-term solution.

PROPOSED REMEDIAL ACTION PLAN

The proposed remedial action plan for the Elmira facility is comprised of several elements:

    o   Stormwater (surface water) management;
    o   Shallow ground-water removal and treatment;
    o   Soil removal in the truck loading pad area;
    o   Surface sealing the drying pad area;

- 3 -

o   Monitoring; and
o   Maintenance.

These elements are described below.

Stormwater Management

In previous winters, stormwater runoff generated on the adjacent
Railroad property to the west would flow onto the site, and cause
flooding of the pad and process areas. Similarly, direct rain-
fall on the drying pad area would flow into the process area and
contact residual contamination in the sumps; thus requiring pump-
ing and hauling or treatment of a large amount of stormwater.

To control this run-on and run-off problem, a stormwater manage-
ment plan has been formulated and is herein proposed. The plan
consists of:

o   The construction of lined diversion ditches along the
    northwestern and southwestern edges of the property to
    divert incoming stormwater around the process and
    drying pad areas. The northwestern ditch (shown on
    Figure 1) would convey incoming stormwater northeast
    along the back edge of the property to a point ap-
    proximately 10 feet beyond the northern corner of
    thedrying pad. A corrugated metal pipe culvert
    originating at this point would convey this water
    easterly across the site and outfall into the "A"
    Street ditch. The southwestern ditch would convey
    water along this property edge and outfall directly
    into the "A" Street ditch at the south corner of the
    process area. Both ditches and the culvert have been
    designed to convey water volumes up to those antici-
    pated for the 100-year storm. It is possible that
    during large storm events, however, the "A" Street
    ditch will be flooded and will prevent the discharge
    of the full flow from these conveyances. Due to this
    possibility, the ditches have been designed to over-
    flow onto the uncontaminated storage yards in the
    northeastern and southwestern portions of the site
    rather than spill over into the drying pad or process
    areas. Due to the low elevations of these storage
    yards, they will likely be flooded anyway to a certain
    extent from run-off from other areas. This precaution
    should result in protection of the sensitive areas of
    the site (the pad and process areas) and result in
    greater access and use of these areas in winter
    months.

o   The routing of roof downspouts from the office build-
    ing directly into the back ditch. This will divert an
    additional amount of clean stormwater from collecting
    in the process area.

- 4 -

○   Roofing of the process area to prevent direct rainfall
    into this area and potential leakage into the "A"
    Street ditch.

## Ground-water Removal and Treatment

To prevent subsequent off-site migration of contaminated shallow
ground water and retrieve contaminated ground water which may
have already moved off-site, a subsurface drainage system is pro-
posed along the southeast edge of the process area and a portion
of the drying pad (Figure 1).  The drain will consist of a 200
foot long, 15 foot deep, 18 inch wide trench with appropriately
sized permeable backfill (Figure 2).  A recovery well will be
located at the mid-point of the drainage trench.  The recovery
well will consist of a 12 inch diameter well casing installed
inside a 24 inch diameter borehole.  The recovery well will ex-
tend to a depth of approximately 20 feet.  The bottom 5 feet of
well casing (below the trench) will be blank and the annulus
around this section will be backfilled with a cement-bentonite
grout.  The section of casing from approximately 3 feet below the
ground surface to the bottom of the trench will consist of a per-
forated section as shown in Figure 2.  The well annulus adjacent
to the perforated section will be backfilled with Caltrans Class
2 permeable filter material.  The annulus opposite the upper 3
feet will be backfilled with a cement bentonite seal.  A submers-
ible pump will be installed within the well and fitted with PVC
piping to deliver the withdrawn ground water to an on-site
storage tank and subsequently to the treatment system.  Down-hole
control switches will turn the pump on and off to maintain the
desired ground-water elevation in the drainage trench.

Based upon preliminary calculations, a water level drawdown of
approximately 5 feet will be adequate to prevent ground water in
the upper 40 feet from crossing a vertical projection of the
trench and will retrieve shallow ground water from at least 300
feet in the downgradient direction.  These calculations indicate
that a flow of approximately 7 gallons/minute can be expected
from this drawdown.

Treatment of collected ground water and surface water will be
accomplished utilizing an ion exchange system with both cation
and anion adsorber columns.  A composite water sample of the E-4,
E-5 and E-6 wells was collected on August 29, 1983 and is cur-
rently being analyzed by the laboratory.  Resin bench test
results will be available to the CRWQCB on September 19 in accor-
dance with the schedule agreed upon on August 5, 1983.  The pro-
posed design configuration (Figure 3) consists of a storage/flow
equalization tank, a cartridge filter to remove inert solids, and
cation and anion columns to remove dissolved copper, chromium,
and arsenic.  After water has passed through these columns it
will be discharged to either the "A" Street ditch or, if permis-
sion is obtained, to the City of Vacaville sanitary sewer system

- 5 -

(see separate letter to CRWQCB dated September 9, 1983). Ef-
fluent from the columns should meet California Drinking Water
Standards for copper, chromium, and arsenic.

Based upon the assumed flow rates discussed above, a column di-
ameter of 18 inches has been selected with column lengths (and
bed depths) of 5 feet. Assuming average influent concentrations
of 10 to 15 ppm for chromium, 0.5 ppm for arsenic, and 2 ppm for
copper, resin change-out frequencies were calculated to prevent
breakthrough. These calculations utilize textbook resin ef-
ficiency numbers which should be tested in the laboratory to se-
lect the appropriate resins and refine hese estimates. Based
upon these calculations, the cation resin will need to be changed
every 78 days and the anion resin changed every 21 days. Based
upon the high capital and operating costs of on-site regenera-
tion, the resins will be disposed of in accordance with ap-
plicable state and federal regulations.

