# EXHIBIT A

1  Lester O. Brown, Bar No. 160828
   LBrown@perkinscoie.com
2  James G. Bernald, Bar No. 205519
   JBernald@perkinscoie.com
3  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
4  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
5  Facsimile:  310.788.3399

6  Attorneys for Counterclaimant
   West Coast Wood Preserving, LLC
7

8                UNITED STATES DISTRICT COURT

9                EASTERN DISTRICT OF CALIFORNIA

10

11  CALIFORNIA DEPARTMENT OF          Case No. 2:14-cv-00595-WBS-EFB
    TOXIC SUBSTANCES CONTROL,
12  et al.,                          **COUNTERCLAIMANT WEST
                                     COAST WOOD PRESERVING,
13             Plaintiffs,           LLC'S COUNTERCLAIM AGAINST
                                     COUNTER-DEFENDANTS
14        v.                         CALIFORNIA DEPARTMENT OF
                                     TOXIC SUBSTANCES CONTROL
15  JIM DOBBAS, INC., et al.,        AND THE TOXIC SUBSTANCES
                                     CONTROL ACCOUNT FOR:**
16             Defendants.

17                                   **(1) CONTRIBUTION**

18  WEST COAST WOOD
    PRESERVING, LLC, a Nevada        **(2) DECLARATORY JUDGMENT**
19  limited liability company

20             Counterclaimant,      Judge:      William B. Shubb
                                     Trial Date:    January 4, 2017
21        v.                         Action Filed:   March 3, 2014

22  CALIFORNIA DEPARTMENT OF
    TOXIC SUBSTANCES CONTROL
23  and the TOXIC SUBSTANCES
    CONTROL ACCOUNT,
24
               Counter-defendants.
25

26  AND RELATED CROSSCLAIMS
    AND COUNTERCLAIM
27

28

LEGAL123536326.3                     WEST COAST WOOD PRESERVING, LLC'S
                                     COUNTERCLAIM 2:14-cv-00595-WBS-EFB

-4-

1    Defendant, cross-defendant and counterclaimant West Coast Wood

2  Preserving, LLC ("WCWP") hereby counterclaims against plaintiffs and counter-

3  defendants California Department of Toxic Substances Control and the Toxic

4  Substances Control Account (collectively "DTSC"). WCWP makes the following

5  allegations upon information and belief as to all matters, other than those

6  allegations specifically referring to WCWP, which it makes based upon its own

7  knowledge:

8                                    **JURISDICTION**

9       1.     The Court has jurisdiction over these counterclaims pursuant to 28

10  United States Code ("U.S.C.") section 1331, and 42 U.S.C. section 9613(b).

11                                       **VENUE**

12      2.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b) and 42

13  U.S.C. section 9613(b) because the alleged acts and omissions relate to the alleged

14  hazardous substances releases giving rise to this counterclaim and DTSC's claims

15  asserted in its complaint filed in this case, and relate to the real property located at

16  or near 147 A Street, Elmira, Solano County, California ("the Site").

17                                       **PARTIES**

18      3.     WCWP is a Nevada limited liability company with its principal place

19  of business in Kern County, California. WCWP is not a successor to Defendant

20  Pacific Wood Preserving, a dissolved California corporation.

21      4.     The California Department of Toxic Substances Control is a public

22  agency responsible for responding to releases and/or threatened releases of

23  hazardous substance into the environment. Its predecessor agency was the

24  California Department of Health Services.

25      5.     The Toxic Substances Control Account is an account within the State

26  of California General Fund.

27

28

1

## GENERAL ALLEGATIONS

2     6.     DTSC, and/or its predecessor agency, the California Department of

3  Health Services, has been involved with the property located at or near the Site for

4  more than thirty-five years.

5     7.     Collins & Aikman Products Company (and its predecessor-in-interest

6  the Wickes Corporation) (collectively "C&A") owned the Site from 1979 to 1997.

7  From the early 1980s to 2005, C&A undertook various actions directed, managed

8  and conducted at the direction of the DTSC and its predecessor agency that resulted

9  in the release of hazardous substances to the environment at and around the Site.

10 Those actions included, leaving known concentrations of hazardous substances in

11 the soil and groundwater at the Site resulting in the continuing release of hazardous

12 substances to the environment, installing a defective groundwater extraction and

13 treatment system that the DTSC knew or should have known would not stop the

14 release of hazardous substances into the environment, failing to properly maintain

15 the groundwater treatment system, and failing to undertake needed response actions

16 at the site during the time Collins and Aikman was a solvent private party PRP and/

17 or owned the site.

18    8.     DTSC and/or its predecessor agency approved a remedial action plan

19 for the Site in or around the year 1983 ("1983 Remedial Action Plan"). A copy of

20 the 1983 Remedial Action Plan is attached hereto as Exhibit A and incorporated by

21 this reference as though fully stated herein.

22    9.     Subsequent to approval and implementation of the 1983 Remedial

23 Action Plan, DTSC and/or its predecessor agency has undertaken additional

24 response actions at, on, and/or near the Site and surrounding properties. Among

25 other things, DTSC identified, approved, and ordered the implementation of the

26 response actions in the 1983 Remedial Action Plan, including the installation of an

27 asphalt cap and the use of a groundwater extraction and treatment system.

28

LEGAL123536326.3                    -2-              WEST COAST WOOD PRESERVING, LLC'S
                                                     COUNTERCLAIM 2:14-cv-00595-WBS-EFB

1    10.    On or about March 6, 1996, DTSC issued a Certification of Remedial

2    Action for the Site ("1996 Certification of Remedial Action"). A copy of the 1996

3    Certification of Remedial Action is attached hereto as Exhibit B and incorporated

4    by this reference as though fully stated herein.

5    11.    The 1996 Certification of Remedial Action states that the

6    removal/remediation actions had been completed and acceptable engineering

7    practices had been implemented.

8    12.    Subsequent to DTSC's 1996 Certification of Remedial Action for the

9    Site, DTSC continued to be actively involved in the Site and surrounding property.

10    13.    In May 2005, C&A declared bankruptcy and shortly thereafter ceased

11    remediation efforts at the Site.

12    14.    In late 2005, DTSC began performing the response actions that C&A

13    previously performed at the Site.

14    15.    In July 2010, DTSC issued a Removal Action Workplan (the "2010

15    Workplan"). The 2010 Workplan called for contaminated soil excavation, off-site

16    disposal, backfilling, confirmation sampling, demolition of the groundwater

17    extraction and treatment system, and long-term groundwater monitoring.

18    16.    In March 2011, DTSC issued an Imminent or Substantial

19    Endangerment Determination Order and Remedial Action Order (the "2011

20    Order"). Based on the data collected by DTSC regarding the environmental

21    conditions as the Site (as set forth in the 2011 Order), hazardous substances were

22    being released to the environment for the entire period of C&A's ownership of the

23    Site and thereafter, up to and including April 2010.

24    17.    From November 2005 to the present, DTSC has taken response actions

25    at the Site, including, among other things, efforts to repair and restart the

26    groundwater extraction and treatment system, completion of a remedial

27    investigation for site soils, preparation of the 2010 Workplan, implementation of

28    the 2010 Workplan, and groundwater monitoring.

18.    According to DTSC, from late 2005 to September 2013 it incurred over $2.2 million in response costs related to the release and/or threatened release of hazardous substances at, around and/or beneath the Site. In addition, DTSC expects to incur additional response costs.

19.    As described above, DTSC managed, directed, and conducted operations specifically related to pollution at the Site. Accordingly, DTSC is an "operator" of the Site as that term is used in 42 U.S.C. section 9607(a).

20.    DTSC, through its response actions at the Site, is a liable party pursuant to 42 U.S.C. section 9607(a).

21.    DTSC's complaint on file in this case includes a claim for recovery of response costs pursuant to 42 U.S.C. section 9607(a) against, *inter alia*, WCWP.

22.    DTSC'S selection and implementation of response actions at, on, and/or near the Site and surrounding properties were, and continue to be, negligent, grossly negligent and/or constitute intentional misconduct.

## FIRST COUNTERCLAIM

### Contribution pursuant to 42 U.S.C. § 9613

23.    WCWP realleges and incorporates by reference the allegations contained in paragraphs 1 through 22, inclusive.

24.    DTSC alleges in its complaint that the Site is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. section 9601(9). If such allegation is true, the Site is a "facility."

25.    DTSC is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. section 9601(21).

26.    DTSC is an "operator," or was an "operator," of the Site "at the time of disposal of any hazardous substance" there, as those terms are used in section 107(a) of CERCLA, 42 U.S.C. section 9607(a).

