Exhibit A

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  SARAH E. MORRISON, State Bar No. 143459
   Supervising Deputy Attorney General
3  THOMAS G. HELLER (Counsel for service)
   State Bar No. 162561
4  DENNIS L. BECK, JR., State Bar No. 179492
   Deputy Attorneys General
5    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013
6  Telephone:  (213) 897-2628
   Fax:  (213) 897-2802
7  E-mail:  Thomas.Heller@doj.ca.gov
8  *Attorneys for the California Department of Toxic*
   *Substances Control and the Toxic Substances*
9  *Control Account*

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                   SACRAMENTO DIVISION

14

15

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,** | Case No. |
| | **FIRST AMENDED COMPLAINT FOR RECOVERY OF RESPONSE COSTS; DECLARATORY RELIEF; INJUNCTIVE RELIEF; TREBLE DAMAGES; AND CIVIL PENALTIES** |
| Plaintiffs, | |
| v. | |
| | **(Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a) and 9613(g)(2), and supplemental state law claims)** |
| **JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; WEST COAST WOOD PRESERVING, LLC, a Nevada limited liability company, and COLLINS & AIKMAN PRODUCTS, LLC, a Delaware limited liability company,** | |
| Defendants. | |

1

Plaintiffs, the California Department of Toxic Substances Control ("Department") and the Toxic Substances Control Account (together "Plaintiffs"), allege as follows:

## JURISDICTION

1.   This Court has jurisdiction under 28 U.S.C. sections 1331 and 1367, and under section 113(b) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. section 9613(b).

## VENUE

2.   Venue is proper in this district under 42 U.S.C. section 9613(b) and 28 U.S.C. section 1391(b), because the releases and threatened releases of hazardous substances into the environment that are at issue occurred in this judicial district.

## INTRA-DISTRICT ASSIGNMENT

3.   Under Local Rule 120(d), Plaintiffs are filing this action in the Sacramento Division of the Eastern District because it arose in Solano County.

## STATEMENT OF THE ACTION

4.   Plaintiffs make a claim against Defendants under section 107(a) of CERCLA, 42 U.S.C. section 9607(a), for the recovery of response costs and interest on such response costs that Plaintiffs have incurred in connection with releases and threatened releases of hazardous substances, including arsenic, chromium, and copper, at, beneath, and/or from the approximately 7.5 acre property located northwest of the intersection of A Street and Holdener Road in the community of Elmira, Solano County, California.  The property has a street address of 147 A Street, Elmira, California 95625, and is identified by Solano County Assessor's Parcel Number(s) 142-010-130, 142-010-140, and 142-042-010.  The property, and the areal extent of the hazardous substances contamination that is, or has been, present at or has extended from the property, are referred to herein as "the Site."

5.   Plaintiffs further make a claim for declaratory relief, under 28 U.S.C. section 2201 and section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), for a declaratory judgment that each of the Defendants is jointly and severally liable to Plaintiffs  for future response costs

FIRST AMENDED COMPLAINT

1    incurred by the Plaintiffs in responding to releases and threatened releases of hazardous

2    substances at, beneath, and/or from the Site.

3         6.    Plaintiffs also seek injunctive relief, treble damages, and civil penalties against

4    certain Defendants pursuant to a supplemental state law claim under Chapter 6.8 of Division 20

5    of the California Health and Safety Code, for the Defendants' failure to comply with an Imminent

6    or Substantial Endangerment Determination Order and Remedial Action Order that the

7    Department issued to those Defendants, concerning the releases and threatened releases of

8    hazardous substances referenced above.

9                                    **PLAINTIFFS**

10        7.    The Department is a public agency of the State of California, organized and existing

11   under California Health and Safety Code section 58000 et seq.  The Department is responsible

12   under state law for determining whether there has been a release and/or threatened release of a

13   hazardous substance into the environment and for responding to releases and/or threatened

14   releases of a hazardous substance into the environment.

15        8.    The Toxic Substances Control Account is an account within the State of California

16   General Fund.  California Health and Safety Code section 25173.6 establishes the account, and

17   the director of the Department administers it.  Under California Health and Safety Code section

18   25361(a), the account shall be a party in any action for recovery of response costs or expenditures

19   incurred from the account under Chapter 6.8 of Division 20 of the California Health and Safety

20   Code.

21                                    **DEFENDANTS**

22        9.    Defendant Jim Dobbas, Inc. ("Dobbas") is a California corporation, with its principal

23   place of business in Placer County, California.  It owned an undivided fifty percent interest in the

24   Site from on or about March 20, 1997 to on or about February 11, 2011, and conducted business

25   operations there during all or part of that time.

26        10.   Defendant Continental Rail, Inc. ("CRI") is a Delaware corporation.  Under Delaware

27   Code, title 8, section 510, its charter is presently void, and all powers conferred by Delaware law

28   on the corporation are presently inoperative.  It owned an undivided fifty percent interest in the

                                         3

1   Site from on or about March 20, 1997 to on or about February 11, 2011, and conducted business

2   operations there during all or part of that time.

3       11.  Defendant David van Over ("Van Over") is a citizen of California residing in Solano

4   County, California.  He currently owns and operates the Site.

5       12.  Defendant Pacific Wood Preserving ("PWP") is a dissolved California corporation.  It

6   conducted business operations at the Site from about 1972 to on or about September 12, 1979,

7   and owned it from 1977 to on or about September 12, 1979.

8       13.  Defendant West Coast Wood Preserving, LLC ("West Coast Wood") is a Nevada

9   limited liability company, with its principal place of business in Kern County, California.  It is a

10  successor to Defendant PWP, as evidenced by the following facts:

11         &bull;    PWP was incorporated in 1972.

12         &bull;    The sole or primary shareholder of PWP was non-party Richard F. Jackson

13             (deceased March 2012).

14         &bull;    Mr. Jackson elected to wind up and dissolve PWP on or about December 30,

15             1979.

16         &bull;    Before PWP's dissolution, Mr. Jackson caused the formation of what is now

17             West Coast Wood Preserving, LLC, which was originally organized as Pacific

18             Wood Preserving of Bakersfield Inc. ("PWP-Bakersfield"), in October 1978.

19         &bull;    On information and belief, Mr. Jackson was the sole or primary shareholder of

20             PWP-Bakersfield until his death in March 2012, just as he was the sole or

21             primary shareholder of PWP.

22         &bull;    Mr. Jackson was a director of both PWP and PWP-Bakersfield.

23         &bull;    Mr. Jackson was the President of PWP during most of all of its corporate

24             existence, and was also the President of PWP-Bakersfield from at least

25             September 1980 until his death.

26         &bull;    In 1979, PWP-Bakersfield (now West Coast Wood) started business operations

27             on  property that PWP owned in Bakersfield, California, and has operated at

28             that location through the present.

4

- Since 1979, PWP-Bakersfield (now West Coast Wood) has engaged in substantially the same wood preserving business at a facility in Bakersfield, California as PWP conducted at the Site in Elmira, California until 1979.
- PWP conveyed its Bakersfield, California property directly to PWP-Bakersfield in September 1981 for unknown consideration.
- PWP's transfer of its Bakersfield, California property to PWP-Bakersfield occurred almost two years *after* PWP certified that it had dissolved.
- PWP-Bakersfield (now West Coast Wood), which incorporated in October 1978, has stated in company brochures and elsewhere that it has operated since 1972, the year of PWP's incorporation.
- PWP-Bakersfield (West Coast Wood) has stated on its website that the proceeds from PWP's sale of the assets of its facility in Elmira, California were used to start the PWP-Bakersfield facility in Bakersfield, California.
- On or about November 19, 2013, PWP-Bakersfield filed Articles of Conversion with the Nevada Secretary of State that provided for the conversion of PWP-Bakersfield to West Coast Wood.
- The Articles of Conversion attached a plan of conversion stating that all debts, liabilities, and obligations of PWP-Bakersfield "shall be assumed and continue as debts, liabilities, and obligations" of West Coast Wood.

14.  Defendant Collins & Aikman Products, LLC (C&A Products LLC) is a Delaware limited liability company.  A Certificate of Cancellation for Defendant C&A Products LLC was filed with the Delaware Secretary of State on or about August 28, 2013.  On November 13, 2014, Plaintiffs petitioned the Delaware Court of Chancery for appointment of a receiver for the company under 6 Delaware Code § 18-805.  Plaintiffs will file this First Amended Complaint following the Delaware Court of Chancery's grant of relief on that petition.

15.  According to records of the Delaware Secretary of State, Defendant C&A Products LLC was formed on or about December 6, 2007, as a conversion of the Delaware corporation Collins & Aikman Products Co.  Collins & Aikman Products Co. was the successor by merger to

5

1   the Delaware corporation Collins & Aikman Group, Inc.  Collins & Aikman Group, Inc. was

2   formerly known as Wickes Companies, Inc., and before that, The Wickes Corporation

3   (hereinafter Wickes).

4       16.  On or about September 12, 1979, Wickes purchased the Site, and conducted business

5   operations at the Site until approximately 1982.  Wickes and its successor Collins & Aikman

6   Products Co. (which is now Defendant C&A Products LLC) also continued to own the Site until

7   on or about March 20, 1997.

8                     **GENERAL ALLEGATIONS**

9       17.  Defendant PWP conducted wood preserving operations at the Site from

10   approximately 1972 through on or about September 12, 1979.

11       18.  From on or about September 12, 1979 through approximately 1982, Wickes

12   conducted wood preserving operations at the Site.

13       19.  At various times since 1972, hazardous substances within the definition of section

14   101(14) of CERCLA, 42 U.S.C. section 9601(14), were released into the environment at and from

15   the Site within the meaning of section 101(22) of CERCLA, 42 U.S.C. section 9601(22).  These

16   hazardous substances included arsenic, chromium, and copper, which were constituents of wood

17   preserving chemicals used at the Site.

18       20.  From the 1980's through 2005, Wickes and its successor Collins & Aikman Products

19   Co. took various actions under oversight of the Department and its predecessor agency to address

20   environmental contamination at, around, and/or beneath the Site.  Those actions included, among

21   other things, soil excavation, installing an asphalt cap over contaminated soils, constructing a

22   building and a drainage system over another contaminated area of the Site, installing and

23   operating a groundwater extraction and treatment system, and groundwater monitoring.

24       21.  On or about October 27, 1995, the Department and Collins & Aikman Products Co.

25   recorded a Covenant to Restrict Use of Property ("Land Use Covenant") concerning the Site

26   under California Health and Safety Code sections 25355.5 and 25356.1 that restricted the

27   permissible uses of the Site based on environmental conditions there.  A copy of the Land Use

28   Covenant is attached as Exhibit A and incorporated by this reference.

1    22.  On or about March 20, 1997, Collins & Aikman Products Co. sold the Site to

2    Defendants Dobbas and CRI, while continuing to take actions to address environmental

3    contamination at, around, and/or beneath the Site.

4    23.  On or about May 17, 2005, Collins & Aikman Products Co. filed a Chapter 11

5    petition in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 05-

6    55932.  That bankruptcy case was jointly administered with the bankruptcy cases of numerous

7    other debtors under Case No. 05-55927.

8    24.  In  July or August 2005, while in Chapter 11 bankruptcy proceedings, Collins &

9    Aikman Products Co. stopped operating the groundwater extraction and treatment system, and

10   stopped taking other action to address contamination at, around, and/or beneath the Site.  The

11   Department was verbally notified that Collins & Aikman Products Co. had stopped operating the

12   groundwater extraction and treatment system in early November 2005.

13   25.  In 2006, the Department requested that Defendants Dobbas and CRI, the then-owners

14   and operators of the Site, resume such actions to address contamination.

15   26.  In July 2007, the bankruptcy court for Collins & Aikman Products Co. preserved the

16   Department's ability to sue Collins & Aikman Products Co. in state or federal court in the future,

17   and obtain a judgment against the company to allow the Department to pursue a direct action

18   against the company's past insurers concerning the Site.  Copies of the stipulation containing

19   these terms, and the bankruptcy court's order approving it, are attached as Exhibits B and C,

20   respectively.  The bankruptcy court ordered that the automatic stay and injunction under the

21   confirmed plan of reorganization for Collins & Aikman Products Co. and other debtors be

22   modified to permit the Department to prosecute legal or administrative actions against the debtors

23   with respect to the Site, up to and including the entry of judgment against the debtors, provided

24   that no such judgment may be collected against the debtors, the trusts created under the confirmed

25   plan, and each of their respective officers, directors, employees, agents and attorneys.

26   Furthermore, the bankruptcy court ordered that the Department may file actions to establish

27   liability and to seek recovery of debtors' insurance proceeds in any non-bankruptcy forums,

28   whether administrative, or in state or federal court, including in California, and none of the

7

1    debtors could object on the ground that such action is barred by the bankruptcy.  Ex. B at 6-8, ¶¶

2    6-11; Ex. C at 60, ¶ 114.

3        27.  In December 2007, Defendant Dobbas agreed to perform certain actions at the Site,

4    which included limited maintenance of the asphalt cap and repair of a roof drainage system for a

5    building over an area that was a source of contamination at the Site.  However, Defendants

6    Dobbas and CRI failed and refused to perform most of the actions formerly conducted by C&A

7    Products to address contamination at, around, and/or beneath the Site.

8        28.  On or about October 16, 2008, CRI filed a Chapter 7 petition in the United States

9    Bankruptcy Court for the Eastern District of California (Sacramento), Case No. 08-34986 (closed

10   December 7, 2010).

11       29.  In July 2010, the Department finalized a Removal Action Workplan for the Site that

12   called for contaminated soil excavation, off-site disposal, backfilling, confirmation sampling,

13   demolition of the groundwater extraction and treatment system, and long-term groundwater

14   monitoring.

15       30.  On or about February 11, 2011, Defendants Dobbas and CRI sold the Site to

16   Defendant Van Over for $2.00.

17       31.  On March 16, 2011, the Department issued an Imminent or Substantial Endangerment

18   Determination Order and Remedial Action Order ("I/SE Order") ordering Defendants Dobbas,

19   CRI, and Van Over to conduct the actions described in the Removal Action Workplan, and to

20   take other response actions.  A copy of the I/SE Order is attached as Exhibit D and incorporated

21   by this reference.

22       32.  Defendants Dobbas, CRI, and Van Over failed to complete the actions described in

23   the Removal Action Workplan, and to take other response actions described in the I/SE Order.

24       33.  Based on the above, from November 2005 to the present, the Department has taken

25   "response" actions of the Site, as that term is defined in section 101(25) of CERCLA, 42 U.S.C.

26   section 9601(25), related the release and/or threatened release of hazardous substances at the Site.

27   The response actions included, inter alia, efforts to repair and restart the groundwater extraction

28   and treatment system, completion of a remedial investigation for site soils, preparation of the

8

Removal Action Workplan, implementation of the Removal Action Workplan in October and November 2011, groundwater monitoring, and other tasks.

34.  As a result of taking response actions at the Site, Plaintiffs have incurred response costs related to the release and/or threatened release of hazardous substances at, around, and/or beneath the Site.

35.  Plaintiffs' unpaid costs related to the Site from November 2005 through September 2013 total $2,202,176.92, exclusive of interest.

36.  Plaintiffs have incurred and expect to continue to incur additional response costs related to the release and/or threatened release of hazardous substances at, beneath, and/or from the Site.

**FIRST CLAIM FOR RELIEF**

(Claim for Recovery of Response Costs Pursuant to

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a))

(Against All Defendants)

37.  Plaintiffs incorporate the allegations in each of the preceding paragraphs as though fully set forth herein.

38.  The Site is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. section 9601(9).

39.  Each Defendant is a "person," within the meaning of section 101(21) of CERCLA, 42 U.S.C. section 9601(21).

40.  The Department is a "State" for purposes of recovery of response costs under section 107(a) of CERCLA, 42 U.S.C. section 9607(a).  Under this section, the Department may also recover interest on response costs incurred.

41.  Each of the Defendants is an "owner" and/or "operator" of the Site, or was an "owner" and/or "operator" of the Site "at the time of disposal of a[] hazardous substance" there, as those terms are used in section 107(a) of CERCLA, 42 U.S.C. section 9607(a).

42.  Plaintiffs have incurred costs in responding to the release or threatened release of hazardous substances at or from the Site in a manner that satisfies the requirements of Section

9

107(a)(4) of CERCLA, 42 U.S.C. section 9607(a)(4), in that the costs arose from activities that are not, and have not been, inconsistent with the applicable requirements of the National Contingency Plan, 40 C.F.R. Part 300.

43. Each of the Defendants is jointly and severally liable, without regard to fault, under section 107(a) of CERCLA, 42 U.S.C. section 9607(a), for Plaintiffs' costs incurred in response to the release or threatened release of hazardous substances at or from the Site.

**SECOND CLAIM FOR RELIEF**

(Declaratory Relief Pursuant to Section 113(g)(2) of

CERCLA, 42 U.S.C. § 9613(g)(2))

(Against All Defendants)

44. Plaintiffs incorporate the allegations of each of the preceding paragraphs as though fully set forth herein.

45. Under section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), Plaintiffs are entitled to a declaratory judgment that each of the Defendants is jointly and severally liable in any subsequent action or actions by the Plaintiffs to recover any further costs incurred in response to the release and/or threatened release of hazardous substances into the environment at or from the Site.

**THIRD CLAIM FOR RELIEF**

(Failure and Refusal to Comply with Imminent or Substantial Determination Order

and Remedial Action Order – California Health and Safety Code sections

25355.5, 25358.3, 25359, 25359.2, 25367)

(Against Defendants Dobbas, CRI, and Van Over)

46. Plaintiffs incorporate the allegations of each of the preceding paragraphs as though fully set forth herein.

47. The Department issued the I/SE Order to Defendants Dobbas, CRI, and Van Over under, inter alia, Chapter 6.8 of Division 20 of the California Health and Safety Code, specifically sections 25355.5 and 25358.3.

48.  California Health and Safety Code section 25358.3(f) provides that upon the failure of any person to comply with any order issued under sections 25355.5 or 25358.3, the director may request the Attorney General to petition for the issuance of a temporary restraining order or preliminary or permanent injunction requiring that person to comply with the order.

49.  California Health and Safety Code 25359(a) provides that any person liable for a release or threatened release of hazardous substances who "fails, without sufficient cause…to properly provide a removal or remedial action upon order of the director…pursuant to Section 25358.3," is liable for "damages equal to three times the…costs incurred by the state account…as a result of the failure to take proper action."  The referenced "state account" is Plaintiff Toxic Substances Control Account.

50.  California Health and Safety Code section 25359.2 provides that any person who does not comply with an order under section 25355.5 or 25358.3 without sufficient cause shall be subject to a civil penalty of not more than twenty-five thousand dollars ($25,000) for each day of noncompliance.

51.  California Health and Safety Code section 25367(c) provides that any person who refuses, without sufficient cause, any activity authorized under section 25358.1 or 25358.3 is subject to a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each separate violation, or for each day of a continuing violation.

52.  Defendants Dobbas, CRI, and Van Over have failed and refused, without sufficient cause, to comply with the I/SE Order, including, without limitation, as follows:

- Defendants failed and refused to restore groundwater monitoring at the Site, as specified in section 5.1 of the I/SE Order.

- Defendants failed and refused to implement the Removal Action Workplan for the Site, as specified in section 5.2 of the I/SE Order.

- Defendants failed and refused to conduct operation and maintenance activities, including maintenance of the asphalt cap, as specified in section 5.4 of the I/SE Order.

11

1       • Defendants failed and refused to demonstrate and maintain financial assurance

2       for operation and maintenance and monitoring, as specified in section 5.9 of the

3       I/SE Order.

4       • Defendant Van Over has used and is using the Site as a residence, in violation

5       of section 5.3 of the I/SE Order and the Land Use Covenant.

6       53.  Plaintiffs have incurred costs as a result of the failure of Defendants Dobbas, CRI,

7  and Van Over to take proper action as directed in the I/SE Order.

