1   Lester O. Brown, Bar No. 160828
    LBrown@perkinscoie.com
2   James G. Bernald, Bar No. 205519
    JBernald@perkinscoie.com
3   PERKINS COIE LLP
    1888 Century Park East, Suite 1700
4   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
5   Facsimile:  310.788.3399

6   Attorneys for Defendant
    West Coast Wood Preserving, LLC
7

8                 UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  CALIFORNIA DEPARTMENT OF        Case No. 2:14-cv-00595-WBS-EFB
    TOXIC SUBSTANCES CONTROL,
12  et al.,                         **NOTICE OF MOTION AND
                                    MOTION FOR SUMMARY
13              Plaintiffs,         JUDGMENT BY DEFENDANT
                                    WEST COAST WOOD
14          v.                      PRESERVING, LLC**

15  JIM DOBBAS, INC., et al.,       [Filed concurrently with Statement of
                                    Undisputed Facts, Declaration of Lester
16              Defendants.         O. Brown, Declaration of Stephen Ryan,
                                    Request for Judicial Notice, and
17                                  [Proposed] Order]

18                                  Date:      January 26, 2015
                                    Time:      2:00 p.m.
19                                  Place:     Courtroom 5, 14th Floor
                                               501 I Street
20                                             Sacramento, CA 95814
                                    Trial:     January 4, 2017
21                                  Action Filed:    March 3, 2014

22  AND RELATED
    COUNTERCLAIMS AND CROSS-
23  ACTIONS.

24

25

26

27

28

1    **TO ALL PARTIES AND COUNSEL OF RECORD:**

2        **PLEASE TAKE NOTICE** that on January 26, 2015 at 2:00 p.m., or as soon

3    thereafter as the matter may be heard by the above-entitled Court, located at Robert

4    T. Matsui United States Courthouse, 501 I Street, Sacramento, CA 95814, in

5    Courtroom 5 of the Honorable William B. Shubb, Defendant, Cross-Defendant,

6    Cross-Claimant and Counterclaimant West Coast Wood Preserving LLC

7    ("WCWP") will and hereby does move for summary judgment against Plaintiffs

8    and Counter-Defendants California Department of Toxic Substances Control and

9    the Toxic Substances Control Account (collectively "DTSC") on the grounds that

10   there is no genuine issue as to any material fact and that the moving party is entitled

11   to judgment as a matter of law for the following reasons:

12       1.      WCWP is not the corporate successor to Pacific Wood Preserving, Inc.

13   and thus has no liability under the Comprehensive Environmental Response,

14   Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§9607(a) and

15   9613(g)(2) with respect to any response costs incurred by DTSC at the site at issue

16   in this case, the Wickes Forest Industries Site located in Elmira, California; and

17       2.      All of DTSC's claims are barred by the applicable statute of

18   limitations, 42 U.S.C. § 9613(g)(2).

19       This motion is based upon this Notice of Motion and Motion, the

20   accompanying Memorandum of Points and Authorities, Statement of Undisputed

21   Facts, Request for Judicial Notice, the Declarations of Lester O. Brown and

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    Stephen Ryan with exhibits attached thereto, all pleadings and papers on file in this

2    action, and upon such other matters as may be presented to the Court prior to or at

3    the hearing.

4

5    DATED: December 15, 2014          **PERKINS COIE LLP**

6

7                                      By:   /s/ Lester O. Brown
                                            Lester O. Brown

8                                      Attorneys for Defendant
                                       West Coast Wood Preserving, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................. 1

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................... 1

    A.  WCWP Is Not the Successor to PWP Corp. ............................. 1

    B.  DTSC's Claims Are Time-Barred ............................................. 3

II.  FACTUAL BACKGROUND .............................................................. 4

    A.  Pacific Wood Preserving of Bakersfield, Inc., later known as WCWP, Operates a Wood Preserving Facility in Bakersfield, California. ...................................................................... 4

    B.  The Formation and Operation of PWP Corp. and Its Bulk Asset Sale to Wickes ............................................................................ 5

    C.  The Bakersfield Property Acquired by WCWP's Predecessor .................................................................................. 9

    D.  The History of the Wickes Site From 1979 to the Present ........ 9

        1.  The 1983 Remedial Action Plan ..................................... 10

        2.  The 1994 Remedial Action Plan ..................................... 11

        3.  The Wickes Site from 1997 to the Present..................... 12

    E.  DTSC Erroneously Alleges that WCWP is the Corporate Successor of PWP Corp. ............................................................... 13

III.  SUMMARY JUDGMENT STANDARD ......................................... 15

IV.  WCWP IS NOT THE SUCCESSOR TO PWP CORP.'S ENVIRONMENTAL LIABILITY AT THE WICKES SITE ............ 16

    A.  WCWP Did Not Acquire the "Principal Assets" of PWP Corp. and Thus Cannot Be Held Liable as a Successor .......... 16

    B.  WCWP Is Not the Corporate Successor of PWP Corp.'s CERCLA Liability Because It Does Not Meet Any of the Four Exceptions for Successor Liability ................................. 18

        1.  WCWP Did Not Agree to Assume PWP Corp.'s CERCLA Liability ........................................................... 18

        2.  The Transaction Between PWP Corp. and WCWP's Predecessor Did Not Amount to a De Facto Merger ................................................................. 19

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

3.    The Transaction Between PWP Corp. and WCWP's Predecessor Was Not Merely for the Purpose of Evading Liability ........................................... 22

4

5

4.    WCWP Is Not a Mere Continuation of PWP Corp ........ 23

6

C.    A Consideration Of All Equitable Factors Does Not Support A Finding Of Successor Liability ................................ 25

7

D.    Because WCWP Is Not the Corporate Successor to PWP Corp., It Is Entitled to Summary Judgment .............................. 27

8

9

V.    ALL OF DTSC'S CLAIMS ARE TIME-BARRED .......................... 28

10

A.    Whether an Action is Removal or Remedial is a Matter of Law ....................................................................................... 29

11

12

B.    DTSC's 1983 and 1994 Response Actions at the Wickes Site are Properly Characterized as a "Remedial" Action ......... 29

13

C.    The Response Actions Associated with the 1983 RAP, the 1994 RAP, and DTSC's post-2005 Activity Are a Single Remedial Action ....................................................................... 31

14

15

D.    DTSC's Cost Recovery Action Is Time-Barred Because Remedial Action Commenced at the Wickes Site More Than Six Years Before It Filed Suit Against WCWP .............. 32

16

17

VI.    CONCLUSION .................................................................................... 33

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

CASES                                                                    **Page**

*Acheson v. Falstaff Brewing Corp.,*
   523 F.2d 1327 (9th Cir. 1975) ....................................................... 2, 17

*Arevalo v. Saginaw Mach. Sys., Inc.,*
   782 A.2d 931 (N.J. Super. Ct. App. Div. 2001) ................................ 11

*Armour-Dial, Inv. v. Alkar Eng'g Corp.,*
   469 F.Supp. 1198 (E.D. Wis. 1979) ................................................. 23

*Bud Antle, Inc. v. Eastern Foods, Inc.,*
   758 F.2d 1451 (11th Cir. 1985) ......................................................... 21

*California Dept. of Toxic Substances Control v. Hearthside Residential
   Corp.,*
   613 F.3d 910 (9th Cir. 2010) ............................................................. 32

*California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem.
   Co.,*
   358 F.3d 661 (9th Cir. 2004) ....................................................... 31, 32

*California ex rel. Cal. Dept. of Toxic Substances Control v. Hyampom
   Lumber Co.,*
   903 F. Supp. 1389 (E.D. Cal. 1995) ("*Hyampom*") ................................. passim

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .......................................................................... 16

*Colorado v. Sunoco, Inc.,*
   337 F.3d 1233 (10th Cir. 2003) ..................................................... 4, 28

*Ferguson v. Arcata Redwood Co.,*
   LLC, 2004 WL 2600471 (N.D. Cal. 2004) ....................................... 24

*Garcia v. New Albertson's, Inc.,*
   2014 WL 4978434 (C.D. Cal. Oct. 3, 2014) ..................................... 17

*Geraghty & Miller, Inc. v. Conoco, Inc.,*
   234 F.3d 917 (5th Cir. 2002) ............................................................. 30

# TABLE OF AUTHORITIES
(continued)

**Page**

*Grand Labs., Inc. v. Midcon Labs of Iowa*,
   32 F.3d 1277 (8th Cir. 1994) ............................................................................ 17

*K.C. 1986 L.P. v. Reade Mf'g*,
   472 F.3d 1009 (8th Cir. 2007) .......................................................................... 24

*Louisiana-Pacific Corp. v. Asarco, Inc.*,
   909 F.2d 1260 (9th Cir. 1990) ............................................................................ 2

*Marks v. Minnesota Mining & Mfg. Co.*,
   187 Cal. App. 3d 1429 (1986) .......................................................................... 20

*Matsushita Elec. Indus Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .......................................................................................... 15

*McClellan v. Northridge Park Townhome Owners Ass'n*,
   89 Cal. App. 4th 746 (2001) ............................................................................. 24

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*,
   766 F.3d 212 (2d Cir. 2014) ............................................................................. 28

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) .......................................................................... 16

*OBG Tech. Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*,
   503 F. Supp. 2d 490 (D. Conn. 2007) .............................................................. 30

*Orthotec, LLC v. REO Spineline, LLC*,
   438 F.Supp.2d 1122 (C.D. Cal. 2006) ............................................................. 17

