# Exhibit J

From RWQCB @ 8/25/04 MTG            Davy 12 Sept 198



**Wickes Companies, Inc.**
Corporate Offices

FEDERAL EXPRESS

[Stamp: SEP 12 1983 — California Department Health Services SACRAMENTO — Hazardous Waste Management Branch]

September 9, 1983

Ms. Karen O'Haire
Regional Water Quality Control Board
3201 S Street
Sacramento, California 95816

Re:  Wickes Forest Industries Facility, Elmira, California

Dear Karen:

The following remedial action proposal has been approved by Wickes management and is submitted to the California Regional Water Quality Control Board ("CRWQCB") and the Department of Health Services ("DOHS") pursuant to the schedule agreed upon at our meeting on August 5, 1983:

1.  Stormwater Management:

    a.  Construct lined diversion ditches along northwestern and southwestern edges of property;

    b.  Construct corrugated metal pipe culvert at northern corner of drying pad;

    c.  Route roof downspouts from office building into back ditch;

    d.  Roof process area to prevent direct rainfall into this area.

2.  Ground-water Removal and Treatment:

    a.  Construct subsurface drainage system 200 feet long, 15 feet deep and 18 inches wide. A recovery well will be located at the midpoint of the drainage system and will contain a submersible sump fitted with PVC piping to deliver water to an on site storage tank and treatment system.

    b.  Construct a treatment plant utilizing an ion-exchange system with both cation and anion adsorber columns.

W-F

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010116

-57-

Ms. Karen O'Haire
September 9, 1983
Page Two

3. Soil Contamination:

   a. Remove soil in truck loading pad area;

   b. Seal drying pad with textile fabric and 4 inch thick layer of asphaltic concrete;

   c. Fence process area.

4. Monitoring:

   a. Visual inspection of sealed pad, fencing and stormwater management construction;

   b. Sampling of effluent from water treatment system;

   c. Sampling of selected on-site and off-site wells;

   d. Repairs as necessary.

Details of the above proposal are set forth in the enclosed "Proposed Remedial Action Plan, Wickes Elmira Facility" prepared by Woodward-Clyde Consultants in conjunction with Levine-Fricke Engineering Consultants. The figures referred to in such document are being express mailed to you directly by Woodward-Clyde. The information requested in your letter to me dated August 29, 1983 is contained in a letter dated September 9, 1983 which is being sent directly to you by Jim Levine of Levine-Fricke.

The schedule agreed to at our meeting on August 5, 1983, calls for the following events:

| | |
|---|---|
| 9-19 | Approval of plan by RWQCB and DOHS. |
| 9-19 | Resin bench test results. |
| 10-10 | Completion of french drain and stormwater trench; draw up design and specifications for fabrication; selection of vendors completed. |
| 11-7 | Construction of treatment plant on site. |
| 11-21 | Start up testing completed. |

*[handwritten margin note: including all aspects of remedial plan?]*

If you have any questions on Wickes' proposed plan, please call me or Bob Tuch immediately so that we can maintain this schedule.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010117

Ms. Karen O'Haire
September 9, 1983
Page Three


It is our understanding that at such time as it is demonstrated that the proposed plan is effecting a continuing reduction in levels of copper, chromium and arsenic in the ground water, and is preventing contamination of surface water and direct contact with contaminated soils, that the staff of the CRWQCB will promptly recommend to the Board that the pending Clean-Up and Abatement Order be dismissed with prejudice.

