Exhibit M



Remedial Action Plan
Wickes Companies Elmira Site
Elmira, California

February 25, 1994
2706.00.009

VOLUME I OF II

Prepared for
Collins & Aikman Group, Inc.
3340 Ocean Park Boulevard, Suite 2000
Santa Monica, California  90405

# LEVINE·FRICKE

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001007

 Collins & Aikman Group, Inc.

February 25, 1994

Messrs. James Tjosvold and Timothy Patenaude
Department of Toxic Substances Control
10151 Croydon Way, Suite 3
Sacramento, CA 95297-2106

RE:   **REMEDIAL ACTION PLAN**
      **FORMER WICKES FOREST INDUSTRIES SITE**
      **(ALSO KNOWN AS THE FORMER PACIFIC WOOD PRESERVING SITE)**
      **ELMIRA, CALIFORNIA**

Gentlemen

In accordance with the terms of the Enforceable Agreement between Collins & Aikman Group, Inc. ("CAG") and the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") and DTSC letter of February 11, 1994, enclosed are three copies of the Final Remedial Action Plan ("RAP") dated February 25, 1994. The plan has been prepared at the request of CAG by Levine*Fricke, Inc. and incorporates the Executive Summary and Record of Public Comment provided by DTSC letter of February 11, 1994.

An updated copy of the plan will also be provided to the public repository at the Solano County Library, Vacaville.

Cordially,

Bruce H. Edelson, P.E.
for Collins & Aikman Group, Inc.

cc:   J. Boggs - WMC (w/o encl)
      J. Orgain, Esq. - CAG (w/o encl)
      C. McNevin, Esq. - PMS (w/o encl)
      F. Lorincz - L*F (w/o encl)

8320 University Executive Park, Suite 102 • Charlotte, North Carolina 28262 • TEL: (704) 548-2350 FAX: (704) 548-2360
Mailing Address: P.O.Box 562237 • Charlotte, North Carolina 28256-2237

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001008

## DISTRIBUTION LIST

Mr. Jim Tjosvold/Tim Patenaude
Department of Toxic Substances Control
10151 Croyden Way, Suite 3
Sacramento, California  95927-2106

Bruce Edelson
Collins & Aikman Group
28520 Meadowmist Drive
Rancho Palos Verdes, California  90274

Jim Boggs
Wickes Manufacturing Company
26261 Evergreen Road, 5th Floor
Southfield, Michigan  48382

Chris McNevin
Pillsbury Madison & Sutro
725 South Figueroa Street, Suite 1200
Los Angeles, California 90017

John Orgain, Esq.
Collins & Aikman Group, Inc.
8320 University
Executive Park
Charlotte, North Carolina  28262

Mark Knox
Frank Lorincz
Levine-Fricke, Inc.
1900 Powell Street, 12th Floor
Emeryville, California 94608

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001009

**LEVINE·FRICKE**

## CONTENTS

| | PAGE |
|---|---|
| VOLUME I | |
| LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . | iv |
| LIST OF FIGURES . . . . . . . . . . . . . . . . . . . . | v |
| ACRONYMS . . . . . . . . . . . . . . . . . . . . . . . | vii |
| CERTIFICATION . . . . . . . . . . . . . . . . . . . . . | viii |
| CERTIFICATION . . . . . . . . . . . . . . . . . . . . . | viii |
| EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . | ix |
| 1.0   INTRODUCTION . . . . . . . . . . . . . . . . . . . | 1 |
| 1.1 Organization of the RAP . . . . . . . . . . | 1 |
| 1.2 Background . . . . . . . . . . . . . . . . | 2 |
| 1.2.1   Previous and Ongoing Environmental Cleanup Activities . . . . . . . . . . | 2 |
| 2.0   DETAILED STUDY AREA DESCRIPTION . . . . . . . . . | 7 |
| 2.1 Study Area Description . . . . . . . . . . . | 7 |
| 2.1.1   Types of Chemicals Handled . . . . . . . | 7 |
| 2.1.2   Areal Extent of Potential Impacts . . . | 8 |
| 2.1.3   Previous Soil Remediation in the Study Area . . . . . . . . . . . . . . . . . | 8 |
| 2.2 Physical Description of the Study Area and Vicinity . . . . . . . . . . . . . . . . . | 8 |
| 2.2.1   Topography . . . . . . . . . . . . . . | 8 |
| 2.2.2   Description of Surrounding Properties and Land Use . . . . . . . . . . . . . | 9 |
| 2.2.3   Demography . . . . . . . . . . . . . . | 9 |
| 2.2.4   Location of Potential Biological Receptors . . . . . . . . . . . . . . | 9 |
| 2.2.5   Climatology . . . . . . . . . . . . . . | 12 |
| 2.2.6   Location of Nearest Public Water-Supply Well and Population That It Serves . . . | 12 |
| 2.3 Chronology of Soil Investigations in the Study Area . . . . . . . . . . . . . . . . . . . | 12 |
| 3.0   REMEDIAL INVESTIGATIONS IN THE STUDY AREA . . . . . | 14 |
| 3.1 Soils . . . . . . . . . . . . . . . . . . . | 14 |
| 3.1.1   Geology . . . . . . . . . . . . . . . . | 14 |
| 3.1.2   Previous Soil Sampling . . . . . . . . . | 14 |
| 3.1.3   Recent Soil Sampling . . . . . . . . . . | 16 |
| 3.1.4   Metals Assessment . . . . . . . . . . . | 18 |

2706/2706NEW.RAP/NAS                              i

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001010

LEVINE·FRICKE

**CONTENTS**
(continued)

PAGE

3.2  Ground Water  . . . . . . . . . . . . . . . . . .   23
    3.2.1  Ground-Water Elevation and Flow
            Direction . . . . . . . . . . . . . . .   23
    3.2.2  Surface Water . . . . . . . . . . . . . .   24
    3.2.3  Metals Assessment . . . . . . . . . . . .   24

4.0  POTENTIAL EFFECTS OF METALS . . . . . . . . . .   26
    4.1  Current Uses of Land and Water . . . . . . .   26
    4.2  Future Potential Uses . . . . . . . . . . .   26
    4.3  Beneficial Uses of Land and Water . . . . .   26

