-116-

# Exhibit P

-116-



 

# Department of Toxic Substances Control

Linda S. Adams
Secretary for
Environmental Protection

Maureen F. Gorsen, Director
8800 Cal Center Drive
Sacramento, California 95826-3200

Arnold Schwarzenegger
Governor

November 13, 2006

Mr. Don Dobbas  
Jim Dobbas Inc.  
280 Taylor Road  
Newcastle, California 95658

Certified Mail No.: 7003 1680 0004 3024 0253

Mr. Gary Kerley  
Continental Rail Co.  
P.O. Box 911  
Seguin, Texas 78156-0911

Certified Mail No.: 7003 1680 0004 3024 0260

IMMINENT AND SUBSTANTIAL ENDANGERMENT DETERMINATION FOR THE WICKES FOREST INDUSTRIES SITE

Dear Sirs:

The Department of Toxic Substances Control (DTSC) has issued the enclosed Imminent and Substantial Endangerment Determination (Determination) for the Wickes Forest Industries Site in Elmira, California. The Site includes the property located at 147 A Street, Elmira, Solano County, California 95625 (the Property) and the areal extent of contamination that resulted from activities on the Property. DTSC has determined you are responsible parties or liable persons as defined in Health and Safety Code section 25323.5(a)(1) because you currently own the Property, which you purchased on April 1, 1997 Issuing the Determination will assist DTSC in hiring a contractor to resume the approved remedial actions for the Site.

Section 25358.3(a) of the Health and Safety Code allows DTSC to take various actions when there may be an imminent and substantial endangerment to public health or welfare or to the environment because of a release of a hazardous substance. Section 25355.5(b)(3) of the Health and Safety Code authorizes DTSC to expend state funds if there is an imminent and substantial endangerment to public health or welfare or to the environment.

As you know, based on your due diligence prior to purchasing the Property in 1997 and your subsequent ownership, operation and maintenance of certain remedial actions previously approved by DTSC are necessary to prevent an imminent and substantial endangerment to the public or the environment from the Site. Details of the remedial

Printed on Recycled Paper

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018465

-117-

Mr. Don Dobbas
Mr. Gary Kerley
November 13, 2006
Page 2

actions taken at the Site are summarized in section 2.1 of the Determination. Maintenance of the asphalt cap and operation of the ground water extraction and treatment system ceased in August 2005 because Collins and Aikman Products Company, the previous owner of the Property and also a responsible party, entered bankruptcy proceedings.

DTSC has allocated state funds for this year to resume operation and maintenance of the remedial actions approved for the site and plans to implement the necessary activities as soon as possible. Cost recovery against the responsible parties may be pursued by DTSC under the Comprehensive Environmental Response Compensation and Liability Act, the Health and Safety Code section 25360, or any other applicable state or federal statute or common law.

If you have any questions, please call Mr. Perry Myers at (916) 255-3708.

Sincerely,

James L. Tjosvold, P.E., Chief
Northern California-Central Cleanup Operations Branch

Enclosure

cc:   Ms. Nicole R. Gleason
      Downey Brand Attorneys LLP
      555 Capitol Mall, 10th Floor
      Sacramento, California 95814

      Ms. Marilee Hanson
      Staff Counsel III
      Office of Legal Affairs
      Department of Toxic Substances Control
      1001 "I" Street
      PO Box 806
      Sacramento, California 95812-0806

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018466

-118-

Mr. Don Dobbas
Mr. Gary Kerley
November 13, 2006
Page 3

cc: Mr. Fernando Amador, P.E., Chief
Sacramento Responsible Party Unit
Northern California-Central Cleanup Operations Branch
Site Mitigation and Brownfields Reuse Program
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, California 95826

Mr. Perry Myers, P.E.
Hazardous Substances Engineer
Sacramento Responsible Party Unit
Northern California-Central Cleanup Operations Branch
Site Mitigation and Brownfields Reuse Program
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, California 95826

