-138-

# Exhibit R

STATE OF CALIFORNIA — ENVIRONMENTAL PROTECTION AGENCY                                                    PETE WILSON Governor

# DEPARTMENT OF TOXIC SUBSTANCES CONTROL
REGION 1
10151 CROYDON WAY, SUITE 3
SACRAMENTO, CA 95827-2106
(916) 255-3567



May 13, 1993

Mr. Donald W. Vagstad, Esq.
General Counsel
Corporate Division Wickes Companies, Incorporated
3340 Ocean Park Boulevard, Suite 2000
Santa Monica, California  90405

▓▓▓▓ COMPANIES, ELMIRA SITE:  COMMENTS ON THE PRELIMINARY DRAFT REMEDIAL ACTION PLAN

Dear Mr. Vagstad:

    The Department of Toxic Substances Control (Department) has completed review of the Preliminary Draft Remedial Action Plan (PDRAP) and the California Environmental Quality Act (CEQA) initial study for the Wickes Companies, Elmira Site.  The PDRAP was prepared by Levine-Fricke on behalf of Collins & Aikman Group Incorporated (CAG), formerly Wickes Companies Incorporated, pursuant to the Enforceable Agreement dated February 5, 1992, between the Department and CAG.  The PDRAP outlines the conceptual plan for the clean-up of soils contaminated with arsenic, chromium, and copper in the northern portion of the site.
    The Department has found the PDRAP to be in substantial part acceptable, however, modifications to the proposed remedial action and document must be made to meet the requirements of Section 25356.1 of the California Health and Safety Code.

    In accordance with Section 6.0 of the Enforceable Agreement, the Department has made the following findings:

A)    The Department is not satisfied with the remedial actions as proposed.  CAG must prepare a Draft Remedial Action Plan (RAP) which conforms with the enclosed requirements and comments.  The most significant modifications to the proposed remedial actions are 1) hazardous waste and designated waste from off-site areas must be disposed to appropriate landfills rather than placed on-site and 2) contaminated soil in the study area with detectable Chromium VI must be excavated and disposed to an appropriate landfill.

B)    After CAG has appropriately modified the PDRAP, the Department will issue the Draft RAP for public review in accordance with the requirements of Health and Safety Code, Section 25356.1(d).

OFFICIAL FILE COPY
DEPT OF TOXIC SUBSTANCES CONTROL
HDQTRS CENTRAL FILE UNIT

Printed on Recycled Paper

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028315

Mr. Donald W. Vagstad, Esq.
May 13, 1993
Page Two

    C)    The Department will propose a CEQA Negative Declaration for the remedial action project. Appropriate CEQA procedures must be followed.

Enclosed are requirements and comments on the PDRAP. These comments shall be used to develop the Draft RAP in accordance with the Enforceable Agreement. Upon submittal the Department will provide the Draft RAP to the Regional Water Quality Control Board (RWQCB) for review. If the RWQCB concurs with the remedial actions proposed then the Department will release the document for public review.

In accordance with the Enforceable Agreement, CAG must notify the Department whether it will proceed with the development of the Draft RAP within 30 calendar days of this letter. If you have any questions or comments please call Timothy Patenaude at (916) 255-3580 or Jim Tjosvold at (916) 255-3730.

    Sincerely,

    *[signature]*

    Anthony J. Landis, P.E., Chief
    Site Mitigation Branch

Enclosures

Certification No. P 329 901 605

cc:  Mr. Bruce Edelson, P.E.
    Collins & Aikman Group, Incorporated
    P.O. Box 4056
    Santa Monica, California 90411-4056

    Mr. Jim Boggs
    Wickes Manufacturing Company
    26261 Evergreen Road, 5th Floor
    Southfield, Michigan 48382

    Mr. Gregson W. Taylor
    Levine - Fricke
    3001 Douglas Boulevard, Suite 320
    Roseville, California 95661

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028316

-140-

Mr. Donald W. Vagstad, Esq.
May 13, 1993
Page Three


cc: Ms. Wendy L. Cohen
    Regional Water Quality Control Board
    Central Valley Region
    3443 Routier Road
    Sacramento, California 95827

    Mr. David Henderson
    Office of Legal Counsel
    P.O. Box 806
    Sacramento, California 95812-0806

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028317

State of California                                                   Department of Toxic Substances Control

# Memorandum

To : Anthony J. Landis, P.E., Chief             Date: May 13, 1993
     Site Mitigation Branch

Via : James Tjosvold, Chief  JT
     Sacramento Responsible Party Unit
     Site Mitigation Branch

From : Timothy Patenaude           *Timothy Patenaude*
     Site Mitigation Branch
     (916) 255-3580

Subject: Comments on Wickes Companies, Elmira Site

### PRELIMINARY DRAFT REMEDIAL ACTION PLAN (PDRAP)

1. Change the title and appropriate other parts of the PDRAP to identify the site as the Wickes Companies, Elmira Site. The site identification must remain consistent for the Department of Toxic Substances Control (Department) and other agency records and for the public's understanding of the project and its location.

