Exhibit V

# REMOVAL ACTION WORKPLAN

## FINAL

**Wickes Forest Industries Site
A Street and Holdener Road
Elmira, Solano County, California**

Prepared for:

**California Environmental Protection Agency
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, California 95826**

Prepared by:

# URS

**2870 Gateway Oaks Drive, Suite 150
Sacramento, California 93838**

**July 2010**

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004010

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Distribution List
July 2010

## DISTRIBUTION LIST - FINAL

**California Environmental Protection Agency**
**Department of Toxic Substances Control, Northern California Region**
- Peter MacNicholl (2 copies), Project Manager

**Solano County Environmental Resource Management, Environmental Health Division**
- Albert Netto (1 Copy)

**URS Corporation Americas**
- Scott Rice, Program Manager
- Scott Lookingbill, Project Manager
- URS Project File

H:\Wprocess\28958\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004011

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Approval Form
July 2010

## IDENTIFICATION/APPROVAL FORM

**Document Title:**   **REMOVAL ACTION WORKPLAN, FINAL
WICKES FOREST INDUSTRIES SITE
ELMIRA, CALIFORNIA**

**Organization Title:**   URS Corporation
**Address:**   2870 Gateway Oaks Drive, Suite 150
Sacramento, California 95833

**Project Manager:**   Scott Lookingbill, PG
**Telephone:**   (916) 679-2388

**Program Manager:**   Scott Rice, PG
**Telephone:**   (916) 679-2095

**Approved by:**

**Signature:**   _____   **Date:** _6/30/10_
**Name:**   Scott Lookingbill, PG

**Signature:**   _____   **Date:** _6/30/10_
**Name:**   Scott Rice, PG

**Report Coverage:** This document constitutes the removal action workplan for the
Wickes Forest Industries Site as a part of the program under Contract No. 07-T3406 A1
for the Department of Toxic Substances Control, Northern California Region. These
services are provided by URS as prime contractor.

The material contained herein is not to be disclosed to, discussed with, or made
available to any person or persons for any reason without prior express approval of a
responsible officer of DTSC.

H:\Wprocess\25856\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004012

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Table of Contents
July 2010
Page i

# TABLE OF CONTENTS

**1.0  INTRODUCTION** ................................................................. **1-1**
    1.1  REMOVAL ACTION OBJECTIVES (RAOs) ........................... 1-1

**2.0  SITE BACKGROUND** ......................................................... **2-1**
    2.1  SITE LOCATION AND DESCRIPTION ................................. 2-1
        2.1.1  Site Name and Address ........................................... 2-1
        2.1.2  Site Description ...................................................... 2-1
        2.1.3  Contact Person, Mailing Address, and Telephone Number ........ 2-1
        2.1.4  EPA Identification Number and Envirostor Database Number ..... 2-2
        2.1.5  Assessor's Parcel Number(s) and Maps ..................... 2-2
        2.1.6  Ownership and Responsible Party ............................ 2-2
    2.2  OPERATIONAL HISTORY AND STATUS ............................. 2-2
    2.3  TOPOGRAPHY ............................................................... 2-3
    2.4  GEOLOGY AND HYDROGEOLOGY ................................... 2-3
        2.4.1  Site Geology and Soil Types .................................... 2-4
        2.4.2  Site Hydrogeologic Setting ...................................... 2-4
    2.5  SURROUNDING LAND USE AND SENSITIVE ECOSYSTEMS ........... 2-4
    2.6  METEOROLOGY ............................................................ 2-4
    2.7  PREVIOUS SITE CLEANUP ACTIONS ............................... 2-5

**3.0  NATURE, SOURCE, AND EXTENT OF CONTAMINANTS** ............. **3-1**
    3.1  TYPE, SOURCE, AND LOCATION OF CONTAMINANTS ........... 3-1
    3.2  EXTENT AND VOLUME OF CONTAMINATION ..................... 3-1
    3.3  HEALTH EFFECTS OF CONTAMINANTS ........................... 3-2
        3.3.1  Arsenic ................................................................. 3-2
        3.3.2  Chromium ............................................................. 3-2
    3.4  RECEPTORS POTENTIALLY AFFECTED BY THE SITE ........... 3-2
    3.5  ADDITIONAL SITE INVESTIGATION ................................. 3-3

**4.0  RISK EVALUATION AND CLEANUP GOALS** ............................ **4-1**
    4.1  SCREENING-LEVEL RISK EVALUATIONS .......................... 4-1
        4.1.1  Human Health ....................................................... 4-1
        4.1.2  Environmental Screening Risk Evaluation ................. 4-3
    4.2  ENDANGERMENT DETERMINATION ................................. 4-3
    4.3  CLEANUP GOALS FOR GROUNDWATER AND SOIL .............. 4-3
    4.4  WASTE CLASSIFICATION ................................................ 4-4

**5.0  ENGINEERING EVALUATION/COST ANALYSIS (EE/CA)** ............. **5-1**
    5.1  REMOVAL ACTION SCOPE ............................................. 5-1
    5.2  IDENTIFICATION AND EVALUATION OF REMOVAL ACTION
        ALTERNATIVES ........................................................... 5-1

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004013

-176-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Table of Contents
July 2010
Page ii

# TABLE OF CONTENTS

|  |  | 5.2.1 EE/CA Alternative Evaluation Criteria | 5-2 |
|  |  | 5.2.2 Description of Removal Action Alternatives | 5-2 |
|  |  | 5.2.3 Comparative Analysis of Removal Action Alternatives | 5-6 |
|  | 5.3 | DESCRIPTION OF PREFERRED REMEDY | 5-10 |
|  | 5.4 | COST OF PREFERRED REMEDY | 5-10 |
| 6.0 |  | APPLICABLE OR RELEVANT AND APPROPRIATE REQUIREMENTS | 6-1 |
|  | 6.1 | PUBLIC PARTICIPATION | 6-1 |
|  | 6.2 | CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA) | 6-1 |
|  | 6.3 | HAZARDOUS WASTE MANAGEMENT | 6-1 |
|  | 6.4 | YOLO/SOLANO COUNTY AIR QUALITY MANAGEMENT DISTRICT | 6-2 |
|  | 6.5 | HEALTH AND SAFETY PLAN (HASP) | 6-2 |
|  | 6.6 | QUALITY ASSURANCE PROJECT PLAN (QAPP) | 6-2 |
|  | 6.7 | REGIONAL WATER QUALITY BOARD | 6-2 |
|  | 6.8 | OTHERS | 6-3 |
| 7.0 |  | REMOVAL ACTION IMPLEMENTATION | 7-1 |
|  | 7.1 | FIELD DOCUMENTATION | 7-1 |
|  |  | 7.1.1 Field Logbooks | 7-1 |
|  |  | 7.1.2 Chain-of-Custody Records | 7-3 |
|  |  | 7.1.3 Photographs | 7-3 |
|  | 7.2 | SITE PREPARATION AND SECURITY MEASURES | 7-3 |
|  |  | 7.2.1 Delineation of Excavation Areas | 7-4 |
|  |  | 7.2.2 Utility Clearance | 7-4 |
|  |  | 7.2.3 Security Measures | 7-4 |
|  |  | 7.2.4 Contaminant Control | 7-4 |
|  |  | 7.2.5 Permits and Plans | 7-5 |
|  | 7.3 | DEBRIS REMOVAL AND EXCAVATION | 7-5 |
|  |  | 7.3.1 Confined Space Entry Requirements | 7-5 |
|  |  | 7.3.2 Soil Staging and Storage Operations | 7-5 |
|  |  | 7.3.3 Waste Segregation Operations | 7-6 |
|  |  | 7.3.4 Decontamination Procedures | 7-6 |
|  |  | 7.3.5 Debris Removal and Excavation Plan | 7-6 |
|  | 7.4 | AIR AND METEOROLOGICAL MONITORING | 7-7 |
|  |  | 7.4.1 Air Monitoring | 7-7 |
|  |  | 7.4.2 Meteorological Monitoring | 7-10 |
|  | 7.5 | DUST CONTROL PLAN | 7-10 |
|  | 7.6 | CONFIRMATION SOIL SAMPLING | 7-11 |
|  | 7.7 | TRANSPORTATION PLAN FOR OFF-SITE DISPOSAL | 7-11 |
|  | 7.8 | BACKFILL AND SITE RESTORATION | 7-12 |
|  |  | 7.8.1 Load Checking | 7-12 |

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004014

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Table of Contents
July 2010
Page III

## TABLE OF CONTENTS (Continued)

|  |  |  |
|---|---|---|
| | 7.8.2 | Diversion of Unacceptable Borrow | 7-12 |
| | 7.8.3 | Documentation of Rejected Loads | 7-13 |
| | 7.8.4 | Backfilling Procedures | 7-13 |
| 7.9 | PERFORMANCE GROUNDWATER MONITORING | 7-13 |
| 7.10 | VARIANCE | 7-13 |
| **8.0** | **PROJECT SCHEDULE AND REPORT OF COMPLETION** | **8-1** |
| **9.0** | **REFERENCES** | **9-1** |

## LIST OF APPENDICES

Appendix A   Contingency Plan for Batch Groundwater Extraction
Appendix B   Envirostor Database Information
Appendix C   Climatological Data
Appendix D   Summary of Remedial Investigation Sample Locations and Analytical Results
Appendix E   Human Health Risk Assessment
Appendix F   DTSC Fact Sheet on Import Fill Material
Appendix G   Health and Safety Plan
Appendix H   Quality Assurance Project Plan
Appendix I   Remedial Alternatives Cost Estimate Spreadsheets

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004015

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Table of Contents
July 2010
Page iv

# LIST OF FIGURES

Figure 1-1   Vicinity Map
Figure 2-1   Site Map
Figure 3-1   Hexavalent Chromium Concentrations in Groundwater, April 2009
Figure 3-2   Arsenic Concentrations in Groundwater, April 2009
Figure 3-3   Proposed Smaller Excavation Limits and Arsenic Concentrations in Soil at 2.5 Feet
Figure 3-4   Proposed Larger Excavation Limits and Arsenic Concentrations in Soil at 2.5 Feet
Figure 3-5   Conceptual Site Exposure Model

# LIST OF TABLES

Table 4-1   Waste Classification Limits
Table 5-1   Alternative Cost Estimate Summary
Table 7-1   Air Quality Monitoring Strategy
Table 7-2   Exposure Guidelines for Site Chemical Hazards
Table 8-1   Schedule of Tasks

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004016

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3408/Work Order No. 1-406-1.0-100164

Abbreviations and Acronyms
July 2010
Page v

# ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACGIH | American Conference of Governmental Industrial Hygienists |
| APN | assessor's parcel number |
| ARAR | applicable or relevant and appropriate requirement |
| ATC | authority to construct |
| | |
| bgs | below ground surface |
| BMP | best management practices |
| | |
| Cascade | Cascade brand calcium polysulfide |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CEQA | California Environmental Quality Act |
| CFR | Code of Federal Regulations |
| CHHSL | California Human Health Screening Levels |
| COC | contaminant of concern |
| Cr(III) | trivalent chromium |
| Cr(VI) | hexavalent chromium |
| CWET | California waste extraction test |
| | |
| DTSC | California Department of Toxic Substances Control |
| | |
| EE/CA | engineering evaluation/cost analysis |
| EPA | United States Environmental Protection Agency |
| ESL | environmental screening levels |
| | |
| GWETS | groundwater extraction and treatment system |
| | |
| HASP | health and safety plan |
| H&SC | Health and Safety Code |
| | |
| ID | identification |
| | |
| LFR | Levine-Fricke |
| | |
| MCL | maximum contaminant level |
| mg/kg | milligrams per kilogram |
| mg/m$^3$ | milligrams per cubic meter |
| mph | miles per hour |
| | |
| NCP | Pollution Contingency Plan |
| NPDES | National Pollutant Discharge Elimination System |

H:\W\process\25956\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004017

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Abbreviations and Acronyms
July 2010
Page vi

## ABBREVIATIONS AND ACRONYMS (Continued)

| | |
|---|---|
| O&M | operation and maintenance |
| OSHA | Occupational Safety and Health Administration |
| PEA | Preliminary Endangerment Assessment |
| PID | photoionization detector |
| PPE | personal protective equipment |
| ppm | parts per million |
| PRG | preliminary remediation goal(s) |
| QAPP | quality assurance project plan |
| RAP | remedial action plan |
| RAO | removal action objective |
| RAW | removal action workplan |
| RCRA | Resource Conservation and Recovery Act |
| RI | remedial investigation |
| RSL | Regional Screening Level |
| RWQCB-CVR | Regional Water Quality Control Board, Central Valley Region |
| RWQCB-SF | Regional Water Quality Control Board, San Francisco |
| SAP | sampling and analysis plan |
| shotcrete | shot concrete |
| Site | Wickes Forest Industries Site |
| STLC | soluble threshold limit concentration |
| TTLC | total threshold limit concentration |
| URS | URS Corporation Americas |
| USA | Underground Services Alert |
| USGS | United States Geological Survey |
| VOC | volatile organic compound |
| XRF | x-ray fluorescence |
| YSAQMD | Yolo/Solano County Air Quality Management District |
| °F | degrees Fahrenheit |
| % | percent |
| µg/L | micrograms per liter |
| µg/m³ | micrograms per cubic meter |

H:\Wprocess\25955\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004018

-181-

REMOVAL ACTION WORKPLAN
 WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Section 1.0
July 2010
Page 1-1

# 1.0 INTRODUCTION

This removal action workplan (RAW) has been prepared by URS Corporation Americas (URS) for the Department of Toxic Substances Control (DTSC) to address the remediation of groundwater contaminated by subsurface metals at the former process area of the Wickes Forest Industries Site (Site) in the City of Elmira, in Solano County, California. The RAW includes an engineering plan for conducting the removal action, a description of the on-site contamination, and the goals to be achieved by the removal action, as required by the California Health and Safety Code (H&SC) §25355.5(a)(1)(B) and §25323.1. The RAW is also consistent with the criteria specified in the H&SC §25356.1(h).

