Exhibit Y



**SHEPPARD MULLIN**
SHEPPARD MULLIN RICHTER & HAMPTON LLP
ATTORNEYS AT LAW

333 South Hope Street | 43rd Floor | Los Angeles, CA 90071-1422
213-620-1780 office | 213-620-1398 fax | www.sheppardmullin.com

Writer's Direct Line: 213-617-4135
soneil@sheppardmullin.com

November 24, 2010

Our File Number: 14LA-157454

**VIA ELECTRONIC MAIL**

Marilee Hanson, Esq.
Senior Staff Counsel
Department of Toxic Substances Control
1001 I Street, 23rd Floor
P.O. Box 806
Sacramento, CA 95812-0806

Thomas G. Heller, Esq.
Deputy Attorney General
Office of the Attorney General
300 S. Spring Street
Los Angeles, CA 90013-1230

Re: <u>PWP-Bakersfield adv. Department of Toxic Substances Control</u>

Dear Ms. Hanson and Mr. Heller:

As you know from our prior conversations, this law firm represents Pacific Wood Preserving-Bakersfield, Inc. ("PWP-Bakersfield"). The purpose of this letter is to respond to the letter from the California Department of Toxic Substances Control ("DTSC") dated September 20, 2010 to Mr. Ronald Laughlin of PWP-Bakersfield.

In the DTSC's September 20, 2010 letter and in our conversation of November 4, 2010, the DTSC contended that PWP-Bakersfield is responsible for contamination at a property in Elmira, California. Specifically, in the DTSC's letter, the DTSC stated that "Pacific Wood Preserving of Bakersfield, Inc. is a responsible party for the release of hazardous substances, including arsenic and chromium at a former wood preserving and treatment facility known as the Former Wickes Forest Industries Site (Site)." PWP-Bakersfield never owned or operated any business at the Site. However, the DTSC contends that a "predecessor" of PWP-Bakersfield, Pacific Wood Preserving Corporation, Inc. ("PWP Corp."), owned and operated the Site from approximately 1972 to 1979. The DTSC has never raised this issue before, despite knowing for nearly 30 years that PWP Corp. formerly operated at the Site.

Contrary to the DTSC's allegations, PWP-Bakersfield is not a successor to the company that formerly operated at the Site in Elmira. PWP-Bakersfield is a separate corporation from the former operator at the Site, PWP Corp. PWP-Bakersfield never operated at the Elmira facility, never owned the Elmira Site, and never conducted any business there. Instead, PWP-Bakersfield operated as a separate and distinct company at a separate and distinct location from PWP Corp. PWP-Bakersfield had separate ownership from PWP Corp., and PWP-Bakersfield

WICKES
M-C

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018744

-271-

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 2

never owned any of the stock of PWP Corp. PWP-Bakersfield also never operated as a parent or a subsidiary of PWP Corp.

PWP Corp. no longer exists, as it was dissolved in accordance with California law on September 11, 1980. PWP-Bakersfield continues to exist as a Nevada corporation and continues to operate at its distinct and separate facility in Bakersfield, California. The two companies were always treated separately, operated separately, and incorporated separately in different states. PWP Corp. was incorporated in California in 1972, while PWP-Bakersfield was incorporated in Nevada in 1978. While PWP Corp. and PWP-Bakersfield were affiliated (through the fact that they shared a single common stock holder) for less than two years until PWP Corp. was dissolved, PWP Bakersfield is not a successor to PWP Corp. in any sense, legal or otherwise. Consequently, PWP-Bakersfield should not be pursued as a responsible party for any contamination that currently exists at the Elmira Site.

I.    FACTUAL BACKGROUND

A.    PWP Corp. is Established and Operates in Elmira, California.

PWP Corp. was incorporated under California law on April 27, 1972. *See* Exhibit 1, corporate filing information from the California Secretary of State's office. PWP Corp. operated a wood preserving and treating facility at the Elmira Site from September of 1972 until September of 1979. PWP Corp. also owned four acres of the Site, and leased the remaining part of the Site from Southern Pacific Transportation Corp.

