1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  SARAH E. MORRISON, State Bar No. 143459
   Supervising Deputy Attorney General
3  LAURA J. ZUCKERMAN, State Bar No. 161896
   THOMAS G. HELLER, State Bar No. 162561
4  Deputy Attorneys General
     1515 Clay Street, 20th Floor
5    Oakland, CA 94612
     Telephone:  (510) 622-2174
6    Fax:  (510) 622-2270
     E-mail:  Laura.Zuckerman@doj.ca.gov
7  *Attorneys for Plaintiffs California*
   *Department of Toxic Substances Control and Toxic*
8  *Substances Control Account*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12

13
   **CALIFORNIA DEPARTMENT OF TOXIC**          Case No. 2:14-cv-00595-WBS-EFB
14 **SUBSTANCES CONTROL and the TOXIC**
   **SUBSTANCES CONTROL ACCOUNT,**             **PLAINTIFFS' MEMORANDUM OF**
15                                             **POINTS AND AUTHORITIES IN**
                                               **OPPOSITION TO DEFENDANT WEST**
                                  Plaintiffs,  **COAST WOOD PRESERVING, LLC'S**
16                                             **MOTION FOR SUMMARY JUDGMENT**
17            v.
                                               Date:  March 9, 2015
18 **JIM DOBBAS, INC., a California**          Time: 2:00 p.m.
   **corporation; CONTINENTAL RAIL, INC.,**   Place: Courtroom 5, 14th Floor
19 **a Delaware corporation; DAVID VAN**              501 I Street
   **OVER, individually; PACIFIC WOOD**               Sacramento, CA 95814
20 **PRESERVING, a dissolved California**     Trial:  January 4, 2017
   **corporation; WEST COAST WOOD**
21 **PRESERVING, LLC., a Nevada limited**     Action Filed: March 3, 2014
   **liability company; and COLLINS &**
22 **AIKMAN PRODUCTS, LLC, a Delaware**
   **limited liability company,**
23
                                  Defendants.
24

25 **AND RELATED COUNTERCLAIMS AND**
   **CROSS CLAIMS**
26

27

28

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

Factual and Procedural Background ............................................................................ 4

    I.     Site Description and History ................................................................. 4

          A.     Description ............................................................................. 4

          B.     1972-1979:  PWP operates the Site ....................................... 5

          C.     1979:  PWP sells its Elmira business to Wickes, and PWP-B uses the proceeds to start operating in Bakersfield ............................................. 7

          D.     1979-1982:  Wickes operates the Site ................................... 9

          E.     The 1983 Remedial Action Plan and resulting work ............... 9

          F.     New facts and the 1994 Remedial Action Plan ..................... 10

          G.     2005-present:  C&A Products files for bankruptcy and stops cleanup work at the Site, creating an imminent public health hazard ....... 12

    II.    DTSC's Claims ................................................................................. 14

Argument ................................................................................................................... 16

    I.     Legal Standards for Summary Judgment ........................................... 16

    II.    Legal Standards for Relief under Rule 56(d) ..................................... 17

    III.    The Court should deny WCWP's motion or defer considering it under Rule 56(d). .................................................................................. 18

    IV.    Even if the Court reaches the merits, it should deny summary judgment ............. 20

          A.     WCWP has not met its initial burden of establishing the absence of a genuine issue of material fact concerning successor liability. ............... 20

          B.     Even if WCWP had met its initial summary judgment burden on successor liability, there are specific facts showing there is a genuine issue for trial on successor liability. ............................................. 23

          C.     DTSC's CERCLA claims are not time-barred. ....................... 24

                1.     DTSC's actions since November 2005 have been "removal actions," and DTSC's CERCLA claims concerning those removal actions are timely. .......................................... 24

                2.     Even if some or all of DTSC's actions since November 2005 were remedial actions, DTSC's CERCLA claims would be timely. ............................................................. 28

Conclusion ................................................................................................................ 32

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ................................................................. 16, 17

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*
   159 F.3d 358 (9th Cir. 1997)....................................................... 19, 21

*Blake v. City of Sacramento*
   No. 2:12-2061-WBS-KJN, 2014 WL 880356 (E.D. Cal. Mar. 5, 2014) ................................ 17

*California Dep't of Toxic Substances Control v. Alco Pacific, Inc.*
   308 F. Supp. 2d 1124 (C.D. Cal. 2004)....................................... 3, 24, 28

*California Dep't of Toxic Substances Control v. Hearthside Residential Corp.*
   613 F.3d 910 (9th Cir. 2010)............................................................. 31

*California Dep't of Toxic Substances Control v. Hyampom Lumber Co.*
   903 F. Supp. 1389 (E.D. Cal. 1995)................................................ 25, 30

*California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*
   358 F.3d 661 (9th Cir. 2004)........................................................... 28

*California v. Campbell*
   138 F.3d 772 (9th Cir. 1998)........................................................... 17

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ................................................................. 16, 20

*Cleveland v. Johnson*
   209 Cal. App. 4th 1315 (2012)........................................... 2, 19, 21, 22

*Colorado v. Sunoco, Inc.*
   337 F.3d 1233 (10th Cir. 2003)......................................................... 30

*D'Lil v. Riverboat Delta King, Inc.*
   No. 2:11-2230-WBS-AC, 2014 WL 4795050 (E.D. Cal. Sept. 25, 2014)........................... 17

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*
   525 F.3d 822 (9th Cir. 2008)........................................................... 17

*Freeman v. ABC Legal Servs., Inc.*
   827 F. Supp. 2d 1065 (N.D. Cal. 2011) ............................................... 17

*Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*
   920 F.2d 1415 (8th Cir.1990)........................................................... 27

ii

# TABLE OF AUTHORITIES
### (continued)

Page

*Katzir's Floor & Home Design, Inc. v. MMLS.com*
394 F.3d 1143 (9th Cir. 2004)............................................................................... 22

*Key Tronic Corp. v. United States*
511 U.S. 809 (1994)............................................................................................... 27

*Marsh v. Rosenbloom*
499 F.3d 165 (2d Cir. 2007).................................................................................. 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986)............................................................................................... 17

*McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*
89 Cal. App. 4th 746 (2001)..................................................................................... 3

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*
766 F.3d 212 (2d Cir. 2014).................................................................................. 30

*New York v. Next Millenium Realty, LLC*
732 F.3d 117 (2d Cir. 2013)............................................................................. 25, 28

*Ray v. Alad Corp.*
19 Cal. 3d 22 (1977) ................................................................... 3, 19, 21, 23

*Razore v. Tulalip Tribes of Washington*
66 F.3d 236 (9th Cir. 1995).................................................................................. 27

*United States v. Manzo*
182 F. Supp. 2d 385 (D.N.J. 2000) ...................................................... 4, 28, 29, 30

*United States v. Moore*
698 F. Supp. 622 (E.D. Va. 1988)........................................................................ 31

*United States v. W.R. Grace & Co.*
429 F.3d 1224 (9th Cir. 2005).............................................................................. 25

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*
No. 1:10-CV-044 JD, 2013 WL 1182985 (N.D. Ind. Mar. 21, 2013) ...................... 26, 27, 29

STATUTES

42 U.S.C. § 9601............................................................................................... 25, 27

42 U.S.C. § 9607................................................................................................... 14

42 U.S.C. § 9613 ............................................................... 3, 4, 14, 24, 28, 30

iii

PLS.' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO DEF. WEST COAST WOOD
PRESERVING, LLC'S MOTION FOR SUMMARY JUDGMENT (2:14-cv-00595-WBS-EFB)

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

42 U.S.C. § 9621 ................................................................................................. 11, 31

4

Cal. Health & Saf. Code §§ 25300 *et seq.* ................................................................. 24

5

Cal. Health & Saf. Code § 25358.3 ..................................................................... 26, 12

6

Comprehensive Environmental Response, Compensation, and Liability Act of 1980
("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* ........................................................... passim

7

8

**COURT RULES**

9

Fed. R. Civ. P. 30 ................................................................................................... 20

10

Fed. R. Civ. P. 56 ........................................................................... 2, 16, 17, 18, 20

11

**OTHER AUTHORITIES**

12

40 C.F.R. § 300.5 ................................................................................................... 29

13

40 C.F.R. § 300.415 ......................................................................................... 26, 27

14

40 C.F.R. § 300.800 ................................................................................................. 4

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively, "DTSC") have spent over $2.2 million in taxpayer funds since November 2005 responding to soil and groundwater contamination at a privately-owned former wood treatment and preserving property in Elmira, California (the "Site").  DTSC never owned the Site, had nothing to do with wood treatment or preserving there, and never did anything to contaminate it.  As the state agency with authority to address the release or threatened release of hazardous substances, DTSC took action because the contamination threatened public health and the environment, and because one of the companies responsible, Collins & Aikman Products Co. ("C&A Products"), the predecessor to defendant Collins & Aikman Products, LLC, filed for bankruptcy in 2005 and stopped the environmental cleanup of the Site.  The Site's owners and operators at the time (defendants Jim Dobbas, Inc. ("Dobbas") and Continental Rail, Inc. ("CRI")), and a later purchaser for $2.00 (defendant David van Over ("Van Over")) also refused to do the cleanup work.

Having spent public funds on privately-created contamination on private property, DTSC seeks cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, and additional relief under state environmental law.  Defendant West Coast Wood Preserving, LLC ("WCWP") is an entity liable under CERCLA for DTSC's costs, as the successor to defendant Pacific Wood Preserving ("PWP").  PWP is a now-dissolved California corporation that, under the leadership of the late Richard F. Jackson, polluted the Site with wood preserving chemicals in the 1970s.

In September 1979, PWP sold the contaminated Site and its Elmira operations to The Wickes Corporation ("Wickes"), which later merged into C&A Products.  But the year before, Mr. Jackson caused Pacific Wood Preserving of Bakersfield Inc. ("PWP-B") to be incorporated, intending to start a Bakersfield version of the same business.  In 1979, PWP-B started that Bakersfield wood treatment and preserving business, using the proceeds of PWP's Elmira sale to start operating on Bakersfield property that PWP owned.  PWP did not transfer ownership of that Bakersfield property to PWP-B until September 1981, even though PWP certified it had wound

1

1    up and dissolved in December 1979.  Mr. Jackson was the President, a board member, and sole or

2    controlling shareholder of both PWP and PWP-B, and PWP-B said that it was a continuation of

3    PWP's business.  Mr. Jackson remained PWP-B's leader until his death in 2012.  In 2013, PWP-

4    B converted into WCWP, and WCWP still does business at the same Bakersfield property.

5          Now, over a year before the fact discovery cutoff date and almost two years before trial,

6    WCWP moves for summary judgment, alleging that it is not the successor of PWP and that

7    DTSC's CERCLA claims are time-barred.  WCWP's motion is premature, and DTSC requests

8    that the Court deny the motion or defer considering it under Federal Rule of Civil Procedure 56(d)

9    to allow DTSC to conduct discovery on issues raised in the motion.  As described in the

10   accompanying declaration of DTSC's counsel, there are specific facts DTSC seeks to elicit from

11   further discovery that are essential in order to oppose summary judgment on successor liability.

