KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
SARAH E. MORRISON, State Bar No. 143459
Supervising Deputy Attorney General
LAURA J. ZUCKERMAN, State Bar No. 161896
THOMAS G. HELLER, State Bar No. 162561
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  Oakland, CA 94612
  Telephone: (510) 622-2174
  Fax: (510) 622-2270
  E-mail: Laura.Zuckerman@doj.ca.gov
*Attorneys for Plaintiffs California
Department of Toxic Substances Control and Toxic
Substances Control Account*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,**<br><br>Plaintiffs,<br><br>v.<br><br>**JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; WEST COAST WOOD PRESERVING, LLC., a Nevada limited liability company; and COLLINS & AIKMAN PRODUCTS, LLC, a Delaware limited liability company,**<br><br>Defendants. | 2:14-cv-00595-WBS-EFB<br><br>**DECLARATION OF PETER MACNICHOLL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT WEST COAST WOOD PRESERVING, LLC**<br><br>Date: March 9, 2015<br>Time: 2:00 p.m.<br>Place: Courtroom 5, 14th Floor<br>      501 I Street<br>      Sacramento, CA 95814<br>Trial: January 4, 2017<br><br>Action Filed: March 3, 2014 |
| **AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS** | |

1

DECL. OF PETER MACNICHOLL IN SUPPORT OF PLFS.' OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT BY DEF. WEST COAST WOOD PRESERVING, LLC (2:14-cv-00595-WBS-EFB)

I, Peter MacNicholl, declare:

1. I am employed by the California Department of Toxic Substances Control ("DTSC") as a Hazardous Substances Engineer. Since June 30, 2001, I have been working in DTSC's Brownfields and Environmental Restoration Program, formerly referred to as the Site Mitigation Program. I have personal knowledge of the facts stated herein, and, if called to do so, could and would testify competently thereto.

2. My current unit, the National Priorities List Unit, conducts and oversees response actions at the former Wickes Industries Site, located at the intersection of A Street and Holdener Road in the unincorporated community of Elmira, Solano County, California ("the Site"). I am DTSC's Project Manager for the Site.

3. I have been actively involved with the Site since approximately March 2010 and I am familiar with the Site's history. The Site is a former wood treatment and preserving facility where past operations have contaminated the soil and groundwater with arsenic, chromium, and copper. From the 1980s until 2005, consultants for Collins & Aikman Products Co. ("C&A Products") or its predecessors took actions to address this contamination. In 2005, C&A Products stopped taking those actions, and since that time, DTSC and its contractors have taken actions to assess the Site and address the contamination. I am familiar with cleanup actions undertaken at the Site since the 1980s.

4. I am knowledgeable about DTSC's work at the Site. I have visited the Site on many occasions and have participated in, among other things, Site inspections, groundwater sampling oversight, preparation of the Removal Action Workplan ("RAW") in 2010, and implementation and oversight of the soil excavation activity in 2011 described in the RAW. I have obtained and reviewed historical documents concerning the Site from the files of the California Regional Water Control Board, Central Valley Region ("Regional Board") and DTSC's files. As the Project Manager for the Site, I have also managed contracts and the staff of environmental engineering firms who have worked at the Site on behalf of DTSC. In addition, I certified the Administrative Record of documents from DTSC's files concerning the response actions taken at the Site.

5.      Attached as Exhibit 1 is a true and correct copy of a Regional Board file memorandum, dated February 28, 1974, that is included in DTSC's files for the Site.

6.      Attached as Exhibit 2 is a true and correct copy of a Regional Board memorandum, dated March 1, 1978, that is included in DTSC's files for the Site.

7.      Attached as Exhibit 3 is a true and correct copy of a Regional Board staff report for Pacific Wood Preserving Corporation, Elmira, Solano County, undated, that is included in DTSC's files for the Site.

8.      Attached as Exhibit 4 is a true and correct copy of a Regional Board memorandum, dated January 29, 1979, that is included in DTSC's files for the Site.

9.      Attached as Exhibit 5 is a true and correct copy of a website page for The Pacific Wood Preserving Companies that I accessed and printed on June 14, 2010.  At the time, the website for the companies was www.pacificwood.com.

10.      Attached as Exhibit 6 is a true and correct copy of another website page for The Pacific Wood Companies that I accessed and printed on June 14, 2010.

11.      Attached as Exhibit 7 is a true and correct copy of an Information Report from the Solano County Sheriff's Department to the Regional Board, dated December 24, 1979, that is included in DTSC's files for the Site.

12.      Attached as Exhibit 8 is a true and correct copy of a Regional Board memorandum, dated December 10, 1980, that is included in DTSC's files for the Site.

13.      Attached as Exhibit 9 is a true and correct copy of an additional Regional Board memorandum, dated December 10, 1980, that is included in DTSC's files for the Site.

14.      Attached as Exhibit 10 is a true and correct copy of a letter from Robert Hedges, Dewante and Stowall, to Steve Debuskey, The Wickes Corporation, dated June 25, 1981, that is included in DTSC's files for the Site.

15.      Attached as Exhibit 11 is a true and correct copy of a letter from Steve Debuskey, Wickes Forest Industries, to Greg Walker, Regional Board, dated September 28, 1981, that is included in DTSC's files for the Site.

16.      Attached as Exhibit 12 is a true and correct copy of a letter from James Tjosvold,

3

DECL. OF PETER MACNICHOLL IN SUPPORT OF PLFS.' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEF. WEST COAST WOOD PRESERVING, LLC (2:14-cv-00595-WBS-EFB)

DTSC, to Donald Vagstad, Wickes Companies, Inc., dated January 17, 1992, that is included in DTSC's files for the Site.

