1  Lester O. Brown, Bar No. 160828
   LBrown@perkinscoie.com
2  Thomas M. McMahon, Bar No. 106074
   TMcmahon@perkinscoie.com
3  PERKINS COIE LLP
   1888 Century Park East, Suite 1700
4  Los Angeles, CA 90067-1721
   Telephone: 310.788.9900
5  Facsimile: 310.788.3399

6  Attorneys for Defendant
   West Coast Wood Preserving, LLC
7

8            UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

11  CALIFORNIA DEPARTMENT OF       Case No. 2:14-cv-00595-WBS-EFB
    TOXIC SUBSTANCES CONTROL,
12  et al.,                        **REPLY BRIEF OF DEFENDANT
                                   WEST COAST WOOD PRESERVING,
13            Plaintiffs,          LLC IN SUPPORT OF ITS MOTION
                                   FOR SUMMARY JUDGMENT**
14      v.
                                   [Filed concurrently with Declarations of
15  JIM DOBBAS, INC., et al.,      Lester O. Brown, Elaina Jackson and
                                   Darrel D. Nicholas in Response to
16            Defendants.          Plaintiffs' Request Pursuant to
                                   Fed.R.Civ.P. 56(d)]
17
                                   Date:      March 9, 2015
18                                 Time:      2:00 p.m.
                                   Place:     Courtroom 5, 14th Floor
19                                            501 I Street
                                              Sacramento, CA 95814
20
                                   Trial:     January 4, 2017
21
                                   Action Filed:  March 3, 2014
22  ─────────────────────────
    AND RELATED CROSS-
23  ACTIONS.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..........................................................................1

II.    THE COURT SHOULD NOT DENY OR DEFER THE
       MOTION PURSUANT TO FED. R. CIV. P. 56(D) ....................................2

III.   THE COURT SHOULD ENTER SUMMARY JUDGMENT
       FOR WCWP ON DTSC'S SUCCESSOR LIABILITY
       THEORY ....................................................................................6

       A.    WCWP Has Made A Prima Facie Showing That It Is Not
             The Successor To PWP's CERCLA Liability At The
             Elmira Site ..........................................................................6

       B.    DTSC Has Failed To Establish A Triable Issue Of
             Material Fact On Successor Liability .......................................9

             1.    PWP transferred its "principal assets" to Wickes,
                   not to Bakersfield..........................................................9

             2.    There is no evidence that Bakersfield was the
                   "mere continuation" of PWP .........................................11

                   a.    PWP and Bakersfield had different owners,
                         directors and officers............................................12

                   b.    Bakersfield provided adequate consideration
                         for the use and transfer of the real property in
                         Bakersfield, California .........................................13

             3.    DTSC's speculations about successor liability do
                   not establish a triable issue of material fact...................13

             4.    Equity demands that DTSC not be permitted to
                   prolong this litigation because of any gaps in the
                   evidence ....................................................................14

IV.    THE COURT SHOULD ENTER SUMMARY JUDGMENT
       FOR WCWP ON THE GROUND THAT DTSC'S CERCLA
       CLAIMS ARE BARRED BY THE APPLICABLE STATUTE
       OF LIMITATIONS .....................................................................16

       A.    Whether Environmental Response Costs Are The Result
             Of A Removal Action Or A Remedial Action Is A
             Question Of Law For The Court, Not DTSC...............................16

1
2

**TABLE OF CONTENTS**
**(continued)**

Page

3
4

B.   The Environmental Response Costs At Issue Are The
Result Of A Remedial Action, Not A Removal Action...................... 17

5
6

1.   The costs arose from the failure of a site
remediation plan that had been approved by DTSC
and implemented by Wickes/C&A............................................ 17

7
8

2.   The costs were incurred to perform a traditional
remedial action, i.e., the removal of soils to obtain a
permanent solution.................................................................... 19

9
10

3.   The excavations in 2011 do not constitute an
"imminent and substantial" removal action because
DTSC waited six years to do the work ..................................... 20

11

C.   There Can Be Only One Remedial Action Per Site............................ 21

12
13

D.   DTSC's CERCLA Claims Against WCWP Are Time-
Barred ......................................................................................... 23

14

V.   CONCLUSION ............................................................................................ 24

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................. 13

6

7

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant Inc.*,
  159 F.3d 358 (9th Cir. 1998) ............................................................... 8

8

9

*Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*,
  613 F.3d 910 (9th Cir. 2010) ............................................................. 24

10

11

*Cal. Dep't of Toxic Substances Control v. Hyampom Lumber Co.*,
  903 F. Supp. 1389 (E.D. Cal. 1995) ......................................... 16, 19, 22

12

13

*Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*,
  358 F.3d 661 (9th Cir. 2004) ........................................................ 19, 23

14

15

*Cal. Dep't of Toxic Substances v. Alco Pac.*,
  308 F. Supp. 2d 1124 (C.D. Cal. 2004) .............................................. 21

16

17

*California v. Celtor Chem. Corp.*,
  901 F. Supp. 1481 (N.D. Cal. 1995) ................................................... 21

18

19

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
  287 F. Supp. 2d 1118 (C.D. Cal. 2003) .............................................. 16

20

21

*City of Moses Lake v. United States*,
  416 F. Supp. 2d 1015 (E.D. Wash. 2005) ..................................... 20, 21

22

23

*Colorado v. Sunoco*,
  337 F.3d 1233 (10th Cir. 2003) .................................................... 20, 21

24

25

*Douglas Autotech Corp. v. The Scott Fetzer Co.*,
  No. 1:07-CV-1062, 2008 WL 205217 (W.D. Mich. Jan. 23, 2008) ................. 22

26

*Family Home & Fin. Ctr. Inc. v. Fed. Home Loan Mortg. Corp.*,
  525 F.3d 822 (9th Cir. 2008) ........................................................ 4, 5

27

28

-iii-

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

*Ferguson v. Arcata Redwood Co., LLC*,

4

    2004 WL2600471 (N.D. Cal. 2004)................................................................. 3, 12

5

*Ferguson v. Arcata Redwood Co., LLC*,

6

    2004 WL2600471 (N.D. Cal. 2008)................................................................. 12

7

*Frey v. EPA*,

8

    403 F.3d 828 (7th Cir. 2005) ......................................................................... 20

9

*Galen v. County of Los Angeles*,

    477 F.3d 652 (9th Cir. 2007) ......................................................................... 14

10

*Geraghty & Miller, Inc. v. Conoco, Inc.*,

11

    234 F.3d 917 (5th Cir. 2000) ......................................................................... 19

12

*Grand Labs Inc. v. MidCon Labs of Iowa*,

13

    32 F.3d (8th Cir. 1994) ................................................................................... 7

14

*Greany v. W. Farm Bureau Life Ins. Co.*,

15

    973 F.2d 812 (9th Cir. 1982) ......................................................................... 15

16

*Martinez v. Columbia Sportswear USA Corp.*,

17

    553 Fed. Appx. 760 (9th Cir. 2014) ............................................................... 3

18

*Miller v. Glenn Miller Prods., Inc.*,

19

    454 F.3d 975 (9th Cir. 2006) ......................................................................... 15

20

*Nelson v. Pima Community College*,

    83 F.3d 1075 (9th Cir. 1996) ..................................................................... 13, 14

21

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*,

22

    808 F. Supp. 2d 417 (N.D.N.Y. 2011) ........................................................... 22

23

*New York v. Shore Realty Corp.*,

24

    759 F.2d 1032 (2d Cir. 1985) ......................................................................... 19

25

*Ray v. Alad Corp.*,

26

    19 Cal. 3d 22 (1977)................................................................................... 8, 12

27

*San Diego Unified Port District v. TDY Indus., Inc.*,

28

    No. 03CV1146, 2006 WL 762838 (S.D. Cal. Mar. 15, 2006) ........................... 20

