Lester O. Brown, Bar No. 160828
LBrown@perkinscoie.com
Thomas M. McMahon, Bar No. 106074
TMcmahon@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA  90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Attorneys for Defendant
West Coast Wood Preserving, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JIM DOBBAS, INC., et al.,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTIONS. | Case No. 2:14-cv-00595-WBS-EFB<br><br>**SUPPLEMENTAL DECLARATION OF LESTER O. BROWN IN RESPONSE TO PLAINTIFFS' REQUEST PURSUANT TO FED. R. CIV. P. 56(d)**<br><br>Date: March 9, 2015<br>Time: 2:00 p.m.<br>Place: Courtroom 5, 14th Floor<br>501 I Street<br>Sacramento, CA 95814<br><br>Trial: January 4, 2017<br><br>Action Filed: March 3, 2014 |

I, Lester O. Brown, declare as follows:

1. I am an attorney licensed to practice in California and admitted before this Court and am a partner of Perkins Coie LLP, counsel of record for Defendant West Coast Wood Preserving, LLC in this action. I submit this Declaration in response to the Declaration of Laura Zuckerman ("Zuckerman Declaration") requesting that the pending Summary Judgment Motion be denied or deferred pursuant to Federal Rule of Civil Procedure 56(d). Other than matters stated upon information and belief, I have personal knowledge of the facts recited herein, and if called as a witness could and would testify competently thereto.

2. In her declaration, Ms. Zuckerman asserts that relevant discovery is available and still remains to be conducted concerning whether WCWP is a mere continuation of Pacific Wood Preserving Corporation ("PWP Corp."), including discovery on (i) the disposition of PWP Corp.'s proceeds from the Wickes transaction, (ii) the details of the dissolution of PWP Corp., (iii) the early use and transfer of the real property in Bakersfield, California and (iv) the issuance of stock in Pacific Wood Preserving of Bakersfield, Inc. ("Bakersfield") to PWP Corp. and its subsequent transfer to Richard Jackson.

3. WCWP has already produced any documents in its possession, custody, or control that would be relevant to these issues. Richard Jackson, who was a shareholder, officer and director in both PWP Corp. and Bakersfield, passed away in 2012. In connection with WCWP's written discovery responses in this action, Richard Jackson's widow, Elaina Jackson, made available to our firm any documents relevant to these issues that were still in her possession, custody and control. Responsive documents have already been produced. Because PWP Corp. has been dissolved for over 35 years, it no longer maintains any books and records.

4. In investigating the facts relevant to DTSC's claims, I have also attempted to obtain relevant documents from third-party sources, including publically available documents and any documents that might have been

1  maintained by former employees, lawyers or financial institutions for PWP Corp. or
2  Bakersfield.  Due to the long passage of time, very few documents were available
3  from these third-party sources, but responsive documents we obtained have already
4  been produced.

5        5.     I am not aware of any reasonably available sources of documents,
6  relevant to the issues identified in the Zuckerman Declaration, which remain to be
7  investigated and produced.

8        6.     In investigating the facts relevant to DTSC's claims, I have also
9  attempted to locate and interview witnesses with percipient knowledge of the issues
10 identified in the Zuckerman Declaration.  As noted, the witness who would have
11 had the most percipient knowledge, Richard Jackson, died in 2012.  Stephen Ryan,
12 who was employed by both PWP Corp. and Bakersfield, has already provided a
13 declaration and has been deposed.  Elaina Jackson was not involved with either the
14 dissolution of PWP Corp. or the creation of Bakersfield.  With respect to four
15 original individual investors in Bakersfield – Jeffery Rodgers, Frank Boge, Darrel
16 Nicholas and Alexander Saucedo – I am informed and believe that only Mr.
17 Nicholas is still alive.  His Declaration is served and filed herewith.  With respect to
18 the Secretary for PWP Corp., Marjorie Moore, I am informed and believe that she is
19 either deceased, or too old and minimally involved in PWP Corp.'s affairs to be
20 able to provide any relevant information.  I am informed and believe that Richard
21 Jackson's first wife, Joan Jackson, has no recollection or understanding of PWP
22 Corp.'s affairs.  I am not aware of any other individual witnesses who have
23 percipient knowledge of the issues set forth in the Zuckerman Declaration.

24       7.     With regard to the DTSC's statement that it will seek to depose a
25 corporate representative of WCWP with respect to the initial establishment of
26 Bakersfield (Opp. Br. at 20, fn. 5), the only knowledgeable witness that WCWP
27 would be able to designate would be Stephen Ryan.  As noted, he has already been
28

1  deposed, after having had an opportunity to review the few WCWP records that
2  remain available, relevant to the issues identified in the Zuckerman Declaration.

3        8.     Attached hereto as Exhibit A is a ledger showing the issuance of stock
4  in Bakersfield.  I was not aware of the existence of this document at the time the
5  Motion was filed.  This document was located, and produced to DTSC on
6  January 15, 2015, as a result of DTSC's document production requests.  Any
7  statement in the opening Motion papers to the effect that Richard Jackson was an
8  original investor in Bakersfield was made upon information and belief, which this
9  ledger now corrects. PWP was an original investor in Bakersfield, and its shares
10 were transferred to Richard Jackson on September 11, 1980.

