1  JENNIFER HARTMAN KING (Bar No. 211313)
   NICOLE R. GLEASON (Bar No. 199655)
2  LOUINDA V. LACEY (Bar No. 275888)
   KING WILLIAMS & GLEASON LLP
3  520 Capitol Mall, Suite 750
   Sacramento, CA 95814
4  Telephone:    (916) 379-7530
   Facsimile:    (916) 379-7535
5  jhartmanking@kwgattorneys.com
   ngleason@kwgattorneys.com
6  llacey@kwgattorneys.com

7  Attorneys for Defendant Jim Dobbas, Inc.

8

9                IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11                      SACRAMENTO DIVISION

12  CALIFORNIA DEPARTMENT OF TOXIC        Case No.: 2:14-cv-00595-WBS-EFB
    SUBSTANCES CONTROL and the TOXIC
13  SUBSTANCES CONTROL ACCOUNT,           POINTS AND AUTHORITIES IN
                                          SUPPORT OF MOTION OF
14           Plaintiffs,                  DEFENDANT JIM DOBBAS, INC. FOR
                                          SUMMARY JUDGMENT
15           v.
                                          Date:  April 6, 2015
16  JIM DOBBAS, INC., a California        Time:  2:00 p.m.
    corporation; CONTINENTAL RAIL, INC., a   Place: Courtroom 5, 14th Floor
17  Delaware corporation; DAVID VAN OVER,         Robert T. Matsui United States
    individually; PACIFIC WOOD                   Courthouse
18  PRESERVING, a dissolved California            501 I Street
    corporation; and WEST COAST WOOD             Sacramento, CA 95814
19  PRESERVING, LLC, a Nevada limited
    liability company,
20
             Defendants,
21
    AND RELATED CROSSCLAIMS AND          Action filed: March 3, 2014
22  COUNTERCLAIMS.

23

24

25

26

27

28
    00017266.4        {00017266.4}

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................ 3

    A.  DTSC Directed and Required C&A Products to Implement Remedial Actions at the Site Per the 1983 Remedial Action Plan ("RAP") ............................................. 3

    B.  DTSC Directed and Required C&A Products to Implement Remedial Actions at the Site Per the 1994 RAP ...................................................................................... 4

    C.  DTSC Certified the Remedial Actions Taken by C&A Products at the Site pursuant to the 1983 RAP and the 1994 RAP as Complete in 1996 ......................... 5

    D.  C&A Products Performed Contractually Obligated Operation and Maintenance Requirements from 1997 to 2005 ........................................................................... 6

    E.  When C&A Products Ceased its Operation and Maintenance Obligations in 2005, DTSC Started to Investigate the Effectiveness of the Remedial Actions it Certified in 1996 .................................................................................................. 7

        1.  DTSC's July 2008 Remedial Investigation Report Revealed that Contaminated Soil Left In Place Per the 1983 RAP and the 1994 RAP Presented an Ongoing Threat to the Site's Groundwater ........................................................... 7

        2.  The 2010 Removal Action Workplan Concludes that the Soil Left in Place Per the 1983 RAP and the 1994 RAP Was the Source of the Continued Contamination and Had to be Removed ......................................................... 8

        3.  Based on These Findings, DTSC Ordered Remediation Six Years After C&A Products Ceased its Operation and Maintenance Obligations ..................... 9

    F.  Eighteen Years After DTSC Certified Remediation at the Site as Completed, It Filed This Lawsuit .................................................................................................. 10

III.  SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE ARE NO GENUINE ISSUES AS TO ANY MATERIAL FACT ................................................ 11

IV.  APPLICATION OF THE STATUTE OF LIMITATIONS UNDER CERCLA DEPENDS ON WHETHER AN ACTION WAS "REMEDIAL" OR "REMOVAL" . 12

V.   IT IS UNDISPUTED THIS ACTION IS AN 'INITIAL' LEGAL ACTION AGAINST DOBBAS ............................................................................................................... 13

VI.  DTSC'S RESPONSE ACTIONS AT ISSUE IN THIS LAWSUIT WERE A "REMEDIAL" ACTION ......................................................................................... 13

    A.  The Statutory Interpretation Should be Done in Light of the Plain Language of the Statute and Harmonized With Its Purpose ......................................................... 14

    B.  "Removal" Actions Are Characterized by Time-Sensitive, Temporary Responses to Real, not Hypothetical, Threats of Harm ............................................................ 15

    C.  The Administrative Record Demonstrates that DTSC's Response Actions Were "Remedial," Not "Removal," in Nature ................................................................... 18

VII. THIS COURT HAS ADOPTED THE RULE THAT THERE MAY ONLY BE ONE REMEDIAL ACTION AND ONE REMOVAL ACTION FOR A TIMELY "INITIAL[LEGAL] ACTION" ................................................................................. 23

    A.  The Statute of Limitations Expired Well Before the Filing of This Action, and The Limited Exception Enumerated in Ambroid and Manzo Does Not Apply ................................................................................................................... 24

    B.  Application of the General Rule to Both "Remedial" and "Removal" Actions Comports With Fairness .......................................................................................... 27

00017266.4     {00017266.4}       i

VIII.    THE COURT SHOULD REFUSE TO EXERCISE SUPPLEMENTAL
         JURISDICTION OVER DTSC'S THIRD CLAIM FOR RELIEF ASSERTED
         PURSUANT TO THE HSAA AND, EVEN IF THE COURT WERE TO RETAIN
         JURISDICTION, DTSC'S HSAA CLAIM FAILS AS A MATTER OF LAW ........... 28

IX.      CONCLUSION ............................................................................................. 32

1

## TABLE OF AUTHORITIES

2

*Cases*

3

Adobe Lumber, Inc. v. Hellman
658 F.Supp.2d 1188 (E.D. Cal. 2009)........................................................ 29

4

Advanced Micro Devices, Inc. v. National Semi-Conductor Corp.
38 F.Supp.2d 802 (N.D. Cal. 1999) ........................................................ 22

5

6

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986)........................................................ 11

7

California ex rel. California Department of Toxic Substances Control v. Alco Pacific, Inc.,
308 F.Supp.2d 1124 (E.D. Cal. 2004)........................................ 22, 24, 25, 27

8

9

California ex rel. California Department of Toxic Substances Control v. Hearthside Residential Corp.
613 F.3d 910 (9th Cir. 2010)........................................................ 24

10

11

California ex rel. California Dept. of Toxic Substances Control v. Hyampom Lumber Co.
903 F.Supp. 1389 (E.D. Cal. 1995)........................................ 14, 17, 22, 24, 26

12

California ex rel. California Dept. of Toxic Substances Control v. Neville Chem. Co.
358 F.3d 661 (9th Cir. 2004)........................................ 14, 15, 16

13

14

Carson Harbor Village, Ltd. v. Unocal Corp.
270 F.3d 863 (9th Cir. 2001)........................................ 14, 32

15

Celotex Corp. v. Catrett
477 U.S. 317 (1986)........................................................ 11

16

17

Colorado v. Sunoco, Inc.
337 F.3d 1233 (10th Cir.2003)........................................ 17, 23, 24, 30

18

Depoali v. Carlton
878 F.Supp. 1351 (E.D. Cal. 1995)........................................................ 11

19

20

Fireman's Fund Ins. Co. v. City of Lodi
302 F.3d 928 (9th Cir. 2002)........................................................ 31

21

Galloway v. General Motors Serv. Parts. Operations
78 F.3d 1164 (7th Cir. 1996)........................................................ 15

22

23

Geraghty and Miller, Inc. v. Conoco, Inc.
234 F.3d 917 (5th Cir. 2000)........................................................ 14

24

Kelley v. E.I. DuPont de Nemours & Co.
17 F.3d 836 (6th Cir. 1994)........................................ 14, 23, 27, 30

25

26

Matsushita Elec. Indus Co. v. Zenith Radio Corp.
475 U.S. 574 (1986)........................................................ 11

27

28

McCarthy v. Bronson
 500 U.S. 136 (1991) ............................................................................................. 14

National Railroad Passenger Corp. v. Morgan
 122 S.Ct. 2061 (2002) .......................................................................................... 15

New York State Elec. and Gas Corp. v. FirstEnergy Corp.
 766 F.3d 212 (2nd Cir. 2014) ................................................................... 21, 23, 24

New York v. Next Millenium Realty, LLC
 732 F.3d 117 (2d Cir. 2013) ................................................................................. 21

New York v. Shore Realty Corp.
 759 F.2d 1032 (2d Cir.1985) ................................................................................ 17

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.
 210 F.3d 1099 (9th Cir. 2000) .............................................................................. 11

Perrin v. U.S.
 444 U.S. 37 (1979) ............................................................................................... 14

Public Service Co. of Colorado v. Gates Rubber Co.
 175 F.3d 1177 (10th Cir. 1999) ............................................................................ 17

TRW Inc. v. Andrews
 534 U.S. 19 (2001) ............................................................................................... 25

United States v. Ambroid Co., Inc.
 34 F.Supp.2d 86 (D. Mass. 1999) ............................................................. 24, 25, 26

United States v. Gomez-Rodriguez
 96 F.3d 1262 (9th Cir. 1996) ............................................................................... 14

United States v. Hagege
 437 F.3d 943 (9th Cir. 2006) ............................................................................... 24

United States v. Manzo
 182 F.Supp.2d 385 (D.N.J. 2000) .............................................................. 24, 25, 26

United States v. Navistar Intern. Transp. Corp.
 152 F.3d 702 (7th Cir. 1998) ......................................................... 13, 15, 23, 27, 28

United States v. W.R. Grace & Co.
 429 F.3d 1224 (9th Cir. 2005) ............................. 14, 15, 16, 17, 18, 19, 20, 24

Vine Street LLC v. Borg Warner Corp.
 776 F.3d 312 (5th Cir. 2015) ............................................................................... 14

Yankee Gas Services Co. v. UGI Utilities, Inc.
 616 F.Supp.2d 228 (D. Conn. 2009) .................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Statutes*

Cal. Health & Safety Code

§ 25310 .................................................................................................... 29

§ 25358.3(f) ........................................................................................... 28

§ 25359 .................................................................................................... 32

§ 25359(a) ............................................................................................... 28

