JENNIFER HARTMAN KING (Bar No. 211313)
NICOLE R. GLEASON (Bar No. 199655)
LOUINDA V. LACEY (Bar No. 275888)
KING WILLIAMS & GLEASON LLP
520 Capitol Mall, Suite 750
Sacramento, CA  95814
Telephone:    (916) 379-7530
Facsimile:    (916) 379-7535
jhartmanking@kwgattorneys.com
ngleason@kwgattorneys.com
llacey@kwgattorneys.com

Attorneys for Defendant Jim Dobbas, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>Plaintiffs,<br><br>v.<br><br>JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; and WEST COAST WOOD PRESERVING, LLC, a Nevada limited liability company,<br><br>Defendants,<br><br>AND RELATED CROSSCLAIMS AND COUNTERCLAIMS. | Case No.:  2:14-cv-00595-WBS-EFB<br><br>**DEFENDANT JIM DOBBAS, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: **April 6, 2015**<br>Time: **2:00 p.m.**<br>Place: Courtroom 5, 14th Floor<br>Robert T. Matsui United States Courthouse<br>501 I Street<br>Sacramento, CA  95814<br><br>Action filed:  March 3, 2014 |

Defendant Jim Dobbas, Inc. ("Dobbas") respectfully submits the following Statement of Undisputed Facts in support of its motion for summary judgment, pursuant to Federal Rules of Civil Procedure, Rule 56(a) and Local Rule 260 of the District Court for the Eastern District of California:

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. The California Department of Toxic Substances Control ("DTSC") (and its predecessor, the Department of Health Services) has been actively overseeing and performing contamination response actions at 147 A Street, Elmira, California ("the Site") for more than thirty years. | 1. DTSC and Toxic Substances Control Account ("TSCA") Complaint (Docket Nos. 1, 1-2.) ("Compl.")at 6, ¶ 17; Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant West Coast Wood Preserving, LLC's Motion for Summary Judgment (Docket No. 107) ("Opp.") at 10:2-5. |
| 2. The contamination at the Site resulted from wood treatment and preservation operations at the Site during the 1970s, and in the early years of the 1980s. | 2. Compl. at Ex. B, 5-6; Opp. at 9:4-11, 5:24-6:25. |
| 3. The wood preserving operations at the Site were conducted by Defendant Pacific Wood Preserving ("PWP") from approximately 1972 through on or about September 12, 1979, and by Defendant Collins & Aikman Products, LLC[1] (formerly known as Collins & Aikman Products Co., and the successor by merger The Wickes | 3. Compl. at 5, ¶¶ 14-15, Ex. B, 5-6; Opp. at 9:4-11, 5:24-6:25. |

---

[1] Collins & Aikman Products, LLC, a cancelled Delaware limited liability company, was formerly known as Collins & Aikman Products Co. and was the successor by merger to The Wickes Corporation. For ease of reference, the term "C&A Products" refers collectively to all of the foregoing entities.

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Corporation) (collectively, "C&A Products") from on or about September 12, 1979, through approximately 1982. | |
| 4. The contamination at the Site resulted from spills of wood preserving products during PWP's and C&A Products' respective ownership. | 4. Compl. at 5, ¶¶ 14-15, Ex. B, 5-6; Opp. at 9:4-11, 5:24-6:25; Response of Plaintiffs to Statement of Undisputed Facts in Support of Motion for Summary Judgment by Defendant West Coast Wood Preserving, LLC (Docket No. 107-1) at 15, Response 47 ("Response to SUMF").  Plaintiffs do not dispute the following: "RAW does not cite to any post-1982 spills or leaks of hazardous substances at the Wickes Site"). |
| 5. There have been no wood preserving or treatment operations at the Site since August 1982. | 5. Response to SUMF at 17, Response 57. |
| 6. On September 9, 1983, Wickes proposed a Remedial Action Plan ("RAP") for the Site. | 6. Response to SUMF at 10, Response 30. |
| 7. The 1983 RAP identified response actions to address the contamination, including soil removal, groundwater extraction and treatment, and installation of an asphalt cap. | 7. Response to SUMF at 10, Response 30. |
| 8. DTSC (through its predecessor, the Department of Health Services) ordered C&A | 8. Response to SUMF 10-11, Responses 31, 33; AR 33-40[2]. |

---

[2] DTSC has lodged a DVD of the certified Administrative Record concerning the alleged response actions at the Site with the Court as Docket No. 103 (Notice of Lodging).  Citations to the Administrative Record as "AR" are to the Bates numbers that appear as "ADMIN[number]" on the bottom right of the cited page, excluding leading zeros.

