UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>        Plaintiffs,<br><br>  v.<br><br>JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; and WEST COAST WOOD PRESERVING, LLC, a Nevada limited liability company,<br><br>        Defendants,<br><br>AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS. | CIV. NO. 2:14-595 WBS EFB<br><br>MEMORANDUM AND ORDER RE: MOTION FOR ORDER APPROVING CONSENT DECREE |

----oo0oo----

Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively

1

"DTSC") brought this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., to recover cleanup costs incurred at 147 A Street in Elmira, California (the "Elmira Site") from defendants Jim Dobbas, Inc. ("Dobbas"), Continental Rail, Inc. ("CRI"), Pacific Wood Preserving Corporation ("PWP"), West Coast Wood Preserving, LLC ("WCWP"), Collins & Aikman Products, LLC ("C&A Products"), and David van Over.  Before the court is DTSC's motion for approval of a proposed consent decree between plaintiffs and WCWP.  (Docket No. 137.)  No party has filed an opposition.

As early as 1972, PWP conducted wood preserving operations at the Elmira Site.  (Decl. of Peter MacNicholl ("MacNicholl Decl.") ¶ 5 (Docket No. 137-2).)  These operations resulted in contamination of soil and groundwater at the site with arsenic, chromium, and copper.  (Id. ¶ 4.)  On September 12, 1979, PWP sold the Elmira Site to the Wickes Corporation.  (Id. ¶ 5.)  DTSC alleges that WCWP is a successor to PWP.  (Id.)

From the 1980s through 2005, the Wickes Corporation and its successor, C&A Products, took various actions at the Elmira Site to address environmental contamination under the oversight of DTSC.  (Id. ¶ 6.)  These actions included excavating soil, installing asphalt caps over contaminated soils, constructing a drainage system, installing a groundwater extraction and treatment system, and performing groundwater monitoring.  (Id.) On March 20, 1997, C&A Products sold the Elmira Site to Dobbas and CRI.  (Id.)  However, C&A Products continued to perform environmental actions and maintain the existing measures.

2

On May 17, 2005, C&A Products filed a petition for Chapter 11 bankruptcy. (Id.) It informed DTSC in November 2005 that it would not perform any further actions at the Elmira Site. (Id.) In 2006, DTSC requested that Dobbas and CRI carry out certain actions at the site. Dobbas and CRI refused. (Id. ¶ 7.) As a result, DTSC initiated state-funded actions beginning around November 9, 2006. (Id. ¶¶ 7-8.)

DTSC performed response actions from 2007 to the present, including excavating and backfilling soil, demolishing the groundwater extraction system, and monitoring groundwater. (See id. ¶¶ 8-10.) It continues to monitor the site and evaluate contamination trends. (Id. ¶ 11.) DTSC states that, as of May 5, 2015, its unreimbursed response costs relating to the site exceed $2.65 million, exclusive of interest. (Id. ¶ 13.) It further states that the costs for future investigation, remediation of contaminated soil, and treatment of surface and groundwater could reach approximately $3.5 million over the next ten years. (Id.)

DTSC contends in this action that WCWP is a responsible party pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is therefore jointly and severally liable for the costs DTSC incurred at the Elmira Site. On December 15, 2014, WCWP moved for summary judgment, asserting, among other things, that DTSC's claims are barred by the applicable statute of limitations and that WCWP is not the corporate successor to PWP. (See Docket No. 79.) Before the court ruled on that motion, however, WCWP and DTSC informed the court that they had reached a settlement. (See Docket No. 120.)

I.  Discussion

"In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" Arizona v. City of Tucson, 761 F.3d 1005, 1011-12 (9th Cir. 2014) (quoting United States v. Montrose Chem. Corp. of Cal., 50 F.3d 741, 748 (9th Cir. 1995)).  Parties seeking approval of a consent decree must provide "evidence sufficient to evaluate the terms of an agreement."  Id. at 1012.

"Fair" and "reasonable" are comparative terms.  Id. Accordingly, the court's "obligation to independently scrutinize the terms of [such agreements]" must involve, among other things, "comparing the proportion of total projected costs to be paid by the [settling parties] with the proportion of liability attributable to them." Id. at 1008 (quoting Montrose, 50 F.3d at 747) (quotation marks omitted).  The court must then "factor into the equation any reasonable discount for litigation risks, time savings, and the like . . . ."  Id. at 1012.  "A district court abuses its discretion where it does not fulfill its obligation to engage in this comparative analysis."  Id.

