KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
SARAH E. MORRISON, State Bar No. 143459
Supervising Deputy Attorney General
OLIVIA W. KARLIN, State Bar No. 150432
LAURA J. ZUCKERMAN (Counsel for service)
State Bar No. 161896
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  Oakland, CA 94612
  Telephone: (510) 622-2174
  Fax: (510) 622-2270
  E-mail: Laura.Zuckerman@doj.ca.gov
*Attorneys for Plaintiffs California*
*Department of Toxic Substances Control and Toxic*
*Substances Control Account*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,<br><br>                          Plaintiffs,<br><br>     v.<br><br>JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; WEST COAST WOOD PRESERVING, LLC., a Nevada limited liability company; and COLLINS & AIKMAN PRODUCTS, LLC, a Delaware limited liability company,<br><br>                          Defendants.<br><br>AND RELATED COUNTERCLAIMS AND CROSS CLAIMS | 2:14-cv-00595-WBS-EFB<br><br>**DECLARATION OF PETER MACNICHOLL IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDICIAL APPROVAL OF CONSENT DECREE BETWEEN PLAINTIFFS AND DEFENDANT JIM DOBBAS, INC.**<br><br>Date:       October 19, 2015<br>Time:      2:00 p.m.<br>Place:     Courtroom 5, 14th Floor<br>            501 I Street<br>            Sacramento, CA 95814<br>Trial:      January 4, 2017<br><br>Action Filed: March 3, 2014 |

# DECLARATION OF PETER MACNICHOLL

I, Peter MacNicholl, declare as follows:

1. I make this declaration in support of the Motion for Judicial Approval of Consent Decree between Plaintiffs State of California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively, "DTSC") and Defendant Jim Dobbas, Inc. ("Settling Defendant"). The facts stated in this declaration are based on my personal knowledge and on my review of files kept by DTSC. If called as a witness, I would and could competently testify hereto.

2. I have been employed with DTSC as a Project Manager for fourteen years, and in this capacity have overseen the cleanup process at many sites throughout the State. At DTSC, I am assigned to the National Priorities List Unit within the Brownfields and Environmental Restoration Program, and have worked in the Unit for over five years. The National Priorities List Unit conducts and oversees response actions at the former Wickes Industries Site, located at 147 A Street, Elmira, Solano County, CA, identified by Solano County Assessor's Parcel Numbers 142-010-130, 142-010-140 and 142-042-010 ("the Site"). As Project Manager, I have been actively involved with the Site since approximately March 2010. I am familiar with the Site's history, and I am knowledgeable about DTSC's work at the Site.

3. I have visited the Site on many occasions. I have participated in, among other things, Site inspections, oversight of groundwater sampling, preparation of the Removal Action Workplan ("RAW") in 2010, and implementation and oversight of the soil excavation activity in 2011, described in the RAW. I have obtained and reviewed historical documents concerning the Site from the files of the California Regional Water Control Board, Central Valley Region ("Regional Board"), and DTSC's files. As the Project Manager for the Site, I have also managed contracts and the staff of environmental engineering firms who have worked at the Site on behalf of DTSC.

## Site History

4. The Site is a former wood treatment and preserving facility where past operations have contaminated the soil and groundwater with arsenic, chromium, and copper. As a result of

1

the wood preserving operations at the Site, hazardous substances have been, and continue to be, released and/or threatened to be released into the environment at and from the Site.

5. At different periods of time, each defendant in this action owned and/or operated the Site. From approximately 1972 to 1982, wood preserving operations were conducted at the Site. From 1997 to 2011, Settling Defendant owned an undivided fifty percent interest in the Site.

### Response Actions and Response Costs at the Site

6. From the 1980's through 2005, the Wickes Corporation and its successor, defendant Collins & Aikman Products, LLC ("C&A Products"), under the oversight of DTSC, took various response actions to address environmental contamination at, around, and/or beneath the Site. Those actions included, among other things, soil excavation, installing an asphalt cap over contaminated soils, constructing a building and a drainage system over another contaminated area of the Site, installing and operating a groundwater extraction and treatment system, and groundwater monitoring. On or about March 20, 1997, C&A Products sold the Site to Settling Defendant and Continental Rail, Inc. ("CRI"). On or about May 17, 2005, C&A Products filed a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 05-55932. In November 2005, while in Chapter 11 bankruptcy proceedings, C&A Products informed DTSC that it was unwilling to continue to perform response actions at the Site.

7. In 2006, DTSC requested that Settling Defendant and CRI, the owners of the Site, carry out response actions to address contamination at the Site. Settling Defendant and CRI refused. As a result, DTSC issued an Imminent or Substantial Endangerment Determination on November 9, 2006, and initiated state-funded contracts to evaluate response actions.

8. In 2007, DTSC tried to resume operating the groundwater treatment system at the Site, but the system would have required too many repairs to clean up the groundwater to remediation goals in a timely manner. Because of the treatment system failure, DTSC reevaluated response actions for the Site. In July 2010, DTSC finalized the RAW for the Site calling for contaminated soil excavation, off-site disposal, backfilling, confirmation sampling, demolition of the groundwater extraction and treatment system, and long-term groundwater monitoring. The RAW noted that contaminated groundwater had migrated from beneath the Site

2

Declaration of Peter MacNicholl In Support of Plaintiffs' Motion for Judicial Approval of Consent Decree Between Plaintiffs and Defendant Jim Dobbas, Inc. (2:14-cv-00595-WBS-EFB)

to the nearby residential area, which created the potential for private irrigation wells located in the residential area to extract and distribute contaminated groundwater.

9. On March 16, 2011, DTSC issued an Imminent or Substantial Endangerment Determination Order and Remedial Action Order ("I/SE Order") ordering Settling Defendant, CRI, and Van Over to conduct the response actions described in the RAW and to take additional response actions at the Site. Settling Defendant, CRI, and Van Over failed to comply with the I/SE Order.

10. DTSC has incurred costs for "response" as that term is defined in CERCLA section 101(25), 42 U.S.C. § 9601(25), in taking actions related to the release and/or threatened release of hazardous substances at, around, and/or beneath the Site. DTSC's response actions included, but were not limited to, the following activities: efforts to repair and restart the groundwater extraction and treatment system, completion of a removal investigation for site soils, preparation of the RAW, implementation of the RAW, and monitoring of stormwater and groundwater.

11. Presently, DTSC is monitoring the condition of the asphalt cap at the Site, and is conducting periodic stormwater monitoring and quarterly groundwater monitoring and reporting to evaluate contaminant trends and ensure the protection of the off-site private irrigation wells. Continued monitoring of stormwater and evaluating the condition of the asphalt cap is necessary to make sure contaminants below the cap are not mobilized by storm water run-off, to prevent discharges to the drainage ditches near the Site, and to block direct exposure of contaminated soil to humans or environmental receptors. Continued groundwater monitoring and reporting is necessary to make certain that the Site is not causing further groundwater contamination and to ensure that contaminant concentrations at the four off-site private irrigation wells do not exceed drinking water standards.

12. Continued stormwater and groundwater monitoring is also necessary to further assess the performance of the 2011 soil excavation, and to assist with preparing a Five-Year Review Report (preparation scheduled to begin in Fall 2016) that will evaluate the effectiveness of the 2011 soil removal action conducted pursuant to the 2010 RAW. It is premature to

determine the efficacy of that 2011 removal action until the Five-Year Review process is complete and DTSC receives and evaluates additional stormwater and groundwater monitoring data. Therefore, at this time, DTSC cannot conclude that all Site actions are finished and complete, or that further response actions at the Site will not be necessary.

13. As of May 5, 2015, DTSC's unreimbursed response costs related to the Site exceeded $2.65 million, exclusive of interest. DTSC is in the process of remediating the Site, and continues to incur response costs related to the Site. DTSC currently estimates that total unreimbursed response costs for investigation and remediation of the contaminated soil, along with stormwater and groundwater monitoring at the Site, could reach approximately $3.5 million by 2025 if DTSC has to continue conducting all the response actions at the Site.

### Settlement Negotiations

14. I have been informed of the settlement negotiations between the parties regarding the liability of Settling Defendant for DTSC's response costs incurred and to be incurred at the Site. Settling Defendant engaged in arms'-length settlement negotiations. Settling Defendant was represented by counsel throughout those negotiations.

15. After arms'-length, good faith settlement negotiations, DTSC and Settling Defendant reached a settlement resolving Settling Defendant's liability in this action. The settlement was incorporated into the Proposed Consent Decree. DTSC and Settling Defendant participated in drafting the proposed Consent Decree. DTSC lodged the proposed Consent Decree with the Court on July 15, 2015.

### Publication of Notice of Proposed Consent Decree

16. On July 17, 2015, DTSC published notice of the proposed Consent Decree in the California Regulatory Notice Register (2015, Volume No. 29-Z), pages 1210-1211 ("Notice") and invited the public to comment on the proposed Consent Decree. The Notice requested that comments on the proposed Consent Decree be submitted to DTSC no later than August 17, 2015. A true and correct copy of the Notice is attached as Exhibit 1. DTSC also published notice of the Proposed Consent Decree in a local newspaper, the Dixon Tribune.

4

Declaration of Peter MacNicholl In Support of Plaintiffs' Motion for Judicial Approval of Consent Decree Between Plaintiffs and Defendant Jim Dobbas, Inc. (2:14-cv-00595-WBS-EFB)

A true and correct copy of the Notice is attached as Exhibit 1. DTSC also published notice of the Proposed Consent Decree in a local newspaper, the Dixon Tribune. A true and correct copy of the newspaper publication is attached as Exhibit 2. Additionally, on July 17, 2015, DTSC informed all defendants and/or their counsel by e-mail about the execution of the proposed Consent Decree and the commencement of the public comment period. A true and correct copy of this e-mail is attached at Exhibit 3.

17. DTSC did not receive comments on, or objections to, the proposed Consent Decree.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 17, 2015, at Sacramento, California.

*/s/ Peter MacNicholl*
PETER MACNICHOLL, P.E.
Project Manager
Brownfields and Environmental Restoration Program

5

Declaration of Peter MacNicholl In Support of Plaintiffs' Motion for Judicial Approval of Consent Decree Between Plaintiffs and Defendant Jim Dobbas, Inc. (2:14-cv-00595-WBS-EFB)