UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,

Plaintiffs,

v.

JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; and WEST COAST WOOD PRESERVING, LLC, a Nevada limited liability company,

Defendants,

AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS.

CIV. NO. 2:14-595 WBS EFB

MEMORANDUM AND ORDER RE: MOTION FOR ORDER APPROVING CONSENT DECREE

----oo0oo----

Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively,

"DTSC") brought this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., to recover cleanup costs incurred at 147 A Street in Elmira, California (the "Elmira Site") from defendants Jim Dobbas, Inc. ("Dobbas"), Continental Rail, Inc. ("CRI"), Pacific Wood Preserving Corporation ("PWP"), West Coast Wood Preserving, LLC ("WCWP"), Collins & Aikman Products, LLC ("C&A Products"), and David van Over ("Van Over"). Presently before the court is DTSC's motion for approval of a proposed Consent Decree between plaintiffs and Dobbas. (Docket No. 146.) No party has filed an opposition.

I. Factual and Procedural Background

From 1972 to 1982, wood preserving operations at the Elmira Site contaminated the soil and groundwater with arsenic, chromium, and copper. (MacNicholl Decl. ¶¶ 4-5 (Docket No. 144).) From the 1980s through 2005, the Wickes Corporation and its successor, C&A Products, took various actions at the Elmira Site to address environmental contamination under the oversight of DTSC. (Id. ¶ 6.) These actions included excavating soil, installing asphalt caps over contaminated soils, constructing a drainage system, installing a groundwater extraction and treatment system, and performing groundwater monitoring. (Id.) In 1997, C&A Products sold the Elmira Site to Dobbas and CRI. (Id.) However, C&A Products continued to perform environmental actions and maintain the existing measures.

In May 2005, C&A Products filed a petition for Chapter 11 bankruptcy. (Id.) It informed DTSC in November 2005 that it would not perform any further actions at the Elmira Site. (Id.)

In 2006, DTSC requested that Dobbas and CRI carry out certain actions at the site. Dobbas and CRI refused. (Id. ¶ 7.) As a result, DTSC initiated and performed state-funded response actions from 2007 to the present, including excavating and backfilling soil, demolishing the groundwater extraction system, and monitoring groundwater. (See id. ¶¶ 7-10.) Dobbas and CRI sold the Elmira Site to Van Over in 2011, and DTSC continues to monitor the site and evaluate contamination trends. (See id. ¶¶ 9-11.) DTSC states that, as of May 5, 2015, its unreimbursed response costs relating to the site exceeded $2.65 million, exclusive of interest. (Id. ¶ 13.) It further states that the costs for future investigation, remediation of contaminated soil, and treatment of surface and groundwater could reach approximately $3.5 million by 2025. (Id.)

DTSC contends in this action that Dobbas is a responsible party pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is therefore jointly and severally liable for the costs DTSC has incurred at the Elmira Site. (Docket No. 77 at 2.) Dobbas has filed counterclaims against DTSC on the same grounds, (Docket Nos. 23-1 to 23-3, 25), and cross-claims against the other defendants, (Docket No. 101). In March 2015, Dobbas moved for summary judgment against DTSC, asserting, among other things, that DTSC's claims are barred by the applicable statute of limitations. (See Docket No. 116.) Before the court ruled on that motion, however, Dobbas and DTSC informed the court that they had reached a settlement. (See Docket Nos. 122-25.) DTSC lodged the proposed Consent Decree on July 15, 2015. (Docket No. 135.)

II. Discussion

"In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" Arizona v. City of Tucson, 761 F.3d 1005, 1011-12 (9th Cir. 2014) (quoting United States v. Montrose Chem. Corp. of Cal., 50 F.3d 741, 748 (9th Cir. 1995)). Parties seeking approval of a consent decree must provide "evidence sufficient to evaluate the terms of an agreement." Id. at 1012.

"Fair" and "reasonable" are comparative terms. Id. Accordingly, the court's "obligation to independently scrutinize the terms of [such agreements]" must involve, among other things, "comparing the proportion of total projected costs to be paid by the [settling parties] with the proportion of liability attributable to them." Id. at 1008 (quoting Montrose, 50 F.3d at 747) (quotation marks omitted). The court must then "factor into the equation any reasonable discount for litigation risks, time savings, and the like . . . ." Id. at 1012. "A district court abuses its discretion where it does not fulfill its obligation to engage in this comparative analysis." Id.

"[W]here state agencies have environmental expertise they are entitled to 'some deference' with regard to questions concerning their area of expertise." Id. at 1014 (quoting City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 94 (1st Cir. 2008)). State agencies are not entitled to deference regarding areas outside their expertise, such as their interpretation of CERCLA's requirements. Id. at 1014-15.

A. Terms of the Proposed Consent Decree

The proposed Consent Decree provides that DTSC will release Dobbas from liability in this action in exchange for, among other things, payment of $350,000. (See Consent Decree ¶¶ 12, 22.) Dobbas also agrees to provide DTSC with copies of all records, documents, and other information in its possession that relate to (1) the ownership, operation, or control of the Elmira Site; (2) the purchase, storage, use, handling, generation, treatment, transportation, or disposal of hazardous substances in connection with the Elmira Site; (3) releases or threatened releases of hazardous substances at the Elmira Site; and (4) response actions conducted by any person at the Elmira Site. (Id. ¶ 24.) The Consent Decree entitles Dobbas to contribution protection pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).[1] (Id. ¶¶ 33-35.) DTSC and Dobbas also agree not to file any claims against each other regarding response costs at the Elmira Site. (See id. ¶¶ 27, 32.)

B. Analysis

1. Procedurally Fair Process

The court must first determine whether the proposed Consent Decree is the "product of a procedurally fair process." Montrose, 50 F.3d at 746. Such a process generally involves good faith, arm's-length negotiations among experienced counsel, during which all parties have an opportunity to participate. See

---

[1] Section 9613(f)(2) provides, in relevant part, "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). However, such person "may seek contribution from any person who is not party to [the] settlement." Id. § 9613(f)(3)(B).

id.; see also United States v. Cannons Eng'g Corp., 899 F.2d 79, 87 (1st Cir. 1990).

The settling parties represent that they engaged in arm's-length settlement negotiations in which all were represented by counsel. (MacNicholl Decl. ¶¶ 14-15.) DTSC and Dobbas jointly drafted the terms of the proposed Consent Decree. (Id. ¶ 15.) The arm's-length character of their negotiations is reinforced by the fact that the parties reached settlement after Dobbas filed counterclaims against DTSC, moved for summary judgment, and put forth substantial evidence in its defense, indicating that both parties had the opportunity to showcase the strengths of their positions before they reached settlement.

After lodging the proposed Consent Decree with the court, DTSC published notice of the Consent Decree in the California Regulatory Notice Register (2015, Volume No. 29-Z), pages 1210-11, and invited the public to comment on it until August 17, 2015. (MacNicholl Decl. ¶ 16, Ex. 1.) It also published such notice in a local newspaper, the Dixon Tribune, (id. ¶ 16, Ex. 2), and emailed notice to all parties in this lawsuit, (id. ¶ 16, Ex. 3). DTSC did not receive any comments on, or objections to, the proposed Consent Decree. (Id. ¶ 17.) Since the court can find no reason to doubt the integrity of these steps, the court concludes that the proposed Consent Decree resulted from a procedurally fair process.

2. Substantively Fair and Reasonable Terms

Next, the court must determine whether the proposed Consent Decree is "substantively fair to the parties in light of a reasonable reading of the facts." Montrose, 50 F.3d at 746;

see also Cannons, 899 F.2d at 87 ("Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible.").

Dobbas has agreed to pay $265,000 of the approximately $2.65 million that DTSC says it incurred in responding to contamination at the Elmira Site. The parties agreed to a covenant not to sue each other in the future for response costs relating to the site, meaning that Dobbas will not face further liability for any of the $3.5 million that DTSC estimates it will incur by 2025. (See MacNicholl Decl. ¶ 13.) The proportion of costs recouped by DTSC is relatively small: Dobbas will pay 10% of the costs that DTSC has incurred to date and approximately 7.6% of the estimated costs it will incur by 2025.

DTSC states that Dobbas's proportionate liability for response costs at the Elmira Site is approximately 20% because Dobbas held half of the site's property interest, never conducted wood preserving operations at the site, and did not cause the contamination there. (DTSC's Mem. at 9 (Docket No. 143). Because DTSC is the lead agency responsible for enforcing California's Hazardous Substance Account Act ("HSAA") and for investigating and responding to hazardous substance releases in California,[2] the court affords "some deference" to DTSC's estimation of Dobbas's proportionate liability of the agency's

[2] See Cal. Health & Safety Code § 25354.5. HSAA is the state analogue to CERCLA. See Coppola v. Smith, 935 F. Supp. 2d 993, 1011 (E.D. Cal. 2013) (Ishii, J.) ("Although the HSAA is not identical to CERCLA, the HSAA expressly incorporates the same liability standards, defenses, and classes of responsible persons as those set forth in CERCLA." (citations omitted)).

response costs. See City of Tuscon, 761 F.3d at 1014.

DTSC justifies discounting Dobbas's proportionate liability to 10% of DTSC's current unreimbursed costs by factoring in several risks that arise from continued litigation between the parties. Dobbas had previously moved for summary judgment on the basis that DTSC's claims were time-barred by the applicable statute of limitations. Such an argument was viable, as this court has found in the past that DTSC's CERCLA claims were in fact time-barred. See, e.g., State of Cal. ex rel Cal. Dep't of Toxic Substs. Control v. Hyampom Lumber Co., 903 F. Supp. 1389, 1394 (E.D. Cal. 1995). If Dobbas prevailed on this argument, it would not have faced any liability for DTSC's response costs.

In addition, Dobbas had filed counterclaims against DTSC asserting that the agency's direction and oversight of response actions at the Elmira Site contributed to the site's contamination and incurred unnecessary costs. (E.g., Docket No. 25 ¶¶ 11-12, 17, 26.) DTSC and Dobbas presumably factored into the settlement amount the possibility that DTSC's negligently selected or implemented response actions may have inflated the agency's asserted unreimbursed costs.

Moreover, both parties face costly and time consuming discovery from continued litigation. Since DTSC requested additional time for discovery in opposing WCWP's motion for summary judgment, (see Docket No. 107 at 17-20), it is likely that DTSC would have required additional discovery in opposing Dobbas's summary judgment motion as well. Because the discovery cutoff set by the court's Pretrial Scheduling Order is March 30,

2016, (Docket No. 20 at 2-3), early settlement also saves DTSC and Dobbas at least four months of additional discovery, research, and related costs and eliminates the parties' costs of going to trial in this case. It is reasonable that DTSC and Dobbas wish to free themselves from these burdens by settling their claims. The court thus finds it reasonable that DTSC discounted Dobbas's proportional liability based on these factors.

Dobbas's status as the second defendant[3] to settle in this case also justifies a discount from its estimated proportional liability. "Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlers, thereby encouraging other parties to settle based on the possibility that late settlers and non-settlers bear the risk that they might ultimately be responsible for an enhanced share of the total claim."[4] United States v. Fort James Operating Co., 313 F. Supp. 2d 902, 909 (E.D. Wis. 2004); see also Cannons, 899 F.2d at 92 ("Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan.").

CERCLA enables this strategy through 42 U.S.C. § 9613(f)(2). "The statute immunizes settling parties from liability for contribution and provides that only the amount of the settlement--not the pro rata share attributable to the

---

[3] The court approved a consent decree between DTSC and WCWP on September 2, 2015. (Docket Nos. 139, 141.)

[4]

settling party--shall be subtracted from the liability of the nonsettlors." Cannons, 899 F.2d at 91. It would thus be reasonable for DTSC to discount Dobbas's proportionate liability and provide Dobbas favorable terms to leverage the remaining defendants' comparatively greater liability in resolving the claims against them.

Accordingly, after conducting the required comparative fault analysis and considering facts in the record that justify a discounted settlement amount, the court concludes that the terms of the proposed Consent Decree are substantively fair and reasonable.

3. Consistent with CERCLA's Objectives

Finally, the court must determine whether the proposed Consent Decree is consistent with CERCLA's objectives. See Montrose, 50 F.3d at 746. This includes holding accountable the parties who are legally responsible for the contamination at issue. See Cannons, 899 F.2d at 90-91. Having addressed Dobbas's accountability at length above, the court sees no need to reiterate the same points here except to note that, by requiring Dobbas to pay for a portion of DTSC's cleanup costs, the Consent Decree advances that objective. See Cannons, 899 F.2d at 90 (noting "consideration of the extent to which consent decrees are consistent with Congress' discerned intent involves matters implicating fairness and reasonableness" and that the approval criteria "were not meant to be mutually exclusive").

In addition, "one of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated

litigation." Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 971 (9th Cir. 2013) (citation omitted). DTSC and Dobbas's settlement of their claims and counterclaims at the pretrial stage advances this purpose and increases the pressure on the remaining defendants to reach a settlement. See Cannons, 899 F.2d at 92.

Lastly, CERCLA was intended to give regulators "the tools necessary for a prompt and effective response to . . . hazardous waste disposal." Cannons, 899 F.3d at 90. The court does not find this objective directly relevant here because the proposed Consent Decree focuses on recovering response costs that DTSC has already expended responding to contamination. However, the Consent Decree may indirectly advance this objective because funds from the settlement reinforce DTSC's ability to respond promptly and effectively to contamination. It also enables DTSC to use state funds with the knowledge that similar consent decrees may be used to bypass the uncertainties of litigation and recover those expenses in the future.

Accordingly, because the court concludes from the evidence before it that the proposed Consent Decree is procedurally and substantively fair, reasonable, and consistent with CERCLA's objectives, the court will order its approval. See City of Tucson, 761 F.3d at 1011-12.

IT IS THEREFORE ORDERED that plaintiffs' motion for approval of the Consent Decree between plaintiffs and Jim Dobbas, Inc. (Docket No. 146) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that all claims for contribution or indemnity against Jim Dobbas, Inc. arising out of response

costs incurred at the Elmira Site be, and the same hereby are, DISMISSED pursuant to 42 U.S.C. § 9613(f)(2).

Dated: November 13, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE