XAVIER BECERRA
Attorney General of California
EDWARD H. OCHOA
Supervising Deputy Attorney General
OLIVIA W. KARLIN, State Bar No. 150432
LAURA J. ZUCKERMAN (Counsel for service)
State Bar No. 161896
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  Oakland, CA 94612
  Telephone: (510) 879-1299
  Fax: (510) 622-2270
  E-mail: Laura.Zuckerman@doj.ca.gov
*Attorneys for Plaintiffs California*
*Department of Toxic Substances Control and the*
*Toxic Substances Control Account*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL and the TOXIC SUBSTANCES CONTROL ACCOUNT,**<br><br>Plaintiffs,<br><br>v.<br><br>Defendants.<br><br>**JIM DOBBAS, INC., a California corporation; CONTINENTAL RAIL, INC., a Delaware corporation; DAVID VAN OVER, individually; PACIFIC WOOD PRESERVING, a dissolved California corporation; WEST COAST WOOD PRESERVING, LLC., a Nevada limited liability company; and COLLINS & AIKMAN PRODUCTS, LLC, a Delaware limited liability company,**<br><br>Defendants.<br><br>**AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS** | 2:14-cv-00595-WBS-EFB<br><br>**DECLARATION OF MCKINLEY LEWIS, JR., IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ENTRY OF DEFAULT JUDGMENT BY COURT AGAINST DEFENDANT COLLINS & AIKMAN PRODUCTS, LLC**<br><br>FED. R. CIV. P. 55(b)<br><br>Date: September 23, 2019<br>Time: 1:30 p.m.<br>Place: Courtroom 5, 14th Floor<br>      501 I Street<br>      Sacramento, CA 95814<br><br>Action Filed: March 3, 2014 |

1

I, McKinley Lewis, Jr., declare as follows:

1. I make this declaration in support of the Application for Entry of Default Judgment by Court Against Defendant Collins & Aikman Products, LLC ("C&A Products") filed by Plaintiffs California Department of Toxic Substances Control and the Toxic Substances Control Account (collectively, "DTSC"). The facts stated in this declaration are based on my personal knowledge and on my review of files which DTSC maintains in the regular course of business and files DTSC obtained from Solano County and the Central Valley Regional Water Quality Control Board ("Water Board"). If called as a witness, I could and would competently testify to the following:

2. I have been employed by DTSC since January 2008, and am currently employed by DTSC as a Hazardous Substances Engineer. My job duties include working in the National Priorities List Unit ("NPL Unit") within the Site Mitigation and Restoration Program. The NPL Unit conducts and oversees response actions under the Hazardous Substances Account Act, California Health and Safety Code section 25300 *et seq*. and its federal counterpart, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. section 9601 *et seq*. ("CERCLA").

3. DTSC is the state agency responsible for enforcing California Health and Safety Code Section 25300 *et seq*., and for investigating and remediating hazardous substances releases at sites in California.

4. As part of my responsibilities at DTSC, I oversee the investigation and cleanup of contaminated sites in California. I am currently the Project Manager for a contaminated site known as at the former Wickes Forest Industries Site, located at the intersection of A Street and Holdener Road in the unincorporated community of Elmira, Solano County, California, identified by Solano County Assessor/Recorder's Parcel Numbers 142-010-130, 142-010-140, and 142-042-010 (the "Site"). I have visited the Site on many occasions, and have participated in, among other things, Site inspections and oversight of groundwater sampling. I have obtained and reviewed historical documents concerning the Site from DTSC's files. I have also reviewed documents obtained from Solano County and the Water Board. As the Project Manager for the

2

DECL. OF MCKINLEY LEWIS, JR., IN SUPPORT OF PLAINTIFFS' APPLIC. FOR ENTRY BY COURT OF
DEFAULT JUDGMENT AGAINST DEF. COLLINS & AIKMAN PRODUCTS, LLC (2:14-cv-00595-WBS-EFB)

Site, I have also managed contracts and the staff of environmental engineering firms who have worked at the Site on behalf of DTSC.

**Site History**

5.  Prior to 1972, the Site was used for agriculture. *See* page 8 of the Remedial Investigation Report dated July 2008, a true and correct copy of which is attached hereto as **Exhibit A**. At various times since 1972, hazardous substances within the definition of section 101(14) of CERCLA, 42 U.S.C. section 9601(14), were released into the environment at and from the Site within the meaning of section 101(22) of CERCLA, 42 U.S.C. section 9601(22). First Amended Complaint, Docket No. 77 ("FAC"), ¶ 19. These hazardous substances included arsenic, chromium, and copper, which were constituents of wood preserving chemicals used at the Site. *Ibid.*

6.  Defendant Pacific Wood Preserving ("PWP") conducted wood preserving operations at the Site from approximately 1972 through on or about September 12, 1979. FAC, ¶ 17. Spills of hazardous substances occurred at the Site during PWP's ownership and operation.

7.  On approximately September 12, 1979, The Wickes Corporation ("Wickes") purchased the Site, subsequently conducting business operations at the Site until approximately 1982. FAC, ¶ 16. Wickes and its eventual successor, defendant C&A Products, continued to own the Site until about March 20, 1997. *Ibid.*

8.  From on or about September 12, 1979 through approximately 1982, Wickes conducted wood preserving operations at the Site. FAC, ¶ 18. Spills of hazardous substances occurred at the Site during Wickes and C&A Products's ownership and operation.

9.  On December 24, 1979, a large amount of green liquid flowed from a large tank located in the yard at the Site. *See* Solano County Sheriff's Department report regarding tank overflow on December 24, 1979, dated December 24, 1979, a true and correct copy of which is attached hereto as **Exhibit B**, at 2. The wind blew the liquid beyond a safety trough around the tank and onto the driveway of the company's building, and flowed down the driveway onto A Street into the drainage ditch running along A Street. *Ibid.* This liquid flowed down the drainage ditch for approximately 150 yards. *Ibid.* The Site manager admitted that the substance that had

3

DECL. OF MCKINLEY LEWIS, JR., IN SUPPORT OF PLAINTIFFS' APPLIC. FOR ENTRY BY COURT OF DEFAULT JUDGMENT AGAINST DEF. COLLINS & AIKMAN PRODUCTS, LLC (2:14-cv-00595-WBS-EFB)

flowed into the drainage was a mixture of water, copper, chromium, and arsenic. *Id*. at 3.

11. 10. On November 7, 1980, a well water supply valve malfunctioned, causing water to flow into a mixing tank that had about 1.5 feet of sludge in it. The spill travelled along the A Street ditch, both east and west of the Site entrance. *See* Solano County Memo from David Eubanks to Albert Vervais regarding wastewater spill on November 7, 1980, dated November 25, 1980, a true and correct copy of which is attached hereto as **Exhibit C**; Letter from Central Valley Regional Water Quality Control Board ("CVRWQCB") to Wickes regarding spill on November 7, 1980, dated December 10, 1980, a true and correct copy of which is attached hereto as **Exhibit D**; CVRWQCB Memorandum from J. Lawrence Pearson to Kathleen Harder regarding spill on November 7, 1980, dated December 10, 1980, a true and correct copy of which is attached hereto as **Exhibit E**; Letter from CVRWQCB to Wickes that references the spill on November 7, 1980, dated April 30, 1981, a true and correct copy of which is attached hereto as **Exhibit F**; Memo with history and status that references 1978 and 1980 spills dated December 21, 1981, a true and correct copy of which is attached hereto as **Exhibit G**; and Letter and Order from CVRWQCB to Wickes regarding spill on November 7, 1980, dated June 9, 1982, a true and correct copy of which is attached hereto as **Exhibit H**. The mixture overflowed onto the surrounding soil and travelled through a drainage ditch in front of the Site on A Street. Exhibit E, at 1; Exhibit F, at 1.

11. Investigations conducted at the Site showed that soil and groundwater were contaminated with arsenic, chromium, and copper, and that impacted groundwater had migrated offsite to the south and east. *See* page 1 of the Quarterly Groundwater Monitoring Report dated April 2018, a true and correct copy of which is attached hereto as **Exhibit I**.

### Response Actions and Response Costs at the Site

12. From the 1980s through 2005, Wickes and its successor Collins & Aikman Products Co. took various actions under oversight of DTSC and its predecessor agency to address environmental contamination at, around, and/or beneath the Site. FAC, ¶ 20. Those actions included, among other things, soil excavation, installing an asphalt cap over contaminated soils, constructing a building and a drainage system over another contaminated area of the Site,

4

installing and operating a groundwater extraction and treatment system, and stormwater and groundwater monitoring. *Ibid.*

13. On or about March 20, 1997, C&A Products sold the Site to Jim Dobbas, Inc. ("Dobbas"), and Continental Rail, Inc. ("CRI"). FAC, ¶ 22. On or about May 17, 2005, C&A Products filed a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 05-55932. FAC, ¶ 23. In July or August 2005, while in Chapter 11 bankruptcy proceedings, Collins & Aikman Products Co. stopped operating the groundwater extraction and treatment system, and stopped taking other action to address contamination at, around, and/or beneath the Site. FAC, ¶ 24. DTSC was notified that Collins & Aikman Products Co. had stopped operating the groundwater extraction and treatment system in early November 2005. *Ibid.*

14. In 2006, DTSC requested that Dobbas and CRI, the then-owners of the Site, carry out response actions to address contamination at the Site. FAC, ¶ 25. In December 2007, Dobbas agreed to perform certain actions at the Site, which included limited maintenance of the asphalt cap and repair of a roof drainage system for a building over an area that was a source of contamination at the Site. FAC, ¶ 27. However, Dobbas and CRI failed and refused to perform most of the actions formerly conducted by Collins & Aikman Products Co. to address contamination at, around, and/or beneath the Site. *Ibid.* As a result, DTSC issued Imminent and Substantial Endangerment Determination, Docket Number I/SED 06/07-011 ("ISE Determination") on November 9, 2006, and reevaluated the proposed response actions at the Site. *See* ¶¶ 2.4.1 and 4.1 of the ISE Determination, a true and correct copy of which is attached hereto as **Exhibit J**.

15. After 2005, the groundwater extraction and treatment system fell into a state of disrepair, and the extensive repairs necessary to make it operational made its operation no longer cost-effective. Exhibit A, at 2. Therefore, at DTSC's request, the groundwater extraction and treatment system and associated equipment were removed from the Site and properly disposed of offsite. Exhibit A, at 2, 11. DTSC then reevaluated response actions for the Site. Exhibit A, at 2. In July 2010, the Department finalized a Removal Action Workplan ("RAW") for the Site that

5

called for contaminated soil excavation, off-site disposal, backfilling, confirmation sampling, demolition of the groundwater extraction and treatment system, and long-term groundwater monitoring. FAC, ¶ 29. The RAW noted that contaminated groundwater had migrated from beneath the Site to the nearby residential area, which created the potential for exposure to contaminants if groundwater were used for irrigation or if crop or orchard tress roots contacted shallow contaminated groundwater. *See* Pages 3-1 and 3-6 to 3-8 and Figures 3-1 and 3-5 of the Draft Final Removal Action Workplan dated October 2009, a true and correct copy of which is attached hereto as **Exhibit K**.

16. On or about February 11, 2011, defendants Dobbas and CRI sold the Site to defendant David Van Over for $2.00. FAC, ¶ 30. On March 16, 2011, DTSC issued Imminent or Substantial Endangerment Determination Order and Remedial Action Order, Docket Number I/SE 10/11-008 ("ISE Order") ordering Dobbas, CRI, and Van Over to conduct the response actions described in the RAW and to take additional response actions at the Site. FAC, ¶ 31. A true and correct copy of the ISE Order is attached hereto as **Exhibit L**. Dobbas, CRI, and Van Over failed to comply with the ISE Order. FAC, ¶ 32.

17. At present, DTSC's ongoing work at the Site includes monitoring the condition of the asphalt cap and conducting groundwater monitoring and reporting. *See* the 2016 Five-Year Review Report, a true and correct copy of which is attached hereto as **Exhibit M**, at 17. Continued groundwater monitoring and evaluation of the condition of the asphalt cap are necessary to ensure contaminants below the cap are not mobilized by infiltration of precipitation, and to block direct exposure of contaminated soil to humans and environmental receptors. *Ibid.* Continued groundwater monitoring and reporting is necessary to further assess the performance of the 2011 soil excavation, to make certain that the Site is not causing further groundwater contamination, and to ensure that contaminant concentrations at the four off-Site private irrigation wells do not exceed drinking water standards. *Ibid.*

18. DTSC has incurred costs for "response," and continues to incur costs for response, as that term is defined in CERCLA section 101(25), 42 U.S.C. § 9601(25), in taking actions related to the release and/or threatened release of hazardous substances at, around, and/or beneath

6

the Site. FAC, ¶ 33. To date, DTSC's response actions at the Site include, but are not limited to, the following activities: efforts to repair and restart the groundwater extraction and treatment system, completion of a remedial investigation for site soils, preparation and implementation of the RAW, groundwater monitoring, and monitoring the condition of the asphalt cap. *Ibid.*

19. I have visited the Site multiple times, and currently direct and oversee the groundwater monitoring at the Site. Groundwater monitoring includes groundwater sampling and reporting on a quarterly basis to evaluate contaminant trends and ensure the protection of the public. Exhibit M, at 8-9. Groundwater samples are collected from monitoring wells located on the Site and off-Site within the surrounding neighborhood. *Ibid.* Several wells used by residents for landscape irrigation are also sampled. *Ibid.* November 2017 sampling results from wells on the Site and off-Site were above remedial action objectives. *See* the Semi-Annual Groundwater Monitoring Report – November 2017, a true and correct copy of which is attached hereto as **Exhibit N**, at 7-8.

20. DTSC's contractor recently evaluated the effectiveness of the 2011 soil removal action and other remedial actions undertaken at the Site as part of the 2016 Five-Year Review Report. The Protectiveness Statement in the Five-Year Review Report identifies lack of maintenance of the cap and surface drainage systems as issues that could compromise the integrity of the cap and its ability to function as a barrier to exposure. *See* Exhibit M at 18. The Five-Year Review Report indicated that once cracks in the cap are mitigated, the surface drainages cleared of weeds, and the cap maintained as specified, the remedy should be protective. *Ibid.* Until the cap is regularly maintained, however, and DTSC receives and evaluates additional groundwater sampling data, DTSC cannot conclude that all Site actions are complete, or that further response actions will not be necessary.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

///

///

///

knowledge and that this declaration was executed in Sacramento, California on August 16, 2019.

McKinley Lewis, Jr.
Project Manager
Site Mitigation and Restoration Program
Dept. of Toxic Substances Control

8

DECL. OF MCKINLEY LEWIS, JR., IN SUPPORT OF PLAINTIFFS' APPLIC. FOR ENTRY BY COURT OF DEFAULT JUDGMENT AGAINST DEF. COLLINS & AIKMAN PRODUCTS, LLC (2:14-cv-00595-WBS-EFB)