## Soil Removal in the Truck Loading Pad Area

To prevent future exposure to presently covered, contaminated
soils underlying the truck loading pad, approximately 2.5 feet of
soil will be excavated and replaced with clean soil fill. The
excavated soil will be disposed in a disposal site approved by
the DOHS and CRWQCB. Excavation of this soil is proposed instead
of sealing the surface of this pad because, unlike the drying
pad:

- o   The truck loading pad is in the same area of the site
      where ground-water contamination was detected. It is
      not known whether the contaminated soil beneath the
      truck loading pad has contributed to this ground-water
      contamination.

- o   The ground surface around the truck loading pad is at
      a low enough elevation (67.9 feet) to make the pad
      area susceptible to potential flooding from high water
      in the "A" Street ditch.

## Concrete Drying Pad

The proposed sealing of the drying pad is intended to reduce
potential human exposure to copper, arsenic and chromium in the
drying pad area. Potential pathways of exposure include direct
contact with soil beneath the slab or with the surface of the
slab. Other pathways of exposure include breathing wind blown
dust from the slab or underlying soil, or ingestion of underlying
soil or runoff water from the surface of the slab.

Sealing the surface of the Drying Pad will mitigate potential
direct contact, dust, and surface water migration of contami-
nants. It is recommended that the Drying Pad be covered with
approximately a 4 inch thick layer of asphaltic concrete (A.C.)

- 6 -

paving. A textile fabric is recommended between the A.C. and the concrete slab to reduce the potential for cracking of the A.C. paving. A special mix of A.C. will be prepared to achieve the desired low permeability. Surface runoff from the sealed Drying Pad will then be diverted directly to the ditch at "A" Street. Continued inspection and maintenance will be performed to provide continued effectiveness of the A.C. surface seal.

Process Area

Potential pathways for human exposure to arsenic, copper, and chromium in the Process Area include: direct contact with concrete or equipment, or direct contact with surface runoff, and ingestion of groundwater from beneath the area. The proposed ground water removal and treatment system is intended to mitigate potential health risks from groundwater. Constructing a roofed structure over the Process Area will mitigate potential off-site migration of copper, arsenic, and chromium in runoff water by preventing rainfall from contacting contaminated surfaces. Presently rainfall collected in the sumps is removed by tank truck to an approved disposal site. Clean runoff from the new roof will be diverted to the ditch on "A" Street. A cyclone fence or siding on the proposed roof structure will be constructed around the process area to prevent direct contact with equipment on-site.

Monitoring Effectiveness

A.    Ground Water Removal and Treatment.

During initial operations it is estimated that the effluent from the ion-exchange water treatment system will need to be sampled and analysed for copper, arsenic, and chromium on a bi-weekly basis. As operational experience develops it is anticipated that effluent sampling and analysis may be reduced to bi-monthly or possibly monthly intervals.

Sampling and measurement of ground water elevations in groundwater monitoring wells and off-site domestic wells should initially be completed at monthly intervals to evaluate the effectiveness of the ground-water removal and treatment system. It is proposed that samples be taken from Wells E-4, E-5, E-6, E-15, E-16, DW-2, the Elmira School well and the Rhodes domestic water well. After evaluation of three months of data, the sampling frequency may be able to be reduced to every two months.

A minimum period of six months after initiation of pumping should be allowed to evaluate the groundwater removal and treatment system since this period of time will be required to develop the desired changes in gradient. Thereafter, the effectiveness of the ground-water removal and treatment system will be evaluated based upon decreasing levels of copper, arsenic, and chromium in

- 7 -

water from the monitoring wells. When the levels of these compo-
nents are at or below the California Drinking Water Standard for
a period of six (6) consecutive months the ground-water removal
system can be discontinued.

B.      Stormwater Management and Sealing.

The effectiveness of the stormwater management and sealing will
be monitored by visual inspection no less frequently than the
sampling of the wells. Upon discontinuance of the ground water
treatment and monitoring, such inspection, and appropriate
mainenance, will occur no less than quarterly.

Annual Maintenance

Annual maintenance of the surface water management system is an-
ticipated to be minimal. The ditches and pipes should be cleaned
and inspected each fall and no less than monthly during the rainy
season. For the Drying Pad the pavement should be inspected each
fall prior to the rainy season and any cracks should be sealed.

Maintenance of the ion-exchange system will require replacement
of the resins and disposal of the used resins. Change out
frequencies for the resins will change over time as the influent
concentrations decrease. Early operations will most likely re-
quire change out of the resins every three to twelve weeks. As
the ground-water concentrations decrease the change out frequen-
cies will be reduced. Very little maintenance is anticipated for
the submersible pump and ground-water removal system.

- 8 -

## REFERENCES

Woodward-Clyde Consultants, 1983(a), consultants report entitled "Interim Phase I Report, Wickes Forest Industries Elmira, California," dated April 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(b), consultants report entitled "Response to Questions in Letter of July 8, 1983, Wickes Elmira Facility," dated July 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(c), consultants report entitled "Phase II Data Report, Wickes Forest Industries Facility, Elmira California," prepared for Wickes Forest Industries, Dinuba, California.

Exhibit A - Dobbas Counterclaims