27.    DTSC negligently selected and implemented response actions at, on, and/or near the Site and surrounding properties.

28.     DTSC has engaged in gross negligence and/or intentional misconduct at and with respect to the Site, in violation of 42 U.S.C. section 9607(d).

29.     WCWP did not cause or contribute to any "hazardous substance" "release" or "threatened release" at or from the Site.

30.     WCWP denies that it is liable for any costs incurred as the result of the alleged release or threatened release of hazardous substances at or from the Site.

31.     To the extent that any party has incurred recoverable response costs and asserts liability for some or all of those costs against WCWP or asserts a contribution claim against WCWP for such costs incurred by another party, WCWP is entitled to contribution from DTSC for such costs to the extent they are recoverable under 42 U.S.C. section 9613.

## SECOND COUNTERCLAIM

### Declaratory Judgment pursuant to 28 U.S.C. § 2201

32.     WCWP realleges and incorporates by reference the allegations contained in paragraphs 1 through 31, inclusive.

33.     An actual controversy exists between WCWP and DTSC regarding their respective rights and obligations for response costs that WCWP may incur to respond to any release and/or threatened release of hazardous substances into the soil and/or groundwater at and from the Site. Unless all of the rights, duties, and obligations of WCWP are determined in this action, there will be a multiplicity of actions. Judicial determination of the liability of DTSC is necessary and appropriate at this time so that WCWP may ascertain its rights as against DTSC.

34.     Pursuant to 28 U.S.C. section 2201(a), this Court has jurisdiction to award declaratory relief. WCWP, therefore, requests a judicial determination of its rights, and the duties and obligations of DTSC, in responding to the release and/or threatened release of hazardous substances into the soil and/or groundwater at and from the Site.

1   35.   Pursuant to 28 U.S.C. section 2202, WCWP further requests that this

2   Court, after entering the declaratory judgment prayed for herein, retain jurisdiction

3   of this action to grant WCWP such further relief against DTSC as necessary and

4   proper to effectuate the Court's declaration.

5   **PRAYER FOR RELIEF**

6   WHEREFORE, WCWP prays for judgment and relief as follows:

7   1.   In the event WCWP is found to have any liability, it is entitled to

8   contribution pursuant to 42 U.S.C. section 9613(f) from DTSC for any costs

9   incurred and/or to be incurred by WCWP in response to the release and/or

10   threatened release of hazardous substances at or from the Site;

11   2.   For a declaration and judgment of this Court in favor of WCWP and

12   against DTSC, that any alleged costs for all remedial actions at the Site to date and

13   in the future should be allocated to DTSC, and an order retaining jurisdiction to

14   effectuate a declaration that DTSC is liable for all costs incurred and/or to be

15   incurred by WCWP in response to the release and/or threatened release of

16   hazardous substances at and from the Site;

17   3.   For costs of suit incurred herein; and

18   4.   Such other relief as the Court deems equitable and just.

19

20   DATED:  October 2, 2014          **PERKINS COIE** LLP

21

22   By: /s/ Lester O. Brown
                                                Lester O. Brown

23

24   Attorneys for Counterclaimant,
        Defendant and Cross-Defendant
        West Coast Wood Preserving, LLC

25

26

27

28

# EXHIBIT A

C5a

**Wickes Companies, Inc.**
Corporate Offices

FEDERAL EXPRESS

FEDERAL EXPRESS

September 9, 1983

Ms. Karen O'Haire
Regional Water Quality Control Board
3201 S Street
Sacramento, California 95816

Re:  Wickes Forest Industries Facility, Elmira, California

Dear Karen:

The following remedial action proposal has been approved by
Wickes management and is submitted to the California Regional
Water Quality Control Board ("CRWQCB") and the Department of
Health Services ("DOHS") pursuant to the schedule agreed upon at
our meeting on August 5, 1983:

1.   Stormwater Management:

     a.   Construct lined diversion ditches along northwestern
          and southwestern edges of property;

     b.   Construct corrugated metal pipe culvert at northern
          corner of drying pad;

     c.   Route roof downspouts from office building into back
          ditch;

     d.   Roof process area to prevent direct rainfall into this
          area.

2.   Ground-water Removal and Treatment:

     a.   Construct subsurface drainage system 200 feet long, 15
          feet deep and 18 inches wide.  A recovery well will be
          located at the midpoint of the drainage system and
          will contain a submersible sump fitted with PVC piping
          to deliver water to an on site storage tank and treat-
          ment system.

     b.   Construct a treatment plant utilizing an ion-exchange
          system with both cation and anion adsorber columns.

OFFICIAL FILE COPY
TOXIC SUBSTANCES CONTROL DIVISION
CENTRAL FILE UNIT

3340 Ocean Park Boulevard, Suite 2000  •  P.O. Box 4056  •  Santa Monica, California 90405  •  (213) 452-9161

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000018

Ms. Karen O'Haire
September 9, 1983
Page Two


3.     Soil Contamination:

       a.   Remove soil in truck loading pad area;

       b.   Seal drying pad with textile fabric and 4 inch thick
            layer of asphaltic concrete;

       c.   Fence process area.

4.     Monitoring:

       a.   Visual   inspection   of   sealed   pad,   fencing   and
            stormwater management construction;

       b.   Sampling of effluent from water treatment system;

       c.   Sampling of selected on-site and off-site wells;

       d.   Repairs as necessary.

Details of the above proposal are set forth in the enclosed "Pro-
posed Remedial Action Plan, Wickes Elmira Facility" prepared by
Woodward-Clyde Consultants in conjunction with Levine-Fricke En-
gineering Consultants.  The figures referred to in such document
are being express mailed to you directly by Woodward-Clyde.   The
information requested in your letter to me dated August 29, 1983
is contained in a letter dated September 9, 1983 which is being
sent directly to you by Jim Levine of Levine-Fricke.

The schedule agreed to at our meeting on August 5, 1983, calls
for the following events:

       9-19    Approval of plan by RWQCB and DOHS.

       9-19    Resin bench test results.

       10-10   Completion of french drain and stormwater trench;
               draw up design and specifications for fabrication;
               selection of vendors completed.

       11-7    Construction of treatment plant on site.

       11-21   Start up testing completed.

If you have any questions on Wickes' proposed plan, please call
me or Bob Tuch immediately so that we can maintain this schedule.

Ms. Karen O'Haire
September 9, 1983
Page Three


It is our understanding that at such time as it is demonstrated
that the proposed plan is effecting a continuing reduction in
levels of copper, chromium and arsenic in the ground water, and
is preventing contamination of surface water and direct contact
with contaminated soils, that the staff of the CRWQCB will
promptly recommend to the Board that the pending Clean-Up and
Abatement Order be dismissed with prejudice.

Very truly yours,

*Jeannette Meier Zacker*

Jeannette Meier Zacker
Associate Counsel

JMZ:cs
enclosure
cc:  Larry Pearson, CRWQCB
     Gary Reents, DOHS
     Steve Debuskey
     Robert Tuch

PROPOSED REMEDIAL ACTION PLAN
WICKES ELMIRA FACILITY
Elmira, California

INTRODUCTION

The herein proposed remedial action plan for the Wickes Elmira facility, developed by Woodward-Clyde Consultants and Levine-Fricke, Inc., is intended to respond to directives from the California Department of Health Services (DOHS) and the Regional Water Quality Control Board, Central Valley Region (CRWQCB). These agencies have required Wickes to develop and submit a proposed remedial action plan to mitigate potential human health hazards associated with residual contamination at the Elmira wood-treating facility. The herein proposed remedial action plan has been developed based upon the results of Phase I and Phase II soil and ground-water investigations performed at the site. Reports for these investigations are dated April 19, 1983 and August 19, 1983, respectively. Additional data and interpretations concerning relevant site conditions are contained in our response to questions from the CRWQCB dated July 28, 1983.

The CRWQCB and DOHS are concerned about potential human exposure to copper, chromium (hexavalent and trivalent), and arsenic; heavy metals that have been identified in soil and ground-water at the site. In developing this remedial action plan, our approach has been to analyze the data on site conditions, to identify the potential pathways of human exposure in different areas of the site, and to develop engineering measures which will interfere with or eliminate the exposure pathways. The potential exposure pathways identified at the site include:

- o   direct contact with contaminated soils, ground water, and surface water;

- o   inhalation of soil particles (dust) from wind-blown contaminated soils; and

- o   drinking of contaminated ground water potentially pumped from the shallow (less than 20 feet deep) zone.

The Phase I and II studies described above provided sufficient data with which to identify areas of the site where these potential exposure pathways are present and areas where the potential exposure would be similar to background conditions. Specific engineering measures were then developed to reduce the potential exposures where they would be above background or more established criteria (i.e. drinking water standards).

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000021

-15-

SITE CONDITIONS

Although site conditions are fully described in the Phase I and Phase II reports (see Reference), a brief description of the site is provided, highlighting those areas with potential exposure problems. For this discussion it is useful to view the site as composed of several operating areas:

   o    The process area - including the storage tanks, the pressure cylinders, associated piping and controls, two collection sumps, and an office building. This is the area where chemicals were stored and mixed, and where wood was treated. Sumps were used to collect drippage and rainwater for use as make-up water for treating solutions.

   o    The drip pad or drying pad area - comprised of a concrete slab area (approx. 120 ft. by 180 ft. in plan dimensions) adjacent to the process area. This area was used to collect the drippage from newly-treated lumber. Drippage and direct rainfall onto this area flowed to the sumps in the process area.

   o    An unpaved storage yard - located northeast of the drying pad. This area as well as a smaller unpaved area southwest of the process area was used for wood storage before treating and after initial drying on the drip pad. The smaller area southwest of the process area is leased from Southern Pacific Railroad.

   o    A truck loading pad - located at the southern corner of the process area. This 40 ft. by 15 ft. concrete area was used for parking tank trucks while they unloaded shipments of treating chemicals.

Laboratory analyses results of soil and ground-water samples from exploratory borings in the northeastern and southwestern unpaved storage yards show relatively low concentrations of copper, arsenic, and chromium that are in the range of background concentrations measured in the site vicinity. These data suggest that potential human exposures to these metals from either direct contact with soils or inhalation of dust would be in the same range as would occur in uncontaminted off-site areas, and thus require no remedial actions.

Laboratory analyses results of ground-water samples collected from Phase I wells in the process area indicated significantly elevated concentrations of chromium and arsenic in the shallow ground water in this area. Phase II monitoring wells indicate that this ground-water contamination is confined to relatively shallow depths (less than 40 feet deep). No off-site contamination has been detected in the shallow Phase II monitoring wells.

- 2 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000022

-16-

Analysis of soil samples from on-site and off-site borings in the area of ground-water contamination show essentially background concentrations of copper, chromium, and arsenic. Where concentrations in soils were higher than background (E-6), the predominance of hexavalent chromium suggests that the vast majority of contamination measured in these soil samples occurs as contaminated pore water. These results suggest that an appropriate remedial strategy for this area would be to install a shallow ground water collection system to prevent subsequent off-site migration of contaminated shallow ground water and to retrieve that which may have already moved off-site. These actions will greatly reduce the potential for shallow ground water to be extracted by local domestic wells and subsequently ingested by residents. Since direct contact with or inhalation of contaminated soils is not considered an important pathway of exposure for residual subsurface contamination in the process area, no soil removal here is considered necessary. Recommended actions to reduce the potential for direct contact with remaining process equipment on-site are described later in this plan.

Laboratory analyses of soil samples from the drying pad area indicate concentrations of copper, chromium, and arsenic above background levels generally to depths of approximately 2 feet below the bottom of the slab and at least 3 feet in two areas. Ground-water analyses results from samples beneath the pad indicate concentrations generally below drinking water criteria. These results indicate that although the concrete surface covering the pad may preclude short-term exposures, the direct contact and inhalation exposure pathways may be important. The ground-water ingestion pathway appears insignificant here as long as infiltration through contaminated underlying soils is minimized. Sealing the surface of the pad is a measure being considered which would interfere with the direct contact and inhalation pathways.

Laboratory analyses results from borings in the truck loading pad indicate that the soil contamination extends to less than 2 feet deep in one end of the pad and greater than 2 feet deep in the other. Potential exposure from direct contact with or inhalation of the contaminated soils appears to be presently precluded by the presence of an overlying concrete pad, however, excavation of contaminated soils is being considered here as a long-term solution.

PROPOSED REMEDIAL ACTION PLAN

The proposed remedial action plan for the Elmira facility is comprised of several elements:

    o   Stormwater (surface water) management;
    o   Shallow ground-water removal and treatment;
    o   Soil removal in the truck loading pad area;
    o   Surface sealing the drying pad area;

- 3 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000023

-17-

    o   Monitoring; and
    o   Maintenance.

These elements are described below.

Stormwater Management

In previous winters, stormwater runoff generated on the adjacent
Railroad property to the west would flow onto the site, and cause
flooding of the pad and process areas. Similarly, direct rain-
fall on the drying pad area would flow into the process area and
contact residual contamination in the sumps; thus requiring pump-
ing and hauling or treatment of a large amount of stormwater.

To control this run-on and run-off problem, a stormwater manage-
ment plan has been formulated and is herein proposed. The plan
consists of:

    o   The construction of lined diversion ditches along the
        northwestern and southwestern edges of the property to
        divert incoming stormwater around the process and
        drying pad areas. The northwestern ditch (shown on
        Figure 1) would convey incoming stormwater northeast
        along the back edge of the property to a point ap-
        proximately 10 feet beyond the northern corner of
        the drying pad. A corrugated metal pipe culvert
        originating at this point would convey this water
        easterly across the site and outfall into the "A"
        Street ditch. The southwestern ditch would convey
        water along this property edge and outfall directly
        into the "A" Street ditch at the south corner of the
        process area. Both ditches and the culvert have been
        designed to convey water volumes up to those antici-
        pated for the 100-year storm. It is possible that
        during large storm events, however, the "A" Street
        ditch will be flooded and will prevent the discharge
        of the full flow from these conveyances. Due to this
        possibility, the ditches have been designed to over-
        flow onto the uncontaminated storage yards in the
        northeastern and southwestern portions of the site
        rather than spill over into the drying pad or process
        areas. Due to the low elevations of these storage
        yards, they will likely be flooded anyway to a certain
        extent from run-off from other areas. This precaution
        should result in protection of the sensitive areas of
        the site (the pad and process areas) and result in
        greater access and use of these areas in winter
        months.

    o   The routing of roof downspouts from the office build-
        ing directly into the back ditch. This will divert an
        additional amount of clean stormwater from collecting
        in the process area.

- 4 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000024

-18-

o   Roofing of the process area to prevent direct rainfall into this area and potential leakage into the "A" Street ditch.

<u>Ground-water Removal and Treatment</u>

To prevent subsequent off-site migration of contaminated shallow ground water and retrieve contaminated ground water which may have already moved off-site, a subsurface drainage system is proposed along the southeast edge of the process area and a portion of the drying pad (Figure 1).  The drain will consist of a 200 foot long, 15 foot deep, 18 inch wide trench with appropriately sized permeable backfill (Figure 2).  A recovery well will be located at the mid-point of the drainage trench.  The recovery well will consist of a 12 inch diameter well casing installed inside a 24 inch diameter borehole.  The recovery well will extend to a depth of approximately 20 feet.  The bottom 5 feet of well casing (below the trench) will be blank and the annulus around this section will be backfilled with a cement-bentonite grout.  The section of casing from approximately 3 feet below the ground surface to the bottom of the trench will consist of a perforated section as shown in Figure 2.  The well annulus adjacent to the perforated section will be backfilled with Caltrans Class 2 permeable filter material.  The annulus opposite the upper 3 feet will be backfilled with a cement bentonite seal.  A submersible pump will be installed within the well and fitted with PVC piping to deliver the withdrawn ground water to an on-site storage tank and subsequently to the treatment system.  Down-hole control switches will turn the pump on and off to maintain the desired ground-water elevation in the drainage trench.

Based upon preliminary calculations, a water level drawdown of approximately 5 feet will be adequate to prevent ground water in the upper 40 feet from crossing a vertical projection of the trench and will retrieve shallow ground water from at least 300 feet in the downgradient direction.  These calculations indicate that a flow of approximately 7 gallons/minute can be expected from this drawdown.

Treatment of collected ground water and surface water will be accomplished utilizing an ion exchange system with both cation and anion adsorber columns.  A composite water sample of the E-4, E-5 and E-6 wells was collected on August 29, 1983 and is currently being analyzed by the laboratory.  Resin bench test results will be available to the CRWQCB on September 19 in accordance with the schedule agreed upon on August 5, 1983.  The proposed design configuration (Figure 3) consists of a storage/flow equalization tank, a cartridge filter to remove inert solids, and cation and anion columns to remove dissolved copper, chromium, and arsenic.  After water has passed through these columns it will be discharged to either the "A" Street ditch or, if permission is obtained, to the City of Vacaville sanitary sewer system

- 5 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000025

-19-

(see separate letter to CRWQCB dated September 9, 1983). Effluent from the columns should meet California Drinking Water Standards for copper, chromium, and arsenic.

Based upon the assumed flow rates discussed above, a column diameter of 18 inches has been selected with column lengths (and bed depths) of 5 feet. Assuming average influent concentrations of 10 to 15 ppm for chromium, 0.5 ppm for arsenic, and 2 ppm for copper, resin change-out frequencies were calculated to prevent breakthrough. These calculations utilize textbook resin efficiency numbers which should be tested in the laboratory to select the appropriate resins and refine hese estimates. Based upon these calculations, the cation resin will need to be changed every 78 days and the anion resin changed every 21 days. Based upon the high capital and operating costs of on-site regeneration, the resins will be disposed of in accordance with applicable state and federal regulations.

## Soil Removal in the Truck Loading Pad Area

To prevent future exposure to presently covered, contaminated soils underlying the truck loading pad, approximately 2.5 feet of soil will be excavated and replaced with clean soil fill. The excavated soil will be disposed in a disposal site approved by the DOHS and CRWQCB. Excavation of this soil is proposed instead of sealing the surface of this pad because, unlike the drying pad:

   o   The truck loading pad is in the same area of the site where ground-water contamination was detected. It is not known whether the contaminated soil beneath the truck loading pad has contributed to this ground-water contamination.

   o   The ground surface around the truck loading pad is at a low enough elevation (67.9 feet) to make the pad area susceptible to potential flooding from high water in the "A" Street ditch.

## Concrete Drying Pad

The proposed sealing of the drying pad is intended to reduce potential human exposure to copper, arsenic and chromium in the drying pad area. Potential pathways of exposure include direct contact with soil beneath the slab or with the surface of the slab. Other pathways of exposure include breathing wind blown dust from the slab or underlying soil, or ingestion of underlying soil or runoff water from the surface of the slab.

Sealing the surface of the Drying Pad will mitigate potential direct contact, dust, and surface water migration of contaminants. It is recommended that the Drying Pad be covered with approximately a 4 inch thick layer of asphaltic concrete (A.C.)

- 6 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000026

-20-

paving. A textile fabric is recommended between the A.C. and the concrete slab to reduce the potential for cracking of the A.C. paving. A special mix of A.C. will be prepared to achieve the desired low permeability. Surface runoff from the sealed Drying Pad will then be diverted directly to the ditch at "A" Street. Continued inspection and maintenance will be performed to provide continued effectiveness of the A.C. surface seal.

Process Area

Potential pathways for human exposure to arsenic, copper, and chromium in the Process Area include: direct contact with concrete or equipment, or direct contact with surface runoff, and ingestion of groundwater from beneath the area. The proposed ground water removal and treatment system is intended to mitigate potential health risks from groundwater. Constructing a roofed structure over the Process Area will mitigate potential off-site migration of copper, arsenic, and chromium in runoff water by preventing rainfall from contacting contaminated surfaces. Presently rainfall collected in the sumps is removed by tank truck to an approved disposal site. Clean runoff from the new roof will be diverted to the ditch on "A" Street. A cyclone fence or siding on the proposed roof structure will be constructed around the process area to prevent direct contact with equipment on-site.

Monitoring Effectiveness

A.    Ground Water Removal and Treatment.

During initial operations it is estimated that the effluent from the ion-exchange water treatment system will need to be sampled and analysed for copper, arsenic, and chromium on a bi-weekly basis. As operational experience develops it is anticipated that effluent sampling and analysis may be reduced to bi-monthly or possibly monthly intervals.

Sampling and measurement of ground water elevations in groundwater monitoring wells and off-site domestic wells should initially be completed at monthly intervals to evaluate the effectiveness of the ground-water removal and treatment system. It is proposed that samples be taken from Wells E-4, E-5, E-6, E-15, E-16, DW-2, the Elmira School well and the Rhodes domestic water well. After evaluation of three months of data, the sampling frequency may be able to be reduced to every two months.

A minimum period of six months after initiation of pumping should be allowed to evaluate the groundwater removal and treatment system since this period of time will be required to develop the desired changes in gradient. Thereafter, the effectiveness of the ground-water removal and treatment system will be evaluated based upon decreasing levels of copper, arsenic, and chromium in

- 7 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000027

water from the monitoring wells.  When the levels of these compo-
nents are at or below the California Drinking Water Standard for
a period of six (6) consecutive months the ground-water removal
system can be discontinued.

B.     Stormwater Management and Sealing.

The effectiveness of the stormwater management and sealing will
be monitored by visual inspection no less frequently than the
sampling of the wells.  Upon discontinuance of the ground water
treatment and monitoring, such inspection, and appropriate
mainenance, will occur no less than quarterly.

Annual Maintenance

Annual maintenance of the surface water management system is an-
ticipated to be minimal.  The ditches and pipes should be cleaned
and inspected each fall and no less than monthly during the rainy
season.  For the Drying Pad the pavement should be inspected each
fall prior to the rainy season and any cracks should be sealed.

Maintenance of the ion-exchange system will require replacement
of the resins and disposal of the used resins.  Change out
frequencies for the resins will change over time as the influent
concentrations decrease.  Early operations will most likely re-
quire change out of the resins every three to twelve weeks.  As
the ground-water concentrations decrease the change out frequen-
cies will be reduced.  Very little maintenance is anticipated for
the submersible pump and ground-water removal system.

- 8 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000028

-22-

REFERENCES

Woodward-Clyde Consultants, 1983(a), consultants report entitled "Interim Phase I Report, Wickes Forest Industries Elmira, California," dated April 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(b), consultants report entitled "Response to Questions in Letter of July 8, 1983, Wickes Elmira Facility," dated July 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(c), consultants report entitled "Phase II Data Report, Wickes Forest Industries Facility, Elmira California," prepared for Wickes Forest Industries, Dinuba, California.

- 9 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000029



*C5a*

RECEIVED
SEP 2 9 1983
JEANNETTE M. ZACKER

September 29, 1983                           **Via Federal Express**

Regional Water Quality Control
  Board
Central Valley Region
3201 S Street
Sacramento, CA 95816

Attn:  Ms. Karen O'Haire

RE:    Proposed Remedial Action Plan/Wickes Forest Industries
       Facility/Elmire, California

Dear Ms. O'Haire:

The purpose of this letter is to provide additional information
to the California Regional Water Quality Control Board ("CRWQCB")
and the Department of Health Service ("DOHS") in regard to the
above referenced remedial action plan proposed on behalf of
Wickes Forest Industries on September 9, 1983, in accordance with
understandings reached in the course of telephone conferences
which occurred on September 27 and 28, 1983 between Larry Pearson
and Gary Varney of the CRWQCB, Gary Reents of DOHS, James Levine
of Levine-Fricke Engineering Consultants, Albert Ridley of
Woodard-Clyde Consultants, you, and myself.

As I stated in my letter to you of September 22, 1983 and reiter-
ated verbally on September 27, Wickes is ready to proceed with
the commencement of immediate construction activities pertaining
to the french drain and storm water diversion ditches outlined in
the remedial action plan as soon as I receive authorized written
approval on behalf of the CRWQCB and DOHS in regard to the
primary elements of the remedial action plan submitted on Septem-
ber 9, 1983.  Specifically, I request approval by CRWQCB and DOHS
of the following elements of our previously submitted remedial
action plan:  (i) storm water management, (ii) ground-water re-
moval and treatment, (iii) soil contamination containment and
control, and (iv) monitoring program.  Based on our prior conver-
sations, it is agreeable to Wickes if the approval by the CRWQCB
and DOHS of the foregoing elements of the remedial action plan is
conditioned upon the subsequent and mutually agreeable negotia-
tion of appropriate deed restrictions on the subject property,
implementation by Wickes of a financial assurance program which
would reasonably underwrite the ability of the company to comply
with the primary monetary obligations undertaken by it pursuant
to the proposed plan, and final refinement of the monitoring
process.

The following information is provided in response to the issues
raised by the CRWQCB and DOHS in the course of the telephone con-
ferences referenced above:

OFFICIAL FILE COPY
TOXIC SUBSTANCES CONTROL DIVISION
CENTRAL FILE UNIT

3340 Ocean Park Boulevard, Suite 2000  ●  P.O. Box 4058  ●  Santa Monica, California 90405  ●  (213) 452-0161

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000030

-24-

1.  **Possible effects of high ground-water encountering contaminated soils under the drying pad.**

    As previously stated, although the possibility that ground-water may contact shallow contaminated soils beneath the concrete drying pad cannot be ruled out entirely, we do not believe there is a significant basis to conclude there will be a resulting leaching or ground-water contamination problem. However, notwithstanding this, and in order to provide an engineering option in case this unlikely event does occur, Wickes intends to construct a seven foot deep subsurface drainage trench along the northeast edge of the drying pad. This trench will include a recovery well similar to that proposed for the southeast side of the property. The purpose of this trench will be to allow, if necessary, maintenance of the ground-water table below the elevation of contaminated soils underlying the concrete drying pad. Ground-water levels will be controlled by the use of electrodes placed at adjustable elevations in the recovery well. We are proposing to construct this trench as part of the remedial action plan previously submitted. This trench is proposed as a safeguard measure to be implemented only if a significant leaching problem is confirmed by monitoring of well E-4 or evidence of surface water contamination is detected in the "A" street ditch resulting from leaching under the pad.

2.  **Injection at the sump near well E-6**

    To aid in flushing residual contaminants from the sump area near well E-6, we are proposing injection of clean water into this area. This injection will commence when draw-down of the ground-water has been effected by the subdrain system. We would advise the CRWQCB and the DOHS in advance of the implementation of these measures.

3.  **Monitoring Program.**

    Wells E-17 and E-18 were not included in the proposed ground-water monitoring program as initially submitted. These wells were intended to be included in the monitorng program and we hereby amend the remedial action plan to include them in the previously submitted ground-water monitoring scheme.

- 2 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000031

4. <u>Financial Assurance Program for Future Operations, Maintenance, and Monitoring</u>

Wickes is pursuing the development of a financial assurance program either in the form of a performance or other type of bond or through the substantial prepayment of expenses and costs involved in the remedial action plan. Whichever route is followed, the primary intent of Wickes is to insure that adequate financial resources will exist endependently of our company to provide for successful implementation and maintenance of the remedial action plan.

5. <u>Proposal for Deed Restriction on Future Use and Sale of the Property.</u>

As previously discussed, we are in agreement with you on the need for the negotiation of appropriate deed restrictions affecting the future use and sale of the subject property. We are in conceptual agreement with the restrictions set forth in Article III of the draft Covenant and Agreement which accompanied your correspondence of September 19, 1983. We intend to negotiate in good faith with the DOHS and CRWQCB in regard to the specific terms and conditions of the covenants and restrictions which will be imposed on the Elmira property.

I trust the foregoing satisfactorily responds to your remaining questions concerning the remedial action plan as proposed by Wickes. If this is the case, please provide the above-mentioned written approval of the DOHS and CRWQCB as soon as possible.

Very truly yours,

Robert I. Tuch
Associate Counsel

RIT/sg

cc: Al Ridley
    Steve Dubuskey
    Jim Levine
    Jeannette Zacker

— 3 —

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000032

-26-

BEFORE THE
DEPARTMENT OF HEALTH SERVICES
STATE OF CALIFORNIA

```
In Re:                        )
Wickes Forest Industries      )          ·        ORDER
A Division of The Wickes      )                    AND
Corporation,                  )         .SCHEDULE OF COMPLIANCE
Elmira Facility               )
```

The attached Settlement Agreement and Schedule of Compliance is

hereby adopted by the Department of Health Services as an Order

and Schedule of Compliance pursuant to Health and Safety Code

Section 25187.

This Order shall become effective on ___2/26/84___ .

IT IS SO ORDERED on this 26th day of ___February___ .

_(Signature)_

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000033

BEFORE THE
DEPARTMENT OF HEALTH SERVICES
AND
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD,
CENTRAL VALLEY REGION
STATE OF CALIFORNIA

In Re:                              )
                                    )        SETTLEMENT AGREEMENT
Wickes Forest Industries,           )               AND
A Division of The Wickes            )        SCHEDULE OF COMPLIANCE
Corporation,                        )
Elmira Facility                     )
                                    )

I

The State Department of Health Services (Department) alleges that The Wickes Corporation (Wickes) has violated, and is in violation of, specific provisions of the Hazardous Waste Control Laws (Act) and regulations adopted thereunder, as set forth more fully in Paragraph VII as a result of its alleged disposal of hazardous waste at its facility in Elmira, California (Site).

II

The California Regional Water Quality Control Board, Central Valley Region, (Board) alleges that Wickes' waste discharges at the Site have violated the Porter-Cologne Water Quality Control Act and regulations and orders adopted thereunder. The Board issued Cleanup and Abatement Orders on June 6, 1982 and October 4, 1982 after finding that on-Site soils were contaminated (in part by a toxic spill on November 7, 1980) and are threatening surface and ground waters in Elmira. The Board alleges that Wickes is in violation of the October 4, 1982 Order.

III

The Settlement Agreement (Agreement) and Schedule of Compliance (Order) have been agreed to by Wickes, the Department and the Board to resolve the matters found and alleged in Paragraphs II and VII without civil litigation and to facilitate implementation of the measures described herein.

IV

Wickes, the Department and the Board admit and agree that the Department and the Board have jurisdiction over these matters and the parties.

V

This Agreement and Order apply to and are binding upon the parties, their successors and assigns.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000034

-28-

Wickes Forest Industries                                                -2-
Elmira Facility

VI

For the purposes of this Agreement and Order, Wickes agrees to waive any
right to a hearing prior to issuance of the Order or to the reimbursement agreed
to in Paragraph VIII of this Agreement. Wickes has denied all of the allegations
in Paragraphs I, II, and VII. Any payments or actions by Wickes pursuant to this
Agreement are not to be construed as an admission of guilt or liability. By means
of this Agreement the Department and the Board make no finding of fact or conclu-
sion of law that resolves issues of culpability or guilt on the part of Wickes.

VII

The Department alleges that Wickes has violated, or is in violation of, the
Act and regulations adopted thereunder for the following reasons:

1. Wickes has disposed of hazardous waste on-site without a permit or an
   Interim Status Document (ISD) for such disposal [Health and Safety Code,
   Sections 25142, 25154, 25189 and 25201 and Title 22, California Adminis-
   trative Code (22 CAC), Sections 66387 and 66490].

2. As a result of its disposal of hazardous wastes, Wickes has committed the
   additional following violations of regulations adopted pursuant to the
   Act:

   a. As a producer of hazardous waste, Wickes did not take steps to ensure
      that its waste was taken to a facility permitted by the Department
      (22 CAC, Section 66505).

   b. Wickes did not operate, design or equip the facility to prevent
      discharge of hazardous wastes and to prevent hazards to public
      health, personal safety and wildlife [22 CAC, Sections 66525(a) and
      66530(e)].

3. Wickes has not complied with closure requirements in Health and Safety
   Code, Section 25159.6 and 40 CFR 265.111 through 265.114.

4. Wickes has not complied with post-closure plan requirements in Health and
   Safety Code, Section 25159.6 and 40 CFR 265.118.

5. Wickes has not complied with financial assurance requirements in Health
   and Safety Code, Section 25159.6 and 40 CFR, Subpart H.

The Department is not aware of any fact regarding the Site which would
constitute additional violations of the Act or regulations adopted thereunder.

VIII

Wickes agrees to reimburse the Department $2,500 as full settlement for all
resources previously expended on this matter and to contribute $10,000 to the
Board's Cleanup and Abatement account. Payment will occur within sixty (60)
days after execution of this Agreement. Such payment shall in no event be
construed as a fine or penalty.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000035

Wickes Forest Industries                                                                     -3-
Elmira Facility

IX

Wickes has conducted sampling and analyses to define the extent of soil and surface and ground water contamination on and off the Site.  In a letter dated 9 September 1983, Wickes submitted a "Remedial Action Plan" (Plan):

1.  The Department and the Board approve the stormwater management, the ground water treatment and contaminated soils removal and containment elements of the Plan, as amended by Wickes' letter to the Board dated 29 September 1983 and any subsequent amendments agreed to in writing by the parties.

2.  Wickes shall implement the Plan and subsequent amendments agreed to in writing by the parties in compliance with the terms herein and shall complete corrective measures, other than the ground water treatment system, on-going treatment, maintenance and monitoring activities, within sixty (60) days from the date of this Agreement.  Wickes shall complete the ground water treatment system within ninety (90) days from the date of this Agreement.

3.  Wickes shall submit a Post-Closure Care Plan (PCCP) and a proposed financial assurance mechanism for post closure care to the Department for approval that meets the requirements of 40 CFR 265.118 within 60 days after the date of this agreement.  Wickes shall implement the approved PCCP in compliance with the terms therein.

4.  Wickes shall provide to the Department and the Board within thirty (30) days from the approval of the PCCP acceptable financial assurance documentation for post-closure care.

5.  Wickes shall propose deed restrictions for the Department's approval.  The restrictions shall limit the type and manner of future uses of the site and ensure the continued integrity of treatment and control facilities.  The proposed restrictions shall be submitted within 60 days of the date of this Agreement.

6.  Wickes shall record the approved deed restrictions within 30 days of the date of their approval.  The deed restrictions may be removed upon written agreement of the parties.

7.  Wickes shall comply with the Board's Monitoring and Reporting Program (MRP).  The attached MRP is approved by the Board.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000036

Wickes Forest Industries                                                                      -4-
Elmira Facility

## X

The goals of the Plan discussed in Paragraph IX are:

1. Elimination of human and animal contact with contaminated soils at the Site within 60 days of the date of this Agreement.

2. Elimination of the migration of contaminated ground water away from the Site within 270 days of the date of this Agreement.

3. Elimination of off-Site contamination in ground water in approximately 5 years.*

4. Elimination of on-Site contamination in ground water in 5 to 10 years.*

   * The goals are based on current drinking water standards. Stricter standards may require review and revision of the time estimates.

## XI

Whenever the remaining elements of the Plan are submitted to the Department and the Board pursuant to this Agreement and Order, the Department and the Board shall review them and either approve them or request modifications within 15 working days of their receipt. If the Department or Board requests modifications to Wickes' submission, Wickes shall respond thereto within 15 working days of the receipt of the request.

## XII

If, for any reason, Wickes is unable to perform any activity or submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Agreement and approved by the Department and Board, Wickes may request, in writing, an extension of the time specified. The extension request shall include a justification for the delay.

## XIII

If the Department and the Board reasonably determine that good cause exists for an extension, they will grant the request and specify in writing a new schedule. Wickes shall comply with the new schedule. No penalty shall be imposed or paid pursuant to Paragraph XIV for any time period included within an extension granted under this paragraph. Extensions may be granted retroactively. Wickes shall notify the Board or Department as soon as possible and in no event later than 24 hours of its knowledge of non-compliance.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000037

-31-

Wickes Forest Industries                                                          -5-
Elmira Facility

The Department and Board will find that good cause exists for an extension if the
delay is caused by factors totally beyond Wickes' reasonable control despite
Wickes' best efforts to comply.

XIV

In the event that Wickes fails to perform work on pad sealing, roof con-
struction, stormwater diversions, soil removal, french drain trench for the
treatment system, or ground water treatment system within the times specified in
the Order Wickes shall pay a civil penalty of $2,500 to the Department and a
contribution of $2,500 to the Board's Cleanup and Abatement account for each day
of non-compliance.  If Wickes fails to submit other documents or perform other
activities within the time specified in the Order Wickes shall pay civil penalties
of $250 to the Department and a contribution of $250 to the Board's Cleanup and
Abatement Account for each day of each item of non-compliance. The provisions of
this paragraph do not apply if Wickes establishes that the failure to comply with
a deadline is due solely to an Act of God.

The Department and the Board will allow additional days for performance of
work on pad sealing, stormwater diversions, soil removal, and the french drain
trenches if the following rainfall occurs.  For each day rainfall exceeds 0.20",
Wickes will be granted an extension of 1 day.  For each day rainfall equals or
exceeds 0.50", Wickes will be granted an extension of 1 additional day per each
0.50" increment of rain.  For example, if rainfall equals 3.00" on a given day,
Wickes shall be entitled to an extension of 7 days.  Rainfall measurements for the
site shall be those recorded by the United States Weather Service at the Vacaville
Station.

XV

If, through the discovery of new facts or otherwise, Wickes, the Department
or the Board believes corrective measures are inadequate or unnecessary to achieve
goals discussed in Paragraph X; or if the Department and Board do not approve
elements submitted pursuant to Paragraph IX or modifications submitted pursuant to
Paragraph XI; or do not approve removal of deed restrictions; the parties shall
seek agreement.  If agreement is not reached within 45 days, or if the Department
or Board believes that Wickes is not in compliance with this Agreement, any of the
parties may seek judicial relief.

In the case of any proposed changes in the MRP, the Board shall provide notice to
Wickes and the Department 30 days before amending it.  The MRP shall be amended
only by written agreement of the parties or by action of the Board at a Board
Meeting.

The Department may amend the PCCP to reflect changes in the MRP or changes in
applicable federal or state laws or regulations.  The Department will provide 30
days notice to Wickes and the Board before amending the PCCP.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000038

-32-

Wickes Forest Industries
Elmira Facility                                                         -6-

## XVI

In consideration of Wickes' performance under this Agreement, the Department and Board hereby convenant not to seek civil or criminal penalties, fines or similar sanctions against Wickes, its parent, subsidiary or affiliated companies on matters alleged in Paragraphs I, II, & VII.

## XVII

Except as specifically provided in Paragraph XVI, nothing in this Agreement or Order shall be construed to prevent or limit the Department or the Board, as part of any judicial relief pursuant to paragraph XV, from taking any additional action authorized by law in regard to those matters alleged in Paragraphs I, II and VII, including, but not limited to removal, remedial, or cost recovery actions pursuant to the Hazardous Substances Act, Health and Safety Code, Section 25300, et seq., or to the Porter-Cologne Water Quality Control Act.

## XVIII

In consideration of Wickes' performance under this agreement, the Board rescinds the Cleanup and Abatement Orders dated October 4, 1982 and June 6, 1982.

## XIX

Wherever notification or submission of documents are required under this Agreement, they shall be addressed to: Enforcement Coordinator, Toxic Substances Control Division, 714/744 P Street, Sacramento, CA 95816; Executive Officer, Regional Board, 3201 S Street, Sacramento, CA 95816 and to the General Counsel, Wickes Companies Inc. 3340 Ocean Park Boulevard, Santa Monica, California 90405. If these persons or addresses change, the affected party shall immediately notify the other parties.

## XX

Wickes, the Department and the Board hereby consent to this Agreement and the issuance of the Order by their duly authorized representative and stipulate that without the necessity of a hearing or findings of fact and conclusions of law the Director of the Department of Health Services or his duly authorized representative may enter an order binding on the parties in accordance with this Settlement Agreement and Order.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000039

-33-

Wickes Forest Industries
Elmira Facility                                                    -7-

2/26/84
_____                    _____
Date                                       Peter Rank
                                           Director
                                           Department of Health Services
                                           State of California

Feb 15, 1984
_____                    _____
DATE                                       William H. Crooks, Executive Officer
                                           California Regional Water
                                             Quality Control Board
                                           Central Valley Region

Feb 9, 1984
_____                    _____
DATE                                       VICE PRESIDENT
                                           The Wickes Corporation

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN000040

# EXHIBIT B

REMEDIAL ACTION CERTIFICATION FORM

1.   Site Name and Location:

Wickes Forest Industries
147 A Street
Solano County
Elmira, California 95625

A.   List any other names that have been used to identify
     sites: Pacific Wood Preserving, Wickes Companies Inc.

B.   Address of site if different from above:

C.   Assessor's Parcel Numbers: 142-01-13 and 14

2.   Responsible Parties:

Collins & Aikman Products Co.
701 McCullough Drive
P. O. Box 32665
Charlotte, North Carolina, 28232
(707) 548-2091
Attn: John B. Orgain, IV

Relationship to site:

     Collins & Aikman Products Co. purchased the Wickes Forest
Industries company which was the owner of the site.

3.   Brief Description and History of the Site:

     Pacific Wood Preserving operated the wood treatment
site until September 1979, when Wickes purchased the Site.
Wickes operated the site until August 1982.   During the
operation period lumber was treated with preservative
solutions containing arsenic, chromium, and copper.
Investigations have shown that the Site soils have been
contaminated by these inorganic metals.  Groundwater beneath
the Site and beneath adjacent properties has also been
affected by chromium.  Two Remedial Actions Plans (RAPs) have
been completed to address the contamination.  The September 9,
1983, RAP was prepared for the soil contamination, storm water
control, and groundwater treatment in the southern portion of
the Site, and the soil contamination in the northern portion
was addressed in the February 25, 1994 RAP.  The RAPs identify
that contaminated soils in the northern and southern areas
shall be remediated by asphalt capping; storm water to be

1

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002281

-36-

°TATE OF CALIFORNIA — ENVIRONMENTAL PROTECTION AGENCY         PETE WILSON, *Governor*

# DEPARTMENT OF TOXIC SUBSTANCES CONTROL
°0151 CROYDON WAY, SUITE 3
ACRAMENTO, CA 95827-2106



(916) 255-3545

March 12, 1996

Mr. James D. Moore III
Environmental Manager
Collins & Aikman Products Co.
P.O. Box 32665
Charlotte, North Carolina 28232

WICKES FOREST INDUSTRIES, ELMIRA CALIFORNIA, SOLANO COUNTY: SITE
CERTIFICATION

Dear Mr. Moore:

      Enclosed is a copy of the signed final Operation and
Maintenance Agreement (OMA) for the Wickes Forest Industries site
in Elmira, California.  The OMA incorporates the language that
was agreed upon through negotiations between DTSC and the Collins
& Aikman Products Co (CAPCo).  With the approval of the October
16, 1995, Operation and Maintenance Manual (OMM) and the signing
of the OMA, DTSC hereby certifies implementation of the final
remedial actions at the Wickes Site.  Be advised that, in
addition to the implementation of the OMM, the OMA contains
paragraphs which specify compliance conditions.  It is CAPCo's
responsibility to insure that these conditions are met.

      DTSC has also completed a review of the March 4, 1996,
transmittal of the sheet for Wickes.  The fact sheet was prepared
by Levine * Fricke on behalf of CAPCo and it is intended to
present a description of the remedial actions conducted at the
site as well as the activities to be conducted as part of ongoing
operation and maintenance.  By this letter DTSC approves the fact
sheet.  It shall be distributed to the recipients identified on
the Wickes mailing list mail and the DTSC mandatory mailing list
within 15 days of the date of this letter.  Attached is the
latest copy of DTSC,s mandatory mailing list.

      If you have any questions or comments please contact Timothy
Patenaude at (916) 255-3580.

Sincerely,

James L. Tjosvold, P.E.
Branch Chief
Central California Cleanup
    Operations Branch

Enclosure

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002277

cc:  John B. Orgain, Esq.
     Senior Counsel
     Collins & Aikman Corporation
     P.O. Box 32665
     Charlotte, North Carolina 28232

     Mr. Frank Lorincz
     Levine-Fricke
     1900 Powell Street, 12th Floor
     Emeryville, California 94608

     Mr. Lawrence Pearson, P.E.
     Supervising Engineer
     Regional Water Quality Control Board
     Central Valley Region
     3443 Routier Road
     Sacramento, California 95827

     Greg Mackin
     Collins & Aikman Corporation
     P.O. Box 32665
     Charlotte, North Carolina 28232

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002278

REGION 1
MANDATORY MAILING LIST
8-17-95

SIERRA CLUB
LIZ ALLEN
394 BLAISDELL
CLAREMONT   CA 91711

TOXICS ASSESSMENT GROUP
JODY SPARKS
P O BOX 73620
DAVIS   CA 95617

CA COUNCIL FOR ENVIRONMENT AND
   ECONOMIC BALANCE
LISA BICKER
100 SPEAR STREET   SUITE 805
SAN FRANCISCO   CA 94105

CA DEPT TOXICS
MARCIA MURPHY   CHIEF
PUBLIC PARTICIPATION
P O BOX 806
SACRAMENTO   CA 95812-0806

CA DEPT TOXICS
JESSE R. HUFF DIRECTOR
P O BOX 806
SACRAMENTO   CA 95812-0806

CA DEPT TOXICS-REGION 1
I   BAKER
EXTERNAL AFFAIRS LIAISON
10151 CROYDON WAY   SUITE 3
SACRAMENTO   CA 95827

CITIZENS FOR A BETTER ENVIRONMENT
MIKE BELLIVEAU
501 SECOND STREET   SUITE 305
SAN FRANCISCO   CA 94107

ENVIRONMENTAL HEALTH COALITION
DIANE TAKVORIAN
1717 KETTNER   SUITE 100
SAN DIEGO   CA 92101

GREENPEACE
BRADLEY ANGEL
568 HOWARD STREET   3RD FLOOR
SAN FRANCISCO   CA 94105-3008

CA DEPT TOXICS-REGION 1
LARRY WOODSON
PUBLIC PARTICIPATION SUPERVISOR
10151 CROYDON WAY   SUITE 3
SACRAMENTO   CA 95827

CENTER FOR COMMUNITY ACTION
 AND ENVIRONMENTAL JUSTICE
PENNY NEWMAN
P O BOX 33124
RIVERSIDE   CA 92519

LEAGUE OF WOMEN VOTERS
ANN COOMBS
5□1 GUADALUPE DRIVE
L   ALTOS   CA 94022

CALPIRG
MARY RAFTERY
LEGISLATIVE ADVOCATE
926 J STREET   SUITE 713
SACRAMENTO   CA 95814

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002279

ENVIRONMENTAL DEFENSE FUND
DAVID ROE
ROCKRIDGE MARKET MALL
5655 COLLEGE AVENUE
OAKLAND   CA 94618

US EPA - REGION IX
GWENDOLYN ENG
REGIONAL REPRESENTATIVE
75 HAWTHORNE STREET
SAN FRANCISCO   CA 94105

DEPT OF TOXIC SUBSTANCES CONTROL
PUBLIC PARTICIPATION OFFICE
SITE FILE
10151 CROYDON WAY   SUITE 3
SACRAMENTO   CA 95827
ATTN:  SUSIE FLOWERS

CA DEPT TOXICS
PAUL BLAIS
SITE MITIGATION
P O BOX 806
SACRAMENTO   CA 95812-0806

MORRISON KNUDSEN CORPORATION
JOHN BORS
180 HOWARD STREET
SAN FRANCISCO   CA 94105

WASTE MANAGEMENT OF NORTH AMERICA
GOVERNMENT AFFAIRS
CHUCK WHITE
915 L STREET   SUITE 1430
SACRAMENTO   CA 95814

SIERRA CLUB
BONNIE HOLMES
C / JOHN WHITE ASSOCIATES
1100 11TH STREET   SUITE 311
SACRAMENTO   CA 95814

DESERT CITIZENS AGAINST POLLUTION
STORMY WILLIAMS
3813 50TH STREET   WEST
ROSAMOND   CA 93560

PLANNING AND CONSERVATION LEAGUE
GARY PATTON
926 J STREET   SUITE 612
SACRAMENTO   CA 95814

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002280

captured and routed off-site; and affected groundwater to be extracted and treated with an on-site electrochemical co-precipitation treatment system. The RAPs also set forth the chemicals to be remediated, remediation levels, requirements for monitoring capture zones, and reporting requirements.

4. **Type of Site:**

| | | | |
|---|---|---|---|
| RCRA-Permitted Facility | _____ | Bond-funded | _____ |
| RCRA Facility Closure | _____ | RP-funded | __X__ |
| Federal Facility | _____ | NPL | _____ |

Other:

Explain Briefly:

5. **Size of Site:**

Small _____   Medium _____   Large __X__   Extra Large _____

6. **Dates of Remedial Action**

- Ground Water Extraction and Treatment – December 1983.
- Soil removal, asphalt cap and expanded groundwater extraction and treatment – October 1994.

7. **Response Action Taken on Site:**

_____ Initial Removal or Remedial Action (site inspection/ sampling)
__X__ Final Remedial Action
_____ RCRA enforcement/closure action
_____ No action, further investigation verified that no cleanup action at site was needed.

A. Type of Remedial Action:

- Soil excavation and off-site disposal.
- Asphalt cap.
- Ground water extraction and treatment in an on-site chemical treatment plant.
- Deed Restriction.

B. Estimated quantity of waste associated with the site:

| | | | |
|---|---|---|---|
| 1. | __X__ removed soil | Amount: | 3,040 Cu Yrds |
| 2. | __X__ untreated (capped sites) | Amount: | 4.3 acres |
| 3. | __X__ treated ground water | Amount: | 45,000,000 gallons to date |

2

DTSC, et al. v. Jim Dobbas, Inc., et al.

ADMIN002282

8.  **Cleanup Levels/Standards**

    A.  **What were the cleanup standards established by DTSC/EPA pursuant to the final RAP or workplan (if cleanup occurred as the result of a removal action (RA) or interim remedial measures (IRM) prior to development of a RAP)?**

        50 part per billion total chromium in groundwater

    B.  **Were the specified cleanup standards met? Yes____ No X**

    C.  **If "no", why not:**

        Ground water is continuing to be extracted and treated pursuant to an operation and maintenance agreement.

9.  **DTSC Involvement in the Remedial Action:**

    A.  **Did DTSC order the Remedial Action?**

        Yes __X__ No _____

        Date of order: 02/26/84

    B.  **Did DTSC/EPA review and approve:**

        __X__ Sampling Analysis Procedures  Date: 02/25/94

        __X__ Health & Safety Protections  Date: 02/25/94

        __X__ Removal/Disposal Procedures  Date: 02/25/94

        __X__ Remedial Action Plan  Date: 02/25/94

    C.  **If site was abated by a responsible party, did DTSC receive a signed statement from a licensed professional on all Remedial Action?**

        Yes X No___  Dates (from) 10/30/84 (to) 06/30/95

    D.  **Did a registered engineer or geologist verify that acceptable engineering practices were implemented?**

        Yes X No___  Name: Mark Knox

        Date of verification: 12/13/94

    E.  **Did DTSC confirm completion of all Remedial Action?**

        Yes___ No X Date of verification: 03/16/95

3

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002283

F.   Did DTSC actually perform the Remedial Action?

Yes___ No_X_ Name of Contractor:

G.   Was there a community relations plan in place?

Yes_X_ No___

H.   Was a remedial action plan developed for this site?

Yes_X_ No___

I.   Did DTSC/USEPA hold a public meeting regarding the draft RAP?

Yes_X_ No___

J.   Were public comments address?  Yes_X_ No____

Date of. DTSC/USEPA analysis and response: 02/25/94

K.   Are all of the facts cited above adequately documented in DTSC files?  Yes_X_ No___

If no, identify areas where documentation is lacking:

10.  <u>EPA Involvement in the Remedial Action:</u>

A.   Was the EPA involved in the site cleanup?  Yes___  No_X_

If yes, did EPA concur with all remedial actions?

Yes___ No___

B.   EPA comments:

C.   EPA staff involved in cleanup:

11.  <u>Other Regulatory Agency Involvement in the Cleanup Action:</u>

Agency:          Activity:

_X_ RWQCB    <u>Waste Discharge Requirements. NPDES_____</u>

_____ ARB    _____

_____ CHP    _____

_____ Caltrans _____

_____. Other  _____

Name of contact persons and agency: RWQCB - Issac  Kiang

4

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002284

-43-

12. <u>Post-Closure Activities:</u>

    A.   Will there be post-closure activities at this site?

       Yes__X__ No_____

       If yes, describe:

           Pursuant to an operation and maintenance agreement, the Collins & Aikman Products Co. will continue to extract, treat, sample and analyze ground water from the site. There are also operation, maintenance, sample and analysis procedures associated with the on-site chemical treatment system and asphalt cap which are described in the June 20, 1995, Operation and Maintenance Plan.

    B.   Have post-closure plans been prepared and approved by the DTSC/USEPA? Yes__X__ No_____

    C.   What is the estimated duration of post-closure activities? 10 years.

    D.   Are deed restrictions proposed or in place? Yes__X__ No___

       If yes, have deed restrictions been recorded with the County Recorder? Yes__X__ No___ Date: 10/27/95

       If no, who is responsible for assuring that the deed restrictions are recorded?

       Who is the Division contact?

    E.   Has cost recovery been initiated? Yes__X__ No_____

       If yes, amount received: $43,731.83

    F.   Were local planning agencies notified of the cleanup action? Yes_____ No__X__

       If yes, the name and address of agency:

13. <u>Expenditure of Funds and Source:</u>

| _____HWCA | $_____ | _____HSA | $_____ |
|---|---|---|---|
| _____HSCF | $_____ | _____RCRA | $_____ |
| __X__RP | $5,500,000 Aprox | _____Other | $_____ |
| _____Federal Cooperative Agreement $_____ | | | |

5

DTSC, et al. v. Jim Dobbas, Inc., et al.

ADMIN002285

14. <u>Certification Statement:</u>  Based upon the information which is currently and actually known to DTSC,

_____ DTSC has determined that all appropriate response actions have been completed, that all acceptable engineering practices were implemented and that no further removal/remedial action is necessary.

_____ DTSC has determined, based upon a remedial investigation or site characterization that the site poses no significant threat to public health, welfare or the environment and therefore implementation of removal/remedial measures is not necessary.

__X__ DTSC has determined that all appropriate removal/remedial actions have been completed and that all acceptable engineering practices were implemented; however, the site requires ongoing operation and maintenance (O&M) and monitoring efforts.  The site will be deleted from the "active" site list following (1) a trial operation and maintenance period and (2) execution of a formal written settlement between DTSC and the responsible parties, if appropriate.  However, the site will be placed on DTSC's list of sites undergoing O&M to ensure proper monitoring of long-term clean-up efforts.

15. <u>Additional Comments:</u>

Chromium sludge generated from the treatment of ground water is disposed in an off-site permitted disposal facility. Treated ground water is used to recharge the aquifer by means of existing drainage ditches.

16. <u>Certification of Remedial Action:</u>

I hereby certify that the foregoing information is true and correct to the best of my knowledge.

1. _____       3/6/96
                    Project Manager                Date

2. _____       3/6/96
                    Unit Chief                     Date

3. _____       3/7/96
                    Branch Chief                   Date

6

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002286

### SITE CERTIFICATION SYNOPSIS

NAME AND LOCATION OF SITE:

    Wickes Forest Industries
    147 A Street
    Solano County
    Elmira, California 95625

DATE PROJECT BEGAN: February 1983

DATE PROJECT CERTIFIED: March 1996

DESCRIPTION OF THE SITE AND CONTAMINANTS:

    During the 1970's the site was used as a wood treatment facility. Lumber was treated with preserving solutions containing arsenic, chromium, and copper. Preserving fluid spills and dribble from treated lumber contaminated the soils at the site with these metals. Chromium has migrated through the soils and contaminated the ground water beneath the site and beneath the adjacent properties.

DESCRIPTION OF REMOVALS AND REMEDIAL ACTIONS:

    Soils with concentrations of metals that exceeded the hazardous waste threshold were excavated and disposed at a permitted off-site disposal facility (89 cubic yards). An asphalt cap was constructed on the site to prevent direct exposure to metals in concentrations above background (25,150 square yards). A ground water extraction and treatment system was constructed to remediate chromium ground water contamination (15 gallons per minute average flow).

DESCRIPTION OF PROBLEMS ENCOUNTERED WHICH CAUSE MAJOR DELAYS:

    For the purpose of investigation, the site was divide into two operable units, wood treatment unit (south) and the wood storage unit (north). During the remedial investigation, preliminary sampling data indicated that the northern portion of the site was not contaminated. A remedial action plan was prepared and implemented for the southern portion of the site. Subsequent confirmation sampling identified additional soil contamination in the northern portion. Consequently, a second remedial action plan, design, and implementation had to be conducted.

DTSC, et al. v. Jim Dobbas, Inc., et al.
ADMIN002287

## DESCRIPTION OF ACCOMPLISHMENTS UNIQUE TO THIS PROJECT:

To date, approximately 45 millions gallons of ground water has been extract and treated to below clean up goals. Sludge from the treatment process is disposed at an off-site disposal facility. Treated ground water recharges the existing aquifer by means of an existing drainage ditch. A storm water management system has been constructed to divert collected rain water away from the asphalt cap.

## FINAL USE OF SITE:

The site is currently fenced and is vacant. However, the responsible party is conducting research into potential use of the site as a railroad equipment or highway maintenance equipment storage facility.

DTSC, et al. v. Jim Dobbas, Inc., et al.

ADMIN002288

# CERTIFICATE OF SERVICE

Case Name: ***California Department of Toxic Substances Control, et al. v. Jim Dobbas, Inc. et al***

Case No.:   **2:14-cv-00595-WBS-EFB**

    I certify that on October 2, 2014, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF LESTER O. BROWN IN SUPPORT OF MOTION FOR LEAVE TO FILE COUNTERCLAIM

    Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

    I am a partner of the law firm of Perkins Coie, LLP, a member of the California State Bar, and admitted in this district.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at Perkins Coie LLP for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at Perkins Coie LLP is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

    I further certify that some of the participants in the case are not registered CM/ECF users.  On October 2, 2014, I have caused to be mailed in Perkins Coie LLP's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

    David Van Over
    216 F Street, #108
    Davis, CA  95616

    I declare under penalty of perjury that the foregoing is true and correct. Executed on October 2, 2014, at Los Angeles, California

    _____          _____/s/ Lester O. Brown_____
          Lester O. Brown                                    Signature
             Declarant