8       54.  The director of the Department has requested the Attorney General to petition for

9  injunctive and other relief concerning the failure and refusal of Defendants Dobbas, CRI, and Van

10 Over to comply with the I/SE Order.

11                                **PRAYER FOR RELIEF**

12      Plaintiffs pray for relief as follows:

13      A.     For a judgment that each Defendant is jointly and severally liable without regard to

14 fault to the Department under section 107(a) of CERCLA, 42 U.S.C. section 9607(a), for all

15 response costs incurred by the Plaintiffs as a result of the release and threatened release of

16 hazardous substances from the Site, in an amount to be proven at trial, but at least $2,202,176.92;

17      B.     For interest on the above sums from each Defendant as provided under section 107(a)

18 of CERCLA, 42 U.S.C. section 9607(a);

19      C.     For a declaratory judgment that each Defendant is jointly and severally liable without

20 regard to fault to the Plaintiffs under section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2),

21 for all future response costs incurred by the Plaintiffs as a result of the release and threatened

22 release of hazardous substances at and/or from the Site;

23      D.     For an injunction ordering Defendants Jim Dobbas, Inc., Continental Rail, Inc., and

24 David van Over to comply with the I/SE Order, including, without limitation, by performing

25 groundwater monitoring and operation and maintenance activities, including asphalt cap

26 maintenance, as required by the I/SE Order, and by obtaining financial assurance as required by

27 that order;

28

12

1          E.      For an injunction ordering Defendant David van Over to stop using the Site as a

2   residence, in violation of the I/SE Order and the Land Use Covenant;

3          F.      For treble damages against Defendants Jim Dobbas, Inc., Continental Rail, Inc., and

4   David van Over under California Health and Safety Code section 25359, in an amount to be

5   proven at trial;

6          G.      For civil penalties against Defendants Jim Dobbas, Inc., Continental Rail, Inc., and

7   David van Over under California Health and Safety Code sections 25359.2 and/or 25367, in an

8   amount to be proven at trial;

9          H.      For enforcement costs against each Defendant, including costs of this suit and

10  attorneys' fees; and

11         I.      For all other relief the Court deems just and appropriate.

12

13  Dated:  November 14, 2014                              Respectfully submitted,

14                                                         KAMALA D. HARRIS
                                                           Attorney General of California
15                                                         SARAH E. MORRISON
                                                           Supervising Deputy Attorney General
16

17                                                         /s/ Thomas G. Heller

18                                                         THOMAS G. HELLER
                                                           DENNIS L. BECK, JR.
19                                                         Deputy Attorneys General
                                                           *Attorneys for the California Department of
20                                                         Toxic Substances Control and the Toxic
                                                           Substances Control Account*
21

22

23

24

25

26

27

28

13

Exhibit A

1995-00068154
Recorded By:                03 RecFee
COLLINS & AIKMAN              SurMon
                             NoPCOR
Official Records             DTTax
County of Solano             Free   $. 0
Robert Blechschmidt          OvrSht
Assessor/Recorder

14:36   27-OCT-95   AR16   11   Pgs

Recording requested by:
Collins & Aikman Products Co.
701 McCullough Drive
Charlotte, North Carolina 28262

When recorded, mail to:
Department of Toxic Substances Control
Region 1
10151 Croydon Way, Suite 3
Sacramento, California 95827
Attention: James L. Tjosvold

### COVENANT
### TO RESTRICT USE OF PROPERTY

Wickes Forest Industries
Elmira, Solano County, California

---

This Covenant and Agreement ("Covenant") is made on
this __27th__ day of __October__, 1995, by Collins & Aikman Products
Co. ("Covenantor"), a Delaware corporation, which is the owner of
record of certain real property situated at 147 A Street in the
City of Elmira, County of Solano, State of California, described in
Exhibit "A" attached hereto and incorporated herein by this
reference ("the Property") and the California Department of Toxic
Substances Control ("DTSC"), with reference to the following facts:

A.    The Property is the real property known as Wickes Forest
Industries, which has been contaminated.

B.    The Property was formerly used as a wood treatment
facility.  During the operational years, wood was treated with
preservative solutions containing arsenic, chromium, and copper.
These metals have contaminated the soils.  Arsenic is highly toxic
by ingestion and inhalation and is a known carcinogen.  Higher
concentrations of copper can be toxic to humans, and aquatic life
is sensitive to lower concentrations.  The soils at the site exceed
local background concentrations for these metals.  Certain of the

1

soils have been left in place, and an asphalt cap has been constructed over the site to prevent direct human exposure and migration of the contamination.

C.     Covenantor desires and intends that in order to protect the present or future public health and safety, and the environment, the Property shall be used in such a manner as to avoid any potential harm to persons or property which may result from contamination in place underneath the Property.

ARTICLE I

GENERAL PROVISIONS

1.01 <u>Provisions To Run With The Land</u>.    This Covenant sets forth protective provisions, covenants, restrictions, and conditions, (collectively referred to as "Restrictions"), upon the Property and subject to which the Property shall be improved, held, used, occupied, leased, sold, hypothecated, encumbered, and/or conveyed. Each and all of the Restrictions shall run with the land and pass with each and every portion of the Property, and shall apply to and bind the respective successors in interest thereof. Each and all of the Restrictions are imposed upon the entire Property unless expressly stated as applicable to a specific portion of the Property.    Each and all of the Restrictions are imposed pursuant to Sections 25355.5 and 25356.1 of the California Health and Safety Code (H&SC) and run with the land pursuant to Section 25230(a)(1) of the California H&SC.    Each and all of the Restrictions are enforceable by DTSC and its successor agencies, if any.

1.02 <u>Concurrence of Owners Presumed</u>.    All purchasers, lessees, or possessors of the Property shall be deemed by their purchase, leasing, or possession of such Property, to be in accord with the foregoing and to agree for and among themselves, their heirs, successors and assignees, and the agents, employees, and lessees of such owners, heirs, successors, and assignees,    that their interests in the Property will be subject to the Restrictions contained herein.

2

1.03 <u>Incorporation Into Deeds and Leases</u>.  Covenantor desires and covenants, and all purchasers, lessees or possessors shall be deemed to have covenanted, that the Restrictions set out herein shall be incorporated by reference in each and all deeds and leases of the Property.

ARTICLE II

DEFINITIONS

2.01   <u>DTSC</u>.   "DTSC" shall mean the California Department of Toxic Substances Control and shall include its successor agencies, if any.

2.02   <u>Improvements</u>.   "Improvements" shall mean all buildings, structures, roads, driveways, regrading, landscaping, bodies of water, park and playground improvements, and paved parking areas, constructed or placed upon any portion of the Property.

2.03   <u>Occupants</u>.   "Occupants" shall mean those persons entitled by ownership, leasehold, or other legal relationship to the exclusive right to occupy any portion of the Property.

2.04   <u>Owner</u>.   "Owner" shall mean the Covenantor, its successors in interest, and their successors in interest, including heirs, and assigns, who at any time hold title to all or any portion of the Property.

2.05 "Final Cap" shall mean the combination of materials that covers the site to reduce infiltration of surface water and limit human exposure to contaminated soil.

2.06 "Excavation" shall mean the excavation of soil below the final cap that covers the Property.

2.07 "Hazardous materials" shall have the meaning set forth in California Code of Regulations, Title 22, Section 66260.10.

ARTICLE III

DEVELOPMENT, USE, AND CONVEYANCE OF THE PROPERTY

3.01 <u>Restrictions on Use</u>. Every Owner and Occupant promises to restrict the use of the Property described in Exhibit "A" as follows:

3



(A)   The Property at 147 A Street shall not be used for residences, hospitals, schools for persons under age 21, day-care centers or any permanently occupied human habitation, including hotels or motels which are used as a permanent residence by employees, without the prior written approval of DTSC.

(B)   Except as specified in subsection (D), no use of the Property shall disturb the integrity of the final cap over the Property as described in Exhibit "A", unless the Covenantor, owner, occupant or lessee can demonstrate to DTSC that the disturbance of the final cap is necessary to the proposed use of the Property and will not increase to an unacceptable level any potential reasonable hazard to the public health and safety or the environment, or is necessary to reduce an imminent threat to the public health and safety or the environment, and DTSC approves such a use in writing.

(C)   The Covenantor, owner, occupant, or lessee may obtain DTSC approvals as provided in subsection (A) and (B) of this paragraph without instituting the variance provisions of Section 4.01.

(D)   The final cap may be disturbed for the purpose of performing emergency repairs, routine periodic maintenance or planned construction, if the final cap is restored to its original condition upon completion of such work.   The Covenantor shall notify DTSC of emergency repairs, or planned construction on the property where the final cap has been disturbed not later than two business days after such repairs are begun.  Upon completion of the emergency repairs or planned construction, the owner or occupant shall provide DTSC with all documentation requested by DTSC to establish that the final cap has been restored to an equivalent condition.

3.02 Conveyance of Property.  The Owner or Owners and the Occupants shall provide a thirty (30) day advance notice to DTSC of any sale, lease, or other conveyance of the Property or an interest in the Property to a third person.  DTSC shall not, by reason of this Covenant, have authority to approve, disapprove, or otherwise affect any sale, lease, or other conveyance of the Property or any

4

interest in it except as otherwise provided by law or by reason of this Covenant.

3.03 <u>Enforcement</u>.   Failure of an Owner to comply with any of the requirements, as set forth in Paragraph 3.01, shall be grounds for DTSC, by reason of this Covenant, to have the authority to require that the Owner modify or remove any Improvements constructed in violation of that paragraph.   Violation of the Covenant shall be grounds for DTSC to file an action against the Owner as provided by law, including but not limited to the provisions of Chapter 6.5 and 6.8, Division 20 of the H&SC.

3.04 <u>Notice in Agreements</u>.   The Covenantor shall provide a notice to all Owners and Occupants that shall accompany all purchase, lease, sublease, or rental agreements relating to the Property by supplying a copy of this Agreement.   In this way all Owners and Occupants shall be aware of the following statement:

> "The land described herein contains hazardous substances. Such condition renders the land and the owner, lessee, or other possessor of the land subject to requirements, restrictions, provisions, and liabilities contained in Chapter 6.5 and Chapter 6.8 of Division 20 of the Health and Safety Code.   This statement is not a declaration that a hazard exists."

### ARTICLE IV
### VARIANCE AND TERMINATION

4.01 <u>Variance</u>.   Any Owner or, subject to the prior written consent of the Owner, any Occupant of the Property or a portion thereof may apply to DTSC for a written variance from the provisions of this Covenant.   Such application shall be made in accordance with Section 25233 of the California H&SC.

4.02 <u>Termination</u>.   Any Owner or, subject to the prior written consent of the Owner, an Occupant of the Property or a portion thereof may apply to DTSC for a termination of the Restrictions as they apply to all or any portion of the Property.   Such application

5

shall be made in accordance with Section 25234 of the California H&SC.

4.03 <u>Term</u>. Unless terminated in accordance with paragraph 4.02 above, by law or otherwise, this Covenant shall continue in effect in perpetuity.

ARTICLE V

MISCELLANEOUS

5.01 <u>No Dedication Intended</u>. Nothing set forth herein shall be construed to be a gift or dedication, or offer of a gift or dedication, of the Property to the general public or for any purposes whatsoever.

5.02 <u>Notices</u>. Whenever any person gives or serves any notice, demand, or other communication with respect to this Covenant, each such notice, demand, or other communication shall be in writing and shall be deemed effective (1) when delivered, if personally delivered to the person being served or to an officer of a corporate party being served, or (2) three business days after deposit in the mail if mailed by United States mail, postage paid, certified, return receipt requested to the record Owner. Notices shall be sent to:

> Collins & Aikman Products Co
> Real Estate Department
> 701 McCullough Drive
> Post Office Box 32665
> Charlotte, North Carolina 28232
> Attention:  Bettie Coltrane
> (704) 548-2369
> (704) 548-2300 FAX

and

> Collins & Aikman Products Co.
> Legal Department
> Post Office Box 32665
> Charlotte, North Carolina 28232
> Attention: John B. Orgain
> (704) 548-2353
> (704) 548-2010 FAX

6

In every case, a copy shall be sent to:

> Department of Toxic Substances Control
> Attention: James L. Tjsovold
> Region 1
> Acting Chief
> Central California Site Mitigation Branch
> 10151 Croydon Way, Suite 3
> Sacramento, California 95827
> (916) 255-3545
> (916) 255-3697 FAX

5.03  <u>Partial Invalidity</u>.   If   any   portion   of   the Restrictions or terms set forth herein are determined to be invalid for any reason, the remaining portions shall remain in full force and effect as if such portion had not been included herein.

5.04  <u>Article Headings</u>.  Headings at the beginning of each numbered article of this Covenant are solely for the convenience of the parties and are not a part of this Covenant.

5.05  <u>Recordation</u>.  This instrument shall be executed by the Covenantor, and by the Director, California Department of Toxic Substances Control.   This instrument shall be recorded by the Covenantor in the County of Solano within fourteen (14) days after the date of execution by both parties in accordance with the recording requirements of the California H&SC, Section 25230.

IN WITNESS WHEREOF, the parties execute this Covenant as of the date first set forth above.

Covenantor:   Collins & Aikman Products Co.
By:        _John B. Organ_
Title:     _Senior Counsel_
Date:      _August 28, 1995_

DEPARTMENT OF TOXIC SUBSTANCES CONTROL
By:        _James Dowell_
Title:     _Acting Branch Chief_
Date:      _July 18, 1995_

7

Order No. 40969

EXHIBIT "A"

The following described parcels of land are located within the County of Solano, State of California.

PARCEL ONE

Beginning at the southeast corner of the Northwest One Quarter of Section Nineteen (19) Township Six (6) North Range One (1) East, Mount Diablo Base and Meridian; running thence North along the Quarter Section line to the Southeasterly boundary of the right of way of the Southern Pacific Railroad; thence Southwesterly along the southeasterly line of the right of way of the Southern Pacific Railroad Company to the Quarter Section line running East and West through said Section Nineteen (19); thence East and along said Quarter Section line to the place of beginning. EXCEPTING THEREFROM, however, all that certain real property as conveyed by Eleanor B. Allison to Southern Pacific Railroad Company, a corporation, by Deed dated May 10th, 1916, and recorded May 23rd, 1916 in Liber "226" of Deeds, Page 104, thereof, and described as follows: Beginning at the point of intersection of the Southeasterly right of way line of the Southern Pacific Railroad Company's railroad (as it now exists across said Northwest Quarter of Section 19) with the east line of the Northwest Quarter of Section 19, Township 6 North Range 1 East, Mount Diablo Base and Meridian; thence Southwesterly along said Southeasterly right of way line of the Southern Pacific Railroad Company, a distance of 506 feet to a point; thence at a right angle Southeasterly 15 feet to a point; thence at a right angle Northeasterly parallel to said right of way line 265 feet to a point; thence at a right angle Southeasterly 15 feet to a point; thence at a right angle Northeasterly parallel to said right of way line 200 feet to a point; thence at a right angle Northeasterly parallel to said right of way line 200 feet to a point on the east line of said Northwest Quarter of Section 19; thence North along said East line of the Northwest Quarter of Section 19, a distance of 50.7 feet to the point of beginning.

PARCEL TWO

Beginning at the intersection of the northerly line of Edwards Street and the westerly line of "A" Street extended northerly; thence running Westerly and along the northerly line of Edwards Street, One Hundred Forty (140) feet, more or less, to the intersection of the easterly line of the right of way of the Southern Pacific Railroad Company; thence Northerly and along the easterly line of the right of way of the Southern Pacific Railroad Company, One Hundred Ninety-One (191) feet more or less to the southerly line of County Road Number Two Hundred Forty-Six (246) sometimes also known as Binghampton Street; thence Easterly and along

CONTINUED

Order No. 40969

Exhibit "A" Cont'd. (Parcel Two)

the southerly line of County Road Number 246, to the intersection of the westerly line of a street, extended Northerly; thence Southerly and along the westerly line of a street, extended Northerly to the northerly line of Edwards Street and the place of beginning.  All as said streets herein referred to are laid down and designated on that certain map entitled: "PLAN OF RESURVEY OF PORTION OF VACA STATION, PROPERTY OF W. C. FARMER, SITUATED ON SOUTH WEST ONE QUARTER (S.W. 1/4) OF SECTION NINETEEN (19) TOWNSHIP VI NORTH RANGE 1 EAST SOLANO COUNTY," surveyed by E. H. Marshall, Deputy County Surveyor, April 8th, 1970 and now appearing of record in Volume "1" of Maps, Page 44 thereof, Solano County Records.

PARCEL THREE

Beginning at the point of intersection of the westerly line of "A" Street, extended Northerly, and the northerly line of County Road Number 246 (Holdener Road, formerly shown as Binghampton Street) in Elmira Townsite, Solano County, California, which point bears North 0° 22' 08" West, 30 feet and South 89° 55' 06" West, 397.80 feet from the southeast corner of the Northwest One-Quarter of Section 19, T6N, R1E, M.D.B. & M.; thence, from said point of beginning, along the northerly line of the aforementioned Binghampton Street South 89° 55' 06" West, 171.67 feet to the easterly right-of-way line of the Southern Pacific Railroad; thence along said easterly right-of-way line South 34° 52' 51" West, 73.21 feet to the southerly line of said Binghampton Street; thence, along said southerly line, North 89° 55' 06" East, 171.67 feet to the westerly line of the aforementioned "A" Street; thence along the prolongation of said westerly line of "A" Street, North 34° 52' 51" East, 73.21 feet to the point of beginning.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    No. 5907

State of _CALIFORNIA_

County of _SACRAMENTO_

On _JULY 18, 1985_ before me, _DAVID HURLEY_,
     DATE                 NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared _JAMES TJOSVOLD_,
                           NAME(S) OF SIGNER(S)

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are
subscribed to the within instrument and ac-
knowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s),
or the entity upon behalf of which the
person(s) acted, executed the instrument.

**DAVID HURLEY**
COMM. #1040551
Notary Public-California
SACRAMENTO COUNTY
My Comm. Exp. Jan. 4, 1999

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

═══════ **OPTIONAL** ═══════

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
            TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                  ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER:_____
_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)
_____
_____

**DESCRIPTION OF ATTACHED DOCUMENT**

_____

TITLE OR TYPE OF DOCUMENT

_____

NUMBER OF PAGES

_____

DATE OF DOCUMENT

_____

SIGNER(S) OTHER THAN NAMED ABOVE

©1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

STATE OF NORTH CAROLINA        )
                               )
COUNTY OF MECKLENBURG          )

      On August 28, 1995, before me the undersigned, a Notary Public in and for said state, personally appeared John B. Orgain, IV, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as Senior Counsel of Collins & Aikman Products Co., the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same pursuant to its bylaws or a resolution of its Board of Directors.

      WITNESS my hand and official seal.

_Karen M. Allen_
Notary Public in and for said County and State
MY COMMISSION EXPIRES JANUARY 31, 1998



This is certified to be an exact
reproduction of the filed record if
certification is imprinted in purple ink,
bearing date of issuance and an original
signature of the Assessor/Recorder or
deputy.
MARC C. TONNESEN
Solano County Assessor/Recorder
By_____ Deputy
Issue Date: 2 13 14
Copy No: 14 - 58766 7



Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al.[1] | ) | Case No. 05-55927 (SWR) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | (Tax Identification #13-3489233) |
| | ) | |
| | ) | Honorable Steven W. Rhodes |

## STIPULATION REGARDING THE CLAIMS OF CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL AND THE CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD AND TO RESOLVE OBJECTIONS TO THE FIRST AMENDED JOINT PLAN OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") and

the California Department of Toxic Substances Control ("DTSC") and the Central Valley

Regional Water Quality Control Board (the "Regional Water Board") (collectively, "California

Environmental Entities"),[2] each by and through their respective attorneys, stipulate and agree as

follows:

---

[1]  The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

[2]  DTSC and the Regional Water Board each make this special limited appearance subject to and without waiving sovereign immunity by such appearance.

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO0000292

A.   WHEREAS, on May 17, 2005 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").

B.   WHEREAS, the California Environmental Entities allege that before the Petition Date, the Debtors owned and/or operated a facility located in Elmira, California.

C.   WHEREAS, the California Environmental Entities allege that prior to the filing of the Debtors' chapter 11 cases (the "Chapter 11 Cases"), the Debtors performed remediation at the Elmira Site (as defined herein) pursuant to orders issued to them by, or agreements entered into with, DTSC, or its predecessor and the Regional Water Board.

D.   WHEREAS, on February 9, 2007, the Debtors filed their First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries (as may be amended from time to time, the "Plan").

E.   WHEREAS, DTSC and the Regional Water Board are environmental agencies of the State of California, and each of these agencies allege that it is authorized pursuant to state and federal statutes and regulations to protect the public welfare and environment of the State of California.

F.   WHEREAS, DTSC alleges that it regulates hazardous waste management in California and enforces laws related to the cleanup of hazardous substances in California's environment.

G.   WHEREAS, on January 10, 2006, DTSC filed a proof of claim alleging claims for pre-petition, post-petition and future estimated environmental response costs against the Debtors in the total amount of not less than $17,074,068.20, which claim was designated as Proof of Claim No. 7649 (the "DTSC Claim"). DTSC alleges that (a) part of the DTSC claim was filed as

2

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000293

a protective measure and (b) it reserved its right to seek post-confirmation response costs and/or declaratory and injunctive relief against the Debtors for the Debtors to comply with environmental obligations, including injunctive orders.

H.    WHEREAS, the Regional Water Board alleges that it is part of the principal state agency that regulates water quality pursuant to state and federal environmental laws.

I.    WHEREAS, on January 10, 2006, the Regional Water Board filed a proof of claim alleging pre-petition, post-petition and future environmental oversight costs in an estimated amount of $44,546.35 and penalties for violations of the Water Code in the amount of $30,000, which claim was designated as Proof of Claim No. 4722 (the "RWB Claim"). The Regional Water Board alleges that (a) part of the RWB Claim was filed as a protective measure and (b) it reserved its right to seek post-confirmation oversight costs and/or injunctive relief against the Debtors for the Debtors to comply with environmental obligations, including injunctive orders.

J.    WHEREAS, the California Environmental Entities allege that the DTSC claim and RWB claim relate, in part, to the former Wickes Forest Industries Site located on approximately 7.5 acres in Elmira, California (the "Elmira Site").

K.    WHEREAS, the California Environmental Entities allege that:    (1) on September 9, 1983, DTSC, the Regional Water Board and Wickes Companies, Inc. entered into an Agreement requiring the Wickes Companies to remove and treat groundwater and manage storm water at the site; (2) on February 26, 1996, DTSC and Collins & Aikman Products Co. entered into an Operations and Maintenance Agreement requiring the Debtors to (a) maintain an asphalt cap, which was placed on the Elmira Site to contain the contamination and (b) operate a groundwater extraction and treatment system; (3) on June 4, 2004, the Regional Water Board

3

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000294

issued the National Pollution Discharge Permit No. CA0081531, WDR No. R5-2004-0066 to Collins & Aikman Products Co.; (4) on January 27 2005, Collins & Aikman Products Co. was issued WDR Order No. R5-2005-0022, which permitted a pilot study that includes the subsurface injection of calcium polysulfide for the treatment of soil and groundwater polluted with hexavalent chromium; and the Debtors reserve their rights with respect to all such allegations.

L.     WHEREAS, on May 4, 2007 and May 7, 2007, the California Environmental Entities filed joint objections to the Plan [Docket Nos. 4611, 4652] (collectively, the "Objections") on the grounds that (a) the discharge, injunction and release language in the Plan is overly broad in many respects and, as such, is contrary to the provisions of the Bankruptcy Code and (b) the Plan fails to provide compliance with existing orders and agreements between the Debtors and the California Environmental Entities with respect to the Elmira Site.

NOW, THEREFORE, in consideration of the mutual premises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby stipulated and agreed to by and between the Debtors and the California Environmental Entities as follows:

1.     The following language will be inserted into the Confirmation Order (as defined in the Plan):

> Notwithstanding anything to the contrary in the Plan or this Order, the California Environmental Entities shall not be Releasing Parties and shall not be subject to the obligation to provide Third Party Releases set forth herein or in Article XII.C of the Plan.
>
> Notwithstanding anything to the contrary in the Plan or this Order, the California Environmental Entities shall not be

4

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000295

subject to the provisions of Article XII.E and Paragraph 5 of this Order.

Nothing in the Plan or this Order discharges, releases or precludes any liability to the California Environmental Entities that is not a Claim.

Any relief provided under the Plan or this Order to non-Debtors shall not release, discharge, enjoin or preclude any liability of such non-Debtors to the California Environmental Entities under any federal, state or local environmental law or regulation.

Nothing in the Plan or this Order discharges, releases or precludes any claim of the California Environmental Entities that arises on or after the Effective Date.

Nothing in the Plan or this Order releases any entity from liability under environmental law as the owner or operator of property located in the State of California that such entity owns or operates after the Effective Date.

The Stipulation between the Debtors and the California Environmental Entities is hereby approved and incorporated in this Order by reference.

2.       Upon the Court entering an order approving this Stipulation and incorporating this Stipulation in the Confirmation Order and the Debtors complying with Paragraph 1 hereof, the Objections shall be deemed withdrawn effective immediately.

3.       The Regional Water Board shall have an allowed Class 5 Claim in the amount of $74,546.35, which shall (a) not be subordinated and (b) receive a distribution under the terms of the Plan. Subject to Paragraph 7 of this Stipulation, the Debtors and the Regional Water Board agree that the unliquidated portion of the RWB Claim as well as the unpaid portions of the RWB Claim will survive for recovery.

4.       Notwithstanding anything contrary in the Plan or Confirmation Order, subject to Paragraph 7 of this Stipulation, the Debtors and the Regional Water Board agree that the entire RWB Claim will survive for recovery and notwithstanding the Chapter 11 Cases, the Regional

5

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000296

Water Board can pursue the RWB Claim against the Debtors and be paid from insurance proceeds.

5.      DTSC shall have an allowed Class 5 Claim in the amount of $224,725.71, which shall (a) not be subordinated and (b) receive a distribution under the terms of the Plan.  Subject to Paragraph 7 of this Stipulation, the Debtors and DTSC agree that the unliquidated portion of the DTSC Claim as well as the unpaid portions of the DTSC Claim will survive for recovery.

6.      Notwithstanding anything contrary in the Plan or Confirmation Order, subject to Paragraph 7 of this Stipulation, the Debtors and DTSC agree that the entire DTSC Claim will survive for recovery and notwithstanding the Chapter 11 Cases, DTSC can pursue the DTSC Claim against the Debtors and be paid from insurance proceeds.

7.      Notwithstanding anything contrary in the Plan or Confirmation Order, after the Effective Date, the automatic stay and any injunction pursuant to the Plan shall be modified to permit the California Environmental Entities to prosecute legal or administrative actions against the Debtors with respect to the Elmira Site to and including the entry of judgment against or settlement with the Debtors (collectively, the "Elmira Site Action"); provided, however, that notwithstanding anything in this Stipulation, the Plan, the order approving this Stipulation and the Confirmation Order (a) no judgment or settlement based on the Elmira Site Action may be collected against the Debtors or the Trusts (as defined in the Plan), and each of their respective officers, directors, employees, agents and attorneys and (b) the California Environmental Entities shall not collect any money or other forms of remuneration or relief to which the California Environmental Entities may be entitled to in connection with the Elmira Site Action, if any, from the Debtors, the Trusts (as defined in the Plan), or any of the Debtors or the Trusts' officers, directors, employees, agents or attorneys.

6

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000297

8.      Notwithstanding anything contrary in the Plan or Confirmation Order, including insurance provisions, subject to Paragraph 7 of this Stipulation, the Debtors specifically acknowledge and agree that any actions by the California Environmental Entities, whether administrative, or in state or federal court, may be filed in any non-bankruptcy forums, including California, and that the Debtors will not object to any action filed against the Debtors to establish liability and to seek recovery of insurance proceeds on the ground that such action is barred by this bankruptcy proceeding.

9.      Subject to Paragraph 7 of this Stipulation, nothing in the Plan or the Confirmation Order releases or nullifies any liability to the California Environmental Entities under environmental statutes or regulations that any entity or person would be subject to as the current or past owner, operator, responsible party, or person as defined in the California Water Code and the California Health and Safety Code after the Confirmation Hearing (as defined in the Plan).

10.     Subject to Paragraph 7 of this Stipulation, nothing in the Plan or the Confirmation Order impairs or restricts the California Environmental Entities' ability to pursue all of their applicable rights and remedies with respect to insurance claims, proceeds, or policies.

11.     Notwithstanding any provisions in the Plan or Confirmation Order to the contrary, all rights, claims and interests of the California Environmental Entities shall not be discharged, impaired, or adversely affected by the Plan and Chapter 11 Cases, shall survive the Chapter 11 Cases as if the Chapter 11 Cases had not been commenced, and shall be determined in the manner and by the non-bankruptcy administrative or judicial tribunals in which such rights, claims, or interests would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced"); provided, however, that notwithstanding anything in this Stipulation, the Plan, the order approving this Stipulation and the Confirmation Order (a) no judgment or

7

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000298

settlement based on the Elmira Site Action may be collected against the Debtors or the Trusts (as defined in the Plan), and each of their respective officers, directors, employees, agents and attorneys and (b) the California Environmental Entities shall not collect any money or other forms of remuneration or relief to which the California Environmental Entities may be entitled to in connection with the Elmira Site Action, if any, from the Debtors, the Trusts (as defined in the Plan), or any of the Debtors or the Trusts' officers, directors, employees, agents or attorneys.

12.     The modification set forth herein of the automatic stay and the injunction set forth in the Plan and the Confirmation Order, shall have no effect as to parties that are not a party to this Stipulation, and the automatic stay and such injunction shall remain in full force and effect with respect to such parties and their claim or cause of action.

13.     Neither this Stipulation, nor any terms contained herein shall be offered or received in evidence or in any way referred to in any legal action or administrative proceeding among or between the parties hereto, other than as may be necessary:  (a) to obtain approval and to enforce this Stipulation;  (b) to seek cost recovery, remediation, penalties, liabilities, declaratory relief, future response costs, damages or injunctive relief in connection therewith; (c) to prove that the automatic stay and the injunction have been modified as set forth herein; and (d) to prove the agreement in Paragraph 8 of this Stipulation.

14.     This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

15.     This Stipulation shall not be modified, altered, amended or vacated without written consent of all parties hereto.

8

K&E 11948221.9

05-55927-swr    Doc 7799    Filed 07/16/07    Entered 07/16/07 13:38:02    Page 8 of 9

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000299

16.     The terms and conditions of this Stipulation shall be immediately effective and enforceable conditioned upon the entry of the order approving this Stipulation and incorporating the Stipulation in the Confirmation Order.

Dated:  July 12, 2007

| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD** |

/s/ Marc J. Carmel
Richard M. Cieri (NY RC 6062)
Citigroup Center
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

/s/ Marilyn H. Levin
Marilyn H. Levin (CA Bar. No. 92800)
Deputy Attorney General
300 S. Spring St., 11th Floor
Los Angeles, California  90013
Telephone: (213) 897-2612
Facsimile: (213) 897-2802

-and-

David L. Eaton (IL 3122303)
Ray C. Schrock (IL 6257005)
Marc J. Carmel (IL 6272032)
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

-and-

Counsel for the Regional Water Board

**CARSON FISCHER, P.L.C.**

**DEPARTMENT OF TOXICS SUBSTANCES CONTROL**

/s/ Donald A. Robinson
Donald A. Robinson (CA Bar No. 72402)
300 S. Spring St., 11th Floor
Los Angeles, California  90013
Telephone: (213) 897-2611
Facsimile: (213) 897-2802
Deputy Attorney General

Joseph M. Fischer (P13452)
4111 West Andover Road
West - Second Floor
Bloomfield Hills, Michigan  48302
Telephone:  (248) 644-4840
Facsimile:  (248) 644-1832

Co-Counsel for the Debtors

Counsel for the DTSC

I hereby certify that the foregoing is a true copy of the original on file in this office.

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
BY: _____ Deputy Clerk
DATE: 2/10/14

9

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000300

Exhibit C

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al.[1] | ) | Case No. 05-55927 (SWR) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | (Tax Identification #13-3489233) |
| | ) | |
| | ) | Honorable Steven W. Rhodes |

## ORDER CONFIRMING FIRST AMENDED JOINT PLAN OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

having filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, on

May 17, 2005 (the "Petition Date"); the Debtors having filed, on January 24, 2007, the First

Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries

[Docket No. 3976] (as amended and filed with the Court on July 9, 2007 [Docket No. 7731] (the

"Plan")[2] and the amended disclosure statement related thereto [Docket No. 3977] (the

---

[1]  The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000301

"Disclosure Statement"); the Court having entered an order [Docket No. 3988] (the "Solicitation Procedures Order") on January 26, 2007, (a) approving the Disclosure Statement, (b) establishing April 9, 2007, as the deadline for submitting ballots to vote to accept or reject the Plan and for filing objections to confirmation of the Plan, (c) establishing April 19, 2007, as the date of commencement of the Confirmation Hearing, (d) approving certain ballots and notices in connection with solicitation of the Plan, including the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and (e) establishing certain procedures for soliciting and tabulating votes with respect to the Plan; the Court having adjourned the Confirmation Hearing and certain other deadlines in connection therewith [Docket Nos. 4400, 4674 and 7379]; the Debtors having provided due, adequate and sufficient notice of the Plan, the Disclosure Statement and the Confirmation Hearing, along with the deadlines for voting on the Plan and objecting to confirmation of the Plan, to Holders of Claims and Equity Interests and other parties in interest; the Debtors having distributed the Plan and the Disclosure Statement to all Holders of Impaired Claims against the Debtors that are entitled to vote on the Plan, together with a solicitation of votes to accept or reject the Plan in accordance with the Solicitation Procedures Order; the Debtors having filed the Debtors' Memorandum of Law (a) in Support of the First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries and (b) in Response to Objections Thereto [Docket No. 7734] (the "Confirmation Memorandum"); the Debtors having filed the Affidavit of Kurtzman Carson Consultants LLC Certifying Ballots Accepting and Rejecting the Debtors' First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries [Docket No. 7732] (the "Voting Affidavit") attesting to and certifying the method and results of the ballot tabulation for each of the Impaired Classes entitled to vote on the Plan; the Debtors having filed the

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000302

Declaration of John Boken in Support of Confirmation of the First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries [Docket No. 7733]; this Court having convened the Confirmation Hearing on July 12, 2007, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128 and 1129 of the Bankruptcy Code, to consider the confirmation of the Plan; the Court having (a) reviewed the above-referenced pleadings and all objections and responses thereto, (b) heard or received the statements of counsel in support of and in opposition to confirmation of the Plan at the Confirmation Hearing, (c) considered all testimony presented and evidence admitted by affidavits or otherwise and (d) taken judicial notice of all other papers, pleadings and records on file in these Chapter 11 Cases; it appearing that notice of the Confirmation Hearing and the opportunity of any party in interest to object to and be heard regarding confirmation of the Plan were adequate and appropriate as to all parties to be affected by the Plan and the transactions contemplated thereby and that the legal and factual bases set forth in the Confirmation Memorandum and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation and good cause appearing therefor,

THE COURT FINDS AND DETERMINES THAT:[3]

### Jurisdiction and Venue

A.      On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue is proper in this

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000303

District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### Modifications to the Plan

B.      Any modifications to the Plan described or set forth herein constitute technical changes or changes with respect to particular Claims by agreement with Holders of such Claims, and do not materially or adversely affect or change the treatment of any Claims or Equity Interests.    Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

### Transmittal of Solicitation Package

C.      The Disclosure Statement (including exhibits, one of which is the Plan), the Confirmation Hearing Notice, the Solicitation Procedures Order, the appropriate ballot(s), voting instructions and a pre-addressed return envelope, if applicable, were transmitted in accordance with Bankruptcy Rule 3017(d) and the Solicitation Procedures Order.

### Publication of Confirmation Hearing Notice

D.      On February 14, 2007, the Debtors published the Confirmation Hearing Notice in the Detroit News / Free Press and The Wall Street Journal.

4

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000304

**Voting Affidavit**

     E.     On July 9, 2007, the Debtors filed the Voting Affidavit certifying the method and results of the ballot tabulation for each of the Classes entitled to vote to accept or reject the Plan with the Court.

**Judicial Notice**

     F.     The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court or its duly appointed agent, including, without limitation, all pleadings and other documents on file, all orders entered and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

**Transmittal and Mailing of Materials; Notice**

     G.     Due, adequate and sufficient notice of the Disclosure Statement, the Plan and the Confirmation Hearing, along with all deadlines for voting on or filing objections to the Plan, has been given in accordance with the procedures set forth in the Solicitation Procedures Order. The Disclosure Statement (including exhibits, one of which is the Plan), the Confirmation Hearing Notice, the Solicitation Procedures Order and the appropriate ballot(s) were transmitted and served in substantial compliance with the Bankruptcy Rules and the Solicitation Procedures Order, and such transmittal and service were adequate and sufficient. Adequate and sufficient notice of the Confirmation Hearing, as continued from time to time, and other dates and deadlines described in the Solicitation Procedures Order was given in compliance with the Bankruptcy Rules and Solicitation Procedures Order, and no other or further notice is, or shall be, required.

**Solicitation**

     H.     The Debtors, the Agent, the Creditors Committee and their respective officers, directors, employees, attorneys, financial advisors, accountants, investment bankers, investment

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000305

advisors, actuaries, professionals, agents, affiliates and representatives have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Solicitation Procedures Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article XII of the Plan.

I.      All procedures used to distribute solicitation materials to the applicable Holders of Claims and Equity Interests and to tabulate the ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan and all other applicable rules, laws and regulations.

### Classes Deemed to Have Accepted the Plan

J.      Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of Holders of Claims in Classes 1 and 2 were therefore not solicited.

### Impaired Classes that Have Voted to Accept the Plan

K.      As evidenced by the Voting Affidavit, which certified both the method and results of the voting, Class 3 (Prepetition Facility Claims), Class 4 (OEM Claims) and Class 5 (General Unsecured Claims) have voted to accept the Plan.

### Classes Deemed to Have Rejected the Plan

L.      Class 8 (Equity Interests), Class 9 (Subordinated Securities Claims) and Class 10 (Intercompany Claims) will receive no distributions and retain no property under the Plan and

6

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000306

are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Holders of Claims and Equity Interests in Classes 8, 9 and 10 were therefore not solicited.

### Impaired Classes that Have Voted to Reject the Plan

M.    As evidenced by the Voting Affidavit, which certified both the method and results of the voting, Class 6 (Senior Note Claims and PBGC Claims) and Class 7 (Senior Subordinated Note Claims) have voted to reject the Plan with respect to the Debtors, as substantively consolidated to the extent set forth in the Plan.

### Burden of Proof

N.    The Debtors, as proponents of the Plan, have met their burden of proving the elements of section 1129(a) and (b) of the Bankruptcy Code.

### Compliance with Requirements of Section 1129 of the Bankruptcy Code

*Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code*

O.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123. Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article II of the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims (which are not required to be classified). As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims and Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. The Debtors have presented clear and convincing evidence that valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and

7

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000307

Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims or Equity Interests.

      P.      Pursuant to section 1123(a)(2) and (3) of the Bankruptcy Code, Articles II and III of the Plan specify all Claims that are Unimpaired and the treatment of all Claims and Equity Interests that are Impaired.

      Q.      Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Equity Interest within a particular Class.

      R.      Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for implementation of the Plan. The Debtors will have, immediately upon the Effective Date of the Plan, sufficient cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Moreover, Article IV and various other provisions of the Plan specifically provide for adequate and appropriate means for the Plan's implementation, including, without limitation: (i) the sale of certain of the Debtors' assets; (ii) establishment of the Post-Consummation Trust, the Litigation Trust and the Residual Trusts; (iii) the transfer of the Post-Consummation Trust Assets, the Litigation Trust Assets and the Residual Trust Assets to the Post-Consummation Trust, the Litigation Trust and the applicable Residual Trust, respectively; (iv) the funding of the expenses of the Post-Consummation Trust and the Litigation Trust; (v) the appointment of the Plan Administrator and the Litigation Trust Administrator; (vi) the cancellation of instruments, securities and other documentation; (vii) the preservation of rights and Causes of Action; and (viii) the general authority for all corporate action necessary to effectuate the Plan.

8

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000308

S.      Section 1123(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases because, among other things, the Debtors are not issuing any securities under the Plan.

T.      The Plan complies with section 1123(a)(7) of the Bankruptcy Code, regarding the selection of individuals to administer debts, because the selection of the Plan Administrator and the Litigation Trust Administrator has been accomplished in a fair and reasonable manner, consistent with public policy.

U.      The Plan's provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (i) distributions to Holders of Claims, (ii) the disposition of executory contracts and unexpired leases, (iii) the retention of, and the right to enforce, sue on, settle or compromise (or refuse to do any of the foregoing with respect to) certain claims or causes of action against third parties, to the extent not waived or released under the Plan, (iv) resolution of Disputed Claims, (v) allowance of certain Claims, (vi) indemnification obligations, (vii) releases by the Debtors, (viii) releases by certain third parties, (ix) exculpation, (x) injunction against certain actions and (xi) establishment of the Trusts and the transfer of assets to the relevant Trusts.

*Section 1129(a)(2) – Compliance with Applicable Provisions of the Bankruptcy Code*

V.      The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.

W.      The Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

9

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000309

X.      The solicitation of acceptances or rejections of the Plan was (i) pursuant to the Solicitation Procedures Order, (ii) in compliance with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation and (iii) solicited after disclosure to Holders of Claims or Equity Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.

Y.      The Debtors, the Agent, the Creditors Committee and their respective officers, directors, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

### Section 1129(a)(3) – Proposal of Plan in Good Faith

Z.      The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself and the process leading to its formulation.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of maximizing the value of the Debtors' assets and the recovery of Holders of Claims under the circumstances of these Chapter 11 Cases.

### Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable

AA.      Pursuant to section 1129(a)(4) of the Bankruptcy Code, any payment made or promised by the Debtors or by any person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, including all administrative expense and substantial contribution claims under sections 503 and 507 of the Bankruptcy Code, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to this Court.  Any such payment made before Confirmation was reasonable and made with appropriate authority of the Court; provided that the reasonableness of Fee Claims that have not

10

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000310

heretofore been Allowed on a final basis will be determined by this Court after submission of a final fee application in accordance with this Order. All such payments to be fixed after Confirmation shall be made pursuant to the terms of the Plan and are subject to the approval of this Court as reasonable and consistent with this Order.

### Section 1129(a)(5) – Disclosure of Identity and Affiliations of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

BB.    Section 1129(a)(5) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases. To the extent section 1129(a)(5) applies to the Post-Consummation Trust and the Litigation Trust, the Debtors have disclosed that (i) the Agent, in consultation with the Prepetition Lenders, has designated Capstone Advisory Group, LLC as the Plan Administrator and (ii) the Agent, in consultation with the Prepetition Lenders and the Creditors Committee, has designated Alan B. Miller as the Litigation Trust Administrator.

### Section 1129(a)(6) – Approval of Rate Changes

CC.    No regulatory commission has any jurisdiction over rate changes by the Debtors, and the Plan does not provide for rate changes by the Debtors. Section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable to these Chapter 11 Cases.

### Section 1129(a)(7) – Best Interests of Creditors and Equity Interest Holders

DD.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Disclosure Statement, including the liquidation analysis, and any other evidence adduced at the Confirmation Hearing (i) are persuasive, credible and accurate as of the dates such evidence was prepared, presented or proffered, (ii) either have not been controverted by other persuasive evidence or have not been challenged, (iii) are based upon reasonable and sound assumptions, (iv) provide a reasonable estimate of the liquidation values of the Debtors upon conversion to a case under chapter 7 of the Bankruptcy Code and (v) establish that each Holder of a Claim or

11

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000311

Equity Interest in an Impaired Class that has not accepted the Plan will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

### Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class

EE.    Pursuant to section 1129(a)(8) of the Bankruptcy Code, Classes 1 and 2 are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan. As set forth in the Voting Affidavit, Classes 3, 4 and 5 have voted to accept the Plan and Classes 6 and 7 have voted to reject the Plan. The Plan provides that Holders of Claims and Equity Interests in Classes 8, 9 and 10 will not receive any distribution or retain any property under the Plan, and Classes 8, 9 and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Nevertheless, the Plan is confirmable because, as more fully set forth in paragraph KK of this Order, the Plan satisfies section 1129(b)(1) of the Bankruptcy Code with respect to Classes 6, 7, 8, 9 and 10.

### Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

FF.    The Plan provides for treatment of Administrative Claims, Priority Tax Claims and Claims entitled to priority pursuant to section 507(a)(4)-(7) of the Bankruptcy Code in the manner required by section 1129(a)(9) of the Bankruptcy Code.

### Section 1129(a)(10) – Acceptance by at Least One Impaired Class

GG.    Section 1129(a)(10) of the Bankruptcy Code is satisfied. Classes 3, 4 and 5 have voted to accept the Plan and, to the best of the Debtors' knowledge, do not contain "insiders."

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000312

### *Section 1129(a)(11) – Feasibility of the Plan*

HH.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The financial projections set forth in the Disclosure Statement and evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence or sufficiently challenged in any of the objections to the Plan and (iii) establish that the Plan is feasible and that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors, except as otherwise proposed in the Plan. The Debtors will have sufficient funds to satisfy their obligations under the Plan.

### *Section 1129(a)(12) – Payment of Bankruptcy Fees*

II.     In accordance with section 1129(a)(12) of the Bankruptcy Code, Article III of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930 until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first, in accordance with section 350(a) of the Bankruptcy Code. The Debtors and the Post-Consummation Trust, as applicable, have adequate means to pay all such fees.

### *Section 1129(a)(13) – Retiree Benefits*

JJ.     The Plan satisfies section 1129(a)(13) of the Bankruptcy Code. Payment of the Debtors' retiree benefits will be governed by, and the Debtors will comply with, the terms of the agreement between the Debtors and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, dated June 1, 2007.

### *Section 1129(b) – Confirmation of the Plan Over Nonacceptance by Impaired Class*

KK.     Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that not all Impaired Classes have voted to accept the Plan. All of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) with respect to such Impaired Classes have been met. With respect to Classes 6 and 7, which

13

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000313

voted to reject the Plan, and Classes 8, 9 and 10, which are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, no Holder of Claims or Equity Interests junior to Classes 6, 7, 8, 9 or 10 will receive or retain any property under the Plan on account of a junior Claim, and, as evidenced by the uncontroverted valuations and estimates contained in the Disclosure Statement and put into evidence at the Confirmation Hearing, no Class of Claims or Equity Interests senior to any such Classes is receiving more than full payment on account of such Claims or Equity Interests.

*Section 1129(d) – Principal Purpose of the Plan*

LL.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

### Treatment of Unimpaired Claims

MM.     The provisions of the Plan with respect to the Holders of Unimpaired Claims are fair and appropriate.

### Objections to Confirmation of the Plan

NN.     All objections to Confirmation filed with the Court have been withdrawn, settled, resolved or have been overruled on their merits pursuant to the Confirmation Hearing and this Order.

### Executory Contracts and Unexpired Leases

OO.     The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their Executory Contracts and Unexpired Leases as set forth in Article V of the Plan and in this Order. Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Order or Article V of the Plan shall be legal, valid and binding upon the applicable Debtor or the Post-Consummation Trust and all other Debtor or non-Debtor parties to such Executory Contract or Unexpired Lease, all to the same extent as if such

14

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000314

assumption or rejection had been authorized and effectuated pursuant to an appropriate order of the Court that was entered pursuant to section 365 of the Bankruptcy Code prior to the Confirmation Date.

### Releases

**PP.** **Except to the extent otherwise set forth in this Order, the releases of Claims and Causes of Action described in Article XII of the Plan constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the release, indemnification and exculpation provisions set forth in the Plan, including Article XII of the Plan, (i) is within the jurisdiction of the Court under 28 U.S.C. § 1334(a), (b) and (d), (ii) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code, (iii) is an integral element of the transactions incorporated into the Plan, (iv) confers material benefit on, and is in the best interest of, the Debtors, their estates and their creditors, (v) is important to the overall objectives of the Plan to finally resolve the Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors and (vi) is consistent with sections 105, 1123 and 1129 and other applicable provisions of the Bankruptcy Code.**

### Preservation of Causes of Action

**QQ.** While the Debtors have made a reasonable effort to identify known actual or potential Causes of Action that the Litigation Trust may pursue after the Effective Date, the Litigation Trust has the right to pursue or defend Causes of Action not specifically or generally identified in Article IV.G of the Plan and Exhibit A to the Plan and the Disclosure Statement.

15

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000315

RR.    It is in the best interests of the Debtors' Estates and the Holders of Claims that all Causes of Action not expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, including this Order, be retained by the Debtors before the Effective Date, and by the Litigation Trust and the Post-Consummation Trust, as applicable, upon and after the Effective Date, pursuant to Article IV.G of the Plan.

### Approval of Settlements and Compromises

SS.    Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise of all Claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any distribution to be made on account of such an Allowed Claim.  The compromise and settlement of such Claims or controversies embodied in the Plan is in the best interests of the Debtors, their Estates and Holders of Claims and is fair, equitable and reasonable.

TT.    The settlement reached among the constituents of the Creditors Committee with respect to the allocation of the Litigation Recovery Interests as set forth on Exhibit J to the Plan is fair, equitable and reasonable, and complies with the applicable legal standard set forth in Bankruptcy Rule 9019.

UU.    All settlements and compromises of Claims and causes of action of non-Debtor entities that are embodied in the Plan are effective and binding on each Holder of a Claim and Equity Interest who may have standing to assert such Claims or causes of action, and no such Holder of a Claim or Equity Interest shall possess standing to assert such Claims or causes of action after the Effective Date.

16

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000316

**Satisfaction of Conditions to Confirmation**

VV.    Each of the conditions precedent to entry of this Order, as set forth in Article X of the Plan, has been satisfied or waived in accordance with the Plan.

**Satisfaction of Conditions of Consummation**

WW.    Each of the conditions precedent to the Effective Date under Article X of the Plan has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied.

**Retention of Jurisdiction**

XX.    The Court may properly retain jurisdiction over the matters set forth in Article XIII of the Plan.

**Exemptions from Taxation**

YY.    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, including the Soft-Trim Sales Transaction, the Remaining Sales Transactions and the other transactions related to the Sale Process (as defined and described in the Disclosure Statement), may not be taxed under any law imposing a stamp tax or similar tax.  Any transfers from the Debtors to the Post-Consummation Trust, the Litigation Trust, the Residual Trusts or otherwise pursuant to the Plan, and any transfers from the NH Trust (as defined below), shall not be subject to any such taxes, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and must accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Any of the transactions described in the Plan or the Disclosure Statement taken on, prior to or after the Effective Date are hereby deemed to have been in furtherance of, or in connection with, the Plan.

17

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000317

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### Confirmation of the Plan

1.     The Plan and each of its provisions, as modified by this Order and on the record at the Confirmation Hearing, is confirmed and approved on a final basis in each and every respect pursuant to section 1129 of the Bankruptcy Code. The terms of the Plan and the exhibits thereto are incorporated by reference into, and are an integral part of, this Order. The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent. Notwithstanding the foregoing, if there is any direct conflict between the terms of the Plan and the terms of this Order, the terms of this Order shall control. All objections and responses to, and statements and comments regarding, the Plan, to the extent not already withdrawn or resolved pursuant to representations on the record at the Confirmation Hearing are overruled on their merits.

### Plan Modifications

2.     All modifications or amendments to the Plan since the solicitation, as set forth in the Plan, this Order and on the record at the Confirmation Hearing, are approved pursuant to section 1127(a) of the Bankruptcy Code, and the Plan, as modified, meets the requirements of, among other applicable law, sections 1122 and 1123 of the Bankruptcy Code.

### Plan Classification Controlling

3.     The classification of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (a) were set forth on the ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or

18

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000318

otherwise affect, the actual classification of such Claims under the Plan for distribution purposes, (c) may not be relied upon by any creditor as representing the actual classification of such Claims under the Plan for distribution purposes and (d) shall not be binding on the Post-Consummation Trust, the Litigation Trust or the Debtors.

## Effects of Confirmation

### *Existing Injunctions and Stays Remain in Effect Until Effective Date*

4.      Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362 or 525 of the Bankruptcy Code or otherwise and in existence on the date of this Order, shall remain in full force and effect until the Effective Date.  This Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan.

### *Injunction*

5.      Article XII.E of the Plan is approved as follows:

> **Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims or the NNA Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is paid, compromised or otherwise classified or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such paid, compromised or otherwise classified Claims, debts or liabilities or terminated Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, any of the Trusts or their respective property, other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, any of the Trusts or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or**

19

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000319

encumbrance against the Debtors, any of the Trusts or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or any of the Trusts; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims or the NNA Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold any claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that are released pursuant to the Plan are permanently enjoined from taking any of the following actions against any released Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:    (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Article XII.E.

*Exculpation*

6.    Article XII.D of the Plan is approved as follows:

Notwithstanding anything contained in the Plan to the contrary except Article XIV.J, the Exculpated Parties will neither have nor incur any liability to any Person for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing or administering the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or

20

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000320

postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; provided that (i) the foregoing provisions of this Article XII.D will have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, (ii) each Exculpated Party will be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan, (iii) the foregoing provisions of this Article XII.D will not apply to any acts or omissions expressly set forth in and preserved by the Plan and (iv) the foregoing provisions of this Article XII.D will have no effect on any liability of the Post-Consummation Trust that results from any such acts or omissions in connection with the Customer Agreement or the Post-Petition Customer Contracts

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will not include the Non-Released Parties, and the Plan will not exculpate nor be deemed to have exculpated any of the Non-Released Parties for any acts they have taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

### Releases by the Debtors and the OEMs

7. Article XII.B of the Plan is approved as follows:

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by each of the Debtor Releasees, including: (1) the discharge of claims and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the officers and directors employed by the Debtors on or after November 1, 2006 in facilitating the expeditious implementation of the transactions contemplated by the Plan, each of the Debtors will provide a full discharge and release to each of the OEMs and the Debtor Releasees (and each such OEM and Debtor Releasee so released will be deemed released and discharged by the Debtors) and the respective properties of each such OEM and Debtor Releasee from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action,

21

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000321

remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the Debtors or any of the Trusts would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the Debtors or any of their Estates and further including those in any way related to the Chapter 11 Cases or the Plan; provided that the foregoing provisions of this Article XII.B will not operate to waive or release any Debtor Releasee from any Causes of Action set forth on Exhibit A.

Notwithstanding anything contained in the Plan to the contrary, except as otherwise set forth in the Customer Agreement and the OEM Excluded Claims, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by the Debtors, including the releases of the OEMs set forth in this Article XII.B, each of the OEMs will provide a full discharge and release to each of the Debtors (and each such Debtor so released will be deemed released and discharged by each of the OEMs) and the Debtors' respective properties from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the OEMs would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the OEMs and

22

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000322

further including those in any way related to the Chapter 11 Cases or the Plan.

Notwithstanding anything contained in the Plan to the contrary, the Debtors will not have released nor be deemed to have released by operation of this Article XII.B or otherwise any of the Causes of Action set forth on Exhibit A or any other claims, causes of action, debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that they or any of the Trusts may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases provided under this Article XII.B, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the OEMs, representing good faith settlement and compromise of the claims released herein; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) approved after due notice and opportunity for hearing; (5) a bar to the Debtors and the Trusts asserting any Claim released herein against any of the Debtor Releasees or their respective property; and (6) a bar to each of the OEMs asserting any Claim released herein against any of the Debtors or their respective property.

*Third Party Releases*

8.    Article XII.C of the Plan is approved as follows:

As of the Effective Date, in consideration for the obligations of the Debtors and the Trusts under the Plan and the Cash, other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Releasing Party will be deemed to forever release, waive and discharge all claims (including Derivative Claims), causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies and liabilities (other than the right to enforce the obligations of the Debtors or the Trusts under the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently

23

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000323

existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Chapter 11 Cases or the Plan that such Person has, had or may have against any Third Party Releasee and their respective property (which release will be in addition to the discharge of Claims and termination of Equity Interests provided herein and under the Confirmation Order and the Bankruptcy Code).

Notwithstanding anything contained in the Plan to the contrary, the Releasing Parties will not have released nor be deemed to have released by operation of this Article XII.C or otherwise any claims or causes of action that they, the Debtors or any of the Trusts may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the release provided under this Article XII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the Releasing Parties, representing good faith settlement and compromise of the claims released herein; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable, and reasonable; (4) approved after due notice and opportunity for hearing; and (5) a bar to any of the Releasing Parties asserting any claim released by this Article XII.C against any of the Third Party Releasees or their respective property.

<u>Matters Relating to Implementation of the Plan</u>

*Executory Contracts and Unexpired Leases*

9.      The Executory Contract and Unexpired Lease provisions of Article V of the Plan are hereby approved and Executory Contracts and Unexpired Leases are rejected under the terms set forth in Article V of the Plan.

10.     Except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Court with an effective date of

24

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000324

such rejection on or before the Effective Date or that is assumed pursuant to Article V.A of the Plan or is assumed elsewhere in this Order, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date will be rejected pursuant to section 365 of the Bankruptcy Code on the Effective Date or as of the date set forth on Exhibit F to the Plan.

11.     If the rejection of an Executory Contract or Unexpired Lease gives rise to a Claim (including any Claims arising from those indemnification obligations) by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors, the Trusts, their respective successors or their respective properties unless a proof of Claim is Filed and served on the Post-Consummation Trust no later than 30 days after the Effective Date.

12.     Nothing in this Order, the Plan or any exhibit to the Plan is intended or shall be construed as a waiver of the Debtors' authority to assume and assign or reject an Executory Contract or Unexpired Lease prior to the Effective Date, including in connection with the sale(s) of the Debtors' businesses, pursuant to procedures approved by the Court.

***Immediate Effectiveness; Successors and Assigns***

13.     Immediately upon the entry of this Order, the terms of the Plan, all exhibits thereto and all other relevant and necessary documents, shall be, and hereby are, deemed effective and binding upon the Debtors, any and all Holders of Claims or Equity Interests, the Creditors Committee, the Agent, the Prepetition Lenders, and any other interested parties and all respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing parties.

***Corporate Authorization; Dissolution***

14.     Upon the entry of this Order by the Court, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without

25

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000325

any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors.  The Debtors may, in consultation with the Agent, for the purpose of effectuating the transfer of the Remaining Assets to the Post-Consummation Trust in a manner deemed to be in the best interests of the Post-Consummation Trust and its beneficiaries (a) preserve the corporate existence of some or all of the Debtors so as to permit the transfer of the Remaining Assets owned by such Debtors by means of direct or indirect transfers of the stock or other equity interests of such Debtors to the Post-Consummation Trust, and if deemed desirable in connection therewith to cancel the existing stock or other equity interests of such Debtors, issue new stock or equity interests of such Debtors, amend the organizational documents of such Debtors and replace the officers and directors of such Debtors,  (b) create new corporations or other entities and transfer certain of the Remaining Assets thereto so as to permit the transfer of such Remaining Assets by means of direct or indirect transfers of the stock or other equity interests of such new corporations or other entities to the Post-Consummation Trust and (c) effect other transactions determined by the Debtors and the Agent to be appropriate to achieve such purpose.  To the extent not used in the transfer of Remaining Assets and not completed prior to the Effective Date, the Debtors (and, in any event, their boards of directors) will dissolve or otherwise terminate their existence following the Effective Date and are authorized to dissolve or terminate the existence of wholly owned non Debtor subsidiaries following the Effective Date as well as any remaining health, welfare or benefit plans.

15.    The Debtors and the Post-Consummation Trust are authorized to effect any Restructuring Transactions.

26

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000326

***Post-Consummation Trust/ Plan Administrator***

16.     The Plan Administrator's appointment shall be effective as of the Effective Date. The Plan Administrator's compensation shall be as set forth in the Post-Consummation Trust Agreement.

17.     The Post-Consummation Trust Agreement and all of the terms and conditions contained therein are approved.

18.     The powers, authority, responsibilities and duties of the Post-Consummation Trust, the Plan Administrator and the Post-Consummation Trust Advisory Board are set forth in and will be governed by the Post-Consummation Trust Agreement.

19.     On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Post-Consummation Trust all of their rights, title and interests in all of the Remaining Assets, which transfer shall have the effect set forth in the Plan (including, without limitation, Articles IV.B and VIII thereof); provided that any assets securing the OEM Cap-Ex Claims that are transferred to the Post-Consummation Trust will be so transferred subject to the OEM Cap-Ex Claims and all other rights and remedies of the OEMs with respect to the OEM Cap-Ex Claims set forth in the Customer Agreement and the July 8, 2005 Agreement.  In connection with the transfer of the Remaining Assets, including rights and Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives, and the Debtors and the Post-Consummation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

27

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000327

*Litigation Trust/ Litigation Trust Administrator*

20.     The Litigation Trust Administrator's appointment shall be effective as of the Effective Date. The Litigation Trust Administrator's compensation shall be as set forth in the Litigation Trust Agreement.

21.     The Litigation Trust Agreement and all of the terms and conditions contained therein are approved.

22.     The powers, authority, responsibilities and duties of the Litigation Trust, the Litigation Trust Administrator and the Litigation Trust Committee are set forth in and will be governed by the Litigation Trust Agreement.

23.     On the Effective Date, and in accordance with section 1123(b)(3) of the Bankruptcy Code and pursuant to the terms of the Plan, the Debtors will transfer to the Litigation Trust all of their rights, title and interests in all of the Litigation Trust Assets. All such assets shall vest exclusively in the Litigation Trust on the Effective Date. The Litigation Trust through its authorized agents or representatives will have and may exclusively enforce any and all of the Litigation Trust Assets in accordance with the provisions of the Litigation Trust Agreement. The Litigation Trust will have the exclusive right, authority and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any and all of the Litigation Trust Assets in accordance with the terms of the Litigation Trust Agreement.

24.     In connection with the transfer to the Litigation Trust of the Litigation Trust Assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust will vest in the Litigation Trust and its authorized agents and representatives,

28

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000328

and the Debtors and the Litigation Trust Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges to the Litigation Trust.

25.     On the Effective Date, the Debtors are authorized to deposit with the Litigation Trust $3 million in Cash to cover the reasonable costs of the Litigation Trust as more fully set forth in the Litigation Trust Agreement. The Litigation Trust will have no obligation to and will not repay the $3 million to the Debtors or the Post-Consummation Trust.

26.     On the Effective Date, the Debtors are authorized to deposit with the Litigation Trust any funds collected by the Debtors prior to the Effective Date on behalf of preference demands and duplicate payments and any interest earned on such collections.

### Residual Trusts

27.     The Residual Trust Agreements and all of the terms and conditions contained therein are approved.

28.     The Debtors, in consultation with the Agent, prior to the Effective Date, or the Post-Consummation Trust, on or after the Effective Date, will have the authority to establish the Residual Trusts in accordance with the Residual Trust Agreements to pay or otherwise resolve any Residual Trust Rights. The sole right to recover on account of the Residual Trust Rights will be limited to the Residual Trust Assets.

### Residual Claims Trust

29.     The Residual Claims Trust Agreement and all of the terms and conditions contained therein are approved.

30.     With the consent of the Insurers, which has been given to Debtors in connection with the Plan, all of the Debtors' rights and obligations under the Insurance Contracts are assigned to, and shall vest in, the Residual Claims Trust. The Residual Claims Trust, the

29

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000329

Post-Consummation Trust and the Litigation Trust shall be bound by the Plan, this Order and the Insurance Contracts.

### *Cancellation and Surrender of Instruments, Securities and Other Documentation*

31.     Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, the DIP Facility, the Prepetition Credit Facility, the Senior Note Indenture, the Senior Subordinated Note Indenture, the Senior Notes, the Senior Subordinated Notes and the Equity Interests will be canceled and of no further force and effect, without any further action on the part of any Debtor or any of the Trusts; except as otherwise provided in the Plan in connection with the charging liens of the Indenture Trustees that the provisions of the Senior Note Indenture and Senior Subordinated Note Indenture governing the rights of the Indenture Trustees with respect to their respective Holders will remain enforceable as between the Indenture Trustees and the Holders.   The Holders of or parties to instruments, securities and other documentation cancelled pursuant to the Plan will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided that no distribution under the Plan will be made to or on behalf of any Holder of an Allowed Claim evidenced by Senior Notes or Senior Subordinated Notes unless and until such instruments or securities are received by the Litigation Trust Administrator or the applicable Disbursing Agent, together with any letter of transmittal required by the Litigation Trust Administrator or applicable Disbursing Agent, to the extent required in Article VI.I of the Plan.

### Adequate Protection Payments

32.     The payment of a portion of the Adequate Protection Payments (as defined in the Disclosure Statement) that was heretofore deferred to August 1, 2007 pursuant to orders of this

30

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000330

Court dated August 29, 2006 and January 11, 2007, and payment of the corresponding portion of the Adequate Protection Payments for the additional periods through September 28, 2007, are hereby deferred to October 31, 2007. Such deferred Adequate Protection Payments (a) shall be deemed satisfied on the Effective Date by the distributions and other treatment provided on account of the Prepetition Facility Claims pursuant to Article III.C.1 of the Plan and (b) because the value of such treatment is substantially less than the principal amount of the Prepetition Facility Claims, the Adequate Protection Payments shall not be taken into consideration in determining the Allowed amount of the Prepetition Facility Claims.

### Distributions

33.     The distribution provisions of Article VI of the Plan are hereby approved in their entirety. The Debtors, the Plan Administrator and the Litigation Trust Administrator, or such Third-Party Disbursing Agents as the Post-Consummation Trust and the Litigation Trust may employ, as applicable, will administer all Claims and make all Distributions required under the Plan pursuant to the terms of the Plan. Pursuant to the terms of the Plan, the Litigation Trust will employ the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee as Third-Party Disbursing Agents with respect to any distributions to the Holders of the Senior Notes and the Holders of Senior Subordinated Notes, respectively, if such Indenture Trustees have offered to provide such services on reasonable and customary commercial terms.

### Maintenance of Causes of Action

34.     The provisions of Article IV.G of the Plan are hereby approved in their entirety. Except as otherwise provided in the Plan (including Article XII.B of the Plan), on the Effective Date, all of the Debtors' rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal

31

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000331

in an adversary proceeding or contested matter Filed in one or more of the Chapter 11 Cases, including, but not limited to, the actions set forth in Article IV.G of the Plan and any Causes of Actions specified on <u>Exhibit A</u> to the Plan, will be transferred to the Litigation Trust or the Post-Consummation Trust, as applicable, in accordance with the Plan.

35.     Unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve and transfer such claim or Cause of Action to the Litigation Trust and the Post-Consummation Trust, as applicable, for later adjudication by the applicable Trust, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or this Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised or settled in the Plan or a Final Order.

### Prosecution of Objections to Claims

36.     All objections to Claims must be Filed by the Claims Objection Bar Date, and if Filed after the Effective Date, such objections shall be served only on the Holders of such Claims and the United States trustee.   If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.   An objection is deemed to have been timely Filed as to all Tort Claims and Potentially Insured Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.   Each such Tort Claim and Potentially Insured Claim will remain a Disputed Claim until it becomes an Allowed Claim by a Final Order.

32

37.     The Debtors, the Post-Consummation Trust, the Litigation Trust and the Residual Claims Trust, as applicable, shall reserve the right to extend the Claims Objection Bar Date by filing a motion with the Court with proper notice to parties in interest in accordance with relevant Local Rules of this Court and the Bankruptcy Rules.

38.     After the Effective Date, except as provided in paragraph 39 of this Order or Article VII.D of the Plan, only the Debtors or the Post-Consummation Trust will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims. After the Effective Date, except as provided in Article VII.D.1(c) of the Plan, the Post-Consummation Trust may settle or compromise any Disputed Claim without approval of the Court; provided that (a) the Post-Consummation Trust will promptly File with the Court a written notice of any settlement or compromise of a Claim with a Face Amount in excess of $1,000,000 and (b) the Agent and the United States trustee will be authorized to contest the proposed settlement or compromise by Filing a written objection with the Court and serving such objection on the Post-Consummation Trust within 20 days of the service of the settlement notice. If such objection is filed and the Post-Consummation Trust and the objecting party are unable to consensually resolve such objection, the objection will be set for hearing before the Court.  If no such objection is Filed, the applicable settlement or compromise will be deemed final without further action of the Court; provided that the Post-Consummation Trust will be authorized, but not required, to file a certification of no objection and submit an order to the Court on account of such settlements and compromises.

39.     Following the Effective Date, objections to and reconciliation of Class 5, 6 and 7 Claims will be performed by the Litigation Trust Administrator under the supervision and direction of the Litigation Trust Committee member(s) appointed by the Creditors Committee.

33

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000333

**Substantial Consummation**

40.    The substantial consummation of the Plan, within the meaning of section 1127 of

the Bankruptcy Code, shall be deemed to have occurred on the Effective Date.

**Retention of Jurisdiction**

41.    Notwithstanding the entry of this Order and the occurrence of the Effective Date,

the Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is

legally permissible, including jurisdiction to:

    a.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, Priority Claim, Secured Claim and Unsecured Claim and the resolution of any objections to the allowance, priority or classification of Claims or Equity Interests;

    b.    Determine any matters related to or in connection with the Soft-Trim Sales Transaction and the Remaining Sales Transactions;

    c.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

    d.    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or the Post-Consummation Trust may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

    e.    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

    f.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

    g.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or this Order;

34

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000334

h.    Resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

i.    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, this Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or this Order; or remedy any defect or omission or reconcile any inconsistency in any Court order, the Plan, the Disclosure Statement, this Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or this Order, in such manner as may be necessary or appropriate to consummate the Plan;

j.    Issue injunctions, enforce the injunctions contained in the Plan and this Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with Consummation, implementation or enforcement of the Plan or this Order;

k.    Enter and implement such orders as are necessary or appropriate if this Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

l.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, this Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or this Order;

m.    Determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes; and

n.    Enter a Final Decree closing the Chapter 11 Cases.

### Payment of Statutory Fees

42.    On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash equal to the amount of such Administrative Claims. After the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930

35

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000335

will be paid by the Post-Consummation Trust in accordance therewith until the closing of the

Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

## Modifications

43.     Without need for further order or authorization of this Court, the Debtors and the

Post-Consummation Trust are authorized to make any and all modifications to the Plan before its

substantial consummation in such a manner that does not materially modify the terms of the

Plan, as modified by this Order, and as may be necessary to carry out the purposes and intent of

the Plan; provided that (a) the consent of the Litigation Trust Administrator shall be required

prior to any modifications to the provisions of the Plan that relate to the Litigation Trust and

(b) the consent of the Insurers shall be required prior to any modifications to the provisions of

the Plan that relate to the Insurers, the Insurance Contracts, or the Insurers' rights.

## Dissolution of the Creditors Committee

44.     Effective thirty (30) days after the Effective Date, if no appeal of this Order is

then pending, the Creditors Committee will dissolve and the members of the Creditors

Committee will be released and discharged from all duties and obligations arising from or related

to the Chapter 11 Cases.  The legal Professionals retained by the Creditors Committee and the

members thereof will not be entitled to assert any Fee Claim for any services rendered or

expenses incurred after thirty (30) days after the Effective Date, and the financial advisory

Professionals retained by the Creditors Committee and the members thereof will not be entitled

to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date,

except in either case for services rendered and expenses incurred in connection with any

applications for allowance of compensation and reimbursement of expenses pending on the

Effective Date or Filed and served after the Effective Date pursuant to Article III.A.1(f)(ii)(A) of

the Plan and in connection with any appeal of this Order.

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000336

**Post-Consummation Notices and Reports**

*Notice of Entry of Confirmation Order*

45.     Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtors are directed to serve a notice of the entry of this Order on all Holders of Claims or Equity Interests to whom the notice of the Confirmation Hearing was mailed and to the United States trustee no later than 60 days after the Confirmation Date; provided that if within 60 days after the Confirmation Date, this Court has entered a final decree closing these Chapter 11 Cases pursuant to Rule 3022, then the Debtors are authorized, in their discretion, to serve on the Persons identified in this paragraph, a combined notice of entry of this Order and entry of the final decree, in lieu of separate notices, no later than 75 days after the Confirmation Date.

46.     The Debtors shall serve copies of this Order on each party that has filed and not withdrawn a notice of appearance in these Chapter 11 Cases and on each party who filed an objection or response to, or statement or comment regarding the Plan, no later than 14 days after the Confirmation Date.

47.     Except as set forth in paragraphs 45 and 46 of this Order, no further notice of the entry of this Order shall be required.

*Notice of Effective Date*

48.     The Debtors shall serve a notice of the Effective Date (the "Effective Date Notice") on all Holders of Claims or Equity Interests to whom the notice of the Confirmation Hearing was mailed and to the United States trustee no later than 10 days after the Effective Date.

*General Bar Date for Administrative Claims*

49.     Except as otherwise provided in paragraph 50, unless previously Filed, requests for payment of Administrative Claims that arise on or before the Effective Date must be Filed

37

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000337

and served on the Post-Consummation Trust no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Post-Consummation Trust, the Litigation Trust or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Post-Consummation Trust and the requesting party by the later of (a) 180 days after the Effective Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims.

### Bar Date for Professional Compensation

50.    Professionals or other Persons asserting a Fee Claim for services rendered before the Effective Date must File and serve an application for final allowance of such Fee Claim no later than 30 days after the Effective Date on the following parties; provided that (a) any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Court review or approval, pursuant to the Ordinary Course Professionals Order and (b) any Professional that is entitled, pursuant to the Plan or an order of the Court, to receive payment from the Estates for fees and expenses incurred after the Effective Date in connection with the Chapter 11 Cases may be compensated by the Post-Consummation Trust without further application to the Court:

38

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000338

| | |
|---|---|
| **The Debtors and the Post-Consummation Trust** | **The Creditors Committee** |
| Richard M. Cieri | Michael S. Stamer |
| Kirkland & Ellis LLP | Philip C. Dublin |
| Citigroup Center | Akin Gump Strauss Hauer & Feld LLP |
| 153 East 53rd Street | 590 Madison Avenue |
| New York, New York 10022 | New York, New York 10022 |
| Telephone: (212) 446-4800 | Telephone: (212) 872-1000 |
| Facsimile: (212) 446-4900 | Facsimile: (212) 872-1002 |
| | |
| -and- | -and- |
| | |
| David L. Eaton | Thomas B. Radom |
| Ray C. Schrock | Butzel Long, P.C. |
| Scott R. Zemnick | 100 Bloomfield Hills Parkway |
| Kirkland & Ellis LLP | Bloomfield Hills, Michigan 48304 |
| 200 East Randolph Drive | Telephone: (248) 258-1616 |
| Chicago, Illinois 60601 | Facsimile: (248) 258-1439 |
| Telephone: (312) 861-2000 | |
| Facsimile: (312) 861-2200 | |
| | |
| -and- | |
| | |
| Joseph M. Fischer | |
| Lawrence A. Lichtman | |
| Carson Fischer, P.L.C. | |
| 4111 West Andover Road -- Second Floor | |
| Bloomfield Hills, Michigan 48302 | |
| Telephone: (248) 644-4840 | |
| Facsimile: (248) 644-1832 | |
| | |
| **The Post-Consummation Trust** | **The Agent** |
| Peter Chadwick | Harold S. Novikoff |
| Capstone Advisory Group, LLC | Gregory E. Pessin |
| 1875 I Street, NW | Wachtell, Lipton, Rosen & Katz |
| Suite 500 | 51 West 52nd Street |
| Washington, D.C. 20006 | New York, New York 10019 |
| Telephone: (202) 429-2079 | Telephone: (212) 403-1000 |
| Facsimile: (202) 429-2081 | Facsimile: (212) 403-2000 |
| | |
| **The United States Trustee** | |
| Stephen E. Spence | |
| U.S. Department of Justice | |
| Office of the United States Trustee | |
| 211 West Fort Street, Suite 700 | |
| Detroit, Michigan 48226 | |
| Telephone: (313) 226-7911 | |
| Facsimile: (313) 226-7952 | |

51.     Objections to any Fee Claim must be Filed and served on the

Post-Consummation Trust and the requesting party by the later of (a) 60 days after the

39

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000339

Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Fee Claim.

### Authorization to Consummate

52.     The Debtors are authorized to consummate the Plan at any time after the entry of this Order subject to the satisfaction or waiver of the conditions precedent to Consummation set forth in Article X.B of the Plan.

53.     The Debtors are authorized and empowered to take any and all actions necessary or appropriate to consummate and implement the Plan, together with all additional instruments and documents that may be reasonably necessary or appropriate to consummate and implement the Plan.

### Failure to Consummate the Plan

54.     In accordance with Article X.D of the Plan, if the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in this Order, the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests, in any Debtor; (b) prejudice in any manner the rights of any Debtor or any other party; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor in any respect.

### Specific Creditor Provisions

55.     Notwithstanding anything contained in the Plan or elsewhere in this Order, the provisions of Article XII.E of the Plan shall not preclude the assertion at any time of a right of setoff or a right of recoupment by Shawmut Corporation for which a proof of claim asserting such right was timely Filed.  Any objection to such right of setoff or right of recoupment shall be determined in accordance with the procedures set forth in the Plan.

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000340

56.     Notwithstanding anything contained in the Plan or elsewhere in this Order, the provisions of Articles XII.C and XII.E of the Plan shall not preclude the assertion at any time of a right of setoff or a right of recoupment or any defense (affirmative or otherwise) by VF Corporation or VF Playwear, Inc. however the same may arise, including those types of matters described in Article XII.E of the Plan, relating to the substance of the matters identified in a proof of claim that was timely Filed.  Any objection to such claim shall be determined in accordance with the procedures set forth in the Plan.  Such rights and/or defenses are preserved and are not reduced or impacted by the Plan.

57.     Neither the provisions of Article XII.E of the Plan nor any other provision of the Plan shall enjoin or otherwise preclude the assertion at any time of a right of setoff, recoupment or any defense (affirmative or otherwise) by H.P. Pelzer Automotive System, Inc. and/or Cimatron Technologies, Inc. to an objection to claim, other contested matter or adversary proceeding.  Such rights and/or defenses are preserved and are not reduced or impacted by the Plan.

58.     Notwithstanding anything to the contrary in the Plan or this Order, CBS Operations Inc. (f/k/a Viacom International Inc.) shall not be a Releasing Party and shall not be subject to the Third Party Releases set forth herein or in Article XII.C of the Plan.

59.     Neither the provisions of Article XII.C or Article XII.E of the Plan, nor any other provision of the Plan, shall enjoin or otherwise preclude the assertion at any time of a right of setoff, recoupment or any defense (affirmative or otherwise) by Becker Properties, LLC; Becker Ventures; Anchor Court, LLC; Townhall 4, LLC; Lear Corporation; Cooper-Standard Automotive Inc.; TR Associates, LLC; Pentastar Aviation, LLC; Freudenberg NOK, Inc.; Freudenberg;   Freudenberg   Spinweb   Company;   Freudenberg   Nonwovens,   L.P.;

41

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000341

Freudenberg Spunweb Company; Freudenberg Nonwovens Group North America Tuft Division; Comerica Leasing Corporation; and/or Comerica Bank in any context (whether as an affirmative defense, an affirmative right or otherwise). Such rights and/or defenses are preserved and are not reduced or impacted by the Plan.

60.    Notwithstanding anything to the contrary in the Plan or this Order, Becker Properties, LLC; Becker Ventures; Anchor Court, LLC; Townhall 4, LLC; Lear Corporation; Cooper-Standard Automotive Inc.; TR Associates, LLC; Pentastar Aviation, LLC; Freudenberg NOK, Inc.; Freudenberg; Freudenberg Spinweb Company; Freudenberg Nonwovens, L.P.; Freudenberg Spunweb Company; Freudenberg Nonwovens Group North America Tuft Division; Comerica Leasing Corporation; and/or Comerica Bank shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

61.    Notwithstanding anything to the contrary in the Plan or this Order, the rejection dates for all of the Unexpired Leases to which Becker Properties, LLC is a counterparty as listed on Exhibit F to the Plan shall be governed by the various orders entered by the Court approving the rejection of such Unexpired Leases, and the "Estimated Dates of Rejection" for such Unexpired Leases as listed on Exhibit F to the Plan are inapplicable.

62.    Notwithstanding any language in the Plan or Disclosure Statement to the contrary, the Debtors acknowledge and agree that they do not retain any equity interest in Collins & Aikman MOBIS, LLC and that the Debtors duly conveyed to MOBIS Alabama, LLC ("MOBIS") all their equity interest in Collins & Aikman MOBIS, LLC pursuant to the Membership Interest Purchase Agreement between MOBIS and Collins & Aikman Products Co. that was approved by this Court by order entered on August 16, 2006.

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000342

63.     Notwithstanding anything to the contrary in the Plan or this Order, the State of Michigan, Treasury Department (the "Treasury") shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.  Notwithstanding anything to the contrary in the Plan or this Order, to the extent the Treasury has a right to a distribution under the Plan on account of its Allowed Other Secured Claim or Allowed Priority Tax Claim and such distribution is not timely made to the Treasury in accordance with the Plan, the Treasury may seek to enforce any right to such distribution, but only after providing the Debtors or, if applicable, the Post-Consummation Trust with 30 days from the Debtors' receipt of written notice by the Treasury of such untimely distribution to make such distribution.

64.     Notwithstanding anything to the contrary in the Plan or this Order, the Debtors and, to the extent applicable, the Post-Consummation Trust, shall continue to fulfill all of the duties and obligations of the Debtors set forth in paragraph 11 of the Final Order Approving Customer Agreement Among the Debtors, Their Principal Customers and JPMorgan Chase Bank, N.A. and Related Relief [Docket No. 3890] (the "Final Customer Agreement Order") in favor of H.S. Die and Engineering, Inc. and its affiliates and subsidiaries, including, but not limited to, the maintenance of the H.S. Die Deemed Segregated Proceeds (as such term is defined in the Final Customer Agreement Order), subject to all rights, claims and defenses of the Debtors, to the extent applicable, the Post-Consummation Trust, the Customers (as such term is defined in the Customer Agreement), the Debtors' prepetition and postpetition senior, secured lenders and other parties in interest, other than contesting the finality of the Final Customer Agreement Order.

65.     Notwithstanding anything to the contrary in the  Plan or this Order, (a) the Inmet Division of Multimatic shall not be a Releasing  Party and shall not be subject to

43

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000343

Article XII.C of the Plan or paragraph 8 of this Order, (b) the provisions of Article XII.E of the Plan shall not preclude the assertion at any time of a right of setoff or a right of recoupment by the Inmet Division of Multimatic (i) for which a proof of claim asserting such right was timely Filed, subject to any rights, claims and defenses of any party with respect thereto or (ii) on account of a postpetition, pre-Confirmation Allowed Administrative Claim maintained by the Inmet Division of Multimatic against the Debtors, if any, subject to any rights, claims and defenses of any party with respect thereto and (c) the provisions of Article XII.E of the Plan shall not preclude the Inmet Division of Multimatic's ability to enforce any right to a distribution on account of a postpetition pre-Confirmation Allowed Administrative Claim, if any, subject to any rights, claims and defense of any party with respect thereto. Any objection to the Inmet Division of Multimatic's right of setoff or right of recoupment shall be determined in accordance with the procedures set forth in the Plan.

66.     Notwithstanding anything to the contrary in the Plan or this Order, DOTT Industries, Inc. shall not be a Releasing Party and shall not be subject to the Third Party Releases set forth herein or in Article XII.C of the Plan, nor shall any provision in the Plan or this Order compromise or diminish DOTT Industries, Inc.'s right, if any, to exercise setoff against any Third Party Releasee or other non-Debtor entity, subject to any rights, claims or defenses of any party with respect thereto.

67.     Notwithstanding anything to the contrary in the Plan or this Order, the Ohio Department of Taxation shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

68.     Notwithstanding anything contained in the Plan or elsewhere in this Order, the provisions of Article XII.E of the Plan shall not preclude the assertion at any time of a right of

44

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000344

setoff or a right of recoupment by Texas Comptroller of Public Accounts for which a proof of claim preserving such right was timely Filed. Any objection to such right of setoff or right of recoupment shall be determined in accordance with the procedures set forth in the Plan.

69.     Notwithstanding anything to the contrary in the Plan or this Order, to the extent the Allowed Priority Tax Claims, if any, of the Texas Comptroller of Public Accounts are not paid within 30 days after the Effective Date, such claims are subject to Article III.A.2. of the Plan except that such claims shall be satisfied in Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest of nine percent (9.0%) per annum from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim.

70.     Notwithstanding anything to the contrary in the Plan or this Order, the case of *Wanda Patterson et al. v. Heartland Industrial Partners, LLP et al.* (the "Patterson Action") currently pending in the United States Court of Appeals for the Sixth Circuit (the "Court of Appeals") shall be permitted to proceed in the Court of Appeals for the limited purpose of allowing (a) the parties in the Patterson Action to present oral argument before the Court of Appeals in connection with their cross-appeals of the summary judgment order previously issued by the United States District Court for the Northern District of Ohio, (b) the Court of Appeals to rule on such appeals and (c) the parties in the Patterson Action to further appeal said ruling(s) to an en banc panel of the Court of Appeals or to the United States Supreme Court. Nothing in this paragraph is intended or shall be construed to permit any other or further proceeding in the Patterson Action, or any other judicial, administrative or other action or proceeding, including the reopening of discovery or any advancement to trial in the Patterson Action.

71.     The Debtors shall serve the Effective Date Notice upon counsel for Connecticut General Life Insurance Company ("CGLIC") in accordance with paragraph 48 of

45

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000345

this Order. Notwithstanding anything to the contrary in the Plan or this Order, each of the Group Contracts/ Policies between the Debtors and CGLIC, pursuant to which CGLIC provides, among other things, claims processing services in connection with the Debtors' self-insured medical benefits plan and other insurance benefits to the Debtors and their employees, (collectively, the "CGLIC Agreements") shall be deemed rejected as of the earlier of (a) ten (10) days after the date of service of the Effective Date Notice and (b) ten (10) days after the date of service of a rejection notice served in accordance with the procedures approved by the Court in the Order Approving Expedited Rejection Procedures for Executory Contracts and Unexpired Leases [Docket No. 3151]; provided that, in the event the Debtors elect to (x) amend Exhibit E to the Plan to add any or all of the CGLIC Agreements or (y) otherwise assume and assign any or all of the CGLIC Agreements prior to the Effective Date, the Debtors shall serve notice of such assumption and assignment upon counsel for CGLIC, and CGLIC shall have until ten (10) days after the date of service of such notice to file an objection to such proposed assumption and assignment.

72.     Pursuant to this Order and the Plan, two custodial trusts will be created to hold the properties and funds described below for the benefit of U.S. EPA (the "Zanesville Trust") and New Hampshire DES (the "NH Trust" and collectively with the Zanesville Trust, the "Custodial Trusts"). The Custodial Trusts shall constitute Residual Trusts under the Plan.

73.     As described below, the following properties will be transferred to the Custodial Trusts, or, in the case of the Farmington Plant Property, to such party as the State of New Hampshire may designate, free and clear of all liens and encumbrances of record:

       a.      Land and buildings constituting the Farmington Plant Property;

       b.      Cardinal Landfill Property; and

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000346

c.      Zanesville Mosaic Tile Property.

74.     The Michigan Department of Environmental Quality ("MDEQ") will not object to the abandonment pursuant to 11 U.S.C. § 554 of the Mancelona Pond Property (a/k/a the Wickes Effluent Pond) by the Debtor[4] subject to the execution and recording of both an easement of access in gross to the property and a restrictive covenant prohibiting the use of groundwater and providing any other necessary use restrictions at the property and subject to paragraph 80 of this Order.

75.     On the Effective Date, the Farmington Plant Property will be transferred to the NH Trust or such party as the State of New Hampshire may designate, free and clear of all liens and encumbrances of record; provided that (a) the Debtor shall be permitted to continue to occupy the Farmington Plant Property for the purpose of liquidating machinery and equipment, and the removal of process waste and debris (as set forth below) located therein and not required to be left in place by the terms hereof until the earlier of (i) the date the Debtor provides notice of its liquidation sales (and cleanup consistent with the terms hereof) of the Farmington Plant Property and (ii) November 1, 2007 (the "Closure Date") and (b) until the Closure Date, the Debtor shall continue to (i) pay all carrying costs associated with the Farmington Plant Property, including any taxes, utilities and other similar costs, and (ii) perform any required environmental quality obligations associated with the Farmington Plant Property and the Cardinal Landfill Property.  On or before the Closure Date, the Debtor will remove from the Farmington Plant waste and debris resulting from facility operations.  The Debtor shall leave "as is" all systems for fire suppression, security, electrical, HVAC, water and the MOM 3A hydraulic containment

---

[4]   All references to the "Debtor" in paragraphs 72 through 84 shall refer to the relevant Collins & Aikman entity or, after the Effective Date, the Post-Consummation Trust or other successor to such entity under the Plan.

47

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000347

system and all related pumps; wells; treatment equipment; electrical and plumbing systems; any keys in Debtor's possession for equipment enclosures, monitoring and pumping wells and gates; and system manuals and information that are currently on-site (the "Hydraulic Containment System"). Until the Closure Date the Debtor will continue to operate the Hydraulic Containment System. The Debtor shall provide to the State of New Hampshire all files and records in its possession pertaining to the environmental condition of the Farmington Plant and the Dover property for which it has information, including all site-specific data prepared by consultants employed by the Debtor not previously supplied to the Department. This shall include paper documents, electronic databases, spread sheets, and other electronic files and records.

76.      At the Cardinal Landfill the Debtor shall leave "as is" all security, electrical, plumbing, monitoring wells, pumps and related equipment and utilities, and the soil vapor management system that are currently on-site, including all related equipment and utilities in the on-site treatment shed ("SVMS"). The Debtor shall provide any keys in its possession for equipment enclosures, monitoring wells, pumping wells and gates at the Cardinal Landfill property. The Debtor shall provide to the State of New Hampshire all files and records in its possession pertaining to the environmental condition of the Cardinal Landfill site for which it has information, including site-specific data prepared by consultants employed by the Debtor not previously supplied to the Department. This shall include paper documents, electronic databases, spread sheets, and other electronic files and records.

77.      At the Mancelona Pond Property, the Debtor shall leave "as is" all monitoring wells, including off-site monitoring wells to the extent permitted by any access agreements between the Debtor and the owners of the property on which the monitoring wells are located, and if the monitoring wells are locked, will provide the MDEQ with keys in its possession. The

48

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000348

Debtor shall provide the MDEQ with keys to the gate for the fenced portion of the Mancelona Pond Property. On or before the Effective Date, the Debtor shall turn over to the MDEQ all files and records in its possession pertaining to the environmental conditions at or associated with the Mancelona Pond Site and the former Wickes Manufacturing Plant (now owned by Dura Operating Corp.), including any site-specific data prepared by consultants employed by the Debtor. This shall include paper documents, electronic databases, spread sheets and other electronic files and records. The Debtor shall also provide, as part of the restrictive covenant and easement in gross, any surveys and legal descriptions of the Mancelona Pond Property that are in its possession.

78.     The terms and conditions related to the Zanesville Mosaic Tile property are set forth in the Zanesville Settlement Agreement (as defined below). The Debtor shall provide to U.S. EPA any surveys and legal description of the Zanesville Mosaic Tile Property that are in its possession.

79.     The NH Trust will be funded with $3,642,857 on the Effective Date.

80.     On the Effective Date, the Debtor shall pay to the State of Michigan $607,143. The MDEQ's share of the base settlement proceeds will be paid directly into the State of Michigan's Environmental Response Fund pursuant to a mutually acceptable Michigan Settlement Agreement, which settlement agreement shall be the stipulation referenced in paragraph 90 of this Order. MDEQ does not assume liability for Claims against the Debtors by receipt of the settlement proceeds.

81.     An agreement in principle has been reached between the Debtor, U.S. EPA and a third party (the "Marmon Group") under which the Zanesville Mosaic Tile property will be transferred to the Zanesville Trust. The terms of the settlement relating to the Zanesville Mosaic

49

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000349

Tile property are set forth in the Zanesville settlement agreement by and between the Debtor, the U.S. EPA and the Marmon Group (the "Zanesville Settlement Agreement"). The date on which the Zanesville Settlement Agreement becomes effective in accordance with its terms is hereinafter referred to as the "Zanesville Effective Date."

82.     In the event the Zanesville Effective Date has not occurred on or before the Effective Date, the Debtor shall deposit $750,000 into escrow pursuant to an escrow agreement in form and substance satisfactory to the parties. If the Zanesville Effective Date occurs within 12 months of the Effective Date, the escrowed funds shall be refunded to the Debtor. If the Zanesville Effective Date does not occur within 12 months of the Effective Date, the escrowed funds less the amount of any Alternate Value (as defined below) shall be paid by the escrow agent to the Agencies (as defined below) in accordance with a formula to be agreed among them and made part of the Escrow Agreement, and escrowed funds in the amount of any Alternate Value shall be refunded to the Debtor. Interest earned on any funds in the escrow shall be paid to the party entitled to receive such funds. "Alternate Value" shall mean 70% of the monetary value of any capping, monitoring or related work at the Zanesville site that Marmon Group or another third party becomes obligated to perform; provided that in no case shall the Alternate Amount exceed $525,000. The Debtor and U.S. EPA will attempt in good faith to agree on the monetary value of such work and, if no such agreement is reached, will seek resolution with the assistance of a mutually acceptable neutral.

83.     U.S. EPA, New Hampshire DES, and MDEQ (collectively, the "Agencies") will not seek injunctive relief or otherwise pursue the Debtor or the Post-Consummation Trust for cleanup of the properties listed in paragraph 73 of this Order.

50

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000350

84.     The Agencies shall have an allowed administrative claim in an amount from $4,250,000 to $5,000,000 (depending upon the timing of the Zanesville Effective Date) in these cases if the Plan is confirmed and consummated, or if an alternative plan that is proposed by the Debtor or other third party is confirmed and consummated, so long as such alternative plan provides the same treatment respecting the Agencies as that afforded the Agencies under the Plan, such claim to be shared among them as set forth in paragraphs 79 through 82 of this Order; provided that in any such case such treatment shall be deemed to satisfy and discharge such administrative claim in full. If, however, these cases are converted to a case under chapter 7 or a plan is confirmed that does not provide for the same treatment afforded the Agencies under the Plan, then the Agencies shall have (a) an allowed administrative claim, binding upon any future trustee, successor to the Debtor or alternative plan proponent totaling no more than $10,500,000 if the Marmon Settlement is finalized (such amount to be shared among New Hampshire DES ($9,000,000) and MDEQ ($1,500,000)), or (b) an allowed administrative claim, binding upon any future trustee, successor to the Debtor, or alternative plan proponent, totaling no more than $11,400,000 if the Marmon Settlement is not finalized.

85.     Paragraphs 72 through 84 of this Order shall also apply to the Debtor-leased property at 16 Industrial Park Drive in Dover, New Hampshire.

86.     Except as set forth in paragraph 83 of this Order, nothing in the Plan or this Order discharges, releases or precludes any liability to a governmental unit that is not a Claim.

87.     Except as set forth in paragraph 83 of this Order, any relief provided under the Plan or this Order to non-Debtors shall not release, discharge, enjoin or preclude any liability of such non-Debtors to a governmental unit under any federal, state or local environmental law except as set forth in the applicable Residual Trust Agreements that govern the Custodial Trusts.

51

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000351

88.    Nothing in the Plan or this Order discharges, releases or precludes any claim of a governmental unit that arises on or after the Effective Date; provided that, to the extent such claim is within the scope of the applicable Residual Trust Agreements that govern the Custodial Trusts, such claim shall be discharged, released and precluded as set forth therein or paragraph 83 of this Order.

89.    Except as set forth in paragraph 83 of this Order or the applicable Residual Trust Agreements that govern the Custodial Trusts, nothing in the Plan or this Order releases any entity from liability under environmental law as the owner or operator of property that such entity owns or operates after the Effective Date.

90.    The Debtors are authorized to enter into the stipulation between the Debtors and the State of Michigan substantially in the form of Docket No. 7729.

91.    Neither the provisions of Article XII.E of the Plan nor any other provision of the Plan or this Order shall enjoin or otherwise preclude the assertion at any time of a right of setoff or recoupment, or any other rights or claims asserted as defenses (affirmative or otherwise), including but not limited to any right to indemnification under the by-laws of Collins & Aikman Corporation, the Delaware General Corporate Law or that certain Services Agreement dated February 23, 2001, as amended, among Heartland Industrial Partners, L.P. ("Heartland") and the Debtors, by (a) Heartland and its affiliates, including but not limited to the Heartland Affiliates (as defined in Heartland's objection to the Plan [Docket No. 4644]), (b) their respective partners (both general and limited), members (both managing and otherwise), officers, directors, employees, agents and representatives, (c) Mr. Daniel P. Tredwell, (d) Mr. W. Gerald McConnell, (e) Mr. Samuel Valenti, III and (f) Mr. David Stockman.    Such rights and/or defenses are preserved and are not reduced or impacted by the Plan or this Order.

52

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000352

92.     Notwithstanding anything to the contrary in the Plan or this Order, (a) Heartland and its affiliates, including but not limited to the Heartland Affiliates (as defined in Heartland's objection to the Plan [Docket No. 4644]), (b) their respective partners (both general and limited), members (both managing and otherwise), officers, directors, employees, agents and representatives, (c) Mr. Daniel P. Tredwell, (d) Mr. W. Gerald McConnell, (e) Mr. Samuel Valenti, III and (f) Mr. David Stockman shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

93.     Notwithstanding anything to the contrary in this Order, the Plan, any exhibit to the Plan or any other Plan document, nothing in this Order, the Plan, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights and defenses of Fireman's Fund Insurance Company and National Surety Company (collectively, "FFIC"), if any, in any respect, including without limitation, any rights of recoupment, setoff, rescission, contribution and subrogation of FFIC. The rights of FFIC shall be determined under their respective insurance policies and applicable law. The Residual Claims Trust, the Post-Consummation Trust, the Litigation Trust and any other trust created by the Plan are bound by the policies issued by FFIC.

94.     Notwithstanding anything to the contrary in the Plan or this Order, The Haartz Corporation shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order, nor shall the provisions of Article XII.E of the Plan preclude the assertion at any time of a right of setoff or a right of recoupment by The Haartz Corporation for which a proof of claim asserting such right was timely Filed. Any objection to such right of

53

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000353

setoff or right of recoupment shall be determined in accordance with the procedures set forth in the Plan.

95.     Neither the provisions of Article XII.E of the Plan nor any other provision of the Plan shall enjoin or otherwise preclude the assertion at any time of a right of setoff, recoupment or any defense (affirmative or otherwise) by Johnson Controls, Inc., Intertec Systems, LLC and Bridgewater Interiors, LLC in any context (whether as an affirmative defense, an affirmative right or otherwise). Such rights and/or defenses are preserved and are not reduced or impacted by the Plan.

96.     Notwithstanding anything to the contrary in the Plan, this Order or the transactions contemplated thereby, The Dow Chemical Company and its subsidiaries and its affiliates (collectively "Dow") shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

97.     Notwithstanding anything to the contrary in the Plan (including but not limited to Article XII. A, C and E of the Plan), this Order, or the transactions contemplated thereby, and notwithstanding Dow's acceptance of any distribution under the Plan, Dow's right to assert any Cause of Action (whether as an affirmative defense, an affirmative right or otherwise) against the Debtors, the Debtor Releasees, and the Trusts (including, without limitation, the rights of setoff, subrogation and recoupment) shall not be limited, reduced, enjoined or otherwise impacted or affected in any way whatsoever; provided that Dow's right to assert any Cause of Action that arose prior to the Effective Date against the Debtors or the Trusts is solely for defensive purposes and Dow shall not have the right to assert any such pre-Effective Date Cause of Action against the Debtors or the Trusts seeking an affirmative recovery, except that Dow may file an administrative expense claim in accordance with and subject to the provisions of the Plan.

54

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000354

98.     Notwithstanding anything to the contrary in this Order, the Plan, the exhibits to the Plan, or any exhibits, schedules or other attachments to any motion or agreement providing for the sale of the Debtors' assets, any and all executory contracts with Dow are rejected as of the Effective Date of the Plan if they are still executory as of the Effective Date and Dow has no obligation to perform according to the terms of such executory contracts after their respective expiration date or the Effective Date, whichever is earlier, unless Dow consents in writing to an extension of such expiration date or rejection date or such contracts are assumed by a Court order prior to such expiration date or rejection date.

99.     Notwithstanding anything to the contrary in the Plan or this Order, Pullman Industries, Inc. ("Pullman") shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

100.    Neither the provisions of Article XII.E of the Plan nor any other provision of the Plan shall enjoin or otherwise preclude the assertion at any time of (a) a right of setoff, recoupment or any defense (affirmative or otherwise) by Pullman in any context (whether as an affirmative defense, an affirmative right or otherwise) or (b) any right or claim of ownership, lien, or otherwise, if and to the extent that same may be asserted as to or against any property in possession of Pullman.  Such rights and/or defenses are preserved and are not reduced or impacted by the Plan or this Order.

101.    Notwithstanding anything to the contrary in the Plan or this Order, the rights and claims of Pullman shall be determined on the merits of the matters before the Court in those adversary proceedings known as Collins & Aikman Corporation, et al. v. Noble International, Ltd., Adversary Proceeding No. 07-5679, and Collins & Aikman Corporation, et al. v. Pullman Industries, Inc., Adversary Proceeding No. 07-5461 (collectively, the

55

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000355

"Pullman Adversary Cases"), and Pullman shall have an Allowed Claim under the Plan as and to the extent awarded in the Pullman Adversary Cases.

102.   The Debtors shall be deemed to have segregated and hold $980,000 (the "TTERTT Fund") for amounts allegedly owed to TTERTT Associates, L.L.C. ("TTERTT") on account of the Debtors' obligations to TTERTT pursuant to the lease between TTERTT Associates, L.L.C. and Collins & Aikman Products Co. dated February 27, 2006 (as amended from time to time, the "Lease") for the period ending November 30, 2007; provided that the TTERTT Fund shall decrease dollar-for-dollar by amounts paid after the date of this Order by the Debtors to TTERTT under the Lease, which amounts once paid will not be subject to disgorgement for any reason. TTERTT shall have the same rights in the TTERTT Fund as TTERTT would have in the amounts in the TTERTT Fund as if the TTERTT Fund were escrowed solely for the benefit of TTERTT.   This provision will be binding upon any subsequently appointed chapter 7 trustee if the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code. The Debtors (on their behalf and on behalf of the Debtors' bankruptcy estates) waive, release and discharge TTERTT (and all brokers receiving commissions under the Lease) from and against any claim, demand and cause of action that they had, have or may have with respect to the Early Termination Fee paid to TTERTT on or about May 31, 2007 in accordance with Section 3.3 of the Lease including, without limitation, the unamortized broker's fee paid to Kojaian Management Corporation. The reservation of rights contained in the Debtors' letter to TTERTT dated May 31, 2007 (which gave notice of the Debtors' intent to terminate the Lease effective November 30, 2007) is withdrawn.

103.   To the extent the Debtors sell or otherwise dispose of the equipment (the "Textron Sales") that is the subject of the agreements (the "Textron Equipment") to which

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000356

Textron Financial Corporation and/or its affiliates (collectively, "Textron") and the Debtors or any of their respective affiliates are parties (the "Textron Agreements"), which equipment Textron has an interest in, the proceeds of such Textron Sales in an amount less than or equal to the principal amount of the Allowed Claims of Textron will be paid to Textron (collectively, the "Textron Sales Proceeds"); provided that (a) to the extent the total amount of the Textron Sales Proceeds exceeds the principal amount of the Allowed Claims of Textron, such excess shall be distributed in accordance with further order of the Court with all parties reserving their rights and defenses with respect to such excess and the treatment of Textron's remaining claim and (b) to the extent the total amount of the Textron Sales Proceeds is less than the principal amount of the Allowed Claims of Textron, Textron shall have an Allowed General Unsecured Claim in Class 5 of the Plan for such deficiency.  To the extent the Textron Equipment is not sold or otherwise disposed of as set forth in the immediately preceding sentence, the Debtors will release their rights, claims and interest in such Textron Equipment to Textron.

104.    Notwithstanding anything to the contrary in the Plan, Exhibit E to the Plan, Exhibit F to the Plan, this Order, the Notice of Rejection of Certain Executory Contracts Filed July 11, 2007 [Docket No. 7749] or any other notice or motion purporting to reject an executory contract or unexpired lease, the Master Services Agreement by and between Infocrossing, Inc. and Alicomp, a division of Alicare, Inc. (collectively, "Infocrossing"), and Collins & Aikman Products Co. dated June 1, 2003 (with all related statements of work and schedules, the "Infocrossing Agreement") shall be assumed pursuant to section 365 of the Bankruptcy Code subject to (a) the cure under section 365(b)(1)(A) of the Bankruptcy Code for the Infocrossing Agreement in the amount of $200,000 in immediately available funds being paid by the Debtors to Infocrossing no later than five business days from the date of entry of this Order

57

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000357

for all defaults under the Infocrossing Agreement and (b) the Infocrossing Agreement being amended so that the Debtors are authorized to terminate the Infocrossing Agreement without penalty upon no less than 60 days prior written notice delivered to Infocrossing by the Debtors or the Post-Consummation Trust, as applicable; provided that such written notice shall not provide for termination prior to December 31, 2007. As soon as practicable after the entry of this Order, the Debtors shall dismiss with prejudice and without costs Adversary Proceeding No. 07-04803 against Alicomp.

105.    Nothing in the Plan or this Order confirming the Plan shall release, discharge, enjoin or impact in any way the claims or the prosecution of the claims of K.J. Egleston, et al. or the members of the putative Class Action Plaintiffs (as defined in the objection of K.J. Egleston, et al. [Docket No. 4655] (the "Egleston Objection")) asserted, or to be asserted, on behalf of the putative Class Action Plaintiffs (as defined in the Egleston Objection) or in their individual capacity against non-Debtors named in the Collins & Aikman Securities Class Action (as defined in the Egleston Objection) and/or against any other non-Debtor, provided that nothing in this paragraph shall allow K.J. Egleston, et al. or the members of the putative Class Action Plaintiffs (as defined in the Egleston Objection) to pursue those claims against the Trusts and/or any persons or entities that operate or effectuate the terms of the Trusts solely in their capacity as such.

106.    Nothing in the Plan or this Order confirming the Plan shall release, discharge, enjoin or impact in any way the claims or the prosecution of the claims of MainStay High Yield Corporate Bond Fund ("MainStay") or the members of the putative Class (as defined in MainStay's objection to the Plan [Docket No. 4628] (the "MainStay Objection")) asserted, or to be asserted, on behalf of the putative Class or in their individual capacity against non-Debtors

58

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000358

named in the Noteholder Litigation (as defined in the MainStay Objection) and/or against any other non-Debtor, provided that nothing in this paragraph shall allow MainStay or the members of the putative Class (as defined in the MainStay Objection) to pursue those claims against the Trusts and/or any persons or entities that operate or effectuate the terms of the Trusts solely in their capacity as such.

107.   The Debtors and Beirne Maynard & Parsons LLP ("BMP") reserve their respective rights with respect to BMP's alleged right and claim to any constructive trust whereby the Debtors hold funds received from insurers for the benefit of BMP.

108.   Notwithstanding anything to the contrary in the Plan or this Order, the California Department of Toxic Substances Control and the Central Valley Regional Water Quality Control Board (collectively, "California Environmental Entities") shall not be Releasing Parties and shall not be subject to the obligation to provide Third Party Releases set forth herein or in Article XII.C of the Plan.

109.   Notwithstanding anything to the contrary in the Plan or this Order, the California Environmental Entities shall not be subject to the provisions of Article XII.E and Paragraph 5 of this Order.

110.   Nothing in the Plan or this Order discharges, releases or precludes any liability to the California Environmental Entities that is not a Claim.

111.   Any relief provided under the Plan or this Order to non-Debtors shall not release, discharge, enjoin or preclude any liability of such non-Debtors to the California Environmental Entities under any federal, state or local environmental law or regulation.

112.   Nothing in the Plan or this Order discharges, releases or precludes any claim of the California Environmental Entities that arises on or after the Effective Date.

K&E 11815541.12

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000359

113.   Nothing in the Plan or this Order releases any entity from liability under environmental law as the owner or operator of property located in the State of California that such entity owns or operates after the Effective Date.

114.   The Stipulation between the Debtors and the California Environmental Entities is hereby approved and incorporated in this Order by reference.

115.   Notwithstanding anything to the contrary in the Plan, the liens, if any, of the City of Evart, Michigan (the "City") arising under Michigan or local law shall continue against the Debtors' Evart, Michigan facility (the "Facility") until the validity, extent or priority of such liens is resolved between the Debtors and the City or determined by the Court or such other court with jurisdiction, subject to any rights, claims and defenses of any party with respect thereto; provided, however, that if the Facility is or becomes subject to a sale, the liens, if any, of the City shall attach to the sale proceeds of the Facility upon the closing of such sale of the Facility, subject to (a) the validity, extent and priority of the liens, if any, of the City being resolved between the Debtors and the City or determined by the Court or such other court with jurisdiction and (b) any rights, claims and defenses of any party with respect thereto.

116.   Notwithstanding anything to the contrary in the Plan or this Order, Valiant Tool & Mold, Inc. ("Valiant") shall not be a Releasing Party and shall not be subject to Article XII.C of the Plan or paragraph 8 of this Order.

117.   Neither the provisions of Article XII.E of the Plan nor any other provision of the Plan shall enjoin or otherwise preclude the assertion at any time of (a) a right of setoff, recoupment or any defense (affirmative or otherwise) by Valiant in any context (whether as an affirmative defense, an affirmative right or otherwise) or (b) any right or claim of ownership, lien or otherwise, if and to the extent that same may be asserted as to or against any tooling or molds

60

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000360

built or fabricated by Valiant. Such rights and/or defenses are preserved and are not reduced or impacted by the Plan.

118. Any lease or contract with Comerica Leasing Corporation shall be removed from Exhibit F to the Plan.

119. Notwithstanding anything to the contrary in this Order, the Plan, any exhibit to the Plan or any other Plan document, nothing in this Order, the Plan, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing London Market Insurers' legal, equitable or contractual rights, if any, in any respect. The rights of London Market Insurers shall be determined under their respective insurance policies or settlements with any of the Debtors relating to such insurance policies.

120. Nothing in the Plan or this Order shall prejudice the ability of the Court to enforce any order entered as a result of (a) the Order Appointing Fee Examiner in the Chapter 11 Cases [Docket No. 7331] or (b) any Fee Claim.

### **Final Order**

121. This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

Signed on July 18, 2007

/s/ Steven Rhodes

**Steven Rhodes**

**ZZ.   Chief Bankruptcy Judge**

I hereby certify that the foregoing is a true copy of the original on file in this office.

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

BY _____
Deputy Clerk:
DATE 2/10/14

61

DTSC, et al. v. Jim Dobbas, Inc., et al.
AGO000361

Form ntcconfclos

211 West Fort Street
Detroit, MI 48226

## UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

Case No.: **05−55927−swr**
Chapter: 11

In Re: (NAME OF DEBTOR(S))
    Collins & Aikman Corporation
    250 Stephenson Highway
    Troy, MI 48083

Social Security No.:

Employer's Tax I.D. No.:
    13−3489233

## NOTICE OF CONFIRMATION AND OPPORTUNITY
## TO OBJECT TO THE CLOSING OF THE CASE

To the Creditors of the above−named Debtor:

NOTICE IS HEREBY GIVEN that the Plan of Reorganization filed on 07/09/2007 was confirmed on 7/18/07 .

The Court will find that the estate has been fully administered and will enter a final decree closing the case in 30 days unless, within that time, an objection is filed. If an objection is filed, it will be set for hearing.

**If the closing is delayed past this time period for any reason, the burden will be on the debtor's counsel to notify the clerk when it is appropriate to close the case so that unnecessary U.S. Trustee fees will not accrue.**

Dated: 7/18/07

BY THE COURT

Katherine B. Gullo , Clerk of Court
UNITED STATES BANKRUPTCY COURT

DTSC, et al. v. Jim Dobbas, Inc., et al.

AGO000362

Exhibit D



## Department of Toxic Substances Control



Linda S. Adams
Acting Secretary for
Environmental Protection

Leonard E. Robinson
Acting Director
8800 Cal Center Drive
Sacramento, California 95826-3200

Edmund G. Brown Jr.
Governor

March 17, 2011

Mr. David Van Over
216 F Street #108
Davis, California 95616

Mr. Don Dobbas
Jim Dobbas, Incorporated
P.O. Box 177
Newcastle, California 95658

Continental Rail, Inc.
3218 Nacodoches Road, #8
San Antonio, Texas 78217

NOTICE OF ISSUANCE OF IMMINENT OR SUBSTANTIAL ENDANGERMENT
ORDER AND REMEDIAL ACTION ORDER (I/SE ORDER) FOR FORMER WICKES
FOREST INDUSTRIES SITE, ELMIRA, CALIFORNIA, SOLANO COUNTY

Dear  Mr. Van Over, Mr. Dobbas and Continental Rail, Inc.:

The purpose of this letter is to provide notification that the Department of Toxic
Substances Control (DTSC) is issuing an Imminent and Substantial Endangerment
Order (I/SE Order) for the former Wickes Forest Industries Site at 147 A Street (the
Property), Elmira, California, due to hazardous substances releases on the site. This
I/SE Order applies to the Property and the areal extent of contamination that resulted
from activities on the Property (hereinafter, the "Site"). Elevated levels of arsenic and
hexavalent chromium in surface and sub-surface soil on the Property are continuing to
act as a persistent source to groundwater contamination and represent a significant
threat to human health and the environment.

DTSC has enclosed a copy of the I/SE Order for your records. The Order is final and
effective five days from the date of mailing, which is the date of this cover letter
transmitting the Order to you.

Any legal representatives acting on behalf of you with regard to this letter or the I/SE
Order should contact  Ms. Marilee Hanson, with DTSC's Office of Legal Counsel  at
(916) 327-0979 or e-mail mhanson@dtsc.ca.gov.

♻ Printed on Recycled Paper

Mr. David Van Over
Mr. Don Dobbas
Continental Rail, Inc.
March 17, 2011
Page 2


If you have any questions or comments on this letter, please feel free to contact
Mr. MacNicholl at (916) 255-3713 or e-mail at pmacnich@dtsc.ca.gov.

Sincerely,

Charles Ridenour, P.E.
Performance Manager
Cleanup Program – Sacramento Office

Enclosure

cc:     Ms. Marilee Hanson
        Staff Counsel III
        Office of Legal Counsel
        Department of Toxic Substances Control
        1011 "I" Street, 23rd Floor
        P.O. Box 806
        Sacramento, California 95812-0806

        Mr. Richard Hume, P.E.
        Supervising Hazardous Substances Engineer
        Cleanup Program – Sacramento Office
        Department of Toxic Substances Control
        8800 Cal Center Drive
        Sacramento, California 95826

        Mr. Peter MacNicholl, P.E.
        Project Manager
        Cleanup Program – Sacramento Office
        Department of Toxic Substances Control
        8800 Cal Center Drive
        Sacramento, California 95826

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of: ) | Docket No. I/SE 10/11 - 008 |
| ) | |
| Wickes Forest Industries Site ) | |
| 147 A Street ) | IMMINENT OR SUBSTANTIAL |
| Elmira, California 95625 ) | ENDANGERMENT |
| ) | DETERMINATION ORDER |
| ) | AND REMEDIAL ACTION ORDER |
| Respondents: ) | |
| Mr. David Van Over ) | |
| 216 F Street #108 ) | |
| Davis, California 95616 ) | |
| ) | |
| Jim Dobbas, Inc. ) | Health and Safety Code |
| P.O. Box 177 ) | Sections |
| Newcastle, California 95658 ) | 25355.5(a)(1)(B), |
| ) | 25358.3(a), 58009 and 58010 |
| Continental Rail, Inc. ) | |
| 3218 Nacodoches Road, #8 ) | |
| San Antonio, Texas 78217 ) | |
| ) | |

## I. INTRODUCTION

1.1    Parties.  The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent or Substantial Endangerment Determination and Order and Remedial Action Order (Order) to Jim Dobbas Inc. (Dobbas), a California Corporation, Continental Rail, Inc., a corporation (Continental Rail), and David Van Over, an individual  (Van Over) (Respondents).

1.2    Property/Site.  This Order applies to the property located at 147 A Street, Elmira, Solano County, California 95625, which consists of 7.5 acres and is identified by Assessor's Parcel Number(s) 142-010-130, 142-010-140, and 142-042-010 (the Property).  A legal description of the Property is attached as Exhibit A.  This Order applies to the Property and the areal extent of contamination that resulted from activities on the Property (hereinafter, the "Site").  The Property is frequently referred to as the "Wickes Forest Industries Site."

1.3    Jurisdiction.  This Order is issued by DTSC to Respondents pursuant to DTSC's authority under Health and Safety Code  sections 25358.3(a), 25355.5(a)(1)(B), 58009 and 58010.

Health and Safety Code section 25358.3(a) authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance. The order may include, but is not limited to, requiring specific dates by which the nature and extent of a release shall be determined and the site adequately characterized, a Remedial Action Plan (RAP) prepared and submitted to DTSC for approval, and a removal or remedial action completed.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically enjoined upon any person, officer, or board, by any law of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II. FINDINGS OF FACT

DTSC hereby finds:

2.1   Liability of Respondents. Respondents are responsible parties or liable persons as defined in Health and Safety Code section 25323.5. Dobbas and Continental Rail both owned undivided fifty percent (50%) interests in the Property from April 1, 1997 until approximately February 15, 2011. Van Over purchased the Property from Dobbas and Continental Rail on or around February 15, 2011, with knowledge that environmental contamination exists at the Site.

2.2   Property/Site History.

2.2.1  The Property is a former wood treatment facility located on approximately 7.5 acres near the intersection of A Street and Holdener Road in Elmira, California. Pacific Wood Preserving (a domestic corporation, dissolved effective September 11, 1980) operated a wood treatment facility at the Property until September 1979. The Wickes Corporation (Wickes), the predecessor to Collins and Aikman Products Company (CAPCO), purchased the Property from Pacific Wood Preserving and then operated the wood treatment facility at the Property until August 1982. Operations at the Property included treating lumber with preservative solutions containing arsenic,

chromium, and copper. Investigations have shown that the Site soils have been affected by these inorganic metals. Groundwater beneath the Site has also been contaminated by chromium, copper, and arsenic. The Central Valley Regional Water Quality Control Board (CVRWQCB) and DTSC conceptually approved a Remedial Action Plan (RAP) on September 19, 1983, submitted by Wickes, which proposed storm water management and treatment measures for the Site. On February 26, 1984, DTSC issued to Wickes an Order and Schedule of Compliance pursuant to Health and Safety Code section 25187. The Order adopted and incorporated a Settlement Agreement and Schedule of Compliance addressing soil, surface water, and ground water contamination at the Site. The CVRWQCB has also issued a series of Waste Discharge Requirements (WDRs) over the years to Wickes and CAPCO, including the last WDR Order No. R5-2005-0022, which was issued to CAPCO on June 4, 2004.

Respondents Dobbas and Continental Rail purchased the Property from CAPCO in April 1997. Respondent Van Over purchased the Property from Dobbas and Continental Rail on or about February 15, 2011.

2.2.2  To address groundwater contamination, a subsurface french drain system 200 feet long with a single recovery well was installed along with an ion-exchange treatment system so effluent could be discharged to the ditch adjacent to Holdener Road and A Street under the 1983 RAP. In 1987, an additional extraction well was connected to the system to prevent the migration of affected ground water further off-site. This system was confined to the southern portion of the Property. In 1992, the groundwater extraction and treatment system (GWETS) was modified significantly. Seven (7) additional extraction wells were installed (five (5) off-Property) and the ion-exchange treatment system was replaced with an electrochemical treatment system that removes chromium, arsenic, and copper from ground water by co-precipitating the metal ions with ferric hydroxide particles. Treated water was then discharged to the ditch along Holdener Road and A Street under a National Pollutant Discharge Elimination System (NPDES) permit from the CVRWQCB.

2.2.3  Initial soil investigations conducted during the early 1980s were centered on the southern portion of the Property where the manufacturing process took place. In 1983, contaminated soil was excavated from the truck loading pad, and the drying pad for treated wood was sealed with a low permeability asphalt cap under a RAP approved by DTSC on September 19, 1983. Soils inside the metal sided building situated over the process area were capped in 1991 with shot-crete to prevent rainwater from further transporting the constituents of concern to ground water. Two additional RAPs were completed to address contamination at the Site. The RAP approved by DTSC on September 9, 1993 addressed the soil contamination, storm water control, and ground water treatment in the southern portion of the Site. On February 25, 1994, DTSC approved a RAP concentrating on soil in the northern portion of the Site (the "1994 RAP"). The implementation of the 1994 RAP included: (i) excavating 2,100 cubic yards of off-Property soil from drainage ditches and placing it on the Property in an area to be capped with asphalt; (ii) excavation of 89 cubic yards of soil from the railroad drainage

ditch and disposing of it at the Chemwaste Kettleman Hills facility in Kettleman City, California; (iii) regrading the Property; (iv) installing an asphalt cap in all areas of the Property that were not previously sealed; and (v) installing a positive drainage system to prevent storm water intrusion under the cap. On January 5, 1996, DTSC approved the Operation and Maintenance Plan dated October 1995 (the "O&M Plan"), which required, among other things, maintenance of the cap and operation of the GWETS.

2.2.4  On October 27, 1995, CAPCO recorded in Solano County a Covenant to Restrict Use of Property-Environmental Restriction, which was entered into between CAPCO and DTSC (the "Covenant"). The Covenant, among other things, disclosed that the Property was contaminated with hazardous substances, banned uses that would disturb the cap, and restricted the Property's use to non-residential purposes without prior written approval from DTSC. On February 26, 1996, CAPCO and DTSC entered into an Operation and Maintenance Agreement, Docket Number 95/96-038 (the "O&M Agreement") in which CAPCO agreed to maintain the cap and operate the GWETS pursuant to the O&M Plan. Respondents Dobbas and Continental Rail purchased the Property from CAPCO on April 1, 1997, after the Covenant for the Property had been recorded and the O&M Agreement was in place. Also on April 1, 1997 an "Access and Remediation Agreement" was recorded which was signed by Respondent Dobbas, in which Dobbas agreed to provide access to the Property for CAPCO's remediation activities. Dobbas subsequently apparently provided access to the Property to CAPCO's contractors to conduct O&M activities, including operating the GWETS. On May 17, 2005, CAPCO filed a voluntary Chapter 11 bankruptcy petition in United States Bankruptcy Court, Eastern District of Michigan (Detroit), Case Number 05-55927-SWR. In August, 2005, CAPCO ceased operating the GWETS. On March 7, 2006, DTSC directed CAPCO to resume operating the GWETS. On March 22, 2006, CAPCO refused to comply.

From July 24, 2006 through September 28, 2006, DTSC negotiated with Dobbas and Continental Rail regarding the continuation of O&M activities at the Site. Respondents refused to conduct O&M activities such as restarting and repairing the GWETS. DTSC issued an Imminent and Substantial Endangerment Determination on November 13, 2006. On January 19, 2007, DTSC contracted with Kleinfelder Inc. to resume operation of the GWETS, groundwater monitoring and reporting and maintenance of the asphalt cap. On December 3, 2007, Dobbas agreed to perform certain repairs at the Site, which included limited maintenance of the asphalt cap and repair of the roof drainage system for the building over the source area. On May 9, 2007, DTSC and Dobbas entered into an Access Agreement.

On February 14, 2008, DTSC contracted with URS Corporation to investigate soils in the source area of the Site. Results of the 2008 URS soil investigation confirmed that elevated levels of arsenic and hexavalent chromium in soil were continuing to act as a persistent source to groundwater contamination. In August 2009, URS on behalf of DTSC prepared a draft Removal Action Work Plan (2010 RAW) to remediate groundwater at the Site. The 2010 RAW identifies demolition of the GWETS, contaminated soil excavation, confirmation sampling, off-site disposal, backfilling,

4 of 17

reporting, and long-term groundwater monitoring to assess the performance of the remedial action.

In February and March 2010, DTSC staff conducted Site inspections and noticed numerous cracks in the asphalt cap, including blockage and disrepair to the drain and gutter systems. Site inspections also revealed that the lock on the main gate was removed, allowing unsecured access to the Site. In April 2010, DTSC conducted surface water sampling of accumulated stormwater inside the Site's source area. Analytical data showed dissolved arsenic at 720 µg/L and 1200 µg/L due to contact with the remaining contaminated soil. Hexavalent chromium concentrations in the storm water measured 14 µg/L and 21 µg/L, including 30 µg/L and 15 µg/L reported for total chromium.

DTSC finalized the Wickes Forest Industries 2010 RAW in July of 2010. On November 22, 2010, DTSC recorded a lien in the amount of $833,347.98 against Dobbas' undivided fifty percent interest in the Property, which reflected the amount of funds DTSC had spent to clean up and mitigate impacts from the Site since December 2006.

Reports about the Site are available on DTSC's website at http://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=48240001 and are otherwise publically available.

2.3    Hazardous Substances Found at the Property.  The Property has been used as a wood preparation, treatment, and storage area. Wood preserving solutions used at the Property contained copper, chromium, and arsenic. Property investigations conducted in 1982 showed that Site soil and ground water have been contaminated with chromium, copper, and arsenic. Samples of groundwater taken in June 1984, as listed in the June 1984 Monthly Monitoring and Progress Report/Wickes Forest Industries Elmira Site, had concentrations of 120 mg/L or parts per million (ppm) of hexavalent chromium and .22 mg/L (ppm) of arsenic. Groundwater samples taken by Kleinfelder Inc. between September 11 and 13, 2007 had a maximum on-Property concentration of 1700 µg/L (ppb) in monitoring well E-6 and a maximum off-Property concentration of 74 µg/L (ppb) in monitoring well E-18A for hexavalent chromium. Analytical groundwater data from February 10, 2010, reported maximum hexavalent chromium concentrations in groundwater of 1500 µg/L and 93 µg/L in both on-site and off-site groundwater, respectively. Maximum concentrations of arsenic in groundwater measured 650 µg/L on-site compared to 190 µg/L in off-site groundwater. Storm water runoff from the leaking gutter on the source area building has allowed rainwater to pond and collect in the two existing sumps. Surface water samples taken from the accumulated storm water in April 2010, identified dissolved arsenic at 720 µg/L and 1200 µg/L due to contact with the remaining contaminated soil. Hexavalent chromium concentrations in the storm water run-off measured 14 µg/L and 21 µg/L, including 30 µg/L and 15 µg/L reported for total chromium.

Near surface soil samples taken by LFR Levine and Fricke in 1991 to support the 1994 RAP showed elevated concentrations of arsenic and hexavalent chromium in the source area ranging from 52 to 70,000 mg/kg and 0.2 to 190 mg/kg (ppm), respectively. URS' 2008 soil investigation at the Site sampled the original locations from the 1991 remedial investigation, but focused efforts on deeper intervals to satisfy the data gaps. URS' 2008 fieldwork effort sampled soil at three depth intervals of 0.5, 2.5, and 5 feet below ground surface. The sampling effort was conducted to further characterize the vertical extent of contaminants remaining and augment the 1991 dataset with newer analytical data. The 2008 analytical soil data produced arsenic concentrations ranging from 4.7 mg/kg to 610 mg/kg, with hexavalent chromium levels spanning 0.05 mg/kg to 17 mg/kg. Fieldwork efforts show that contaminant concentrations are the highest in surface soil and attenuate with depth, indicating that surface releases likely contaminated the Site.

Soil cleanup goals identified in the 2010 RAW specify 13 mg/kg for arsenic (background), the target compound at the site. Due to the similar distribution patterns of arsenic and chromium in the soil, the cleanup will allow for the remediation of chromium concurrent with the removal of arsenic contaminated soil. The 2010 RAW presents a groundwater cleanup goal of 10 µg/L for both arsenic and hexavalent chromium, including 50 µg/L for total chromium. If new cleanup standards are promulgated by State or federal agencies, those new standards may be applicable at the Site.

2.4   Health Effects.

2.4.1  Arsenic. Acute ingestion of arsenic may lead to a burning sensation in the mouth, nausea and vomiting. Chronic exposure to arsenic is associated with a persistent metallic taste in the mouth, hyperkeratosis, anemia, and peripheral nerve disease, and may increase the risk of developing skin cancer, aplastic anemia and leukemia.

2.4.2  Chromium. Chronic inhalation of Chromium (VI) compounds has been associated with the development of lung disease, including cancer in humans.

2.4.3  Copper. Acute inhalation of copper fumes or dust can result in a reversible influenza-like syndrome. Chronic ingestion of high levels of copper has been reported to cause hemolysis, fibrosis, and cirrhosis of the liver, nervous system damage and kidney dysfunction.

2.5   Routes of Exposure. Potential routes of exposure at the Site for hazardous substances that may affect public health or the environment, factoring the protectiveness of the asphalt cap, include direct contact with contaminated soil, air routes for dust, contact with contaminated surface storm water in the source area, consumption of food irrigated with contaminated groundwater, migration of hazardous substances to groundwater, and migration of hazardous substances in soil and surface runoff from rain into surface water bodies. If the drinking water source is impacted, direct exposure could be through bathing or drinking the water or breathing vapors while

using the water.  Ecological habitat receptors may be more sensitive to hazardous substances concentrations than are human receptors.

2.6   Public Health and/or Environmental Risk.  The Property is limited to non-residential use by a Covenant recorded with Solano County on October 27, 1995 that will remain in effect until its termination is approved in writing by DTSC.  Adjacent properties are used for commercial and residential purposes.  Nearby residences use down-gradient irrigation water drawn from the contaminated aquifer to grow produce for personal consumption.  Additional remedial actions are necessary at the Site to address the existing soil contamination.  Remedial actions including contaminated soil removal, will eliminate human exposure pathways, protect the environment, restore the beneficial uses of the aquifer, and remediate the persistent source of groundwater contamination for both on-site and off-site aquifers.  Without mitigating the persistent source of groundwater contamination, domestic irrigation wells and potential drinking water already impacted by contaminants, would likely reach concentrations that would exceed federal standards and present an acute risk to human health. Inspection and maintenance of the asphalt cap and storm water drainage systems are necessary to prevent direct contact with contaminated soil, eliminate exposure pathways due to contaminated surface storm water, help mitigate infiltration and flushing of contaminated soils with surface water, and to reduce hydraulic influences therefore aiding in the capture of the groundwater plume and helping to achieve the remedial action objectives established for the Site.

### III.  CONCLUSIONS OF LAW

3.1   Respondents are responsible parties as defined by Health and Safety Code section 25323.5.

3.2   Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

3.3   There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site, as defined in Health and Safety Code section 25320.

3.4   The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment.

3.5   Response action is necessary to abate a public nuisance and/or to protect and preserve the public health.

### IV.  DETERMINATION

4.1   DTSC issued an Imminent or Substantial Endangerment Determination for the Site on November 13, 2006, thereby determining that response actions are necessary at the Site due to the release of a hazardous substance.

4.2     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site due to the unauthorized cessation of the approved remedy.

## V. ORDER

Based on the foregoing FINDINGS, CONCLUSIONS, AND DETERMINATION, IT IS HEREBY ORDERED THAT Respondents conduct the following response actions in the manner specified herein, and in accordance with a schedule specified by DTSC as follows:  All response actions taken pursuant to this Order shall be consistent with the requirements of Chapter 6.8 (commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations.

5.1     Groundwater Monitoring.  Respondents shall immediately restore groundwater monitoring in accordance with the approved O&M Plan for the Site dated October 16, 1995 and the Final Sampling and Analysis Plan for Groundwater Monitoring dated April 2009, prepared by URS Corporation.

5.2     Groundwater Remediation.  Respondents shall take all necessary steps to implement the 2010 RAW and meet its remedial action objectives, including any additional steps necessary to remediate groundwater and restore its beneficial uses.

5.3     Land Use Covenant.  The Respondents shall comply with the Covenant recorded with Solano County on October 27, 1995.

5.4     Operation and Maintenance (O&M).  Respondents shall conduct all operation and maintenance activities for the approved Site remedies including the asphalt cap and shall comply with the O&M Plan approved by DTSC for the Site dated October 16, 1995 as part of the 1993 and 1994 RAPs.  Within thirty (30) days of the effective date of this Order, Respondents shall submit to DTSC for approval an O&M Plan implementation schedule.  The schedule shall propose that Respondents initiate the following within sixty (60) days from the effective date of the Order: a) a routine inspection and necessary maintenance program for the Cap and storm water drainage system; and b) groundwater monitoring activities.  Respondents shall implement section Section G, subsection 6.0, of the O&M Plan specifying the work necessary and maintenance schedule for the asphalt cap fieldwork efforts.

5.5     Five-Year Review.  The remedial action shall be reviewed and reevaluated after a period of five (5) years from the completion of construction and startup, and every five (5) years thereafter.  The last comprehensive five year review for the Site was completed on July 27, 2001; a five year review for the asphalt cap only was completed on March 1, 2005.  The 2001 five year review determined that the current ground water pump and treat system would likely be unsuccessful in meeting the

remedial action objectives and proposed an alternative technology. The 2010 RAW specifies demolition of the GWETS due the unsuccessful system performance, required access to remaining soil contamination, and the necessity to remove impacted soil acting as continuing source to groundwater contamination.

As a result of any review performed under this Section, Respondents may be required to perform additional Work or to modify Work previously performed.

5.6     Stop Work Order.  In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondents to stop further implementation of this Order for such period of time needed to abate the endangerment. In the event that DTSC determines that any Site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondents to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate. Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.7     Emergency Response Action/Notification.  In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager.  Respondents shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order.  Within seven (7) days of the onset of such an event, Respondents shall furnish a report to DTSC, signed by Respondents' Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto.  In the event that Respondents fail to take appropriate response and DTSC takes the action instead, Respondents shall be liable to DTSC for all costs of the response action.  Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.8     Discontinuation of Remedial Technology.  Any remedial technology employed in implementation of any DTSC approved RAP or RAW shall be left in place and operated by Respondents until and except to the extent that DTSC authorizes Respondents in writing to discontinue, move or modify some or all of the remedial technology because Respondents have met the criteria specified in the approved RAP or RAW for its discontinuance, or because the modifications would better achieve the goals of the approved RAP or RAW.

5.9     Financial Assurance.  Respondents shall demonstrate to DTSC and maintain financial assurance for operation and maintenance and monitoring. Respondents shall demonstrate financial assurance within sixty (60) days of the

effective date of the Order and shall maintain it throughout the period of time necessary to complete all required operation and maintenance activities. The financial assurance mechanisms shall meet the requirements of Health and Safety Code section 25355.2. All financial assurance mechanisms are subject to the review and approval of DTSC.

## VI. GENERAL PROVISIONS

6.1   Project Coordinator.  Within fourteen (14) days from the date the Order is signed by DTSC, Respondents shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from DTSC.  Respondents shall promptly notify DTSC of any change in the identity of the Project Coordinator. Respondents shall obtain approval from DTSC thirty (30) days before the new Project Coordinator performs any work under this Order.

6.2   Project Engineer/Geologist.  The work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or a registered geologist in the State of California, with expertise in hazardous substance site cleanups.  Within fourteen (14) calendar days from the date this Order is signed by DTSC, Respondents shall submit:  a) The name and address of the project engineer or geologist chosen by Respondent; and b) in order to demonstrate expertise in hazardous substance cleanup, the resumé of the engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work.  Respondents shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist. Respondents shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3   Monthly Summary Reports.  Within sixty (60) days from the date this Order is signed by DTSC, and on a monthly basis thereafter, Respondents shall submit a Monthly Summary Report of its activities under the provisions of this Order.  The report shall be received by DTSC by the fifteenth (15th) day of each month and shall describe:

(a)  Specific actions taken by or on behalf of Respondents during the previous calendar month;

(b)  Actions expected to be undertaken during the current calendar month;

(c)  All planned activities for the next month;

(d)  Any requirements under this Order that were not completed;

(e)  Any problems or anticipated problems in complying with this Order; and

(f)  All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4     Quality Assurance/Quality Control (QA/QC).  All sampling and analysis conducted by Respondents under this Order shall be performed in accordance with QA/QC procedures submitted by Respondent and approved by DTSC pursuant to this Order.

6.5     Submittals.  All submittals and notifications from Respondents required by this Order shall be sent simultaneously to:

> Charles Ridenour, P.E.
> Performance Manager
> Cleanup Program – Sacramento Office
> Attention: Peter MacNicholl, P.E.
> Project Manager (two copies)
> Department of Toxic Substances Control
> 8800 Cal Center Drive
> Sacramento, California 95826

6.6     Communications.  All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondents in writing by the Cleanup Program Performance Manager, or his/her designee.  No informal advice, guidance, suggestions or comments by DTSC regarding reports, plans, specifications, schedules or any other writings by Respondents shall be construed to relieve Respondents of the obligation to obtain such formal approvals as may be required.

6.7     DTSC Review and Approval.

(a)     All response actions taken pursuant to this Order shall be subject to the approval of DTSC.  Respondents shall submit all deliverables required by this Order to DTSC.  Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b)     If DTSC determines that any report, plan, schedule or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

    (1)  Modify the document as deemed necessary and approve the document as modified; or

    (2)  Return comments to Respondents with recommended changes and a date by which Respondents must submit to DTSC a revised document incorporating the recommended changes.

(c)     Any modifications, comments or other directives issued pursuant to (a) above, are incorporated into this Order.  Any noncompliance with these modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8     Compliance with Applicable Laws.  Nothing in this Order shall relieve Respondents from complying with all other applicable laws and regulations, including but not limited to compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board.  Respondents shall conform all actions required by this Order with all applicable federal, state and local laws and regulations.

6.9     Respondent Liabilities.  Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current or future operations of Respondents.  Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site.  Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment and recovering the cost thereof.  Notwithstanding compliance with the terms of this Order, Respondents may be required to take further actions as are necessary to protect public health and the environment.

6.10    Site Access.  Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC.  Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law.  DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to: inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site; reviewing the progress of Respondents in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondents.

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondents, Respondents shall use best efforts to secure from such persons access for Respondents, as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order.  To the extent that any portion of the Site is controlled by tenants of Respondents, Respondents shall use best efforts to secure from such tenants, access for Respondents, as well as for DTSC, its representatives, and contractors, as necessary to effectuate this Order.  For purposes of this Section, "best efforts" includes the payment of reasonable sums of money in consideration of access.  If any access required to complete the Work is not obtained within sixty (60) days of the effective date of this Order, or within forty-five (45) days of the date DTSC notifies Respondents in writing that additional access beyond that previously secured is necessary, Respondents shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondents have taken to attempt to obtain access.  DTSC may, as it deems appropriate, assist Respondents in obtaining access.  Respondents shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

Respondents shall grant access to any persons who need access for the purpose of conducting activities pursuant to this Order or for activities deemed necessary by DTSC to meet the objectives of this Order and/or the O&M Plan.

6.11   Sampling, Data and Document Availability.   Respondents shall permit DTSC and its authorized representatives to inspect and shall provide copies of all sampling, testing, monitoring or other data including technical records and contractual documents generated by Respondents, or on Respondents' behalf in any way whether or not such information or data was developed pursuant to this Order.   Respondents shall submit all such data upon the request of DTSC.   Copies shall be provided within (7) days of receipt of DTSC's written request.   For Final reports, Respondents shall submit one hard (paper) copy and one electronic copy with all applicable signatures and certification stamps as a text-readable Portable Document Formatted (pdf) file Adobe Acrobat or Microsoft Word formatted file. Respondents shall inform DTSC at least (7) days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondents pursuant to this Order.   Respondents shall maintain a central depository of the data, reports, and other documents prepared pursuant to this Order.

6.12   Record Retention.   All such data, reports and other documents shall be preserved by Respondents for a minimum of ten years after the conclusion of all activities under this Order.   If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondents shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction.   Respondents shall notify DTSC in writing at least six months prior to destroying any documents prepared pursuant to this Order.

6.13   Government Liabilities.   The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondents, or related parties specified in Section 6.25, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondents or its agents in carrying out activities pursuant to this Order.

6.14   Additional Actions.   By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.15   Extension Requests.   If Respondents are unable to perform any activity or submit any document within the time required under this Order, Respondents may, prior to expiration of the time, request an extension of the time in writing.   The extension request shall include a justification for the delay. All such requests shall be in advance of the date on which the activity or document is due.

6.16   Extension Approvals.   If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing.   Respondents shall comply with the new schedule incorporated in this Order.

shall comply with the new schedule incorporated in this Order.

6.17   Liability for Costs.  Respondents are liable for all of DTSC's costs that have been incurred in taking response actions at the Site (including costs of overseeing response actions performed by Respondents and costs to be incurred in the future.

6.18   Payment of Costs.  DTSC may bill Respondents for costs incurred in taking response actions at the Site prior to the effective date of this Order.  DTSC will bill Respondents quarterly for its response costs incurred after the effective date of this Order.  Respondents shall pay DTSC within sixty (60) days of receipt of any DTSC billing.  Any billing not paid within sixty (60) days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1.  All payments made by Respondents pursuant to this Order shall be by cashier's or certified check made payable to this "DTSC," and shall bear on the face the project code of the Site (Site # 100164) and the Docket number of this Order.  Payments shall be sent to:

> Department of Toxic Substances Control
> Accounting/Cashier
> 1001 I Street, 21st Floor
> P.O. Box 806
> Sacramento, California 95812-0806

A photocopy of all payment checks shall also be sent to the person designated by DTSC to receive submittals under this Order.

6.19   Severability.  The requirements of this Order are severable, and Respondents shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

6.20   Incorporation of Plans, Schedules and Reports.  All plans, schedules, reports, specifications and other documents that are submitted by Respondents pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondents.  Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

6.21   Modifications.  DTSC reserves the right to unilaterally modify this Order.  Any modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

6.22   Time Periods.  Unless otherwise specified, time periods begin from the effective date of this Order and "days" means calendar days.

6.23   Termination and Satisfaction.  Except for Respondents' obligations under Sections 5.4 Operation and Maintenance (O&M), 5.5 Five-Year Review, 5.9 Financial Assurance, 6.12 Record Retention, 6.17 Liability for Costs, and 6.18 Payment of Costs, Respondents' obligations under this Order shall terminate and be deemed satisfied upon Respondents' receipt of written notice from DTSC that Respondents have

6.24   Calendar of Tasks and Schedules.  This Section is merely for the convenience of listing in one location the submittals required by this Order.  If there is a conflict between the date for a scheduled submittal within this Section and the date within the Section describing the specific requirement, the latter shall govern.

Calendar of Tasks and Schedules

| TASK | SCHEDULE |
|---|---|
| 1.    Identify Project Coordinator; Section 6.1; | Within fourteen (14) days from the effective date of this Order. |
| 2.    Identify Project Engineer/Geologist; Section 6.2; | Within fourteen (14) days from the effective date of this Order. |
| 3.    Submit Monthly Summary Reports; Section 6.3; | Within sixty (60) days from the effective date of this Order. |
| 4.    Submit groundwater level measurements Section 5.1; | First Monday of specified month. |
| 5.    Groundwater sampling results; Section 5.1; | Quarterly basis. |
| 6.    Submit O&M Workplan Schedule; Section 5.4; | Within thirty (30) days of DTSC's request. |
| 7.    Submit and initiate O&M Workplan; Section 5.4; | Within sixty (60) days from the effective date of this order. |
| 8.    Submit Emergency Response Action Report; Section 5.7; | Within seven (7) days of a emergency response action. |
| 9.    Provide copies of sampling, data, and documentation; Section 6.11; | Within seven (7) days of receipt of DTSC's request. |
| 10.   Maintain central depository of data, reports, documentation; Section 6.12; and | Maintain central depository for a minimum of ten years after conclusion of all activities conducted pursuant to this Order. |
| 11.   Provide prior written notice to DTSC before destroying any documentation prepared pursuant to this Order; Section 6.12. | At least six months prior to destroying any documents. |

15 of 17

6.25   Parties Bound.  This Order applies to and is binding upon Respondents, and their officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including but not limited to, individuals, partners, and subsidiary and parent corporations.  Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants that are retained to conduct any work performed under this Order, within fifteen (15) days after the effective date of this Order or the date of retaining their services, whichever is later. Respondents shall condition any such contracts upon satisfactory compliance with this Order.  Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Order and for ensuring that its subsidiaries, employees, contractors, consultants, subcontractors, agents and attorneys comply with this Order.

6.26   Change in Ownership.  No change in ownership or corporate or partnership status relating to the Property shall in any way alter Respondents' responsibility under this Order.  No conveyance of title, easement, or other interest in the Site, or a portion of the Property, shall affect Respondents' obligations under this Order.  Unless DTSC agrees that such obligations may be transferred to a third party, Respondents shall be responsible for and liable for any failure to carry out all activities required of Respondents by the terms and conditions of this Order, regardless of Respondents' use of employees, agents, contractors, or consultants to perform any such tasks.  Respondents shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred.

## VII.  NOTICE OF INTENT TO COMPLY

7.0   Not later than seven (7) days after the effective date of this Order, Respondents shall provide written notice, in accordance with paragraph 6.5 Submittals of this Order, stating whether or not Respondents will comply with the terms of this Order.  If Respondents do not unequivocally commit to perform all of the requirements of this Order, they, or each so refusing, shall be deemed to have violated this Order and to have failed or refused to comply with this Order.  Respondents' written notice shall describe, using facts that exist on or prior to the effective date of this Order, any "sufficient cause" defenses asserted by Respondents under Health and Safety Code sections 25358.3(a) and 25355.5(a)(1)(B) or CERCLA section 107(c)(3), 42 U.S.C. section 9607(c)(3).

## VIII.  EFFECTIVE DATE

8.0   This Order is final and effective five days from the date of mailing, which is the date of the cover letter transmitting the Order to you.

## IX.  PENALTIES FOR NONCOMPLIANCE

9.0   Each Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive

damages up to three times the amount of any costs incurred by DTSC as a result of Respondent's(s') failure to comply, pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c).  Health and Safety Code section 25359.4.5 provides that a responsible party who complies with this Order, or with another order or agreement concerning the same response actions required by this Order, may seek treble damages from responsible parties who fail or refuse to comply with this Order without sufficient cause.


DATE OF ISSUANCE: 3/16/11

Charles Ridenour, P.E.
Performance Manager
Cleanup Program – Sacramento Office
Department of Toxic Substances Control

EXHIBIT "A"

The land referred to herein is in the State of California, County of Solano, unincorporated area, and is described as follows:

PARCEL ONE

Beginning at the southeast corner of the Northwest One Quarter of Section Nineteen (19) Township Six (6) North Range One (1) East, Mount Diablo Base and Meridian, running thence north along the Quarter Section line to the southeasterly boundary of the right of way of the Southern Pacific Railroad; thence southwesterly along the southeasterly line of the right of way of the Southern Pacific Railroad Company to the Quarter Section line running east and west through said Section Nineteen (19); thence east and along said Quarter Section line to the place of beginning.

EXCEPTING THEREFROM, however, all that certain real property as conveyed by Eleanor B. Allison to Southern Pacific Railroad Company, a corporation, by Deed dated May 10, 1916, and recorded May 23, 1916 in Liber "226" of Deeds, Page 104, thereof, and described as follows:  Beginning at the point of intersection of the southeasterly right of way line of the Southern Pacific Railroad Company's railroad (as it now exists across said Northwest Quarter of Section 19) with the east line of the Northwest Quarter of Section 19, Township 6 North Range 1 East, Mount Diablo Base and Meridian, thence southwesterly along said southeasterly right of way line of the Southern Pacific Railroad Company, a distance of 506 feet to a point; thence at a right angle southeasterly 15 feet to a point, thence at a right angle northeasterly parallel to said right of way line 265 feet to a point, thence at a right angle southeasterly 15 feet to a point, thence at right angle northeasterly parallel to said right of way line 200 feet to a point, thence at a right angle northeasterly parallel to said right of way line 200 feet to a point on the east line of said Northwest Quarter of Section 19, thence north along said east line of the Northwest Quarter of Section 19, a distance of 50.7 feet to the point of beginning.

PARCEL TWO

Beginning at the intersection of the northerly line of Edwards Street and the westerly line of "A" Street extended northerly, thence running westerly and along the northerly line of Edwards Street, One Hundred Forty (140) feet, more or less, to the intersection of the easterly line of the right of way of the Southern Pacific Railroad Company, thence northerly and along the easterly line of the right of way of the Southern Pacific Railroad Company, One Hundred Ninety-One (191) feet more or less to the southerly line of County Road Number Two Hundred Forty-Six (246) sometimes also know as Binghampton Street, thence easterly and along the southerly line of County Road Number 246, to the intersection of the westerly line of a Street, extended northerly, thence southerly and along the westerly line of a Street, extended northerly to the northerly line of Edwards Street and the place of beginning.  All as said streets herein referred to are laid down and designated on that certain Map entitled: "Plan of

1 of 2

Resurvey of Portion of Vaca Station, Property of W.C. Farmer, situated on South West One Quarter (S.W. ¼) of Section Nineteen (19) Township VI North Range 1 East Solano County," surveyed by E.H. Marshall, Deputy County Surveyor, April 8, 1870 and now appearing of record in Volume "1" of Maps, Page 44 thereof, Solano County Records.

PARCEL THREE

Beginning at the point of intersection of the westerly line of "A" Street, extended northerly, and the northerly line of County Road Number 246 (Holdener Road, formerly shown as Binghampton Street) in Elmira Townsite, Solano County, California, which point bears north 0°22' 08" west, 30 feet and south 89°55' 06" west, 397.80 feet from the southeast corner of the Northwest One-Quarter of Section 19, T6N, R1E, M.D.B & M., thence, from said point of beginning, along the northerly line of the aforementioned Binghampton Street south 89°55' 06" west, 171.67 feet to the easterly right-of-way line of the Southern Pacific Railroad and thence along said easterly right-of-way line south 34° 52' 51" west, 73.21 feet to the southerly line of said Binghampton Street, thence, along said southerly line, north 89°55' 06" east, 171.67 feet to the westerly line of the aforementioned "A" Street, thence along the prolongation of said westerly line of "A" Street, north 34°52" 51" east, 73.21 feet to the point of beginning.

A.P.N. 142-010-130, 142-010-140 and 142-042-010