*Philadelphia Elec. Co. v. Hercules, Inc.*,
   762 F.2d 303 (3rd Cir. 1985) ............................................................................ 21

*Ray v. Alad Corp.*,
   19 Cal. 3d 22 (1977) ("*Ray*") ........................................................... 2, 17, 23, 24

*Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*,
   159 F.3d 358 (9th Cir. 1998) ..................................................................... passim

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Hagege*,
  437 F.3d 943 (9th Cir. 2006) .................................................................. 32

*United States v. Sterling Centrecorp Inc.*,
  960 F. Supp. 2d 1025 (E.D. Cal. 2013) ................................. 18, 19, 20

*United States v. W.R. Grace & Co.*,
  429 F.3d 1224 (9th Cir. 2005) ............................................................... 29

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*,
  2013 WL 1182985 (N.D. Ind. March 21, 2013) .................................. 30

*Washington v. United States*,
  930 F. Supp. 474 (W.D. Wash. 1996) ................................................... 24


**STATUTES**

42 U.S.C. § 9601(24) .......................................................................... 4, 29

42 U.S.C. § 9613(g)(2)(B) ............................................................ 4, 28, 29

Cal. Com. Code §§ 6102(a)(3) .................................................................. 6

Cal. Health and Safety Code § 25356.1(e) ............................................. 15

Cal. Health and Safety Code § 25356.1(g) ............................................. 15

CERCLA § 107(a) .................................................................................. 27

CERCLA § 107(a)(2) .............................................................................. 27

CERCLA §113(g)(2) ............................................................................... 27

CERCLA § 113(g)(2)(B) ......................................................................... 31

# TABLE OF AUTHORITIES
(continued)

**Page**

### RULES

Fed. R. Civ. P. 56(a) ................................................................15

### OTHER AUTHORITIES

4 Witkin, Summary of Cal. Law (10th), Sales § 219 ................................6

C. Hugh Friedman, *Cal. Practice Guide: Corporations* (The Rutter Group
    2014) § 4:511 ....................................................................7

Lawrence P. Schnapf, *CERCLA and the Substantial Continuity Test: A
    Unifying Proposal for Imposing CERCLA Liability on Asset Purchases*, 4
    Envtl. Law. 435, 444 (1998)........................................................17, 23

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant, Cross-Defendant, Crossclaimant and Counterclaimant West Coast Wood Preserving, LLC ("WCWP") submits the following Memorandum of Points and Authorities in support of its motion for summary judgment ("Motion").

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

WCWP is a Nevada limited liability company that has conducted wood preserving operations in Bakersfield, California since 1979.  WCWP, formerly known as Pacific Wood Preserving of Bakersfield, Inc., never owned or operated any facility in Elmira, California.

This action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for response costs incurred by Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively "DTSC") arises from the alleged release of hazardous substances into the environment at real property located at 147 A Street, Elmira, California, usually referred to by DTSC as the "Wickes Forest Industries Site" ("Wickes Site").

By this Motion, WCWP seeks summary judgment on two separate grounds.  First, WCWP is not liable for DTSC's CERCLA response costs because it is not the corporate successor of Defendant Pacific Wood Preserving Corporation ("PWP Corp.") which owned and operated the facility in Elmira, California.  Second, DTSC's claims are barred by the applicable statute of limitations in CERCLA.

### A.   WCWP Is Not the Successor to PWP Corp.

DTSC's sole basis for seeking to impose CERCLA response costs on WCWP is successor liability.  Specifically, DTSC alleges in its complaint that PWP Corp. owned and operated the Wickes Site, that WCWP is the corporate successor of PWP Corp. and that WCWP is therefore jointly and severally liable pursuant to CERCLA for response costs incurred by DTSC in the cleanup of hazardous

substances at the Wickes Site.  The facts regarding WCWP's formation and its acquisition of a single asset from PWP Corp. — unrelated real property in Bakersfield, California — are undisputed.  The parties dispute, however, whether as a matter of law WCWP is the corporate successor of PWP because of that asset transfer.

Asset transfers or purchases are different from mergers or stock purchases.  It is well settled that, "[u]nder traditional rules of successor liability, asset purchasers are not liable as successors…." *Louisiana-Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1263 (9th Cir. 1990) ("*Asarco*"), *overruled on other grounds by Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362 (9th Cir. 1998) ("*ATSF*").  In the context of CERCLA, successor liability is no different. *Asarco*, 909 F.2d at 1263.

In the Ninth Circuit and California, even a corporation that has purchased the "principal assets" of another corporation will not be held liable as the successor unless the asset sale meets at least one of four exceptions:  (1) there is an express or implied assumption of liabilities; (2) the transaction amounts to a merger of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability for the seller's debts. *ATSF*, 159 F.3d at 361; *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977) ("*Ray*").

Significantly, these exceptions are "applicable only where *all or substantially all* of a corporation's assets are purchased..." by the purported successor.  *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975) (emphasis added); *see Ray*, 19 Cal. 3d at 28 (purported successor must purchase the "principal assets" for exceptions to apply).  Here, WCWP did not acquire the "principal assets" of PWP Corp., but only a parcel of undeveloped real property unrelated to the Wickes Site.  Another company, the Wickes Corporation ("Wickes"), purchased the "principal assets," and indeed, "substantially all" of PWP Corp.'s assets.  Thus,

1   WCWP cannot be the successor to PWP Corp. for the purposes of CERCLA
2   liability.

3       Moreover, even if WCWP had purchased PWP Corp.'s "principal assets" –
4   which it did not – none of the four exceptions are applicable to the single asset
5   transfer between PWP Corp. and WCWP, because:  (1) there was no express or
6   implied agreement by WCWP to assume PWP Corp.'s liabilities; (2) there was no
7   effective merger or consolidation of PWP Corp. and WCWP; (3) the undisputed
8   facts establish that WCWP is not the "mere continuation" of PWP Corp.; and
9   (4) there is no evidence that the transaction between WCWP and PWP Corp. was
10  structured or used to evade liability or defraud creditors.

11      Consequently, WCWP is not a responsible party under CERCLA, and is not
12  liable for costs incurred by the DTSC for the cleanup of hazardous substances at the
13  Wickes Site.  For these reasons, WCWP respectfully requests that the Court enter
14  an order granting summary judgment to WCWP.

15          **B.    DTSC's Claims Are Time-Barred.**

16      In the alternative, WCWP requests entry of summary judgment on the ground
17  that DTSC's claims for recovery of costs incurred at the Wickes Site are time-
18  barred pursuant to CERCLA's statute of limitations.

19      DTSC, its predecessor agency, the California Department of Health Services,
20  and the California Regional Water Quality Control Board, Central Valley Region
21  ("Regional Board") have been overseeing and managing the handling of hazardous
22  substances, and directly involved in the cleanup of such substances, at the Wickes
23  Site since at least 1982.  The State's initial Remedial Action Plan ("RAP") for the
24  Wickes Site was formally adopted in February 1984.  DTSC implemented another
25  RAP at the site between 1994 and 1996.  DTSC then waited until 2014 to sue
26  WCWP, seeking, *inter alia*, recovery of costs incurred in connection with the most
27  recent portion of that remedial action.

28

1    Whether it was the implementation of the 1983 RAP or the 1994 RAP that

2  started the clock running under CERCLA, DTSC's attempt to recover such costs

3  clearly runs afoul of the statutory limitations period contained in CERCLA.  A

4  CERCLA cost recovery claim associated with "remedial" actions must be

5  commenced within six years of the initiation of physical on-site construction of the

6  remedial action.  42 U.S.C. § 9613(g)(2)(B).  CERCLA defines "remedial" actions

7  as "those actions consistent with permanent remedy."  42 U.S.C. § 9601(24).  The

8  language of CERCLA's statute of limitations "indicates that there will be … a

9  single 'remedial action' per site or facility."  *Colorado v. Sunoco, Inc.*, 337 F.3d

10  1233, 1241 (10th Cir. 2003).

11    Because the State's post-1983 response activities are all part of the same

12  remedial action, consistent with the permanent remedy of cleaning up the Wickes

13  Site, DTSC had six years following the initiation of on-site construction pursuant to

14  the 1983 RAP to bring suit against WCWP (or any other party) for cost recovery

15  under CERCLA.  Because DTSC waited until 2014 to file suit, DTSC's CERCLA

16  claims are time-barred.

17  **II.    FACTUAL BACKGROUND**

18    **A.    Pacific Wood Preserving of Bakersfield, Inc., later known as
       WCWP, Operates a Wood Preserving Facility in Bakersfield,**
19     **California.**

20    In 1978, a group of investors approached Richard Jackson about forming a

21  new company to provide wood treatment and preserving services to the growing

22  Bakersfield market.  Declaration of Stephen Ryan, ("Ryan Dec."), ¶18.  This new

23  company, Pacific Wood Preserving of Bakersfield, Inc., was incorporated under

24  Nevada law on October 27, 1978.  Statement of Undisputed Facts, Fact No. ("UF")

25  23.  In 1979, Pacific Wood Preserving of Bakersfield, Inc. began operating a wood

26  preserving and treatment plant at 5601 District Boulevard, Bakersfield, California.

27  UF 24.

28

1  During the late 1980s, Pacific Wood Preserving of Bakersfield, Inc.

2  experienced financial difficulties which caused it to file a petition for Chapter 11

3  reorganization in 1991 in the United States Bankruptcy Court for the Eastern

4  District of California, Case Number 91-28246-A-11, entitled *In re Pacific Wood*

5  *Preserving of Bakersfield*.  Ryan Dec., ¶ 16; WCWP's Request for Judicial Notice

6  ("RJN"), ¶ 2, Ex. B.  The State of California filed a claim in the bankruptcy

7  proceeding relating to an unfilled purchase order for lumber.  RJN, ¶ 3, Ex. C.  The

8  Bankruptcy Court for the Eastern District of California confirmed the

9  reorganization plan on or about June 8, 1993.  RJN, ¶ 4, Ex. D.[1]

10  In November 2013, Pacific Wood Preserving of Bakersfield, Inc. converted

11  from a corporation into a limited liability company entitled West Coast Wood

12  Preserving, LLC ("WCWP").  UF 56.

**B.    The Formation and Operation of PWP Corp. and Its Bulk Asset
Sale to Wickes.**

PWP Corp. was incorporated under California law in 1972 and operated a

wood treatment and preserving business at the Wickes Site in Elmira, California

from 1972 until September 1979.  UF 1.  Richard Jackson was PWP Corp.'s sole

shareholder and was one of its board members.  UF 2.  PWP Corp. operated from

its single location in Elmira, California.  UF 3.

In late 1978, the Wickes Corporation ("Wickes"), a multi-billion dollar

corporation, expressed interest in purchasing PWP Corp.'s operations.  UF 4.

Negotiations began in 1979 and concluded with a sale agreement on September 12,

1979 (the "Purchase Agreement"). UF 5.  In order to obtain not only the assets of

---

[1] DTSC's claims in this action are barred by the 1993 bankruptcy discharge,
because:  (1) DTSC's cost recovery action is a "claim" under the Bankruptcy Code;
(2) DTSC's claims arose before the bankruptcy petition due to the prior response
actions at the Wickes Site; and (3) Pacific Wood Preserving of Bakersfield, Inc.
provided actual notice of its bankruptcy to the State of California; or (4) in the
alternative, it was not obligated to provide notice to an unknown creditor like
DTSC.  By this Motion, WCWP is not seeking entry of summary judgment against
DTSC based on the bankruptcy discharge, but WCWP reserves the right to do so in
a future motion.

PWP Corp., but also its goodwill and business relationships, Wickes purchased or assumed from PWP Corp.:

- The land in Elmira on which the facility was situated;
- The "machinery, equipment, office furniture, [and other] goods and chattels" at the facility;
- The buildings and improvements at the facility;
- The licenses for the proprietary wood preserving treatment processes utilized by PWP Corp.;
- PWP Corp.'s inventory;
- PWP Corp.'s trade accounts payable; and
- The PWP name and an agreement by PWP Corp. to refrain from using the trade name "Pacific Wood Preserving," except where it is necessary for it to wind-up its operations.

UF 6.

Pursuant to the Purchase Agreement, Wickes also retained 26 of PWP Corp.'s employees.  UF 7.  These employees included Marjorie Moore, the office manager and corporate secretary of PWP Corp., and Richard Brinkman, the facility superintendent.  UF 8.

Wickes and PWP Corp. characterized their transaction as a "bulk sale" in the Purchase Agreement, and Wickes agreed to comply with California's Bulk Sales Statutes prior to the closing.  UF 9.  A sale or transfer of more than half of a going business' inventory and equipment is considered a "bulk sale."  Cal. Com. Code §§ 6102(a)(3).[2]  California's Bulk Sales statutes are designed to put the seller's creditors on notice of the sale and provide them with an opportunity to assert claims

---

[2] California's Bulk Sales statutes were revised in 1990 but retained many features of the former law.  4 Witkin, Summary of Cal. Law (10th), Sales § 219.  For the purposes of this Motion, the revisions are irrelevant.  *See, e.g., id.* at § 220 (former statute applied to "retail and wholesale merchant[s]"; current statute applies to sellers whose "principal business is the sale of inventory from stock….").

before the sale takes place.  C. Hugh Friedman, *Cal. Practice Guide: Corporations* (The Rutter Group 2014) § 4:511.

At the time of the Purchase Agreement, the only *other* asset that PWP Corp. had, which was not being transferred to Wickes, was an undeveloped parcel of real property located in Bakersfield, California.  UF 11.  As evidenced by the "Bulk Sale" designation given to the Purchase Agreement with Wickes, this remaining asset of PWP Corp. in no way constituted "all or substantially all" of PWP Corp.'s assets.

To ensure that there would be no competition for wood treatment services in the Elmira, California area, Wickes insisted that both PWP Corp. (at § 4.15 of the Purchase Agreement) and Richard Jackson agree not to enter into any wood treating business within 250 miles of the Elmira site.  Ryan Dec., ¶¶ 7 - 8, Ex. A, p. 16, and Ex. B, pp. 59-60.

No stock was transferred to Jackson in exchange for the sale of PWP Corp.'s assets to Wickes.  UF 10.

Before Wickes would complete the purchase, it insisted that PWP Corp. complete an investigation and remediation of the Wickes Site required by the Regional Board resulting from a spill of chemicals.  UF 12.

In 1979, PWP Corp. performed the work required by the Regional Board. It hired CH2M Hill, a well-known engineering firm, to do the engineering work and sampling of soils and groundwater at the site.  UF 13.  PWP Corp. also hired IT Corporation and other companies to collect and dispose of the contaminated soils. UF 13.  PWP Corp. also expanded its wastewater collection by constructing a 70,000 gallon holding tank to prevent further escapes of the treatment chemicals in the event of large rain storms.  Brown Dec., ¶¶ 4, 6, Exs. A, p. 11, and C, p. 30.

CH2M Hill conducted the required studies, the response plan and the site improvements required by the Regional Board.  Brown Dec., ¶¶ 4 - 5, Exs. A, pp. 8-20, and B, pp. 22-28.  The State signed off on CH2M Hill's plan in the spring

of 1979.  Brown Dec., ¶ 7, Ex. D, p. 32.  CH2M Hill prepared a report dated May 9, 1979, on behalf of PWP Corp., which was submitted to the Regional Board.  UF 14. CH2M Hill and its contractors completed the investigation, clean up and improvements in late summer 1979.  UF 15.

On November 19, 1979, the Regional Board notified PWP Corp. that the required actions had been satisfactorily completed.  UF 16.  In the summer of 1979, PWP Corp. also had begun negotiations with the State of California's Attorney General with regard to litigation based on a notice of violation resulting from the same spill.  Brown Dec., ¶ 8, Ex. E.  Because of PWP Corp.'s cooperation with the Regional Board and satisfactory completion of the required actions, the State agreed to dismiss the lawsuit for a nominal fee of $7,500 after the parties entered into a Stipulation of Judgment and PWP Corp. paid the fine.  RJN, ¶ 8, Ex. G.

All told, PWP Corp. expended approximately $100,000 investigating, remediating and improving the site before Wickes took it over.  Ryan Dec., ¶¶ 7 and 10, Ex. A, p. 27.[3]

Because there was no business of PWP Corp. to continue after the Purchase Agreement with Wickes, on September 11, 1980 PWP Corp. filed for dissolution in accordance with California law.  UF 17.  That process was not complete until sometime in late 1981.  UF 18.  Although Jackson entered into a consulting agreement with Wickes to assist Wickes in promoting its business interests in the Elmira area, the Declaration of Stephen Ryan – a PWP Corp. officer at the time – establishes that from shortly after the time of the Purchase Agreement, neither Ryan nor Jackson had any involvement or concerns about the Elmira site.  Ryan Dec., ¶8, Ex. B.

---

[3] The Purchase Agreement, executed before the final sign-off by the State, required that certain monies be reserved in the event the work was not completed to the satisfaction of the authorities. Ryan Dec., ¶¶ 7 and 10, Ex. A.  Ultimately, because of the State's sign-off, PWP Corp. was able to receive these monies back.  Ryan Dec., ¶ 11.

MOTION FOR SUMMARY JUDGMENT
2:14-cv-00595-WBS-EFB

### C.   The Bakersfield Property Acquired by WCWP's Predecessor.

Prior to the dissolution of PWP Corp., in October 1978, PWP Corp. had purchased a parcel of property at 5601 District Boulevard, Bakersfield, California for $250,000.  UF 19.  PWP Corp. financed $177,500 of this amount with a mortgage secured by a deed of trust from the seller, Tenneco Realty Development Corporation ("Tenneco").  UF 20.  The mortgage required three annual payments of one third of the purchase price.  Ryan Dec., ¶ 15.

On September 19, 1980, about a week after PWP Corp. filed paperwork with the State of California declaring its intention to wind up and dissolve, Tenneco reconveyed its deed of trust on the Bakersfield property back to PWP Corp.  UF 21. The "Full Reconveyance" that Tenneco filed with the Kern County Recorder's Office states that the debt secured by the deed of trust had been fully paid.  UF 22. The "Full Reconveyance" also asked that a copy of the document be mailed to Lloyds Bank California when it was recorded.  Ryan Dec., ¶ 12, Ex. K.

The same day – September 19, 1980 – WCWP's predecessor executed a "Short Form Deed of Trust and Assignment of Rents" in favor of Lloyds Bank California to secure a loan in the amount of $200,000.  UF 25.  Those monies were used by WCWP's predecessor to purchase the property from PWP Corp., as the final payment for the property was due and owing and PWP Corp. no longer had any funds to pay it.  UF 26.

On September 21, 1981, PWP Corp. filed a "Grant Deed (Corporation)" with the Kern County Recorder's office granting the property at 5601 District Boulevard, Bakersfield, California to Pacific Wood Preserving of Bakersfield, Inc., which later became WCWP.  UF 27.

### D.   The History of the Wickes Site From 1979 to the Present.

After Wickes took over PWP Corp.'s operations in Elmira, California, several documented chemical spills took place resulting in enforcement action by the Regional Board and DTSC's predecessor.  For example, on November 7, 1980,

a large spill of toxic chemicals occurred at the Wickes Site.  UF 28.  Testing conducted after the November 7, 1980 spill revealed that the Wickes Site had concentrations of hexavalent chromium and arsenic in the groundwater exceeding drinking water standards.  Brown Dec., ¶ 10, Ex. G, p. 41.  The Regional Board issued two cleanup and abatement orders on June 7, 1982 and October 4, 1982.  UF 29.  Although Wickes stopped treating wood at the site in 1982, as the former operator and current owner of the Wickes Site it agreed to investigate the contamination and perform remedial response actions, as directed, supervised, and managed by the State of California.  UF 57, Brown Dec., ¶ 12, Ex. I.

### 1.   The 1983 Remedial Action Plan.

On September 9, 1983, Wickes – at the direction of the Regional Board – proposed a Remedial Action Plan ("RAP") for the Wickes Site that required it to, *inter alia*, construct a groundwater "treatment plant utilizing an ion-exchange system," to construct a subsurface drainage system, to remove soil in the truck loading pad area, and to cap the drying pad area with asphalt, instead of removing contaminated soils.  UF 30.  The Regional Board, with the concurrence of DTSC's predecessor, conceptually approved the RAP on September 19, 1983.  UF 31.

In February 1984, Wickes, DTSC, and the Regional Board entered into a Settlement Agreement and Schedule of Compliance regarding Wickes' disposal of hazardous substances at the Site.  UF 32.  Pursuant to this settlement agreement, the State formally approved the 1983 RAP.  UF 33.  The settlement stated that the goals of the 1983 RAP included the elimination of all groundwater contamination (both on- and off-site) in five to ten years.  UF 34.

Wickes commenced the physical on-site construction of work called for by the 1983 RAP in the fall of 1983, including but not limited to the asphalt paving of the drying pad area.  UF 35.  Wickes also constructed the groundwater extraction and ion-exchange treatment system, which began operating in April 1984.  UF 36.

1    In November 1986, Wickes purchased the Collins & Aikman Corporation for

2    approximately $1.16 billion.  UF 37.  In 1992, Wickes changed its name to Collins

3    & Aikman Group, Inc., and following a 1994 corporate restructuring, became

4    known as Collins & Aikman Products Co., Inc. ("C&A").  *See Arevalo v. Saginaw*

5    *Mach. Sys.*, *Inc.*, 782 A.2d 931, 934 (N.J. Super. Ct. App. Div. 2001) (describing

6    corporate history of Wickes and C&A from 1983 to 1994).

7    Response actions continued at the Wickes Site for many years after the

8    adoption of the 1983 RAP.  In 1987, C&A expanded the groundwater treatment

9    system by constructing an additional extraction well to prevent off-site migration of

10   groundwater.  Brown Dec., ¶ 19, Ex. P, p. 122.  In 1991, Wickes capped more soil

11   at the site, this time with a layer of concrete.  Brown Dec., ¶ 16, Ex. M, pp. 97-98.

12   In July 1992, and with the approval of DTSC and the Regional Board, C&A began

13   construction on an electrochemical co-precipitation treatment system to replace the

14   ion-exchange groundwater treatment system.  Brown Dec., ¶ 16, Ex. M, p. 99.  This

15   new system began operation in November 1992.  Brown Dec., ¶ 16, Ex. M, p. 99.

16   ## 2.    The 1994 Remedial Action Plan.

17   On February 5, 1992, DTSC and C&A entered into an Enforceable

18   Agreement requiring C&A to propose a new RAP for the Wickes Site.  UF 38.  In

19   May 1993, as part of its requirement for approval of this new RAP, the State

20   required C&A to add a preliminary nonbinding allocation of responsibility to the

21   new RAP with regard to the costs of investigating and remediating the Elmira site,

22   assigning 100% of the responsibility to C&A as successor in interest to Wickes, in

23   turn as successor in interest to PWP Corp.  UF 39

24   On February 25, 1994, C&A proposed the new RAP which concentrated on

25   soil contamination in the northern portion of the Site (the "1994 RAP").  UF 40.

26   DTSC's official and published Executive Summary of the 1994 RAP described it as

27   a "Final Remedial Action Plan."  UF 41.  The 1994 RAP called for, *inter alia*, the

28   grading of soil and the installation of an asphalt cap in all areas of the Wickes Site

that were not previously sealed, and the recording of a deed restriction.  UF 42.
The 1994 RAP also included a Preliminary Nonbinding Allocation of Financial
Responsibility ("NBAR") stating that C&A was "[t]he responsible party," and the
"successor in interest" to Wickes, which was the "successor in interest" to PWP
Corp.  UF 43.

In a "Final RAP Checklist" from February 1994, DTSC wrote that the
response activities associated with the 1994 RAP would "result in a permanent
solution to the contamination problem (*e.g.* total removal)."  UF 44.

In March 1996, DTSC certified implementation of the 1994 RAP at the
Wickes Site.  UF 45.  In this "Remedial Action Certification Form" (the "1996
RAC") which was signed by the DTSC Project Manager, Unit Chief, and Branch
Chief, and published to all the interested parties, DTSC confirmed that:

- "Two Remedial Actions Plans (RAPs) have been completed to address the contamination";
- The "Response Action Taken on Site" was a "Final Remedial Action";
- The remedial action taken at the site between 1983 and 1996 consisted of soil excavation and off-site disposal, an asphalt cap, groundwater extraction and treatment in an on-site chemical treatment plant, and a deed restriction;
- C&A spent approximately $5.5 million in response costs associated with the 1994 RAP; and
- "DTSC has determined that all appropriate removal/remedial actions have been completed and that all acceptable engineering practices were implemented."

UF 46.

### 3.    The Wickes Site from 1997 to the Present.

In April 1997, Jim Dobbas, Inc. ("Dobbas") and Continental Rail Co.
("CRI") purchased the Wickes Site property from C&A.  Complaint, ECF No. 1,

p. 6.  Dobbas contends that it was led to believe that the Wickes Site had been fully remediated, and on that basis purchased the site.  RJN ¶ 15, Ex. N, p. 3, lines 12-14.

In August 2005, nearly ten years after the remedial actions at the Wickes Site were certified by DTSC as complete, C&A entered bankruptcy proceedings.  Brown Dec., ¶ 24, Ex. U.  DTSC filed a bankruptcy claim against C&A.  Brown Dec., ¶ 24, Ex. U.

In 2006, DTSC unsuccessfully requested that Dobbas and CRI resume the maintenance and operation of the groundwater treatment system at the site.  Brown Dec., ¶ 19, Ex. P, p. 123.  According to DTSC, the groundwater treatment and extraction system fell into disrepair and DTSC allowed it to fail.  Brown Dec., ¶ 25, Ex. V, p. 188.

In 2009, DTSC commissioned a Removal Action Workplan ("RAW"), which was finalized in July 2010.  UF 47.  This RAW called for soil excavation, off-site disposal, and groundwater monitoring.  UF 47.  This RAW did not cite to any post-1982 spills or leaks of hazardous substances at the Wickes Site.  UF 47.

The 2010 RAW also called for the demolition of the previously-installed groundwater treatment system.  Brown Dec., ¶ 25, Ex. V, p. 188.

The July 2010 RAW was implemented by DTSC in 2011-2012.  UF 48.  In its Complaint, DTSC alleges that it has spent in excess of $2 million since 2007 to remediate the Wickes Site.  UF. 49.

**E.     DTSC Erroneously Alleges that WCWP is the Corporate Successor of PWP Corp.**

After PWP Corp.'s bulk asset sale to Wickes, Richard Jackson and Stephen Ryan focused their energies on the development of Pacific Wood Preserving of Bakersfield, Inc., later WCWP.  Ryan Dec., ¶ 21.  As part of PWP Corp.'s dissolution, and once all creditors were paid off, the undeveloped Bakersfield real property – of no use to Wickes – was purchased by Pacific Wood Preserving of Bakersfield, Inc., WCWP's predecessor.  UF 25-27.  With the exception of Jackson,

1   PWP Corp. and Pacific Wood Preserving of Bakersfield, Inc. had different

2   shareholders and board members.  UF 50.  No stock in PWP Corp. was transferred

3   to Pacific Wood Preserving of Bakersfield, Inc., Jackson, or anyone else.  UF 10.

4   The wood treating business operations of PWP Corp. in Elmira, California

5   continued through Wickes, not through WCWP's predecessor.  UF 5-9, 28.

6   Accordingly, WCWP was never the successor to PWP Corp.

7        Following the bankruptcy of C&A in 2005, and after thirty (30) years of the

8   State taking the position that C&A was the only Responsible Party at the Wickes

9   Site *and* after twenty (20) years since the DTSC declared, without objection, that

10   C&A was the successor to both Wickes and PWP Corp., DTSC decided to reverse

11   itself and create the fiction that WCWP was the successor to PWP Corp.'s

12   environmental liabilities at the Wickes Site.  Specifically, in September 2010, for

13   the first time, DTSC sent a letter to WCWP alleging that it was a potentially

14   responsible party ("PRP") for the cleanup of hazardous substances at the Wickes

15   Site as the successor to PWP Corp.  UF 51.  WCWP denied any such responsibility,

16   and there was no further contact shortly after that exchange until around the time

17   the DTSC filed suit earlier this year.  UF 52.

18        DTSC's website identifies C&A as the responsible party at the Wickes Site.

19   UF 53.  Moreover, DTSC's only official allocation pronouncement, which has not

20   been amended, states that C&A is the responsible party.  Brown Dec., ¶16, Ex. M,

21   p. 93.

22        Recently, DTSC has alleged that some advertising and promotion pieces

23   published in the last ten years prove that WCWP is the true successor to PWP Corp.

24   As the Ryan Declaration proves, however, WCWP – both in its official

25   pronouncements and industry reporting – tried to ensure that its operations were not

26   confused with the Wickes operations in Elmira.  UF 54.  In fact, Pacific Wood

27   Preserving of Bakersfield, Inc. emphasized in advertisements that it was a "brand

28   new" wood treating company.  UF 55.  Since Richard Jackson was a pioneer, and

1  well-known in the industry, however, other marketing materials may have

2  sometimes over-stated or "puffed" with respect to his former relationship with the

3  Elmira operations.  Ryan Dec., ¶ 26.

4       DTSC has also argued that the transfer of the Bakersfield property to

5  WCWP's predecessor is proof that WCWP is the successor of PWP Corp.  The

6  transfer of that property from PWP Corp. to WCWP's predecessor, as well as the

7  Deeds of Trust, were on the public record in 1980 and 1981.  Accordingly, they

8  were readily available to the State at that time, and at the time DTSC issued its

9  NBAR in 1993.  RJN, ¶ 14, Ex. M.  DTSC obviously did not believe that this asset

10  transfer was enough to consider WCWP to be the successor to PWP Corp., or else it

11  would have been obligated to ensure that the NBAR reflected such a contention.

12       The NBAR in the 1994 RAP, left unchallenged, established the legal basis

13  for DTSC's orders that C&A conduct and pay for all needed action at the Wickes

14  Site. *See* Cal. Health and Safety Code § 25356.1(e).[4]

15  ### III.   SUMMARY JUDGMENT STANDARD

16       A motion for summary judgment shall be granted if the papers submitted

17  show there is no triable issue as to any material fact and the moving party is entitled

18  to a judgment as a matter of law. Fed. R. Civ. P. 56(a).  The purpose of summary

19  judgment is to "pierce the pleadings and assess the proof in order to see whether

20  there is a genuine need for trial."  *Matsushita Elec. Indus Co. v. Zenith Radio*

21  *Corp.*, 475 U.S. 574, 587 (1986).  In order to be granted summary judgment, a

22

23  [4] Because of the severity of such a finding, an NBAR is appealable by any
designated PRP found to be allocated over 50% of the site cost responsibility. *See*
24  Cal. Health and Safety Code § 25356.1(g).  Thus, although C&A could have
appealed this ruling (*e.g.,* to name WCWP as a liable party), and it had every reason
25  to do so if this was even arguably correct given the over $5 million it was about to
spend at the site at that time, it never did so.  Moreover, DTSC has not produced
26  any documents in this case indicating that this NBAR was ever challenged.  Since
DTSC never made its current assertion at the time of the 1994 RAP, WCWP was
27  denied, in violation of DTSC's own rules, the ability to challenge the allegation
(first raised in 2010) that WCWP is the successor to environmental liability at the
28  Wickes Site and responsible for 100 percent of the latest DTSC costs.  Instead,
DTSC simply filed suit against WCWP.

-15-

1  defendant must negate or disprove an essential element of the plaintiff's case or

2  show that the opposing party does not have enough evidence of an essential element

3  of its claim to carry its ultimate burden or persuasion at trial.  *Celotex Corp. v.*

4  *Catrett*, 477 U.S. 317, 322 (1986).  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

5  *Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

6  It is appropriate for a District Court to grant summary judgment to a

7  defendant in a CERCLA case where successor liability is alleged, but the required

8  factual elements do not exist.  *See e.g. ATSF*, 159 F.3d at 365 (affirming a grant of

9  summary judgment to an asset purchaser defendant in a CERCLA case because it

10  was not a successor to the liability).

## IV.   WCWP IS NOT THE SUCCESSOR TO PWP CORP.'S ENVIRONMENTAL LIABILITY AT THE WICKES SITE.

12
13  It is undisputed that WCWP did not merge with PWP Corp. nor acquire any

     of its stock.  Rather, WCWP simply acquired a single asset from PWP Corp., *i.e.*,
14
     the unrelated and undeveloped Bakersfield real property.  Accordingly, to prevail
15
     on its claims, DTSC must prove that PWP Corp.'s asset sale to WCWP's
16
     predecessor establishes successor liability.
17

### A.   WCWP Did Not Acquire the "Principal Assets" of PWP Corp. and Thus Cannot Be Held Liable as a Successor.
18

19  Asset purchasers are ***not liable*** as corporate successors, subject to certain

20  equitable exceptions recognized by courts.  *Asarco*, 909 F.2d at 1263.  In the Ninth

21  Circuit and California, even a corporation that has purchased the "principal assets"

22  of another corporation will only be held liable as the successor if the asset sale

23  meets at least one of four exceptions:  (1) there is an express or implied assumption

24  of liabilities; (2) the transaction amounts to a merger of the two corporations; (3)

25  the purchasing corporation is a mere continuation of the seller; or (4) the transfer of

26  assets is for the fraudulent purpose of escaping liability for the seller's debts.

27  *ATSF*, 159 F.3d at 361.  "Courts tend to construe these exceptions strictly because

28  there is such a strong presumption against holding asset purchasers liable for the

1  acts of their predecessors."  Lawrence P. Schnapf, *CERCLA and the Substantial*

2  *Continuity Test:  A Unifying Proposal for Imposing CERCLA Liability on Asset*

3  *Purchases*, 4 Envtl. Law. 435, 444 (1998).

4         Significantly, these exceptions to the general rule regarding successor

5  liability are applicable only where the purchasing company acquires the "principal

6  assets" of the seller.  *Ray,* 19 Cal. 3d. at 28; *see Acheson*, 523 F.2d at 1330 (no

7  successor liability where purchaser did not buy receivables, trade name, and

8  goodwill); *Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1281 n. 5 (8th

9  Cir. 1994) ("Most jurisdictions hold that a prerequisite to the imposition of liability

10  against a corporation under any of the four exceptions to the nonliability of

11  successors is a transfer or sale of all, or substantially all, the assets of the

12  predecessor to the successor.") (*citing Acheson*, 523 F.2d at 1329-1330).

13         Thus, in *Garcia v. New Albertson's, Inc.*, 2014 WL 4978434 at *11 (C.D.

14  Cal. Oct. 3, 2014), the court held as a matter of law that it could not impose

15  successor liability where the seller transferred less than half of its assets to the

16  purchaser.  And in *Orthotec, LLC v. REO Spineline, LLC*, 438 F.Supp.2d 1122,

17  1128-30 (C.D. Cal. 2006), the court refused to impose successor liability where no

18  transfer of assets had taken place, only the hiring of former employees.

19         In this case, it is beyond rational dispute that neither WCWP, nor its

20  predecessor Pacific Wood Preserving of Bakersfield, Inc., acquired the "principal

21  assets" of PWP Corp.  PWP Corp. sold assets to two different companies:  Wickes

22  and WCWP's predecessor.  But WCWP's predecessor only acquired one asset from

23  PWP Corp.:  the undeveloped Bakersfield real property, unrelated to the ongoing

24  Elmira operations, which PWP Corp. had purchased in 1978 for $250,000.  Wickes,

25  on the other hand, acquired "substantially all" of PWP Corp.'s assets, including the

26  Elmira site, all of its buildings and site improvements, PWP Corp.'s inventory,

27  PWP Corp.'s machinery and equipment, PWP Corp.'s employees, PWP Corp.'s

28  licensing rights and PWP Corp.'s good will, etc.  UF 6.

In short, WCWP is not, and can never be, the corporate successor of PWP Corp. because WCWP did not acquire PWP Corp.'s "principal assets." Thus, there is no need for this Court even to analyze whether the transfer of the Bakersfield real property falls within one of the four exceptions to the general rule that an asset purchaser does *not* assume the CERCLA liability of the seller.

**B.    WCWP Is Not the Corporate Successor of PWP Corp.'s CERCLA Liability Because It Does Not Meet Any of the Four Exceptions for Successor Liability.**

Even if the Court were to assume that WCWP acquired all or substantially all of PWP Corp.'s assets, which it did not, none of the four exceptions apply to the transfer of the Bakersfield real property from PWP Corp. to WCWP's predecessor.

**1.    WCWP Did Not Agree to Assume PWP Corp.'s CERCLA Liability.**

Assumption of an environmental liability may be expressed or implied. *ATSF*, 159 F.3d at 361.  "Successor liability exists when the parties have, through agreements, words, or conduct, indicated their intent to shift liability from one party to another." *United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1035 (E.D. Cal. 2013) (citations omitted).  "The analysis of whether a contracting party has expressly assumed the liabilities of a seller begins by construing the parties' written agreements." *Sterling Centrecorp*, 960 F. Supp. 2d at 1035.  "Even where there has been no express assumption of liabilities, an implied assumption may still be found." *Sterling Centrecorp*, 960 F. Supp. 2d at 1037.  "Courts have emphasized that an implied assumption of liabilities is like an express assumption, an agreement between parties with the intent of transferring liability…." *Id.* at 1038.

Here, the only written instrument specifically documenting the transfer of the asset between PWP Corp. and WCWP's predecessor is the 1981 Grant Deed.  This document contains no language regarding the assumption or transfer of liabilities

between PWP Corp. and WCWP's predecessor.  UF 27.  Accordingly, there has been no *express* assumption of liabilities by WCWP.

In addition, there is no evidence that WCWP or its predecessor *impliedly* assumed any of PWP Corp.'s liabilities, let alone PWP Corp.'s environmental liabilities at the Wickes Site.  WCWP is a separate enterprise operating at a different location in Bakersfield with different employees, equipment, and customers.  UF 10 and 11.  WCWP never owned the property or controlled or participated in the operations at the Wickes Site, and, did not need to assume any of PWP Corp.'s liabilities in order to conduct its business.  Wickes, on the other hand, assumed PWP Corp.'s rights and obligations as necessary to continue the wood preserving business at the Elmira site, by, *inter alia*, explicitly assuming PWP Corp.'s trade accounts and certain contracts, and implicitly assuming any environmental liability at the Wickes Site that might exist.  UF 6-8.

### 2.    The Transaction Between PWP Corp. and WCWP's Predecessor Did Not Amount to a *De Facto* Merger.

With regard to CERCLA successor liability, courts look to the following factors to determine whether a *de facto* merger has occurred:  (1) continuity of the enterprise of the seller in terms of management, personnel, physical location, assets, and operations; (2) continuity of shareholders; (3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and (4) the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations.  *Asarco*, 909 F.2d at 1264, *overruled on other grounds by ATSF*, 159 F.3d at 362. Courts attempting to determine whether a *de facto* merger took place should base their decision "on the need for fairness, and conduct a holistic inquiry rather than a rote factor-by-factor analysis."  *Sterling Centrecorp*, 960 F.Supp.2d at 1043.  As explained below, fairness compels a finding that there was no *de facto* merger between WCWP and PWP Corp.

### a. There Was No Continuity of Enterprise Between PWP Corp. and WCWP's Predecessor.

There was little or no continuity of personnel or assets, and no continuity of physical location or operations between PWP Corp. and WCWP's predecessor. UF 5 and 6. Wickes, not WCWP's predecessor, purchased all of PWP Corp.'s real and personal property assets in Elmira, and continued PWP Corp.'s operations at the Elmira site for several years. UF 5-9, 28. Further, the vast majority of PWP Corp.'s employees at the time of the sale continued working for Wickes. UF 7 and 8. Wickes also expressly assumed certain rights and obligations connected with the Elmira site, and may have impliedly assumed others. UF 5 and 6.

Further, although PWP Corp. and WCWP's predecessor were both engaged in the same *type* of business—treating and preserving wood—that does not mean that there was "continuity of operations" between the two companies. In the context of a *de facto* merger, courts have interpreted "continuity of operations" to mean continuing the prior company's business operations, not operating a new company in the same line of business. *See Sterling Centrecorp*, 960 F.Supp.2d at 1044 (court found *de facto* merger where purchaser "continued the general business operations" of seller at same location with same employees); *Marks v. Minnesota Mining & Mfg. Co.*, 187 Cal. App. 3d 1429, 1436-37 (1986) (court found *de facto* merger where purchaser: (1) hired all of seller's employees, including all founders; (2) continued to manufacture same product without alteration; and (3) assumed all of seller's normal operating liabilities.).

### b. There Was No Continuity of Ownership Between PWP Corp. and WCWP's Predecessor.

The Ninth Circuit has definitively stated that a continuity of shareholders is required for a finding of a *de facto* merger. *Asarco*, 909 F.2d at 1264-1265 ("'[t]o find that a *de facto* merger has occurred there must be ... continuity of stockholders' [Citation]," and "'continuity of shareholders is [o]ne of the key requirements' of the doctrine [Citation].")  Continuity of shareholders, also referred to as continuity of

-20-

1   ownership, means and refers to a transfer of assets in exchange for the buyer's

2   corporate securities, not just that some of the shareholders have the same identity.

3   *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985). This

4   is because corporate liability adheres to "the corporate entity itself" and if assets are

5   not transferred for stock, then "no basic fundamental change occurs in the

6   relationship of the stockholders to their respective corporations, … and absent

7   continuity of shareholder interest, the two corporations are strangers, both before

8   and after the sale." *Id.*

9          PWP Corp. and WCWP's predecessor were and are corporate strangers, both

10   before and after the transfer of the Bakersfield real property to WCWP's

11   predecessor, because no stock was used as consideration for the transfer of the

12   Bakersfield land. *Bud Antle*, 758 F.2d at 1458. Richard Jackson was the sole

13   shareholder of PWP Corp. at the time of its dissolution, and the majority

14   shareholder of Pacific Wood Preserving of Bakersfield, Inc. at the time of its

15   formation. UF 2 and 50. However, Mr. Jackson's ownership interests in both

16   companies does not establish the required "continuity of ownership" between the

17   two companies for *de facto* merger analysis purposes.

### c.     PWP Corp.'s Dissolution Was Not Connected To or the Result of the Transfer of the Bakersfield Land.

20          To determine whether an asset purchase should be considered a *de facto*

21   merger, one of the factors courts consider is whether "[t]he seller corporation ceases

22   its ordinary business operations, liquidates, and dissolves as soon as legally and

23   practically possible." *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310

24   (3rd Cir. 1985).

25          PWP Corp. was in the process of dissolving when it transferred the

26   Bakersfield property to WCWP's predecessor. UF 17, 18, 21, 22, 26, and 27.

27   However, the dissolution of PWP Corp. was not connected to or the result of that

28   asset transfer. Instead, PWP Corp.'s dissolution came about because it had

previously sold substantially all of its assets to Wickes.  UF 5.  After the sale of its principal assets to Wickes, PWP Corp. had no reason to continue its existence, and therefore PWP Corp.'s Board of Directors elected to wind up and dissolve the company.  UF 17.  Thus, the asset purchase by *Wickes* may meet this part of the test for a *de facto* merger, but the asset transfer to *WCWP's predecessor* does not.

Moreover, PWP Corp. spent in excess of $100,000 to clean up the Wickes Site.  Ryan Dec., ¶ 10.  PWP Corp. only elected to dissolve in December 1979 after receiving a November 19, 1979 letter from the State of California declaring that PWP Corp. was in compliance with the State's Cleanup and Abatement Order.  UF 16.  Thus, PWP Corp. did not liquidate and dissolve in an effort to avoid environmental liability.  Instead, it accepted its environmental liability and, to the best of its knowledge, addressed that liability in full, as confirmed by the Regional Board.  Accordingly, this factor does not support a finding that there was a *de facto* merger between PWP Corp. and WCWP.

### d.	WCWP's Predecessor Did Not Assume Any Liabilities of PWP Corp.

As explained above in Section IV.B.1. of this memorandum, WCWP did not expressly or impliedly assume any liabilities of PWP Corp.  Consequently, this factor does not support the finding of a *de facto* merger between WCWP and PWP Corp.

### 3.	The Transaction Between PWP Corp. and WCWP's Predecessor Was Not Merely for the Purpose of Evading Liability.

An asset transfer which is fraudulently entered into in order to escape liability will not insulate the successor corporation from liability under CERCLA.  *ATSF*, 159 F.3d at 361.  In determining whether or not a transaction was entered into fraudulently, the sufficiency of consideration given for the assets purchased is a

significant factor. *Id.* at 365.[5]  However, merely showing that the "principal assets" were transferred for less than their fair market value will not normally be enough to warrant imposition of successor liability under this exception.  *Schnapf*, *supra*, at 447 (*citing Armour-Dial, Inv. v. Alkar Eng'g Corp.*, 469 F.Supp. 1198, 1202 (E.D. Wis. 1979)).  Further, the intent of the parties to fashion the transaction solely to circumvent CERCLA liability is an important factor.  *ATSF*, 159 F.3d at 365. Notably, this exception is rarely, if ever, applied in a CERCLA context. *ATSF*, 159 F.3d at 365.

There is no evidence that the transaction between PWP Corp. and Wickes or the asset transfer between PWP Corp. and WCWP's predecessor was made for the purpose of evading environmental liability.  As explained above, PWP Corp. agreed to clean up the Wickes Site, and did so to the satisfaction of the State of California. UF 16.  Further, PWP Corp. had sold already substantially all of its assets to Wickes in a "Bulk Sale" transaction.  UF 9.  At the time of the transfer of the Bakersfield property, PWP Corp. had already begun to wind up and dissolve, and thus PWP Corp.'s dissolution does not support a finding that it was attempting to escape environmental liability for the Wickes Site.  UF 12.  In short, there is no evidence whatsoever that the transfer of the Bakersfield property from PWP Corp. to WCWP's predecessor was done to evade liability.

### 4.    WCWP Is Not a Mere Continuation of PWP Corp.

"[C]orporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a

---

[5] Numerous courts have recognized that as long as the seller receives adequate consideration for its assets, the seller's creditors will generally be protected even if the purchaser does not assume liability.  *See, e.g., Ray*, 19 Cal. 3d at 29 (consideration paid for assets was available to meet claims of creditors, thus the acquisition of "assets was not in the nature of a merger or consolidation.").  DTSC has not produced any evidence that WCWP's predecessor gave inadequate consideration for the Bakersfield land.  In fact, the publicly available real estate records indicates that WCWP's predecessor paid adequate consideration for the property.  UF 21, 22, 25-27.

1    continuation of the old." *McClellan v. Northridge Park Townhome Owners Ass'n*,

2    89 Cal. App. 4th 746, 756 (2001) (citations omitted).  A company is a mere

3    continuation of another company when only one company remains after  the

4    principle asset transfer, and there is an identity of stock, stockholders and directors.

5    *Ferguson v. Arcata Redwood Co*., LLC, 2004 WL 2600471 at *5 (N.D. Cal. 2004);

6    *Washington v. United States*, 930 F. Supp. 474, 478 (W.D. Wash. 1996).  Factors

7    examined by courts in mere continuation analysis include the continuation by the

8    buyer of the divesting corporation's business and an inability of the divesting

9    corporation to pay its debts after the asset transfer, because no adequate

10   consideration was given for the seller's assets.  *K.C. 1986 L.P. v. Reade Mf'g*, 472

11   F.3d 1009, 1025 (8th Cir. 2007); *Ray*, 19 Cal. 3d at 29.

12       In *McClellan*, the Peppertree homeowners association ("HOA") decided to

13   disband and reform as the Northridge Park HOA in order to avoid a debt.

14   *McClellan*, 89 Cal. App. 4th at 749-50.  The Northridge Park HOA conducted the

15   same business, collected the same revenues, operated through the same Board of

16   Directors, had the same management company, and presided over the same

17   condominiums as the Peppertree HOA.  *Id.* at 750.  The *McClellan* court held that

18   the new HOA, Northridge Park, was "nothing more than the continuation of

19   Peppertree under a different name" and "[d]isregarding the corporate entity by

20   finding successor liability was proper." *Id.* at 755-56.

21       Nothing remotely similar to the corporate shenanigans of *McClellan* occurred

22   here.  Specifically, there is no evidence that WCWP's predecessor was formed as a

23   vehicle to avoid PWP Corp.'s environmental liability at the Wickes Site.  To the

24   contrary, PWP Corp. accepted its environmental liability at the Wickes Site, and

25   spent approximately $100,000 in cleaning it up to the satisfaction of the Regional

26   Board.  UF 13-16; Ryan Dec., ¶ 10.  Furthermore, WCWP's predecessor was

27   formed with new shareholders for a new and different business venture located 300

28   miles away from PWP Corp.'s operations.  UF 24 and 50.  Thus, the asset transfer

between PWP Corp. and WCWP's predecessor does not meet the standard for imposing "mere continuation" successor liability.

Additionally, the transaction between PWP Corp. and WCWP's predecessor lacks an identity of stock, stockholders, or directors.  WCWP's predecessor did not fund the purchase of the asset from PWP Corp. with its own stock.  UF 25 and 26.  The former sole shareholder of PWP Corp., Richard Jackson, was not the only shareholder in WCWP.  UF 2 and 50.  Only one director of PWP Corp., Richard Jackson, was on the Board of Directors of WCWP's predecessor around the time of its formation.  UF 2 and 50.

Further, WCWP's predecessor did not continue PWP Corp.'s business operations; Wickes did.  UF 5-9.  Also, PWP Corp. was able to pay its creditors after the asset transfer to WCWP's predecessor because it had received adequate consideration (about $690,000) from Wickes from the sale of the Elmira property and business.  UF 5, 9; Ryan Dec., ¶ 7, Ex. A at 7.

### C.    A Consideration Of All Equitable Factors Does Not Support A Finding Of Successor Liability.

All of the equitable factors set forth above militate strongly against a finding of successor liability for WCWP.  Indeed, there is nothing equitable about imposing liability upon a new corporation (WCWP) which merely acquired an extraneous real property asset of a corporation that dissolved (PWP Corp.).  This is especially true when that real property asset was not relevant to the operations of the seller entering dissolution, and when all of the assets essential for the continuation of the operations at the relevant site – in Elmira – were transferred to another viable corporation engaged in the same business (Wickes).

Moreover, any examination of equitable factors requires a careful consideration of how the State of California treated the Elmira site, the true successors Wickes and C&A, and the now-alleged successor, WCWP.  From November 1979, when the State signed off on investigation and cleanup of the

MOTION FOR SUMMARY JUDGMENT
2:14-cv-00595-WBS-EFB

1   overflow of chemicals while the plant was owned and operated by PWP Corp., until
2   September 2010, the State made no attempt whatsoever to notify WCWP of any
3   potential liability at the Wickes Site.  Thus, for thirty-one years the State of
4   California exhibited no belief that WCWP might be a PRP at the site.

5        Even Wickes and C&A, when faced with enforcement action by the State of
6   California during the period from 1982 to 2005, never asserted that WCWP was a
7   successor to PWP Corp. and had liability for contamination at the Wickes Site.
8   This was true even though, after the passage of CERCLA in 1980, Wickes and
9   C&A had such a right, and both entities were in financial distress and had a strong
10  interest in transferring their liability to WCWP, if at all possible.

11       To the extent that DTSC now argues that it did not know until 2010 that
12  PWP Corp.'s dissolution administrator had agreed to transfer the Bakersfield real
13  property to WCWP's predecessor in 1981, it should still not prevail.  The grant
14  deed transferring the Bakersfield property to WCWP's predecessor was duly filed
15  in the public records of Kern County and available since September 1981 for the
16  State to review.  Instead, the State made a conscious decision to place the liability
17  for contamination at Wickes' doorstep, and then its successor C&A's doorstep.  It
18  was only five years after C&A went bankrupt, and the State could only obtain about
19  $1,500 from the C&A bankruptcy estate, that it suddenly came up with the theory
20  that WCWP is really the successor to PWP Corp.'s liability at the Wickes Site.  If
21  there was ever a case for laches with regard to a State's successor liability
22  argument, this is it.  Equity demands that this Court rule against DTSC on this
23  issue.

24       Although the State first notified WCWP in 2010 that it might be a PRP at the
25  Wickes Site, it waited until 2014, after most of WCWP's out-of-state assets were
26  sold, to again press the argument that WCWP was a PRP.  This was well after the
27  State conducted yet another response action at the site.  There was no mystery to
28  the timing of the removal action in 2011, because the State, through its

MOTION FOR SUMMARY JUDGMENT
2:14-cv-00595-WBS-EFB

1  mismanagement of the hazardous substance releases at the site, had allowed the
2  contaminants removed in 2011 to continuously pollute the environment after its
3  initial involvement in 1979.  Equity demands that the State not now be permitted to
4  impose a belated successor liability theory on a company that is winding down in
5  reliance upon the contrary position that the State had been taking for over 30 years.
6  Moreover, it is highly inequitable for WCWP to continue carrying the cost burden
7  of this litigation, and for WCWP's shareholders to be prevented from selling the
8  remaining assets of WCWP because of the State's belated argument for successor
9  liability.  These inequitable burdens can only be lifted by the Court granting this
10  Motion.

11       **D.**  **Because WCWP Is Not the Corporate Successor to PWP Corp., It Is Entitled to Summary Judgment**

12      DTSC alleges two claims for relief against WCWP:  a claim for response
13  costs pursuant to section 107(a) of CERCLA; and a claim for declaratory relief
14  pursuant to section 113(g)(2) of CERCLA.  Both claims are premised on the
15  argument that PWP Corp. owned the property and/or operated the facility at the
16  Wickes Site at the time of disposal of hazardous substances, within the meaning of
17  section 107(a)(2) of CERCLA, and that WCWP is the corporate successor to PWP
18  Corp.'s environmental liability.

19      For the reasons set forth above, WCWP is *not* the successor in interest to
20  PWP Corp.'s environmental liability at the Wickes Site.  Accordingly, WCWP is
21  not liable under CERCLA for any response costs incurred by the DTSC.  Similarly,
22  DTSC is not entitled to declaratory relief against WCWP. Consequently, this Court
23  should grant summary judgment in favor of WCWP as to both of DTSC's
24  CERCLA claims.

25

26

27

28

1    **V.    ALL OF DTSC'S CLAIMS ARE TIME-BARRED.**

2           As an alternative ground to the lack of successor liability, WCWP requests

3    entry of summary judgment on the ground that all of DTSC's claims are barred by

4    the applicable statute of limitations in CERCLA.

5           A CERCLA cost recovery claim associated with "remedial" actions must be

6    commenced within six years after initiation of physical on-site construction of the

7    remedial action. 42 U.S.C. § 9613(g)(2)(B).  The language of CERCLA's statute of

8    limitations "indicates that there will be but one 'removal action' per site or facility,

9    as well as a single 'remedial action' per site or facility."  *Sunoco,* 337 F.3d at 1241;

10   *see New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 235-36

11   (2d Cir. 2014) ("Virtually every court" agrees that "there can only be one remedial

12   action at any given site."); *see also California ex rel. Cal. Dept. of Toxic*

13   *Substances Control v. Hyampom Lumber Co*., 903 F. Supp. 1389, 1394 (E.D. Cal.

14   1995) ("*Hyampom*") ("There is no authority for the view that each 'remedial'

15   activity undertaken at a site triggers a new cause of action for the cost recovery of

16   that activity.").

17          Under the supervision of DTSC and the Regional Board, Wickes and its

18   corporate successor C&A performed response actions to address the contamination

19   at the Wickes Site pursuant to two Remedial Action Plans ("RAP").  The first RAP

20   was dated September 9, 1983, and the second was dated February 25, 1994.  UF 30

21   and 40.  The 1983 RAP was "conceptually" approved by the Regional Board in

22   September 1983, and again approved in February 1984.  UF 31 and 33.  Shovels

23   went into the ground as a result of this RAP in 1983.  UF 35.  The 1994 RAP was

24   certified as completed by DTSC in 1996, with shovels in the ground beginning in

25   1994.  UF 45.  DTSC's suit, filed decades after the 1983 and 1994 RAPs, seeks

26   recovery for costs it incurred associated with its post-2005 remedial activity at the

27   Wickes Site.  Complaint, ECF No. 1 at pp. 7-8.  Pursuant to the single remedial

28   action per site rule, the post-2005 removal activity is part of the single remedial

1  action at the Wickes Site, which began in *1983*.  DTSC had six years to bring suit

2  against WCWP after the initiation of physical on-site construction pursuant to the

3  1983 RAP, but did not do so.  Thus, under the applicable CERCLA statute of

4  limitation, DTSC's suit is time-barred.  42 U.S.C. § 9613(g)(2)(B).

5        **A.**     **Whether an Action is Removal or Remedial is a Matter of Law.**

6       The first step in the CERCLA statute of limitations analysis is to determine

7  whether the remedial activity associated with the 1983 RAP and the 1994 RAP

8  constitutes one or more remedial actions followed by a continuation of the remedial

9  action(s) through DTSC's post-2005 response action.  Where, as here, the facts

10  regarding the response actions at the site are undisputed, the determination of

11  whether an action can be characterized as a removal action or a remedial action "is

12  one of law and is therefore appropriate for resolution on summary judgment."

13  *Hyampom*, 903 F. Supp. at 1391; *see United States v. W.R. Grace & Co.*, 429 F.3d

14  1224, 1234 (9th Cir. 2005) ("Whether the … cleanup activity was a removal

15  action—or, on the other hand, a remedial action in removal action's clothing—is a

16  question of statutory interpretation.").

17       **B.**     **DTSC's 1983 and 1994 Response Actions at the Wickes Site are**

18                **Properly Characterized as a "Remedial" Action.**

19  The term "remedial action" is defined by CERCLA as:

20  [T]hose actions consistent with permanent remedy taken instead of or

21  in addition to removal actions in the event of a release or threatened

22  release of a hazardous substance into the environment, to prevent or

23  minimize the release of hazardous substances so that they do not

24  migrate to cause substantial danger to present or future public health or

25  welfare or the environment.

26  42 U.S.C. § 9601(24).

27       Courts addressing the distinction between removal and remedial actions have

28  developed the universally accepted principle that "removal actions generally are

immediate or interim responses, and remedial actions generally are permanent responses." *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 926 (5th Cir. 2002) (citation omitted).  Consistent with this approach, this Court has held that "'removal' actions are short-term, temporary responses to an immediate threat as well as actions taken to assess, monitor, and evaluate a given site, while 'remedial actions' are those measures taken to achieve a permanent solution." *Hyampom*, 903 F. Supp. at 1391.

As opposed to remedial actions, removal actions are usually short in duration and occur early in the cleanup "life" of a site.  *See OBG Tech. Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 523 (D. Conn. 2007) (regarding Congress' motives for different statutes of limitation for removal and remedial actions).  Further, removal actions usually precede remedial actions.  *Id.* at 525 (plaintiff could not point to permanent remedial action that followed its so-called removal actions "because the actions it considers to be removal actions were, in fact, the permanent remedial solution envisioned under CERCLA.").  Courts also emphasize the circumstances in which the response action is taken, rather than the type of response activity, to determine whether a response action should be characterized as a removal action or a remedial action. *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 2013 WL 1182985 at *9 (N.D. Ind. March 21, 2013).

This Court, in *Hyampom*, set forth several factors to be considered in determining whether a response action at a hazardous waste site is properly characterized as a "removal" action or a "remedial action."  These factors, applied on a case-by-case basis with no one factor carrying more weight than any other, are: (1) proximity in time of the response action to disclosure of the final remedial design; (2) whether RI/FS monitoring and testing are ongoing at the time of the response action; (3) whether the response action falls within the statutory definition of "removal" (or "remedial"); and (4) the response action's role in the

1   implementation of the permanent remedy.  *Hyampom*, 903 F. Supp. at 1392-1394.

2   Regarding the fourth factor, the Ninth Circuit has held that whether a given

3   response action is consistent with a permanent remedy "is when the permanent

4   remedy is actually selected" *i.e.*, when a final remedial action plan is approved.

5   *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358

6   F.3d 661, 667 (9th Cir. 2004).

7       **C.    The Response Actions Associated with the 1983 RAP, the 1994
            RAP, and DTSC's post-2005 Activity Are a Single Remedial**
8       **Action.**

9       Application of *Hyampom* and *Neville* to the present case establishes that

10  DTSC's response activities are properly characterized as CERCLA "remedial"

11  actions subject to section 113(g)(2)(B)'s six-year statute of limitations.

12      Construction and other response activities related to the 1983 RAP

13  commenced in fall 1983 and continued for many years following DTSC's formal

14  approval in February 1984.  During this time period, Wickes engaged in physical

15  on-site construction activities, including but not limited to the construction of the

16  groundwater treatment system, removal of contaminated soils and the sealing of the

17  lumber drying pad.  UF 35 and 36.  According to Wickes, it undertook these

18  activities to reduce the level of contamination at the site and to prevent

19  contamination of surface water.  UF 34.  Further, these activities were done

20  pursuant to, and following approval of, the 1983 RAP, *i.e.*, the "final remedial

21  design."  UF 31.

22      On-site physical construction activities related to the 1994 RAP took place in

23  the period between 1993 and 1996.  UF 44-46.  DTSC certified the implementation

24  of the 1994 RAP in 1996.  UF 45.  The 1996 RAP states that C&A spent

25  approximately $5.5 million to remediate the site pursuant to the 1994 RAP, and that

26  this work was a "Final Remedial Action."  UF 46.

27      DTSC's post-2005 response activities, although sometimes referred to as a

28  "Removal Action" by DTSC and its agents, were in fact nothing more than the

1  continuation of the response actions envisioned by the 1983 and 1994 RAPs.

2  Further, DTSC's post-2005 activities at the site took place more than twenty years

3  after the final remedial plan identified in the 1994 RAP, and more than thirty years

4  after the final remedial plan identified in the 1983 RAP, even though there had been

5  no wood preserving operations at the Wickes Site (and thus no new production of

6  hazardous substances) since 1982.  The activities relating to the 2010 RAW

7  included soil excavation, off-site disposal, and groundwater monitoring – the same

8  response activities called for in the 1983 and 1994 RAPs.  UF 47 and 48.

9  Moreover, DTSC's response activity implemented pursuant to the 2010 RAW was

10  consistent with the final remedy of remediating groundwater contamination, and

11  was not done in response to any emergency.

12      In short, all of the aforementioned activities in the 1980s, the 1990s, and the

13  2000s, and 2010s at the Wickes Site were performed at the direction of or directly

14  by DTSC with one goal – the **permanent** remediation of the Wickes Site.

15  Accordingly, all of these activities are properly described as a single remedial

16  action subject to CERCLA's six-year statute of limitations.  *See Hyampom*, 903 F.

17  Supp. at 1391 ("'remedial actions' are those measures taken to achieve a permanent

18  solution.").

19      **D.**    **DTSC's Cost Recovery Action Is Time-Barred Because Remedial**
                **Action Commenced at the Wickes Site More Than Six Years**

20                  **Before It Filed Suit Against WCWP.**

21      Statutes of limitations ensure "that the defendant is given the protections of

22  predictability and promptness."  *United States v. Hagege*, 437 F.3d 943, 955 (9th

23  Cir. 2006); *see California Dept. of Toxic Substances Control v. Hearthside*

24  *Residential Corp.*, 613 F.3d 910, 914 (9th Cir. 2010) (statutes of limitation are

25  intended in part to protect defendants).

26      Pursuant to *Neville*, DTSC had until, at the latest, February 1990 to bring suit

27  against WCWP for CERCLA cost recovery associated with the Wickes Site,

28  following the construction activities at the Site after the February 1984 formal

-32-

approval of the 1983 RAP.  Instead, DTSC waited a further twenty-four (24) years to bring suit against WCWP.  Unless the Court dismisses DTSC's claims, WCWP would be deprived of the protections of predictability and promptness granted by CERCLA's six-year statute of limitations.

Accordingly, all of DTSC's claims against WCWP are time barred and WCWP is entitled to entry of summary judgment on this alternative ground.

**VI.    CONCLUSION**

WCWP is not the corporate successor to PWP Corp.'s CERCLA liability for the Wickes Site.  In fact, WCWP and PCP Corp. are corporate strangers.  Further, DTSC waited far too long to bring this CERCLA action, and is now barred by the applicable statute of limitations.  Accordingly, WCWP requests that the Court enter summary judgment against DTSC on either or both of these grounds.

DATED: December 15, 2014                Respectfully Submitted,

**PERKINS COIE LLP**


By:   /s/ Lester O. Brown
      Lester O. Brown

Attorneys for Defendant
West Coast Wood Preserving, LLC