→ w/ monitoring provisions

Very truly yours,

Jeannette Meier Zacker
Associate Counsel

JMZ:cs
enclosure
cc: Larry Pearson, CRWQCB
    Gary Reents, DOHS
    Steve Debuskey
    Robert Tuch

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010118

-59-

PROPOSED REMEDIAL ACTION PLAN
WICKES ELMIRA FACILITY
Elmira, California

INTRODUCTION

The herein proposed remedial action plan for the Wickes Elmira facility, developed by Woodward-Clyde Consultants and Levine-Fricke, Inc., is intended to respond to directives from the California Department of Health Services (DOHS) and the Regional Water Quality Control Board, Central Valley Region (CRWQCB). These agencies have required Wickes to develop and submit a proposed remedial action plan to mitigate potential human health hazards associated with residual contamination at the Elmira wood-treating facility. The herein proposed remedial action plan has been developed based upon the results of Phase I and Phase II soil and ground-water investigations performed at the site. Reports for these investigations are dated April 19, 1983 and August 19, 1983, respectively. Additional data and interpretations concerning relevant site conditions are contained in our response to questions from the CRWQCB dated July 28, 1983.

The CRWQCB and DOHS are concerned about potential human exposure to copper, chromium (hexavalent and trivalent), and arsenic; heavy metals that have been identified in soil and ground-water at the site. In developing this remedial action plan, our approach has been to analyze the data on site conditions, to identify the potential pathways of human exposure in different areas of the site, and to develop engineering measures which will interfere with or eliminate the exposure pathways. The potential exposure pathways identified at the site include:

  o   direct contact with contaminated soils, ground water, and surface water;

  o   inhalation of soil particles (dust) from wind-blown contaminated soils; and

  o   drinking of contaminated ground water potentially pumped from the shallow (less than 20 feet deep) zone.

The Phase I and II studies described above provided sufficient data with which to identify areas of the site where these potential exposure pathways are present and areas where the potential exposure would be similar to background conditions. Specific engineering measures were then developed to reduce the potential exposures where they would be above background or more established criteria (i.e. drinking water standards).

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010119

SITE CONDITIONS

Although site conditions are fully described in the Phase I and Phase II reports (see Reference), a brief description of the site is provided, highlighting those areas with potential exposure problems. For this discussion it is useful to view the site as composed of several operating areas:

- o  The process area - including the storage tanks, the pressure cylinders, associated piping and controls, two collection sumps, and an office building. This is the area where chemicals were stored and mixed, and where wood was treated. Sumps were used to collect drippage and rainwater for use as make-up water for treating solutions.

- o  The drip pad or drying pad area - comprised of a concrete slab area (approx. 120 ft. by 180 ft. in plan dimensions) adjacent to the process area. This area was used to collect the drippage from newly-treated lumber. Drippage and direct rainfall onto this area flowed to the sumps in the process area.

- o  An unpaved storage yard - located northeast of the drying pad. This area as well as a smaller unpaved area southwest of the process area was used for wood storage before treating and after initial drying on the drip pad. The smaller area southwest of the process area is leased from Southern Pacific Railroad.

- o  A truck loading pad - located at the southern corner of the process area. This 40 ft. by 15 ft. concrete area was used for parking tank trucks while they unloaded shipments of treating chemicals.

Laboratory analyses results of soil and ground-water samples from exploratory borings in the northeastern and southwestern unpaved storage yards show relatively low concentrations of copper, arsenic, and chromium that are in the range of background concentrations measured in the site vicinity. These data suggest that potential human exposures to these metals from either direct contact with soils or inhalation of dust would be in the same range as would occur in uncontaminted off-site areas, and thus require no remedial actions.

Laboratory analyses results of ground-water samples collected from Phase I wells in the process area indicated significantly elevated concentrations of chromium and arsenic in the shallow ground water in this area. Phase II monitoring wells indicate that this ground-water contamination is confined to relatively shallow depths (less than 40 feet deep). No off-site contamination has been detected in the shallow Phase II monitoring wells.

- 2 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010120

-61-

Analysis of soil samples from on-site and off-site borings in the area of ground-water contamination show esentially background concentrations of copper, chromium, and arsenic. Where concentrations in soils were higher than background (E-6), the predominance of hexavalent chromium suggests that the vast majority of contamination measured in these soil samples occurs as contaminated pore water. These results suggest that an appropriate remedial strategy for this area would be to install a shallow ground water collection system to prevent subsequent off-site migration of contaminated shallow ground water and to retrieve that which may have already moved off-site. These actions will greatly reduce the potential for shallow ground water to be extracted by local domestic wells and subsequently ingested by residents. Since direct contact with or inhalation of contaminated soils is <u>not considered an important</u> pathway of exposure for residual subsurface contamination in the process area, no soil removal here is considered necessary. Recommended actions to reduce the potential for direct contact with remaining process equipment on-site are described later in this plan.

Laboratory analyses of soil samples from the drying pad area indicate concentrations of copper, chromium, and arsenic above background levels generally to depths of approximately 2 feet below the bottom of the slab and at least 3 feet in two areas. Ground-water analyses results from samples beneath the pad indicate concentrations generally below drinking water criteria. These results indicate that although the concrete surface covering the pad may preclude short-term exposures, the direct contact and inhalation exposure pathways may be important. The ground-water ingestion pathway appears insignificant here as long as infiltration through contaminated underlying soils is minimized. Sealing the surface of the pad is a measure being considered which would interfere with the direct contact and inhalation pathways.

Laboratory analyses results from borings in the truck loading pad indicate that the soil contamination extends to less than 2 feet deep in one end of the pad and greater than 2 feet deep in the other. Potential exposure from direct contact with or inhalation of the contaminated soils appears to be presently precluded by the presence of an overlying concrete pad, however, excavation of contaminated soils is being considered here as a long-term solution.

PROPOSED REMEDIAL ACTION PLAN

The proposed remedial action plan for the Elmira facility is comprised of several elements:

- o   Stormwater (surface water) management;
- o   Shallow ground-water removal and treatment;
- o   Soil removal in the truck loading pad area;
- o   Surface sealing the drying pad area;

- 3 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010121

    o   Monitoring; and
    o   Maintenance.

These elements are described below.

Stormwater Management

In previous winters, stormwater runoff generated on the adjacent Railroad property to the west would flow onto the site, and cause flooding of the pad and process areas. Similarly, direct rainfall on the drying pad area would flow into the process area and contact residual contamination in the sumps; thus requiring pumping and hauling or treatment of a large amount of stormwater.

To control this run-on and run-off problem, a stormwater management plan has been formulated and is herein proposed. The plan consists of:

    o   The construction of lined diversion ditches along the northwestern and southwestern edges of the property to divert incoming stormwater around the process and drying pad areas. The northwestern ditch (shown on Figure 1) would convey incoming stormwater northeast along the back edge of the property to a point approximately 10 feet beyond the northern corner of thedrying pad. A corrugated metal pipe culvert originating at this point would convey this water easterly across the site and outfall into the "A" Street ditch. The southwestern ditch would convey water along this property edge and outfall directly into the "A" Street ditch at the south corner of the process area. Both ditches and the culvert have been designed to convey water volumes up to those anticipated for the 100-year storm. It is possible that during large storm events, however, the "A" Street ditch will be flooded and will prevent the discharge of the full flow from these conveyances. Due to this possibility, the ditches have been designed to overflow onto the uncontaminated storage yards in the northeastern and southwestern portions of the site rather than spill over into the drying pad or process areas. Due to the low elevations of these storage yards, they will likely be flooded anyway to a certain extent from run-off from other areas. This precaution should result in protection of the sensitive areas of the site (the pad and process areas) and result in greater access and use of these areas in winter months.

    o   The routing of roof downspouts from the office building directly into the back ditch. This will divert an additional amount of clean stormwater from collecting in the process area.

- 4 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010122

-63-

o  Roofing of the process area to prevent direct rainfall into this area and potential leakage into the "A" Street ditch.

Ground-water Removal and Treatment

To prevent subsequent off-site migration of contaminated shallow ground water and retrieve contaminated ground water which may have already moved off-site, a subsurface drainage system is proposed along the southeast edge of the process area and a portion of the drying pad (Figure 1). The drain will consist of a 200 foot long, 15 foot deep, 18 inch wide trench with appropriately sized permeable backfill (Figure 2). A recovery well will be located at the mid-point of the drainage trench. The recovery well will consist of a 12 inch diameter well casing installed inside a 24 inch diameter borehole. The recovery well will extend to a depth of approximately 20 feet. The bottom 5 feet of well casing (below the trench) will be blank and the annulus around this section will be backfilled with a cement-bentonite grout. The section of casing from approximately 3 feet below the ground surface to the bottom of the trench will consist of a perforated section as shown in Figure 2. The well annulus adjacent to the perforated section will be backfilled with Caltrans Class 2 permeable filter material. The annulus opposite the upper 3 feet will be backfilled with a cement bentonite seal. A submersible pump will be installed within the well and fitted with PVC piping to deliver the withdrawn ground water to an on-site storage tank and subsequently to the treatment system. Down-hole control switches will turn the pump on and off to maintain the desired ground-water elevation in the drainage trench.

Based upon preliminary calculations, a water level drawdown of approximately 5 feet will be adequate to prevent ground water in the upper 40 feet from crossing a vertical projection of the trench and will retrieve shallow ground water from at least 300 feet in the downgradient direction. These calculations indicate that a flow of approximately 7 gallons/minute can be expected from this drawdown.

Treatment of collected ground water and surface water will be accomplished utilizing an ion exchange system with both cation and anion adsorber columns. A composite water sample of the E-4, E-5 and E-6 wells was collected on August 29, 1983 and is currently being analyzed by the laboratory. Resin bench test results will be available to the CRWQCB on September 19 in accordance with the schedule agreed upon on August 5, 1983. The proposed design configuration (Figure 3) consists of a storage/flow equalization tank, a cartridge filter to remove inert solids, and cation and anion columns to remove dissolved copper, chromium, and arsenic. After water has passed through these columns it will be discharged to either the "A" Street ditch or, if permission is obtained, to the City of Vacaville sanitary sewer system

- 5 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010123

-64-

(see separate letter to CRWQCB dated September 9, 1983). Effluent from the columns should meet California Drinking Water Standards for copper, chromium, and arsenic.

Based upon the assumed flow rates discussed above, a column diameter of 18 inches has been selected with column lengths (and bed depths) of 5 feet. Assuming average influent concentrations of 10 to 15 ppm for chromium, 0.5 ppm for arsenic, and 2 ppm for copper, resin change-out frequencies were calculated to prevent breakthrough. These calculations utilize textbook resin efficiency numbers which should be tested in the laboratory to select the appropriate resins and refine hese estimates. Based upon these calculations, the cation resin will need to be changed every 78 days and the anion resin changed every 21 days. Based upon the high capital and operating costs of on-site regeneration, the resins will be disposed of in accordance with applicable state and federal regulations.

Soil Removal in the Truck Loading Pad Area

To prevent future exposure to presently covered, contaminated soils underlying the truck loading pad, approximately 2.5 feet of soil will be excavated and replaced with clean soil fill. The excavated soil will be disposed in a disposal site approved by the DOHS and CRWQCB. Excavation of this soil is proposed instead of sealing the surface of this pad because, unlike the drying pad:

- o  The truck loading pad is in the same area of the site where ground-water contamination was detected. It is not known whether the contaminated soil beneath the truck loading pad has contributed to this ground-water contamination.

- o  The ground surface around the truck loading pad is at a low enough elevation (67.9 feet) to make the pad area susceptible to potential flooding from high water in the "A" Street ditch.

Concrete Drying Pad

The proposed sealing of the drying pad is intended to reduce potential human exposure to copper, arsenic and chromium in the drying pad area. Potential pathways of exposure include direct contact with soil beneath the slab or with the surface of the slab. Other pathways of exposure include breathing wind blown dust from the slab or underlying soil, or ingestion of underlying soil or runoff water from the surface of the slab.

Sealing the surface of the Drying Pad will mitigate potential direct contact, dust, and surface water migration of contaminants. It is recommended that the Drying Pad be covered with approximately a 4 inch thick layer of asphaltic concrete (A.C.)

- 6 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010124

-65-

paving. A textile fabric is recommended between the A.C. and the concrete slab to reduce the potential for cracking of the A.C. paving. A special mix of A.C. will be prepared to achieve the desired low permeability. Surface runoff from the sealed Drying Pad will then be diverted directly to the ditch at "A" Street. Continued inspection and maintenance will be performed to provide continued effectiveness of the A.C. surface seal.

Process Area

Potential pathways for human exposure to arsenic, copper, and chromium in the Process Area include: direct contact with concrete or equipment, or direct contact with surface runoff, and ingestion of groundwater from beneath the area. The proposed ground water removal and treatment system is intended to mitigate potential health risks from groundwater. Constructing a roofed structure over the Process Area will mitigate potential off-site migration of copper, arsenic, and chromium in runoff water by preventing rainfall from contacting contaminated surfaces. Presently rainfall collected in the sumps is removed by tank truck to an approved disposal site. Clean runoff from the new roof will be diverted to the ditch on "A" Street. A cyclone fence or siding on the proposed roof structure will be constructed around the process area to prevent direct contact with equipment on-site.

Monitoring Effectiveness

A.   Ground Water Removal and Treatment.

During initial operations it is estimated that the effluent from the ion-exchange water treatment system will need to be sampled and analysed for copper, arsenic, and chromium on a bi-weekly basis. As operational experience develops it is anticipated that effluent sampling and analysis may be reduced to bi-monthly or possibly monthly intervals.

Sampling and measurement of ground water elevations in groundwater monitoring wells and off-site domestic wells should initially be completed at monthly intervals to evaluate the effectiveness of the ground-water removal and treatment system. It is proposed that samples be taken from Wells E-4, E-5, E-6, E-15, E-16, DW-2, the Elmira School well and the Rhodes domestic water well. After evaluation of three months of data, the sampling frequency may be able to be reduced to every two months.

A minimum period of six months after initiation of pumping should be allowed to evaluate the groundwater removal and treatment system since this period of time will be required to develop the desired changes in gradient. Thereafter, the effectiveness of the ground-water removal and treatment system will be evaluated based upon decreasing levels of copper, arsenic, and chromium in

- 7 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010125

-66-

water from the monitoring wells. <u>When the levels of these components are at or below the California Drinking Water Standard for a period of six (6) consecutive months the ground-water removal system</u> can be discontinued.

B.      Stormwater Management and Sealing.

The effectiveness of the stormwater management and sealing will be monitored by visual inspection no less frequently than the sampling of the wells. Upon discontinuance of the ground water treatment and monitoring, such inspection, and appropriate mainenance, will occur no less than quarterly.

Annual Maintenance

Annual maintenance of the surface water management system is anticipated to be minimal. The ditches and pipes should be cleaned and inspected each fall and no less than monthly during the rainy season. For the Drying Pad the pavement should be inspected each fall prior to the rainy season and any cracks should be sealed.

Maintenance of the ion-exchange system will require replacement of the resins and disposal of the used resins. Change out frequencies for the resins will change over time as the influent concentrations decrease. Early operations will most likely require change out of the resins every three to twelve weeks. As the ground-water concentrations decrease the change out frequencies will be reduced. Very little maintenance is anticipated for the submersible pump and ground-water removal system.

- 8 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010126

-67-

## REFERENCES

Woodward-Clyde Consultants, 1983(a), consultants report entitled "Interim Phase I Report, Wickes Forest Industries Elmira, California," dated April 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(b), consultants report entitled "Response to Questions in Letter of July 8, 1983, Wickes Elmira Facility," dated July 28, 1983, prepared for Wickes Forest Industries, Dinuba, California.

Woodward-Clyde Consultants, 1983(c), consultants report entitled "Phase II Data Report, Wickes Forest Industries Facility, Elmira California," prepared for Wickes Forest Industries, Dinuba, California.

- 9 -

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC010127

-68-