5.0  FEASIBILITY STUDY . . . . . . . . . . . . . . .   27
    5.1  Feasibility Study Process . . . . . . . . .   27
        5.1.1  Consistency of FS/RAP with Appropriate
                Federal, State, and Local Requirements .   27
        5.1.2  Public Health Evaluation . . . . . . .   28
        5.1.3  Remedial Action Objectives and Remedial
                Goals . . . . . . . . . . . . . . .   32
    5.2  Technology Screening and Evaluation . . . .   39
        5.2.1  Remedial Technologies Screening Criteria   39
        5.2.2  Remedial Technologies Screening . . . .   40
        5.2.3  Screening Summary . . . . . . . . . . .   49
    5.3  Identification of Alternatives and Alternative
        Evaluation Criteria . . . . . . . . . . . .   49
        5.3.1  Identification of Alternatives . . . . .   50
        5.3.2  Alternative Evaluation Criteria . . . .   50
    5.4  Alternative Evaluation  . . . . . . . . . .   52
        5.4.1  Alternative 1:  "No Action" and
                Monitoring . . . . . . . . . . . . .   53
        5.4.2  Alternative 2:  Consolidation,
                Stabilization, Capping, and Monitoring .   55
        5.4.3  Alternative 3:  Consolidation,
                Excavation, Stabilization, Capping, and
                Monitoring . . . . . . . . . . . . .   58
        5.4.4  Alternative 4:  Excavation and Off-Site
                Disposal . . . . . . . . . . . . . .   61
        5.4.5  Alternative Evaluation Summary . . . . .   63

6.0  RECOMMENDED FINAL REMEDIAL ACTION . . . . . . .   68
    6.1  Justification for Selected Alternative . . . .   69
    6.2  Potential Effect on Human Health and the
        Environment . . . . . . . . . . . . . . . .   71
    6.3  Consistency with California Health and Safety
        Code  . . . . . . . . . . . . . . . . . . .   71

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001011

**LEVINE·FRICKE**

CONTENTS
(continued)

| | | PAGE |
|---|---|---|
| 6.4 | Administrative Requirements . . . . . . . . . . | 72 |
| 6.5 | Off-Site Treatment of Hazardous Wastes . . . . | 72 |
| 6.6 | Health and Safety . . . . . . . . . . . . . . . | 72 |
| 7.0 | IMPLEMENTATION SCHEDULE . . . . . . . . . . . . . | 73 |
| 8.0 | ONGOING OPERATION, MAINTENANCE, AND MONITORING . . . | 74 |
| 8.1 | Estimated Duration of Operation, Maintenance, and Monitoring . . . . . . . . . . . . . . . . | 74 |
| 8.2 | Estimated Costs of Operation, Maintenance, and Monitoring . . . . . . . . . . . . . . . . . | 74 |
| REFERENCES | . . . . . . . . . . . . . . . . . . . . . . | 75 |

VOLUME II

TABLES

FIGURES

APPENDICES

A    SOIL ANALYTICAL DATA

B    LABORATORY SOIL LEACHING STUDY

C    POTENTIALLY APPLICABLE OR RELEVANT AND APPROPRIATE
     REQUIREMENTS AND TO BE CONSIDERED CRITERIA

D    COST ESTIMATES

E    WIND ROSE

2706/2706NEW.RAP/NAS                    iii

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001012

**LEVINE·FRICKE**

## LIST OF TABLES

1   Summary of Influent and Effluent Metals Concentrations and Pounds of Metals Removed, Ground-Water Treatment System

2   Total Chromium, Copper, and Arsenic Detected in Soil Samples During Previous Investigations

3   Soil-Quality Data Collected During Recent Investigations

4   Well Construction and Depth-Interval Data

5   Results of Hydraulic Test Data

6   Ground-Water Elevation Data

7   Vertical Hydraulic Gradients

8   Metals Detected in Ground-Water Samples from 1991 to 1992

9   Screening of Chemicals of Potential Concern Within the Study Area

10   Initial Screening of Soil Process Options

11   Process Option Screening for Soils

12   Remedial Alternative Evaluation Summary

### APPENDIX B

B1   California WET Procedure Results for Selected Soil Samples

B2   Total and Extractable Concentrations of Arsenic, Chromium, Hexavalent Chromium, and Copper in Metals-Affected Soils

2706/2706WEW.RAP/NAS                    iv

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001013

LEVINE·FRICKE

## LIST OF FIGURES

1    Site Plan

2    Study Area

3    Existing Remedial Facilities

4A   County Assessor's Map

4B   County Assessor's Map

5A   Previous Consultants' Sampling Locations

5B   Previous Levine·Fricke Sampling Locations

6    Local Sample Locations

7    Concentrations of Arsenic, Hexavalent Chromium, and Total
     Chromium Detected in Recent Soil Samples

8    Concentrations of Copper Detected in Recent Soil Samples

9    Shallow Ground-Water Elevations Measured on October 19,
     1992

10   Isoconcentration Contours of Total Chromium Detected in
     Shallow Ground Water, July 1992

11   Alternative 2

12   Alternative 3

13   Alternative 4

14   The Extent of Soils Requiring Remedial Action

15   RAP Implementation Schedule

APPENDIX B

B1   Concentrations of Arsenic in the "Soluble" (KCl),
     "Adsorbed" (MgCL$_2$), and "Easily Reducible" (NH$_2$OH)
     Fractions Extracted from Soils

B2   Concentrations of Chromium in the "Soluble" (KCl),
     "Adsorbed" (MgCL$_2$), and "Easily Reducible" (NH$_2$OH)
     Fractions Extracted from Soils

2706/2706NEW.RAP/NAS                    v

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001014

LEVINE·FRICKE

LIST OF FIGURES
(continued)

B3   Concentrations of Copper in the "Soluble" (KCl),
     "Adsorbed" (MgCL$_2$), and "Easily Reducible" (NH$_2$OH)
     Fractions Extracted from Soils

2706/2706NEW.RAP/NAS                      vi

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001015

# LEVINE·FRICKE

### ACRONYMS

| | |
|---|---|
| AALs | Applied Actions Levels |
| ARARs | Applicable Relevant and Appropriate Requirements |
| bgs | below ground surface |
| CAG | Collins & Aikman Group, Inc. |
| CCR | California Code of Regulations |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 |
| DHS | Department of Health Services |
| DTSC | Department of Toxic Substances Control |
| EPA | Environmental Protection Agency |
| FS | Feasibility Study |
| GWETS | Ground-Water Extraction and Treatment System |
| HSP | Health and Safety Plan |
| HSC | Health and Safety Code |
| LDRs | Land Disposal Restrictions |
| MCL | Maximum Contaminant Level |
| mg/kg | milligrams per kilogram |
| mgL | milligrams per liter |
| msl | mean sea level |
| NCP | National Contingency Plan |
| NPDES | National Pollutant Discharge Elimination System |
| OM&M | operation, maintenance, and monitoring |
| ppm | parts per million |
| RAP | Remedial Action Plan |
| RAO | Remedial Action Objective |
| RCRA | Resource Conservation and Recovery Act |
| RDWALs | Recommended Drinking Water Action Levels |
| RI/FS | Remedial Investigation/Feasibility Study |
| RG | Remedial Goal |
| RWQCB | Regional Water Quality Control Board |
| SARA | Superfund Amendments and Reauthorization Act of 1986 |
| SPTCo | Southern Pacific Transportation Company |
| STLC | Soluble Threshold Limit Concentration |
| SVETS | Soil-Vapor Extraction and Treatment System |
| TBC | To be Considered |
| TTLC | Total Threshold Limit Concentration |
| WDR | Waste Discharge Requirements |
| yds | cubic yards |

2705/2706NEW.RAP/NAS

vii

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001016

-85-

**LEVINE·FRICKE**

### CERTIFICATION

All hydrogeologic and geologic information, conclusions, and recommendations presented in this report have been prepared under the supervision of and reviewed by a Levine·Fricke California Registered Geologist.  All engineering information, conclusions, and recommendations presented in this report have been prepared under the supervision of and reviewed by a Levine·Fricke California Professional Engineer.

Gregson W. Taylor
Senior Associate Hydrogeologist
California Registered Geologist (4758)

2/25/94
Date

Mark D. Knox
Chief Engineer
California Professional Engineer (33194)

2/25/94
Date

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001017

STATE OF CALIFORNIA—ENVIRONMENTAL PROTECTION AGENCY <span>PETE WILSON, *Governor*</span>

# DEPARTMENT OF TOXIC SUBSTANCES CONTROL
REGION 1
10151 CROYDON WAY, SUITE 3
SACRAMENTO, CA  95827-2106



### WICKES FOREST INDUSTRIES
### ELMIRA CALIFORNIA
### Final REMEDIAL ACTION PLAN

### EXECUTIVE SUMMARY

This Final Remedial Action Plan (RAP) Executive Summary was prepared and approved by the Department of Toxic Substances Control (DTSC).  The Final RAP is based upon investigations performed by Collins and Aikman Group, Inc. ([CAG] formerly Wickes Companies, Inc.) and its consultants with the oversight of DTSC and other responsible agencies.  This Executive Summary briefly describes the proposed action to remediate soil contamination at the Wickes site and the reason for the selection of this action.  DTSC does not necessarily agree with all data, statements, and conclusions contained in the documents produced by CAG and its consultants.  Where there are conflicts between such documents and this Executive Summary, the information and conclusions in this Executive Summary shall be deemed correct.

This Final RAP is consistent with the National Contingency Plan (NCP) (40 Code of Federal Regulations, Part 300 et seq.); Chapter 6.8, Section 25356.1 of the California Health and Safety Code (H&SC); and additional requirements contained in the February 5, 1993, Enforceable Agreement between CAG and DTSC.

A.   Site Description

The Wickes Forest Industries (Wickes) site is a former wood treatment facility located on 7.5 acres near the intersection of A Street and Holdener Road in Elmira, California.  Pacific Wood Preserving operated the wood treatment facility until September 1979, when Wickes purchased the site.  Wickes operated the facility until August 1982.  During the operation period, wood was treated with preservatives containing arsenic, chromium and copper.  Spills and drippage from treated wood has contaminated the soils with these metals.  Also, groundwater under the site has been contaminated with chromium.

Remedial actions have been implemented at the site to address storm water and soils in the southern area and groundwater beneath the entire site.  These remedial actions are outlined in a RAP prepared by Woodward-Clyde Consultants and submitted to the Department and the California Regional Water Quality Control Board on September 9, 1983.


*Printed on Recycled Paper*

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC001018

WICKES FOREST INDUSTRIES
Page 2

B.   SUMMARY OF INVESTIGATION

The Study Area for this RAP consists of the northern portion of the Site ("the on-site area") and three, adjacent, off-site areas (the farm area, the ditch area, and the railroad area).  The RAP presents the results of previous investigations conducted in the Study Area by Levine-Fricke and provides a combined Remedial Investigation/Feasibility Study Report (RI/FS) for soil in the Study Area.

Levine-Fricke collected soil samples from 114 locations in the Study Area during September and October 1992, and from 31 locations in the study area during August 1993. These samples were collected to further characterize the lateral and vertical extent of shallow metals-affected soil. The soil samples were analyzed for the metals of concern: arsenic, chromium, hexavalent chromium, and copper.  Soil samples were collected from the on-site area, and the railroad area, the farm area, and the ditch area (Collectively the "off-site area").  Additionally, soil samples were collected from stockpiles located immediately south of the on-site area.

Analytical results for recent soil samples collected in the Study Area indicate that surface soil (0 to 0.5 feet below ground surface (bgs)) and shallow soil (1 to 2 feet bgs) are affected by arsenic, hexavalent chromium, total chromium and copper.  Surface soil samples contain higher concentrations of arsenic, chromium, and copper than do shallow soil samples.  The following data is based on the recent soil investigation results.

Arsenic concentrations were highest in the on-site area and lowest in the farm area.  The highest level was in sample location SS-42 with 940 parts per million (ppm) with an on-site average of 168 ppm.  The farm area average was 7 ppm.

The highest hexavalent chromium concentrations were detected in the on-site area and the ditch area was lowest with no detectable hexavalent chromium.  50 ppm was the most hexavalent chromium detected in soil samples from the shallow zone of the on-site area.

WICKES FOREST INDUSTRIES
Page 4

D.    Remedial Alternatives Analyses

        The RAP outlines the screening of six treatment
technology types based on their effectiveness,
implementability, and cost.  From this screening, four
remedial alternatives were developed and evaluated using the
nine criteria required by the NCP (40 Code of Federal
Regulations, Part 300).  The criteria used in evaluating
each alternative are:

    1.    Overall protection of human health and the environment.

    2.    Compliance with applicable or relevant and appropriate
          requirements (ARARs).

    3.    Long-term effectiveness and permanence.

    4.    Reduction of toxicity, mobility, and volume.

    5.    Short-term effectiveness.

    6.    Implementability.

    7.    Cost-effectiveness.

    8.    State acceptance.

    9.    Community acceptance.

        The treatment technologies that were screened for this
    RAP are:

**Technology Type:  No Action.**  The "no action" technology serves
as a baseline for comparing other remedial alternatives and is
required under CERCLA guidelines (EPA 1988).

**Technology Type:  Institutional Actions.**  Institutional actions
are implemented by legal or regulatory actions.  Three process
options were considered under this technology type.

        **Access Restrictions Using Zoning and Deed Restrictions.**
Zoning or deed restrictions could be applied to the area of
affected soils to limit future exposure to affected soils in
the On-Site Area.  Access restrictions are only easily
implementable for the On-Site Area.  Access restrictions are
not immediately implementable in the Off-Site Area because
of multiple ownership and uses in these areas.

                                DTSC, et al. v. Jim Dobbas, Inc., et al.
                                DTSC001020

-89-

WICKES FOREST INDUSTRIES
Page 5

**Access Restrictions Using Barriers.** The access restriction process option would consist of establishing barriers to prevent general access to the Study Area. Appropriate access barriers would include locks, fencing, walls, gates, and signs. Currently, On-Site Area access is restricted by fencing, gates, locks, and signs.

**Environmental Monitoring.** Environmental monitoring could involve air and soil sampling in the Study Area.

Air Sampling: Ambient air sampling for particulates affected with the chemicals of potential concern could be conducted.

Soil Sampling: Periodic sampling of source area soils for chemicals of potential concern could be conducted to evaluate reductions in chemical concentrations associated with soil excavation or movement. All media samples for laboratory analysis would be collected using appropriate protocols and submitted to a state-certified analytical laboratory.

**Technology Type: Containment Using Horizontal Barriers.** The feasibility of containing the chemicals of potential concern using horizontal barriers was evaluated because the chemicals of potential concern are present in surface and shallow soils.

**Surface Seal.** Under this option, Study Area soils containing chemicals of potential concern could be graded and sealed with a variety of materials, including asphalt with a slurry seal, concrete, or low permeability soils or clays. A drainage system would be installed to route all precipitation flow to the drainage ditch off site.

This process option would prevent exposure pathways from becoming complete. Thus, it is unlikely that there would be any adverse health effects associated with site use after a surface seal was installed.

**Technology Type: Source Removal.** The source of the chemicals of potential concern is surface and shallow soils, which would be removed under this technology.

**Soil Consolidation or Excavation.** This option would consist of removing soils containing chemicals of potential concern (i.e., surface soils to approximately 1 foot bgs in the railroad and ditch areas) and soils with concentrations of chemicals of potential concern above remedial goals (i.e., selected shallow soils in the On-Site Area) from

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001021

WICKES FOREST INDUSTRIES
Page 6

selected portions of the Study Area with conventional earth-moving equipment, including scrapers, backhoes, or large-diameter augers. After removal, soils would be excavated and placed on the On-Site Area or disposed of at a permitted facility. Excavations in the Off-Site Area would be backfilled with clean fill.

**Technology Type: Soil Treatment.** Two process options were considered for treating shallow affected soils.

**Stabilization.** Stabilization technologies bind chemicals into an immobile matrix using a variety of cement-, silicate-, iron-, asphalt-, or organic-polymer-based substances. Soils can be stabilized to resist leaching by:

o    incorporating the soil into a solid, concrete-like monolith with low permeability

o    adding materials to the soil that strongly sorb or encapsulate chemicals of potential concern within the stabilized soil matrix

The second mechanism allows the stabilized soil to remain in a generally workable condition rather than transforming it into a monolithic block of concrete.

Stabilization can be performed in situ of with an aboveground mixing process.

**Soil Washing.** With the soil washing process, water and acids and/or chelating solutions would be introduced into the excavated soils to enhance the transfer of chemicals from the soil matrix to the liquid phase. "Washing" excavated soil would remove chemicals of potential concern from soils by dissolving them into the wash solution, or by concentrating the chemicals of potential concern into a smaller volume of soil through simple particle-size separation techniques.

**Technology Type: Off-Site Disposal.** Following excavation, affected soils could be disposed of off site.

**Landfilling.** The off-site disposal alternative would consist of excavating the affected soils and transporting the material to a suitable permitted hazardous waste landfill.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001022

-91-

WICKES FOREST INDUSTRIES
Page 7


E.    Selected Remedial Alternative

        The recommended alternative to address the remediation
    of soils in the Study Area is as follows:

    o    approximately 3,710 cubic yards of Off-Site Area soils
         containing chemicals of potential concern will be
         relocated from the ditch area and railroad area and
         placed onto the On-Site Area and incorporated into the
         grading and capping plan for the On-site Area

    o    an estimated 2,370 cubic yards of on-site area soils
         with concentrations of hexavalent chromium above the
         detection limits will be excavated and stabilized.
         After stabilization, these on-site soils will be spread
         over the top of the on-site terrain prior to
         application of the asphalt cap and slurry seal.  The
         excavated area will be backfilled with clean soil prior
         to capping

    o    an estimated 40 cubic yards of railroad area soils
         exceeding 500 ppm of arsenic will be excavated and
         disposed at a permitted hazardous waste facility.
         These railroad area soils exceed total threshold limit
         concentrations for arsenic

    o    approximately 21,000 square yards of affected soils in
         the On-Site Area will be graded and capped with
         asphalt.  The final materials and thicknesses of the
         cap will be developed during engineering design.  The
         asphalt cap will be developed to achieve and balance
         both structural integrity and low permeability needs.
         The slurry seal and asphalt will be maintained to keep
         the integrity of the cap intact.  Drainage structures
         for the cap will be designed to handle a 100-year storm
         event.  Runoff from the cap surface will flow to the
         drainage ditch adjacent to the Study Area

    o    deed restrictions will be implemented to identify
         specific areas where affected soils are located, limit
         future site development to industrial or commercial use
         and reduce the potential for exposure to affected soils
         during future excavation or development of the Study
         Area.


                            DTSC, et al. v. Jim Dobbas, Inc., et al.
                                            DTSC001023

WICKES FOREST INDUSTRIES
Page 8

F.   PRELIMINARY NONBINDING ALLOCATION OF FINANCIAL
     RESPONSIBILITY

     The responsible party associated with the Wickes Forest
Industries site is the Collins & Aikman Group, Inc. (a
Delaware Corporation); formerly known as Wickes Companies,
Inc.; Formerly know as The Wickes Corporation; operating
through its former Wickes Forest Industries Division which
purchased the site from Pacific Wood Preserving of Vacaville
(a Domestic Corporation, dissolved effective September 11,
1980).

James Tjosvold

James L. Tjosvold, P.E.
Acting Branch Chief
Site Mitigation Branch

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001024

-93-

STATE OF CALIFORNIA—ENVIRONMENTAL PROTECTION AGENCY                          PETE WILSON, *Governor*

## DEPARTMENT OF TOXIC SUBSTANCES CONTROL
REGION 1
10151 CROYDON WAY, SUITE 3
SACRAMENTO, CA  95827-2106



Record of Public Comment
on the
Remedial Action Plan
for
Wickes Forest Industries
Elmira California


     The Department of Toxic Substances Control (Department)
provided a public comment period to receive written and oral
comments on the December 27, 1993 Draft Remedial Action Plan
(DRAP) for Wickes Forest Industries.  The public comment period
was open for 30 days beginning January 3, 1994 and ending on
February 2, 1994.  This period also served as the comment period
for a proposed California Environmental Quality Act negative
declaration.  Concurrent with release of the DRAP for public
review, a display advertisement was published in the Vacaville
Reporter identifying the comment period and public meeting for
the project.  The DRAP was available for public review at the
Department's Region 1 office and at the Solano County Library in
Vacaville.  A fact sheet was prepared and distributed to all the
citizens of Elmira and to all potential responsible agencies.

     On January 25, 1994, the Department held a public meeting to
present the DRAP and receive oral and written comments.  The
public meeting was held at 7:30 p.m. in the Elmira Fire Station.
A total of 12 people from the public and local agencies attended
the public meeting.

     No oral or written comments were received during the public
meeting or comment period.



Printed on Recycled Paper

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001025

LEVINE·FRICKE

February 25, 1994                          LF 2706.00.009

REMEDIAL ACTION PLAN
WICKES COMPANIES ELMIRA SITE
ELMIRA, CALIFORNIA

## 1.0 INTRODUCTION

This Remedial Action Plan (RAP) has been prepared by
Levine·Fricke on behalf of the Collins & Aikman Group, Inc.
(CAG), formerly Wickes Companies, Inc., pursuant to the
Enforceable Agreement, dated October 2, 1992, between the
California Environmental Protection Agency, Department of
Toxic Substances Control (DTSC) (formerly the California
Department of Health Services [DHS]) and CAG, for the Wickes
Companies Elmira Site ("the Site"; Volume II Figure 1),
located near the intersection of A Street and Holdener Road in
Elmira, California.  This RAP has been prepared in accordance
with the requirements of California Health and Safety Code
(HSC) §25356.1, under the California Hazardous Substances
Account Act.

The Study Area for this RAP consists of the northern portion
of the Site ("the On-Site Area) and three, adjacent, off-site
areas ("the Off-Site Area").  The farm area, the ditch area,
and the railroad area comprise the Off-Site Area.  Figure 2
(Volume II) presents the boundaries of the Study Area, and
Figure 1 (Volume II) presents the boundaries of the Site.

This RAP presents the results of previous investigations
conducted in the Study Area by Levine·Fricke and provides a
combined Remedial Investigation/Feasibility Study report
(RI/FS) for soil in the Study Area.  This RAP also briefly
summarizes previous remedial measures implemented to date at
the Site.

### 1.1 Organization of the RAP

The RAP presents the following information:

•   a description of the Study Area, including its historical
    use and physical characteristics (Section 2.0)

•   results of recent soil investigations (Section 3.0)

2706/2706NEW.RAP/NAS                     1

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001026

LEVINE·FRICKE

- an assessment of the effects of arsenic, chromium, and copper on current and potential future uses of soil and ground water in the site vicinity (Section 4.0)

- the identification of remedial action goals and an evaluation of soil remediation technologies and alternatives (Section 5.0)

- a recommended remedial alternative for the Study Area (Section 6.0)

- an implementation schedule for the recommended remedial alternative (Section 7.0)

- a plan for future operation, maintenance, and monitoring of the recommended remedial alternative (Section 8.0)

## 1.2 Background

The Site was used for agricultural purposes before it was developed as a wood preparation, treatment, and storage area in 1972. After development, Pacific Wood Preserving operated a wood treatment facility at the Site, until September 1979 when Wickes Forest Industries ("Wickes"), a subsidiary of Wickes Companies, Inc., purchased the Site. Wickes operated a wood treating facility on the adjacent southern area of the Site until August 1982. During the operating period, wood preserving facilities typically used wood preserving solutions containing arsenic, chromium, and copper. All machinery and process equipment was removed from the Site during 1991. No facility operations have occurred at the Site since 1982.

Currently, four buildings are located at the Site. Three of these buildings (a pole barn, a metal-sided building, and a shed) are located in the Study Area and are discussed in Section 2.1. The other structure is also a metal-sided building (which includes the former facility offices) located in the southern portion of the Site.

### 1.2.1 Previous and Ongoing Environmental Cleanup Activities

Remedial actions have been implemented at the Site to address the storm water and soil in the southern area of the Site and the ground water beneath the entire Site. Figure 3 (Volume II) shows each area where remedial measures were implemented.

2706/2706NEW.RAP/NAS                                              2

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001027

**LEVINE·FRICKE**

**1.2.1.1  Storm-Water Management.**  A Proposed Remedial Action
Plan (RAP) prepared by Woodward-Clyde Consultants (WCC)
(Woodward-Clyde Consultants 1983b) was submitted to the
California Regional Water Quality Control Board (RWQCB) and
the DHS on September 9, 1983.  This RAP addressed remediation
issues for the Site.  The RAP included the following remedial
measures for storm water, which were implemented in fall 1983:

- construction of concrete surface-water diversion ditches
  along the northwestern and southwestern edges of the
  property to divert storm water from around the process and
  drying pad areas, directly toward the "A" Street drainage
  ditch

- routing of roof downspouts from the existing office
  building into the new concrete ditches to divert storm
  water that (without diversion) collected in the process
  area

- construction of a metal-sided building over the process
  area to prevent direct rainfall into this area and
  eliminate potential leakage into the "A" street ditch

**1.2.1.2  Soil.**  The RAP prepared by WCC also addressed the
following remedial measures for soil, which were implemented
in fall 1983:

- excavating contaminated soil (to a depth of 2.5 feet)
  under the Truck Loading Pad Area and backfilling with
  clean imported soil; contaminated soil was disposed at an
  off-site landfill

- paving the surface of the concrete drying pad with 4
  inches of low permeability asphaltic concrete

- installing a chain-link fence around the perimeter of the
  Site

Additional remediation of the soils in the southern area of
the Site was proposed by CAG in 1991.  In the report entitled
"Results of Soil Sample Analyses and Evaluation of Soil
Remedial Alternatives," dated July 31, 1991 (Levine·Fricke
1991a), CAG proposed remediation of the affected soils inside
the metal-sided building over the former process area.  The
remediation consisted of capping the affected soils inside the

2706/2706NEW.RAP/NAS                          3

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001028

-97-

**LEVINE·FRICKE**

building.  After approval from the DTSC and the RWQCB, the
former process area inside the building was capped with a
layer of "shot-crete" (pumped concrete) material in April 1992
(Wickes 1992).

**1.2.1.3  Ground Water.**  The RAP prepared by WCC also addressed
remedial measures for ground water at the Site.  The remedial
measures were implemented to prevent off-site migration of
contaminated shallow ground water and to extract and treat
contaminated ground water.  In the RWQCB Settlement Agreement
with Wickes dated February 26, 1984 (California DHS 1984), the
ground-water cleanup goals were California Drinking Water
Standards for copper, chromium, and arsenic.  The remedial
measures for ground-water removal and treatment in the WCC RAP
included the following:

* A subsurface french drain system 200 feet long, 15 feet
  deep, and 18 inches wide was constructed.  A recovery well
  (well EX) was located at the midpoint of the french drain
  and was used to deliver ground water to the treatment
  system.

* A ground-water ion-exchange treatment system, which
  treated ground water to meet National Pollutant Discharge
  Elimination System (NPDES) discharge limits, was
  constructed and system effluent was discharged into the
  ditch adjacent to Holdener Road and A Street.

The ground-water extraction and ion-exchange treatment system
began operation in April 1984 and operated at an average rate
of 5.5 gallons per minute (gpm).

In August 1987, an additional shallow/intermediate-depth
extraction well (E-25) was connected to the treatment system.
The well was installed to prevent the migration of affected
ground water further off site.  Well E-25 is screened from 5
to 35 feet and is located southeast of the Site on the
Williams' residential property (Levine·Fricke 1989).

In response to a request from Wickes, Levine·Fricke completed
a Preliminary Environmental Site Assessment (PESA)
(Levine·Fricke 1990a) of the northern portion of the Site
during 1989 and 1990.  Further subsurface investigations were
conducted, and based on these investigations, Wickes proposed
adding seven wells to the existing extraction system and
replacing the existing ion-exchange treatment system with an
improved larger capacity treatment system.  The proposed work
was included in a report titled "Results of Hydrogeologic
Investigations and Further Recommendations for the Former

2706/2706NEW.RAP/NAS                           4

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001029

**LEVINE·FRICKE**

Wickes Forest Industries Facility" prepared by Levine·Fricke
dated July 11, 1990 (Levine·Fricke 1990b).  After the DTSC and
RWQCB approved the proposed measure as a final remedial
measure for ground water, construction of the new ground-water
treatment system began in July 1992 and the system began
operation on November 3, 1992.  The system consists of the
following:

- an electrochemical co-precipitation treatment system rated
  to a capacity of 35 gpm

- extraction well E-34, screened from 9 to 24 feet, which is
  located at the edge of "A" Street across from the southern
  portion of the Site and connected to the treatment system
  on November 3, 1992

- extraction well EX-2, screened from 14 to 34 feet, which
  is located in the middle of the on-site area and connected
  to the treatment system on December 4, 1992

- five off-site extraction wells (EX-3, EX-4, EX-5, EX-6,
  and EX-7), screened from 7 to 23 feet, which are located
  near the northeastern property line of the On-Site Area
  and connected to the treatment system on July 7, 1993

The expanded ground-water extraction and treatment system
(GWETS) operates at an average flow rate of approximately 15
gpm and has a total chromium influent concentration of
approximately 0.3 parts per million (ppm).

The new treatment system is an electrochemical treatment
system that removes chromium, arsenic, and copper from ground
water by coprecipitating the metal ions with ferric hydroxide
particles before treated water is discharged to the ditch
along Holdener Road and "A" Street under NPDES permit.  The
ferric hydroxide particles are produced in an electrochemical
cell by passing an electrical current through iron plates.
The metal particles are settled in a clarifier and dewatered
with a filter press.  When sufficient quantities of filter
press cake have accumulated, the chromium in the filter cake
is recycled.

Table 1 in Volume II presents a summary of the influent and
effluent metals concentrations and the pounds of metals
removed by the GWETS.  As shown in Table 1, the GWETS has
effectively reduced the concentration of metals in ground
water.  The concentration of chromium in the influent has been
reduced from 11 ppm in April 1984 to 0.3 ppm in June 1992, a

2706/2706NEW.RAP/NAS                    5

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001030

**LEVINE·FRICKE**

97 percent reduction in chromium concentration.  Arsenic and
copper concentrations in influent ground water have been
reduced to below method detection limits.

2706/2706NEW.RAP/NAS                    6

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001031

**LEVINE·FRICKE**

## 2.0 DETAILED STUDY AREA DESCRIPTION

The approximately 14.6-acre Study Area consists of four
subareas: the northern 4.3 acres of the 7.5-acre Site ("the
On-Site Area"), a 5.1-acre property immediately east of this
northern portion ("the farm area"), a 1.8-acre area containing
the ditch along Holdener Road ("the ditch area"), and the
3.4-acre drainage swale along the western property boundary
("the railroad area") (Volume II Figure 2). The farm area,
ditch area, and railroad area are collectively referred to as
the "Off-Site Area."

### 2.1 Study Area Description

The On-Site Area was used as a process area for the
preparation and storage of raw lumber before the lumber was
treated. This usage occurred between 1972 to 1982. Three
buildings associated with former facility operations are
present in the On-Site Area. One is a 6,000-square-foot
enclosed metal-sided building. The second is a 6,000-square-
foot open-sided pole barn. Both buildings have concrete pads.
The third is a small, 50-square-foot pump house. A concrete
pad area also is present between the pole barn and the metal-
sided building, along the east side of the metal-sided
building, and along the east side of the open-sided pole barn.

Use of the railroad area as a railroad right-of-way, the farm
area as agricultural land, and the ditch area as a drainage
ditch remained consistent throughout operation of the wood
treatment facility at the Site and have remained consistent
since the facility ceased operations in 1982.

### 2.1.1 Types of Chemicals Handled

Within the Study Area, physical treatment of wood (i.e.,
pricking and cutting) was conducted in the On-Site Area. As
noted in Section 1.2, during the period of operations at the
Site, such operations typically used preservation chemicals
containing copper, chromium, and arsenic.

Chemicals known or suspected to have been associated with
operations at the Site are present in soil. A more detailed
discussion of the extent of the chemicals of potential concern
in the Study Area is presented in Section 3.0.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001032

-101-

**LEVINE·FRICKE**

### 2.1.2  Areal Extent of Potential Impacts

Potential releases of chemicals within the Study Area may have occurred as a result of drying of freshly treated lumber in the southern portion of the On-Site Area, storm-water runoff into ditches west and east of the Site, and a possible minor discharge of chemicals from a chemical solution barrel onto a concrete pad and then to soil in the On-Site Area.

### 2.1.3  Previous Soil Remediation in the Study Area

Soil has been excavated from the ditch area on two occasions. An RWQCB staff report (1979) indicates that in March 1978 "all contaminated soils were removed from the drainage ditch." With regard to the second excavation, a Dewante and Stowell report (1982) indicates that 480 lineal feet of the ditch area was excavated in August 1982.  This 480 feet consisted of the following:

- the area between the fence and A Street for a distance of 150 feet west of the plant entrance, excavated to a depth of 2 feet bgs

- the area between the fence and Holdener Road, excavated to a depth of 2 feet for a distance of 200 feet east of the entrance and to a depth of 1 foot for the next 130 feet.

Clean backfill was installed after all excavations (Dewante and Stowell 1982).

In the area formerly occupied by the chemical solution barrel, excavation of soil to a depth of 1 foot bgs was accomplished during August 1982 by Dewante and Stowell to remove On-Site Area soils affected by the discharge (Dewante and Stowell 1982).

### 2.2  Physical Description of the Study Area and Vicinity

A copy of the Solano County Assessor's Parcel Map for the Study Area is presented in Volume II Figures 4A and 4B.

### 2.2.1  Topography

Study Area topography is relatively flat, with a slight slope to the southeast.  Surface elevation ranges from approximately 67 feet above mean sea level (msl) in the eastern portion of the Study Area, to approximately 70 feet above msl in the western portion.  The ditch area, the railroad area, and most of the On-Site Area are covered with grass.  The portion of

2706/2706NEW.RAP/NAS                              8

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001033

-102-

**LEVINE·FRICKE**

the On-Site Area not covered with grass consists of a
compacted fill.  The farm area is alternately exposed soil or
covered with a hay crop.

## 2.2.2  Description of Surrounding Properties and Land Use

Land use in the vicinity of the Study Area is residential east
of A Street and south of Holdener Road.  An elementary school
is located south of the Study Area.  Land bordering the north
and northeastern portions of the property is used for
agricultural purposes, specifically for growing hay for animal
feed.  To the west, land immediately adjacent to the property
boundary is a Southern Pacific Transportation Company (SPTCo)
railroad right-of-way, and land farther west is agricultural.

## 2.2.3  Demography

The Study Area is located in the unincorporated town of Elmira
in Solano County, California.  Population estimates for 1990
provided by Solano County and the Association of Bay Area
Governments indicate 15,171 people reside in 5,087 households
within census tracts 2529.06 and 2529.04, which encompass an
area of approximately 25 square miles.  Elmira is included
within these tracts in unincorporated Solano County and has a
population of a few hundred people.

## 2.2.4  Location of Potential Biological Receptors

An ecological assessment was conducted as specified in the
May 13, 1993 letter to CAG (DTSC 1993a), to identify plant and
animal populations, and especially special status species,
that may be in direct or indirect contact with chemicals of
concern from the proposed remedial activities in the Study
Area.

**2.2.4.1  Methods.**  This assessment involved collecting
background information and using that information to target
potential receptor species and habitats, and visiting the Site
to survey targeted species and habitats and assess general
ecological characteristics of the Study Area.

**Targeted Species and Habitats.**  A map overlay (for Elmira
7.5-minute quadrangle) and printout from the California
Natural Diversity Data Base (CNDDB) were obtained and reviewed
for reports of special status species in the Study Area
vicinity.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001034

# LEVINE·FRICKE

Based on the CNDDB information, five species and habitats were targeted: Swainson's Hawk, Burrowing Owl, Valley Needlegrass Grassland, Northern Claypan Vernal Pool and related species, and Showy Indian Clover. The closest reported species or habitat to the Study Area was approximately 3.2 miles to the south. Because of the report of Burrowing Owls, special attention was paid in the field to locating possible burrows and evidence of occupation.

**Field Visit.** A field visit was conducted by the Levine·Fricke ecologist, Mr. Stuart Siegel, on September 22, 1993. Both On-Site and Off-Site areas were surveyed.

## 2.2.4.2   Result and Discussion

**On-Site Area.** Vegetation cover varied from sparse to moderate density of introduced annuals. No native grassland species were observed. The predominant species observed was Yellow Star Thistle (*Centaurea solstitialis*). Several introduced annual grasses were also present (e.g., *Avena* spp., *Hordeum* spp., *Lolium* spp.). One area adjacent to a ditch and approximately 5 m$^2$ in size contained Salt Grass (*Distichlis spicata*), a native facultative wetland halophytic species. A few individuals of Salt Bush (*Atriplex* spp.) were also observed adjacent to a ditch.

No evidence of burrows was found in the On-Site Area, either large in size for Burrowing Owls or small in size for small rodents. Consequently, there was no evidence found of occupied burrows. Two raptor scat were found beneath a telephone pole alongside the On-Site Area fence and a Red-Tailed Hawk was observed in the vicinity. A small number of Pigeons was observed in the pole barn.

The On-Site Area contained no evidence of vernal pool formations, such as barren clay hardpan areas. Species of plants and animals associated with vernal pools would not be observable in the fall dry soil conditions of September.

Numerous butterflies were observed in flight in the On-Site Area. No species identification was made nor specimen collected. Organisms alighted on Yellow Star Thistle and other introduced plant species, suggesting that they may use on-site vegetation as a resource.

**Off-Site.** The off-site areas immediately adjacent to the Site were similar to On-Site Area conditions. Namely, vegetative cover varied from sparse to moderate and was dominated by Yellow Star Thistle and other introduced grasses and thistles.

2706/2706NEW.RAP/NAS                    10

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC001035

LEVINE·FRICKE

The only possible burrow areas found were two concrete blocks overgrown with vegetation. Neither block showed any evidence of occupation. Butterflies were observed in most of the off-site areas, including those areas not identified for excavation.

The drainage ditch parallel to Holdener Road, extending approximately 3,000 feet east from the Site to Lewis Road (the "Ditch"), contained virtually no emergent vegetation. Water depth varied from approximately 3 inches at the western end to 8 to 12 inches at the eastern end. Aquatic algae was present through much of the standing water, and very short (less than 3-cm height) aquatic vegetation was present intermittently on the moist soil at the water's edge. The only organisms observed were Dragon Flies. No other aquatic invertebrates or vertebrates (e.g., fish, reptiles, amphibians) were observed. Small burrows (<2-inch opening) were observed on the south bank near the eastern end of the Ditch (near Lewis Road). The burrow entrances were on the top of the bank, and burrow paths were visible on the Ditch sidewall. There was no scat, feathers, or other evidence of Burrowing Owl occupation. No small mammals were observed using any of these burrows.

### 2.2.4.3   Summary and Conclusions.

**On-Site Area.** The On-Site Area is a highly disturbed area containing sparse to moderate cover of introduced annual plants. No evidence of special status plants or animals, or their habitats, were found, and thus contact with chemicals of potential concern is considered unlikely. The only ecological function observed was a transient butterfly population, and removal of vegetation will eliminate the potential for contact with chemicals of potential concern by butterflies. Because of the virtual lack of raptor scat, it is unlikely that the On-Site Area supports significant avian functions. Therefore, avian contact with chemicals of potential concern is considered unlikely. The lack of burrows indicates that there are no small mammals using the On-Site Area, which suggests that there is no contact with chemicals of potential concern for small mammals.

**Off-Site Area.** For the off-site areas immediately adjacent to the Site, the same conclusions can be made as for On-Site Area conditions.

The Ditch alongside Holdener Road does not appear to be providing functions and values for special status nor other species. This conclusion is derived from the lack of emergent vegetation and aquatic organisms, combined with the apparently

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC001036

-105-

**LEVINE·FRICKE**

unused burrows at the east end of the Ditch.  Consequently,
the potential for contact with chemicals of potential concern
appears to be very low.

## 2.2.5  Climatology

The Study Area is characterized by warm, dry summers and mild
wet winters.  Average rainfall is about 18 inches per year as
measured at the closest national weather station, located in
Sacramento, California.  The prevailing wind direction is
toward the east-northeast.

## 2.2.6  Location of Nearest Public Water-Supply Well and Population That It Serves

Currently, each household in Elmira obtains its drinking water
from privately owned domestic wells (personal communication,
City of Vacaville Public Works Department, 1992).  Private
domestic wells located nearest the Study Area include wells
MP-1, MP-2, RW, RH-A, and EL (elementary school well) (Volume
II Figure 2).  The screened intervals of wells MP-1, MP-2, RW,
and RH-A reportedly are greater than 100 feet bgs; the
screened interval of well EL is unknown.  These wells have
been tested periodically and results indicate that they are
not affected by potential releases from the Site.

By the end of 1993, a new municipal supply well will be
installed to supply drinking water to Elmira residents.  The
new municipal well will be located on Meridian Road,
approximately 400 to 500 feet north of Elmira Road.  This is
approximately 2,000 feet west of and upgradient from the Site.
Recent test results indicate that the new municipal supply
well is clean.

## 2.3  Chronology of Soil Investigations in the Study Area

Soil investigation activities conducted in the Study Area by
Levine·Fricke personnel and other consultants are described in
the following reports:

·    Letter to Sequoia Wood Products from Anlab, dated March 4,
     1981

·    "Site Investigation - Elmira Facility," prepared by
     Dewante and Stowell, dated June 25, 1981

·    "Report on Site Cleanup - Elmira Facility," prepared by
     Dewante and Stowell, dated August 30, 1982

2706/2706NEW.RAP/NAS                    12

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC001037

LEVINE·FRICKE

- "Interim Phase I Report, Wickes Forest Industries, Elmira, California," prepared by Woodward-Clyde Consultants, dated April 28, 1983

- "Proposed Remedial Action Plan, Wickes Elmira Facility," prepared by Woodward-Clyde Consultants, dated September 7, 1983

- "Results of Soil Sampling in the Drainage Ditch Along Holdener Road, Wickes Facility, Elmira, California," prepared by Levine·Fricke, dated June 16, 1987

- "Monthly and Quarterly Operations and Monitoring Report, Elmira Facility," prepared by Levine·Fricke, dated July 31, 1987

- "Preliminary Environmental Site Assessment of the Northeastern Portion of the Wickes Elmira Property," prepared by Levine·Fricke, dated June 20, 1990

- "Results of Soil Sample Analyses and Evaluation of Soil Remedial Alternatives, Former Wickes Forest Industries Facility, Elmira, California," prepared by Levine·Fricke, dated July 31, 1991

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC001038