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018467

-119-

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | | |
|---|---|---|
| In the Matter of: | ) | Docket No. : I/SED 06/07-011 |
| | ) | |
| Former Wickes Forest Industries Site | ) | |
| 147 A Street | ) | Imminent and Substantial |
| Elmira, California 95625 | ) | Endangerment Determination |
| | ) | |
| | ) | Health and Safety Code |
| | ) | Sections 25358.3(a) and |
| | ) | 25355.5(b)(3) |
| | ) | |

## I. INTRODUCTION

1.1   Site.  This Imminent and Substantial Endangerment Determination (Determination) applies to the property located at 147 A Street, Elmira, Solano County, California 95625, which consists of 7.5 acres and is identified by Assessor's Parcel Number(s) 142-010-130, 142-010-140, and 142-042-010 (the Property). A map showing the Property is attached as Exhibit A. This Determination applies to the Property and the areal extent of contamination that resulted from activities on the Property (hereinafter, the "Site"). The Site is frequently referred to as the "Wickes Forest Industries Site".

1.2   Jurisdiction. Section 25355.5(b)(3) of the Health and Safety Code authorizes the Department of Toxic Substances Control (DTSC) to expend funds from the Hazardous Substance Account and the Hazardous Substance Cleanup Fund without first taking the actions specified in Health and Safety Code Section 25355.5(a), if DTSC determines that removal or remedial action is necessary at a site because there may be

Page 1 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018468

-120-

an imminent and substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance. Section 25358.3(a) of the Health and Safety Code authorizes DTSC to take various actions when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

## II. FINDINGS OF FACT

DTSC hereby finds:

2.1   Site History.

2.1.1   The Site is a former wood treatment facility located on approximately 7.5 acres near the intersection of A Street and Holdener Road in Elmira, California. Pacific Wood Preserving (a domestic corporation, dissolved effective September 11, 1980) operated a wood treatment facility at the Property until September 1979. Collins and Aikman Products Company (CAPCO); formerly known as Collins and Aikman Group; formerly known as Wickes Companies; formerly known as the Wickes Corporation; operating through its former Wickes Forest Industries Division, purchased the Property from Pacific Wood Preserving and then operated the wood treatment facility at the Property until August 1982. CAPCO is a responsible party for the Site. Jim Dobbas Inc. and Continental Rail Co. ,also responsible parties for the Site, purchased the Property from CAPCO in April 1997. Operations at the Property included treating lumber with preservative solutions containing arsenic, chromium, and copper. Investigations have shown that the Site soils have been affected by these inorganic metals. Groundwater beneath the Property and beneath adjacent properties has also been contaminated by chromium, copper, and arsenic. The Central Valley Regional Water Quality Control Board (CVRWQCB) and DTSC conceptually approved a Remedial Action Plan (RAP) on September 19, 1983, submitted by Wickes Companies, Inc, that addressed storm water management, soil contamination, and ground water removal and treatment

Page 2 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018469

-121-

measures for the southern portion of the Property. On February 26, 1984 DTSC issued to the Wickes Corporation an Order and Schedule of Compliance pursuant to Health and Safety Code section 25187. The Order adopted and incorporated a Settlement Agreement and Schedule of Compliance entered into by and between Wickes Forest Industries, the CVRWQCB and DTSC addressing soil, surface water, and ground water contamination, as it was then understood, at the Site. The CVRWQCB has also issued a series of Waste Discharge Requirements (WDRs) over the years to Wickes and CAPCO, including the current WDR Order No. R5-2004-0066, which was issued to CAPCO on June 4, 2004.

2.1.2  To address groundwater contamination, a subsurface french drain system 200 feet long with a single recovery well was installed along with an ion-exchange treatment system so effluent could be discharged to the ditch adjacent to Holdener Road and A Street under the 1983 RAP. In 1987 an additional extraction well was connected to the system to prevent the migration of affected ground water further offsite. This system was confined to the southern portion of the Property. In 1992, the groundwater extraction and treatment system (GWETS) was highly modified. Seven (7) additional extraction wells were installed (five (5) off-Property) and the ion-exchange treatment system was replaced with an electrochemical treatment system that removes chromium, arsenic, and copper from ground water by co-precipitating the metal ions with ferric hydroxide particles before treated water is discharged to the ditch along Holdener Road and A Street under an NPDES permit from the CVRWQCB.

2.1.3  Initial soil investigations conducted during the early 1980s were centered on the southern portion of the Property where the manufacturing process took place. In 1983 contaminated soil was excavated from the truck loading pad, and the drying pad for treated wood was sealed with a low permeability asphalt concrete under the 1983 RAP approved by DTSC. Soils inside the metal sided building situated over the process area were capped in 1991 with shot-crete to prevent rainwater from further transporting the constituents of concern to ground water. On February 25, 1994 DTSC approved another RAP concentrating on soil contamination in the northern portion of the Site (the "1994 RAP"). The implementation of the 1994 RAP included: (i) Excavating 2,100 cubic

Page 3 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018470

-122-

yards of off-Property soil from drainage ditches and placing it on the Property in an area to be capped with asphalt; (ii) Excavation of 89 cubic yards of soil from the railroad drainage ditch and disposing of it at the Chemwaste Kettleman Hills facility in Kettleman City, California; (iii) Regrading the Property; (iv) Installing an asphalt cap in all areas of the Property that were not previously sealed; and (v) Installing a positive drainage system to prevent storm water intrusion under the cap. On January 5, 1996, DTSC approved the Operation and Maintenance Plan (the "O&M Plan"), which required, among other things, maintenance of the cap and operation of the GWETS.

2.1.4  On October 27, 1995, CAPCO recorded in Solano County a Covenant to Restrict Use of Property-Environmental Restriction, which was entered into between CAPCO and DTSC (the "Covenant"). The Covenant, among other things, disclosed that the Property was contaminated with hazardous substances, banned uses that would disturb the cap and restricted the Property's use to non-residential purposes without prior written approval from DTSC. On February 26, 1996, CAPCO and DTSC entered into an Operation and Maintenance Agreement, Docket Number 95/96-038 (the "O&M Agreement") in which CAPCO agreed to maintain the cap and operate the GWETS pursuant to the O&M Plan. Jim Dobbas Inc. and Continental Rail Co. (the Owners) purchased the Property from CAPCO on April 1, 1997, after the Covenant for the Property had been recorded and the O&M Agreement was in place. The Owners have apparently since provided access to the Property to CAPCO's contractors to conduct O&M activities, including operating the GWETS. On May 17, 2005, CAPCO filed a voluntary Chapter 11 bankruptcy petition in United States Bankruptcy Court, Eastern District of Michigan (Detroit), Case Number 05-55927-SWR. In August, 2005, CAPCO ceased operating the GWETS. On March 7, 2006, DTSC directed CAPCO to resume operating the GWETS. On March 22, 2006, CAPCO refused to comply. To date, the Owners have not restored operation of the GWETS and have not provided to DTSC the required cap inspection and maintenance reports to demonstrate the cap is being adequately maintained. Unless and until these O&M activities are restored, the Site may present an imminent and substantial endangerment to the public health or welfare or the environment.

Page 4 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018471

-123-

2.2 **Substances Found at the Site**. From 1972 to 1982 the Property was used as a wood preparation, treatment, and storage area. Wood preserving solutions used at the Property contained copper, chromium, and arsenic. Property investigations conducted in 1982 showed that Site soil and ground water have been contaminated with chromium, copper, and arsenic. Samples of groundwater taken in June 1984, as listed in the June 1984 Monthly Monitoring and Progress Report, Wickes Forest Industries Elmira Site, had concentrations of 120,000 micrograms/L (ppb) of hexavalent chromium and 220 micrograms/L (ppb) of arsenic. Groundwater samples taken by DTSC on May 4 and 5 2006 had a maximum on Property concentration of 1665 micrograms per liter (ppb) in monitoring well E-6 and a maximum off Property concentration of 53 micrograms per liter (ppb) in monitoring well E-20 for hexavalent chromium. The remedial action objectives (RAO) for ground water for the Site are 10 micrograms per liter (ppb) for arsenic, 10 micrograms per liter (ppb) for hexavalent chromium, and 50 micrograms per liter (ppb) for total chromium, as listed in "Results of a Laboratory Treatability Study and Work Plan to Conduct a Pilot Scale Study for In Situ Treatment" by LFR Levine Fricke March 25, 2004. Soil samples were taken in 1992 and 1993 as part of the 1994 RAP. Arsenic was detected in sample SS-27 at 940 parts per million (ppm) and hexavalent chromium was detected in sample SS-66 at 40 ppm. Cleanup goals for soil are arsenic 9ppm, hexavalent chromium at the detection limit of less than 10 ppm, and total chromium at 90 ppm, per the 1994 RAP.

2.3 **Health Effects**.

2.3.1 **Arsenic**. Acute ingestion of arsenic may lead to a burning sensation in the mouth, nausea and vomiting. Chronic exposure to arsenic is associated with a persistent metallic taste in the mouth, hyperkeratosis, anemia, and peripheral nerve disease, and may increase the risk of developing skin cancer, aplastic anemia and leukemia.

2.3.2 **Chromium**. Chronic inhalation of Chromium (VI) compounds has been associated with the development of lung disease, including cancer in humans.

Page 5 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018472

-124-

Ingestion of high amounts of Chromium (VI) compounds causes gastrointestinal effects in humans and animals, including abdominal pain, vomiting, and hemorrhage.

2.3.3 <u>Copper</u>. Acute inhalation of copper fumes or dust can result in a reversible influenza-like syndrome. Chronic ingestion of high levels of copper has been reported to cause hemolysis, fibrosis, and cirrhosis of the liver, nervous system damage and kidney dysfunction.

2.4   <u>Routes of Exposure</u>. Potential routes of exposure at the Site for hazardous substances that may affect public health or the environment include direct contact with contaminated soil, air routes for dust, consumption of food irrigated with contaminated groundwater, migration of hazardous substances to groundwater, and migration of hazardous substances in soil and surface runoff from rain into surface water bodies. If the drinking water source is impacted, direct exposure could be through bathing or drinking the water or breathing vapors while using the water. Ecological habitat receptors may be more sensitive to hazardous substances concentrations than are human receptors.

2.5   <u>Public Health and/or Environmental Risk</u>. The Property is limited to non-residential use by a Covenant recorded with Solano County on October 27, 1995 that will remain in effect until its termination is approved in writing by DTSC. Adjacent properties are used for commercial and residential purposes. Operation of the GWETS and maintenance of the asphalt cap on the Property had been providing capture of the groundwater plume but these operations ceased in August, 2005. Nearby residences use irrigation water drawn from the contaminated aquifer to grow produce for personal consumption. Continued operation of the GWETS and maintenance of the asphalt cap is necessary to provide capture of the groundwater plume and achieve remedial action objectives. Without capture of the plume domestic irrigation wells and drinking water could be adversely affected. Inspection and maintenance of the asphalt cap prevents direct contact with contaminated soil and infiltration of storm water which would transport further contamination to groundwater.

Page 6 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018473

### III. CONCLUSIONS OF LAW

3.1 Each of the substances listed in Section 2.3 is a "hazardous substance," as defined by Health and Safety Code Section 25316, and has been found at the Site.

3.2 A "release" or threatened release of the hazardous substances listed in Section 2.3 has occurred at or from the Site, as defined by Health and Safety Code Section 25320.

3.3 The actual and/or threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment.

### IV. DETERMINATION

4.1 Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that removal or remedial action is necessary at the Site because there may be an imminent and substantial endangerment to the public health or welfare or to the environment.

_____   Date: 11/9/06

James L. Tjosvold, P.E., Chief
Northern California-Central Cleanup Operations Branch
Site Mitigation and Brownfields Reuse Program
Department of Toxic Substances Control

Page 7 of 7

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018474

-126-