2. Revise the background section of the PDRAP to include a discussion of previous and ongoing environmental clean-up activity at the site.

    A. Identify physical areas of the site that were included in former agreements or remedial action decisions.

    B. Discuss past resolutions to soil, surface water, and ground water contamination. Include maps identifying the location of remediation facilities including caps, treatment plant, and extraction systems. List the ground water clean-up levels.

    C. Distinguish precisely what area is being evaluated in the PDRAP and explain how remediation in this area relates to environmental clean-up for the whole facility.

3. Alamo Creek should be identified in Section 3.2.2 as a surface water near the study area. In Figure 5, Alamo Creek appears to be within 1500 feet of the study area. Specify whether site drainage ditches flow into Alamo Creek.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028318

Anthony J. Landis, P.E., Chief
May 13, 1993
Page Two

4. Supply information on air investigations at the Study Area and/or site. If there has been no detailed air investigations conducted, describe the rationale for this decision. At a minimum, include a narrative about contamination assessment given the potential for fugitive dust migration. Furnish a wind rose for the vicinity.

5. Report on data from ecological investigations. /is (are) Identify plant and animal populations that (will be) in direct or indirect contact with contaminants. If biological receptors were not considered in evaluating remediation alternatives discuss the rationale for this decision.

6. There seems to be limited soil sampling data from off-site, south of the study area. This area is predominantly residential and contains an elementary school. Since this area may embody the most sensitive receptors, discuss the reasoning for not investigating potential off-site migration in this area.

7. Modify the potential human exposure section to include an evaluation of dermal contact as a potential exposure pathway for inorganics from site soils.

8. Provide a site map showing ground water contamination contours.

9. Include, into the study area, the region of the site that encompasses soil sample locations 103 and 104. This region also includes a portion of the soil piles generated from drilling operations at the site. Include this region in the final remedial action alternative.

10. Explain sample location 104 in relationship to the paved area. Was the pavement breached to allow access to the underlying soil? What is the rationale for selecting this location for a soil sample?

11. We agree with the use of background concentrations for clean-up levels; however, we don't agree with the use of large regional background values obtained from the literature. Local background should be used. We believe that most of the values in the farm area to the east of the site represent a local background condition. Using these values, we calculate the following 95 percent upper confidence levels for background concentrations to be used for clean-up levels: total chromium is 90 parts per million (ppm) and arsenic is 9 ppm. Detections of hexavelant

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028319

Anthony J. Landis, P.E., Chief
May 13, 1993
Page Three

chromium at the detection limit of 10 ppm indicate contamination. Therefore, the clean-up level for hexavelant chromium is the detection limit. For future sampling, additional effort must be made to lower the detection limit. Copper at the levels observed at the site does not pose a threat to public health.

12. The PDRAP sampling data indicates that some on-site and off-site soils exceed the total threshold limit concentration which identifies them as hazardous waste by the characteristic of toxicity. This designation requires that these soils must be managed in a manner consistent with the hazardous waste requirements of the California Code of Regulations, Title 22. The excavation of off-site soils classified as hazardous waste and the subsequent on-site consolidation of these soils constitutes placement of waste. Placement triggers land disposal restrictions which necessitate that the on-site area must be designated as a hazardous waste landfill and that it must meet minimum technology requirements under Title 22. Therefore, off-site soils that are hazardous waste must be excavated and taken to an off-site Class I disposal facility.

13. Remove from the PDRAP claims that study area soils do not present a threat to ground water quality. Table 4 indicates that soil samples, subjected to leaching studies using deionized water (used to mimic rain water), leached arsenic and chromium at levels exceeding maximum concentration limits for drinking water. This analysis indicates that these soils may be considered designated waste pursuant California Code of Regulations Title 23, Section 2522(a). The Regional Water Quality Control Board (RWQCB) will have to make this decision. In addition, off-site soils that are characterized as designated waste shall not be placed on-site. These soils should be excavated for Class I or II off-site disposal.

14. Sample analysis of on-site soils in the vicinity of locations 29, 35, 36, 44, 49, 53, and 54 indicates that the hexavalent chromium level increases with depth. This trend in conjunction with sample concentrations provides a potential threat to ground water. Therefore, the Department believes that the soils in this area should be excavated and removed for proper disposal.

15. Off-site soils and on-site stockpiled soils that are not hazardous waste or designated waste are considered to be inert waste. Inert waste soils that exceed proposed

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028320

-144-

Anthony J. Landis, P.E., Chief
May 13, 1993
Page Four

clean-up levels may be used to fill excavated on-site areas. However, the amount of off-site soils brought on-site as fill shall not exceed the amount of on-site excavation. The on-site area shall not become a landfill.

16. Estimate the quantity of on-site and off-site soil that exceed hazardous waste, designated waste and clean-up levels.

17. The extent of contamination in soils in the off-site railroad area, along the western boundary of the site, has not been completely defined. Sample locations 1 and 106 have contaminant concentrations above the clean-up levels. Identify in the PDRAP that additional soil samples will be taken to confirm that excavation in the off-site railroad area has removed all contaminated soils above remedial action goals.

18. In the farm area, two areas may be contaminated with chromium. In the North, the area is represented by samples 86, 89, and 90 and in the South, the area is represented by samples 68, 71, and 72. These areas should be remediated or additional sampling done to clarify whether the existing sampling is indicative of contamination.

19. Remove the contents of Appendix A. The Department will provide an initial study checklist for inclusion into Appendix A.

20. Incorporate institutional controls as part of the selected remedial alternative. Identify that the on-site area will be fenced to restrict access by the public. A deed restriction will be required which will preclude future use of the property for habitation including housing and schools, preclude use of chemicals which could increase the mobility of contaminants left on-site and preclude the excavation of contaminated soils. An Operation and Maintenance Agreement would address the cap and ground water extraction and treatment system and include financial assurance to assure continued operation and maintenance of the facilities.

21. Update the PDRAP Implementation Schedule to incorporate the following changes:

    A. Change the Departments comments date to the actual date these comments are submitted.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028321

Anthony J. Landis, P.E., Chief
May 13, 1993
Page Five

    B.    Subsequent review of the Draft RAP by the Department shall be scheduled for 30 days.

    C.    Additional modifications to the Draft RAP shall be conducted by Collins & Aikman Group (CAG) within 15 days.

    D.    Preparation of the Final RAP and response summary shall be broken into three parts with 15 day intervals each. First, CAG shall prepare the final RAP with response to public comments. Second, the Department shall review the Final RAP and work with CAG to incorporate minor changes if needed. Finally, the Department shall approve the Final RAP and adopt the California Environmental Quality Act (CEQA) Negative Declaration.

22. An Executive Summary must be included which summarizes the contamination on the site, remedial alternatives evaluated and the recommended remedial actions, identifies the reasons for the proposed remedial actions selection and lists clean-up levels.

23. Include a section within the RAP identifying the Department's nonbinding preliminary allocation of responsibility. The language is provided by Enclosure 2.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028322

Enclosure 2

## NONBINDING PRELIMINARY ALLOCATION OF RESPONSIBILITY

Health and Safety Code (HSC) Section 25356.1(d) requires the Department of Toxic Substances Control (Department) to prepare a Nonbinding Preliminary Allocation of Responsibility (NBAR) among all identifiable Potentially Responsible Parties (PRPs). HSC §25356.3(a) allows PRPs with an aggregate allocation in excess of 50% to convene an arbitration proceeding by submitting to binding arbitration before an arbitration panel. If PRPs with over 50% of the allocation convene arbitration then any other PRP wishing to do so may also submit to binding arbitration.

The sole purpose of the NBAR is to establish which PRPs will have an aggregate allocation in excess of 50% and can therefore convene arbitration if they so choose. The NBAR, which is based on the evidence available to the Department, is not binding on anyone, including PRPs, the Department, or the arbitration panel. If a panel is convened, its proceedings are de novo and do not constitute a review of this provisional allocation. The arbitration panel's allocation will be based on the panel's application of the criteria spelled out in HSC §25356.3(b) to the evidence produced at the arbitration hearing. Once arbitration is convened, or waived, the NBAR has no further effect in arbitration, litigation or any other proceedings, except that both the NBAR and the arbitration panel's allocation are admissible in a court of law, pursuant the HSC §25356.7, for the sole purpose of showing the good faith of the parties who have discharged the arbitration panel's decision.

The Department sets forth the following nonbinding preliminary allocation of responsibility for liability for costs of all removal and remedial actions at the Site known as the "Wickes Companies, Elmira":

100% - Collins & Aikman Group, Incorporated (a Delaware Corporation), as successor in interest to:

• The Wickes Corporation (a Delaware Corporation) operating through its Wickes Forest Industries Division, as successor in interest to:

• Pacific Wood Preserving Corporation (a Domestic Corporation, dissolved effective September 11, 1980)

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC028323

-147-