The Site is a former wood-treatment facility located in an area of low topographic relief near the intersection of A Street and Holdener Road in Elmira, California (Figure 1-1). The Site is bordered by agricultural land to the east and north, a commercial property to the west, and residential property to the south, across A Street. An elementary school is located less than 200 feet south of the primary source of contamination. Historical Site operations included lumber treatment using wood preservatives that contained arsenic, chromium, and copper. Contaminants of concern (COC) in site soil and groundwater are arsenic and hexavalent chromium (Cr[VI]). Cr(VI) is more toxic than other forms of chromium and is also more mobile than other metals.

DTSC and RWQCB have been involved with the site since 1982. Since then, DTSC has approved two remedial action plans (RAPs) and the site has been capped with asphalt and concrete. In addition, a groundwater treatment system, that discharged under an NPDES permit, was installed at the site in 1984 and run until 2005. Groundwater monitoring for COCs has been ongoing for 25 years. Details of these actions are provided in Section 2.7. In July 2005, Collins and Aikman Products Company, the owners of the site, became insolvent and the site subsequently became a DTSC orphan site.

## 1.1 REMOVAL ACTION OBJECTIVES (RAOs)

Removal action objectives (RAOs) have been established for the Site. Achieving the RAOs will ensure the selected remedy is protective of human health and the environment by reducing the potential for exposure to shallow soil encountered at the Site and limiting vertical migration of COCs to groundwater. These RAOs are presented below:

- Protect existing and potential beneficial uses of groundwater, as defined by the Regional Water Quality Control Board Basin Plan, to the extent technically and economically feasible by minimizing the migration of COCs to groundwater.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004019

-182-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 07-T3406/Work Order No. 1-406-1.0-100164

Section 1.0
July 2010
Page 1-2

- Minimize exposure of humans to COCs in shallow soil through inhalation, dermal absorption, and ingestion by eliminating complete exposure pathways.

- Minimize potential for migration of COCs from the soil to groundwater by removing or treating soil with arsenic concentrations above cleanup goals established in this RAW.

- Obtain DTSC certification, after completion of the removal action, that the necessary response actions have been completed in accordance with the approved RAW and that the RAOs have been met.

The selected removal action for the Site will be responsive to these RAOs. The selected removal action for the Site is performance-based and focuses on removal of COCs from the heavily contaminated area beneath the former chemical storage and wood treatment areas to eliminate the source of groundwater contamination.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004020

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-1

# 2.0  SITE BACKGROUND

This section provides background information regarding the Wickes Forest Industries Site. Additional Site background information is contained in the remedial investigation (RI) report (URS, 2008).

## 2.1  SITE LOCATION AND DESCRIPTION

### 2.1.1 Site Name and Address

The site name is the Wickes Forest Industries Site, Elmira, Solano County, California. The Site is located on the northwest side of the intersection of A Street and Holdener Road in Elmira, California (see Figure 1-1).

### 2.1.2 Site Description

The Site is located at the north end of Elmira, California. The former industrial portion of the Site to the north of A Street and Holdener Road is covered with asphalt. There are two, large metal-sided buildings on this portion of the Site. The building northwest of A Street was constructed to cover the former process area, where most of the soils with elevated levels of arsenic and chromium have been covered with shot concrete (shotcrete). Within this building are several sumps and a groundwater treatment system that is not currently operating.

The residential area on the south side of A Street and Holdener Road is considered part of the Site because groundwater containing COCs have migrated beneath this area. Three domestic water wells used for irrigation (MP-2, RH-A, and RW) are located within this residential area. Ten groundwater extraction wells, and 52 groundwater monitoring wells have been installed at the Site since 1982. A Site map is presented as Figure 2-1.

### 2.1.3 Contact Person, Mailing Address, and Telephone Number

DTSC manages the environmental remediation and groundwater monitoring program at the Site. The DTSC contact person for this Site is:

Mr. Peter MacNicholl, P.E.
California Environmental Protection Agency
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, California 95826
(916) 255-3713
pmacnich@dtsc.ca.gov

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004021

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-2

### 2.1.4 EPA Identification Number and Envirostor Database Number

The United States Environmental Protection Agency (EPA) database identification (ID) number assigned to the Site is CAD000627109. During implementation of this RAW, DTSC will use this EPA ID number for generation, transportation, and off-site disposal of soil and/or groundwater from the Site.

The Envirostor database ID number 48240001 has been assigned to the Site. Properties in the Envirostor database are designated by the DTSC as potential or confirmed hazardous substance release sites. Information stored in the Envirostor database regarding the Site is available via the Internet at the following url: http://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=48240001.

### 2.1.5 Assessor's Parcel Number(s) and Maps

The Solano County Assessor's Parcel Numbers (APN) for the Site property are 142-010-14, 142-010-13, and 142-042-10. A portion of the United States Geological Survey (USGS) quadrangle showing the Site and surrounding area, is presented as Figure 1-1.

### 2.1.6 Ownership and Responsible Party

The name and address of the Site's owner is:

Don Dobbas
Jim Dobbas, Inc.
P.O. Box 177
Newcastle, California 95658

## 2.2  OPERATIONAL HISTORY AND STATUS

Prior to 1972, the Site was used for agriculture. Pacific Wood Preserving operated a wood-treatment facility at the Site from 1972 to 1979. Wickes Forest Industries purchased the Site in September 1979 and continued to operate the wood-treatment facility until August 1982. Wood-preservative solutions used at the Site contained arsenic, chromium, and copper.

The primary source area is contained within an 11,000-square-foot area within the gray metal building that was constructed over the historical process area as part of the initial remedy, located on the southwest corner of the property, as shown on Figure 2-1. Four cylindrical wood-preservative product tanks were formerly located along the west side of the process area. A 3-foot-high concrete block wall provided secondary containment around the tanks and the area inside the wall was covered in concrete, except for the areas beneath the tanks. Retort vessels and sumps that also contained wood-

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004022

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-3

preserving solution were located to the east of the area of secondary containment, with the area around them partially covered by concrete.

In February 1974, approximately 50 to 100 gallons of concentrated wood-preservative solution spilled during the filling of a storage tank. In February 1978, residents of Elmira reported to the Regional Water Quality Control Board, Central Valley Region (RWQCB-CVR) that a bright yellow chemical had covered two roadside ditches located on A Street. A RWQCB-CVR investigation revealed the source to be runoff from wet lumber drying on a gravel yard at the Site.

On January 22, 1979, the California Department of Health filed a complaint regarding a yellow precipitate lining the ditches along Holdener Road and A Street. A RWQCB-CVR inspection again found wet lumber drying in the gravel yard, where it was exposed to rainwater.

On December 24, 1979, a green liquid, later determined to be water mixed with arsenic, chromium, and copper was reported to be flowing over the top of the 3-foot containment wall and into a ditch along the north side of A Street.

In November 1980, approximately 12,000 gallons of reportedly contaminated well water discharged into the drainage ditches.

Currently, the subject property is not in use. A groundwater extraction and treatment system (GWETS) operated at the Site from 1982 to 2005 and is currently shut down. DTSC is conducting quarterly groundwater monitoring to assess migration of COCs in groundwater. There is a land use covenant on the Site that requires contaminated soil to be covered and that site access be controlled with a perimeter fence.

## 2.3 TOPOGRAPHY

The Site lies at an approximate elevation of 68 feet above mean sea level. The Site is located near the western edge of the Sacramento Valley, where it abuts the California Coast Range. Alamo Creek runs toward the east, approximately 2,000 feet south of the Site.

The Site is located in an industrial/residential/agricultural area.

## 2.4 GEOLOGY AND HYDROGEOLOGY

The Site geology and hydrogeology were obtained from the RI report (URS, 2008).

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004023

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-4

## 2.4.1 Site Geology and Soil Types

Shallow soils beneath the Site consist of 1 to 3 feet of engineered fill composed of silt, sand, and gravel, underlain by silty clay. This clay becomes harder and more consolidated with depth.

## 2.4.2 Site Hydrogeologic Setting

Groundwater occurs under semi-confined conditions and is encountered at depths of 2 to 7 feet below ground surface (bgs), depending on the season. Static groundwater in extraction well E-6 (shown on Figure 2-1) has ranged from near ground surface to 6 feet bgs.

The prevailing groundwater flow direction beneath the former wood processing area is toward the southeast. The flow direction is typically toward the east in the northern portion of the Site. Secondary porosity, such as fractures within the silty clay aquifer, may allow a flow velocity as high as 50 feet per year. However, the COCs (particularly arsenic) are relatively insoluble and, therefore, move much slower than groundwater.

## 2.5  SURROUNDING LAND USE AND SENSITIVE ECOSYSTEMS

The Site is currently zoned as industrial/residential. Figure 1-1 provides an illustration of land use adjacent to the Site. To the east and the south, residential properties are located across A Street and Holdener Road. These streets are adjacent to the 7.5-acre parcel on which the wood treatment facility was formerly located. The property is surrounded by security fence and is mostly covered in asphalt. At the southern end of the parcel is a sheet metal structure that covers the former wood processing area. The nearest houses are located approximately 100 feet east of the former wood treatment area. The Site is bordered to the north and west by railroad tracks and by undeveloped agricultural land on the opposite side of the tracks to the northwest and northeast.

## 2.6  METEOROLOGY

Climate data for a weather station in nearby Vacaville is presented in Appendix C. The average summer high temperature vicinity of the Site is 93 degrees Fahrenheit (° F). The average winter low temperature is 40° F. The average annual rainfall is approximately 24.5 inches, with most of that rainfall occurring between November and April.

Wind roses for Vacaville during the past three Novembers (when removal action activities are expected to occur) are included in Appendix C. In November, prevailing winds are generally from the north and northwest and less frequently from the southwest west. Wind gusts up to 35 miles per hour (mph) rarely occur in November. Winds are calm approximately 50 percent (%) of the time in November.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-5

## 2.7  PREVIOUS SITE CLEANUP ACTIONS

The section below summarizes the investigative and monitoring activities conducted at the Site beginning in 1983. Tabulated results and sample location maps originating from the RI report are provided in Appendix D.

In 1983, contaminated soil was excavated from the truck-loading pad, and the pad used for drying treated wood was sealed with a low-permeability concrete under an approved RAP (Woodward Clyde Consultants, 1983).

In 1983 and 1984, a GWETS consisting of a 13-foot-deep, 200-foot-long French drain and recovery well, was installed at the Site to remediate impacted groundwater. Groundwater was pumped to the surface where it was treated in an on-site ion-exchange treatment system. In 1992, seven additional extraction wells were added to the GWETS and the ion-exchange treatment system was replaced with a more effective, electrochemical treatment system. GWETS-treated groundwater was discharged to the ditch along Holdener and A Street under a discharge permit with the RWQCB-CVR. Metals concentrations in shallow groundwater have been significantly reduced by this treatment. However, COC concentrations began to level off in 1998. The GWETS was shut down in May 2005 due to the bankruptcy of the responsible party. Efforts have been made to repair the system, but it is not currently operational. Based on the decreasing contaminant removal rates over time and the extensive repairs necessary to make the system operational, DTSC has determined that it is no longer cost-effective to operate the GWETS.

On April 8, 1991, 11 near-surface (less than 1 foot depth) soil samples were collected inside the wood preservative storage and process area (Levine-Fricke [LFR], 1991). The arsenic and Cr(VI) data from this investigation are included in Appendix D. The data indicated total chromium concentrations ranged from 38 parts per million (ppm) to 4,700 ppm; Cr(VI) ranged from less than 0.2 ppm to 190 ppm; arsenic ranged from 52 ppm to 70,000 ppm; and copper concentrations ranged from 9.3 ppm to 8,600 ppm. To reduce the risk of human exposure to these soils and the risk of vertical migration to groundwater, those soils inside the metal building that had not been covered with a concrete slab were covered in 1991 with approximately 6 inches of shotcrete.

A second RAP (LFR, 1994) was implemented in 1994 to remediate affected soils throughout the Site that had not been previously addressed (mostly in the northern area of the property). Under this RAP, approximately 2,100 cubic yards of impacted soils was excavated from off-site drainage ditches and stockpiled on site, where it was capped with asphalt. An additional 89 cubic yards of soil was excavated from a railroad drainage ditch and disposed off site. The site was then regraded and sealed with an asphalt cap. A positive-drainage system was installed to prevent stormwater from ponding and seeping through the cap.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 2.0
July 2010
Page 2-6

The monitoring well network at the Site consists of 52 monitoring wells, 4 private domestic wells, and 10 groundwater extraction wells. Twenty-five of the monitoring wells and two extraction wells are located on the Site property. The remaining wells are located in the immediate vicinity. Forty-two monitoring wells are less than 25 feet deep and are considered shallow zone wells. Five monitoring wells are screened from 25 to 40 feet bgs within the intermediate zone. Five monitoring wells are screened deeper than 45 feet bgs within the deep zone. The well locations are shown on Figure 2-1. Quarterly groundwater monitoring is ongoing. The most recent monitoring event was conducted in April 2009 (URS, 2009a).

In January 2009, URS prepared a contingency plan (Appendix A) for batch groundwater extraction from wells located along A Street and off-site treatment of the extracted groundwater. The contingency plan will be implemented if DTSC determines groundwater monitoring results indicate an unacceptable threat to human health or the environment. This contingency plan was prepared in lieu of a more permanent remedy for contaminated groundwater at the Site.

H:\Wprocess\25858\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004026

-189-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 3.0
July 2010
Page 3-1

# 3.0 NATURE, SOURCE, AND EXTENT OF CONTAMINANTS

## 3.1 TYPE, SOURCE, AND LOCATION OF CONTAMINANTS

Based on the results of previous investigations, the COCs identified for the Site are arsenic and Cr(VI). No other metals or organic constituents were detected during recent sampling events at concentrations that pose a concern to human health or the environment. Based on soil sampling results, isoconcentration maps were prepared (Appendix D, Figures 3 through 8). The highest COC concentrations are present in near surface soil; however, elevated COC levels were reported in soil samples collected at 2.5 feet bgs and at 5 feet bgs in the former process area. Because static groundwater at the Site can rise to near ground surface during the winter months, it is assumed that these heavily impacted, near-surface soils are periodically in contact with groundwater. This contact would desorb the metals for the soil into the groundwater. This desorbtion is especially true for Cr(VI) which is more soluble (and thus more mobile) than other forms of chromium or arsenic.

The distribution of arsenic and Cr(VI) in shallow groundwater (above 25 feet bgs) is shown on Figures 3-1 and 3-2, respectively. These figures indicate that the main area of groundwater impact originates at the former retort vessels and storage tanks and has spread toward the east and southeast, across A Street. Based on April 2009 monitoring data, groundwater impact above maximum contaminant levels (MCLs) currently extends less than 100 feet downgradient from the primary source location. There are two additional areas of Cr(VI) groundwater contamination in the center and northern portions of the Site (Figure 3-2). The GWETS has reduced COC concentrations in these areas significantly, and concentrations have not rebounded appreciably in these areas since the GWETS was shut down in 2005. Selected wells in this area will continue to be sampled biannually to ensure plume stability and monitoring for further reductions in contaminant concentrations.

## 3.2 EXTENT AND VOLUME OF CONTAMINATION

Based on the data obtained during the RI, estimates of the extent and volume of soil contamination have been developed. The estimated lateral and vertical extent of soil containing COC levels above the RAOs that can be removed with the overlying structure in place is shown on Figure 3-3. The estimated extent of all soil contamination above RAOs is shown on Figure 3-4.

The vertical extent of soil contamination is generally between 2.5 feet and 5 feet bgs except in areas bounded by the 7 foot contour where contaminated soil extends deeper than 5 feet bgs and may extend deeper than 7 feet bgs. The vertical extent of excavation will be limited by the occurrence of groundwater.

H:\Wprocessl25955\Wickes\RAW\Final RAW.doc

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 3.0
July 2010
Page 3-2

## 3.3  HEALTH EFFECTS OF CONTAMINANTS

This section provides a brief description of the health hazards associated with the on-site COCs.

### 3.3.1 Arsenic

Arsenic is a naturally occurring element widely distributed in the earth's crust. Inorganic arsenic compounds have been used to preserve wood. Arsenic cannot be destroyed in the environment, it can only change form.

Breathing high levels of inorganic arsenic can cause a sore throat or irritated lungs. Ingesting very high levels of arsenic can cause death by destroying the lining of the digestive tract. Long-term exposure to low levels of arsenic can cause darkening of the skin and the appearance of small warts on the palms, soles, and torso. Skin contact with inorganic arsenic may cause redness and swelling.

Inorganic arsenic has been determined to be a human carcinogen by the EPA.

### 3.3.2 Chromium

Chromium is a naturally occurring element found in rocks, animals, plants, and soil. There are many forms (valent states) of chromium. Trivalent chromium (Cr[III]) and Cr(VI) are used in wood preserving. Chromium can change from one form to another in water and soil, depending on the conditions present.

Cr(III) is an essential nutrient and, although it can be toxic at high concentrations, it is generally not considered toxic in the environment. In humans, Cr(III) is much less toxic than Cr(VI). Concentrations of Cr(III) in Site soil and groundwater do not exceed regulatory standards. However, breathing high levels of Cr(VI) can cause respiratory problems including lung cancer. Ingestion of water with dissolved Cr(VI) can lead to stomach tumors. Cr(VI) is more soluble, and more mobile in the subsurface than arsenic.

## 3.4  RECEPTORS POTENTIALLY AFFECTED BY THE SITE

A conceptual site exposure model has been developed that identifies the receptors that may contact the COCs and the exposure pathways through which contact may occur (Figure 3-5). Residents near the Site are supplied potable water by the local utility, but would be the primary potential receptors if contaminated groundwater were used for

H:\W\process\25950\Wickes\RAW\Final RAW.doc

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 3.0
July 2010
Page 3-3

irrigation, or if crop or orchard tree roots contacted shallow contaminated groundwater. Irrigation with contaminated groundwater water could cause COC concentrations to accumulate in the shallow soils being irrigated (which could create a contact or dust-inhalation threat to human health), or food crop roots in contact with contaminated soil and groundwater could create a human health risk from eating those food crops. Both arsenic and Cr(VI) can be absorbed by food crop plants that use water from the irrigation wells or tap directly into groundwater. DTSC will take steps to ensure the potential risk is not unacceptable, including source-area remediation and continued groundwater monitoring.

Also at risk would be future construction workers and industrial workers at the Site, if soil excavation were to occur.

## 3.5  ADDITIONAL SITE INVESTIGATION

The RI did not include an assessment of potential asbestos-containing building materials for the existing structures at the Site built while the facility was in operation. Such assessment will be conducted by the DTSC contractor separately, if necessary.

H:\Wprocess\26956\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004029

-192-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 4.0
July 2010
Page 4-1

# 4.0  RISK EVALUATION AND CLEANUP GOALS

This section presents detailed information regarding development of cleanup goals for the identified contamination at the Site.

## 4.1  SCREENING-LEVEL RISK EVALUATIONS

Screening-level risk evaluations are summarized below for potential threats to human health and to the environment. Screening-level evaluations use health- and environmentally protective assumptions to ensure threats are not overlooked, and were conducted to characterize current conditions at the site and incorporate additional information and sampling data collected since land-use restrictions were enacted in 1995.

### 4.1.1 Human Health

Land-use restrictions were imposed in 1995 to ensure protection of human health by prohibiting inappropriate future uses of the Site. Contaminated soil at the Site was capped to prevent people from contacting COCs, and installation and operation of a system to monitor groundwater contamination was implemented as part of previously approved remedies. In 2005, the then-owners of the property became insolvent and ceased cap maintenance and groundwater monitoring. In 2008, groundwater monitoring and cap maintenance were resumed by DTSC and additional soil sampling was conducted in the source area. Based on the land use restrictions imposed in 1995 and these recently collected data, a screening-level evaluation was conducted to characterize potential threats to human health from inorganic constituents in soil and groundwater at the Wickes Site, as summarized below (and detailed in Appendix E).

### Soil

The evaluation of potential health threats from inorganic constituents in soil used two complementary tracks: the first used the process developed by the DTSC (1994) for their Preliminary Endangerment Assessment (PEA) process; the second was a comparison of site concentrations of chemicals to agency-acceptable screening-level benchmarks. The health risk evaluation (Appendix E) was not a formal PEA. However, the PEA's health-risk *process* was used to evaluate the concentrations of inorganic constituents in soil, the potential for unrestricted land use under current conditions and using more recent data (since inception of the land use controls) was employed as a means to evaluate cumulative health risks from multiple constituents in soil at the site. The second track, comparison with screening-level benchmarks, is a chemical-by-chemical comparison of measured site concentrations to agency-acceptable values (California Human Health Screening Levels [CHHSLs], USEPA Regional Screening Levels [RSLs], and California Water Board Environmental Screening Levels [ESLs]) which are believed to be without appreciable risk to human health under long-term

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004030

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 4.0
July 2010
Page 4-2

exposure conditions. The benchmark approach is useful for screening on an individual-chemical basis, and the PEA approach ensures that cumulative risks are addressed.

The screening evaluation for human health effects consisted of three steps: (1) identifying potentially complete exposure pathways based on a conceptual Site model; (2) identifying COCs; and (3) estimating COC exposures and chronic daily intakes or doses, and comparing the exposures and intakes/doses to health-based toxicity values (cancer risk and non-cancer hazard factors) and to screening-level benchmark values developed by the EPA and the California EPA.

For this health-risk screening evaluation, the primary receptor for evaluation is the hypothetical resident ("hypothetical" because the Site is not currently residential), although other receptors (e.g., industrial workers, construction workers) are plausible, more likely, and in accordance with the land use restrictions imposed on the site. Despite the known contamination at the site (which gave rise to the land use restrictions), the hypothetical resident was considered an appropriate receptor because a primary focus of this RAW is development of cleanup goal(s) for the contamination known to be present at the site; such a receptor helps provide a range of options for risk managers to consider (beyond industrial use scenarios). Exposure pathways include ingestion, inhalation, and contact with COCs in soil. Mathematical models (simulations) for predicting the exposure of hypothetical resident receptors to chemicals were combined with toxicity values to provide indicators of the likelihood for adverse health effects.

Concentrations of arsenic exceed acceptable thresholds for hypothetical cancer risks and noncancer health hazards for unrestricted use scenarios, and also exceed screening level benchmarks for industrial land uses. Consequently, environmental remediation options must be considered (i.e., the remedial actions evaluated in this workplan). Concentrations of arsenic that would result in less than a one in a million risk (for either residential or industrial land uses) are computed to be much lower than the minimum detected concentration. Site concentrations of total chromium, Cr(III), Cr(VI), and copper in soil do not pose a threat to human health under an industrial use scenario, and concentrations of total chromium, Cr(III), and copper do not exceed benchmarks under the more stringent residential use scenario. Two of the 15 detected concentrations of Cr(VI), out of 48 samples in all, exceed the residential ESL but not the residential CHHSL or residential RSL.

## Groundwater

Groundwater occurs under the Site at depths of near-surface to approximately 7 feet bgs, depending on the season. Site-related contamination of groundwater has occurred and is being monitored. Currently, there are no expected uses of groundwater on the Wickes property, and the domestic water supply to the property and nearby residences

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004031

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 4.0
July 2010
Page 4-3

is provided via the local water district. Thus, there is no complete pathway for domestic exposure to site-related groundwater by site users or nearby residents.

However, site-affected groundwater has migrated from beneath the Wickes property to the residential area on the south side of A Street and Holdener Road. This residential area has four domestic water wells that supply irrigation water. The movement of contaminated groundwater from the former process area to the residential area has created the potential for those wells to extract and distribute contaminated groundwater. However, these off-property irrigation wells are being monitored, and a contingency plan is in place, to ensure that irrigation-related exposure pathways do not become causes for concern.

## 4.1.2 Environmental Screening Risk Evaluation

There are no complete pathways for direct exposure of ecological organisms to COCs in soil at the Site. The portion of the Site where near-surface soil contamination is present is industrial, lacks habitat for organisms, and is capped, thereby precluding contact with surface soil by organisms. Surficial runoff from the Site would not contact soil COCs, but could be conveyed off site through groundwater. Leaching of soil COCs to groundwater has occurred, but ecological organisms would not contact groundwater on site.

There do not appear to be significant potential threats to the environment.

## 4.2  ENDANGERMENT DETERMINATION

Arsenic and chromium are "hazardous substances" as defined in H&SC §25316. There has been a "release" and/or there is a "threatened release" of the COCs at the Site, as defined in H&SC §25320. The actual release of COC at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment. As such, DTSC has determined that a removal action is necessary at the Site to protect and preserve public health.

## 4.3  CLEANUP GOALS FOR GROUNDWATER AND SOIL

The purpose of the cleanup goals is to quantify the parameters of removal action activities in order to achieve RAOs. As discussed in Section 3.1, arsenic and Cr(VI) are COCs identified for this Site with respect to groundwater. The maximum concentration of arsenic found in soil samples collected on site was 70,000 mg/kg in boring 3 (LFR, 1991). The monitoring well with the highest concentrations of arsenic and Cr(VI) is E-6 (located near the former retort vessels). In December 2008, the sample from E-6 reported 1,100 micrograms per liter (µg/L) of Cr(VI) and 140 µg/L of arsenic. The MCL established for arsenic is 10 µg/L (Appendix E). An MCL has not been established for Cr(VI), but it is anticipated that an MCL of 10 µg/L will be established. Cleanup goals for

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004032

-195-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 4.0
July 2010
Page 4-4

groundwater of 10 µg/L for both arsenic and Cr(VI) have been established for this site based on these established and proposed MCLs.

Based on the results of the recent soil investigation (URS, 2008), arsenic concentrations are approximately 100 times higher than Cr(VI) concentrations. Because these two contaminants have similar distribution patterns in soil and essentially the same toxicity, arsenic will be the target contaminant for any source removal actions conducted at the Site.

Evaluation of the recent soil investigation results indicates the 95% upper confidence limited for background soil concentrations of arsenic is approximately 13 mg/kg which is consistent with the previously established average background estimate of 9 mg/kg by DTSC (LFR, 1994) that was based on a more limited data set. Background concentrations represent the conditions at the site prior to operation of the wood treatment facility and are, therefore, appropriate to use as the cleanup goal, even if other screening levels are lower. Therefore, the established cleanup goal for site soil is an arsenic concentration of 13 mg/kg.

## 4.4 WASTE CLASSIFICATION

Waste classification is part of a regulation-controlled process to develop appropriate options for disposal of excavated materials. None of the soils at the Site are considered to be listed wastes. Waste materials can be classified as hazardous based on corrosivity, ignitability, reactivity, or toxicity characteristics. Wastes from the Site will be classified based on toxicity characteristics because the COCs (arsenic and chromium) are not present at the site in corrosive, ignitable, or reactive forms. Waste classification is dependent on a decision sequence for comparing site-specific concentrations to state and federal regulatory thresholds, for example, the total threshold limit concentration (TTLC), the toxicity characteristic leaching procedure (TCLP) concentration, and the soluble threshold limit concentration (STLC) limits. The TCLP concentration and the STLC represent not-to-be-exceeded aqueous concentrations (for leachate extracted from waste materials), while the TTLC represents a soil concentration threshold for designation as a DTSC-regulated waste (and is derived based on the STLC and chemical-specific assumptions for extraction). Site COC limits are listed in Table 4-1 below.

Soil concentrations that exceed the TTLC are considered to be California hazardous waste. If soil concentrations are less than the TTLC but greater than 10 times the STLC, then a California waste extraction test (CWET) is performed; if the leachate result from the CWET exceeds the STLC, then the soil is also classified as California hazardous waste. If soil results are less than the 10 times the STLC value, or CWET leachate results are less than STLC limits, the associated soils are not considered to be a California hazardous waste.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004033

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 4.0
July 2010
Page 4-5

**TABLE 4-1**

**Waste Classification Limits**

| Metal | California | | | Federal | |
|---|---|---|---|---|---|
| | TTLC (mg/kg) | STLC (mg/L) | 10 x STLC[a] (mg/L) | TCLP (mg/L) | 20 x TCLP (mg/kg) |
| Arsenic | 500 | 5.0 | 50 | 5.0 | 100 |
| Chromium (VI) | 500 | 5.0 | 50 | 5.0 | 100 |

Notes:

[a] = "Ten times rule" due to tenfold dilution during the California waste extraction test (CWET). The CWET is only necessary when the metal in soil result exceeds the 10 x STLC value, assuming that 100% extraction of leachable metal is possible.

mg/kg = milligrams per kilogram
mg/L = milligrams per liter
STLC = soluble threshold limit concentration
TCLP = toxicity characteristic leaching procedure
TTLC = threshold limit concentration

Classification as a federal hazardous waste is based on exceedance of the TCLP concentration (also a leachate concentration using deionized water instead of citric acid). A general guideline value for characterizing solid-phase soil samples is a threshold of 20-times the TCLP value: if the concentration in representative bulk waste samples exceeds 20-times the TCLP value, then the samples should be submitted for extraction via the TCLP process. Then, waste-leachate-based results can be compared directly with TCLP standards for classification as a federal hazardous waste.

CWET and TCLP analyses for arsenic were recently conducted on surface and near surface soil samples collected from the areas of highest soil impact. The data indicated that near-surface soil samples collected in the former process area and in the former aboveground storage tank area would be a California Hazardous waste but not a Resource Conservation and Recovery Act (RCRA) waste. It also suggested that soil deeper than 1 foot bgs would be non-hazardous. For samples collected by URS during the 2008 RI (URS, 2008), only one soil sample collected at 2.5 feet bgs (Boring B-1) exceeded the arsenic TTLC (Appendix D). Therefore, while it is assumed that all soils excavated from the top 1 foot will be classified as California hazardous waste, the excavation contractor will collect composite soil samples from the shallow soil stockpile and the deeper soil stockpile to sufficiently characterize the soil prior to disposal. The contractor will conduct TTLC, STLC, and TCLP analyses, as warranted, for waste classification purposes. Waste classification will be established prior to shipping the soil off site.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-1

## 5.0 ENGINEERING EVALUATION/COST ANALYSIS (EE/CA)

This engineering evaluation/cost analysis (EE/CA) was conducted for the proposed removal action at the Site in accordance with the EPA guidance, titled *Guidance on Conducting Non-Time-Critical Removal Actions under CERCLA* (EPA, 1993). It was prepared, as part of the RAW developed for the Site, to aid in the evaluation of remediation alternatives for the mitigation of contaminated soils and groundwater at the Site.

The removal action at the Site has been determined to be a non-time-critical removal based on the risk evaluation and Site considerations. The proposed removal action will be conducted consistent with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the National Oil and Hazardous Substances Pollution Contingency Plan (more commonly called the National Contingency Plan [NCP]). Under Title 40 of the Code of Federal Regulations (CFR) 300.415 of the NCP, an EE/CA is required to address the implementability, effectiveness, and cost of a non-time-critical removal action.

This EE/CA will be used as the basis for the planned non-time-critical removal action. As the lead agency, DTSC has final authority of the selected alternative and of overall public participation activities.

### 5.1 REMOVAL ACTION SCOPE

This RAW addresses shallow groundwater with arsenic and Cr(VI) concentrations greater than 10 µg/L. These areas of contamination are shown on Figures 3-1 and 3-2, respectively. Also targeted are shallow soils impacted by arsenic at levels above the cleanup goal of 13 mg/kg. It is expected that remediation of the impacted shallow soils will lead to a rapid decline in groundwater concentration of arsenic and Cr(VI). The soil cleanup goals for the identified COC are as described in Section 4.3.

### 5.2 IDENTIFICATION AND EVALUATION OF REMOVAL ACTION ALTERNATIVES

The first step of the EE/CA process is to identify removal actions that may prevent, minimize, stabilize, mitigate, or eliminate the release or threat of release of a hazardous waste or substance at the Site. Based on historical patterns of remedy selection for sites with similar COCs, the "No Action" alternative and six common alternatives were identified. A screening process was then used to generally evaluate the applicability of options to treat or otherwise remediate the COC that drives risk at the Site, based on EE/CA evaluation criteria (effectiveness, implementability, and relative cost) and DTSC's project guidance (general scientific and engineering evaluation).

H:\Worocess\25958\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004035

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-2

## 5.2.1 EE/CA Alternative Evaluation Criteria

The criteria listed below were used during this evaluation process.

### Effectiveness

- Performance and reliability to eliminate or reduce the risk associated with the identified contamination or COCs (in terms of toxicity, mobility, or volume) at the Site.
- Overall protection of public health and the environment.
- Compliance with applicable or relevant and appropriate requirements (ARARs) presented in Section 6.0.
- Long- and short-term effectiveness.
- Reduction of toxicity, mobility, or volume through treatment.
- Ability to meet the RAOs presented in Section 1.1.

### Implementability

- Capability of the alternative with respect to administrative and technical feasibility to Site conditions, e.g., space limitations, equipment availability, resource availability, utility requirements, monitoring concerns, and operations and maintenance (O&M).
- Ability of the alternative to meet applicable federal, state, and local regulations and permitting requirements.
- Ability of the alternative to meet the project schedule and facility operations requirements.

### Cost

- Assess the relative cost of each alternative based on estimated capital cost for construction or initial implementation and ongoing groundwater monitoring costs and O&M costs.

## 5.2.2 Description of Removal Action Alternatives

A screening evaluation was conducted to assess remedial technologies and process options for mitigating the impacted soil present at the Site so that the source of groundwater impact is eliminated. Based on the RAOs presented in Section 1.1, the alternatives discussed below were identified and developed for the proposed removal action at the Site:

H:\W\process\25856\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004036

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-3

- No Action
- In Situ Treatment
- Excavation and Off-Site Disposal
- Excavation and Off-Site Disposal with Backfill Treatment
- Excavation, Off-Site Disposal, and Building Demolition
- Excavation, Off-Site Disposal, Building Demolition, and Backfill Treatment

Although a number of other removal action alternatives were considered for application at this Site, they were eliminated based on past experience at other similar sites and/or on scientific consideration and engineering judgment indicating that they would be either ineffective in achieving RAOs, inappropriate technologies for remediating the Site-specific COCs, or could not be implemented in a cost-effective manner (with consideration of the shallow and relatively small volume of impacted soil at the Site).

Biannual groundwater monitoring is a component of all of the alternatives except the No Action alternative. For the cost estimates, it was assumed that biannual monitoring would be conducted on the wells specified in the existing sampling and analysis plan (SAP) (URS, 2009b) for the first five years. After that period, the monitoring program would be optimized for fewer wells and a 46% decrease in annual sampling costs (see spreadsheet in Appendix I). A description and initial screening of the seven alternatives above is presented below.

## Alternative 1: No Action

The No Action alternative would leave the Site as it is. No attempt would be made to remediate the soil and groundwater that has been impacted with arsenic and Cr(VI). Although this alternative will not be effective at meeting the RAOs, it has been retained as a requirement of NCP to serve as a baseline against which the relative benefits of all other alternatives could be compared.

## Alternative 2: In Situ Treatment

A bench scale test of potential amendments for in situ groundwater remediation was conducted in 2001 (Prima Environmental, 2002). The amendments tested during this laboratory experiment included molasses, cheese whey, and Cascade brand calcium polysulfide (Cascade). The results of this test indicated that Cascade would be the most effective amendment for the Site as it would reduce 100% of the Cr(VI) to the much less toxic Cr(III) valent state. It would also likely stabilize arsenic by forming arsenic sulfides that would precipitate out of the groundwater. However, the effectiveness of arsenic treatment is difficult to predict given the 98% reduction in arsenic in the control sample during the bench test. A pilot test may be required prior to full scale implementation. A waste discharge permit would be required prior to the pilot test and full implementation.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-4

Significant groundwater monitoring for potential bi-products would be required for both the pilot test and full implementation.

## Alternative 3: Limited Excavation and Off-Site Disposal

**Excavation**: Excavation involves the removal of soil containing COCs where practical without removing the surrounding building. The estimated lateral limits and depths of this excavation are shown on Figure 3-3.

Based on the historical soil sampling results for arsenic and Cr(VI), excavation depth most likely will be an average of 4 feet, going to a depth of 7 feet at several "hot spots," where cleanup goals were exceeded in RI soil samples collected at 5 feet bgs (Appendix D). Approximately 1,364 cubic yards of COC-impacted soil are expected to be removed. Confirmation soil sampling and analysis would be conducted with a field portable x-ray fluorescence (XRF) analyzer and by laboratory analysis to verify that cleanup criteria are met at the excavation bottom and perimeter.

Space constraints inside the building can be overcome without demolishing the building through use of a mini-excavator and small dump truck. The dump truck would be used to transport the soil outside the north end of the building where it would be stockpiled on visqueen pending characterization and transport to an off-site disposal facility. Clean import soil or other fill material will then be transported to the Site for use as backfill for areas where impacted soil was removed. Import soil and/or other fill material would be accompanied by certificates, analytical data, or other supporting documents that indicate the import material is in conformance with cleanup criteria and DTSC requirements presented in Appendix F.

Excavation and soil loading activities may generate fugitive dust emissions. Suppressant water spray and other forms of vapor and dust control would be implemented and workers would be required to use personal protective equipment (PPE) to reduce exposure to dust from contaminated soil. Dust monitoring would be conducted at regular intervals within the work area and upwind and downwind of the work area.

**Off-Site Disposal:** Off-site disposal involves removing impacted soil from the Site and transporting it to an appropriate off-site facility for disposal. An estimated 88% of the soils may be disposed of as non-hazardous waste. Off-site disposal would be an effective means of removing contaminated soil from the Site and the RAOs for soil could be met using this technology. Additional groundwater monitoring would be necessary until groundwater concentrations meet cleanup goals.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004038

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-5

## Alternative 4: Limited Excavation and Off-Site Disposal with Cascade Treatment

**Excavation/Off-Site Disposal**: This alternative would be the same as the previously described alternative, but with the addition of Cascade treatment to the bottom of the excavation (as described below).

**Cascade Treatment:** Prior to placement of the backfill, Cascade brand calcium polysulfide would be distributed evenly over the bottom of the excavation (approximately 4 feet bgs). The purpose is to help treat/reduce COC concentrations in shallow groundwater that comes in contact with backfill during the winter, when groundwater levels rise to approximately 1 foot bgs. Results of the in situ pilot test indicated that Cascade would be an effective amendment for both reducing Cr(VI) to the much less toxic Cr(III) valent state, and it would stabilize arsenic by forming arsenic sulfides that would precipitate out of the groundwater. Elevated concentrations of sulfides cause groundwater to become yellow and to produce an odor.

## Alternative 5: Building Demolition, Expanded Excavation, and Off-Site Disposal

**Excavation/Building Demolition:** This alternative involves demolishing and off-site disposal of the building covering the proposed excavation area, and excavation of a larger area shown in Figure 3-4. Impacted soil containing COCs above cleanup goals both inside and outside the building footprint would be removed using large excavators and other appropriate soil-moving equipment as described in Alterative 4. The depth of excavations are expected to average 4 feet, going to a depth of 7 feet at the "hot spots," shown on Figure 3-4 where cleanup goals were exceeded in RI soil samples collected at 5 feet bgs (Appendix D). Approximately 1,641 cubic yards of COC-impacted soil would be removed. Additional confirmation soil sampling would be required due to the larger excavation.

**Off-Site Disposal:** Off-site disposal involves removing impacted soil from the Site and transporting it to an appropriate off-site facility for disposal. An estimated 88% of the soils may be disposed of as non-hazardous waste.

All building debris would be transported off site to an appropriate off-site facility for recycling or disposal as appropriate.

## Alternative 6: Building Demolition, Expanded Excavation, Off-Site Disposal, with Cascade Treatment

**Excavation/Off-Site Disposal**: Excavation and off-site disposal would involve removal of soil containing COCs above cleanup goals, using the same equipment/parameters as those for Alternatives 4 through 6.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004039

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-6

**Cascade Treatment:** Clean import soil or other fill material will be transported to the Site for use as backfill in areas where impacted soil was removed to bring the surface grade of the excavation back to its original level. Prior to placement, Cascade brand calcium polysulfide would be evenly distributed over the bottom of the excavation to treat any remaining COCs in shallow groundwater that come in contact with backfill during the winter, when groundwater levels rise.

## 5.2.3 Comparative Analysis of Removal Action Alternatives

NCP requires that remedial response actions be screened to eliminate those that do not meet the RAOs, are more difficult to implement, or are much more costly than other alternatives that provide essentially the same level of protection. In this section, the remedial actions presented in Section 5.2.2 are evaluated with respect to effectiveness, implementability, and cost.

## Alternative 1: No Action

The No Action alternative would leave the Site as it is. No attempt would be made to remediate the soil and groundwater that has been impacted with arsenic and Cr(VI).

- **Effectiveness.** This alternative is not effective in meeting the RAOs, and does not comply with the ARARs presented in Section 6.0 because it does not meet the RAO for groundwater.

- **Implementability.** This alternative requires little action to implement from a technical and administrative standpoint. No equipment and no personnel would be necessary for implementation. This alternative, therefore, meets the criteria for technical implementablity. In practice, however, the No Action alternative is expected to have little regulatory or public support, which reduces its implementability score.

- **Cost.** If this option is selected, no new monitoring wells would be installed, and no soil removal would occur. As such, the No Action alternative has no associated costs and meets this criterion.

Although this alternative will not be effective at meeting the RAOs, it has been retained as a requirement of NCP to serve as a baseline against which the relative benefits of all other alternatives could be compared.

## Alternative 2: In Situ Treatment

The results of the bench scale test (Prima Environmental, 2002) indicated that Cascade treatment would be the most effective amendment for the Site as it would both reduce Cr(VI) to the much less toxic Cr(III) valent state and it would stabilize arsenic by forming arsenic sulfides that would precipitate out of the groundwater.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-7

- **Effectiveness.** The effectiveness of arsenic treatment is difficult to predict given the 98% reduction in arsenic in the control sample during this experiment. It is uncertain if the Cascade could be distributed effectively within the impacted aquifer matrix, particularly within shallow soils that are seasonally saturated. A pilot test may be required prior to full-scale implementation. Based on the success of the bench scale test, in situ groundwater remediation with Cascade was retained for further evaluation.

- **Implementability.** A waste discharge permit would be required from the RWQCB-CVR to introduce Cascade into the subsurface. Injection wells and additional monitoring wells would be installed. Additional sampling and monitoring, specific to calcium polysulfide would be required. The attainment of RWQCB-CVR approval would involve a lengthy application process, including the collection of background groundwater samples, a detailed description of the application and monitoring plan, sensitive receptor survey, and a contingency plan to address any potential violations of the RWQCB-CVR guidelines.

- **Cost.** As shown in Table 5-1, there would be significant implementation costs for this alternative due to permitting and performance groundwater monitoring for both the pilot test and for full-scale implementation. Including 10 years of biannual groundwater monitoring and well abandonment, the total cost for this alternative is estimated at $605,330 similar to the cost of Alternative 6.

Because of the relatively high cost and the uncertain effectiveness of this alternative, it is eliminated from further consideration.

## Alternative 3: Limited Excavation and Off-Site Disposal

Excavation would involve the removal of soil containing COCs above cleanup goals within the existing structure, using a mini-excavator, and small dump truck. Off-site disposal would involve transporting stockpiled soil to an appropriate off-site landfill for disposal. An estimated 88% of the soils may be disposed of as non-hazardous waste.

- **Effectiveness.** Limited excavation from within the building excavation and off-site disposal would be an effective means for removing impacted soil from the site. Removal of these contaminated soils would remove the most heavily contaminated soils which are considered an ongoing source of groundwater contamination. This removal is expected to produce significant decreases in groundwater concentrations to the southeast of the former process area where the most significant potential for future groundwater contamination currently exists. RAOs for soil may be met under this alternative; however, additional groundwater monitoring would be necessary until groundwater concentrations meet cleanup goals. This alternative will leave some soils in place with contaminants above cleanup goals, but the majority of

H:\Wprocess\26856\Wickes\RAW\Final RAW.doc

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-8

contaminated soil would be removed. The soils with contaminants above cleanup goals would be covered to eliminate potential contact with receptors. No amendment would be added to the excavation backfill but could be injected into the backfill at a later date, if necessary.

- **Implementability.** Implementation of the excavation would be difficult due to space constraints inside the building, but this difficulty can be overcome without demolishing the building if a mini-excavator and small dump truck are utilized inside the building. The dump truck would be used to transport the soil outside the north end of the building where it would be stockpiled on visqueen pending characterization and transport to an off-site disposal facility. Clean import soil or other fill material will then be transported to the Site for use as backfill for areas where impacted soil was removed. Dust monitoring and dust control would be required inside and outside the building during the removal action.

- **Cost.** As shown in Table 5-1 at $448,031, this option is the least expensive of the remedial alternatives. The majority of cost consists of long-term groundwater monitoring, well destruction, and disposal of the GWETS.

## Alternative 4: Limited Excavation and Off-Site Disposal with Cascade Treatment

Excavation and off-site disposal would involve removal of soil containing COCs above cleanup goals, using the equipment/ parameters discussed in Alternative 3. Cascade treatment would involve distributing Cascade brand calcium polysulfide product over the bottom of the excavation. The purpose is to help treat/reduce COC concentrations in shallow groundwater that comes in contact with backfill during the winter, when groundwater levels rise.

- **Effectiveness.** Excavation and backfill treatment would be an effective means for removing impacted soil from the Site and would be used in conjunction with appropriate disposal options. Removal of contaminated soils would eliminate the primary source of groundwater contamination; however, some soils with contaminants above cleanup goals would be left in place. The soils with contaminants above cleanup goals would be covered to eliminate potential contact with receptors. The addition of Cascade to the bottom of the excavation is expected to produce more significant decreases in groundwater concentrations than soil removal alone. Results of the in situ pilot test indicated that Cascade would be an effective amendment for reducing Cr(VI) to Cr(III) and precipitating arsenic out of the dissolved phase. RAOs for soil could be met using this technology; however, additional groundwater monitoring would be necessary until groundwater concentrations meet cleanup goals.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-9

- **Implementability.** This alternative is the same as Alternative 2 except that a waste discharge permit would be required from the RWQCB-CVR to introduce Cascade into the subsurface and additional sampling and monitoring, specific to calcium polysulfide, would be necessary. The attainment of RWQCB-CVR approval is expected to involve a lengthy application process, which would involve collection of background groundwater samples, a detailed description of the application and monitoring plan, sensitive receptor survey, and a contingency plan to address any potential violations of the RWQCB-CVR guidelines.

- **Cost.** As shown in Table 5-1, the long-term cost of this alternative would be approximately 20% more than Alternative 3. This cost increase is related to the additional permitting and monitoring requirements and the cost of the Cascade product.

## Alternative 5: Building Demolition, Expanded Excavation, and Off-Site Disposal

This alternative involves excavation from a larger area to remove all soil in the former process area where arsenic concentrations exceed the cleanup goal of 13 mg/kg. Impacted soil containing COCs above cleanup goals both inside and outside the building footprint would be removed, requiring demolition of the building that covers the former process area. Clean import soil or other fill material would be then transported to the Site for use as backfill for areas where impacted soil was removed.

- **Effectiveness.** The larger excavation option would be potentially more effective for removing impacted soil from the Site, and RAOs for soil could be met using this technology. No amendment would be added to the excavation backfill but could be injected into the backfill at a later date, if necessary.

- **Implementability.** A large-scale excavation would require larger equipment, a longer time frame for project completion, more dust control and monitoring, and greater control over stockpiling soil and building debris so as not to cause cross-contamination or misidentification of hazardous and non-hazardous wastes. However, these difficulties can be overcome with additional funding and proper planning and execution of the removal action.

- **Cost.** As detailed in Table 5-1, the long-term cost of this alternative is estimated to be $518,702, or approximately 16% more than Alternative 3 due to the additional costs for building demolition and costs associated with the larger excavation.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004043

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-10

## Alternative 6: Building Demolition, Expanded Excavation, Off-Site Disposal, with Cascade Treatment

This alternative would involve excavation of the larger area of the Site shown on Figure 3-4 using the same equipment/parameters described in Alternative 5. Prior to backfilling, Cascade would be introduced to the bottom of the excavation to treat any remaining COCs in shallow groundwater that come in contact with backfill during the winter, when groundwater levels rise.

- **Effectiveness.** The larger excavation option would be potentially more effective for removing impacted soil from the Site, and RAOs for soil could be met using this technology. The addition of Cascade to the bottom of the excavation is expected to treat the most heavily impacted groundwater at the Site and smear zone, and would potentially reduce the time necessary for groundwater concentrations to meet cleanup goals.

- **Implementability.** As mentioned in Alternative 5, implementation of this alternative would require larger equipment and greater control over soil excavation and off-site disposal. As with Alternative 4, introducing Cascade into the subsurface would be require additional time, effort, and funds because RWQCB-CVR approval would be necessary. Additional groundwater monitoring would be necessary for compliance purposes.

- **Cost.** The long-term cost of this alternative is estimated to be approximately $606,702 as shown in Table 5-1. (Although this alternative would potentially produce the most rapid decrease in groundwater concentrations, the additional cost does not appear to be justified based on the recent stability of the groundwater plumes).

## 5.3  DESCRIPTION OF PREFERRED REMEDY

Based on the evaluation of the removal action alternatives conducted in Section 5.2, the preferred removal action is Alternative 3, limited excavation and off-site disposal. This option is considered to be the most cost-effective means of removing the source of groundwater contamination and reducing long-term monitoring expenses. A detailed description of the implementation of this alternative is presented in Section 7.0.

## 5.4  COST OF PREFERRED REMEDY

As shown on Table 5-1, the long-term cost associated with the selected alternative is estimated to be $448,031. This estimate includes the $246,000 for groundwater monitoring over a 10-year period, $29,000 for a removal action report, and $41,710 for well abandonment and demolition of the existing GWETS. The remaining upfront costs are associated with the soil excavation and disposal and confirmation soil sampling.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004044

-207-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 5.0
July 2010
Page 5-11

TABLE 5-1

## Alternative Cost Estimate Summary

| Activity | Alternative 2: In Situ Treatment with Cascade | Alternative 3: Limited Excavation and Off-Site Disposal | Alternative 4: Limited Excavation and Off-Site Disposal with Backfill Treatment | Alternative 5: Expanded Excavation, Disposal, and Building Demolition | Alternative 6: Expanded Excavation, Disposal, Building Demolition, and Backfill Treatment |
|---|---|---|---|---|---|
| Pilot Test | $121,600 | N/A | N/A | N/A | N/A |
| Building demolition | N/A | N/A | N/A | 14,100 | 14,100 |
| In situ treatment with Cascade with permitting | $95,000 | N/A | N/A | N/A | N/A |
| Excavation and backfill | N/A | $53,776 | $53,776 | $78,657 | $78,657 |
| Disposal of debris and contaminated soil | $4,000 | $65,843 | $65,843 | $90,573 | $90,573 |
| Backfill treatment with Cascade with permitting | N/A | N/A | $23,000 | N/A | $23,000 |
| Dust monitoring | N/A | $6,140 | $6,140 | $6,140 | $6,140 |
| Confirmation sampling and analysis | N/A | $5,562 | $5,562 | $6,522 | $6,522 |
| Treatment system demolition and disposal | $10,730 | $13,710 | $13,710 | $13,710 | $13,710 |
| Removal action report | $35,000 | $29,000 | $34,000 | $35,000 | $40,000 |
| Groundwater monitoring for Cascade byproducts | $60,000 | N/A | $60,000 | N/A | $60,000 |
| Biannual groundwater monitoring and reporting (10 years, 20 events) | $246,000 | $246,000 | $246,000 | $246,000 | $246,000 |
| Well abandonment | $33,000 | $28,000 | $28,000 | $28,000 | $28,000 |
| Total | $605,330 | $448,031 | $536,031 | $518,702 | $606,702 |

Notes:
All costs include a 6% markup of subcontractor fees and materials.
Cost details are presented in Appendix I.

H:\WIproposals\C26550\WGoerl\SAWVFinal RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004045

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 6.0
July 2010
Page 6-1

# 6.0 APPLICABLE OR RELEVANT AND APPROPRIATE REQUIREMENTS

Previous investigations of the Site indicate the presence of COCs in soil and groundwater exceeding the Site-specific cleanup goals as approved by DTSC. The preferred removal action has been determined to be soil excavation with off-site disposal, combined with continuation of the groundwater monitoring program described in the Groundwater SAP (URS, 2009b). This section discusses the ARARs for the proposed soil excavation and off-site disposal.

## 6.1 PUBLIC PARTICIPATION

Public participation activities for the removal action are outside URS' scope of work under its contract with DTSC. All public participation activities will be conducted by DTSC directly.

## 6.2 CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)

Preparing documents to comply with the California Environmental Quality Act (CEQA) as it relates to the removal action is outside URS' scope of work under its contract with DTSC. CEQA-compliance activities will be conducted by DTSC in conjunction with public participation activities prior to approval of the draft RAW as final.

## 6.3 HAZARDOUS WASTE MANAGEMENT

Elevated levels of arsenic and Cr(VI) have been detected in the Site soil. Based on the limited amount of soil analytical data, approximately one-half of the upper 1 foot of soil or 12% of the soil is assumed to be a RCRA hazardous waste.

On July 8, 2009, URS collected three surface soil samples from the portions of the site where the highest levels of COCs were previously reported. In addition, one soil sample was collected from a depth of 1.5 feet bgs. These samples were analyzed by CWET to estimate the waste category of the excavated soils as discussed in Section 4.4.. Excavated soils will be segregated into presumed hazardous and non-hazardous stockpiles based on XRF screening for total arsenic. Composite soil samples will then be collected from the soil stockpiles and analyzed for total arsenic and Cr(VI). Any composite stockpile soil samples exceeding the TTLC concentration for any COC will be analyzed for that COC by CWET. If the CWET data indicate the soil exceeds STLC levels, it will be classified as a California hazardous waste. Any soils classified as California Hazardous waste will then be tested by the TCLP method to determine if they are RCRA waste.

The Site EPA ID number (CAD000627109) will be used for proper management of all soil transported off site for disposal. Compliance with the DTSC requirements of

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004046

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 6.0
July 2010
Page 6-2

hazardous waste generation, temporary on-site storage, transportation, and disposal is required. Any container used for on-site storage will be properly labeled with a hazardous waste label. Within 90 days after its generation, the hazardous waste will be transported off site for disposal. Any shipment of hazardous wastes in California will be transported by a registered hazardous waste hauler under a uniform hazardous waste manifest. Land ban requirements will also be followed as necessary.

## 6.4  YOLO/SOLANO COUNTY AIR QUALITY MANAGEMENT DISTRICT

The Yolo/Solano County Air Quality Management District (YSAQMD) has one regulation, Regulation 8, that addresses dust generated by excavations. The applicable rules of this regulation are 8021, 8031, 8041, and 8051. The text of these rules is available at the YSAQMD Web site (www.ysagmd.org).

Several elements of Regulation 8 have been incorporated into this RAW. Given the limited scale of the excavation, submittal of a dust suppression plan to YSAQMD is not required. In addition, an authority to construct (ATC) permit is not required. There are no other permits required in Solano County for dust suppression. However, dust control measures and track-out prevention will be implemented on Site to prevent off-site contamination as outlined in the dust control plan (Section 7.5) and the transportation plan (Section 7.7). An air monitoring plan is outlined in Section 7.4.

## 6.5  HEALTH AND SAFETY PLAN (HASP)

All contractors will be responsible for operating in accordance with the most current California Occupational Safety and Health Administration (Cal-OSHA) regulations including California Code of Regulations, Title 8, Section 5192. A Site-specific health and safety plan (HASP) is included as Appendix G.

## 6.6  QUALITY ASSURANCE PROJECT PLAN (QAPP)

Quality assurance/quality control measures that will be used during project execution are documented in the Quality Assurance Project Plan (QAPP) included as Appendix H. The QAPP will assure that Site field and analytical data collected meet project data quality objectives and RAOs to support decisions for development of the Site as a residential/agricultural property.

## 6.7  REGIONAL WATER QUALITY BOARD

If it becomes desirable to use calcium polysulfide as a polishing step to further reduce groundwater concentrations of COCs, a notice of intent will be submitted to the RWQCB-CVR and the applicable waste discharge requirements outlined in RWQCB-CVR Order R5-2008-0149 will be followed.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004047

-210-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 6.0
July 2010
Page 6-3

## 6.8 OTHERS

All necessary permits and approvals identified in this RAW will be obtained prior to any removal activities. Upon approval from DTSC, removal activities will be performed by a California-certified contractor with oversight from a California-registered geologist or professional civil engineer.

If a previously unidentified environmental concern is discovered at any time during the remediation process, the contractor shall cease all activities at the Site, notify DTSC, and take necessary response actions as required by DTSC.

H:\W\process\25056\Wickes\RAW\Final RAW.doc

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-1

# 7.0 REMOVAL ACTION IMPLEMENTATION

Based on the EE/CA presented in Section 6.0, the most effective removal action has been determined to be Alternative 3, consisting of the limited soil excavation and off-site disposal. The project proponent for this removal action is DTSC. Upon receipt of DTSC's formal notice to proceed, removal activities will be performed by a California-certified contractor with oversight of a California-registered geologist or professional Civil Engineer, both to be hired by DTSC.

All removal, transportation, and disposal will be performed in accordance with all applicable federal, state, and local laws, regulations, and ordinances. Field operations shall follow the suggested operational guidelines to prevent cross-media transfer of contaminants, as specified in *Best Management Practices (BMP) for Soils Treatment Technologies* (EPA 530-R-97-007).

The removal action is expected to begin in fall 2010. Field activities are expected to last approximately three weeks. Figure 3-3 illustrates the planned excavation areas.

## 7.1 FIELD DOCUMENTATION

DTSC's contractor will be responsible for maintaining a field logbook during the removal action activities. The field logbook will serve to document observations, personnel on Site, equipment arrival and departure times, and other vital project information.

### 7.1.1 Field Logbooks

Field logbooks will document where, when, how, and from whom any vital project information was obtained. Logbook entries will be complete and accurate enough to permit reconstruction of field activities. Logbooks will be bound with consecutively numbered pages. Each page will be dated and the time of entry noted in military time. All entries will be legible, written in black or blue ink, and signed by the individual making the entries. Language will be factual, objective, and free of personal opinions or other terminology, which might prove inappropriate. If an error is made, corrections will be made by crossing a line through the error and entering the correct information. Corrections will be dated and initialed. No entries will be obliterated or rendered unreadable.

Entries in the field logbook will include at a minimum the following for each fieldwork date:

- Site name and address
- Recorder's name
- Team members and their responsibilities

H:\Wproossel\25656\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004049

- Time of site arrival/entry on site and time of site departure
- Other personnel on site
- A summary of any on-site meetings
- Quantity of impacted soils (in terms of RCRA hazardous wastes, non-RCRA hazardous waste, and non-hazardous wastes) excavated
- Quantity of impacted soils (in terms of RCRA hazardous wastes, non-RCRA hazardous waste, and non-hazardous wastes) temporarily stored on site
- Quantity of excavated soils and other refuse in truckloads (in terms of RCRA hazardous wastes, non-RCRA hazardous waste, and non-hazardous wastes) transported off site
- Names of waste transporters and proposed disposal facilities
- Copies or numbers of manifests or other shipping documents (such as bill of landing) for waste shipments
- Quantity of import fill material in truckloads
- Deviations from this RAW and Site HASP
- Changes in personnel and responsibilities as well as reasons for the changes
- Levels of safety protection
- Equipment model, serial number, and calibration readings for any equipment used

At a minimum, the following information will be recorded during the collection of each sample:

- Sample ID number
- Sample location and description
- Site sketch showing sample location and measured distances
- Sampler's name(s)
- Date and time of sample collection
- Designation of sample as composite or grab
- Type of sample (i.e., matrix)
- Type of preservation
- Type of sampling equipment used
- Field observations and details important to analysis or integrity of samples (e.g., heavy rains, odors, colors, etc.)

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004050

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-3

- Instrument readings (e.g., XRF or photoionization detector [PID], etc.)
- Transport arrangements (courier delivery, lab pickup, etc.)
- Recipient laboratory(ies)

## 7.1.2 Chain-of-Custody Records

Chain-of-custody records are used to document sample collection and shipment to laboratory for analysis. A chain-of-custody record will accompany all sample shipments for analyses. Form(s) will be completed and sent with the samples for each laboratory and each shipment. If multiple coolers are sent to a single laboratory on a single day, chain-of-custody form(s) will be completed and sent with the samples for each cooler. The chain-of-custody record will identify the contents of each shipment and maintain the custodial integrity of the samples. Generally, a sample is considered to be in someone's custody if it is either in someone's physical possession, in someone's view, locked away, or kept in a secured area that is restricted to authorized personnel. Until receipt by the laboratory, the custody of the samples will be the responsibility of the sample collector. Chain-of-custody procedures are further discussed in the QAPP.

A self-adhesive custody seal will be placed across the lid of each sample. For volatile organic compound (VOC) samples, if any, the seal will be wrapped around the cap. The shipping containers in which samples are stored (usually sturdy picnic cooler or ice chest) will also be sealed with self-adhesive custody seals any time they are not in someone's possession or view before shipping. All custody seals will be signed and dated.

## 7.1.3 Photographs

Photographs will be taken at excavation areas, sample locations, and other areas of interest on site, as necessary to verify information entered in the field logbook. When a photograph is taken, the following information will be written in the logbook or will be recorded in a separate field photography log:

- Time, date, location, and, if appropriate, weather conditions
- Description of the subject photographed
- Name of person taking the photograph

## 7.2 SITE PREPARATION AND SECURITY MEASURES

Prior to equipment mobilization for the proposed removal action Site preparation activities may include Site inspections, demarcation of excavation areas, utility connections or disconnections, installation of ventilation fans, and installation of appropriate barriers, as necessary.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004051

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-4

## 7.2.1 Delineation of Excavation Areas

The lateral limits of all excavations will be delineated by DTSC's contractor, before commencement of removal activities. The areas to be excavated shall be called the "excavation areas" and they will be marked (as the exclusion zones) in the field by DTSC's contractor with stakes and/or high-visibility paint and/or high-visibility ribbon, whichever is appropriate.

## 7.2.2 Utility Clearance

Clearance of remaining utilities and other hazardous underground obstacles will be performed prior to initiating any soil intrusion or subsurface investigation activities. Such possible obstacles may include water, electrical, gas, communication cable, phone cable, TV cable, and sewer lines. At a minimum, the utility clearance will include a two-week notification of the local utility providers, a one-week notification of Underground Services Alert (USA) and a geophysical survey by a private utility locator. Isolation of the on-site utilities by the various providers will be verified (lock-out/tag-out or physical disconnection).

## 7.2.3 Security Measures

To ensure trespassers or unauthorized personnel are not entering work areas, security measures may include, but are not limited to:

- Posting notices directing visitors to the Site manager.
- Maintaining a visitor's log. Visitors must have prior approval from the Site manager to enter the Site. Visitors shall not be permitted to enter the Site without first receiving Site-specific health and safety training from the Site safety coordinator.
- Maintaining the existing security fence that surrounds the perimeter of the property.
- Locking all site access gates at the conclusion of each work day.

Persons requesting site access will be required to demonstrate a valid purpose for access and provide appropriate documentation to demonstrate they have received proper training required by the Site-specific HASP (see Appendix G).

## 7.2.4 Contaminant Control

Prior to beginning the overall excavation process, nearby residents will be notified of the upcoming work. Dust-generating work will be performed only between the hours of 7:00 a.m. to 5:00 p.m. As described in Section 7.5, water will be applied as necessary for dust suppression. As described in Section 7.4, air monitoring at the fence line of the

Site will be performed during excavation to assess whether substantial off-site migration of the COC in airborne dust is occurring. Excavation work will be stopped if the air-monitoring action levels are exceeded.

### 7.2.5 Permits and Plans

As discussed in Section 6.7, all necessary permits or approvals will be obtained prior to the implementation of excavation.

## 7.3  DEBRIS REMOVAL AND EXCAVATION

Properly trained and equipped hazardous waste workers will complete all fieldwork. Soil will be removed with backhoes, shovels, or other types of earth-moving equipment, as necessary. While no sensitive receptors are immediately adjacent to the Site, excavation areas will be controlled to avoid dust generation with soil wetting and air monitoring (at property perimeter and work area). Each excavation area will be secured, and water will be used to control any fugitive dust from blowing onto other properties. The Site will be controlled, and no excavation will be conducted in times of high wind conditions (e.g., wind speed in excess of 25 mph).

### 7.3.1 Confined Space Entry Requirements

For the proposed removal action, confined-space entry procedures do not apply. In general, excavations deeper than 4 feet will not be entered. Confirmation samples from these excavations will be obtained from the excavator bucket. In the event that compliance is necessary, the Site-specific HASP (Appendix G) will be updated.

### 7.3.2 Soil Staging and Storage Operations

Excavated soils will be moved to a soil staging area located on the asphalt outside the building to the northeast of the excavation. The soil staging process will be monitored to ensure that excessive dust is not created. The staging area will be a designated section of the existing on-site pavement. At the staging area, excavated soil will be covered with tarps or other proper materials to minimize any run-off and/or dust generation. As an alternative, excavated soils may be placed in covered roll-off bins.

The total volume of impacted soil shown on Figure 3-3 is estimated to be 1,240 cubic yards. With an assumed 10% over-excavation, 1,364 cubic yards of in situ soils will be excavated. Estimated soil density is 1.4 ton per cubic yard, resulting in an estimated excavation mass of approximately 1,900 tons. Excavation will cause the soil volume to expand by 30%, resulting in an estimated transportation volume of 1,770 cubic yards. Additional excavation may be necessary, based on the results of confirmation sampling as discussed in Section 7.6.

H:\Wprocess\25956\Wickes\RAW\Final RAW.doc

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004053

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-6

The temporary on-site storage of excavated soil wastes will be secured and properly labeled with hazardous waste signs until off-site transportation and disposal are ready for loading. The goal will be to haul staged soils to the disposal facility within three working days, and no more than five working days.

### 7.3.3 Waste Segregation Operations

The top 1 foot of soil from the Site will be stockpiled separately from the deeper soil in an attempt to minimize the amount of hazardous waste generated. The contractor will collect the appropriate number of composite soil samples from each of the soil stockpiles, as discussed in Section 7.6. Soils will then be loaded onto a dump truck or picked up in the roll off bin and transported to an appropriate off-site disposal facility.

### 7.3.4 Decontamination Procedures

Entry to the contaminated areas will be limited to avoid unnecessary exposure and related transfer of contaminants. Following is the procedure to be used to decontaminate equipment or trucks in a designated decontamination area before leaving the Site.

All equipment or trucks that come into contact with potentially contaminated soil or water will be decontaminated to assure the quality of samples collected and/or to avoid cross contamination. Disposable equipment intended for one time use will not be decontaminated, but will be packaged for appropriate disposal. Decontamination will occur prior to and after each designated use of a piece of equipment or truck. All excavating, transporting, and storage devices used will be decontaminated by steam cleaning.

All sampling equipment used will be decontaminated using the following procedures:

- Non-phosphate detergent and tap water wash, using a brush if necessary.
- Tap-water rinse.
- Initial deionized/distilled water rinse.
- Final deionized/distilled water rinse.

Equipment will be decontaminated in pre-designated areas, to be laid out on existing pavement. Water used for decontamination will be collected in drums, analyzed, and shipped off site to an appropriate destination.

### 7.3.5 Debris Removal and Excavation Plan

The excavation will include all areas indicated on Figure 3-3. Prior to any excavation, all concrete walls, steel pipe, and concrete ground cover will be removed from the

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004054

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-7

excavation area. All debris shall be segregated in two categories (concrete and other debris) prior to off-site disposal.

An estimate of the limits of the proposed excavation based on the RI results (URS, 2008) is shown on Figure 3-3. To guide the excavation, the removal of contaminated soil will be conducted in "lifts" of 1 foot deep to the desired depth (e.g., 1 foot or 2 feet) at each identified excavation area, using a backhoe, bulldozer or excavator. Confirmation soil samples will be collected from the bottom and perimeter of the excavation at 20-foot centers on the floor and every 20 linear feet along the perimeter. Perimeter samples will be collected at depths of 1 foot bgs to assess whether the soil containing the COC at a concentration exceeding the cleanup goals has been removed. If a confirmation sample contains the COC at a concentration exceeding the cleanup goals, an extra foot of soil will be excavated from the side or bottom of the location where the confirmation sample was collected until the cleanup goals are met or the presence of groundwater or lateral obstructions prevent further excavation.

## 7.4  AIR AND METEOROLOGICAL MONITORING

This section details the air and meteorological monitoring strategy and methodologies that will be used during the soil removal action.

- Meteorological Monitoring (Wind).

### 7.4.1 Air Monitoring

Air monitoring will be performed during all soil-moving activities in which contaminated or potentially contaminated materials are being disturbed or handled. DTSC's contractor will staff the Site with an air monitoring/health and safety professional whose responsibilities will include:

- Monitoring dust levels in the exclusion zone and other locations. The Site air monitoring professional will have the authority to stop work in the event that on-site activities generate dust levels that exceed the Site or community action levels (see Table 7-2 below). No specific regulatory wind velocity restrictions for soil excavation in the subject area were found to exist. However, a self-imposed action level for cessation of work will be set at a sustained wind velocity of 25 mph, as recommended by DTSC. The air-monitoring professional will monitor on-site meteorological instrumentation and coordinate with off-site meteorological professionals to identify these conditions.

- Assure that all real-time aerosol monitors, and industrial hygiene air sampling equipment and media are properly calibrated and in good working condition. Real-time, data-logging aerosol monitors (personal data ram) will be used, when required, to measure dust levels. Real-time information will be posted

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004055

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-8

daily, and discussed with Site workers. As discussed below, measuring dust levels will provide adequate protection against arsenic at this Site, based on the concentrations of the COC found in soil samples.

- Coordinate general site safety activities including all daily hazard communication, safety practices and procedure briefings.
- Oversight of personal decontamination practices.
- General site safety leadership, support and recordkeeping activities.

## Air Monitoring Strategy and Methodologies

DTSC's contractor will monitor dust levels as specified in Table 7-1.

### TABLE 7-1

### Air Quality Monitoring Strategy

| Sample Type/Location | Monitor / Sample Technique | Analyte (Method) | Frequency |
|---|---|---|---|
| Background Monitoring – Site Perimeter (fence-line) | Mini-Vol | Total particulate (NIOSH 0500) Metals (NIOSH 7300) (including, but not limited to, arsenic) | Prior to beginning field activities to determine airborne background concentrations. 1 day at 5 samples/day 1 downwind, 1 upwind, 1 to be determined. |
| Excavation and Soil Loading Activities (inside and outside of the building) | Mini-Vol | Total particulate (NIOSH 0500) Metals (NIOSH 7300) (including, but not limited to, arsenic) | During initial field activities that will generate elevated dust emissions due to field activities. 6 days at 3 samples/day 2 downwind, 1 upwind, 1 to be determined. |

Criteria Descriptions:

[1] Total Particulate: a maximum of 8 milligrams per cubic meter (mg/m$^3$) of dust to is allowed for personal exposure based on the occupational health criteria and the highest known concentration of arsenic in the soil.

* The highest arsenic concentration was reported during the 2008 RI was 610 milligrams per kilogram (mg/kg). It is assumed that dust will be generated only during Site activities, and Site activities will occur approximately eight hours per day. Assuming a constant contaminant level of 610 mg/kg, and a 8-hour release, it can be calculated that dust emissions should be maintained at or below 8 mg/m$^3$ to keep emissions below the arsenic California Permissible Exposure Level (PEL) of 0.01 mg/m$^3$.

Remediation is scheduled to begin in late 2009. The background air-sampling program will begin approximately one day before remediation to collect five hourly background samples. Site air monitoring will continue throughout the entire remediation program as described below. The background sampling program will include setup of the MET station and initiation of monitoring of Site-specific meteorological conditions, and setup, calibration, and start of background monitoring using the MiniVol air samplers.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004056

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-9

Background sampling will be conducted for one day to assess particulate and metals concentrations present in the ambient air in the absence of remediation activities.

During the first week of active remediation, routine air quality monitoring will take place daily for three consecutive days. If results indicate no migration of pollutants occurring off site, monitoring events will be reduced to twice per week, or until a change in Site activities. Sampling conducted during remediation activities will be conducted for 8 to 10 hours, encompassing the actual construction work hours. Table 7-1 provides additional details regarding the monitoring/sampling schedule. The sampling frequency will be adjusted as necessary, in consultation with DTSC, based on Site conditions and newly available data.

Arsenic is the primary COC in Site soil. Arsenic occurs as either particulate or adsorbed to particulates, thus DTSC's contractor will focus on collection and analysis of airborne dust levels and concentration of arsenic associated with dusts generated by removal activities. As specified in the HASP (Appendix G), the excavation contractor will base site safety procedures, including dust control measures, on the action levels specified in the chart below.

**TABLE 7-2**

**Exposure Guidelines for Site Chemical Hazards**

| Chemical Name | Odor Threshold | CAL/OSHA PEL[a] | ACGIH TLV[b] | Site Action Levels [c] |
|---|---|---|---|---|
| Total Dust | Not listed | 10 mg/m$^3$ | 10 mg/m$^3$ | 5.0 mg/m$^3$ |
| Arsenic | Not listed | 0.01 mg/m$^3$ | 0.01 mg/m$^3$ | 0.005 mg/m$^3$ |

Notes:
[a]  Permissible Exposure Limits (Cal/OSHA Article 107, Table AC1)
[b]  1990-1991 Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices, American Conference of Governmental Industrial Hygienists (ACGIH)
[c]  Site action level is calculated as 50% of threshold limit value or PEL (as measured by National Institute for Occupational Safety and Health methods), whichever is lower. If an action level is met or exceeded, then additional dust mitigation measures will be implemented. If the Site air contaminants cannot be controlled reliably within 15 minutes, all work will cease and a certified industrial hygienist will be consulted. If one or more Site action levels for dust or arsenic are exceeded on the integrated air monitors, a certified industrial hygienist will be immediately consulted. Refer to Table 7-1 as it provides the justification of the site action levels and the protection of receptors. See Appendix G for use of respirators if concentrations exceed Site Action Levels.

| | | |
|---|---|---|
| ACGIH | = | American Conference of Governmental Industrial Hygienist |
| CAL/OSHA | = | California Department of Industrial Relations, Division of Industrial Occupational Health and Safety |
| mg/m$^3$ | = | milligrams per cubic meter |
| PEL | = | Permissible Exposure Limits |
| TLV | = | Threshold Limit Values |

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004057

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-10

### 7.4.2 Meteorological Monitoring

On-site ambient weather conditions (wind speed and direction, and relative humidity) will be monitored by an on-site meteorological station.

On-site meteorological monitoring will be performed simultaneously with the excavation activities to ensure all necessary precautions have been taken. Detailed information is described in the Site-specific HASP (see Appendix G).

## 7.5 DUST CONTROL PLAN

If required, in consultation with DTSC, the contractor will implement appropriate procedures to control the generation of airborne dusts by soil removal activities. Such procedures will include but will not be limited to the following:

- The Site air monitoring professional will monitor dust levels in the locations outlined in Section 7.4. The Site air monitoring professional will have the authority to stop work in the event of that on-site activities generate dust levels in excess of the on-site (5.0 milligrams per cubic meter [$mg/m^3$]) or community/fence line (50 micrograms per cubic meter [$\mu g/m^3$]) action levels. Liberation of dust during the removal operations will be minimized as necessary with the use of water as a dust suppressant. The water will be available via a metered discharge from a fire hydrant located proximate to the Site. Should the hose cause a hazard when laying across the street, site personnel can use a portable water tank as an alternate source of water that can provide sufficient pressure and an acceptable flow rate for dust suppression. The contractor will control dust generation by spraying water prior to daily work activities, during excavation/loading activities (as necessary to maintain concentrations below action levels), and at truck staging locations. Watering equipment will be continuously available to provide proper dust control.

- If required, the air monitoring professional will monitor on-site meteorological instrumentation to identify conditions that require cessation of work. All removal activities will cease in the event wind conditions impede dust control.

- The water used for dust suppression may be from the fire hydrant located across the street or from a portable water tank with sufficient pressure to provide water with an acceptable flow rate. At a minimum, one PDM-3 Miniram or equivalent will be placed upwind to monitor background, and a second device will be placed downwind of soil stockpiling and loading activities to provide "worst-case" dust concentrations on the Site. These instruments will be calibrated daily, and monitoring information will be posted daily and discussed with site personnel. The monitors will be set to log dust levels over 5-minute periods and will be read visually every 15 minutes. In

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004058

-221-

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-11

consultation with DTSC, the frequency may be changed based on Site conditions and newly available data. Site workers will use half-face respirators with appropriate cartridge in the event particulate concentrations exceed 5 mg/m$^3$ (see Appendix G).

## 7.6  CONFIRMATION SOIL SAMPLING

Once excavated to the planned depth, confirmation soil samples will be collected from the bottom and sidewalls of each excavation area to verify contaminant removal. Samples will be collected from the bottom center of the excavation every 20 feet (10 samples). Sampling of the sidewalls will be conducted at a frequency of one sample per 20 feet (25 samples).

Samples will be field screened for arsenic using a multi-element low-energy XRF analyzer. The field screening will be conducted by DTSC personnel familiar with the use of the instrument. Additional confirmation sampling will be implemented if any visually impacted soil is encountered at excavation depth. Confirmation soil samples will be compared to the cleanup goals on a dry-weight basis. If the field screening results exceed two times the soil cleanup goals (26 mg/kg) at a sample location the excavation will be expanded, if practical, by 1 foot. This process will be repeated until the cleanup goals are met (from any sidewall sample and/or final bottom sample) or as otherwise dictated by groundwater levels or other facility constraints. Final confirmation soil samples will be collected from 1 foot bgs every 20 linear feet along the perimeter and on 20-foot centers from the bottom of the excavation for laboratory analysis of arsenic (and Cr(VI) for selected samples).

Confirmation soil samples will be collected directly into sampling jars, thereby reducing the amount of sampling equipment which will significantly reduce the possibility of cross-contamination. The samples will be stored on site in a cooler filled with ice or Blue Ice prior to delivery to a California-certified laboratory. All confirmation soil samples will be analyzed for arsenic, using the analytical methods set forth in the QAPP. Soil samples collected from the bottom of the excavation and selected samples from the sidewalls will also be analyzed for Cr(VI). DTSC will determine in the field which sidewall samples to analyze for Cr(VI) based on the XRF screening data.

Samples will be delivered to the lab no later than the morning of the day following collection. The samples will be secured under proper chain-of-custody documentation and hand delivered to the laboratory.

## 7.7  TRANSPORTATION PLAN FOR OFF-SITE DISPOSAL

The waste material will be profiled and landfill approval will be received prior to transportation and disposal. Based on the analytical results gathered, the soil excavated

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC004059

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-12

from the Site during the removal action will be handled, transported, and disposed of as either RCRA-hazardous waste, California-hazardous waste, or non-hazardous waste.

Final determination of the landfill used for disposal will be based on approval from the landfill. Once the disposal facility is selected, copies of waste profile reports used to secure disposal permission from the landfill will be provided to DTSC. In addition, compliance with the land disposal restrictions and land ban requirements for hazardous wastes will be documented and provided to DTSC once it is determined which disposal facility will be used. DTSC will sign each manifest as the generator and the EPA ID number for the Site will be provided on each manifest.

## 7.8  BACKFILL AND SITE RESTORATION

All excavations will be backfilled with clean fill material. The DTSC fact sheet regarding import fill material is presented in Appendix F. An off-site source of clean backfill material has not been identified. These soils will be appropriately tested before excavation activities commence.

### 7.8.1 Load Checking

Evaluation of the import soils for presence of contaminants must be concluded prior to their consideration for use as replacement fill at the Site. Only soils which meet DTSC criteria will be transported to the Site (see Appendix F).

All loads of imported fill will be checked by XRF and organic vapor analyzer for each truckload entering the Site, and by visual screening for fuel/hydraulic oil leaks (or other staining) at the working face.

### 7.8.2 Diversion of Unacceptable Borrow

If loads containing unacceptable materials (exhibiting staining or detectable VOCs) are dumped, transporters of the unacceptable loads will be stopped before leaving the Site.

Equipment operators will watch for evidence of contaminated imported fill in loads being dumped at the working face. If contaminated soils are found or suspected, the imported fill soils are to be isolated. The hauler of the prohibited materials will be identified, and the Site manager will be contacted to determine what appropriate actions will be taken.

Segregated, improper materials will be removed from the working face immediately. These materials will be reloaded to the transporter's vehicle when possible or stockpiled in an appropriate area for later removal by a properly licensed waste hauler.

H:\Wprocess\25986\Wickes\RAW\Final RAW.doc

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-13

### 7.8.3 Documentation of Rejected Loads

All loads which enter the Site and are subsequently rejected will be recorded. Data compiled will include when the incident occurred, the hauler's name, the reason the load was rejected, whether the load was dumped prior to rejection, and what steps were taken to remove the rejected material. Additional data may be recorded as deemed necessary for the particular situation. The Site has sufficient paved areas which can serve as temporary storage area for unacceptable materials, pending removal by the original transporter or a properly licensed waste hauler. These loads will be stored solely for the length of time required to enlist the services of a licensed waste hauler for their removal.

### 7.8.4 Backfilling Procedures

The pit will be backfilled with clean imported soil. The soil will consist of soft loam that can be easily distributed with a mini-excavator being deposited with a dump truck. The deepest (7 foot) portions of the excavation will be filled up to the level of the remainder of the excavation (4 feet). Next, the remainder of the excavation will be backfilled working from south to north in 2-foot lifts. As soil is added, it will be partially compacted with the wheels of the excavator. Full compaction is not necessary for the site as there are no plans for development. Finally, the surface will be covered with a gravel road base or chip seal.

### 7.9   PERFORMANCE GROUNDWATER MONITORING

If it becomes necessary to inject Cascade into the backfill of the excavation at a later date, a performance monitoring program will be implemented to evaluate the downgradient effects of the Cascade on shallow groundwater. Under this program, wells EX and E21 would sampled for the following parameters on a quarterly basis:

- Nitrate, nitrite, chloride, and sulfate by EPA Method E300
- Sulfide by EPA Method E376.2
- TDS by EPA Method E160.1
- Dissolved CAM 17 Metals by the EPA Method 6010B (filtered)

These data would be reviewed by a URS chemical engineer to evaluate the performance of the reagent, and to determine whether Cascade additions (injections) or other measures would be appropriate for the Site.

### 7.10 VARIANCE

As field conditions may vary, it may become necessary to implement minor modifications to soil removal activities as presented in this RAW. Field personnel will

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 7.0
July 2010
Page 7-14

notify the project manager when deviations from this RAW are necessary. DTSC will be notified of the modification immediately, and a verbal or written approval will be obtained from DTSC before implementing the modifications, as appropriate. Modifications to the approved RAW will be documented in the field logbook and in the Report of Completion for this RAW.

REMOVAL ACTION WORKPLAN
WICKES FOREST INDUSTRIES SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 8.0
July 2010
Page 8-1

# 8.0 PROJECT SCHEDULE AND REPORT OF COMPLETION

DTSC is prepared to proceed with removal activities upon receiving approval of the appropriate funding and completion of public participation and CEQA activities. The removal excavation, scheduled to begin in fall 2009, will focus on excavation, confirmation sampling, and off-site disposal.

Table 8-1 indicates the anticipated schedule of implementation and subsequent reporting for this project. A Report of Completion, documenting all activities conducted pursuant to an approved RAW and certifying that all activities have been conducted consistent with this RAW, will be prepared as expeditiously as possible upon completion of the removal action and submitted to DTSC for review and approval.

### TABLE 8-1

### Schedule of Tasks

| Task | Days to Complete | Notes |
|---|---|---|
| 1. Draft Work Plan Review | 20 | Submitted to DTSC in June 2009. |
| 2. Draft Final Work Plan Preparation | 20 | |
| 3. Draft Final Work Plan Review | 10 | Available for public review November 2009. |
| 4. CEQA | 44 | Public review. |
| 5. Final Work Plan Preparation | 10 | Includes any public comments. |
| 6. Final Workplan Approval | 14 | |
| 7. Field Preparation | 8 | Coordinate waste stream approval. |
| 8. Field Implementation | 20 | Anticipated fall 2010 during low water levels. |
| 9. Data Compilation | 20 | Data review and presentation. |
| 10. Reporting | 40 | A draft completion report is submitted. |

Note: Numbers are calendar days beginning June 1.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004063

REMOVAL ACTION WORKPLAN
FRESNO BATTERY EXCHANGE SITE
URS Corporation Americas
Contract No. 01-T2304/Task Order No. 1-304-1.0-101375

Section 9.0
July 2010
Page 9-1

## 9.0 REFERENCES

Environmental Protection Agency, 1993. *Guidance on Conducting Non-Time-Critical Removal Actions under CERCLA.*

Department of Toxic Substances Control, 1994 (Second Printing: 1999). *Preliminary Endangerment Assessment Guidance Manual.* State of California; Environmental Protection Agency, Department of Toxic Substances Control. January.

Levine Fricke (LFR), 1994. *Remedial Action Plan, Wickes Companies Elmira Site.* February 25.

LFR, 1991. *Results of Soil Sample Analyses and Evaluation of Soil Remedial Alternatives, Former Wickes Forest Industries Facility, Elmira, California.* July 31.

Prima Environmental, 2002. *Report of Findings, Evaluation of Reducing Agents for Removal of Hexavalent Chromium in Groundwater. Elmira California.* January 28.

URS Corporation Americas (URS), 2008. *Remedial Investigation Report, Wickes Forest Industries Site, Elmira California.* July.

URS, 2009a. *Groundwater Monitoring Report, Wickes Forest Industries Site, Elmira California.* May.

URS, 2009b. *Sampling and Analysis Plan, Wickes Forest Industries Site, Elmira California.* April.

Woodward Clyde Consultants, 1983. *Remedial Action Plan, Former Wickes Forest Industries, Elmira, California.* September.

DTSC, et al. v. Jim Dobbas, Inc., et al.

DTSC004064