The stock of PWP Corp. was owned by Mr. Richard Jackson. As the sole shareholder of PWP Corp., Mr. Jackson hired a general manager at the Elmira facility to conduct the daily operations. This general manager, Mr. Richard Brinkman, made the daily decisions relating to treatment of wood at the facility, use of chemicals, and disposal of chemicals. In contrast, Mr. Jackson's primary role for PWP Corp. was to act as a business developer, bringing in work from new and existing clients. The day-to-day operations at the Elmira facility were primarily the responsibility of the general manager. While PWP Corp. operated at the Elmira facility, there were no spills or leaks from the facility resulting from any disposal practices.

In 1978, two large rain storms caused wood treatment chemicals to overflow from the treatment area at the Elmira facility. Those heavy rains washed the wood treating chemicals into a nearby drainage ditch. After the storms, the Central Valley Regional Water Quality Control Board ("Regional Board") issued a Cleanup and Abatement Order ("CAO") on March 2, 1978. That CAO required: (1) clean-up and disposal of all contaminated soil from the spill, and (2) the development and implementation of methods to contain contaminated storm waters in the future. PWP Corp. hired IT Corporation to collect and dispose of the contaminated soils. PWP Corp. also expanded its wastewater collection and overflow capacity beyond its original capacity

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018745

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 3

of 36,000 gallons through the construction of a 70,000 gallon holding tank. The purpose of this expansion was to prevent further discharges to surface waters and surface water drainage courses in the event of large rain storms.

The work required under the Clean-up and Abatement Order was conducted throughout 1979. CH$_2$M Hill prepared a report dated May 9, 1979 on behalf of PWP Corp., which was submitted to the Regional Board. This report proved, to the satisfaction of the Regional Board, that PWP had accomplished "the complete removal of all contaminated soil to a Class I landfill and its replacement with clean native soils." *See* Exhibit 2; Memorandum from Greg K. Vaughn of Regional Board to Stan Phillippe of Regional Board. The Regional Board also concluded that the required expansion of the wood treatment facility's storm water capacity had been completed, including the construction of the 70,000 gallon holding tank designed to prevent further discharge in the event of heavy storms. *See* Exhibit 2. Mr. Vaughn oversaw the Site cleanup on a nearly daily basis, and he approved and signed off on the work conducted by PWP Corp. and its environmental consultants.

The events that led to the Clean-up and Abatement Order also resulted in a civil enforcement lawsuit being filed against PWP Corp. by the State of California. Attached as Exhibit 3 is a copy of the Complaint for Mandatory Injunctive Relief and Civil Monetary Damages, which was filed on March 30, 1979. PWP Corp. and the State of California settled the lawsuit for $7,500, and PWP Corp. satisfied that judgment on December 20, 1979. *See* Stipulation for Judgment dated September 25, 1979, attached hereto as Exhibit 4. *See also* Satisfaction of Judgment dated December 20, 1979, attached hereto as Exhibit 5.

B.     PWP Corp. Sells Its Assets to The Wickes Corporation.

While PWP Corp. was complying with the CAO, the company received an offer to buy its operations in Elmira. In September of 1978, company officers discussed the fact that The Wickes Corporation ("Wickes") had expressed an interest in purchasing the Elmira facility. Negotiations then commenced, and on September 12, 1979, PWP Corp. and Wickes entered into a Purchase and Sale Agreement. Under that agreement, all or substantially all of the property and assets of PWP Corp. were sold to Wickes. Richard Jackson, the sole shareholder of PWP Corp., complied with California corporation law by approving a resolution authorizing the sale of the corporate assets from PWP Corp. to Wickes on September 11, 1979. All of the assets associated with PWP Corp.'s operations in Elmira were transferred to Wickes by Bill of Sale dated September 12, 1979. Wickes also acquired the real property from PWP Corp., and assumed the lease between PWP Corp. and Southern Pacific Transportation Corp.

The sale occurred with Wickes having full knowledge of the CAO and the lawsuit served against PWP Corp. Shortly after the sale to Wickes, the Regional Board issued the memorandum that concluded that PWP Corp. had successfully completed the clean-up and the

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018746

-273-

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 4

construction measures required to expand the storm water capacity of the Elmira facility, as required by the CAO. *See* Exhibit 2. Wickes purchased the Elmira facility for fair market value, and took possession of a clean property. The Regional Board had demanded that the remediation must be completed before it would approve of the sale of the business to Wickes free of liability. Wickes continued operating the Elmira Site from 1979 until 1982. At that time, Wickes closed the Elmira facility.

  C. PWP Corp. Dissolves In Accordance With California Law.

    Following the sale of PWP Corp.'s assets to Wickes, PWP Corp. engaged in the process of wrapping up its business and dissolving its corporate existence. On September 11, 1980, PWP Corp. was dissolved in accordance with California law. A true and correct copy of the "Certificate of Election to Wind Up and Dissolve Pacific Wood Preserving" is attached hereto as Exhibit 6. This certificate was filed with the California Secretary of State's office on September 11, 1980. PWP Corp. was formally dissolved under California law on that date.

  D. PWP-Bakersfield Begins Operating in Bakersfield, California.

    Before PWP Corp. was dissolved, Mr. Jackson and a group of individual investors started a separate wood-treating company based in Bakersfield, California. That company, PWP-Bakersfield, was incorporated under Nevada law on October 27, 1978. At its inception, PWP-Bakersfield was owned by Mr. Jackson and four other individuals. Mr. Jackson did not use cash from the sale of PWP Corp. to fund his initial purchase of PWP-Bakersfield. PWP-Bakersfield operated at 5601 District Boulevard in Bakersfield, California, and it continues to operate there to this day. Mr. Brinkman, the general manager at PWP Corp. in Elmira, was never employed by PWP-Bakersfield. PWP Corp. operated independently of PWP-Bakersfield at a separate location, and the two corporations observed corporate formalities, did not commingle assets, kept separate and distinct accounting records, and filed independent tax returns. Although PWP-Bakersfield was affiliated with PWP Corp. through the fact that Mr. Jackson was a shareholder in each business, legal formalities and distinctions between the corporations were maintained.

  E. Wickes' Operations Result in Site Contamination.

    Wickes operated the Site from 1979 until 1982. On November 7, 1980, a known spill of toxic chemicals occurred at the Site. The Regional Board issued two cleanup and abatement orders on June 6, 1982 and October 4, 1982. The CAO's were issued in part due to that known toxic spill. Testing conducted after the known toxic release revealed that the Site had concentrations of 120,000 ppb of hexavalent chromium and 200 ppb of arsenic in the groundwater. Although Wickes stopped operating on the Site in 1982, its successors, Collins & Aikman Group and Collins & Aikman Products Company ("CAPCO"), were ordered to

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018747

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 5

investigate and remediate the Site. The current owners of the Site, Jim Dobbas and Continental Rail Co., purchased the property from CAPCO in April of 1997 with knowledge of the contamination and the ongoing Site investigation and remedial work.

Despite the fact that this contamination has been present since November of 1980, neither the Regional Board nor the DTSC approached PWP-Bakersfield or sought to hold it responsible until the DTSC's letter of September 20, 2010.

II.    LEGAL DISCUSSION

   A.   The Liabilities of PWP Corp. and Its Shareholder Were Extinguished by the Dissolution of PWP Corp. in 1980

PWP Corp. was legally dissolved in 1980, three months before Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq.. PWP Corp.'s dissolution was performed in accordance with California law, and that dissolution extinguishes the liability of both the corporation and its shareholders.

A cause of action against a dissolved corporation may be brought against the dissolved corporation, but only to the extent of its undistributed assets. Cal. Corp. Code § 2011(a)(1)(A). If the assets of the dissolved corporation have been distributed to shareholders, a claim may be brought against shareholders of the dissolved corporation to the extent of their pro rata claim or to the extent of the corporate assets distributed to them upon dissolution of the corporation, whichever is less. However, all causes of action against the shareholder of a dissolved corporation arising under Section 2011 are extinguished unless the claimant commences a proceeding to enforce the cause of action against that shareholder of a dissolved corporation prior to the earlier of (a) the expiration of the statute of limitations applicable to the cause of action; or (b) four years after the effective date of the dissolution of the corporation. Cal. Corp. Code § 2011(a)(2)(A),(B).

As for the status of California corporate law at the time of the dissolution, Section 2011(a) of the California Corporations Code only authorized suing a shareholder in the corporate name of such corporation "upon any cause of action against the corporation arising prior to its dissolution." Cal. Corp. Code § 2011. (Emphasis added.) Any claim for relief against PWP Corp. or Mr. Jackson under CERCLA would not be timely because the cause of action did not arise prior to the dissolution of PWP Corp. CERCLA was enacted three months after the dissolution of PWP Corp., and consequently any claim against a shareholder of PWP Corp. would not be authorized under the California Corporations Code as it existed in 1980.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018748

-275-

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 6

       Within the context of the Comprehensive Environmental Response, Compensation and Liability Act, a plaintiff is not entitled to bring an action against a dissolved corporation or its shareholders under CERCLA in those instances when CERCLA was not enacted until after the dissolution of the corporation at issue. This is true even though liability is sought to be imposed for acts occurring before the dissolution. *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 817 F.2d 1448, 1450 (9th Cir. 1987). California Corporations Code Section 2010, as it existed in 1980, did not authorize a suit against a dissolved corporation when the basis for the cause of action was not created until after the dissolution.

       The *Levin Metals* case is directly on point here. PWP Corp. was dissolved on September 11, 1980. CERCLA was enacted on December 11, 1980, three months after PWP Corp. was dissolved. The Ninth Circuit has ruled that the capacity of the corporation to sue or be sued shall be determined by the law under which it was organized. Since PWP Corp. was organized under the laws of the State of California, neither PWP Corp. not its shareholders can be sued for a liability that (if it arose at all) arose before CERCLA was even enacted.

       The Ninth Circuit's holding in *Levin Metals* has been reaffirmed in *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431 (9th Cir. 1993). In *Louisiana-Pacific*, the Ninth Circuit ruled that a suit filed against a dissolved corporation outside of the time limit established by the state corporation capacity statutes, but within the CERCLA statute of limitations, may not be maintained. PWP Corp. was properly dissolved on September 11, 1980, and there are no facts that would suggest to the contrary. The current California dissolution statute cuts off liability after four years. Under prior California law, no plaintiff may pursue a dissolved corporation or its shareholders based on a particular cause of action when the basis for that cause of action was not created until after the dissolution.

       California corporations law also protects Mr. Jackson as the shareholder of PWP Corp. The assets of PWP Corp. were distributed to Mr. Jackson over 30 years ago. The California Corporations Code bars the pursuit of those assets at any time past the statute of limitations of the underlying claim and, in any event, no claim may be brought more than four years after the dissolution, regardless of the statute of limitations of the underlying claim. Consequently, under California law, neither PWP Corp. nor its sole shareholder, Mr. Richard Jackson, can be pursued for liability that did not exist, if at all, until three months after PWP Corp was dissolved.

    B.    PWP-Bakersfield Is Not the Legal Successor to PWP Corp.

       In the DTSC's September 20, 2010 letter, the DTSC stated that PWP-Bakersfield is responsible for the release of hazardous substances at the Site because it is a successor to PWP Corp. In response to our request for legal authority to support its position, the DTSC cited to a series of cases that addressed the issue of whether a party that purchased the entirety of a

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018749

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 7

corporation's assets could be held liable as a successor to the selling corporation. Those cases are inapplicable here. PWP-Bakersfield never purchased the assets of PWP Corp. Instead, the entirety of PWP Corp.'s assets were purchased by The Wickes Corporation. The case authority provided by the DTSC would only apply if the DTSC were now trying to hold Wickes liable as a successor to PWP Corp. Those cases are simply not on point and do not support the DTSC's position that PWP-Bakersfield is the successor to PWP Corp.

The cases that the DTSC cited generally address the issue of whether a company that purchases substantially all of the assets of another company will be liable as a successor corporation. Under the general rule, where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption; (2) the transaction amounts to a consolidation or merger of the two corporations; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liabilities for debts. *McClellan v. Northridge Park Townhome Owners Association*, 89 Cal. App. 4th 746, 753 (2001); *Ortiz v. South Bend Lathe*, 46 Cal. App. 3d 842, 846 (1975), accord, *Ray V. Alad Corp.* 19 Cal. 3d 22, 28 (1977).

A fair number of cases have dealt with these issues in different jurisdictions. In fact, the cases that you cite as support for the proposition that PWP-Bakersfield is a successor to the liabilities of PWP Corp. arise out of this general scenario. For instance, in *Atchison, Topeka and Santa Fe Co. v. Brown & Bryant*, 159 F.3d 258 (9th Cir. 1997), the issue is whether a purchaser of assets can be held as a mere continuation of the corporation from which the assets were purchased. The same holds true for *U.S. v. Carolina Transformer Co.*, 978 F.2d 832, 839-41 (4th Cir. 1992) and *Cytec Industries v. B.F. Goodrich*, 196 F. Supp. 2d 644, 657-659 (S.D. Ohio 2002). In *Cytec*, for instance, a company purchased the stock of a responsible party corporation and set it up as a subsidiary. The purchaser then "absorbed" all of the subsidiary's assets. The court held that this conduct amounted to a *de facto* merger.

In our case, PWP Corp. and PWP-Bakersfield were never involved in an asset purchase transaction. The party that could be analyzed under these cases as a potential successor of PWP Corp. would be Wickes, because it purchased all of the assets of PWP Corp. PWP-Bakersfield does not stand in the same position as the defendants in any of the cases that the DTSC cited. For these reasons, PWP-Bakersfield is not a successor to PWP Corp.

C. <u>Richard Jackson Is Not Individually Liable as a Former Shareholder of PWP Corp.</u>

In your e-mail correspondence to me dated November 12, 2010, you asked us to address the issue of Richard Jackson's individual liability for contamination at the Elmira Site. Specifically, you cited to the principles articulated in four cases – *United States v. Carolina*

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018750

-277-

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 8

*Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 744 (8th Cir. 1986); *United States v. Bliss*, 667 F. Supp. 1298, 1313 (E.D. Mo. 1987); and *Liquid Chemical Corp. v. Department of Health Services*, 227 Cal. App. 3d 1682, 1704-1705 (1991). These cases do not support a case of individual liability against Richard Jackson.

PWP Corp. operated the Elmira Site from 1972 to 1979. PWP Corp. owned a portion of the Site and entered into a lease with the owner of the reminder of the property, Southern Pacific Transportation Company. PWP Corp. conducted business in its legitimate corporate capacity during that time frame. Mr. Jackson was the sole shareholder of PWP Corp., but all of his activities were conducted as an employee and officer of PWP Corp. At no time did Mr. Jackson own the Site on an individual basis or lease the remainder of the property individually from the owner. Further, Mr. Jackson never conducted business on the Site in his individual capacity.

Corporate officers may not be held individually liable for hazardous waste cleanup under the Comprehensive Environmental Response, Compensation and Liability Act, nor may direct liability be imposed on parent corporations, without first piercing the corporate veil. *Joslyn Corp. v. T.L. James & Co., Inc.*, 696 F. Supp. 222, *affirmed*, 893 F. 2d 80 (W.D. La. 1988). There are simply no facts here that would justify piercing the corporate veil and pursuing Mr. Jackson individually. The company conducted corporate meetings, adopted corporate resolutions, and filed corporate tax returns. There are simply no facts that would suggest that PWP Corp. was operated in a manner that would justify piercing the corporate veil.

As for the cases cited by DTSC, they generally involve tortious individual conduct that justifies pursuing the individual defendant as an operator, arranger or other responsible party under CERCLA. For instance, in *United States v. Northeastern Pharmaceutical and Chemical Co., Inc., et al., supra*, the corporate officers were held to be individually liable for the torts that they had personally committed while employed by the corporation. In that case, the corporate officers had located a farm upon which they obtained consent to dump hazardous waste in violation of federal law. The individual defendants had personally transported barrels of chemicals that included dioxin, hexachlorophene, toluene and other toxic chemicals, and they had dug a ditch for the disposal of those chemicals. Similarly, in *United States v. Bliss, et al, supra*, 667 F. Supp. 1298, 1303, the individuals at issue personally drove contaminated waste to horse stables and arenas where those liquid wastes would be sprayed as a dust suppressant. Those liquid wastes contained dioxin, and the individual defendant personally transported those materials and sprayed them on the ground. Similarly, the individual defendant in *Liquid Chemical Corporation v. Department of Health Services*, 227 Cal. App. 3d 1682 (1991) engaged in illegal conduct with specific knowledge of the illegality.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018751

-278-

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 9

In contrast, Mr. Jackson did not engage in any unlawful disposal practices or unlawful business practices. His liability arose from two flooding events, in which the amount of storm water overwhelmed the capacity of the plant's storm water system. Further, he cleaned any resulting contamination completely, to the point where the Regional Board acknowledged that the cleanup and additional preventive measures had been completed. Mr. Jackson acted in compliance with law throughout that process, and the remediation eliminated the environmental contamination. There is simply no evidence that Mr. Jackson personally engaged in any criminal or tortious conduct. For these reasons, the corporate veil should not be pierced, and Mr. Jackson should not be held individually responsible for remediating the Site.

D. It Would Be Inequitable to Pursue PWP-Bakersfield or Richard Jackson for Cleanup of the Elmira Facility.

As stressed throughout this letter, PWP Corp. remediated the contamination at the Elmira facility and the Regional Board acknowledged completion of that project in November of 1979. Three years later, Wickes spilled toxic materials at the Site. The Regional Board pursued Wickes and its successors for nearly 30 years. Throughout that time, neither the Regional Board nor the DTSC pursued PWP-Bakersfield or Mr. Richard Jackson for the presence of any contamination at the Elmira Site. Now that CAPCO and the current property owners are either unwilling or unable to complete the remediation, the DTSC has accused PWP-Bakersfield and Richard Jackson of being responsible for Site remediation.

While we do not intend to address every single defense available to PWP-Bakersfield and Richard Jackson in this letter, it seems clear that the doctrine of laches and the applicable statute of limitations would act to protect both PWP-Bakersfield and Mr. Jackson in this case. Further, as stressed throughout this letter, PWP Corp. actually cleaned the problem that resulted from flooding during its period of operations on the Site. The contamination caused by Wickes, however, remains on the Site. Neither PWP-Bakersfield nor Richard Jackson are responsible for the presence of that contamination.

By the way, Marilee and Tom, on an important personal note, Mr. Jackson has been diagnosed with inoperable pancreatic cancer. He is being treated for this condition, but any lawsuit against Mr. Jackson could have harmful effects upon his health. We understand Mr. Jackson's health condition may not directly affect DTSC's substantive theories; however, given the situation, we would respectfully ask that you honestly and expeditiously re-assess your claim in light of the strong facts provided in this letter, and consider withdrawing your claim to avoid any such harmful effects which could arise from contentious litigation.

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018752

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Marilee Hanson, Esq.
Thomas G. Heller, Esq.
November 24, 2010
Page 10

### III.    CONCLUSION

For the reasons set forth in this letter, PWP-Bakersfield and Mr. Richard Jackson are not liable for the continuing Site investigation and remediation at the Elmira Site. There is simply no basis for a claim against either PWP-Bakersfield or Mr. Richard Jackson based on the facts that gave rise to the current contamination, and based on the legal defenses that have been outlined in this letter.

Based on our brief discussions, we suspect that we are providing some historical facts in this letter of which the DTSC was not fully aware. This letter may clarify the situation, and we hope that DTSC will be willing to re-assess its preliminary theories. However, if not, please write or call so we can better understand the basis for any remaining DTSC claims. Alternatively, we would be willing to meet with you in person to further discuss the issues.

Very truly yours,

Stephen J. O'Neil

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:LOB\403091402.2

DTSC, et al. v. Jim Dobbas, Inc., et al.
DTSC018753