12   The facts DTSC seeks include more information about PWP's relationship to PWP-B (now

13   WCWP) when PWP was winding down and PWP-B was starting.  The sought-after facts concern

14   not just PWP's post-dissolution transfer of its Bakersfield property to PWP-B, but also its transfer

15   to PWP-B of the proceeds of PWP's 1979 sale of its Elmira operations and property, including

16   the Site.  The facts to be elicited also include information about what consideration, if any, PWP-

17   B gave to PWP to use the Bakersfield property between 1979 and 1981, which is when PWP

18   finally deeded it to PWP-B.  In addition, the facts to be elicited include more information on

19   PWP's initial ownership of shares of PWP-B, and transfer of those shares to Mr. Jackson.

20         Successor liability "depends on all the facts and circumstances."  *Cleveland v. Johnson*, 209

21   Cal. App. 4th 1315, 1334 (2012).  DTSC does not yet have all the facts necessary to oppose

22   WCWP's summary judgment motion.  Further, at this juncture the Court also does not have all

23   the facts necessary to make a fully informed decision on successor liability.  WCWP responded

24   on January 15, 2015 to DTSC's written discovery requests on successor liability, and Plaintiffs

25   need more time to supplement that written discovery with depositions or interviews of witnesses

26   with knowledge of the relationship between PWP and PWP-B.  Therefore, the Court should deny

27   WCWP's motion or defer considering all, or at least the successor liability part, of the motion.

28

1    Second, if the Court does reach the merits, WCWP has not met its burden to present

2    evidence negating that it is PWP's successor.  WCWP says it cannot be PWP's successor because

3    PWP did not transfer its principal assets to PWP-B (WCWP's predecessor), but WCWP does not

4    present evidence negating such a transfer.  PWP received about $477,000 from the 1979 sale of

5    PWP's Elmira operations and property to Wickes, and according to PWP-B, those proceeds were

6    used to start PWP-B's business on PWP's Bakersfield property.  But WCWP presents no

7    evidence about this transfer of proceeds from PWP to PWP-B.  WCWP's evidence also does not

8    negate the possibility that PWP-B gave inadequate consideration for those proceeds or for PWP's

9    Bakersfield property, or that there was continuity of officers, directors, or stockholders between

10   PWP and PWP-B.  Therefore, WCWP has not met its initial burden of negating that WCWP

11   could be liable as PWP's "mere continuation."  *See Ray v. Alad Corp.*, 19 Cal. 3d 22, 29 (1977).

12   Third, even if WCWP did carry its initial summary judgment burden, the facts already

13   known about the history, similarities, and relationship of PWP and WCWP present a triable issue

14   on successor liability.  "[C]orporations cannot escape liability by a mere change of name or a shift

15   of assets when and where it is shown that the new corporation is, in reality, but a continuation of

16   the old."  *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th 746,

17   754 (2001).  There is a triable issue whether PWP-B (and thus WCWP) was "in reality, but a

18   continuation" of PWP.  *Id.*

19   Finally, WCWP's assertion that DTSC's causes of action under CERCLA are time-barred

20   is without merit.  DTSC's response actions at the Site from November 2005 through the present

21   are CERCLA "removal actions" taken to address an imminent public health hazard that arose

22   when C&A Products stopped cleanup work at the Site, and Dobbas, CRI (and later Van Over)

23   would not take action themselves.  DTSC may bring a lawsuit to recover costs of removal actions

24   under CERCLA within three years of the completion of all removal actions.  42 U.S.C. §

25   9613(g)(2)(A); *California Dep't of Toxic Substances Control v. Alco Pacific, Inc.*, 308 F. Supp.

26   2d 1124, 1133 (C.D. Cal. 2004).  DTSC implemented a "Removal Action Workplan" from June

27   2011 until November 2011, and is still monitoring the Site to determine if additional response

28

1   actions are necessary.  DTSC filed its complaint on March 3, 2014, and therefore its CERCLA

2   causes of action are timely.

3        WCWP asserts, incorrectly, that DTSC's CERCLA causes of action are time-barred

4   because they are governed by CERCLA six-year statute of limitations for a "remedial action,"

5   and Wickes and C&A Products took remedial actions at the Site in the 1980s and 1990s.  A

6   CERCLA cost recovery case concerning remedial actions must commence within six years of

7   "the initiation of physical on-site construction of the remedial action."  42 U.S.C. § 9613(g)(2)(B).

8   But even if some or all of DTSC's actions since November 2005 were "remedial," the Court

9   should hold that they were a separate and distinct phase of remedial action from what Wickes and

10   C&A Products did in the 1980s and 1990s that is subject to its own statute of limitations.  *See*

11   *United States v. Manzo,* 182 F. Supp. 2d 385, 402-404 (D.N.J. 2000).  If it applied, the remedial

12   action statute of limitations would have begun to run on this separate and distinct phase in June

13   2011, when DTSC's contractor began implementing the Removal Action Workplan.  Therefore,

14   the CERCLA causes of action in DTSC's March 3, 2014 complaint would still be timely.

15        Accordingly, the Court should deny WCWP's motion, or at least defer considering it until

16   DTSC has had more time to conduct discovery concerning the successor liability issues raised in

17   the motion.

18              **FACTUAL AND PROCEDURAL BACKGROUND**

19   **I.    SITE DESCRIPTION AND HISTORY**

20        **A.    Description**

21        The Site is a former wood treatment and preserving facility in Elmira, Solano County,

22   California.  It is about 7.5 acres shaped like half an arrowhead that points northeast.  (Admin.

23   Record ("AR") 7850, 7896.)[1]  The Site is bounded to the south by A Street and southeast by

---

24        [1] DTSC has lodged a DVD of the certified Administrative Record concerning the response
25   actions at the Site.  (*See* Docket No. 103 (Notice of Lodging).)  Under CERCLA, the lead
     government agency for an environmental response action "shall establish an administrative record
26   that contains the documents that form the basis for the selection of a response action."  40 C.F.R.
     § 300.800(a).  Citations to the Administrative Record are to the Bates numbers that appear as
27   "ADMIN[number]" on the bottom right of the cited page, excluding leading zeros.  DTSC
     produced the Administrative Record to WCWP and the other appearing defendants in July 2014
28   as part of DTSC's initial disclosures.

4

1   Holdener Road.  There are homes immediately to the east across A Street, to the west, and

2   beyond Holdener Road to the south.  Four domestic wells that supply irrigation water are located

3   in the residential area to the east of A Street and south of Holdener Road.  (AR 6225.)  Railroad

4   tracks border the Site to the northwest, beyond which there are more homes, and then agricultural

5   land.  There is also agricultural land to the east of the Site north of Holdener Road.  (AR 7850,

6   7896-97.)

7          The Site is generally flat and has been mostly covered with asphalt since the 1990s.  (AR

8   7850.)  It is fenced and has three large metal-sided buildings on it, including an 11,000-square-

9   foot building that covers the former lumber "process area" in the southwest corner.  There is also

10  a former office building in that corner, and a storage building near the middle of the Site.  (AR

11  6215, 7850, 7897.)

12          **B.      1972-1979:  PWP operates the Site**

13          In 1972, Richard F. Jackson and his wife bought the formerly agricultural Site with another

14  couple.  (DTSC Request for Judicial Notice ("DTSC RJN") ¶ 1, Ex. 1; *see also* AR 6215.)  That

15  year, the same two couples formed PWP, a California corporation, to operate at the Site.  (WCWP

16  Statement of Undisputed Facts, Fact No. ("WCWP UF") 1.)  Mr. Jackson was initially PWP's

17  Vice-President and majority shareholder, but soon became its President and sole shareholder.

18  (WCWP UF 2; Decl. of Laura J. Zuckerman ("Zuckerman Decl.") ¶¶ 2-4, Ex. 1 at 8-10, Ex. 2 at

19  13, Ex. 3 at 16.)  He was also a member of PWP's initial Board of Directors, along with his wife

20  and the other couple.  (WCWP UF 2; WCWP Request for Judicial Notice ("WCWP RJN") Ex. F.)

21  Later, the four-person Board of Directors would include Mr. Jackson, his wife, a relative, and

22  PWP's corporate secretary.  (Zuckerman Decl. ¶ 5, Ex. 4 at 18.)  Mr. Jackson and the Site's other

23  owners quitclaimed the Site to PWP in 1977.  (DTSC RJN ¶ 2, Ex. 2, 3.)

24          PWP operated a wood treatment and preserving business at the Site from 1972 until

25  September 1979.  (WCWP UF 1.)  In its business, PWP applied chemical preservatives to wood

26  products to protect the wood from decay and infestation.  (WCWP RJN Ex. F; AR 7850-7851.)

27  Four large product tanks for the chemical preservative solutions were near the lumber process

28

1    area in the southwest part of the Site, and PWP used large retort (pressure) vessels in the same

2    area to pressure treat lumber with the solutions.  (AR 6215, 7850-7851.)

3         PWP's wood preserving solutions contained chromium, arsenic, and copper.  (AR 1, 7851.)

4    Over the years, PWP spilled, leaked, and dripped large amounts of those solutions onto the

5    ground and into nearby drainage ditches and canals.  In 1974, PWP's night crew spilled 50 to 100

6    gallons of wood preserving solutions (sodium dichromate and copper sulfate) while filling a

7    storage tank, and hosed down the spill to dilute and remove it, discharging yellowish water into a

8    drainage ditch that flowed into a canal about a mile away.  (Decl. of Peter MacNicholl

9    ("MacNicholl Decl.") ¶ 5, Ex. 1 at 8.)  In February 1978, another spill sent a green-blue solution

10   (copper sulfate) into a drainage ditch for a quarter mile from the Site.  (MacNicholl Decl. ¶ 6, Ex.

11   2 at 11.)  In November 1978, an employee of the California Regional Water Quality Control

12   Board, Central Valley Region ("Regional Board") observed small spills at the Site, and samples

13   contained high levels of arsenic, copper, and chromium.  (MacNicholl Decl. ¶¶ 7-8, Ex. 3 at 14,

14   17, Ex. 4 at 22.)  In December 1978 and January 1979, PWP again discharged wood preserving

15   solutions to a nearby drainage ditch, and lumber drippings and rainwater had created "a large

16   pond…of concentrated chemical waste between the plant and the railroad tracks" that was about

17   100 feet long, 8 feet wide, and 1 foot deep.  (MacNicholl Decl. ¶ 8, Ex. 4 at 23.)  Water samples

18   from the pond, a PWP sump, and the drainage ditch contained high levels of arsenic, copper, and

19   chromium.  *Id.*

20        After the February 1978 spill, the Regional Board ordered PWP to clean up contamination

21   in the drainage ditch on the north side of Holdener Road, and take action to prevent future "storm

22   runoff containing toxic materials…."  (AR 1-2.)  PWP did not comply, and after more spills in

23   late 1978 and early 1979, the Regional Board sued PWP in state court to compel compliance with

24   the order and for damages.  (DTSC RJN ¶ 3, Ex. 4.)  The lawsuit prompted PWP to address the

25   Regional Board's requirements in the summer of 1979.  (WCWP UF 15.)

26

27

28

**C.    1979:  PWP sells its Elmira business to Wickes, and PWP-B uses the proceeds to start operating in Bakersfield**

On September 12, 1979, with the Regional Board's case against it still pending, PWP sold the Site and its Elmira business to Wickes.  (WCWP UF 5.)  Wickes paid PWP about $477,000, and also assumed specified PWP accounts payable, contracts, notes, and a trust deed.  (*See* WCWP Ryan Dec. Ex. A at 7-9; Zuckerman Decl. ¶¶ 6-7, Ex. 5 at 20, Ex. 6 at 25.)[2]  To get the full payment, PWP had to resolve the Regional Board's case against it, and finishing the work the Regional Board had ordered had to cost Wickes $100,000 or less.  (WCWP Ryan Decl. Ex. A at 26-27.)  In late September 1979, PWP resolved the Regional Board case by stipulating to a $7,500 judgment against it.  (WCWP RJN Ex. G.)  In late November 1979, the Regional Board determined that the work it had ordered was  finished, but noted that "chromium approaching drinking water standards" was still present in Site groundwater.  (WCWP Brown Decl. Ex. C at 30.)  Therefore, the Regional Board directed that "future sampling of monitoring wells…be done to assure continued compliance with water quality criteria."  (WCWP Brown Decl. Ex. C at 30.)

PWP's sale to Wickes did not include a large piece of property that PWP owned in Bakersfield.  (*See* WCWP Ryan Decl. Ex. A.)  PWP bought the Bakersfield property in October 1978, just before PWP-B incorporated under Nevada law.  (WCWP UF 19, 23.)  PWP was an initial stockholder of PWP-B.  (Zuckerman Decl. ¶ 8, Ex. 7 at 32:1.)  WCWP says that PWP-B was a "new" wood treatment and preserving company of Mr. Jackson and a "group of investors," formed to serve "the growing Bakersfield market."  (WCWP Mot. at 4:20-22.)  Over three decades later, PWP-B would become WCWP, with WCWP assuming "all debts, liabilities, and obligations" of PWP-B.  (WCWP UF 56; WCWP RJN Ex. E at 66.)

PWP-B began operating on PWP's Bakersfield property in 1979, and still does business there as WCWP.  (WCWP Mot. at 4-5.)  PWP-B would use PWP's Bakersfield property until

---

[2] The price for the Site and PWP's machinery and equipment was $690,000.  (WCWP Ryan Dec. Ex. A at 6.)  The price for PWP's inventory was $260,612.60, and taxes and miscellaneous costs added another $23,663.82.  (Zuckerman Decl. ¶ 7, Ex. 6 at 25.)  Wickes assumed PWP accounts payable totaling $320,197.34, and PWP contracts, notes, and trust deed obligations totaling $176,655.64, which reduced what Wickes paid PWP by those amounts. (WCWP Ryan Dec. Ex. A at 8-9: Zuckerman Decl. ¶¶ 6-7, Ex. 5 at 20, Ex. 6 at 25.)

7

1    1981, when PWP deeded it to PWP-B. (WCWP UF 27.) PWP remained the owner of the

2    Bakersfield property for almost two years after PWP had certified it had wound up and dissolved.

3    (*See* WCWP RJN Ex. H at 86, Ex. M.) Mr. Jackson was one of the PWP directors who signed

4    that certification of dissolution in December 1979, and he also signed the deed from PWP to

5    PWP-B in September 1981. (WCWP RJN Ex. H at 86, Ex. M.) The deed does not indicate a

6    purchase price, and the amount of documentary transfer tax (which is usually a percentage of the

7    price) is listed as "None." (WCWP RJN Ex. M.) There is no evidence that PWP-B paid PWP to

8    use the property between 1979 and 1981.

9        The 1979 agreement between PWP and Wickes concerning Elmira allowed the "similar

10   business" of Mr. Jackson in Bakersfield (i.e. PWP-B) to use the PWP name or a variant of it, as

11   long as the business did not compete with Wickes within 250 miles of Elmira for three years.

12   (WCWP Ryan Dec. Ex. A at 15-16.) Later, PWP-B was one of the of "The Pacific Wood

13   Preserving Companies," a group of lumber treatment plants under Mr. Jackson's leadership in

14   several western states. (MacNicholl Decl. ¶¶ 9-10, Ex. 5 at 26, Ex. 6 at 28-29.) As with PWP,

15   Mr. Jackson was the President and a member of PWP-B's Board of Directors until his death in

16   2012. (Zuckerman Decl. ¶¶ 8-9, Ex. 7 at 34, 37-38, Ex. 8 at 43; MacNicholl Decl. ¶ 9, Ex. 5 at 26;

17   *see also* WCWP Mot. at 25:7-9.) Mr. Jackson was also PWP-B's majority shareholder after

18   receiving PWP's shares of PWP-B in September 1980. (WCWP Mot. at 21, 25; Zuckerman Decl.

19   ¶ 8, Ex. 7 at 32:1-4.)

20       PWP-B had just four other initial stockholders, who with Mr. Jackson served on the

21   company's five-person Board of Directors beginning in late 1978. (Zuckerman Decl. ¶ 8, Ex. 7 at

22   32:1-4, 36-37.) PWP-B's website and brochures would later say that The Pacific Wood

23   Preserving Companies started in 1972 in Elmira, the year that PWP was formed. (*E.g.*,

24   MacNicholl Decl. ¶¶ 9-10, Ex. 5 at 26, Ex. 6 at 29; Zuckerman Decl. ¶ 10, Ex. 9 at 45-46.) In

25   addition, PWP-B's website said that the proceeds of PWP's 1979 sale of the Elmira facility to

26   Wickes were used to start PWP-B's business in Bakersfield in 1979. (MacNicholl Decl. ¶ 10, Ex.

27   6 at 29.) The website read: "Pacific Wood Preserving originally started in 1972 in Elmira, Calif.

28

8

1    The assets of this facility were sold in 1978 [sic], and with the proceeds from this sale, the

2    Bakersfield facility was started in 1979." *Id.*

3    **D.    1979-1982: Wickes operates the Site**

4    After September 12, 1979, Wickes operated the Site in Elmira until 1982, and had its own

5    share of spills.  In December 1979, a forty foot high tank containing water, arsenic, and

6    chromium overflowed when a valve was left open over the weekend.  (MacNicholl Decl. ¶ 11, Ex.

7    7 at 32-33.)  High winds blew the green liquid onto a driveway at the Site, and rain washed it 150

8    yards down a drainage ditch along A Street, prompting a police report.  *Id.*  In November 1980,

9    another open valve sent too much water into a mixing tank with sludge at the bottom, and about

10    12,000 gallons overflowed and reached a drainage ditch on A Street.  (MacNicholl Decl. ¶ 12, Ex.

11    8 at 36; *see* WCWP UF 28.)

12    Soil samples of the ditch from even before that November 1980 spill showed "high levels

13    of contaminants," suggesting a "spill which had not been cleaned up previously," or leaching of

14    contaminants from the Site.  (MacNicholl Decl. ¶ 13, Ex. 9 at 39.)  Therefore, the Regional Board

15    made Wickes test soil and groundwater at multiple locations in December 1980 and May 1981.

16    (MacNicholl Decl. ¶¶ 13-14, Ex. 9 at 39, Ex. 10 at 41-42.)  Wickes found arsenic, chromium, and

17    copper contamination in various areas.  (MacNicholl Decl. ¶ 14, Ex. 10 at 41-45.)

18    In June and October 1982, the Regional Board issued two "Cleanup and Abatement

19    Orders" to Wickes about the contamination.  (AR 10, 13; WCWP UF 29.)  Wickes denied that

20    spills during its ownership caused the contamination (*see* MacNicholl Decl. ¶ 15, Ex. 11 at 47),

21    but PWP, the prior owner, had already certified it was dissolved as of December 1979.  (WCWP

22    RJN Ex. H at 86.)  The Regional Board ordered Wickes to remove the contaminated soils,

23    investigate the extent of Site contamination, implement a Regional Board action plan to be

24    selected after the investigation, and monitor groundwater.  (AR 12, 15.)

25    **E.    The 1983 Remedial Action Plan and resulting work**

26    To address the Regional Board's orders, Wickes proposed a "Remedial Action Plan" in

27    1983 to build a groundwater treatment system, remove a small area of contaminated soils, cap

28    other contaminated soils with asphalt, and erect a building over the former process area to divert

9

PLS.' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO DEF. WEST COAST WOOD
PRESERVING, LLC'S MOTION FOR SUMMARY JUDGMENT (2:14-cv-00595-WBS-EFB)

1  rainfall.  (AR 18, 30, 513-15; WCWP UF 30.)  The plan concerned the southern area of the Site.

2  (AR 2266.)  The Regional Board and the California Department of Health Services ("DHS"),

3  Toxic Substances Control Division, the predecessor governmental entity to DTSC, approved the

4  storm water management, groundwater treatment, and soil removal and containment elements of

5  the plan in a 1984 Settlement Agreement with Wickes.  (AR 36.)  The Settlement Agreement

6  preserved the agencies' rights to revisit the plan if they came to believe, "through the discovery of

7  new facts or otherwise," that the corrective measures were inadequate.  (AR 38.)

8        Wickes began the planned work in 1983, and the groundwater treatment system began

9  operating in April 1984.  (UF 35, 36.)  The treatment system initially included a single recovery

10  well and subsurface drainage.  (AR 515.)  In August 1987, Wickes (which by then was named

11  Wickes Companies, Inc.) added another recovery (extraction) well to the southeast of the Site.

12  (AR 515; DTSC RJN ¶ 4, Ex. 5 at 31.)

13        **F.    New facts and the 1994 Remedial Action Plan**

14        In 1989, Wickes proposed further groundwater investigation based on data showing

15  "unexpected migration" of chromium contamination in groundwater to a nearby private well.

16  (AR 88.)  The new data indicated to DHS that "the long-term assumptions Wickes made in

17  defining contaminate movement horizontally and vertically in groundwater [in the 1984 Remedial

18  Action Plan] appear[] not to be supported."  (AR 88.)  Wickes performed further groundwater and

19  soil investigations between 1989 and 1991.  (AR 90, 193, 346; *see also* MacNicholl Decl. ¶ 16,

20  Ex. 12 at 50.)  In 1992, it poured concrete over the dirt floor inside the building over the former

21  process area to prevent possible direct contact exposure to high levels of arsenic and other heavy

22  metals.  (AR 413-14.)  In 1992, DTSC (having succeeded DHS) also told Wickes that "new facts"

23  discovered during the investigations required Wickes to prepare another Remedial Action Plan.

24  (AR 405; *see also* MacNicholl Decl. ¶ 16, Ex. 12 at 49.)

25        DTSC and Wickes entered into an "Enforceable Agreement" in 1992 that required Wickes

26  to prepare the new Remedial Action Plan.  (AR 403.)  By then, Wickes had changed its name

27  again, this time to Collins & Aikman Group, Inc. ("C&A Group").  (AR 412.)  The Enforceable

28  Agreement also authorized C&A Group to replace the groundwater treatment system with an

10

1   improved one that included more extraction wells.  (AR 409.)  C&A Group completed the

2   replacement and connected the extra extraction wells by 1993.  (AR 516.)

3       In 1994, C&A Group proposed the new Remedial Action Plan for the Site, and DTSC

4   approved its implementation.  (WCWP UF 40; AR 832.)[3]  The Remedial Action Plan primarily

5   concerned soil contamination in the northern part of the Site and nearby drainage ditches.  (AR

6   2266.)  Later in 1994, C&A Group merged into Collins & Aikman Products Co. ("C&A

7   Products"), and C&A Products implemented the planned work.  (DTSC RJN ¶ 5, Ex. 6.)  A

8   consultant for C&A Products excavated about 89 cubic yards of contaminated soil from a railroad

9   drainage ditch for offsite disposal as a hazardous waste.  (AR 985-986.)  C&A Products also

10  excavated about 2,100 cubic yards of contaminated soil from offsite drainage ditches and

11  stockpiled the soils onsite.  (AR 985.)  C&A Products then re-graded and sealed the Site with an

12  asphalt cap, and built a drainage system to prevent storm water from ponding and seeping through

13  the cap.  (AR 986.)  It also recorded a deed restriction on the Site disclosing the contamination

14  and restricting the Site's future use.  (*See* AR 2270.)

15      C&A Products finished this work in 1996, and DTSC certified the work under the 1983 and

16  1994 Remedial Action Plans as the final remedial action.  (AR 2267.)  But DTSC also found that

17  "the site requires ongoing operation and maintenance (O&M) and monitoring efforts" to ensure

18  that the cleanup was effective.  (AR 2271.)  Therefore, DTSC required C&A Products to

19  implement an O&M Plan, monitor the groundwater, submit annual reports, review and reevaluate

20  the remedy after five years, and pay DTSC's reasonable costs for up to forty hours of oversight

21  per year.  (AR 2211-2212, 2221; *see* 42 U.S.C. § 9621(c) (CERCLA five year review).)  If the

22  systems in place were "ineffective or…unable to meet cleanup goals" after five years, C&A

23  Products had to propose further actions to meet cleanup goals, and implement those actions upon

24  DTSC approval.  (AR 2212.)

25

26      [3] WCWP focuses on the "Preliminary Nonbinding Allocation of Responsibility" in the
    1994 Remedial Action Plan (WCWP Mot. at 11-12, 14-15), which states that C&A Group is the
27  responsible party associated with the Site.  (AR 510.)  By definition, that allocation is:  (1)
    preliminary; and (2) nonbinding, and is immaterial to WCWP's motion.

28

In 1997, C&A Products sold the Site to defendants Dobbas and CRI, but continued performing the required O&M work using its contractors.  (AR 2316.)  In 2001, C&A Products' five-year review of the cleanup found that while the groundwater treatment system had controlled contaminant migration, it was "unlikely…that groundwater extraction will achieve [allowed Maximum Contaminant Levels] in all wells."  (AR 2358.)  A consultant for C&A Products recommended studying "the potential application of an in-situ [i.e. in-place] remediation approach to enhance the existing remedy."  (AR 2359.)  C&A Products studied several possible remedy modifications and enhancements between 2002 and early 2005.  (AR 2419, 2503, 3295, 3338.)

### G.   2005-present:  C&A Products files for bankruptcy and stops cleanup work at the Site, creating an imminent public health hazard

In August 2005, DTSC told C&A Products that the groundwater treatment system had reached "asymptotic levels above remediation goals" (i.e., would never reach those goals), and that alternative treatment technologies appeared necessary.  (AR 3728.)  C&A Products replied that it had filed for Chapter 11 reorganization earlier that year, and was "not able to commit to perform further actions at this site."  (AR 3731.)  In November 2005, DTSC learned that C&A Products had shut down the groundwater system entirely a few months earlier.  (AR 3734.)

DTSC asked C&A Products to resume work at the Site, but the company refused.  (AR 3735, 3738.)  In 2006, DTSC also asked the then-owners and operators of the Site, Dobbas and CRI, to do the work, but they would not.  (AR 3753.)  In late 2006, DTSC determined that the Site "may present an imminent and substantial endangerment to the public health or welfare or to the environment," and that it had to spend state funds to address this threat.  (AR 3748, 3756; *see also* Cal. Health & Saf. Code § 25358.3(a)(2) (following an endangerment determination, DTSC may "[t]ake or contract for any necessary removal or remedial action.")  The risks were that contaminated groundwater would spread to nearby irrigation wells and further contaminate the drinking water aquifer, and that failure of the asphalt cap would allow direct contact with contaminated soil or further surface water or groundwater contamination.  (AR 3755; *see also* MacNicholl Decl. ¶¶ 20-21.)

1    DTSC initially tried in 2007 and 2008 to resume operation of the remedy that it had

2    approved in 1996.  (AR 3757.)  But the idled groundwater treatment system required too many

3    repairs, and a DTSC contractor eventually dismantled it.  (AR 7851.)  In 2007, a DTSC contractor

4    began monitoring the groundwater at the Site (AR 3819), which monitoring would continue

5    quarterly or semi-annually in the ensuing years.  (*E.g.*, AR 4095, 4648, 4985. 5345, 5839.)  After

6    multiple requests from DTSC, defendant Dobbas eventually agreed to perform limited

7    maintenance of the asphalt cap on the Site.  (AR 4084.)

8    In 2008, DTSC investigated whether the soil in the former process area of the Site was a

9    continuing source of groundwater contamination.  (AR 4087, 4547.)  Wickes had previously

10   covered the soil in that area with concrete in 1992.  (AR 413-14.)  DTSC's contractor, URS Corp.

11   ("URS"), concluded in a "Remedial Investigation Report" that some contaminated soil in that

12   area was "a source of groundwater contamination."  (AR 4908.)  At DTSC's direction, URS then

13   prepared a contingency plan in February 2009 for a quick response if the groundwater

14   contamination spread to nearby domestic irrigation wells (AR 6269-6273), and a "Removal

15   Action Workplan" to evaluate cleanup alternatives for this source.  (AR 6202.)  DTSC approved

16   the Removal Action Workplan in July 2010 ("2010 Removal Action Workplan").  (AR 6429.)

17   The 2010 Removal Action Workplan reported that contaminated groundwater had migrated

18   from beneath the Site to the residential area on the south side of A Street and Holdener Road.

19   The movement of contaminated groundwater from the former process area on the Site to the

20   residential area created the potential for irrigation wells located there to extract and distribute

21   contaminated groundwater.  (AR 6225.)  Arsenic and hexavalent chromium (Cr (VI)) were

22   identified as the contaminants of concern.  (AR 6212, 6220.)  Cr (VI) is more toxic than other

23   forms of chromium and is also more mobile than other metals.  (AR 6212.)  URS concluded that

24   limited soil excavation and off-site disposal was the best option to address the contamination.

25   (AR 6234-35, 6242.)

26   In February 2011, Dobbas and CRI sold the Site to Van Over for $2.00.  (MacNicholl Decl.

27   ¶ 17, Ex. 13.)  In March 2011, DTSC issued an "Imminent or Substantial Endangerment

28   Determination Order and Remedial Action Order" ("I/SE Order"), determining again that "there

13

1   may be an imminent and/or substantial endangerment to the public health or welfare or to the

2   environment" from environmental conditions at the Site, and directing Dobbas, CRI, and Van

3   Over to implement the 2010 Removal Action Workplan, among other tasks.  (AR 6825, 6834.)

4   Dobbas, CRI, and Van Over did not comply.  (AR 7109.)  Therefore, DTSC had a contractor,

5   Arcadis US, Inc. ("Arcadis") do the work from June to November 2011.  (AR 7186, 7587, 10525.)

6   Arcadis excavated and removed over 1,500 tons of hazardous soil and about 515 tons of

7   hazardous concrete material from the former process area.  (AR 7876-7877.)  Arcadis also

8   removed the former groundwater treatment system and several above-ground storage tanks, and

9   repaired the gutter system on the building over the former process area.  (AR 7877.)

10      Since those actions in 2011, URS has continued to monitor groundwater at the Site for

11  DTSC.  (AR 7620, 9303, 9380, 9509, 9582, 9771, 9975, 10193, 10264.)  In April 2012, URS

12  installed three replacement groundwater monitoring wells.  (AR 9286.)  In August 2013, URS

13  plugged fifteen groundwater extraction or monitoring wells, some of which "presented an

14  unacceptable risk of contaminant migration to groundwater."  (AR 9968.)

15      DTSC will continue to monitor groundwater at the Site for several years to evaluate

16  contaminant trends, ensure the protection of the public, and determine if additional response

17  actions are necessary.  (MacNicholl Decl. ¶¶ 25-26.)  The 2010 Removal Action Workplan

18  recommended at least ten more years of groundwater monitoring.  (AR 6234, 6238.)  DTSC is

19  also monitoring the asphalt cap to make sure storm water runoff does not mobilize contaminants

20  below the cap.  (MacNicholl Decl. ¶¶ 25-26.)

21  **II.    DTSC'S CLAIMS**

22      DTSC filed the original complaint on March 3, 2014 against Dobbas, CRI, Van Over, PWP,

23  and WCWP.  (Compl., Mar. 3, 2014, Docket No. 1.)  On December 11, 2014, DTSC filed an

24  amended complaint adding Collins & Aikman Products, LLC as a defendant, as the first step in

25  pursuing possible historic insurance coverage of its predecessors Wickes and C&A Products.

26  (First Am. Compl., Dec. 11, 2014, Docket No. 77.)  The first two causes of action allege that each

27  defendant is jointly and severally liable under sections 107(a) and 113(g)(2) of CERCLA, 42

28  U.S.C. sections 9607(a) and 9613(g)(2), for over $2.2 million in unreimbursed costs that DTSC

14

1  incurred in response to the releases or threats of releases of hazardous substances at the Site.

2  (First Am. Compl. 9:11-10:17, 12:11-22, ¶¶ 37-45.)  DTSC's third cause of action is a

3  supplemental state law claim against Dobbas, CRI, and Van Over for their failure to comply with

4  DTSC's 2011 I/SE Order.  (First Am. Compl. 10:18-12:10, ¶¶ 46-54.)  WCWP is not a defendant

5  in that cause of action.

6       DTSC's CERCLA causes of action against WCWP are based on allegations that WCWP is

7  PWP's successor.  (First Am. Compl. 4:8-5:19, ¶ 13.)  The $2.2 million in costs that DTSC

8  requests are response costs it incurred since November 2005.  (First Am. Compl. 8:24-9:10, ¶¶

9  33-36.)  That is when DTSC learned C&A Products had stopped operating the groundwater

10 treatment system, and DTSC began taking actions itself to address the resulting public health and

11 environmental threats.  (AR 3734.)  DTSC had no unreimbursed costs in the 1980s, 1990s, or

12 early 2000s, and very few before November 2005, because C&A Products paid or resolved them.

13 (MacNicholl Decl. ¶ 18, Ex. 14 at 56.)[4]  DTSC filed a proof of claim for response costs in the

14 bankruptcy of C&A Products for the Site, but received less than $1,900.  (MacNicholl Decl. ¶ 19,

15 Ex. 15 at 60-61; *see also* Docket No. 77-2 (C&A Products bankruptcy stipulation).)  DTSC also

16 filed a proof of claim in CRI's 2008 Chapter 7 bankruptcy, but received no payment on it.  (*In re*

17 *Continental Rail, Inc.,* No. 2:08-bk-34986 (Bank. E.D. Cal., filed Oct. 16, 2008), Claim No. 2-1

18 & Docket No. 12.)

19      Dobbas, Van Over, and WCWP all answered the original complaint.  (Docket No. 22, 23,

20 24.)  CRI and PWP defaulted.  (Clerk's Certificates of Entry of Default, June 2, 2014, Docket

21 Nos. 18, 19.)  Dobbas and WCWP have also answered the First Amended Complaint (Docket

22 Nos. 85, 89), but Van Over and Collins & Aikman Products, LLC have not.

23      On December 15, 2014, WCWP filed the present summary judgment motion.  (Docket No.

24 79.)  Promptly thereafter, on December 19, 2014, DTSC served WCWP with document requests

25 and interrogatories related to the motion.  (Zuckerman Decl. ¶¶ 11-12, Ex. 10-11.)  WCWP

26

27     [4] C&A Products paid or resolved all of DTSC's oversight costs until 2004, but stopped
paying those costs in late 2004, just before the company entered bankruptcy.  (MacNicholl Decl.
¶ 18, Ex. 14 at 56.)

28

1    served responses, objections, and over 300 pages of documents on January 15, 2015, and

2    produced more documents on January 21, 2015.  (Zuckerman Decl. ¶¶ 8, 13, Ex. 7, 12.)  Based on

3    the responses and documents, DTSC asked WCWP's counsel for available dates to depose

4    Stephen Ryan, WCWP's main declarant on the motion, along with Darrel Nicholas, one of PWP-

5    B's initial directors, Vice President, and a minority shareholder.  (Zuckerman Decl. ¶ 20.)  DTSC

6    deposed Mr. Ryan on February 19, 2015, which was the first day that WCWP's counsel said he

7    was available, and the day before this opposition is due.  (Zuckerman Decl. ¶ 20.)  DTSC has not

8    yet been able to depose Mr. Nicholas.  According to WCWP's counsel, he resides somewhere in

9    Mississippi, but is currently outside the continental United States.  (Zuckerman Decl. ¶ 20.)

10        The fact discovery cutoff is over a year away, on March 30, 2016.  (Status (Pretrial

11   Scheduling) Order 2:28, June 2, 2014, Docket No. 20.)  WCWP jointly proposed that cutoff with

12   DTSC, Dobbas, and Van Over.  (Joint Status Report 7:6, May 23, 2014, Docket No. 15.)  Trial is

13   set for January 4, 2017.  (Docket No. 20.)

14                                    **ARGUMENT**

15   I.   **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

16        Summary judgment is proper "if the movant shows that there is no genuine dispute as to

17   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

18   A material fact is one that could affect the case's outcome, and a genuine dispute is one that could

19   permit a reasonable jury to enter a verdict for the non-moving party.  *Anderson v. Liberty Lobby,*

20   *Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden

21   of establishing the absence of a genuine issue of material fact and can satisfy this burden by

22   presenting evidence that negates an essential element of the non-moving party's case.  *Celotex*

23   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Alternatively, the moving party can demonstrate

24   that the non-moving party cannot produce evidence to support an essential element upon which it

25   will bear the burden of proof at trial.  *Id.*

26        Once the moving party meets its initial burden, the burden shifts to the non-moving party to

27   "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at

28   324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do

                                        16

1  more than simply show that there is some metaphysical doubt as to the material facts."

2  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere

3  existence of a scintilla of evidence...will be insufficient; there must be evidence on which the jury

4  could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

5       In deciding a summary judgment motion, the court must view the evidence in the light most

6  favorable to the non-moving party and draw all justifiable inferences in its favor.  *Anderson*, 477

7  U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of

8  legitimate inferences from the facts are jury functions, not those of a judge...ruling on a motion

9  for summary judgment...."  *Id.; D'Lil v. Riverboat Delta King, Inc.*, No. 2:11-2230-WBS-AC,

10  2014 WL 4795050, at *2 (E.D. Cal. Sept. 25, 2014).

11  **II.   LEGAL STANDARDS FOR RELIEF UNDER RULE 56(D)**

12       Under Federal Rule of Civil Procedure 56(d), if a party opposing summary judgment

13  "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to

14  justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to

15  obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

16  Fed. R. Civ. P. 56(d).  For a court to grant a Rule 56(d) request, the requesting party "must show:

17  (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2)

18  the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment."

19  *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir.

20  2008) (citing *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)).

21       "Courts are reluctant to deny Rule 56(d) requests."  *Freeman v. ABC Legal Servs., Inc.*, 827

22  F. Supp. 2d 1065, 1071 (N.D. Cal. 2011).  "[U]nless plaintiffs failed to exercise due diligence in

23  conducting discovery, filed an untimely Rule 56(d) request, or failed to explain how additional

24  facts would oppose summary judgment, the request is generally granted with liberality."  *Id.;*

25  *Blake v. City of Sacramento,* No. 2:12-2061-WBS-KJN, 2014 WL 880356, *1 (E.D. Cal. Mar. 5,

26  2014).

27

28

17

PLS.' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO DEF. WEST COAST WOOD
PRESERVING, LLC'S MOTION FOR SUMMARY JUDGMENT (2:14-cv-00595-WBS-EFB)

1   **III.   THE COURT SHOULD DENY WCWP'S MOTION OR DEFER CONSIDERING IT UNDER**
2         **RULE 56(D).**

3         As an initial matter, DTSC requests that the Court deny WCWP's motion or defer

4   considering it under Federal Rule of Civil Procedure 56(d).  The fact discovery cutoff to which

5   WCWP stipulated is over a year away, and there are specific facts DTSC seeks from further

6   discovery that are essential to oppose summary judgment on successor liability.  As described in

7   the accompanying declaration of DTSC's counsel (Zuckerman Decl. ¶¶ 14-18), the facts include

8   more information about PWP's relationship to PWP-B (now WCWP) when PWP was winding

9   down and PWP-B was starting.  The sought-after facts concern not just PWP's post-dissolution

10  transfer of its Bakersfield property to PWP-B in 1981, but also its transfer to PWP-B of the

11  proceeds of PWP's 1979 sale of its Elmira operations and property.  The facts also include

12  information about what consideration, if any, PWP-B gave to PWP to use the Bakersfield

13  property between 1979 and 1981, which is when PWP finally deeded it to PWP-B.  The facts also

14  include more information on PWP's and Mr. Jackson's ownership of PWP-B.  All of these facts

15  are relevant to WCWP's liability as PWP's successor.  (Zuckerman Decl. ¶¶ 14-18.)

16        Before DTSC filed this case, PWP-B's website said that the proceeds from the sale of the

17  Elmira facility were used to start PWP-B's business in Bakersfield.  (MacNicholl Decl. ¶ 10, Ex.

18  6 at 29.)  DTSC should be permitted to discover facts about what consideration, if any, was given

19  for the transfer of these proceeds from PWP to PWP-B, and how the transfer occurred.  As to the

20  transfer of the Bakersfield property from PWP to PWP-B in September 1981, it occurred almost

21  two years after PWP certified it had already dissolved (WCWP RJN Ex. H at 86), and the grant

22  deed said the transfer was subject to no documentary transfer tax, suggesting minimal or no

23  consideration.  (WCWP RJN Ex. M.)  DTSC should be permitted to discover facts about what

24  consideration, if any, was given for this transfer, and whether it was the afterthought of a

25  company (PWP-B) that was a mere continuation of PWP.

26        WCWP also provides no evidence that PWP-B gave PWP any consideration to use PWP's

27  Bakersfield property from 1979 until 1981, when PWP finally deeded it to PWP-B.  DTSC

28  should be permitted to discover facts about whether any consideration was given for that use.

18

1    DTSC also should be permitted to discover more facts about PWP's and Mr. Jackson's ownership

2    of PWP-B.  WCWP's interrogatory responses indicate that PWP owned PWP-B shares at the time

3    of PWP-B's formation, and then transferred those shares to Mr. Jackson in September 1980.

4    (Zuckerman Decl. ¶ 8, Ex. 7 at 32:1-4.)  Mr. Jackson was the President and a board member of

5    both companies, the sole shareholder of PWP, and the "majority shareholder" of PWP-B after that

6    transfer.  (*See* WCWP Mot. at 21.)  Additional discovery about PWP-B's ownership is necessary

7    to evaluate continuity of ownership between PWP and PWP-B.

8            More facts must exist about PWP's transfers of assets to PWP-B than what WCWP has

9    selectively disclosed in its motion.  WCWP says nothing about the use of the proceeds of PWP's

10   Elmira sale to start PWP-B's business in Bakersfield, or about why PWP certified it dissolved in

11   1979 when it still owned the Bakersfield property, which PWP-B was using.  More facts must

12   also exist about PWP's deed of that property to PWP-B in 1981, almost two years after PWP had

13   certified it was dissolved.  Additional facts about the transfer of PWP-B shares from PWP to Mr.

14   Jackson should also be ascertainable.

15           All of these sought-after facts are essential to oppose WCWP's motion for summary

16   judgment, because they are all relevant to WCWP's liability as PWP's successor.  (Zuckerman

17   Decl. ¶¶ 14-18.)  Inadequate consideration for a transfer of assets is relevant to whether the

18   receiving corporation is the successor of the transferring corporation as a "mere continuation" of

19   the transferor.  *Ray*, 19 Cal. 3d at 28-29; *see also Atchison, Topeka & Santa Fe Ry. Co. v. Brown

20   & Bryant, Inc.*, 159 F.3d 358, 362 (9th Cir. 1997) (successor liability rules under CERCLA

21   "mirror" traditional rules of most states, including California).  Continuity of ownership between

22   the corporations is also relevant to this form of successor liability.  *Ray*, 19 Cal. 3d at 29;

23   *Cleveland*, 209 Cal. App. 4th at 1334.

24           Promptly after receiving WCWP's summary judgment motion, DTSC served document

25   requests and interrogatories on these subjects.  (Zuckerman Decl. ¶¶ 11-12, Ex. 10-11.)  WCWP

26   served responses, objections, and over 300 pages of documents on January 15, 2015, and

27   produced more documents on January 21, 2015.  (Zuckerman Decl. ¶¶ 8, 13, Ex. 7, 12.)  The

28   documents include corporate minutes, stock certificates, and a PWP-B stock transfer ledger.  (*See*

1    Zuckerman Decl. ¶ 19.)  The responses and documents provide some of the sought-after

2    information, but DTSC needs more time to supplement that discovery with depositions or

3    interviews of witnesses with knowledge of the relationship between PWP and PWP-B.  *Id.*  One

4    of those witnesses is Stephen Ryan, WCWP's main declarant, who DTSC just deposed on

5    February 19, 2015, the first available date provided by WCWP's counsel.  (Zuckerman Decl. ¶

6    20.)[5]  Another witness is Darrel Nicholas, an initial director, Vice President, and minority

7    shareholder of PWP-B, who resides in Mississippi and is currently outside the continental United

8    States.  (Zuckerman Decl. ¶¶ 8, 20, Ex. 7 at 32:1-4, 33-34, 36-38.)  A third is Marjorie Moore,

9    who was PWP's Secretary and a Board of Directors member when that company certified in

10   December 1979 that it was dissolved.  (Zuckerman Decl. ¶ 20; *see also* WCWP RJN ¶ 9, Ex. H at

11   86.)  WCWP's discovery responses provide no address or telephone information for her, and

12   DTSC needs more time to contact and interview or depose her.  (Zuckerman Decl. ¶ 20.)

13   **IV.    EVEN IF THE COURT REACHES THE MERITS, IT SHOULD DENY SUMMARY JUDGMENT.**

14          Even if the Court reaches the merits of WCWP's motion at this juncture, WCWP has failed

15   to show that there is no genuine dispute as to any material fact and that WCWP is entitled to

16   judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Therefore, the Court should deny summary

17   judgment.

18          **A.    WCWP has not met its initial burden of establishing the absence of a
            genuine issue of material fact concerning successor liability.**
19

20          First, WCWP has not met its initial burden of establishing the absence of a genuine issue of

21   material fact concerning successor liability.  *Celotex*, 477 U.S. at 322–23.

22          WCWP first asserts that it cannot be the successor to WCWP under any theory because

23   PWP-B did not acquire the principal assets of PWP.  (WCWP Mot. at 16-18.)  But after PWP's

24   1979 sale in Elmira to Wickes, PWP had at least three assets:  (1) the Bakersfield property (*see*

25   WCWP Mot. at 7); (2) about $477,000 in proceeds from the Elmira sale (*see supra* at 7 n.2;

26

27          [5] Based on Mr. Ryan's deposition, DTSC will seek to depose WCWP under Federal Rule
     of Civil Procedure 30(b)(6) concerning PWP-B's initial formation and capitalization, matters
     about which Mr. Ryan had little or no knowledge.

28

1    WCWP Ryan Decl. Ex. A at 7-9; Zuckerman Decl. ¶¶ 6-7, Ex. 5 at 20, Ex. 6 at 25); and (3)

2    shares of PWP-B (Zuckerman Decl. ¶ 8, Ex. 7 at 32:1).  WCWP admits that PWP transferred the

3    Bakersfield property to PWP-B in 1981.  (WCWP UF 27.)  WCWP's recent interrogatory

4    responses state that PWP transferred the shares of PWP-B to Mr. Jackson in 1980.  (Zuckerman

5    Decl. ¶ 8, Ex. 7 at 32:1-4.)  But WCWP does not present evidence of what happened to the

6    approximately $477,000 in proceeds that PWP received from the Elmira sale.

7         When it was PWP-B, WCWP said that the proceeds of PWP's sale in Elmira to Wickes

8    were used to start PWP-B's business in Bakersfield.  (MacNicholl Decl. ¶ 10, Ex. 6 at 29.)  That

9    business started on a large parcel of property in Bakersfield that PWP (not PWP-B) owned.  (*See*

10   WCWP UF 19, 24.)  WCWP's motion discusses PWP's sale in Elmira to Wickes, but fails to

11   discuss the transfer of the sale proceeds from PWP to PWP-B.  WCWP's motion also does not

12   address the fact that PWP owned shares of PWP-B, and transferred those shares to Mr. Jackson in

13   1980.  (Zuckerman Decl. ¶ 8, Ex. 7 at 32:1-4.)  WCWP has therefore not established the absence

14   of a general issue of material fact concerning the transfer of PWP's principal assets.

15        WCWP next asserts it has presented evidence negating all four circumstances under which

16   a corporation acquiring another corporation's assets can be liable as a successor, which are:  (1)

17   the purchasing corporation expressly or impliedly agrees to assume the liability; (2) the

18   transaction amounts to a *de facto* consolidation or merger; (3) the purchasing corporation is

19   merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered

20   into in order to escape liability.  *Atchison*, 159 F.3d at 361.  As to the "mere continuation"

21   exception to the general rule of non-liability, "California decisions…have imposed such liability

22   only upon a showing of one or both of the following factual elements:  (1) no adequate

23   consideration was given for the predecessor corporation's assets and made available for meeting

24   the claims of its unsecured creditors; (2) one or more persons were officers, directors, or

25   stockholders of both corporations."  *Ray*, 19 Cal. 3d at 29 (citations omitted); *see also Cleveland*,

26

27

28

21

1    209 Cal. App. 4th at 1327; *Katzir's Floor & Home Design, Inc. v. MMLS.com*, 394 F.3d 1143,

2    1150 (9th Cir. 2004).[6]

3         WCWP's evidence does not negate the possibility of inadequate consideration given for

4    PWP's assets, or of continuity of officers, directors, or stockholders between PWP and PWP-B

5    (now WCWP).  As to inadequate consideration, WCWP says nothing about what consideration

6    PWP received from PWP-B for the $477,000 in proceeds from PWP's Elmira sale to Wickes,

7    which were used to start PWP-B's Bakersfield business.  (*See* MacNicholl Decl. ¶ 10, Ex. 6 at 29.)

8    Furthermore, the 1981 grant deed for the Bakersfield property from PWP to PWP-B does not

9    describe any consideration given, and lists the documentary transfer tax (which is usually based

10   on the purchase price) as "None."  (WCWP RJN Ex. M.)

11        WCWP asserts that PWP-B gave adequate consideration for the Bakersfield property by

12   paying the remaining balance on a 1978 deed of trust on the property for PWP, but that alleged

13   payment occurred over a year before the transfer from PWP to PWP-B.  (WCWP UF 25-27.)

14   Furthermore, only one final payment out of three equal annual payments remained on the

15   Bakersfield property, and the original balance on the deed of trust was just $177,500.  (WCWP

16   Mot. at 9:2-7.)  In contrast, WCWP asserts that PWP bought the property in 1978 for $250,000.

17   (WCWP Mot. at 9:4.)  This evidence does not negate that PWP-B may have given PWP

18   inadequate consideration for the Bakersfield property.

19        WCWP also does not present evidence negating that there was continuity of officers,

20   directors, and stockholders between PWP and PWP-B.  WCWP says there was no continuity

21   because Mr. Jackson was the only board member common to both companies and "not the only

22   shareholder in [PWP-B]."  (WCWP Mot. at 25.)  But PWP itself initially owned shares of PWP-B,

23   and PWP transferred those shares to Mr. Jackson, PWP's sole shareholder, in September 1980.

24   (Zuckerman Decl. ¶ 8, Ex. 7 at 32-:1-4.)  Mr. Jackson was PWP-B's "majority shareholder" after

25   _____

26        [6] Although this standard is described in the disjunctive, the Ninth Circuit in *Katzir's* held
     that "[i]nadequate consideration is an 'essential ingredient' to a finding that one entity is a mere
27   continuation of another."  *Katzir's*, 394 F.3d at 1150 (citation omitted); *but see Cleveland*, 209
     Cal. 4th  at 1334 ("[W]e decline to find that a plaintiff must necessarily establish the
28   inadequacy of the consideration purportedly paid for the transferred assets.")

1    that transfer, and there were only four other PWP-B minority shareholders and board members.

2    (WCWP Mot. at ¶:13-14; Zuckerman Decl. ¶ 8, Ex. 7 at 32:1-2, 36.)  In addition, Mr. Jackson

3    was the President of both PWP and PWP-B.  (WCWP Ryan Decl. ¶ 4; Zuckerman Decl. ¶ 8, Ex.

4    7 at 34.)  Mr. Ryan, WCWP's declarant, was also an officer of both companies.  (WCWP Ryan

5    Decl. ¶ 1; Zuckerman Decl. ¶ 8, Ex. 7 at 34-35; WCWP RJN ¶ 14, Ex. M (deed for Bakersfield

6    property that Mr. Ryan signed as PWP's Assistant Secretary).)

7        The companies' boards, and Mr. Jackson's ownership interests in both companies, did not

8    have to be identical for PWP-B to be a mere continuation of PWP.  Mr. Jackson was the

9    "pioneer" who led both companies (WCWP Mot. at 14:28), and continuity may arise from "one

10    or more persons [being] officers, directors, or stockholders of both corporations."  *Ray*, 19 Cal. 3d

11    at 29.  Based on the record before the Court, WCWP has not met its initial burden of establishing

12    the absence of a genuine issue of material fact concerning successor liability.

13
      **B.**    **Even if WCWP had met its initial summary judgment burden on successor**
14           **liability, there are specific facts showing there is a genuine issue for trial on**
          **successor liability.**

15        Even if WCWP had met its initial summary judgment burden on successor liability, the

16    facts already known about the history, similarities, and relationship of PWP and WCWP indicate

17    that there is a triable issue on successor liability.  Mr. Jackson's roles as President and a board

18    member of both PWP and PWP-B, as sole shareholder of PWP, and as majority shareholder for

19    PWP-B, create a genuine issue as to continuity of officers, directors, or stockholders between

20    PWP and PWP-B (now WCWP).  *Ray*, 19 Cal. 3d at 29.  Mr. Ryan was also an officer of both

21    companies, and PWP itself owned PWP-B stock before transferring it to Mr. Jackson.

22    (Zuckerman Decl. ¶ 8, Ex. 7 at 32:1-4, 34-35; WCWP RJN ¶ 14, Ex. M.)  The transfer of the

23    proceeds of PWP's sale in Elmira to PWP-B, and of PWP's Bakersfield property to PWP-B long

24    after PWP said it had dissolved, create a genuine issue as to whether WCWP is the mere

25    continuation of PWP based on inadequate consideration.  *Ray*, 19 Cal. 3d at 29.  The companies

26    were in the same business, used nearly the same names, and PWP-B formed shortly before PWP

27    dissolved.  Before this case began, PWP-B's website and brochures as part of The Pacific Wood

28    Preserving Companies said that the companies started in 1972 in Elmira.  (MacNicholl Decl. ¶¶

23

1  9-10, Ex. 5 at 26, Ex. 6 at 29; Zuckerman Decl. ¶ 10, Ex. 9 at 45-46.)  All of these facts create a

2  genuine issue for trial as to whether WCWP is the "mere continuation" of PWP.

3        **C.**    **DTSC's CERCLA claims are not time-barred.**

4              **1.**    **DTSC's actions since November 2005 have been "removal actions,"**
                       **and DTSC's CERCLA claims concerning those removal actions are**

5                      **timely.**

6        The statute of limitations is "an especially disfavored defense when asserted against

7  government entities." *Alco Pacific*, 308 F. Supp. 2d at 1135.  WCWP asserts that DTSC's two

8  CERCLA causes of action for cost recovery and declaratory relief are time-barred.  (WCWP Mot.

9  at 28-33.)[7]  But WCWP incorrectly asserts which CERCLA statute of limitations is applicable.

10  DTSC's actions from November 2005 through the present are CERCLA "removal" actions, and

11  DTSC may bring an action to recover costs of removal actions under CERCLA within three years

12  of the completion of all removal actions.  *Alco Pacific*, 308 F. Supp. 2d at 1133.  DTSC

13  implemented the 2010 Removal Action Workplan between June and November 2011, and DTSC

14  is still monitoring the Site to determine if additional response actions are necessary.  Therefore,

15  Plaintiffs' March 3, 2014 complaint is timely.

16        CERCLA has different statutes of limitations for "removal" and "remedial actions."  An

17  initial action for recovery of response costs related to a removal action must be commenced

18  "within 3 years after completion of the removal action…."  42 U.S.C. § 9613(g)(2)(A).  An initial

19  action for recovery of response costs related to a remedial action must be commenced "within 6

20  years after initiation of physical on-site construction of the remedial action, except that, if the

21  remedial action is initiated within 3 years after the completion of the removal action, costs

22  incurred in the removal action may be recovered in the cost recovery action brought under this

23  subparagraph."  42 U.S.C. § 9613(g)(2)(B).

24

25        [7] WCWP argues that "all of DTSC's claims are barred by the applicable statute of
   limitations in CERCLA" (WCWP Mot. at 28:3-4), but DTSC's third cause of action is not a

26  CERCLA claim, and is not asserted against WCWP.  Instead, it is a supplemental state law claim
   against Dobbas, CRI, and Van Over under the Carpenter-Presley-Tanner Hazardous Substance

27  Account Act, Cal. Health & Saf. Code §§ 25300 *et seq.*  (First Am. Compl. 10:18-12:10, ¶¶ 46-
   54.)

28

1   "Removal actions are clean-up or removal measures taken to respond to immediate threats

2   to public health and safety.  42 U.S.C. § 9601(23)."  *New York v. Next Millenium Realty, LLC*,

3   732 F.3d 117, 124-25 (2d Cir. 2013) (further citations omitted).[8]  "Remedial actions are generally

4   actions designed to permanently remediate hazardous waste.  42 U.S.C. §9601(24)."  *Id.* (further

5   citations omitted).[9]  Due in part to overlap in the definitions of "removal" and "remedial action,"

6   the Ninth Circuit has held that the meanings of these terms are "inescapably vague."  *United*

7   *States v. W.R. Grace & Co.* 429 F.3d 1224, 1241 (9th Cir. 2005).  But "a defining characteristic

8   of removal actions" is that they are taken "in response to an imminent public health hazard."

9   *Next Millenium Realty*, 732 F.3d at 126; *see also W.R. Grace & Co.*, 429 F.3d at 1244 (collecting

10  cases); *California Dep't of Toxic Substances Control v. Hyampom Lumber Co.*, 903 F. Supp.

11

12  ──────────────────

13  [8] 42 U.S.C. § 9601(23) provides:

14      The terms "remove" or "removal" mean[] the cleanup or removal of released
        hazardous substances from the environment, such actions as may be necessary taken

15      in the event of the threat of release of hazardous substances into the environment,
        such actions as may be necessary to monitor, assess, and evaluate the release or threat

16      of release of hazardous substances, the disposal of removed material, or the taking of
        such other actions as may be necessary to prevent, minimize, or mitigate damage to

17      the public health or welfare or to the environment, which may otherwise result from a
        release or threat of release. The term includes, in addition, without being limited to,

18      security fencing or other measures to limit access, provision of alternative water
        supplies, temporary evacuation and housing of threatened individuals not otherwise

19      provided for, action taken under section 9604(b) of this title, and any emergency
        assistance which may be provided under the Disaster Relief and Emergency

20      Assistance Act [42 U.S.C. § 5121 et seq.].

21  [9] 42 U.S.C. § 9601(24) provides in part:

22      The terms "remedy" or "remedial action" mean[] those actions consistent with
        permanent remedy taken instead of or in addition to removal actions in the event of a

23      release or threatened release of a hazardous substance into the environment, to
        prevent or minimize the release of hazardous substances so that they do not migrate to

24      cause substantial danger to present or future public health or welfare or the
        environment. The term includes, but is not limited to, such actions at the location of

25      the release as storage, confinement, perimeter protection using dikes, trenches, or
        ditches, clay cover, neutralization, cleanup of released hazardous substances and

26      associated contamination materials, recycling or reuse, diversion, destruction,
        segregation of reactive wastes, dredging or excavations, repair or replacement of

27      leaking containers, collection of leachate and runoff, onsite treatment or incineration,
        provision of alternative water supplies, and any monitoring reasonably required to

28      assure that such actions protect the public health and welfare and the environment….

25

1   1389, 1391-92 (E.D. Cal. 1995); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-

2   044 JD, 2013 WL 1182985, *6 (N.D. Ind. Mar. 21, 2013).

3        DTSC's actions since November 2005 at the Site have the defining characteristic of being

4   taken in response to an imminent public health hazard.  In November 2005, DTSC learned that

5   C&A Products had shut down the groundwater treatment system entirely a few months earlier.

6   (AR 3734.)  The groundwater treatment system had kept contamination from spreading to nearby

7   domestic irrigation wells and further contaminating the drinking water aquifer.  (*See* AR 3755.)

8   C&A Products also stopped maintaining the asphalt cap, which had kept people from being

9   exposed to contaminated soils underneath the cap, and those soils from further contaminating

10   groundwater.  (AR 3755.)  DTSC asked C&A Products to resume work at the Site, but the

11   company refused.  (AR 3735, 3738.)  In 2006, DTSC also asked the then-owners of the Site,

12   Dobbas and CRI, to do the work, but they would not.  (AR 3753.)

13        This abandonment of environmental work at the Site in 2005 created imminent risks that

14   contaminated groundwater would spread to nearby wells and further contaminate the drinking

15   water aquifer, and that the asphalt cap would fail and allow direct human contact with

16   contaminated soil or contribute to more surface water or groundwater contamination.  (AR 3755;

17   MacNicholl Decl. ¶¶ 20-21.)  Given these risks, DTSC determined in late 2006 that the Site "may

18   present an imminent and substantial endangerment to the public health or welfare or to the

19   environment," and that it had to spend state funds to address this threat.  (AR 3748, 3756; *see also*

20   Cal. Health & Saf. Code § 25358.3(a); 40 C.F.R. § 300.415(b)(1) (authorizing removal actions

21   where lead government agency determines there is "a threat to public health or welfare of the

22   United States or the environment….")  DTSC's actions since November 2005 have been in

23   response to this imminent public health hazard at the Site.  (MacNicholl Decl. ¶¶ 20-21.)

24        DTSC initially tried in 2007 and 2008 to resume operating the Wickes/C&A Products

25   remedy that DTSC had approved in 1996.  (AR 3757.)  But this was only an interim measure to

26   contain the groundwater contamination while evaluating alternative cleanup approaches, because

27   the groundwater treatment system had reached "asymptotic levels above remediation goals,"

28   meaning that it would not clean up the groundwater to those goals.  (AR 3728; *see also*

26

1    MacNicholl Decl. ¶ 22.)  Ultimately, the idled groundwater treatment system would require too

2    many repairs to restart.  (*See* AR 7851.)

3        Therefore, DTSC undertook a 2008 "Remedial Investigation" (AR 4894), which is a type of

4    removal action.  *See Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir. 1995)

5    (Remedial Investigation/Feasibility Study ("RI/FS") is a CERCLA removal action).  The 2008

6    Remedial Investigation found that the contaminated soil in the former process area was a threat to

7    groundwater.  (AR 4900, 4908.)  The 2008 Remedial Investigation in turn led to a February 2009

8    contingency plan for a quick response if contaminated groundwater spread to nearby wells (AR

9    6269-6273), and to the 2010 Removal Action Workplan for the excavation of the contaminated

10   soil in the process area and related tasks.  (AR 6202.)  Before implementing the 2010 Removal

11   Action Workplan, DTSC made another determination in 2011 that "there may be an imminent

12   and/or substantial endangerment to the public health or welfare or to the environment" from

13   environmental conditions at the Site, and ordered Dobbas, CRI, and Van Over to do the work.

14   (AR 6825, 6834.)  They did not, and a DTSC contractor completed the work in November 2011,

15   excavating and removing over 2,000 tons of hazardous soil and concrete.  (AR 7587, 7877,

16   10525.)  Excavation and removal of these highly contaminated materials was a CERCLA removal

17   action, that is, a "removal of released hazardous substances from the environment."  42 U.S.C. §

18   9601(23); 40 C.F.R. § 300.415(e)(6) (listing "[e]xcavation, consolidation, or removal of highly

19   contaminated soils" as a removal action); *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*,

20   920 F.2d 1415, 1419 (8th Cir.1990) (finding excavation to be a removal activity even though

21   listed as a remedial example in 42 U.S.C. § 9601(24)), *abrogated on other grounds by Key Tronic*

22   *Corp. v. United States*, 511 U.S. 809 (1994); *Valbruna*, 2013 WL 1182985, at *9 (excavation and

23   capping of contaminated area were removal actions).

24       Since then, DTSC's contractor has continued to monitor groundwater at the property (AR

25   7620, 9303, 9380, 9509, 9582, 9771, 9975, 10193, 10264), installed replacement groundwater

26   monitoring wells (AR 9286), and plugged fifteen groundwater extraction or monitoring wells,

27   some of which "presented an unacceptable risk of contaminant migration to groundwater."  (AR

28   9968.)  Currently, DTSC is still monitoring the Site to evaluate contaminant trends, ensure the

27

PLS.' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO DEF. WEST COAST WOOD
PRESERVING, LLC'S MOTION FOR SUMMARY JUDGMENT (2:14-cv-00595-WBS-EFB)

1 protection of the public, and determine if additional response actions are necessary.  All of this

2 was done in response to an imminent public health hazard (MacNicholl Decl. ¶¶ 20-21), which is

3 a "defining characteristic" of CERCLA removal actions.  *Next Millenium Realty*, 732 F.3d at 126.

4      WCWP asserts, incorrectly, that DTSC's CERCLA causes of action are time-barred

5 because Wickes/C&A Products implemented Remedial Action Plans in the 1980s and 1990s, and

6 "the State's post-1983 activities are all part of the same remedial action."  (WCWP Mot. at 4.)

7 But "even though an action can only be remedial if it is taken after the final remedial action plan

8 is approved, that does not mean that *all* actions taken after the final remedial action plan is

9 approved are remedial."  *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville*

10 *Chem. Co.*, 358 F.3d 661, 670 (9th Cir. 2004).  In other words, removal actions can be taken after

11 a remedial action.  Here, DTSC's actions since November 2005 were CERCLA "removal

12 actions," not remedial actions.  Therefore, the three year statute of limitations for removal actions

13 is applicable, not the six year statute of limitations for remedial actions.

14      DTSC may bring a CERCLA action to recover costs of removal actions within three years

15 of the completion of all removal actions.  42 U.S.C. § 9613(g)(2)(A): *Alco Pacific*, 308 F. Supp.

16 2d at 1133.  Here, DTSC's removal actions included implementation of the 2010 Removal Action

17 Workplan from June 2011 through November 2011, and continued groundwater monitoring and

18 assessment through the present.  DTSC filed its complaint on March 3, 2014, and DTSC's

19 CERCLA causes of action are therefore timely.

20        **2.**     **Even if some or all of DTSC's actions since November 2005 were**

21               **remedial actions, DTSC's CERCLA claims would be timely.**

22      Even if some or all of DTSC's actions since November 2005 were "remedial," the Court

23 should hold that they comprise a separate and distinct phase of remedial action from what Wickes

24 and C&A Products did in the 1980s and 1990s that is subject to its own statute of limitations.  *See*

25 *Manzo*, 182 F. Supp. 2d at 402-404.

26      In *Manzo*, the court concluded that separate actions for multiple CERCLA removal or

27 remedial actions can be available under the right circumstances.  *Manzo*, 182 F. Supp. 2d at 402-

28

28

1  404.  The court held that the logical breakdown point coincides with the concept of an "operable

2  unit," which as defined by United State Environmental Protection Agency regulations:

3      [M]eans a discrete action that comprises an incremental step toward comprehensively
       addressing site problems. This discrete portion of a remedial response manages

4      migration, or eliminates or mitigates a release, threat of a release, or pathway of
       exposure. The cleanup of a site can be divided into a number of operable units,

5      depending on the complexity of the problems associated with the site. Operable units
       may address geographical portions of a site, specific site problems, or initial phases of

6      an action, or may consist of any set of actions performed over time or any actions that
       are concurrent but located in different parts of a site.  40 C.F.R. § 300.5.

7

8  *Manzo*, 182 F. Supp. 2d at 402.  The court further held that each operable unit of an incremental

9  remedy was subject to separate analysis under the CERCLA six-year statute of limitations for

10  remedial actions.  *Id.* at 404.

11      The regulatory definition of an operable unit "is reflective of the reality that CERCLA

12  cleanups often…span several decades. They tend to evolve continuously, in phases, from the

13  initial detection of contamination to a final solution for the entire threatened site."  *Valbruna*,

14  2013 WL 1182985, at *12.  The holding in *Manzo* that each operable unit of an incremental

15  remedy has its own statute of limitations purposes is reflective of the same reality.  *See also*

16  *Valbruna*, 2013 WL 1182985, at *12-13 (activities taken at a site in the 1980s and 1990s, even if

17  CERCLA remedial actions, were "separate and distinct remedial actions" that did not trigger the

18  statute of limitations on a different, more recent remediation that was underway).

19      Even if DTSC's actions since November 2005 were remedial actions, they fit the definition

20  of a discrete operable unit.  DTSC's actions since November 2005 culminated in implementation

21  of the 2010 Removal Action Workplan, which "comprise[d] an incremental step toward

22  comprehensively addressing site problems" which "manage[d] migration, or eliminate[d] or

23  mitigate[d] a release, threat of a release, or pathway of exposure" and "address[ed] geographical

24  portions of a site[.]"  40 C.F.R. § 300.5.  The 2010 Removal Action Workplan primarily

25  concerned soil in the former process area that was a continuing source of groundwater

26  contamination.  (AR 6231, 6242, 7850.)  Removal of that soil was an incremental cleanup step

27  that eliminated a particular source of groundwater contamination, and concerned a particular

28  geographical portion of the Site.

29

1       The work that Wickes and C&A Products did in the 1980s and 1990s also involved

2   incremental cleanup steps, but did not eliminate this particular source of groundwater

3   contamination.  (*See* MacNicholl Decl. ¶ 24; AR 2272 (for 1980s and 1990s investigations, "the

4   site was divide[d] into two operable units, wood treatment unit (south) and the wood storage unit

5   (north)").)  Wickes erected a building over the soils in the 1980s to divert rainfall (AR 514), and

6   covered the contaminated soils with concrete in 1992 to prevent direct contact exposures (AR

7   413-14), but neither action really addressed the source problem – the contaminated soil.  The

8   2008 Remedial Investigation conducted by DTSC's contractor revealed the extent of the threat to

9   groundwater from those contaminated soils.  (AR 4910.)  DTSC then took action to excavate and

10   dispose of the contaminated soils by developing and implementing the 2010 Removal Action

11   Workplan.  (*See* MacNicholl Decl. ¶ 24.)

12       Even if these actions since November 2005 were remedial, they constitute a separate and

13   distinct phase of remedial action from what Wickes and C&A Products did in the 1980s and

14   1990s that is subject to its own statute of limitations.  *See Manzo,* 182 F. Supp. 2d at 402-404.  If

15   it applied, the six-year statute of limitations for remedial actions would have begun to run on this

16   distinct phase in June 2011, when DTSC's contractor began implementing the 2010 Removal

17   Action Workplan.  (AR 7186; *see* 42 U.S.C. § 9613(g)(2)(B).)  Therefore, the CERCLA causes of

18   action in DTSC's March 3, 2014 complaint would be timely even under that statute of limitations.

19       DTSC acknowledges that some other circuit courts have held there can only be one

20   remedial action at any given site, and have therefore declined to evaluate different operable units

21   separately for statute of limitations purposes.  *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1241

22   (10th Cir. 2003); *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 236 (2d

23   Cir. 2014).  To DTSC's knowledge, the Ninth Circuit has not ruled on this issue.  In a case that

24   did not involve different operable units, this Court also found "no authority for the view that each

25   'remedial' activity undertaken at a site triggers a new cause of action for the cost recovery of that

26   activity."  *Hyampom*, 903 F. Supp. at 1394.

27       But finding that the statute of limitations on DTSC's response actions since November

28   2005 began to run in February 1984, as WCWP asserts (WCWP Mot. at 32), would be

1   unwarranted and contrary to CERCLA's purposes "that hazardous waste sites should be cleaned

2   up and that those responsible for the contamination should bear the costs." *Marsh v. Rosenbloom*,

3   499 F.3d 165, 178 (2d Cir. 2007).  Indeed, CERCLA had no statute of limitations for a cost

4   recovery action until October 1986, almost three years after WCWP says the statute of limitations

5   began to run. *See United States v. Moore*, 698 F. Supp. 622, 625 (E.D. Va. 1988).  Furthermore,

6   during the 1980s and 1990s, Wickes and C&A Products were cooperating with DTSC and its

7   predecessor agency in performing the required work at the Site, and paying DTSC's oversight

8   costs.  Finding that the statute of limitations was running in the 1980s or 1990s would mean that

9   DTSC nonetheless had to sue every potentially responsible party under CERCLA in order to

10   preserve its rights to recover future costs that DTSC would only incur if the cooperating company

11   someday stopped doing the work.  CERCLA was not meant to require this result.  As the Ninth

12   Circuit recently noted, "[a] rule that produces a lawsuit in every case is the opposite outcome that

13   CERCLA seeks to promote." *California Dep't of Toxic Substances Control v. Hearthside*

14   *Residential Corp.*, 613 F.3d 910, 915 (9th Cir. 2010).

15        Such a ruling would also not be reflective of the reality that environmental remedies,

16   especially decades-old ones, sometimes just stop working.  CERCLA acknowledges this reality

17   by requiring five-year reviews and other means for government or responsible parties to continue

18   to evaluate the effectiveness of response actions and implement alternative measures if necessary

19   to protect public health and the environment. *See* 42 U.S.C. § 9621(c).  If a remedy stops

20   working, the government should not be foreclosed under CERCLA from recovering taxpayer

21   funds spent on response actions necessary to protect public health and the environment, while

22   responsible parties sit on the sidelines.  To avoid this result, a separate statute of limitations

23   should apply to response actions taken to address a remedy that stops working, such as the

24   groundwater treatment system at the Site.

25

26

27

28

1

**CONCLUSION**

2      Based on the above, the Court should deny WCWP's motion, or at least defer considering it

3 until DTSC has had more time to conduct discovery on the successor liability issues raised in the

4 motion.

5 Dated:  February 20, 2015                    Respectfully Submitted,

6                                              KAMALA D. HARRIS
                                               Attorney General of California
7                                              SARAH E. MORRISON
                                               Supervising Deputy Attorney General
8
                                               */s/ Thomas G. Heller*
9
                                               LAURA J. ZUCKERMAN
10                                             THOMAS G. HELLER
                                               Deputy Attorneys General
11                                             *Attorneys for Plaintiffs California*
                                               *Department of Toxic Substances Control*
12                                             *and Toxic Substances Control Account*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO DEF. WEST COAST WOOD
PRESERVING, LLC'S MOTION FOR SUMMARY JUDGMENT (2:14-cv-00595-WBS-EFB)