17. Attached as Exhibit 13 is a true and correct copy of a letter from David van Over to Chief, Northern California – Central Cleanup Branch, DTSC, dated February 14, 2011, that is included in DTSC's files for the Site

18. Attached as Exhibit 14 is a true and correct copy of an Invoice Balance Report for the Site from DTSC's Cost Recovery Billing System, dated September 25, 2013.  The Invoice Balance Report is a DTSC accounting record of the amounts and dates of unpaid DTSC costs concerning the Site.

19. Attached as Exhibit 15 is a true and correct copy of a check that DTSC received from the Collins & Aikman Litigation Trust Distribution Account, dated October 11, 2012, that is included in DTSC's files for the Site.

20. It was necessary for DTSC to take actions at the Site after C&A Products stopped performing work there in 2005 to prevent an imminent public health hazard.  C&A Products shut down the groundwater treatment system entirely in 2005, and the Site's owners at the time refused to restart it.  The groundwater treatment system had kept contamination from spreading to nearby domestic irrigation wells and further contaminating the drinking water aquifer.  C&A Products also stopped maintaining the asphalt cap on the Site that prevented people from being exposed to contaminated soils, and that prevented those soils from further contaminating surface water and groundwater.

21. The shutdown of the groundwater treatment system created a threat that contaminated groundwater would spread to nearby irrigation wells and the drinking water aquifer. Residents near the Site could have been exposed to contaminated groundwater when those wells were used for irrigation, or if crop or orchard tree roots contacted shallow contaminated groundwater.  The cessation of cap maintenance activities created a threat that the asphalt cap would fail and allow direct human contact with contaminated soil or surface water, or contribute to more groundwater contamination.  Given the Site's proximity to residences and the irrigation wells, DTSC determined that these threats could not be left unabated.  DTSC's actions at the Site

4

since November 2005 have been taken to address these threats to public health and the environment.

22. DTSC initially tried in 2007 and 2008 to resume operating the Wickes/C&A Products remedy that DTSC had approved in 1996. But the groundwater treatment system had already reached a point at which it was evident that it would not clean up the groundwater to remediation goals. Ultimately, the idled groundwater treatment system would require too many repairs to make it cost-effective to restart. But until DTSC discovered the system could not be fixed, DTSC viewed re-starting it as an interim measure to contain the "plume" (i.e. underground area) of groundwater contamination until alternative cleanup approaches could be evaluated.

23. DTSC's actions after November 2005 culminated in the 2010 RAW. The 2010 RAW focused on three major activities: (a) removal of contaminated soil from the former process area on the Site (source area); (b) removal of the abandoned groundwater extraction and treatment system; and (c) groundwater monitoring for at least ten years. The work in the 2010 RAW was intended to reduce contamination migration and focused only on excavating "hot spots," which were areas of concrete debris and soil contamination that remained in the source area.

24. Besides the significant gap in time, the work that DTSC's contractor performed in 2011 under the 2010 RAW was very different from the work performed by contractors for The Wickes Corporation or Collins & Aikman Group, Inc. under the 1983 and 1994 Remedial Action Plans ("RAPs") for the Site, in the following ways:

(a) First, unlike the 1983 and 1994 RAPs, the 2011 work did not construct, install, expand, or continue use of the groundwater extraction and treatment system ("GWETS"). Based on (i) evaluations of the GWETS starting in 2005, which determined that contaminant removal rates were decreasing over time and that it was not addressing contamination from the process area (source area); and (ii) the extensive repairs that would be necessary to make the system operational after C&A Products shut it off, DTSC determined that it was no longer cost-effective to operate the GWETS. Further, although the GWETS had to some extent contained the groundwater contamination emanating from the Site, it did not reduce the contamination coming from the source area. Rather than re-starting or expanding the GWETS, the 2010 RAW called for

5

dismantling and removal of the GWETS equipment and other parts of the system from the Site.

(b)     The other significant difference between the 1983 and 1994 RAPs and the 2010 RAW (and its implementation in 2011) was that it was not until the 2010 RAW that contamination emanating from the source area was specifically targeted. A structure was placed over the source area pursuant to the 1983 RAP and shotcrete (a form of concrete) was placed over it in 1992. However, excavation and removal of contaminated soil from the source area did not occur until implementation in 2011 of the 2010 RAW, because it was not until the 2008 Remedial Investigation Report by DTSC's contractor that the extent of the threat to groundwater from these soils was revealed. Rather than simply containing the spread of ongoing contamination, the goal of the 2011 work was to eliminate a persistent source of the contamination.

25.     Presently, DTSC is monitoring the condition of the asphalt cap, and is conducting groundwater sampling and reporting on a quarterly basis to evaluate contaminant trends and ensure the protection of the public. Continued monitoring of the asphalt cap is necessary to make sure contaminants below the cap are not mobilized by storm water run-off, to prevent discharges to drainage ditches near the Site, and to block direct exposure to contaminated soil. Continued groundwater monitoring and reporting is necessary to make certain that the Site is not causing further groundwater contamination and to ensure that contaminant concentrations at the four off-Site irrigation wells do not exceed drinking water standards.

26.     Continued groundwater monitoring is also necessary to assist with development of a Five-Year Review Report (scheduled to start in Fall 2016) that will evaluate the effectiveness of the 2011 soil removal action conducted pursuant to the 2010 RAW. Until the Five-Year Review process is complete and DTSC receives and evaluates additional groundwater sampling data, DTSC cannot conclude that all Site actions are complete, or that further response actions will not be necessary.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 19th, 2015, at Sacramento, California.

_____
Peter MacNicholl

6