**TABLE OF AUTHORITIES**
**(continued)**

Page

*State of Cal. ex. rel. Cal. Dep't of Toxic Substances Control v. Campbell,*
    138 F.3d 772 (9th Cir. 1998) ................................................................. 3

*United States v. Hagege,*
    437 F. 3d 943 (9th Cir. 2006) ............................................................. 24

*United States v. Manzo,*
    182 F. Supp. 2d 385 (D.N.J. 2000) ...................................................... 22

*United States v. W.R. Grace & Co.,*
    429 F.3d 1224 (9th Cir. 2005) ................................................ 16, 20, 21

*Washington v. United States,*
    930 F. Supp. 474 (W.D. Wash. 1996) ................................................. 12

**STATUTES**

42 U.S.C. § 9601(23) ................................................................................ 19

42 U.S.C. § 9601(24). ............................................................................... 19

42 U.S.C. §9613(g)(2)(B) ......................................................................... 23

**RULES**

Fed. R. Civ. P. 56(d) .........................................................................passim

**OTHER AUTHORITIES**

Schnapf, Lawrence P., *CERCLA and the Substantial Continuity Test: A Unifying Principle for Imposing CERCLA Liability on Asset Purchases*, 4 Envtl. Law (1998) ................................................................. 9

1 **I.     INTRODUCTION.**

2          DTSC's opposition papers illustrate for this Court what WCWP has long

3 known to be true:  there is no evidence suggesting that WCWP is the successor to

4 the CERCLA liability of Pacific Wood Preserving Corporation ("PWP") at the

5 Elmira Site, nor any reasonable basis for believing that such evidence might still

6 come to light.  DTSC's papers also demonstrate that the only disputed issue with

7 regard to the statute of limitations is whether DTSC's post-2005 response costs

8 were in connection with a "remedial" action or a "removal" action.  The State's

9 1983 internal memorandum predicting the remedial action failure which occurred

10 by 2005, followed by DTSC's six-year delay in excavating the impacted area,

11 provide irrefutable proof that the costs at issue arose from a "remedial" action

12 rather than a "removal" action.

13          As an initial matter, DTSC's request for Rule 56(d) relief should be denied

14 because DTSC failed to conduct a reasonable factual investigation *before* filing

15 suit, complete discovery against WCWP *after* filing suit (despite the passage of one

16 year and the granting of two Motion continuances), or provide any reasonable basis

17 for believing that discovery which would defeat the Motion is still available thirty-

18 five years after the relevant events.  The extraordinary burdens that this litigation

19 has already imposed upon WCWP provide an additional reason for this Court to

20 deny Rule 56(d) relief.

21          As to the merits, DTSC has failed to identify any triable issue of fact on its

22 successor liability theory.  No precedent exists for imposing CERCLA successor

23 liability on a company that did not even acquire the environmental site at issue.

24 Indeed, the theory's first requirement is that the successor receive the "principal

25 assets" of the predecessor.  Here, PWP transferred its principal assets, including the

26 Elmira Site, to Wickes for consideration that greatly exceeded the value of a

27 contemporaneous transfer of real property to WCWP's predecessor, Pacific Wood

28 Preserving of Bakersfield, Inc. ("Bakersfield").  DTSC also cannot establish a

1   triable issue on the second requirement of successor liability, *i.e.*, that Bakersfield

2   was a "mere continuation" of PWP.  The two companies had separate locations and

3   different employees.  There was no *identity* of shareholders, directors and officers.

4   Bakersfield also gave adequate consideration for the property it received.

5          Finally, summary judgment should be granted for WCWP on the statute of

6   limitations issue.  No Rule 56(d) request or disputed facts exist here, only the *legal*

7   issue of whether DTSC's post-2005 costs were pursuant to a "remedial" action or a

8   "removal" action.  These costs were clearly an attempt to fix a remedial action that

9   had been proposed, agreed to and performed decades beforehand.  Indeed, a July 8,

10  1983 internal memorandum of the State's Department of Health Services -- which

11  DTSC chose *not* to place in the Administrative Record lodged with this Court --

12  predicted the spread of groundwater contamination as a result of the proposed cap.

13  DTSC disingenuously tries to characterize this spread as an "imminent and

14  substantial danger," which renders its post-2005 response costs part of a "removal"

15  action.  Because DTSC confirmed this spread of groundwater contamination by

16  2005, and did not excavate the impacted soils until 2011, some six years later, it is

17  preposterous for DTSC to claim that its costs were pursuant to an emergency

18  removal action.  This Court has agreed with most Circuit Courts that there can be

19  only one remedial action per site.  Because the six-year statute began to run when

20  ground broke on remedial action decades ago, DTSC's CERCLA claims against

21  WCWP are time-barred.

## II.   THE COURT SHOULD NOT DENY OR DEFER THE MOTION PURSUANT TO FED. R. CIV. P. 56(d).

23         Rule 56(d) of the Federal Rules of Civil Procedure permits the Court to deny

24  or defer a motion for summary judgment, and allow time to obtain declarations or

25  take discovery, if for specified reasons the non-moving party cannot present facts

26  essential to justify its opposition.  Fed. R. Civ. P. 56(d).  "District courts have 'wide

27  latitude in controlling discovery, and [their] rulings will not be overturned in the

absence of a clear abuse of discretion.'"  *State of Cal. ex. rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779-80 (9th Cir. 1998).  In ruling on a Rule 56(d) request, there is no bright-line rule based on the timing of the summary judgment motion, and the district court should consider (i) whether the requesting party had sufficient opportunity to conduct discovery, (ii) whether the requesting party was diligent, (iii) whether the information sought is based on mere speculation, and (iv) whether allowing additional discovery would preclude summary judgment. *Martinez v. Columbia Sportswear USA Corp.*, 553 Fed. Appx. 760 (9th Cir. 2014).

In this case, it is plain that DTSC has not been "diligent."  Indeed, DTSC appears to have commenced this action against WCWP without having the evidence necessary to prove its claims, or any reasonable belief that such evidence could be obtained through investigation or discovery.  DTSC concedes that CERCLA successor liability requires (i) a transfer of the predecessor company's "principal assets" to the alleged successor, and (ii) proof of one or more of the four exceptions to the general rule that even a principal asset sale does *not* establish successor liability.  DTSC's Opposition Brief, "Opp. Br.," at 20-22.  DTSC has identified the one exception upon which it relies as whether the successor company was a "mere continuation" of the predecessor company." *Id*. at 21, ll. 20-25.  This exception requires proof that the successor company had an identity of shareholders and directors with the predecessor company, and that the successor company did not provide adequate consideration for the assets transferred. *Ferguson v. Arcata Redwood Co., LLC*, 2004 WL2600471 at *5 (N.D. Cal. 2004).

The only facts that DTSC appears to have known when it filed its complaint against WCWP were:  (i) WCWP's predecessor, Bakersfield, had a name that was similar to PWP, and (ii) Richard Jackson had been involved in both PWP and Bakersfield.  These facts were patently insufficient to support a claim for successor liability under the applicable case law.  DTSC did request information from WCWP

-3-

1  in 2010 and 2014.  Declaration of Elaina Jackson, "Jackson Dec.," ¶¶ 5-6.  But the
2  information provided did not support DTSC's claims against WCWP.

3       Even if the complaint was properly filed, Rule 56(d) relief should be denied
4  because DTSC has had ample opportunity to conduct discovery.  DTSC filed this
5  action on March 3, 2014.  It has had almost one year to conduct discovery against
6  WCWP, yet only served written discovery requests on WCWP on December 19,
7  2014, after WCWP filed the instant Motion.  WCWP even stipulated to two
8  separate requests from DTSC to extend the hearing date on this Motion, from its
9  original date of January 26, 2015 to the current date of March 9, 2015.  Now, DTSC
10 requests yet another continuation of the Motion hearing, even though there are no
11 outstanding written discovery requests from DTSC to WCWP, and no additional
12 depositions have been scheduled.[1]

13       Moreover, implicit in Rule 56(d) is the notion that the additional information
14 sought, relevant to the issue in dispute on the Motion, *actually exists*.  *Family Home*
15 *& Fin. Ctr. Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir.
16 2008).  But that is not the case here.  Because PWP dissolved and Bakersfield was
17 formed more than thirty-five (35) years ago, relatively few documents and
18 percipient recollections still exist.

19       The Declaration of Laura Zuckerman ("Zuckerman Dec.") identifies the issue
20 as to which discovery is allegedly available, and will be sought by DTSC, as the
21 relationship between PWP and Bakersfield, and in particular, (i) the disposition of
22 PWP's proceeds from the Wickes transaction, (ii) the details of the dissolution of
23 PWP, (iii) the early use and transfer of the real property in Bakersfield California,
24 and (iv) the issuance of stock in Bakersfield to PWP and its subsequent transfer to

25

26 [1]  The fact that WCWP did not object to the proposed trial date of January 4, 2017,
    or to the proposed discovery cut-off date of March 30, 2016, is irrelevant.  The
27 presence of several other potentially responsible parties in this litigation, with
    complex factual issues concerning both their roles and DTSC's clean-up work,
28 accounts for the parties' agreement to these dates.

1  Richard Jackson.  Zuckerman Dec., ¶¶ 14-18.

2         There is no reasonable basis to believe that documents remain to be obtained,

3  and percipient recollections remain to be recorded, with respect to these issues.  As

4  set forth in the Supplemental Declaration of Lester O. Brown served and filed

5  herewith ("Supp. Brown Dec."), WCWP has already produced documents relevant

6  to the issues identified in the Zuckerman Declaration, and in doing so had access to

7  any records still kept by Richard Jackson or his widow.  Supp. Brown Dec., ¶ 3.

8  PWP was dissolved almost thirty-five (35) years ago and therefore no longer

9  maintains any books or records.  *Id*.  WCWP has already sought and produced what

10  few documents were available from third-party sources, including public filings and

11  any documents that may have been kept by some former employees, lawyers, title

12  insurers and financial institutions.  *Id*., ¶ 4.

13         Moreover, the witness likely to have had the most relevant recollections,

14  Richard Jackson, died in 2012.  Jackson Dec., ¶ 2.[2]  Stephen Ryan, who worked at

15  both PWP and Bakersfield, has already given a declaration and been deposed.

16  Supp. Brown Dec., ¶ 6.  With respect to the creation of Bakersfield, there were four

17  individual investors in addition to PWP (which transferred its original shares to

18  Richard Jackson upon its dissolution).  Of these four individuals, WCWP is

19  informed and believes that only Darrel Nicholas is still alive.  *Id*.  As set forth in

20  Mr. Nicholas' Declaration, served and filed herewith ("Nicholas Dec."), Mr.

21  Nicholas has very minimal recollections concerning the issues identified in the

22  Zuckerman Declaration.  Nicholas Dec., ¶¶ 2-6.[3]

23         The Court should also exercise its discretion to deny Rule 56(d) relief

24  _____

25  [2]  Despite sending Bakersfield a potentially responsible party notice letter in
   September 2010, DTSC made no attempt to interview Mr. Jackson and preserve his
   critical recollections.  Jackson Dec., ¶ 5.  Now he is gone.

26  [3]  Although Richard Jackson's first wife, Joan Jackson, signed some PWP
   documents, she was not involved in the day-to-day business and has no

27  understandings or recollections about them.  *Id*.  PWP's secretary, Marjorie Moore,
   is either deceased or unlikely to provide any relevant information due to her age

28  and minimal involvement.  *Id*.

1  because of the horrendous burden this litigation has already imposed upon WCWP.

2  WCWP is a small wood treating company that provides job in the Bakersfield area.

3  Jackson Dec., ¶ 9.  WCWP has already paid several hundred thousand dollars in

4  legal fees to defend itself against DTSC's meritless claims.  *Id*.  A Rule 56(d) delay

5  would only increase this terrible hardship and could bankrupt the company.  *Id.*  In

6  addition, a specific prospective purchaser of WCWP's Bakersfield operations will

7  not consummate a transaction while this litigation remains pending against WCWP.

8  *Id.*, ¶ 10.  The Court should not permit any further harm to WCWP, and should

9  deny Rule 56(d) relief.[4]

10  **III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR**
11  **WCWP ON DTSC'S SUCCESSOR LIABILITY THEORY.**

12     **A.   WCWP Has Made A *Prima Facie* Showing That It Is Not The**
    **Successor To PWP's CERCLA Liability At The Elmira Site.**

13        WCWP made a conclusive showing in its opening papers that it is not the

14  successor to any CERCLA liability of PWP at the Elmira Site.  At a bare minimum,

15  as the party moving for summary judgment, WCWP has presented a *prima facie*

16  case that no such liability exists.

17        First, WCWP established that any environmental liability that PWP had at

18  the Elmira Site no longer exists.  DTSC's predecessor, the Regional Water Quality

19  Control Board ("Regional Board"), demanded action from PWP in response to

20  environmental conditions at the Elmira Site, and PWP's contractor performed the

21  required work in 1979.  UF 12-15.  The Regional Board confirmed on November

22  19, 1979 that PWP had satisfactorily completed the required work.  UF 16.

23  Moreover, PWP dissolved in 1980.  UF 17.[5]  Thus, any environmental liability that

24

25  _____
   [4] The unavailability of evidence and the burden on WCWP apply with equal force
   to the joinder of Defendant Jim Dobbas, Inc. ("Dobbas") in DTSC's Rule 56(d)
26  request.  Dobbas' counsel attended the Ryan deposition and has had the same
   information available to it as DTSC.
27  [5]  DTSC misleadingly argues that PWP's dissolution was completed in 1979.  Opp.
   Br. at 18, ll. 20-21.  In fact, the certificate of dissolution was only *prepared* in 1979.
28  It was not *filed* until September 11, 1980.  RJN, Ex. H at 86.

1    PWP might still have had, *arguendo*, after the Regional Board confirmed that the

2    required work was completed, ceased to exist when PWP dissolved.  DTSC

3    obtained a default against PWP and has the right to pursue any remaining assets.

4         Second, WCWP has proven that the "principal assets" of PWP were

5    transferred to Wickes, not Bakersfield.  Thus, DTSC cannot establish this

6    prerequisite to successor liability.  *Grand Labs Inc. v. MidCon Labs of Iowa*, 32

7    F.3d, 1277, 1281, n. 5 (8th Cir. 1994).  Between 1979 and 1980, PWP was closing

8    its operations, transferring its assets and dissolving its corporate existence.

9    According to DTSC, Wickes's consideration for its acquisition of the Elmira Site

10   and its related operations totaled $974,276 in direct payments *and* assumptions of

11   debt.  DTSC's Memorandum in Opposition to the Motion, "Opp. Br." at 7, fn. 2.

12        The only transfer of an asset from PWP to Bakersfield was the real property

13   located in Bakersfield.  PWP had purchased this property in 1978 with a loan of

14   $177,500.  RJN, Ex. J.  The consideration that Bakersfield paid to use and obtain

15   this real property from PWP consisted of taking out a secured loan on

16   September 19, 1980 (RJN, Ex. L) to pay the final one-third installment due on

17   PWP's note (Ryan Dec., ¶ 24).  PWP had also been issued 1,020 shares of stock in

18   Bakersfield on November 3, 1978 (Supp. Brown Dec. ¶ 8, Ex. A), which

19   constituted additional consideration for the early use and/or transfer of the

20   Bakersfield real property.  The initial value of a share of stock in Bakersfield was

21   $100.  Nicholas Dec., ¶ 3.  Because PWP was issued 1,020 shares, they had a value

22   of $102,000.  The closeness in time between the Wickes transaction and the

23   Bakersfield transactions (1978-1980) establishes that they were two parts of the

24   same event – PWP closing its operations, selling its assets and dissolving its

25   corporate existence.  In that process, Wickes plainly received the vast majority of

26   the assets, not Bakersfield.[6]  Indeed, the Wickes transaction was specifically

27   _____

[6] The asset used by, and ultimately transferred to, Bakersfield was essentially
28   valued at $161,166 (one-third of the $177,500 note, plus $102,000 in stock).

described as a "Bulk Sale" transfer.  Ryan Dec., ¶ 7, Ex. A at 25.  DTSC has utterly failed to establish the first essential requirement of successor liability.

Third, WCWP has shown that the second requirement of successor liability also does not exist, *i.e.*, one of the four exceptions to the general rule that even principal asset sales do *not* establish successor liability.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant Inc.*, 159 F.3d 358, 361-62 (9th Cir. 1998); *Ray*, 19 Cal. 3d at 26 (1977).  DTSC argues only one of these exceptions, *i.e.*, that Bakersfield is supposedly a "mere continuation" of PWP.  Opp. Br. at 21, ll. 20-25. However, WCWP has demonstrated that Bakersfield was not a mere continuation of PWP because (i) it had different shareholders, officers and directors than PWP (Ryan Dec., ¶ 25; Zuckerman Dec., ¶ 8, Ex. 7 at 030-38) [7] and (ii) it provided adequate consideration for the asset which it received (Supp. Brown Dec., ¶ 8, Ex. A; RJN, Ex. L; Ryan Dec., ¶ 24).

Additional undisputed facts confirm that Bakersfield was not a "mere continuation" of PWP.  PWP sold the Elmira Site at issue to a party *other than* the alleged successor.  Ryan Dec., ¶ 7, Ex. A.  No cases cited by the DTSC, nor any case that WCWP has reviewed, has ever imposed CERCLA successor liability on one company, when the environmental site in question was transferred to *another company* through a bulk asset sale.  In addition, PWP operated only in Elmira, California with a particular plant and local employees.  Bakersfield operated only in Bakersfield, California, about 300 miles away, with a different plant and (aside from Stephen Ryan) different employees.  Bakersfield even advertised itself as a "new company."  Ryan Dec. 25, Ex. C.

---

[7]  For example, Darrell Nicholas, Frank Boge, Alejandro Saucedo and Jeffrey Rodgers received a total of 900 shares in Bakersfield.  Supp. Brown Dec., ¶ 8, Ex. A.  The value of each share was $100.  Nicholas Dec., ¶ 3.  Thus, Bakersfield was capitalized with $90,000 not supplied by either PWP or Richard Jackson.

**B.   DTSC Has Failed To Establish A Triable Issue Of Material Fact On Successor Liability.**

     **1.   PWP transferred its "principal assets" to Wickes, not to Bakersfield.**

DTSC tries to rebut WCWP's conclusive showing that the principal assets of PWP were transferred to Wickes, rather than Bakersfield, by arguing that the Wickes transaction took place *before* the Bakersfield transaction.  In other words, because PWP still had some asset(s) in its possession after the Wickes transaction, the transfer of the Bakersfield property constituted a "principal asset" sale to Bakersfield.  Opp. Br. at 20-21.

However, the obvious conclusion to be drawn from the available documents and the Declaration of Stephen Ryan is that both of these transactions were part of the same event, *i.e.*, PWP's decision to cease operations, sell its assets and dissolve its corporate existence in 1979-80.  Because PWP had two types of assets to be transferred to two different interested parties –  (i) the Elmira Site and operations to Wickes, and (ii) the Bakersfield property to Bakersfield – one of these transactions necessarily had to take place somewhat earlier in time then the other.  But that does not mean that this Court should blind itself to the reality of the situation, and assume that these two transactions were totally unrelated events for purposes of successor liability.  Rather, a court should strictly interpret the elements of successor liability "because there is a strong presumption against holding asset purchasers liable for the acts of their predecessor."  Lawrence P. Schnapf, *CERCLA and the Substantial Continuity Test:  A Unifying Principle for Imposing CERCLA Liability on Asset Purchases*, 4 Envtl. Law 435, 444 (1998).

The Purchase Agreement between PWP and Wickes was signed on September 12, 1979 (Ryan Dec., ¶ 7, Ex. A) and PWP did not receive the agreed upon payments until sometime thereafter.  Bakersfield issued the stock to PWP in late 1978 and took out the loan to pay the final installment of PWP's indebtedness

1    in 1980.[8]  All of these events are close enough in time to establish that they were

2    *contemporaneous* asset transfers, and that the "principal" assets of PWP went to

3    Wickes, rather than to Bakersfield.

4         DTSC also tries to prove that there was a "principal asset" sale from PWP to

5    Bakersfield by arguing that the proceeds from the Wickes transaction went to

6    Bakersfield.  But there is no evidence for this assertion.  The Wickes Purchase

7    Agreement states that payments would be made *to PWP* and that the debts of *PWP*

8    would be assumed by Wickes.  Ryan Dec., ¶ 7, Ex. A at 7-8.  This consideration

9    was subsequently received by PWP.  Unfortunately, because DTSC waited until

10   thirty-five years after PWP dissolved to bring its claims, evidence of the exact

11   dates, check numbers and amounts no longer exist.  When PWP dissolved in 1980,

12   as evidenced by the September 11, 1980 certificate (RJN, Ex. H at 86), its assets

13   would have been distributed to Richard Jackson, who was the sole shareholder of

14   PWP.[9]  Unfortunately, due to DTSC's failure to interview him prior to his death in

15   2012, Mr. Jackson's confirming recollection cannot be provided.

16        The only "evidence" that DTSC now offers for the proposition that the

17   Wickes consideration went to Bakersfield is a website page which states that

18   "Pacific Wood Preserving originally started in 1972 in Elmira, California.  The

19   assets were sold in 1978, and with the proceeds from this sale, the Bakersfield

20   facility was started in 1979."  Opp. Br. at 8-9; Declaration of Peter MacNicholl,

21   "MacNicholl Dec.," ¶ 10, Ex. 6 at 29.

22        WCWP objects to any consideration of this promotional website page on the

23   grounds of multiple hearsay and lack of foundation.  There has been no showing as

24

25   ────────────────
     [8]  The September 16, 1981 deed transferring any interest in the Bakersfield property
26   from PWP to Bakersfield appears to be nothing more than a formal confirmation of
     a transfer that had already taken place.  Bakersfield had been operating a wood-
27   treating facility at that property since 1979.  Ryan Dec., ¶ 20.  Bakersfield had
     already provided the stock (1978) and loan (1980) considerations to PWP.
28   [9]  For example, the dissolution of PWP caused its shares in Bakersfield to be
     transferred to Richard Jackson in September 1980.  Supp. Brown Dec., ¶ 8, Ex. A.

1   to who made the quoted statement and what personal knowledge that person had

2   concerning these events.  Indeed, the statement contains several obvious errors,

3   contradicting other evidence relied upon by DTSC.  For example, the statement

4   claims that, PWP of Elmira California sold its assets "*in* 1978."  It is undisputed

5   that PWP sold its assets in Elmira to Wickes *in 1979*.  Ryan Dec., ¶ 7, Ex. A.  In

6   addition, the Bakersfield facility could not have been started "with the proceeds

7   from this sale."  It is undisputed that wood treating operations at the Bakersfield

8   property were already underway in 1979.  Ryan Dec., ¶ 20.  But the Wickes

9   Purchase Agreement was not signed until September 2, 1979 (Ryan Dec., ¶ 7), and

10  Wickes did not make the required payments to PWP until even later.

11          In short, there is no admissible and credible evidence that Wickes paid its

12  consideration to Bakersfield rather than to PWP, or that PWP received the

13  consideration from Wickes and transmitted it directly to Bakersfield.  What

14  happened was that PWP received the Wickes consideration in late 1979 or 1980,

15  PWP was dissolving in 1980, and it distributed its assets (including the Wickes

16  consideration) to Richard Jackson.  Richard Jackson did contribute to Bakersfield

17  through his investment and his work, which may be what the website page was

18  inartfully attempting to suggest.  But this website page certainly does not suggest

19  that PWP transferred its "principal assets" to Bakersfield, rather than to Wickes.

20  Because DTSC has failed to establish a triable issue on the first requirement of

21  successor liability, summary judgment should be entered in WCWP's favor.

22                  **2.     There is no evidence that Bakersfield was the "mere**
                            **continuation" of PWP.**

23

24          To establish the second requirement of successor liability, *i.e.*, an exception

25  to the general rule that even a principal asset sale does not impose successor

26  liability, DTSC argues only that Bakersfield was a "mere continuation" of PWP.

27  Opp. Br. at 21, ll. 20-25.  One company can be considered to be a "mere

28  continuation" of another if, after a transfer of principal assets, there is a continuity

1   of owners and directors, and inadequate consideration was given for the asset

2   transfer. *Ray v. Alad Corp.*, 19 Cal. 3d 22 (1977).

3               a.      **PWP and Bakersfield had different owners, directors
                        and officers.**

4

5       DTSC tries to create a triable issue of fact on whether WCWP was a "mere

6   continuation" of PWP by arguing that Richard Jackson was a shareholder, officer

7   and director in both companies.  However, the test is whether there is "an identity"

8   of such positions, not an overlap of one person.  *See, e.g., Ferguson v. Arcata

    Redwood Co., LLC*, 2004 WL2600471, at *5 (N.D. Cal. 2008); *Washington v.

9   United States*, 930 F. Supp. 474, 478 (W.D. Wash. 1996).  The Court in *Arcata*

10  noted that "Plaintiff must plead facts alleging that only one corporation remained

11  after the transfer of assets and that there is *an identity of stock, stockholders, and

12  directors between the two corporations* in order to assert successor liability under

13  the "mere continuation" exception."  2004 WL2600471 at *5, emphasis added.

14      No such identity of shareholders and directors exists here.  PWP had one

15  shareholder (Everett L. Johnston) who was never a shareholder in Bakersfield.

16  Zuckerman Dec., ¶ 8, Ex. 7 at 031.  Conversely, Bakersfield had several

17  shareholders (*e.g.*, Jeffrey Rodgers, Darrel Nicholas, Frank Boge and Alejandro

18  Saucedo) who were never shareholders in PWP.  *Id.*  Moreover, PWP had directors

19  (*e.g.*, Everett Johnston, Carolyn Johnston and Joan Jackson) who were never

20  directors of Bakersfield.  *Id.* at 035.  Bakersfield had directors (*e.g.*, Jeffrey

21  Rodgers, Darrel Nicholas, Frank Boge, Alejandro Saucedo, Stephen Ryan and Lynn

22  Shurtliff) who were never directors of PWP.  *Id.* at 036-38.  The officers of PWP

23  and Bakersfield were also different.  *Id.* at 032-33 and 033-35.  The only person

24  who was a shareholder, director and officer in both PWP and Bakersfield was

25  Richard Jackson.  *Id.* at 030-38.  However, this fact fails to create a triable issue on

26  the first prong of the "mere continuation" theory.

27

28

WCWP REPLY TO OPPOSITION
2:14-cv-00595-WBS-EFB

1

2

**b.** **Bakersfield provided adequate consideration for the use and transfer of the real property in Bakersfield, California.**

3      DTSC attempts to establish a triable issue of fact on whether adequate

4  consideration was paid for the Bakersfield property by pointing only to the

5  September 19, 1981 deed, which recites no consideration paid or transfer tax owed.

6  Opp. Br. at 22, ll. 8-10; RJN, Ex. M.  However, as noted, this deed merely

7  corrected the record title on the prior use and transfer of this land.  On November 3,

8  1978, PWP received $102,000 worth of Bakersfield stock, and there is no evidence

9  that PWP provided anything other than the Bakersfield property to obtain it.  In

10  1979, Bakersfield began wood treating operations on the property.  In 1980,

11  Bakersfield took over PWP's remaining indebtedness on the property.  Obviously,

12  the 1981 deed was a formal correction of the title – necessary after PWP's

13  September 11, 1980 dissolution – which has no relevance to the consideration

14  Bakersfield previously provided.  The $161,166 value of these transactions

15  constitutes adequate consideration for the use and transfer of the property.

16

**3.** **DTSC's speculations about successor liability do not establish a triable issue of material fact.**

17

18      In response to the Motion, DTSC was required to present specific facts

19  showing a genuine issue for trial.  Instead, DTSC asks this Court to deny the

20  Motion based on mere speculation, thirty-five years after PWP dissolved and

21  Bakersfield was formed, that PWP's "principal assets" were sold to Bakersfield,

22  and that Bakersfield was a "mere continuation" of PWP.  DTSC's position is

23  contrary to law.  "The mere existence of a scintilla of evidence in support of

24  plaintiff's position [is] insufficient," to meet DTSC's burden and cannot prevent

25  entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

26  (1986); *Nelson v. Pima Community College*, 83 F.3d 1075, 1081 (9th Cir. 1996)

27

28

1  (same).[10]

2      **4.    Equity demands that DTSC not be permitted to prolong this litigation because of any gaps in the evidence.**

3

4      WCWP concedes that the best evidence is missing with respect to the

5  successor liability issue.  WCWP wishes it could have presented this Court with a

6  declaration from Richard Jackson confirming the consideration that Bakersfield

7  provided to PWP for the use and transfer of the Bakersfield property, or checks and

8  deposit slips proving that the proceeds from the Wickes  transaction went to PWP,

9  and then to Richard Jackson upon the dissolution of PWP, or letters from a lender

10  or title insurer showing that the 1981 deed from PWP to Bakersfield does not

11  establish a "free" transfer of that land, but merely a correction of the record

12  ownership of that property.

13      Unfortunately, these events occurred over thirty-five years ago before

14  electronic document storage technology was invented.  PWP dissolved in 1980, and

15  it is hardly surprising that few paper records of its transactions and its dissolution

16  can now be reconstructed. [11]  Richard Jackson, who died of pancreatic cancer in

17  2012, can no longer answer the questions DTSC has about the differences between

18  PWP and Bakersfield, although he could have done so if DTSC had bothered to

19  interview him in connection with its 2010 CERCLA notice letter.

20      Clearly, the fault for any imperfection in the evidentiary record of this

21  Motion lies squarely with DTSC.  In 1979, DTSC's predecessor knew all about

22  PWP's operations at the Elmira Site, but certified that it had completed the

23  requested remediation work.  DTSC acted throughout the 1980's and 1990's on the

24  fact that Wickes, and its successor C&A, were the real successors to any

25  _____

[10]  Similarly, while courts will draw all reasonable inferences in the nonmoving party's favor, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson*, 83 F.3d at 1081; *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) ("Bald assertions that genuine issues of material fact exist are insufficient.").

[11]  DTSC's argument that "[m]ore facts *must* exist about PWP's transfers of assets …" (Opp. Br. at 19:8, emphasis added) is not supported by any facts.

1   environmental liability at the Elmira Site.  DTSC suspected that the cap placed at

2   the Elmira Site pursuant to the Wickes remediation plan might not be a permanent

3   solution, but approved it anyway.  Then, after C&A went bankrupt, and after the

4   predicted failure of the cap took place, and after thirty years had passed since PWP

5   dissolved and Bakersfield was formed, DTSC suddenly decided that *WCWP* was

6   the successor of PWP's environmental liability of the Elmira Site after all.  There is

7   no excuse whatsoever for DTSC not having notified Bakersfield about the Elmira

8   Site in the early 1980s, in the mid-1990s, or at the very least, in 2005.  DTSC has

9   forced WCWP through expensive notices, pleadings, discovery and the filing of

10  this summary judgment motion.  DTSC now has the temerity to argue that

11  WCWP's evidence to *disprove* successor liability is not sufficient for an entry of

12  summary judgment, and that this case should just continue, even if it bankrupts

13  WCWP.

14       Equity dictates that this Court not permit DTSC's egregious conduct to

15  succeed.  Bakersfield relied to its detriment on DTSC's failure, for over thirty

16  years, to give notice of any contention that Bakersfield was the successor to PWP's

17  environmental liability at the Elmira Site.  *See e.g., Greany v. W. Farm Bureau Life*

18  *Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1982) (stating the elements of equitable

19  estoppel).  DTSC knew of its argument that Bakersfield was the successor to

20  PWP's environmental liability at the Elmira Site, DTSC intended Bakersfield to

21  rely on DTSC's inaction, Bakersfield was ignorant of DTSC's argument, and

22  Bakersfield relied to its detriment by failing to preserve more documents and

23  testimony that would disprove any such liability.

24       Although generally disfavored in the context of CERCLA claims, the

25  equitable doctrine of laches, *in this particular case*, calls for a bar to DTSC's

26  claims against WCWP.  *See e.g., Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975,

27  997 (9th Cir. 2006) (laches requires "(1) that the opposing party lacked diligence in

28  pursuing its claim, and (2) that prejudice resulted from that lack of diligence.").

1   This Court should put an end to the extraordinary burdens that these ancient

2   and tenuous claims have placed on WCWP, Richard Jackson's widow and her

3   family.  Jackson Dec., ¶¶ 9-10.  The Court should find that no triable issue of fact

4   exists on successor liability and enter summary judgment for WCWP.

5   **IV.   THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR**
    **WCWP ON THE GROUND THAT DTSC'S CERCLA CLAIMS ARE**
6   **BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.**

7   "Leaving the source intact (as Wickes proposes) will both greatly increase

8   the time for cleanup and the potential for further groundwater contamination."[12]

9   **A.   Whether Environmental Response Costs Are The Result Of A**
    **Removal Action Or A Remedial Action Is A Question Of Law For**
10  **The Court, Not DTSC.**

11  In an attempt to obscure the fact that it waited over thirty years to assert its

12  claims against WCWP, DTSC ignores remedial activities implemented under its

13  direction in the 1980s and 1990s and, instead, analyzes only the most recent

14  activities conducted at the Elmira Site.  Based on this incomplete premise, DTSC

15  then erroneously concludes that its post-2005 clean-up efforts are removal actions

16  under CERCLA.  This Court, not DTSC, is charged with determining as a matter of

17  law whether the actions taken at the Elmira Site are characterized as removal

18  actions or remedial actions.  *United States v. W.R. Grace & Co.*, 429 F.3d 1224,

19  1234 (9th Cir. 2005) ("Whether the . . . cleanup activity was a removal action - or,

20  on the other hand, a remedial action in removal action's clothing - is a question of

21  statutory interpretation.").[13]

22

23  [12]  From the State's memorandum dated July 8, 1983, which is not in the
    Administrative Record, proving that DTSC's post-2005 actions were to address a
24  predicted failure in a remediation plan, not to remove the imminent and substantial
    danger from a release.  Supp. Brown Dec. ¶ 9, Ex. B.

25  [13]  *See also, California Dep't of Toxic Substances Control v. Hyampom Lumber
    Co.*, 903 F. Supp. 1389, 1394 (E.D. Cal. 1995) (concluding that the distinction
26  between removal and remedial actions "is one of law and is therefore appropriate
    for resolution on summary judgment); *Carson Harbor Village, Ltd. v. Unocal
27  Corp.*, 287 F. Supp. 2d 1118, 1157 (C.D. Cal. 2003) ("Whether a party's response
    is a removal action or a remedial action is a question of law that can be decided on
28  summary judgment.").

DTSC's Rule 56(d) request has nothing to do with this statute of limitation issue, for the simple reason that all of the relevant cleanup facts are within DTSC's knowledge and control.  There are also no significant disputes as to what are the *facts* of the remediation history, as evidenced by a review of both WCWP's and DTSC's statement of facts.  Only the legal significance of these facts is disputed, which means that the statute of limitations issue is now ripe for summary judgment.

**B.    The Environmental Response Costs At Issue Are The Result Of A Remedial Action, Not A Removal Action.**

**1.    The costs arose from the failure of a site remediation plan that had been approved by DTSC and implemented by Wickes/C&A.**

DTSC has overseen or conducted remedial activities at the Elmira Site since 1983.  Specifically, under DTSC's supervision, Wickes and its corporate successor C&A performed response actions to address contamination at the site pursuant to two Remedial Action Plans ("RAP").

The first RAP was dated September 9, 1983, and was conceptually approved by the Regional Board in September 1983 and again approved pursuant to a Settlement Agreement and Schedule of Compliance in February 1984.  UF 30, 33.  Onsite construction of the remedial actions described in the first RAP began in September 1983.  UF 35.  Pursuant to the 1983 RAP, Wickes constructed a groundwater treatment system that utilized ion-exchange, built a subsurface drainage system, removed contaminated soils in the truck loading pad area, and sealed the lumber drying pad.  UF 30, 35-36.  Wickes successor, C&A, continued work under the 1983 RAP, including expansion of the existing ion-exchange groundwater treatment system and additional capping of contaminated soils.  Brown Dec. ¶ 16, Ex. M at 99.  In 1992, with DTSC's approval, C&A constructed a new electrochemical co-precipitation groundwater treatment system to replace the ion-exchange treatment system.  Brown Dec. ¶ 16, Ex. M at 99.  According to DTSC's settlement with Wickes, the goal of the 1983 RAP was to eliminate all on-

-17-

1    site and off-site groundwater contamination within five to ten years.  UF 34. As

2    quoted in the introduction to this section, DTSC knew in July of 1983 that the

3    proposed cap likely would not stop the further spread of groundwater

4    contamination.  Brown Supp. Dec., ¶ 9, Ex. B.

5        The second RAP was approved on February 25, 1994.  UF 40.  Onsite

6    construction of the remedial action detailed in the second RAP occurred between

7    1993 and 1996.  UF 44-46.  Under the 1994 RAP, C&A graded soil, installed

8    asphalt caps in all areas that were previously unsealed, and recorded a deed

9    restriction for the site.  UF 42.  The 1994 RAP also included a Preliminary

10   Nonbinding Allocation of Financial Responsibility stating that C&A was the

11   responsible party and successor in interest to Wickes, which was the successor in

12   interest to PWP.  UF 43.  DTSC stated the activities implemented under the 1994

13   RAP would "result in a permanent solution to the contamination problem (*e.g.* total

14   removal)."  UF 44.  The second RAP was completed in 1996, and DTSC confirmed

15   that "[t]wo Remedial Action Plans (RAPs) have been completed to address the

16   contamination" and the "Response Action Taken on Site" was a "Final Remedial

17   Action."  UF 45-46.  Unfortunately, DTSC did not require the removal of impacted

18   soil, which the July 1983 memorandum indicated was necessary.

19       In 1997, Jim Dobbas and Continental Rail Co. purchased the Elmira Site

20   from C & A.  Compl., ECF No. 1, p. 6.  C&A continued to operate the groundwater

21   treatment system until late 2005, at which point C&A entered bankruptcy

22   proceedings.  Brown Dec. ¶ 19, Ex. P at 123.  DTSC requested that Jim Dobbas and

23   Continental Rail Co. resume operation and maintenance of the treatment system,

24   but they declined.  At this time, the groundwater treatment system fell into

25   disrepair.  Brown Dec. ¶ 19, Ex. V at 188.  As predicted in the 1980s by DTSC, the

26   cap and groundwater treatment system began to fail.  Supp. Brown Dec. ¶ 9, Ex. B;

27   Brown Dec. ¶ 19, Ex. V at 188.

28       Four years later, in 2009, DTSC commissioned a Removal Action Workplan

("RAW"), which was finalized in July 2010, to address actions required to achieve the same remedial goals stated in the first and second RAPs.  UF 47.  The RAW required groundwater monitoring and additional excavation of contaminated soils and concrete.  UF 47.  The RAW was implemented in 2011, six years after DTSC became aware of the potential for the spread of contamination.  UF 48.  DTSC alleges that it has incurred over $2 million in costs to address contamination caused by the failing cap and groundwater treatment system, which was installed, operated, and maintained pursuant to the 1983 and 1994 RAPs.  UF 30,35-36, 42, 49.

### 2. The costs were incurred to perform a traditional remedial action, *i.e.*, the removal of soils to obtain a permanent solution.

CERCLA's definitions of "removal" and "remedial" are detailed and somewhat overlapping.  42 U.S.C. § 9601(23), (24).  "[R]emoval actions generally are immediate or interim responses, and remedial actions are generally permanent responses."  *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 926 (5th Cir. 2000); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985) ("[R]emedial actions [are] generally long-term or permanent containment or disposal programs and removal efforts [are] typically short-term cleanup arrangements.") (footnote omitted); *Hyampom*, 903 F. Supp. at 1391 (holding that "'removal' actions are short-term, temporary responses to an immediate threat as well as actions taken to assess, monitor, and evaluate a given site, while 'remedial' actions are those measures taken to achieve a permanent solution").

DTSC ignores the earlier 1983 and 1994 RAPs to argue that the work conducted after 2005 is a removal action.  The Court should reject this false distinction.  DTSC concedes that the work conducted pursuant to the first and second RAPs was remedial.  Opp. Br.at 28.  DTSC argues, however, that the work conducted after 2005 was a removal action because "not… all actions taken after the final remedial plan is approved are remedial."  *Id.* (citing *Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 670 (9th Cir. 2004)

1   ("*Neville*")).  While the general rule may be that a removal action may occur after

2   approval of a remedial action plan, it does not apply here.  DTSC's post-2005

3   activities were conducted to achieve the final remedial solution described in the

4   1983 and 1994 RAPs, not in response to an immediate and substantial

5   endangerment to public health.  Indeed, DTSC was aware that the remedial action

6   in the 1980s and 1990s would require ongoing maintenance and eventual repair, as

7   evidenced by its July 1983 memorandum.  Brown Supp. Dec. ¶ 9, Ex. B.

8        As expected, DTSC's post-2005 activities, which included soil excavation

9   and installation of replacement groundwater monitoring wells, were all activities

10  described as part of the permanent solution under the first and second RAPs.

11  Contrary to DTSC's argument, all of its post-2005 actions have been described as

12  remedial activities under CERCLA.[14]  Furthermore, the substantial time DTSC

13  spent and costs DTSC incurred at the Elmira Site post-2005 reflect activities that

14  are much more consistent with a permanent remedial action than with an

15  emergency removal action at a small site like the Elmira Site.  *See United States v.*

16  *W.R. Grace & Co.*, 429 F.3d 1224, 1228 (9th Cir. 2005) (noting that superfund

17  financed removal actions are typically required to be terminated after $2 million has

18  been obligated or 12 months have elapsed); *Colorado v. Sunoco*, 337 F.3d 1233,

19  1240 (10th Cir. 2003) (holding that a removal action generally costs less and takes

20  less time than a remedial action).

21        **3.    The excavations in 2011 do not constitute an "imminent and**
            **substantial" removal action because DTSC waited six years**
22          **to do the work.**

23        DTSC's sole support for its contention that the post-2005 activities were

24

25  [14] *See Frey v. EPA*, 403 F.3d 828, 835 (7th Cir. 2005) (holding that excavation was
    a remedial action because it was consistent with a permanent remedy); *San Diego*
26  *Unified Port District v. TDY Indus., Inc.*, No. 03CV1146, 2006 WL 762838, at *7
    (S.D. Cal. Mar. 15, 2006) (finding that installation of a cap is remedial in nature);
27  *City of Moses Lake v. United States*, 416 F. Supp. 2d 1015, 1021-25 (E.D. Wash.
    2005) (recognizing that an RI/FS may be a remedial action and holding that EPA's
28  proposed plan was a remedial action).

1   removal actions and not remedial actions is its characterization of the risk at the site

2   as an imminent and substantial endangerment to public health and the environment.

3   Opp. Br. at 31-32.   Based on this characterization, DTSC argues that its activities

4   were removal and not remedial actions.  The facts and law belie DTSC's position.

5          DTSC claims that in 2005 it identified "imminent risks that contaminated

6   groundwater would spread to nearby wells and further contaminate the drinking

7   water aquifer."  Opp. Br. at 31.  Despite this "imminent risk," DTSC waited nearly

8   six years before it conducted any soil removal or work on previously installed

9   groundwater treatment facilities.  *Id.*  DTSC's lengthy delay is not typical for

10  removal actions taken to address imminent risks.  *See City of Moses Lake*, 416 F.

11  Supp. 2d at 1024-25 (holding that an EPA RI/FS that took six years to develop was

12  not a removal action because it was not a "rapid action" nor did it address an

13  "urgent situation"); *see also W.R. Grace & Co.*, 429 F.3d at 1228; *Sunoco*, 337 F.3d

14  at 1240.  DTSC's attempts to characterize its activities as removal actions are

15  unpersuasive given DTSC's six-year delay in conducting any activities to address

16  contamination at the site.  As previously noted, the activities ultimately conducted

17  by DTSC are the very same remedial activities required for the permanent remedy

18  under the 1983 and 1994 RAPs, including soil excavation, installation and

19  maintenance of a groundwater treatment system, and ongoing monitoring.

20          **C.     There Can Be Only One Remedial Action Per Site.**

21          With only rare exceptions, there is one removal action and one remedial

22  action at a given site.  *See, e.g., W.R. Grace & Co.*, 429 F.3d at 1231 n.9 (noting

23  that there is a "single response action rather than a patchwork of discrete smaller

24  actions" at a single site); *Sunoco*, 337 F.3d at 1241-42 (10th Cir. 2003) (holding

25  that the cost recovery statute of limitations contemplates only one removal and one

26  remedial action per site); *California v. Celtor Chem. Corp.*, 901 F. Supp. 1481,

27  1487-89 (N.D. Cal. 1995) (holding that a multi-phase cleanup had a single

28  "removal" phase and later a single "remedial action"); *Cal. Dep't of Toxic*

1   *Substances v. Alco Pac.*, 308 F. Supp. 2d 1124, 1131 (C.D. Cal. 2004) (holding that

2   the site at issue had a single removal action with one statute of limitations).  In fact,

3   this Court has already ruled that "[t]here is no authority for the view that each

4   'remedial' activity undertaken a site triggers a new cause of action for the cost

5   recovery of that activity."  *Hyampom*, 903 F. Supp. at 1394.  DTSC offers no

6   reason for the Court to reconsider this prior ruling other than its desire to escape the

7   applicable statute of limitations under CERCLA.

8          DTSC concedes that very few courts have found separate remedial actions,

9   each subject to a separate statute of limitations, at a single geographic facility.  In

10  fact, the only circumstance in which a site may be divided in this manner is where

11  the regulator has separated the site into distinct operable units, with each operable

12  unit governed by separate remedial action plans.  *United States v. Manzo*, 182 F.

13  Supp. 2d 385, 399-405 (D.N.J. 2000) (each operable unit of a single site may have a

14  separate limitations period if the remedial plans for each unit are distinct, with

15  separate RODs and separate remedial action plans).[15]

16         This Court should not countenance DTSC's post-hoc rationalization

17  regarding the alleged geographic distinction between clean-up activities conducted

18  on the Elmira site.  DTSC has never identified operable units for the Elmira Site,

19  nor did it refer to distinct geographic areas of remedial activity.  DTSC only does so

20  now in its opposition brief in an effort to argue against the widely accepted rule that

21  CERCLA contemplates only one removal and one remedial action per site – a rule

22  that this Court has already adopted.  *Hyampom*, 903 F. Supp. at 1394.[16]

23  _____

24  [15] *Cf. New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 511 (N.D.N.Y. 2011) (finding "persuasive those cases in which courts have

25  concluded that regardless of the number of operating units at a site, there can be only one remedial action for any given facility"); *Douglas Autotech Corp. v. The Scott Fetzer Co.*, No. 1:07-CV-1062, 2008 WL 205217, at *6 (W.D. Mich. Jan. 23,

26  2008) (finding that a single statute of limitations applied to the entire site because EPA had not divided the site into separate operable units).

27  [16] Even if the Court were to determine that the site was divided into two distinct geographic units, as DTSC urges, DTSC's claims would still be time-barred

28  because DTSC's post-2005 activities were conducted pursuant to either the first or

**D.   DTSC's CERCLA Claims Against WCWP Are Time-Barred.**

The statute of limitations for a remedial action is triggered by "the initiation of physical on-site construction of the remedial action." 42 U.S.C. §9613(g)(2)(B). The Ninth Circuit has adopted a bright-line rule that "initiation of physical on-site construction of the remedial action can only occur after the final remedial action plan is adopted" and that the statute of limitations only begins to run after the agency with oversight approves the final remedial plan. *Neville*, 358 F.3d at 671.

Here, DTSC approved the first RAP in February 1984, after Wickes had started remedial work in September 1983. Therefore, under *Neville*, the initiation of physical onsite construction of the remedial activity is February 1984. If the Court believes that the second RAP contains the final, permanent solution, the latest potential date that the Court could find for the initiation of physical onsite construction would be February 1994, which is the date that DTSC approved the second RAP. As described above, all work after these dates completed by Wickes, C&A, and the DTSC was conducted pursuant to the final and permanent remedial solution outlined in the RAPs; therefore, CERCLA's six-year statute of limitations applies. 42 U.S.C. §9613(g)(2)(B).

Whether the Court determines that February 1983 or February 1994 was the initiation of physical onsite construction, pursuant to *Neville* DTSC had until February 2000, at the very latest, to file its claims against WCWP. DTSC instead waited over thirty years after work began at the site pursuant to the first RAP and fourteen years beyond the latest possible date to file its claims to bring this case

---

second RAP. In other words, if the Court determines that the first RAP addressed the permanent remedy for one portion of the Elmira Site with the statute of limitations beginning in February 1983, and the second RAP addressed the permanent remedy at a different portion of the site with the statute of limitations beginning in February 1994, DTSC's claims against WCWP that were filed in 2014 would still be time-barred. DTSC's post-2005 activities were conducted to repair the final and permanent remedy at the site. It makes no difference for statute of limitations purposes whether those activities were conducted pursuant to the first or second RAP. Either way, DTSC's claims are untimely.

1   against WCWP.  CERCLA does not permit such abuse of process.  *United States v.*
2   *Hagege*, 437 F. 3d 943, 955 (9th Cir. 2006) (holding that statutes of limitations are
3   to ensure "that the defendant is given the protections of predictability and
4   promptness"); *California Dep't of Toxic Substances Control v. Hearthside*
5   *Residential Corp.*, 613 F.3d 910, 914 (9th Cir. 2010).  Accordingly, all of DTSC's
6   claims against WCWP are time-barred.

7       Finally, DTSC's appeal to this Court based on CERCLA policy to find that
8   the applicable statute of limitations for remedial actions should not apply is
9   unavailing in light of the facts.  Opp. Br. at 31.  DTSC knew in 2005 when C & A
10   filed for bankruptcy that it no longer had a cooperative responsible party to fund the
11   remediation of the Elmira Site.  Nevertheless, DTSC waited another nine years to
12   assert it claims.  The inevitable issues created by this substantial delay were of
13   DTSC's own making.  This Court should not permit DTSC to escape the
14   consequences of its unreasonable delay.

15   **V.   CONCLUSION**

16       Rule 56(d) relief is not warranted in this case.  There is no triable issue of
17   material fact on DTSC's successor liability theory.  Nor is there one on DTSC's
18   failure to bring this action within the applicable statute of limitations.  For each of
19   the foregoing reasons, WCWP requests that the Court enter summary judgment in
20   WCWP's favor on all of DTSC's claims in this action.

21   DATED:  February 27, 2015           Respectfully Submitted,

22                                       **PERKINS COIE LLP**

23

24                                       By:   /s/ Lester O. Brown
25                                             Lester O. Brown

26                                       Attorneys for Defendant
                                         West Coast Wood Preserving, LLC

27

28