11       9.     Attached hereto as Exhibit B is an internal memorandum of the State
12 of California Department of Health Services dated July 8, 1983.  This document
13 was produced by DTSC in its initial disclosure in this litigation, as evidenced by the
14 Bates numbers DTSC015171-73.  This document does not appear in the
15 Administrative Record that DTSC lodged with this Court in connection with the
16 Motion.

17     I declare under penalty under the laws of the United States of America that
18 the foregoing is true and correct.

19
20     Executed on this 27th day of February 2015 at Santa Barbara, California.
21
22                              /s/ Lester O. Brown
23                              Lester O. Brown
24
25
26
27
28

# Exhibit A

Stock Transfer Ledger – Pacific Wood Preserving of Bakersfield Inc.

| Cert. No. | Shareholder | Date | From Whom Transferred | Certificates Surrendered | Certificates Issued | Date of Transfer | To Whom Transferred |
|---|---|---|---|---|---|---|---|
| 1 | Frank E. Boge | 11/3/78 | | | No. 1 250 shares | | |
| 2 | Darrel D. Nicholas | 11/3/78 | | | No. 2 250 shares | | |
| 3 | Jeffrey K. Rodgers | 11/3/78 | | | No. 3 150 shares | | |
| 4 | Alejandro R. Saucedo | 11/3/78 | | | No. 4 250 shares | | |
| 5 | Pacific Wood Preserving | 11/3/78 | | | No. 5 1,020 shares | | |
| 6 | Frank E. Boge | 4/15/80 | | No. 1 250 shares | No. 6 25 shares | | |
| 7 | Darrel D. Nicholas | 4/15/80 | | No. 2 250 shares | No. 7 25 shares | | |
| 8 | Jeffrey Rodgers | 4/15/80 | | No. 3 150 shares | No. 8 15 shares | 2/14/84 | Richard Jackson |
| 9 | Alejandro R. Saucedo | 4/15/80 | | No. 4 250 shares | No. 9 25 shares | 2/14/84 | Richard Jackson |
| 10 | Pacific Wood Preserving | 4/15/80 | | No. 5 1,020 shares | No. 10 102 shares | 9/11/80 | Richard Jackson |
| 11 | Steve Ryan | 1/31/86 | | | No. 11 5,350 shares | | PWPB, A. Jackson |
| 12 | Richard Jackson | 1/31/86 | | No. 10 102 shares | No. 12 82,810 shares | | |
| 13 | Frank Boge | 1/31/86 | | No. 6 25 shares | No. 13 5,920 shares | | PWPB, A. Jackson |
| 14 | Darrel D. Nicholas | 1/31/86 | | No. 7 25 shares | No. 14 5,920 shares | | A. Jackson, R. Jackson |
| 15 | Alan Jackson | 1/31/93 | Richard Jackson | | No. 15 7,500 shares | | |
| 16 | Ryan Jackson | 1/31/93 | Richard Jackson | | No. 16 7,500 shares | | |
| 17 | Dean & Donna Beckett | 10/29/99 | | | No. 17 742 shares | 5/28/02 | PWP of Bakersfield |

| Cert. No. | Shareholder | Date | From Whom Transferred | Certificates Surrendered | Certificates Issued | Date of Transfer | To Whom Transferred |
|---|---|---|---|---|---|---|---|
| 18 | Dean & Donna Beckett | 10/29/99 | | | No. 18 9,264 shares | 5/28/02 | PWP of Bakersfield |
| 19 | Dean & Donna Beckett | 10/29/99 | | | No. 19 10,006 shares | 5/28/02 | PWP of Bakersfield |
| 20 | Richard Jackson | 1/31/93 | | No. 12 82,810 shares | No. 20 67,810 shares | | |
| 21 | Alan Jackson | 10/31/98 | Steve Ryan | | No. 21 1,350 shares | | |
| 22 | Alan Jackson | 10/31/98 | Frank Boge | | No. 22 1,920 shares | | |
| 23 | Alan Jackson | 10/31/98 | Darrel Nicholas | | No. 23 1,325 shares | | |
| 24 | Ryan Jackson | 10/31/98 | Darrel Nicholas | | No. 24 4,595 shares | | |
| 25 | Steve Ryan | 5/3/99 | | No. 11 5,350 shares | No. 25 4,000 shares (for collateral purposes only) | 1/01 (return of collateral certificates) | PWP of Bakersfield |
| 26 | Frank Boge | 5/3/99 | | No. 13 5,920 shares | No. 26 4,000 shares (for collateral purposes only) | 1/01 (return of collateral certificates) | PWP of Bakersfield |
| 27 | Richard Jackson | 11/1/01 | | | No. 27 3,946 shares | | |
| 28 | Elaina Jackson | 11/1/01 | | | No. 28 3,946 shares | | |

WCWP000804

# Exhibit B

# Memorandum

To : James M. Pappas, P.E.
Senior Engineer
Permits, Surveillance and
Enforcement Section

Date : July 8, 1983

Subject: Wickes Wood Treating
Plant, Elmira, Solano County

From : Gary Reents
Waste Management Engineer
Permits, Surveillance and
Enforcement Section
Hazardous Waste Management Branch

This memo is in response to three communications from Wickes to the Central Valley Regional Water Quality Control Board (RWQCB) dated May 2, May 19, and June 16, 1983, respectively. The May 2 letter contained the Phase I Soil and Ground Water Sampling Report dated April 28, 1983. The May 19 and June 16 letters contained a proposal for Phase II Ground Water Investigations and a Remedial Action Plan. I have the following comments on each of the three pieces of correspondence:

June 28 Phase I Soil and Ground Water Sampling Report

- In calculating the hydraulic gradient, Woodward-Clyde (Wickes' consultants) uses data collected on two days. This actual data and any associated calculations should be forwarded to us.

  Also, the validity of these results should be assessed by Woodward-Clyde considering major hydrogeological factors such as season of the year, surrounding irrigation, drawdown effects from nearby wells (including the lower aquifer), etc.

- Actual data of monitoring well production rates should be submitted to determine the effectiveness of well production. Details of the well design including grade of sand used as packing material, the size and number of well screen perforations, and any other pertinent data should also be submitted.

- Actual data and calculations used to determine the hydraulic conductivity values on-site should be supplied.

- Regarding Soil Sampling and Analysis:

  a. TTLC values from the California Assessment Manual (CAM) are continually referenced by Woodward-Clyde. Use of TTLC and STLC values for determining contamination impacts is not appropriate. These values are for determining what is or what is not hazardous waste for correct handling, treatment, and disposal. In evaluating contaminated soils and ground water, the routes of exposure and potential health and environmental impacts must be assessed in each case on a site-by-site basis.

James Pappas -2- July 8, 1983

Wickes, Elmira Plant

June 28 Phase I Soil and Ground Water Sampling Report (cont'd.)

- Regarding Soil Sampling and Analysis:

    b. The two areas of greatest contamination, samples B-12 and B-14, were only sampled to 1.5 and 3-foot depths, respectively. Given the fact that high levels of contamination were found on-site as deep as 10 feet, why were no more samples analyzed from borings B-12 and B-14?

    c. There are no samples taken and analyzed to provide background levels for use as a control and to allow comparative analysis of results.

    d. Laboratory methods used for analysis of soil samples should be submitted. Also, data on soil pH and how extractable the metals of concern are should be submitted.

- The conclusion is drawn that the pad area presents no contamination threat based on the contaminant levels found in well E-4. Since well E-4 is down-gradient of only part of the pad and is not down-gradient of the substantial pad contamination at borings B-12 and B-14, this conclusion would appear unwarranted.

- No attempt is made to quantify the vertical movement of water in the shallow aquifer. The slug tests performed will most probably reflect horizontal hydraulic conductivities only. Unless there is a continuous sand lens beneath the site through which nearly all of the shallow ground water is moving, there will probably be some vertical, as well as, horizontal movement.

- There is an obvious difference in the proportion of $Cr^{+3}$ to $Cr^{+6}$ in the soils versus the ground water samples. The probable reasons and/or mechanisms for this difference should be discussed. Potential for conversion of $Cr^{+3}$ to $Cr^{+6}$ should be assessed.

In conclusion, the outstanding aspects still to be assessed on-site are the extent (in area and depth) of soil contamination, the actual relationship of soil contaminants versus ground water contaminants, the areal extent of ground water contamination, and the relationship and continuity of the shallow aquifer (if any) to the deeper aquifer used for domestic and irrigation water.

Remedial Action Plan (Letters of May 19 and June 16)

Wickes proposes to construct a French Drain System to intercept contaminated ground water as it leaves the site, then treat and dispose of the collected waters. Design and operational details regarding the specific collection,

James M. Pappas                     -3-                      July 8, 1983

Wickes, Elmira Plant


Remedial Action Plan (Letters of May 19 and June 16) cont'd.

pumping, treating, and disposal aspects of this system should be submitted to our office for review.

The primary concern I have regarding this proposal is whether or not all contaminated ground water will be intercepted. Based on the comments above regarding the Phase I Report, it is obvious that no data exists to determine the areal extent of contamination, the potential for vertical migration, any continuity of the shallow and deep aquifers, and the depth of shallow ground water. All of these items are vital in assessing the proposed French Drain System's potential for ground water treatment.

Secondly, it is not clear that the contaminated soils already identified on-site are not a continual source of ground water contamination. Leaving the source intact (as Wickes proposes) will both greatly increase the time for cleanup and the potential for further ground water contamination. Additionally, contaminated soil will remain a source for surface water pollution, wind-blown contamination, and direct exposure contact.

Unless Wickes can provide further information and data to assure that the contaminated soils on-site present no potential hazard to public health and the environment or to further ground water contamination, this office should require complete cleanup of all contaminated soils on-site to surrounding background levels, as recommended by our Epidemiological Section.

If any contaminated soils or ground waters were to remain on-site, deed restrictions or other legal actions would have to be considered also.


GAR:st