§ 25359.2 ........................................................................................... 28, 32

§ 25360.4 ................................................................................................ 30

§ 25360.4(a) ........................................................................................... 30

§ 25363(a) .............................................................................................. 31

§ 25367 .................................................................................................... 32

§ 25367(c) .............................................................................................. 28

28 U.S.C., § 1367(c) .......................................................................... 29

42 U.S.C.

§ 9601 (23) ............................................................................................ 16

§ 9601 (24) ............................................................................................ 16

§ 9613(g)(2) .......................................................................................... 12

§ 9613(g)(2)(A) ........................................................................ 12, 23, 30

§ 9613(g)(2)(B) .................................................................................... 12

*Regulations*

40 C.F.R.

§ 300.415(e) ......................................................................................... 18

§ 300.430 ........................................................................................ 17, 20

*Rules*

Fed. R. Civ. P. 56(a), (c) ................................................................... 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively, "DTSC") filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA") based on the alleged release of hazardous substances into the environment at the real property located at 147 A Street, Elmira, California, usually referred to by DTSC as the "Wickes Forest Industries Site" ("the Site"). Defendant Jim Dobbas, Inc. ("Dobbas") respectfully requests entry of summary judgment on the grounds that (1) DTSC's CERCLA claims for recovery of costs incurred at the Site are time-barred pursuant to the applicable statutes of limitations; and (2) DTSC could not legally have required Dobbas to perform the remedial action that is the subject of its HSAA claim because the statute of limitations on the **one** remedial action allowed at the Site for statute of limitations purposes expired in 1999 and, therefore, no relief is available to DTSC under this claim. There is no genuine issue as to any material fact relating to the foregoing bases for granting judgment against DTSC on its First, Second and Third Claims for Relief against Dobbas, each of these claims fails as a matter of law, and no further discovery would alter this conclusion.

## I.   INTRODUCTION

The outcome of the case turns on whether DTSC can breathe new life into otherwise dead claims to recoup funds DTSC expended when it took a proverbial second bite at the apple to remediate contamination released at the Site in the 1970s and 1980s, after previously having certified the remediation of this contamination as complete in 1996. This Court has ruled that there can be only one removal action and one remedial action per site. While the completion of a removal action triggers the running of the statute of limitations for a removal action, it is the initiation of physical on-site construction of the remedial action that triggers the running of the statute of limitations for a remedial action. Here, because DTSC certified the remediation at the Site as complete in 1996, there can be no question that the six-year statute of limitation for the remedial action at the Site ran and expired many years prior to 2014, when DTSC filed its complaint in this case.

00017266.4          {00017266.4}                1

1        To mask its failure to pursue the parties responsible for the contamination within the

2   statute of limitations, DTSC plays a game of semantics to obscure the true nature of its most

3   recent cleanup activities.  In this regard, DTSC attempts to dress its activities with the phrase

4   "removal action," because acknowledging its true nature as a "remedial action" would drive a

5   nail into its claims' coffin.  The dress, however, does not make the claim.  The Ninth Circuit

6   directs the Court to cut through the semantics to determine whether the activities that DTSC

7   undertook in response to the contamination are, in actuality, a remedial action in removal

8   action's clothing.  This is the precise situation here.

9        Recognizing that the Court will likely come to this conclusion, DTSC asks the Court to

10  disregard its own established precedent and, instead, apply a very narrow exception to the widely

11  applied "one [legal] action" rule.  Notably, this narrow exception has been recognized by only a

12  few courts across the country, and none of those decisions are within the Ninth Circuit.

13  Moreover, if the Court were to consider application of this narrow exception to the general rule,

14  it would have to significantly expand the exception to encompass the undisputed facts involved

15  here.  To do so, the Court would render the statute of limitations a dead letter, because all any

16  party would need to do to revive an expired limitations period is to start activities under the guise

17  of a removal action.  Such a finding is rife with the potential for abuse and would wholly

18  disregard the plain language of the statute.

19       Dobbas is entitled to the protections of predictability and promptness intended by the

20  statute of limitation provisions written into CERCLA.  The HSAA also provides Dobbas with

21  these protections by requiring that any lawsuit to recover costs for the removal and remedial

22  actions at a site shall be brought within three years of the state's certification that the cleanup is

23  complete.  DTSC's 1996 certification of the Site cleanup as complete means that DTSC could

24  not and cannot direct Dobbas to perform the additional remedial action at the Site as requested in

25  2011 (12 years after the statute of limitations had expired for the **one** remedial action allowed at

26  the Site for statute of limitations purposes).

27       Because, as DTSC recently acknowledged in its Opposition to Defendant West Coast

28  Wood Preserving, LLC's Motion for Summary Judgment, there is no dispute as to any relevant

00017266.4      {00017266.4}                    -2-

1   and material facts relating to the foregoing, Dobbas is entitled to a judgment in its favor as a

2   matter of law.   No further discovery would alter this conclusion.   Accordingly, Dobbas

3   respectfully requests that this Court grant summary judgment in Dobbas' favor on DTSC's First,

4   Second and Third Claims for Relief herein.

5                    **II.      FACTUAL BACKGROUND[1]**

6          DTSC has been actively overseeing and performing contamination response actions at the

7   Site for more than thirty years. Defendant Jim Dobbas, Inc.'s Statement of Undisputed Facts in

8   Support of Its Motion for Summary Judgment ("UMF") 1.   The contamination resulted from

9   wood treatment and preservation operations at the Site during the 1970s and early 1980s.  UMF 2.

10  The wood preserving operations at the Site were conducted by Defendant Pacific Wood

11  Preserving ("PWP") from approximately 1972 through on or about September 12, 1979, and by

12  Defendant Collins & Aikman Products, LLC[2] (formerly known as Collins & Aikman Products

13  Co., and the successor by merger The Wickes Corporation) (collectively, "C&A Products") from

14  on or about September 12, 1979, through approximately 1982. UMF 3.  It is undisputed that the

15  contamination at the Site resulted from spills of wood preserving products during PWP's and

16  C&A Products' respective ownership.   UMF 4.   It is also undisputed that there have been no

17  wood preserving or treatment operations at the Site since August 1982.  UMF 5.

18          **A.      DTSC Directed and Required C&A Products to Implement Remedial
                     Actions at the Site Per the 1983 Remedial Action Plan ("RAP")**
19

20          In 1983, C&A Products submitted a RAP for the Site to the Department of Health

21  Services ("DHS") (predecessor to DTSC) for approval.   UMF 6.   The 1983 RAP identified

22  response actions to address the contamination, including soil removal, groundwater extraction and

23  treatment, and installation of an asphalt cap.  UMF 7.  DHS ordered C&A Products, the then-

24  owner of the Site, to implement the response actions that DHS identified and selected in the RAP.

25  _____

26      [1] DTSC has lodged a DVD of the certified Administrative Record concerning the alleged response actions at
    the Site with the Court as Docket No. 103 (Notice of Lodging).  Citations to the Administrative Record are to the
    Bates numbers that appear as "ADMIN[number]" on the bottom right of the cited page, excluding leading zeros.
27      [2] Collins & Aikman Products, LLC, a cancelled Delaware limited liability company, was formerly known as
    Collins & Aikman Products Co. and was the successor by merger to The Wickes Corporation.  For ease of reference,
28  the term "C&A Products" refers collectively to all of the foregoing entities.

00017266.4          {00017266.4}                      -3-

1   UMF 8.  The 1983 RAP required C&A Products to, *inter alia*, construct a groundwater "treatment

2   plant utilizing an ion-exchange system," construct a subsurface drainage system, remove soil in

3   the truck loading pad area, and cap the drying pad area with asphalt, instead of removing

4   contaminated soils.  UMF 9.

5        In February 1984, C&A Products, DTSC, and the Regional Water Quality Control Board

6   ("Regional Board") entered into a Settlement Agreement and Schedule of Compliance regarding

7   C&A Products' disposal of hazardous substances at the Site.  UMF 10.  Pursuant to this

8   settlement agreement, DTSC formally approved the "stormwater management, the ground water

9   treatment and contaminated soils removal and containment elements" of the 1983 RAP.  UMF 11.

10  The settlement stated that the goals of the 1983 RAP included the elimination of all groundwater

11  contamination (both on- and off-site) in five to ten years.  UMF 12.

12       C&A Products commenced the physical on-site construction of the work identified in the

13  1983 RAP in the fall of 1983, including but not limited to the asphalt paving of the drying pad

14  area.  UMF 13.  C&A Products also constructed the groundwater extraction and ion-exchange

15  treatment system, which began operation in April 1984.  UMF 14.  Response actions continued at

16  the Site for many years after the adoption of the 1983 RAP, including C&A Products' 1987

17  expansion of the groundwater treatment system.  UMF 15.  In 1992, C&A Products poured

18  concrete over the dirt floor inside the building over the former process area to prevent possible

19  direct contact with the contamination.  UMF 16.  In July 1992, and with the approval of DTSC

20  and the Regional Board, C&A Products began construction on an electrochemical co-

21  precipitation treatment system to replace the ion-exchange groundwater treatment system.  UMF

22  17.  DTSC also advised C&A Products to prepare another RAP in 1992.  UMF 18.

23       **B.    DTSC Directed and Required C&A Products to Implement Remedial
            Actions at the Site Per the 1994 RAP.**
24

25       On February 5, 1992, DTSC and C&A Products entered into an Enforceable Agreement

26  requiring C&A Products to propose a new RAP for the Site.  UMF 19.  On February 25, 1994,

27  C&A Products proposed the new RAP which concentrated on soil contamination in the northern

28  portion of the Site (the "1994 RAP").  UMF 20.  DTSC's official and published Executive

00017266.4        {00017266.4}              -4-

1   Summary in the 1994 RAP described it as a "Final Remedial Action Plan." UMF 21. The 1994

2   RAP called for, *inter alia*, the grading of soil and the installation of an asphalt cap in all areas of

3   the Site that were not previously sealed, and the recording of a deed restriction. UMF 22.

4        The "Final RAP Checklist" states that the response activities associated with the 1994

5   RAP would "result in a permanent solution to the contamination problem (*e.g.* total removal)."

6   UMF 23. The Final RAP also provided for ongoing monitoring of groundwater. UMF 24.

7        **C.    DTSC Certified the Remedial Actions Taken by C&A Products at the
           Site pursuant to the 1983 RAP and the 1994 RAP as Complete in 1996**
8

9        After several years of implementation of the 1983 RAP and 1994 RAP requirements by

10  C&A Products and DTSC, DTSC issued a Certification of Remedial Action for the Site in March

11  1996 ("Certification"), which "certifie[d] implementation of the final remedial actions" at the

12  Site. UMF 25. The Certification contains a "Remedial Action Certification Form," which

13  identifies, in pertinent part the following "Dates of Remedial Action": (1) groundwater

14  extraction and treatment was December 1983; and (2) soil removal, asphalt cap and expanded

15  groundwater extraction and treatment in October 1994. UMF 26. The "Remedial Action

16  Certification Form," also contains the following "Brief Description and History of the Site":

17       Pacific Wood Preserving operated the wood treatment site until September 1979,
         when Wickes purchased the Site. Wickes operated the site until August 1982. During the
18       operation period lumber was treated with preservative solutions containing arsenic, chromium,
         and copper. Investigations have shown that the Site soils have been contaminated by these
19       inorganic metals. Groundwater beneath the Site and beneath adjacent properties has also been
         affected by chromium. Two Remedial Actions Plans (RAPs) have been completed to address
20       the contamination. The September 9, 1983, RAP was prepared for the soil contamination,
         storm water control, and groundwater treatment in the southern portion of the Site, and the soil
21       contamination in the northern portion was addressed in the February 25, 1994 RAP. The
         RAPs identify that contaminated soils in the northern and southern areas shall be remediated
22       by asphalt capping; storm water to be captured and routed off-site; and affected
         groundwater to be extracted and treated with an on-site electrochemical co-precipitation
23       treatment system. The RAPs also set forth the chemicals to be remediated, remediation
         levels, requirements for monitoring capture zones, and reporting requirements.
24

25       UMF 27.

26  / / /

27  / / /

28  / / /

00017266.4        {00017266.4}                    -5-

In its Certification, DTSC confirmed that, among other things:

1. "Two Remedial Actions Plans (RAPs) have been completed to address the contamination";

2. The "Response Action Taken on Site" was a "Final Remedial Action";

3. The remedial action taken at the Site between 1983 and 1996 consisted of soil excavation and off-site disposal, an asphalt cap, groundwater extraction and treatment in an on-site chemical treatment plant, and a deed restriction;

4. C&A Products spent approximately $5.5 million in response costs associated with the 1994 RAP; and

5. **"DTSC has determined that all appropriate removal/remedial actions have been completed** and that all acceptable engineering practices were implemented."

UMF 28 (bold added).

**D.      C&A Products Performed Contractually Obligated Operation and Maintenance Requirements from 1997 to 2005**

In April 1997, after DTSC certified that "all appropriate removal/remedial actions" had already been completed at the Site, Dobbas and Continental Rail, Inc. ("CRI") purchased the Site from C&A Products. UMF 25, 26, 29. There were no wood preserving or treatment operations during Defendant Jim Dobbas, Inc.'s ownership of the Site, and Dobbas did not contribute to the release or threatened release of hazardous substances at the Site. UMF 30-31.

Following the Certification and through 2005, C&A Products performed various actions required in its operation and maintenance agreement with DTSC. UMF 32. In 2001, C&A Products' five-year review of the cleanup found that while the groundwater treatment system had controlled contaminant migration, it was "unlikely…that groundwater extraction [would] achieve [allowed Maximum Contaminant Levels] in all wells." UMF 33. In response, C&A Products' consultant considered "the potential application of an in-situ [i.e. in-place] remediation approach to enhance the existing remedy" and several possible remedy modifications and enhancements between 2002 and early 2005. UMF 34.

1    **E.    When C&A Products Ceased its Operation and Maintenance Obligations in 2005, DTSC Started to Investigate the Effectiveness of the Remedial Actions it Certified in 1996**

2

3    After C&A Products declared bankruptcy in 2005 and "stopped operating the groundwater

4    extraction and treatment system, and stopped taking other action," DTSC demanded that Dobbas

5    and others perform various activities relating to C&A Products' contractual obligations. UMF 35.

6    In a letter dated November 13, 2006, DTSC determined that the Site "may present an imminent

7    and substantial endangerment to the public health or welfare or to the environment," and that it

8    had to spend state funds to address this threat ("2006 I/SE Determination"). UMF 36. DTSC

9    stated that "[i]ssuing the [2006 I/SE Determination] w[ould] assist DTSC in hiring a contractor to

10   resume the approved remedial actions for the Site." UMF 37. DTSC's 2006 I/SE Determination

11   was made based on the cessation of C&A Products' operation and maintenance contractual

12   requirements. UMF 38.

13   DTSC has purportedly spent over $2.2 million "to assess and clean up the Site" from

14   November 2005 to September 2013. UMF 39. DTSC describes its "response costs" as "efforts to

15   repair and restart the groundwater extraction and treatment system, completion of a remedial

16   investigation for site soils, preparation of the Removal Action Workplan, implementation of the

17   Removal Action Workplan in October and November 2011, groundwater monitoring, and other

18   tasks." UMF 40.

19   1.   DTSC's July 2008 Remedial Investigation Report Revealed that Contaminated Soil Left In Place Per the 1983 RAP and the 1994 RAP Presented an Ongoing Threat to the Site's Groundwater

20

21   In 2008, DTSC contracted with URS Corporation to investigate the soils at the Site. UMF

22   41. Despite DTSC's prior Certification of the Site and the fact that no further wood treatment and

23   preservation operations occurred after the Certification, the soils and groundwater analysis at the

24   Site revealed continuing contamination. UMF 42. The July 2008 Remedial Investigation Report

25   concludes, however, that the results showed "that the contaminated soil in the former process

26   area" was "an **ongoing** threat to Site groundwater" and recommended "**continued** groundwater

27   sampling as well as one year of monthly groundwater monitoring from shallow wells at the Site

28   to assess seasonal changes in groundwater flow directions and gradients." UMF 43. URS

00017266.4      {00017266.4}                    -7-

1    Corporation also recommended "evaluation of several **remedial** alternatives for areas where

2    arsenic and Cr(VI) impacts were indicated in soil deeper than 2 feet bgs [and that a] detailed cost

3    analysis should be prepared for each alternative, along with an estimate of the **remedial**

4    alternative effectiveness." UMF 44.    URS Corporation recommended the evaluation of three

5    specific "**remedial** alternatives" and a combination of those strategies. UMF 45.

6        At DTSC's direction, URS Corporation then prepared a contingency plan in February

7    2009 to allow for emergency response if the groundwater contamination had spread to nearby

8    domestic irrigation wells.    UMF 46.    Ultimately, however, DTSC did not implement the

9    contingency plan and, instead, instructed URS Corporation to analyze potential remedial

10    alternatives.    UMF 47.    URS Corporation did so and set forth various potential remedial

11    alternatives in its 2010 RAW.

12        2.    The 2010 Removal Action Workplan Concludes that the Soil Left in Place
            Per the 1983 RAP and the 1994 RAP Was the Source of the Continued
13           Contamination and Had to be Removed

14        "In July 2010, the Department finalized a Removal Action Workplan for the Site that

15    called for contaminated soil excavation, off-site disposal, backfilling, confirmation sampling,

16    demolition of the groundwater extraction and treatment system, and long-term groundwater

17    monitoring." UMF 48.    Specifically, according to DTSC, the 2010 RAW "focused on three

18    major activities: (a) removal of contaminated soil from the former process area on the Site

19    (**source** area); (b) removal of the abandoned groundwater extraction and treatment system; and

20    (c) groundwater monitoring for at least ten years." UMF 49.

21        Pursuant to DTSC's direction, the 2010 RAW was "prepared by [URS Corporation] for

22    [DTSC] to address the **remediation** of groundwater contaminated by subsurface metals at the

23    former process area of the [Site]." UMF 50.    "The 2010 Removal Action Workplan primarily

24    concerned soil in the former process area that was a **continuing source** of groundwater

25    contamination." UMF 51.    The soil excavation would remove "areas of concrete debris and soil

26    contamination that **remained** in the **source** area." UMF 52.    "The primary **source** area is

27    contained within an 11,000-square-foot area within the gray metal building that was constructed

28    over the historical process area as part of the **initial remedy**." UMF 53.

00017266.4        {00017266.4}            -8-

1      Due to the "continued contamination," URS Corporation (DTSC's consultant) explained

2  that "environmental **remediation** options must be considered (**i.e., the remedial actions**

3  **evaluated in this workplan**)." UMF 54. In this regard, "[a] screening evaluation was

4  conducted to assess **remedial** technologies and process options for mitigating the impacted soil

5  present at the Site so that the **source** of groundwater impact is eliminated." UMF 55.

6      In the 2010 RAW, URS Corporation analyzed various proposed alternatives in Section 5,

7  explaining that the "NCP requires that **remedial** response actions be screened to eliminate those

8  that do not meet the RAOs, are more difficult to implement, or are much more costly than other

9  alternatives." UMF 56. Therefore, in Section 5.2.3 of the report, "the **remedial** actions

10  presented in Section 5.2.2 are evaluated with respect to effectiveness, implementability, and

11  cost." UMF 57. DTSC approved the 2010 RAW and selected one of the alternatives described

12  therein (excavation). UMF 58.

13          3.    Based on These Findings, DTSC Ordered Remediation Six Years After
                  C&A Products Ceased its Operation and Maintenance Obligations

14

15      Defendants Dobbas and CRI sold the Site to Defendant Van Over on February 11, 2011.

16  UMF 59. On March 16, 2011, DTSC issued an Imminent or Substantial Endangerment

17  Determination Order and Remedial Action Order ("2011 I/SE Order") ordering Defendants

18  Dobbas, CRI, and Van Over to conduct the actions described in the 2010 RAW. UMF 60.

19  Similar to the 2006 I/SE Determination, the 2011 I/SE Order explained that the contaminants "in

20  surface and sub-surface soil on the [Site] are **continuing** to act as a **persistent source** to

21  groundwater contamination and represent a significant threat to human health and the

22  environment." UMF 61. DTSC further stated that "[a]dditional **remedial** actions are necessary

23  at the Site to address the existing soil contamination . . . including contaminated soil removal ...

24  and [to] **remediate** the persistent source of groundwater contamination for both on-site and off-

25  site aquifers." UMF 62.

26  / / /

27  / / /

28  / / /

1       The 2011 I/SE Order also states that:

2       On February 14, 2008, DTSC contracted with URS Corporation to investigate soils in the

3 source area of the Site.  Results of the 2008 URS soil investigation confirmed that elevated levels

4 of arsenic and hexavalent chromium in soil were **continuing to act as a persistent source to**

5 **groundwater contamination**.   In August 2009, URS on behalf of DTSC prepared a draft

6 Removal Action Work Plan (2010 RAW) to **remediate** groundwater at the Site.

7 UMF 63.

8       While DTSC stated there could be "[p]otential routes of exposure at the Site" relating to

9 the contamination from the source area, it fails to identify any specific and/or known routes of

10 exposure.  UMF 64.  Furthermore, in deciding not to implement the 2009 contingency plan,

11 DTSC had already determined that no threat to the nearby irrigation wells existed, that this

12 potential exposure route was not complete, and did not warrant emergency action.  UMF 46-47.

13 The 2011 I/SE Order directs the respondents to "take all necessary steps to implement the 2010

14 RAW and meet its **remedial** action objectives."  UMF 65.

15       In the absence of the respondents' agreement to perform the work, DTSC directed its

16 consultant to implement the selected alternative of the 2010 RAW.  UMF 66.  Following the

17 implementation of the selected alternative, DTSC's consultant filed a Removal Action

18 Completion Plan, in which it states, in part, that "[t]he **remedial excavation** was conducted to the

19 extent practical and resulted in the removal of 514.71 tons of RCRA hazardous concrete material,

20 492.62 tons of RCRA hazardous waste soil, and 1,066.15 tons of non-RCRA, California

21 hazardous waste soil." UMF 67.

22       **F.**    **Eighteen Years After DTSC Certified Remediation at the Site as**
                    **Completed, It Filed This Lawsuit**

23

24       After more than three decades of DTSC's active oversight and eventual performance of

25 the remediation at the Site, all of which involved extreme mismanagement of the remedial

26 activities, DTSC filed the Complaint against Dobbas and others on March 3, 2014, seeking

27 recovery of response costs, declaratory relief, injunctive relief, treble damages, and civil

28 ///

1    penalties.  In response, Dobbas filed an Answer to the Complaint, and a Counterclaim against

2    DTSC.

3        **III.    SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE ARE NO**

4              **GENUINE ISSUES AS TO ANY MATERIAL FACT**

5              Summary judgment is appropriate when there exists no genuine issue as to any material fact

6    and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c);

7    Matsushita Elec. Indus Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Matsushita").  The

8    purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see

9    whether there is a genuine need for trial."  Matsushita, 475 U.S. at 587.  To carry its burden on a

10   request for summary judgment, a defendant must either produce evidence to negate or disprove an

11   essential element of the nonmoving party's case or show that the nonmoving party does not have

12   enough evidence of an essential element of its claim to carry its ultimate burden or persuasion at

13   trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("Celotex"); Nissan Fire & Marine Ins.

14   Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

15             Once a movant's initial burden is met, the burden shifts to the opponent, who must then

16   produce specific facts beyond the pleadings and show the existence of genuine disputes of

17   material fact.  Matsushita, 475 U.S. at 585-587.  The opposing party cannot establish disputed

18   material facts by relying on allegations in the pleadings, but must tender admissible evidence

19   showing the genuineness of the dispute regarding material issues.  Depoali v. Carlton, 878

20   F.Supp. 1351, 1357 (E.D. Cal. 1995).  As to materiality, "[o]nly disputes over facts that might

21   affect the outcome of the suit under the governing law will properly preclude the entry of

22   summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the

23   record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

24   there is no "genuine issue for trial."  Matsushita, 475 U.S. at 586.

25             The summary judgment procedure should not be regarded as a "disfavored procedural

26   shortcut" but should be viewed as an "integral part of the Federal Rules as a whole, which are

27   designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex,

28   477 U.S. at 323-24, 327.  Dobbas is entitled to such a determination here.

00017266.4        {00017266.4}                    -11-

## IV.   APPLICATION OF THE STATUTE OF LIMITATIONS UNDER CERCLA DEPENDS ON WHETHER AN ACTION WAS "REMEDIAL" OR "REMOVAL"

While DTSC inappropriately attempts to use the terms "removal" and "remedial" interchangeably to discuss and identify its "response actions" at the Site since 2005, conflating these terms is DTSC's attempt to convince the Court to allow it to circumvent the applicable statute of limitation.   CERCLA has different statute of limitations provisions for cost recovery based on a "removal" action versus a "remedial" action, and the law distinguishes between "initial" versus "subsequent" legal actions to recover costs, as explained further below.   The distinction between "the remedial action" and "the removal action" for purposes of the statute of limitation applicable to an "initial" action is an important one – the timeliness of a cost recovery claim for the former depends on the **initiation** of certain activities and, for the latter, on the **completion** of the action.

For "the removal action," a party must file a lawsuit to recoup its costs "within 3 years after completion of the removal action." 42 U.S.C., § 9613(g)(2)(A). For "the remedial action," a party must file its lawsuit to recoup its costs "within 6 years after initiation of physical on-site construction of the remedial action." Id. at § 9613(g)(2)(B). The only exception to the recovery of costs for "the removal action" is if "the remedial action is initiated within 3 years after the completion of the removal action," in which case the costs incurred in "the removal action" may be recovered in the cost recovery action brought for "the remedial action." Id.

Of course, Congress also realized that certain clean-up activities could take a significant amount of time and numerous efforts to complete.   To ensure that the government or private parties could recoup further response costs beyond the statute of limitations applicable to "initial [legal] actions," Congress added a separate statute of limitations for a "subsequent [legal] action or actions." In this regard, CERCLA provides that when the government or a private party brings a **timely** "initial" legal action (i.e., lawsuit), "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent [legal] action or actions to recover further response costs or damages." Id. at § 9613(g)(2). By filing a **timely** "initial [legal] action," the government or the private party would extend the statute of limitations

1   because a "subsequent [legal] action or actions . . . for further response costs at the vessel or

2   facility may be maintained at any time during the response action, but must be commenced no

3   later than 3 years after the date of completion of all response action." Id.

4          While the foregoing statutes appear to be relatively straightforward, there has been

5   significant litigation relating to their application due to the ambiguity of the "remedial action"

6   versus "removal action" definitions in CERCLA. Fortunately, as explained further below, several

7   cases provide important guidance on this issue and all of these cases support Dobbas' position

8   that DTSC's post-2005 activities at the Site were part of a "remedial" action, for which the statute

9   of limitations on an "initial [legal] action" had run over two decades prior to DTSC's filing of the

10  pending lawsuit. Consequently, DTSC's first and second claims for relief against Dobbas are

11  time-barred.

12       **V.     IT IS UNDISPUTED THIS ACTION IS AN 'INITIAL' LEGAL ACTION**

13                              **AGAINST DOBBAS**

14         It is undisputed that this lawsuit must be identified as an "initial" legal action rather than

15  a "subsequent" legal action for the statute of limitations analysis, because a "subsequent" legal

16  action is "one brought against the same party or parties against which an 'initial action' to

17  recover such costs has been maintained."[3] United States v. Navistar Intern. Transp. Corp., 152

18  F.3d 702, 710 (7th Cir. 1998) ("Navistar"). Because this is the first and only lawsuit filed by

19  DTSC against Dobbas relating to the Site, this lawsuit can only be considered an "initial" action.

20  Accordingly, the sole issue is whether the "response actions" for which DTSC seeks cost

21  recovery are properly classified as "remedial" or "removal" activities, which in turn determines

22  the applicable statute of limitations.

23       **VI.    DTSC'S RESPONSE ACTIONS AT ISSUE IN THIS LAWSUIT WERE A**

24                            **"REMEDIAL" ACTION**

25         Whether a suit to recover response costs under section 107 is a "removal action" or a

26  "remedial action" is a question of law and statutory interpretation that can be decided on

27          [3] There has been only one other lawsuit relating to the contamination at the Site, which was brought by the
Central Valley Regional Water Quality Control Board against PWP. That action, which involved neither Dobbas nor
28  DTSC, was resolved in late September 1979, when PWP stipulated to a $7,500 judgment against it. UMF 68.

00017266.4          {00017266.4}                     -13-

1   summary judgment. <u>United States v. W.R. Grace & Co.</u>, 429 F.3d 1224, 1234-35 (9th Cir. 2005)

2   ("<u>W.R. Grace</u>") ("Whether the ... cleanup activity was a removal action—or, on the other hand, a

3   remedial action in removal action's clothing—is a question of statutory interpretation" and thus,

4   "a legal issue that we review as a matter of law"); <u>see also</u> <u>Geraghty and Miller, Inc. v. Conoco,</u>

5   <u>Inc.</u>, 234 F.3d 917, 925-26 (5th Cir. 2000) ("<u>Conoco</u>") (classification of an activity as "removal"

6   or "remedial" is "determined as a matter of law") (abrogated as recognized on different grounds

7   in <u>Vine Street LLC v. Borg Warner Corp.</u>, 776 F.3d 312, 317 (5th Cir. 2015)); <u>California ex rel.</u>

8   <u>California Dept. of Toxic Substances Control v. Hyampom Lumber Co.</u>, 903 F.Supp. 1389,

9   1391, 1394 (E.D. Cal. 1995) ("<u>Hyampom</u>") (concluding that the distinction between removal and

10  remedial actions "is one of law and is therefore appropriate for resolution on summary

11  judgment").

12  **A. The Statutory Interpretation Should be Done in Light of the Plain Language**
    **of the Statute and Harmonized With Its Purpose**

13

14      Statutory interpretation begins with the wording of the statute. A basic rule of statutory

15  interpretation is to give the language of the statute its "plain meaning," which is its ordinary,

16  contemporary, and common meaning. See <u>United States v. Gomez-Rodriguez</u>, 96 F.3d 1262,

17  1264 (9th Cir. 1996); <u>Perrin v. U.S.</u>, 444 U.S. 37, 42 (1979). However, "no statutory provision is

18  written in a vacuum." <u>Carson Harbor Village, Ltd. v. Unocal Corp.</u>, 270 F.3d 863, 880 (9th Cir.

19  2001) ("<u>Carson</u>"). CERCLA has been described as a "maze"-like structure requiring

20  examination of the statute as a whole, including its purpose and its various provisions. <u>Id.</u>, citing

21  <u>McCarthy v. Bronson</u>, 500 U.S. 136, 139 (1991) ("In ascertaining the plain meaning of [a]

22  statute, the court must look to the particular statutory language at issue, as well as the language

23  and design of the statute as a whole"); <u>see also</u> <u>California ex rel. California Dept. of Toxic</u>

24  <u>Substances Control v. Neville Chem. Co.</u>, 358 F.3d 661, 663 (9th Cir. 2004) ("<u>Neville</u>").

25      "CERCLA has two overriding objectives—cleaning up hazardous waste, and doing so at

26  the expense of those who created it." <u>Kelley v. E.I. DuPont de Nemours & Co.</u>, 17 F.3d 836, 843

27  (6th Cir. 1994) ("<u>Kelley</u>"). While DTSC argues that the statute of limitations should be construed

28  in the government's favor, such a construction cannot run afoul with the salutary goals of

00017266.4      {00017266.4}                      -14-

1    CERCLA. "Congress had a specific purpose in mind when it added the statute of limitations to

2    CERCLA in 1986." Navistar, 152 F.3d at 707. "By implementing the statute of limitations, it

3    expressed a determination that, in order to achieve timely clean-up of affected sites and to ensure

4    replenishment of the fund, cost recovery actions must commence in a timely fashion." Id.

5    Accordingly, while ambiguities in the statute may be read in favor of the government to avoid

6    frustrating the beneficial purposes of CERCLA in certain circumstances, "Congress has

7    determined that those beneficial purposes are serviced by the timely filing of recovery actions."

8    Id.

9        The Ninth Circuit has acknowledged the need for clarity with respect to CERCLA's

10   statute of limitation provisions as well – "[p]otential plaintiffs need to know when to file suit, and

11   potential defendants would surely prefer clear notice as to when their legal liability, if any,

12   lapses." Neville, 358 F.3d at 663. This comports with the Supreme Court's direction that statute

13   of limitation provisions not be interpreted "in a grudging, hostile fashion," because they "serve

14   the important purpose of encouraging the prompt filing of claims and by doing so of enhancing

15   the likelihood of accurate determinations and removing debilitating uncertainty about legal

16   liabilities." Galloway v. General Motors Serv. Parts. Operations, 78 F.3d 1164, 1165 (7th Cir.

17   1996) (internal citations omitted) (abrogated as recognized on different grounds in National

18   Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061 (2002)).

19       **B.**     **"Removal" Actions Are Characterized by Time-Sensitive, Temporary**
                    **Responses to Real, not Hypothetical, Threats of Harm**
20

21       While the "tangled language of CERCLA hardly lends itself to clear-cut distinctions"

22   between "remedial" and "removal" actions, and Courts have often described trying to distinguish

23   between the definitions as "[a]ttempting to untie the Gordian knot," various Court decisions

24   provide a robust framework for finding that DTSC's post-2005 response actions were, under the

25   law, "remedial." W.R. Grace, 429 F.3d at 1232, 1239.

26       We begin with the language of the statute, which defines "removal" and "remedial"

27   actions as:

28   / / /

00017266.4        {00017266.4}                    -15-

(23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessar[ily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.  The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act ….

(24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.  The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or **excavations**, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.  The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C., §§ 9601(23), (24) (bold added).

While it is clear that, for purposes of "the onset of the limitations period for recovery of remedial action costs under CERCLA," no action can be "remedial" until adoption of a final remedial action plan," there is no such bright-line rule to distinguish between a remedial versus a removal action.  Neville, 358 F.3d at 667, 670.  "Nonetheless, certain overarching attributes emerge with the time-sensitivity of the threat and the significance of the public health threat as key factors underlying removal actions."  W.R. Grace, 429 F.3d at 1232.

The key distinction between these types of actions is the purpose for which the action is undertaken.  The rule of thumb is that remedial actions are "long-term or permanent containment

1    or disposal programs," while removal actions are typically short-term, temporary clean-up

2    responses.   New York v. Shore Realty Corp., 759 F.2d 1032, 1040 (2d Cir.1985); see also

3    Hyampom, 903 F.Supp. at 1391.   In general, "a removal action costs less [than a remedial action],

4    takes less time, and is geared to address an immediate release or threat of release." Colorado v.

5    Sunoco, Inc., 337 F.3d 1233, 1240 (10th Cir.2003) ("Sunoco").   One of the reasons a remedial

6    action is generally more expensive and takes longer to complete is because remedial actions

7    "require[] certain analysis of the costs and effectiveness of the remediation" and other statutory

8    requirements, whereas the regulatory requirements for removal actions provide "substantial

9    flexibility to tailor prompt and effective responses to immediate threats to human health and the

10   environment, are considerably relaxed."   W.R. Grace, 429 F.3d at 1226, 1229 (the agency "is

11   required to consider costs when selecting remedial alternatives whereas 'CERCLA contains no

12   corresponding mandate for removal actions.'"); see also 40 C.F.R., § 300.430 (listing

13   requirements for a selection of remedy includes consideration of effectiveness, permanence, and

14   cost).

15          In Public Service Co. of Colorado v. Gates Rubber Co., 175 F.3d 1177, 1182 (10th Cir.

16   1999) (internal citations and footnote omitted), the Tenth Circuit explained:

17          Generally, a removal action costs less, takes less time, and is geared to address an
            immediate release or threat of release.  In broad contrast, a remedial action seeks
18          to effect a permanent remedy to the release of hazardous substances when there is
            no immediate threat to the public health.  Remedial actions usually cost more and
19          take longer.  Elements of either response action may overlap and semantics often
            obscure the actual nature of the cleanup performed.
20

21          Courts have "stressed the immediacy of a threat in deciding whether a cleanup is a

22   removal action."   W.R. Grace, 429 F.3d at 1244 (collecting cases).   To cut through the semantics,

23   the Ninth Circuit has identified a 2-part analysis to determine whether activities actually qualify

24   as "removal" or "remedial" action: (1) whether the agency's "selection of a removal action was

25   proper"; and (2) "whether the actions actually taken ... to combat the threat are properly

26   categorized as such."   Id. at 1233 (italics in original).   Accordingly, while the Court may give

27   some deference to an agency with regard to its selection of either a "removal action" or a

28

1    "remedial action" in response to contamination, to determine whether the agency's actions

2    comport with the statutory requirements under CERCLA, the Court must determine whether the

3    agency **in fact** performed a "removal action" or a "remedial action" by evaluating and analyzing

4    the actions that the **agency actually took** in responding to the contamination. Id. at 1232-49. For

5    this inquiry, the Court may consider "among other things, the interplay between a removal and

6    remedial action conducted at a single site and whether the action comports with the examples in

7    40 C.F.R. § 300.415(e)." Id. at 1237.

8         C.    **The Administrative Record Demonstrates that DTSC's Response**
               **Actions Were "Remedial," Not "Removal," in Nature**
9

10        Despite the plethora of statements in the administrative record, in which DTSC

11   characterizes its "response actions" as "remedial" (see "Factual Discussion" in Section II E.),

12   DTSC relies on its 2011 I/SE Order to argue that its post-2005 activities were part of a removal

13   action, rather than aremedial action. While an agency's interpretation of the type of action taken

14   may be entitled to some deference, such deference "is not blind." W.R. Grace, 429 F.3d at 1247.

15   "Courts must, as a matter of law, ultimately determine that the [agency's] characterization of a

16   given response action accords with CERCLA." Id.

17        Here, DTSC acknowledges that its 2011 I/SE Order arose from the "abandonment of

18   environmental work at the Site in 2005" and the fact that soil in the former process area of the

19   Site was a continuing source of groundwater contamination. UMF 35, 38, 43, 49. Indeed,

20   DTSC's 2006 I/SE Determination and 2011 I/SE Order are virtually identical with respect to the

21   circumstances giving rise to DTSC's imminent and substantial endangerment determination –

22   C&A Products' 2005 cessation of groundwater extraction and monitoring activities pursuant to

23   the 1994 RAP. However, it took DTSC until 2008 to engage a consultant to evaluate a proposed

24   action plan for addressing the "continuing" contamination, and until 2011 to commence on-site

25   soil excavation in the source area. UMF 41, 69. Indeed, DTSC analyzed whether an emergency

26   threat to nearby irrigation wells existed that would have required urgent action pursuant to the

27   2009 contingency plan but, as no such threat actually existed, DTSC never implemented that

28   contingency plan. Instead, DTSC returned to analyzing various remedial alternatives and

00017266.4        {00017266.4}                    -18-

1   ultimately proceeded with implementing one of the proposed remedies set forth in the 2010

2   RAW.  UMF at 46-47.  Importantly, DTSC performed this remedial work more than two years

3   after it had engaged its consultant (URS Corporation) and approximately five years after cessation

4   of C&A Products' remedial work.  DTSC's lengthy delay in responding to the purported 2005

5   notice that a threat of contamination existed runs wholly counter to the purpose of a "removal

6   action," which is to quickly address time-sensitive actual threats to human health or the

7   environment.

8       In W.R. Grace, the Ninth Circuit explained that "prompt action" is generally a crucial

9   element of removal actions.  W.R. Grace, 429 F.3d at 1244.  Therefore, "removal actions

10  encompass interim, partial time-sensitive responses taken to counter serious threats to public

11  health."  Id. at 1245.  The Court upheld the EPA's interpretation of its actions as "removal" in

12  nature at a site known as "Libby," explaining:

> Crucial to our determination is the documented evidence that, absent immediate
> attention, the airborne toxic particles would continue to pose a substantial threat to
> public health.  To combat this widespread, looming threat, the EPA had no choice
> but to undertake an aggressive removal action of an expansive scope.  The removal
> activities easily fall within the statutory definition of removal.  Notably, the
> definitions for removal and remedial actions consciously include some overlap.
> Because of the nature of the contaminant, some of the measures taken by the EPA
> as part of the removal action might also effect a permanent solution for a particular
> location (e.g., removing exposed piles of vermiculite).  But by no means did the
> removal action fully eliminate the public health threat or amount to a full-blown
> remediation.  According to the EPA's CERCLIS database, the EPA is continuing
> work to ensure that potential or actual human exposures are under control.
> [Citation omitted.]  Although Libby's problems appear far from solved, the EPA is
> making progress.  As envisioned by CERCLA, the EPA plans to effect a
> comprehensive resolution to the asbestos contamination through the pending
> remedial action.

Id. at 1247.

23  The Court explained, however, that its determination was based on circumstances that

24  were "truly extraordinary," and which required immediate action to address "exposure to asbestos

25  particles [that were] being released through documented exposure pathways."  Id. at 1226.  The

26  Ninth Circuit explained the grim reality "that people [were] sick and dying as a result of this

27  continuing exposure."  Id. at 1226-27.  In this case, the **action actually taken** by DTSC (i.e.,

28  source area excavation) in response to the proclaimed "imminent threat" pales in comparison in

00017266.4        {00017266.4}              -19-

1    that it was far too delayed to have been in reaction to any actual "imminent threat" and was taken

2    without any confirmation of a complete human exposure pathway.  Indeed, even a cursory look at

3    the administrative record reveals that DTSC's actions were merely a remedial action cloaked in

4    removal action's clothing.  For example:

5        • The administrative record supporting the 2011 I/SE Order is devoid of identification

6          of any known, actual receptor or exposure pathways.  See e.g., UMF 70 ("the primary

7          receptor for evaluation is the hypothetical resident ('hypothetical' because the Site is

8          not currently residential); UMF 71 ("In January 2009, URS prepared a contingency

9          plan [that] will be implemented **if** DTSC determines groundwater monitoring results

10         indicate an unacceptable threat to human health or the environment."); UMF 72

11         (stating that the "movement of contaminated groundwater from the former process

12         area to the residential area has created the **potential** for those wells to extract and

13         distribute contaminated groundwater," but "these off-property irrigation wells are

14         being monitored, and a contingency plan is in place, to ensure that irrigation-related

15         exposure pathways do not become causes of concern.")  DTSC, however, never

16         implemented the contingency plan, which indicates that the "potential" exposure

17         pathway did not materialize.  UMF 46-47.  In contrast, in W.R. Grace, the Ninth

18         Circuit placed great emphasis on the EPA's documentation of "complete human

19         exposure pathways" to support the need for time-sensitive action.  W.R. Grace, 429

20         F.3d at 1230.

21       • The 2010 RAW details the factors and considerations regarding the effectiveness,

22         permanence, and cost relating to each alternative identified therein.  UMF 73.  The

23         consideration of these factors indicates selection of a remedy rather than identification

24         of a removal action.  See W.R. Grace, 429 F.3d at 1226, 1229; see also 40 C.F.R., §

25         300.430.

26         In addition, DTSC's activities to resume operation of the existing groundwater extraction

27    and treatment system were clearly an effort to continue implementation of the 1994 RAP, which

28    was a remedial action.   Moreover, and in addition to DTSC's own nomenclature, its

00017266.4         {00017266.4}              -20-

1   acknowledgement that its "response actions" were taken to remediate the "source" of the

2   contamination demonstrates that its actions were "remedial" in nature.  UMF 51-55.  Indeed,

3   DTSC explains that the 2010 RAW focused on three major activities: "(a) removal of

4   contaminated soil from the former process area on the Site (source area); (b) removal of the

5   abandoned groundwater extraction and treatment system; and (c) groundwater monitoring for at

6   least ten years."  UMF 49.  Notably, soil excavation and the installation of groundwater

7   monitoring wells were activities identified as remedial actions in the 1983 RAP and the 1994

8   RAP.

9       DTSC's "response actions" also stand in stark contrast to the activities that were found to

10  be "removal" actions in New York v. Next Millenium Realty, LLC, 732 F.3d 117 (2d Cir. 2013)

11  ("Next Millenium").  In Next Millenium, the Second Circuit explained that the activities were

12  "removal" in nature because they were not "designed to remedy the underlying source of the

13  contamination, namely, the hazardous waste."  Id. at 126-129.  Indeed, in that case, "the fact that

14  the [volatile organic compounds] were migrating from the [source] was not even confirmed"

15  when the town took its responsive actions, and thus the town's actions "could not have been

16  intended to permanently remediate the contamination coming from the [source]."  Id. at 127.

17  Here, to the contrary, DTSC conducted an extensive excavation to remove soil from the former

18  process area, which was acting as the continued source of contamination at the Site.  The removal

19  of the soil from the former process area was intended to permanently remediate the source area of

20  the contamination.

21      Similarly, in New York State Elec. and Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 231

22  (2nd Cir. 2014) ("FirstEnergy"), the Second Circuit explained that removal actions generally

23  address contamination "at its endpoint," whereas remedial actions are designed to permanently

24  address the hazardous waste causing the contamination.  Thus, activities are "'far more akin to a

25  removal action' than a remedial action [when] it only addresse[s] work 'performed at a discrete

26  portion of the site, which was significantly removed from the location of … the source of

27  contamination …' and was designed to contain the contamination migrating [into the location

28  where the activities occurred]."  Id. at 232-3.  In contrast, later activities that included excavating

00017266.4    {00017266.4}    -21-

1   the soil at the source and surrounding area were considered part of the remedial action designed

2   to permanently remediate the contamination. Id. at 233. Likewise, DTSC's excavation of the

3   source area at the Site pursuant to the 2010 RAW is part of the remedial action designed to

4   permanently remediate the Site.

5        The above-discussed authorities are in accord with California case law on this topic. It is

6   the role of the activity and its purpose that determines whether the activity is a "removal action"

7   or a "remedial action." See Hyampom, 903 F. Supp. at 1391 (the installation of utilities that

8   "played a critical role in the implementation of the permanent remedy" was part of the remedial

9   action); Advanced Micro Devices, Inc. v. National Semi-Conductor Corp., 38 F.Supp.2d 802, 812

10  (N.D. Cal. 1999) (a water extraction system installed years before a final remedy was developed

11  was a "removal action"). Here, the focus of the 2010 RAW was to address the **source** of the

12  contamination, the soil in the former process area that was left in place. The removal of the

13  contamination source is an attempt to implement a final remedy. The remaining activities

14  discussed in the 2010 RAW "were central parts of the 'construction of the permanent remedy.'"

15  Hyampom, 903 F. Supp. at 1393. Accordingly, DTSC's response activities were part of a

16  remedial action to permanently remedy the source of the contamination, and to evaluate the result

17  thereof.

18       Furthermore, DTSC's actions here may be contrasted with its activities in California ex

19  rel. California Department of Toxic Substances Control v. Alco Pacific, Inc., 308 F.Supp.2d 1124

20  (E.D. Cal. 2004) ("Alco Pacific"), for further illustration. In that case, the Court explained that

21  DTSC's various actions between 1993 and 2003 were "removal actions" because it took those

22  actions when "DTSC [had] not yet approved the [Final Draft Removal Action Workplan] or

23  decided what to do about soil contamination on the Site. [Citation omitted.] Accordingly, DTSC

24  ha[d] not yet decided on a final course of action for clean-up of the Site. [Citation omitted.]" Id.

25  at 1130. Here, in contrast, DTSC has determined that the soil in the prior process area is the

26  source of the contamination at the Site, the removal of which is part of the final, permanent

27  remedial action for cleaning up the Site.

28

1        In sum, the "response action" at issue (i.e., the soil excavation conducted pursuant to the

2   2010 RAW) in DTSC's first and second claims for relief against Dobbas is "remedial," as: (1) it

3   was taken in response to C&A Products' cessation of its contractual obligations in 2005; (2)

4   constituted a permanent remedy; (3) was far too delayed to have been in reaction to any actual

5   "imminent threat;" (4) was taken without any confirmation of a complete human exposure

6   pathway and after apparent confirmation that the "potential" irrigation well exposure pathway had

7   not materialized into actual impacts; and (5) was performed after DTSC's analysis of the cost and

8   effectiveness of various potential remedial options.  It, therefore, is clear that the response action

9   that forms the subject of this litigation is a "remedial" action that DTSC is attempting to cloak in

10   "removal" action clothing in an effort to circumvent the applicable statute of limitation.

11   **VII.    THIS COURT HAS ADOPTED THE RULE THAT THERE MAY ONLY BE ONE**

12           **REMEDIAL ACTION AND ONE REMOVAL ACTION FOR A TIMELY "INITIAL**

13                                   **[LEGAL] ACTION"**

14        While the express language of CERCLA is silent on whether its statutes of limitations

15   apply to one or multiple "removal" or "remedial" action(s) per site (i.e., whether each separate

16   activity that meets the "remedial" or "removal" definition can restart the clock for bringing an

17   "initial" legal action), "[v]irtually every court that has considered this issue has agreed" that there

18   may only be one remedial action and one removal action per site for purposes of applying the

19   statutes of limitations.  FirstEnergy, 766 F.3d at 235-36.  This conclusion is supported by the

20   plain language and the underlying purpose of the CERCLA statute.

21        As the Sixth Circuit explained in Kelley, "Congress's choice of the modifying articles 'a'

22   and 'the' to precede 'removal action,' in section 9613(g)(2)(A) 'proves that Congress intended

23   that there generally will be only one removal action.'"  Kelley, 17 F.3d at 843.  The same use of

24   the modifying articles "a" and "the" to precede "remedial action" leads to the same conclusion.

25   Sunoco, 337 F.3d at 1241 ("this language [of the statute] indicates there will be but one 'removal

26   action' per site or facility, as well as a single 'remedial action' per site or facility"); see Navistar,

27   152 F.3d at 713; FirstEnergy, 766 F.3d at 236.  Accordingly, "[t]he mere fact that the initial

28   / / /

1    attempt at remediation failed, does not make the second try on the same remedial action a new

2    cause of action." Navistar, 152 F.3d at 713.

3          The conclusion that there can be only one remedial action and one removal action also

4    comports with the reasoning and purpose of statutes of limitation, which is to ensure "that the

5    defendant is given the protections of predictability and promptness." United States v. Hagege,

6    437 F.3d 943, 955 (9th Cir. 2006); California ex rel. California Department of Toxic Substances

7    Control v. Hearthside Residential Corp., 613 F.3d 910, 914 (9th Cir. 2010) ("Hearthside")

8    ("statutes of limitation are intended in part to protect defendants"). Applying this purpose in the

9    context of CERCLA, for example, when a potentially responsible party completes an approved

10   remediation plan, which "is supposed to be a final, once-and-for-all cleanup of a site" and to

11   "*permanently* remediate hazardous waste," "it would not be logical-or fair-to subject that entity to

12   additional CERCLA lawsuits seeking yet additional permanent relief." FirstEnergy, 766 F.3d at

13   236.

14         The Ninth Circuit and California District Courts, including this Court, are in accord with

15   this general rule. W.R. Grace, 429 F.3d at 1230, n. 9 (citing favorably to Sunoco, 337 F.3d at

16   1241 for "concluding that there can be but one 'removal action' per site" and agreeing to "analyze

17   the [Environmental Protection Agency's] activities [at the Libby site] as a single response action

18   rather than a patchwork of discrete smaller actions"); Hyampom, 903 F. Supp. at 1394 ("There is

19   no authority for the view that each 'remedial' activity undertaken at a site triggers a new cause of

20   action for the cost recovery of that activity"); Alco Pacific, 308 F.Supp.2d 1124 (all removal

21   actions performed at a single site constituted a single indivisible removal action). None of these

22   courts have espoused the limited exception to the general rule set forth in United States v.

23   Ambroid Co., Inc., 34 F.Supp.2d 86 (D. Mass. 1999) ("Ambroid") and United States v. Manzo,

24   182 F.Supp.2d 385 (D.N.J. 2000) ("Manzo").

25   **A. The Statute of Limitations Expired Well Before the Filing of This Action,**
         **and The Limited Exception Enumerated in Ambroid and Manzo Does Not**
26       **Apply**

27         Dobbas is aware of only two reported cases that have applied a very narrow exception to

28   the widely applicable general rule that there can only be one removal and one remedial action for

00017266.4      {00017266.4}                        -24-

1    statute of limitations purpose. Both of those cases are non-California district court decisions and,

2    to the extent the limited exception they applied remains valid,[4] the exception is limited to the

3    specific facts at issue in those cases.

4         In Ambroid, the Court identified more than one removal action for statute of limitation

5    purposes based on the unusual circumstance that, eighteen months after the United States

6    Environmental Protection Agency ("EPA") closed the site, the site was broken into and drums

7    containing hazardous waste were scattered and damaged, requiring a new removal action.

8    Ambroid, 34 F.Supp.2d at 88-89. Another unusual fact was that the EPA left the drums behind

9    on the site after closing because "there were no legally approved methods of disposal for the

10   remaining drums." Id. at 87. As the District Court for the Central District of California

11   explained, the unusual facts in Ambroid render the exception "very narrow" and highly

12   distinguishable. Alco Pacific, 308 F.Supp.2d at 1132.

13        The other reported case in which a narrow exception to the widely applicable general rule

14   was applied is Manzo. That case also involved very distinct facts, including but not limited to:

15   (1) the remediation involved numerous parcels under different ownerships on sixty acres of land

16   in two different Townships; and (2) the contamination involved numerous different hazardous

17   substances, "including but not limited to polychlorinated bi-phenyls ('PCBs'), lead, methylene

18   chloride, trichloroethylene, chloroform, and benzene." Manzo, 182 F.Supp.2d at 388-93. In

19   contrast, "a site with a single source of pollution is almost always considered one 'facility' within

20   the meaning of CERCLA and is generally not divisible absent extraordinary circumstances."

21   Yankee Gas Services Co. v. UGI Utilities, Inc., 616 F.Supp.2d 228, 270-71 (D. Conn. 2009)

22   (citations omitted).

23        Importantly, this Court has adopted the general rule, citing "no authority for the view that

24   each 'remedial' activity undertaken at a site triggers a new cause of action for the cost recovery of

25   _____

26        [4] It should be noted that the exception enumerated in Manzo and Ambroid renders Congress's distinction
     between "initial" and "subsequent" actions largely superfluous and insignificant. See, e.g., TRW Inc. v. Andrews,
27   534 U.S. 19, 31 (2001) (noting canon that statutes should be read to avoid making any provision "superfluous, void,
     or insignificant"). If every separate remedial or removal action restarts the clock for statute of limitation purposes,
28   there would have been no need for Congress to require the initiation of an "initial" legal action for purposes of being
     able to recover further response costs in a "subsequent" legal action.

     00017266.4        {00017266.4}              -25-

1    that activity." <u>Hyampom</u>, 903 F. Supp. at 1394.  The language of the statute remains unchanged

2    since this Court's decision in <u>Hyampom</u> and there are no grounds to warrant a different

3    conclusion here.  Even assuming that the limited exception applied in <u>Ambroid</u> and <u>Manzo</u>

4    remains good law, the facts in the present case have no commonality with the unusual and

5    exceptional circumstances that gave rise to those decisions.  Facts that militate against the

6    application of the exception in this case include, but are not limited to, the following:

7         •    Unlike the Records of Decision at issue in <u>Manzo</u>, nothing in the 1983 RAP or the

8              1994 RAP identify the remedial actions discussed therein as "interim" measures

9              subject to a final remedy to be adopted at a later date.  Any argument to the contrary

10             would be wholly inconsistent with DTSC's Certification of the Site in 1996.

11        •    All of the response actions relating to this Site occurred on one parcel of

12             approximately seven acres, as compared to the various parcels on sixty acres of land

13             under different ownerships that were at issue in <u>Manzo</u>.  Additionally, DTSC's

14             response actions did not involve a new or different geographical area from the actions

15             taken under the 1983 RAP and the 1994 RAP (the implementation of which was

16             certified as complete by DTSC in 1996).

17        •    All of the response actions at the Site relate to one source of contamination (i.e., the

18             wood preserving products).  DTSC acknowledges that its response actions were taken

19             to "address[] the **source** problem – the contaminated soil," which it believed was a

20             "**continuing source** of groundwater contamination."  UMF 74.  DTSC further

21             acknowledges that the "source problem" – i.e., the soil in the former process area –

22             was the subject of remediation activities in the 1980s when C&A Products erected a

23             building over the soil, and again in 1992 when the contaminated soils were covered

24             with concrete.  UMF 75.  Unlike the drums containing hazardous substances that were

25             scattered and damaged in <u>Ambroid</u>, giving rise to the potential for a release of new

26             contamination, there has been no new source of contamination at this Site.

27        Based on the foregoing, DTSC's proposal that, if its response actions were remedial in

28   nature, such actions should be considered a separate "operable unit" implementing the final

00017266.4          {00017266.4}                    -26-

1  remedy at the Site holds no water.  Whether or not the prior remediation actions eliminated the

2  "particular" source of groundwater contamination at issue at this Site is irrelevant for purposes of

3  analyzing the application of the statute of limitation.  "The mere fact that the initial attempt at

4  remediation failed, does not make the second try on the same remedial action a new cause of

5  action."  Navistar, 152 F.3d at 713.  Congress was concerned with the initiation of remedial

6  action, not its completion.  Id.  Given DTSC's 1996 certification of the remedial actions in the

7  1983 RAP and the 1994 RAP, it is clear that the statute of limitations with respect to the remedial

8  action at the Site ran long before DTSC filed this action in 2014.[5]

9       **B.    Application of the General Rule to Both "Remedial" and "Removal"
           Actions Comports With Fairness**
10

11      Irrespective of the plain language of the statute, which includes "the" rather than "a"

12  before both phrases ("remedial action" and "removal action") for triggering the applicable

13  statutes of limitation, the general rule also comports with fairness.  Quite simply, DTSC cannot

14  have its cake and eat it too.  In the past, when it has benefited DTSC, the government has argued

15  that various removal actions at a site should be considered a single unitary action for purposes of

16  the statute of limitations, despite various "discrete" removal actions having been completed well

17  beyond the 3-year statute of limitation under CERCLA.  For example, in Alco Pacific, 308

18  F.Supp.2d 1124, DTSC favored the "one [legal] action rule" because, otherwise, the completion

19  of each phase of removal activities in that case would have triggered the start of the three-year

20  statute of limitations on cost-recovery actions, which would have precluded DTSC from seeking

21  recovery of certain removal costs.  There is no rational or legal reason to treat remedial and

22  removal actions differently given the language of the statute.

23      In Kelley, the Sixth Circuit acknowledged that "there may be cases where the EPA or a

24  state might be tempted to revive a dead cause of action by instituting new removal activity."

25  Kelley, 17 F.3d at 844.  This is such a case.  DTSC attempts to argue that its "response actions" at

26  ───────────
27      [5] Dobbas need not and does not address the red herring raised by DTSC as to whether Congress' adoption of
    the statute of limitations in October 1986 applied retroactively to the 1983 RAP.  (Opp. At p. 31.)  Even if the Court
    declines to apply the statute of limitations retroactively to the 1983 RAP implementation, it would still undoubtedly
28  apply it to the 1994 RAP implementation, still rendering this action untimely.

issue in this case were removal actions because the statute of limitations begins to run upon completion of the removal action. In <u>Kelley</u>, the Court found no abuse of process because the removal actions at issue in that case were funded by a single appropriation action, both activities started within days of each other, and evidence showed that the two activities were interdependent. <u>Kelley</u>, 17 F.3d at 844. In contrast, here, the first remedial action and the post-2005 "response actions" span more than 20 years, were funded entirely independent of one another, and have no interdependence on one another (other than the fact that the post-2005 "response actions" were required because DTSC declined to have the responsible party remove the contaminant source over 30 years ago). As the Seventh Circuit noted in <u>Navistar</u>, an argument that would allow the government such an extended amount of time to pursue an "initial" legal action against a party does not "[comport] with Congress' intent in adding the statute of limitations to CERCLA – 'to provide some measure of finality to affected responsible parties.'" <u>Navistar</u>, 152 F.3d at 710.

What is good for the goose is good for the gander. In the absence of statutory language indicating a different accrual of causes of action applicable to remedial actions and removal actions, fairness demands that the same standard be applied to both.

## VIII.   THE COURT SHOULD REFUSE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER DTSC'S THIRD CLAIM FOR RELIEF ASSERTED PURSUANT TO THE HSAA AND, EVEN IF THE COURT WERE TO RETAIN JURISDICTION, DTSC'S HSAA CLAIM FAILS AS A MATTER OF LAW

Similar to DTSC's CERCLA claims, its Third Claim for Relief, which is based on various provisions of the HSAA, also fails. While DTSC does not seek recovery of its response costs under the HSAA (likely because it understands that such a claim would be time-barred), it requests an injunction pursuant to Cal. Health and Safety Code section 25358.3(f) to direct Dobbas to comply with the 2011 I/SE Order, and civil penalties and treble damages for Dobbas' alleged non-compliance with the 2011 I/SE Order. DTSC cites to Cal. Health and Safety Code sections 25359(a), 25359.2, and 25367(c) as support for its request for civil penalties and treble damages.

00017266.4           {00017266.4}                    -28-

1    Because the CERCLA claims for relief that establish federal subject matter jurisdiction

2    fail for failure to comply with the applicable statute of limitations, this Court should decline to

3    exercise supplemental jurisdiction over the remaining HSAA claim. 28 U.S.C., § 1367(c) (a

4    district court may decline to exercise supplemental jurisdiction if … "the district court has

5    dismissed all claims over which it has original jurisdiction"). It certainly would be reasonable for

6    the Court to conclude that its limited time and resources should not be burdened with a case based

7    solely on a state law claim. If, however, the Court opts to maintain supplemental jurisdiction over

8    the HSAA claim, judgment must be entered in Dobbas' favor on this claim as DTSC could not

9    have required Dobbas to perform the remedial action outlined in the 2010 RAW because, as

10   explained further below, the statute of limitations on the **one** remedial action allowed at the Site

11   expired in 1999 and, therefore, no relief is available to DTSC under this claim.

12       The HSAA is modeled after CERCLA and, therefore, is interpreted to be consistent with

13   the federal superfund act unless the statute expressly provides otherwise. <u>Adobe Lumber, Inc. v.</u>

14   <u>Hellman</u>, 658 F.Supp.2d 1188, 1192 (E.D. Cal. 2009); <u>see</u> Health & Safety Code, § 25310. This

15   is important because, similar to CERCLA's statutes of limitations, the HSAA's statutes of

16   limitations apply to "**the** removal or remedial action" (not "a removal or remedial action") and

17   make a distinction between initial and subsequent legal actions, as follows:

18       (a) An action under Section 25360 for the recovery of the costs of removal or
         remedial action incurred by the department from the state account, or any other
19       source authorized by law, or for the recovery of administrative costs incurred by
         the department in connection with any removal or remedial action performed by
20       the department or by any responsible party, shall be commenced **within three**
         **years after completion of the removal or remedial action has been certified** by
21       the department.

22       (b) An action under subdivision (c) of Section 25352 for costs incurred by the
         department for the purposes specified in subdivision (a) or (b) of Section 25352
23       shall be commenced within three years after certification by the department of the
         completion of the activities authorized under subdivisions (a) and (b) of Section
24       25352.

25       (c) In any action described in subdivision (a) or (b) for recovery of the costs of a
         removal action, a remedial action, administrative costs, or damages, where the
26       court has entered a judgment for these past costs or damages, the court shall also
         enter an order reserving jurisdiction over the case and the court shall have
27       continuing jurisdiction to determine any future liability and the amount. The
         department may immediately enforce the judgment for past costs and damages.
28       The department may apply for a court judgment as to future costs and damages

1    that have been incurred at any time during the removal and remedial actions or during the performance of the activities authorized by Section 25352, but the application shall be made not later than three years after the certification of completion of the actions or activities.

2

3    (d) An action may be commenced under Section 25360 or subdivision (c) of Section 25352 at any time prior to expiration of the three-year limitation period provided for by this section.

4

5    Cal. Health & Saf. Code, § 25360.4 (bold added).

6         Reading the HSAA's statutes of limitation consistent with the "one remedial/removal

7    action rule" under CERCLA, as explained in Section VII above, there can be only one removal

8    action and one remedial action per site.  Even if the Court finds that the HSAA's statutes of

9    limitations should be read independent of CERCLA's interpretation, the statutory interpretation

10   and application outlined in Kelley, 17 F.3d at 843 (choice of modifying article "the" to precede

11   "removal action" proves "Congress intended that there generally will be only one removal

12   action") and Sunoco, 337 F.3d at 1241 (use of "the" as the modifier to "remedial action" leads to

13   the same conclusion) renders the same result.  Compare 42 U.S.C., § 9613(g)(2)(A) ("within 3

14   years after completion of the removal action") with Health & Saf. Code, § 25360.4(a).

15        As further explained above, DTSC's response actions that form the basis of this lawsuit

16   were remedial in nature and it is undisputed that DTSC certified the remedial action with respect

17   to the Site in 1996.  Accordingly, the statute of limitations for the remedial action at the Site

18   under the HSAA ran in 1999, DTSC had no authority to issue the 2011 I/SE Order and cannot

19   avoid the statute of limitations by bringing this action to enforce the 2011 I/SE Order against

20   Dobbas.  Indeed, as explained herein, the very "source" of the contamination that DTSC ordered

21   for remediation in the 2011 I/SE Order was the soil in the former process area of the Site, which

22   was deemed remediated in the 1996 Certification.  In the absence of an enforceable order,

23   DTSC's request for civil penalties, treble damages, and an injunction cannot lie.[6]

24        Even if the foregoing were not the case, however, this Claim for Relief would still fail as a

25   matter of law.  Dobbas cannot be deemed liable to DTSC under the HSAA as a matter of law, as

26

27   _____

[6] We anticipate that DTSC will argue that it is not seeking cost recovery under the HSAA and, therefore, the statute of limitations does not apply.  However, without authority to issue the order in the first place, this argument must fail.

28

00017266.4        {00017266.4}                    -30-

1    it is undisputed that the contamination resulted from wood preserving and treatment activities that

2    ended decades before Dobbas acquired an ownership interest in the Site.  Dobbas did not cause or

3    contribute to any of the contamination at the Site.  This is one aspect where CERCLA and the

4    HSAA expressly diverge.  Unlike CERCLA, the HSAA does not apply joint and several liability.

5    Rather, the HSAA applies several liability to each potentially responsible party and specifically

6    requires apportionment of liability in cost recovery actions according to fault.  Fireman's Fund

7    Ins. Co. v. City of Lodi, 302 F.3d 928, 946 (9th Cir. 2002).  Indeed, Cal. Health and Safety Code

8    section 25363(a) provides that "any party found liable for costs or expenditures recoverable under

9    this chapter who establishes by a preponderance of the evidence that only a portion of those costs

10   or expenditures are attributable to that party's actions, shall be required to pay only for that

11   portion."

12          Here, it is undisputed that:

13   •    The contamination at the Site was the result of wood preserving and treatment

14        operations at the Site until sometime in 1982 (UMF 4-5);

15   •    There have been no wood preserving or treatment operations at the Site since August

16        1982 (UMF 5);

17   •    The contaminated soil in the former process area is the source of the ongoing

18        contamination at the Site (UMF 51);

19   •    The contaminated soil in the former process area was contained within a 11,000-

20        square-foot area with a grey metal building that was constructed over the historical

21        process area as part of the initial remedy (UMF 53);

22   •    The initial remedy was certified by DTSC in 1996 (UMF 25);

23   •    Dobbas purchased the Site in 1997 (UMF 29); and

24   •    The soil that was excavated pursuant to the 2010 RAW was the soil from the former

25        process area (UMF 49).

26          Based on the foregoing and the information in the administrative record, there is no

27   genuine issue of disputed fact that the source of the contamination in response to which DTSC

28   performed response actions, was in existence prior to Dobbas' ownership of the Site.  Indeed,

00017266.4      {00017266.4}                    -31-

1    DTSC's complaint in this matter further supports this conclusion by basing all claims on

2    contamination that occurred decades before Dobbas took possession of the Site and by asserting

3    no allegations that Dobbas caused or contributed to the contamination at issue. Thus, whether

4    Dobbas caused or contributed to the contamination is undisputed, Dobbas cannot be held liable as

5    a matter of law, and no further discovery would alter this conclusion.[7] As a result, Dobbas had

6    "sufficient cause" in accordance with Cal. Health and Safety Code sections 25359, 25359.2 and

7    25367 to decline participation in DTSC's newly proposed remedial activities, no civil penalties or

8    treble damages can be imposed on Dobbas relating to the 2011 I/SE Order, and this claim fails as

9    a matter of law.

10           For all of the above reasons, summary judgment must be entered in Dobbas' favor on

11   DTSC's Third Claim for Relief.

12                                   **IX.    CONCLUSION**

13           Because no further discovery in this matter would yield a triable issue of material fact

14   with regard to the expiration of the statute of limitations on DTSC's claims for cost recovery

15   under CERCLA and on its ability to direct Dobbas to perform the remedial actions at the Site, this

16   motion for summary judgment is ripe for the Court's determination. For each of the foregoing

17   reasons, Dobbas requests that the Court enter summary judgment in favor of Dobbas on all of

18   DTSC's claims in this action.

19   Dated: March 2, 2015                      Respectfully submitted,

20                                             KING WILLIAMS & GLEASON LLP

21                                             By:      /s/ Jennifer Hartman King
                                                    Jennifer Hartman King
22                                                  Nicole R. Gleason
                                                    Louinda v. Lacey
23                                             Attorneys for Defendant JIM DOBBAS, INC.

24

25

26

27          [7] Although DTSC might argue that the contamination continued to migrate while Dobbas owned the Site,
     this would be a red herring because the passive migration of contaminants through soil during an entity's ownership
28   cannot establish liability. Carson, 270 F.3d at 874-887. Any such argument, therefore, is inapposite.
     00017266.4        {00017266.4}              -32-