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Products, the then-owner of the Site, to implement the response actions that DTSC identified and selected in the 1983 RAP. | |
| 9. The 1983 RAP required C&A Products to, *inter alia*, construct a groundwater "treatment plant utilizing an ion-exchange system," construct a subsurface drainage system, remove soil in the truck loading pad area, and cap the drying pad area with asphalt, instead of removing contaminated soils. | 9. Response to SMUF at 10, Response 30. |
| 10. In February 1984, C&A Products, DTSC, and the Regional Board entered into a Settlement Agreement and Schedule of Compliance regarding C&A Products' disposal of hazardous substances at the Site. | 10. Response to SMUF at 10, Response 32 AR 33-40. |
| 11. Pursuant to this settlement agreement, DTSC approved the "stormwater management, the ground water treatment and contaminated soils removal and containment elements" of the 1983 RAP. | 11. Response to SMUF at 11, Response 33. |
| 12. The settlement stated that the goals of the 1983 RAP included the elimination of all groundwater contamination (both on- and off-site) in five to ten years. | 12. Response to SMUF at 11, Response 34. |
| 13. C&A Products commenced the physical on-site construction of work called for by the | 13. Response to SMUF at 11, Response 35. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1983 RAP in the fall of 1983, including but not limited to the asphalt paving of the drying pad area. | |
| 14. C&A Products also constructed the groundwater extraction and ion-exchange treatment system, which began operating in April 1984. | 14. Response to SMUF at 11, Response 36. |
| 15. Response actions continued at the Site for many years after the adoption of the 1983 RAP, including C&A Products' 1987 expansion of the groundwater treatment system. | 15. Opp. at 10:8-12. |
| 16. In 1992, C&A Products poured concrete over the dirt floor inside the building over the former process area to prevent possible direct contact with the contamination. | 16. Opp. at 10:20-21; AR 413-14. |
| 17. In 1992, and with the approval of DTSC and the Regional Board, C&A Products began construction on an electrochemical co-precipitation treatment system to replace the ion-exchange groundwater treatment system. | 17. AR 4549. |
| 18. DTSC advised C&A Products to prepare another Remedial Action Plan in 1992. | 18. Opp. at 10:22-24. |
| 19. On February 5, 1992, DTSC and C&A Products entered into an Enforceable Agreement requiring C&A Products to propose a new RAP for the Site. | 19. Response to SMUF at 12, Response 38. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 20. On February 25, 1994, C&A Products proposed the new RAP which concentrated on soil contamination in the northern portion of the Site. | 20. Opp. at 11:3-6; AR 832; Response to SUMF at 12-13, Response 40. |
| 21. DTSC's official and published Executive Summary of the 1994 RAP described it as a "Final Remedial Action Plan." | 21. Response to SUMF 13, Response 41. |
| 22. The 1994 RAP called for, *inter alia*, the grading of soil and the installation of an asphalt cap in all areas of the Site that were not previously sealed, and the recording of a deed restriction. | 22. Response to SUMF 13, Response 42. |
| 23. In a "Final RAP Checklist" from February 1994, DTSC wrote that the response activities associated with the 1994 RAP would "result in a permanent solution to the contamination problem (e.g. total removal)." | 23. Response to SUMF 13, Response 44. |
| 24. The 1994 RAP also provided for ongoing monitoring of groundwater. | 24. AR 2266-2267. |
| 25. In March 1996, DTSC issued a Certification of Remedial Action for the Site in March 1996 ("Certification"), which "certifie[d] implementation of the final remedial actions" at the Site. | 25. Response to SUMF 14, Response 45; AR 2266-2271; Opp. at 11: 15-16. |
| 26. The Certification contains a "Remedial Action Certification Form," which identifies, in | 26. AR 2267. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| pertinent part the following "Dates of Remedial Action": (1) groundwater extraction and treatment was December 1983; and (2) soil removal, asphalt cap and expanded groundwater extraction and treatment in October 1994. | |
| 27. The Certification contains the following "Brief Description and History of the Site":<br><br>Pacific Wood Preserving operated the wood treatment site until September 1979, when Wickes purchased the Site. Wickes operated the site until August 1982. During the operation period lumber was treated with preservative solutions containing arsenic, chromium, and copper. Investigations have shown that the Site soils have been contaminated by these inorganic metals. Groundwater beneath the Site and beneath adjacent properties has also been affected by chromium. Two Remedial Actions Plans (RAPs) have been completed to address the contamination. The September 9, 1983, RAP was prepared for the soil contamination, storm water control, and groundwater treatment in the southern portion of the Site, and the soil contamination in the northern portion was addressed in the February 25, 1994 RAP. The RAPs identify that contaminated soils in the northern and southern areas shall be remediated by asphalt capping; storm water to be captured and routed off-site; and affected groundwater to be extracted and treated with an on-site electrochemical co-precipitation treatment system. The RAPs also set forth the chemicals to be remediated, remediation levels, requirements for monitoring capture zones, and reporting requirements. | 27. AR 2266-67. |
| 28. In the Certification, which was signed by the DTSC Project Manager, Unit Chief, and Branch Chief, and published to all the interested parties, DTSC confirmed that: | 28. Response to SUMF at 13-14, Response 46; AR 6429. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| • "Two Remedial Actions Plans (RAPs) have been completed to address the contamination"; <br> • The "Response Action Taken on Site" was a "Final Remedial Action"; <br> • The remedial action taken at the site between 1983 and 1996 consisted of soil excavation and off-site disposal, an asphalt cap, groundwater extraction and treatment in an on-site chemical treatment plant, and a deed restriction; <br> • C&A spent approximately $5.5 million in response costs associated with the 1994 RAP; and <br> • "DTSC has determined that all appropriate removal/remedial actions have been completed and that all acceptable engineering practices were implemented." | |
| 29. Jim Dobbas, Inc. and Continental Rail Co. purchased the Site in April 1997. | 29. Compl. at 3-4, ¶¶ 9-10; Opp. at 12: 1-2. |
| 30. There were no wood preserving or treatment operations during Jim Dobbas, Inc.'s ownership of the site. | 30. Response to SUMF at 17, Response 57. |
| 31. Plaintiffs' Complaint contains no allegations that Dobbas caused or contributed to | 31. See Compl. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| the contamination at the Site. | |
| 32. Following the Certification and through 2005, C&A Products performed various actions required in its operation and maintenance agreement with DTSC. | 32. Compl. at 6, ¶ 17; Opp. at 12: 1-9. |
| 33. In 2001, C&A Products' five-year review of the cleanup found that while the groundwater treatment system had controlled contaminant migration, it was "unlikely…that groundwater extraction [would] achieve [allowed Maximum Contaminant Levels] in all wells." | 33. Opp. at 12: 2-5. |
| 34. In response, C&A Products' consultant considered "the potential application of an in-situ [i.e. in-place] remediation approach to enhance the existing remedy" and several possible remedy modifications and enhancements between 2002 and early 2005. | 34. Opp. at 12: 5-9. |
| 35. After C&A Products declared bankruptcy in 2005 and "stopped operating the groundwater extraction and treatment system, and stopped taking other action," DTSC demanded that Dobbas and others perform various activities relating to C&A Products' contractual obligations. | 35. Opp. at 12: 12-20. |
| 36. In a letter dated November 13, 2006, DTSC determined that the Site "may present an | 36. Opp. at 12: 20-24; AR 3748, 3756. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| imminent and substantial endangerment to the public health or welfare or to the environment," and that it had to spend state funds to address this threat ("2006 I/SE Determination"). | |
| 37. In the 2006 I/SE Determination, DTSC stated that "[i]ssuing the [2006 I/SE Determination] w[ould] assist DTSC in hiring a contractor to resume the approved remedial actions for the Site." | 37. AR 3747. |
| 38. DTSC's 2006 I/SE Determination was made based on the cessation of C&A Products' operation and maintenance contractual requirements. | 38. AR 3753 ("Unless and until these O&M activities are restored, the Site may present an imminent and substantial endangerment to the public health or welfare or the environment."); Declaration of Peter MacNicholl in Support of Plaintiffs' Opposition to Motion for Summary Judgment by Defendant West Coast Wood Preserving, LLC (Docket No. 108) at 4, ¶ 21 ("MacNicholl Decl."). |
| 39. DTSC has purportedly spent over $2.2 million "to assess and clean up the Site" from November 2005 to September 2013. | 39. Compl. at 8:6-7, ¶ 31. |
| 40. DTSC describes its "response costs" as "efforts to repair and restart the groundwater extraction and treatment system, completion of a remedial investigation for site soils, preparation | 40. Compl. at 7:24-8:2, ¶ 29. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| of the Removal Action Workplan, implementation of the Removal Action Workplan in October and November 2011, groundwater monitoring, and other tasks." | |
| 41. In 2008, DTSC contracted with URS Corporation to investigate the soils at the Site. | 41. Response to SUMF at 15, Response 47. |
| 42. Despite DTSC's prior Certification of the Site and the fact that no further wood treatment and preservation operations occurred after the Certification, the soils and groundwater analysis at the Site revealed continuing contamination. | 42. Response to SUMF at 17, Response 57; Response to SUMF 14, Response 45; AR 2266-2271; Opp. at 11: 15-16. |
| 43. The 2008 Remedial Investigation Report concludes that the results showed "that the contaminated soil in the former process area" was "an **ongoing** threat to Site groundwater" and recommended "continued groundwater sampling as well as one year of monthly groundwater monitoring from shallow wells at the Site to assess seasonal changes in groundwater flow directions and gradients." | 43. AR 4910 (bold added). |
| 44. The 2008 Remedial Investigation Report recommends "evaluation of several **remedial** alternatives for areas where arsenic and Cr(VI) impacts were indicated in soil deeper than 2 feet bgs [and that a] detailed cost analysis should be prepared for each alternative, along with an | 44. AR 4910 (bold added). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| estimate of the **remedial** alternative effectiveness." | |
| 45. URS Corporation recommended the evaluation of three specific "**remedial alternatives**" and a combination of those strategies. | 45. AR 4910 (bold added). |
| 46. At DTSC's direction, URS Corporation prepared a contingency plan in February 2009 to allow for emergency response if the groundwater contamination had spread to nearby domestic irrigation wells. | 46. Opp. at 13:12-15; AR 6202-6273. |
| 47. DTSC did not implement the contingency plan and, instead, instructed URS to analyze potential remedial alternatives. | 47. Opp. at 13:12-15; AR 6202. |
| 48. "In July 2010, the Department finalized a Removal Action Workplan for the Site that called for contaminated soil excavation, off-site disposal, backfilling, confirmation sampling, demolition of the groundwater extraction and treatment system, and long-term groundwater monitoring." | 48. Compl. at 7, ¶ 25. |
| 49. According to DTSC, the 2010 RAW "focused on three major activities: (a) removal of contaminated soil from the former process area on the Site (**source** area); (b) removal of the abandoned groundwater extraction and treatment | 49. MacNicholl Decl. at 5, ¶ 23. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| system; and (c) groundwater monitoring for at least ten years." | |
| 50. Pursuant to DTSC's direction, the 2010 RAW was "prepared by [URS Corporation] for [DTSC] to address the **remediation** of groundwater contaminated by subsurface metals at the former process area of the [Site]." | 50. AR 6212. |
| 51. "The 2010 Removal Action Workplan primarily concerned soil in the former process area that was a **continuing source** of groundwater contamination." | 51. Opp. at 29:24-26 (bold added). |
| 52. The soil excavation would remove "areas of concrete debris and soil contamination that **remained** in the **source** area." | 52. MacNicholl Decl. at 5, ¶ 23 (bold added). |
| 53. "The primary **source** area is contained within an 11,000-square-foot area within the gray metal building that was constructed over the historical process area as part of the **initial remedy**." | 53. AR 6215 (bold added). |
| 54. Due to the "continued contamination" URS Corporation (DTSC's consultant) explained that "environmental **remediation** options must be considered (**i.e., the remedial actions evaluated in this workplan**)." | 54. AR 6224 (bold added). |
| 55. The 2010 RAW states, "[a] screening evaluation was conducted to assess **remedial** | 55. AR 6229 (bold added). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| technologies and process options for mitigating the impacted soil present at the Site so that the **source** of groundwater impact is eliminated." | |
| 56. In the 2010 RAW, URS Corporation analyzed various proposed alternatives in Section 5, explaining that the "NCP requires that **remedial** response actions be screened to eliminate those that do not meet the RAOs, are more difficult to implement, or are much more costly than other alternatives." | 56. AR 6233-37 (bold added). |
| 57. Section 5.2.3 of the 2010 RAW states "the **remedial** actions presented in Section 5.2.2 are evaluated with respect to effectiveness, implementability, and cost." | 57. AR 6233 (bold added). |
| 58. DTSC approved the 2010 RAW and selected one of the alternatives described therein (excavation). | 58. MacNicholl Decl. at 2, ¶ 4; AR 6846-6855; AR 6429. |
| 59. Defendants Dobbas and CRI sold the Site to Defendant Van Over on February 11, 2011. | 59. Compl. at 7, ¶ 26. |
| 60. On March 16, 2011, DTSC issued an Imminent or Substantial Endangerment Determination Order and Remedial Action Order ("2011 I/SE Order") ordering Defendants Dobbas, CRI, and Van Over to conduct the actions described in the 2010 RAW. | 60. Compl. at 7, ¶ 27. |

| | UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|---|
| | 61. The 2011 I/SE Order explained that the contaminants "in surface and sub-surface soil on the [Site] are **continuing** to act as a **persistent source** to groundwater contamination and represent a significant threat to human health and the environment." | 61. AR 6825, (bold added). |
| | 62. The 2011 I/SE Order states that "[a]dditional **remedial** actions are necessary at the Site to address the existing soil contamination . . . including contaminated soil removal … and [to] **remediate** the persistent source of groundwater contamination for both on-site and off-site aquifers." | 62. AR 6833 (bold added). |
| | 63. The 2011 I/SE Order further explains that:<br><br>   On February 14, 2008, DTSC contracted with URS Corporation to investigate soils in the source area of the Site. Results of the 2008 URS soil investigation confirmed that elevated levels of arsenic and hexavalent chromium in soil were **continuing to act as a persistent source to groundwater contamination**. In August 2009, URS on behalf of DTSC prepared a draft Removal Action Work Plan (2010 RAW) to **remediate** groundwater at the Site. | 63. AR 6830 (bold added). |
| | 64. The 2011 I/SE Order states there could be "[p]otential routes of exposure at the Site" relating to the contamination from the source area, but it does not identify any specific and/or | 64. AR 6825-45. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| known routes of exposure. | |
| 65. The 2011 I/SE Order directs the respondents to "take all necessary steps to implement the 2010 RAW and meet its **remedial** action objectives." | 65. AR 6834 (bold added). |
| 66. In the absence of the respondents' agreement to perform the work, DTSC directed its consultant to implement the selected alternative of the 2010 RAW. | 66. Opp. at 13:27-14:5. |
| 67. Following implementation of the selected alternative under the 2010 RAW, DTSC's consultant filed a Removal Action Completion Plan, in which it states, in part, that "[t]he **remedial excavation** was conducted to the extent practical and resulted in the removal of 514.71 tons of RCRA hazardous concrete material, 492.62 tons of RCRA hazardous waste soil, and 1,066.15 tons of non-RCRA, California hazardous waste soil." | 67. AR 7877 (bold added). |
| 68. In late September 1979, PWP resolved the Regional Board case by stipulating to a $7,500 judgment against it. | 68. Opp. at 7:9-10. |
| 69. The soil excavation pursuant to the 2010 RAW commenced in 2011. | 69. Response to SUMF, Response 48; AR 7876-7877. |
| 70. The 2010 RAW states, "the primary receptor for evaluation is the hypothetical | 70. AR 6224. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| resident ('hypothetical' because the Site is not currently residential)." | |
| 71. The 2010 RAW states, "[i]n January 2009, URS prepared a contingency plan [that] will be implemented if DTSC determines groundwater monitoring results indicate an unacceptable threat to human health or the environment." | 71. AR 6219. |
| 72. The 2010 RAW states that the "movement of contaminated groundwater from the former process area to the residential area has created the **potential** for those wells to extract and distribute contaminated groundwater," but "these off-property irrigation wells are being monitored, and a contingency plan is in place, to ensure that irrigation-related exposure pathways do not become causes of concern." | 72. AR 6225 (bold added). |
| 73. The 2010 RAW details the factors and considerations regarding the effectiveness, permanence, and cost relating to each alternative identified therein. | 73. AR 6229-6237. |
| 74. DTSC acknowledges that its response actions were taken to "address[] the **source** problem – the contaminated soil," which it believed was a "**continuing source** of groundwater contamination." | 74. Opp. at 29:24-30:11. |

| | UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|---|
| | 75. DTSC acknowledges that the "source problem" – i.e., the soil in the former process area – was the subject of remediation activities in the 1980s when C&A Products erected a building over the soil and again in 1992 when the contaminated soils were covered with concrete. | 75. Opp. at 30:5-11. |

Dated: March 2, 2015

Respectfully submitted,

KING WILLIAMS & GLEASON LLP

By: */s/ Jennifer Hartman King*
    Jennifer Hartman King
    Nicole R. Gleason
    Louinda v. Lacey

Attorneys for Defendant JIM DOBBAS, INC.