"[W]here state agencies have environmental expertise they are entitled to 'some deference' with regard to questions concerning their area of expertise."  Id. at 1014 (quoting City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 94 (1st Cir. 2008)).  State agencies are not entitled to deference regarding areas outside their expertise, such as their interpretation of CERCLA's requirements.  Id. at 1014-15.

///

4

A. <u>Terms of the Proposed Consent Decree</u>

The proposed Consent Decree provides that DTSC will release WCWP from liability in this action in exchange for, among other things, payment of $350,000. (<u>See</u> Consent Decree ¶¶ 13, 23.) The payment will be made in three installments, unless WCWP sells its business, in which case the full amount will be due within sixty days of the completion of the sale. (<u>Id.</u> ¶ 23.)

WCWP further agrees to provide DTSC with copies of all records, documents, and other information in its possession that relate to (1) the ownership, operation, or control of the Elmira Site; (2) the purchase, storage, use, handling, generation, treatment, transportation, or disposal of hazardous substances in connection with the Elmira Site; (3) releases or threatened releases of hazardous substances at the Elmira Site; and (4) response actions conducted by any person at the Elmira Site. (<u>Id.</u> ¶ 25.)

The Consent Decree provides for contribution protection pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).[1] (Consent Decree ¶¶ 36-39.) DTSC and WCWP also agree not to sue or assert claims against each other in connection with the subject matter of DTSC's First Amended Complaint or for response costs related to the Elmira Site. (<u>See</u> <u>id.</u> ¶¶ 29-31, 35).

///
///

---

[1] Section 113(f)(2) provides, in relevant part, "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

5

B. Analysis

    1. Procedurally Fair Process

The court turns first to whether the proposed Consent Decree is the "product of a procedurally fair process." Montrose, 50 F.3d at 746. Such a process generally involves good faith, "arm's length" negotiations among experienced counsel, during which all the parties have an opportunity to participate. See Montrose, 50 F.3d at 746; see also United States v. Cannons Eng'g Corp., 899 F.2d 79, 87 (1st Cir. 1990).

The settling parties represent that they engaged in arms'-length settlement negotiations in which all were represented by counsel. (MacNicholl Decl. ¶ 14.) Those negotiations included a day-long mediation with a neutral mediator experienced in environmental law. (See id.) DTSC and WCWP jointly drafted the terms of the proposed Consent Decree during several months of negotiations. (Id. ¶ 15.)

The arms'-length character of their negotiations is reinforced by the fact that the parties reached settlement after WCWP moved for summary judgment and put forth substantial evidence in its defense. DTSC vigorously opposed the motion with its own evidence, suggesting that both parties had the opportunity to showcase the strengths of their position before settlement was reached.

DTSC lodged the proposed Consent Decree with the court on June 2, 2015. (Docket No. 131-1.) On June 19, 2015, DTSC published notice of the Consent Decree in the California Regulatory Notice Register (2015, Volume No. 25-Z), page 1060, and invited the public to comment on it by July 20, 2015. (See

1  MacNicholl Decl. ¶ 16, Ex. 1.)  DTSC also published notice in a
2  local newspaper, the Dixon Tribute, (see id. ¶ 16, Ex. 2), and it
3  emailed notice to all parties in this lawsuit, (see id. ¶ 16, Ex.
4  3).  DTSC did not receive any comments on the proposed Consent
5  Decree.  (Id. ¶ 17.)  Accordingly, because the court can find no
6  reason to doubt the integrity of these steps, the court concludes
7  the proposed Consent Decree resulted from a procedurally fair
8  process.

### 2. Substantively Fair and Reasonable Terms

Next, the court must consider whether the proposed Consent Decree is "substantively fair to the parties in light of a reasonable reading of the facts." Montrose, 50 F.3d at 746; see also Cannons, 899 F.2d at 87 ("Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible.").

WCWP has agreed to pay $350,000 of the approximately $2.65 million that DTSC says have been spent responding to contamination at the Elmira Site.  The parties agreed to a covenant not to sue each other in the future for response costs relating to the site, meaning that WCWP will not face further liability for any of the estimated $3.5 million that DTSC states will be incurred over the next ten years.  (See MacNicholl Decl. ¶ 13.)  In short, WCWP will pay $350,000 toward an estimated total of approximately $6.15 million in costs incurred by the state.

The proportion of costs recouped by DTSC is relatively small.  WCWP will pay about thirteen percent of the costs

7

incurred to date and just under six percent of the total estimated costs DTSC says it will incur responding to contamination at the Elmira Site.

DTSC states in its supporting memorandum that WCWP's proportionate liability for response costs at the Elmira Site is approximately one-third. (DTSC's Mem. at 9 (Docket No. 137-1).) DTSC justifies this number by pointing to its allegations that, unlike other defendants who merely owned the Elmira Site, WCWP was both an owner and operator of the site. (Id.) At oral argument today, counsel for DTSC further represented that the parties considered factors such as the length of time WCWP's alleged predecessor PWP owned and operated the Elmira Site, whether WCWP had complied with any agency or court orders relating the site, and whether WCWP had paid for any cleanup costs before this lawsuit.

DTSC is the lead agency responsible for enforcing California's Hazardous Substance Account Act ("HSAA") and for investigating and responding to releases of hazardous substances in California.[2] See Cal. Health & Safety Code § 25354.5. Accordingly, because court may afford DTSC "some deference" on the subject of responding to releases of hazardous substances, it will give deference to DTSC's estimation that WCWP's actions are

---

[2] HSAA is the state analogue to CERCLA. See Coppola v. Smith, 935 F. Supp. 2d 993, 1011 (E.D. Cal. 2013) (Ishii, J.) ("Although the HSAA is not identical to CERCLA, the HSAA expressly incorporates the same liability standards, defenses, and classes of responsible persons as those set forth in CERCLA." (citations omitted)); Castaic Lake Water Agency v. Whittaker Corp., 272 F. Supp. 2d 1053, 1084 n.40 (C.D. Cal. 2003) ("HSAA creates a scheme that is identical to CERCLA with respect to who is liable." (citations and internal quotation marks omitted)).

responsible for approximately one-third of the agency's response costs.  See City of Tuscon, 761 F.3d at 1014.

This does not mean the court may defer to DTSC's representations that the Consent Decree is substantively fair. See id. at 1014-15 (stating that a state agency is not entitled to deference concerning its interpretation of CERCLA's mandate). Through CERCLA, "Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created."  Cannons, 899 F.2d at 90-91 (quoting Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986)).  If WCWP is responsible for one-third of DTSC's cleanup costs, as DTSC says it is, the parties must contemplate a substantial discount for "litigation risks, time savings, and the like" to arrive at the thirteen percent of costs so far incurred--and six percent of total costs--that WCWP will actually pay pursuant to their agreement.  See City of Tucson, 761 F.3d at 1012.  The court will therefore evaluate factors justifying such a discount next.

The record supports several risks for DTSC from continued litigation against WCWP.  WCWP highlighted at least two of these risks in its motion for summary judgment.  WCWP argued that it is not a corporate successor to PWP, and therefore cannot be held liable for contamination caused at the Elmira Site by PWP.  The motion also contended that DTSC's claims are time-barred by the applicable statute of limitations.  This was not an idle argument, as this court has found CERCLA claims brought by DTSC to be time-barred in the past.  See, e.g., State of Cal. on

9

Behalf of Cal. Dep't of Toxic Substances Control v. Hyampom Lumber Co., 903 F. Supp. 1389, 1394 (E.D. Cal. 1995).  Had WCWP prevailed on either of these arguments, it would not have faced any liability for DTSC's response costs.

In addition, WCWP and several other defendants have filed counterclaims against DTSC asserting that the agency's direction and oversight of response actions at the Elmira Site contributed to the site's contamination and incurred unnecessary costs.  (See WCWP's Counterclaim ¶ 7 (Docket No. 67).)  For example, WCWP alleges that DTSC knew or should have known that the installation of a groundwater extraction and treatment system would not remedy contamination at the site but approved its use in 1983 nonetheless.  (Id.)  DTSC later demolished the groundwater system in 2010, incurring additional and allegedly unnecessary costs.  (Id. ¶¶ 15-18.)  These allegations suggest the unreimbursed response costs asserted by DTSC were inflated by the agency's reckless or negligent selection of response actions.  (See id. ¶ 27.)  This possibility will presumably have factored into the parties' settlement amount.

Both parties also face costly and time consuming discovery from continued litigation.  DTSC's opposition to WCWP's motion for summary judgment requested additional time pursuant to Federal Rule of Civil Procedure 56(d) for discovery related to WCWP's relationship to PWP and the Elmira Site.  (See Pls.' Opp'n at 17-20 (Docket No. 107).)  The record therefore supports the fact that additional subjects for discovery remained at the time the parties reached a settlement.

Moreover, the discovery cutoff set by the court's

Pretrial Scheduling Order is March 30, 2016.  (See Pretrial Scheduling Order at 2-3 (Docket No. 20).)  Early settlement saves DTSC and WCWP at least six months of further discovery.  It also eliminates the costs of pretrial research, pretrial filings, and ultimately, bringing these claims to trial.  In considering whether to approve the settlement, the court finds it entirely reasonably that DTSC and WCWP would wish to free themselves from these burdens by settling their claims.  It is also entirely reasonable to discount WCWP's proportional liability based on these savings.

WCWP's status as the first party in this case to settle could justify another discount from its estimated proportional liability.  "Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlers, thereby encouraging other parties to settle based on the possibility that late settlers and non-settlers bear the risk that they might ultimately be responsible for an enhanced share of the total claim."[3]  United States v. Fort James Operating Co., 313 F. Supp. 2d 902, 909 (E.D. Wis. 2004); see also Cannons, 899 F.2d at 92 ("Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan.").  DTSC may have provided

---

[3]  CERCLA enables this strategy through 42 U.S.C. § 9613(f)(2).  As the First Circuit explained in Cannons, "[t]he statute immunizes settling parties from liability for contribution and provides that only the amount of the settlement--not the pro rata share attributable to the settling party--shall be subtracted from the liability of the nonsettlors."  Cannons, 899 F.2d at 91.

WCWP with favorable terms in order to leverage comparatively greater liability toward resolving claims against the remaining defendants.

Accordingly, after conducting the required comparative fault analysis and considering facts in the record that justify a discounted settlement amount, the court concludes that the terms of the proposed Consent Decree are substantively fair and reasonable.

### 3. Consistent with CERCLA's Objectives

Finally, the court must consider whether the proposed Consent Decree is consistent with CERCLA's objectives. See Montrose, 50 F.3d at 746. These objectives include holding a party that is legally responsible for contamination accountable. See Cannons, 899 F.2d at 90-91. Having addressed accountability at length above, the court sees no need to reiterate the same points here except to note that, by requiring WCWP to pay for a portion of DTSC's cleanup costs, the Consent Decree advances that objective. See Cannons, 899 F.2d at 90 (noting "consideration of the extent to which consent decrees are consistent with Congress' discerned intent involves matters implicating fairness and reasonableness" and that the approval criteria "were not meant to be mutually exclusive").

In addition, "one of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation." Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 971 (9th Cir. 2013) (quoting Cal. Dep't of Toxic Substances Control v. City of Chico, 297 F. Supp. 2d 1227, 1235

(E.D. Cal. 2004) (Karlton, J.)).  The resolution of DTSC's claims against WCWP before going to trial therefore advances this purpose by securing settlement with WCWP and increasing the pressure on remaining parties to reach a settlement.  See Cannons, 899 F.2d at 92.

The Cannons court also explained that CERCLA was intended to give regulators "the tools necessary for a prompt and effective response to . . . hazardous waste disposal."  Cannons, 899 F.3d at 90.  The court does not find this objective directly relevant in the instant context because the proposed Consent Decree focuses on recovering response costs that have already been expended responding to contamination.  However, this objective may be indirectly advanced by reinforcing DTSC's ability to promptly and effectively respond to contamination using state funds with the knowledge, ex ante, that similar consent decrees may be used to bypass the uncertainties of litigation and recover those expenses later.

Accordingly, because the court concludes from the evidence before it that the proposed Consent Decree is procedurally and substantively fair, reasonable, and consistent with CERCLA's objectives, the court will order its approval.  See City of Tucson, 761 F.3d at 1011-12.

IT IS THEREFORE ORDERED that plaintiffs' motion for approval of the Consent Decree be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that all claims for contribution or indemnity against West Coast Wood Preserving, LLC arising out of response costs incurred at the Elmira Site be, and the same

hereby are, DISMISSED pursuant to 42 U.S.C. § 9613(f)(2).

Dated:  August 24, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE