1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                                ----oo0oo----

11

12   CALIFORNIA DEPARTMENT OF TOXIC        No. 2:14-cv-00595 WBS JDP
     SUBSTANCES CONTROL and the TOXIC
13   SUBSTANCES CONTROL ACCOUNT,

14              Plaintiffs,               MEMORANDUM OF DECISION,
                                          FINDINGS OF FACT, AND
15        v.                              CONCLUSIONS OF LAW

16   JIM DOBBAS, INC., a California
     corporation; CONTINENTAL RAIL,
17   INC., a Delaware corporation;
     DAVID VAN OVER, individually,
18   PACIFIC WOOD PRESERVING, a
     dissolved California
19   corporation; WEST COAST WOOD
     PRESERVING, LLC; a Nevada
20   limited liability company; and
     COLLINS & AIKMAN PRODUCTS, LLC,
21   a Delaware limited liability
     company,
22
                Defendants.
23
     and
24
     THE CONTINENTAL INSURANCE
25   COMPANY, et al.,

26   Defendant-Intervenors.

27

28                                ----oo0oo----

                                        1

1        Plaintiffs the California Department of Toxic
2   Substances Control and the Toxic Substances Control Account
3   (collectively, "DTSC") brought this cost recovery action under
4   the Comprehensive Environmental Response, Compensation, and
5   Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA"), against several
6   defendants.  The sole remaining defendant is Collins & Aikman
7   Products, LLC ("C&A"), a dissolved corporation.  This action
8   concerns the release of hazardous substances at a former wood
9   treatment facility in Elmira, California ("the Elmira site," "the
10  site").  (Docket No. 75.)  C&A's insurers intervened in the
11  action and have since been defending against plaintiff's claims.

12       In its order granting DTSC's motion for summary
13  judgment (Docket No. 312), the court found C&A liable under
14  CERCLA for costs incurred by DTSC while conducting cleanup
15  activities at the Elmira site.  The court held a bench trial on
16  the sole remaining issue in the case: the amount of costs DTSC
17  may recover pursuant to its response actions between June 1,
18  2005, and June 30, 2023.  This memorandum constitutes the court's
19  findings of fact and conclusions of law pursuant to Federal Rule
20  of Civil Procedure 52(a).

21                    History of the Elmira Site

22       The Elmira site is a former wood treatment facility
23  located in the town of Elmira, California, on approximately 7.5
24  acres of land; the site abuts residential neighborhoods.  The
25  site has been divided into southern and northern areas, with the
26  northern area being used for storage and staging of treated
27  lumber, and the southern area being used for chemical storage,
28  wood treatment, and lumber drying.  The site was originally owned

1  and operated by Pacific Wood Preserving from 1972 to 1979.  In

2  1979, C&A (at that time known as Wickes Corporation) purchased

3  the property and thereafter conducted wood treatment at the

4  Elmira site until 1982, when it discontinued operations.

5      The wood treatment process involves the use of

6  hazardous substances, namely hexavalent chromium ("chrome 6") and

7  arsenic.  The Elmira site was inspected several times by

8  regulatory authorities during its ten years of operation in

9  response to community complaints about observed contamination in

10  nearby drainage ditches.  In 1983, initial investigations found

11  that chrome 6 and arsenic had been released into the environment,

12  causing contamination of soil and groundwater in both the

13  southern and northern areas.

14      C&A submitted a Remedial Action Plan (RAP) to DTSC in

15  1983, which proposed response actions to address contamination in

16  the southern area of the Elmira site.  Pursuant to the RAP, and

17  under DTSC's supervision, C&A excavated contaminated soil,

18  installed a concrete cap to prevent further migration of

19  contaminants, built a metal shed as a containment structure, and

20  implemented a groundwater extraction and treatment system

21  ("GWETS") to remediate the impacted groundwater.

22      In 1994, a second RAP was approved and implemented in

23  the northern area of the site, which involved excavating off-site

24  soil impacted by drainage ditches, regrading and covering the

25  site with an additional asphalt cap, and installing a drainage

26  system to prevent rainwater from seeping through the cap.  In

27  1996, DTSC certified the northern and southern response actions

28  as final remedies and indicated that the GWETS should run for at

1    least 10 years.

2          In 2004, C&A determined through a laboratory study

3    that, although the GWETS had been successful at reducing

4    contamination, additional implements were needed to achieve

5    remedial action objectives.  One such potential implement was in-

6    situ treatment, a process whereby a reductant is injected into

7    contaminated material to accelerate its dilution into a non-

8    hazardous form.  However, C&A went bankrupt in 2005 before it

9    could put into place any such implement.  After going bankrupt,

10   C&A abandoned the GWETS and ceased conducting response actions at

11   the Elmira site altogether.  When DTSC urged it to continue, C&A

12   refused.  DTSC subsequently requested the new owners of the site

13   -- Jim Dobbas, Inc. and Continental Rail, Inc. -- to conduct

14   response actions; they, too, refused.

15         The GWETS eventually shut down, after which DTSC

16   concluded that further measures were needed to protect the Elmira

17   community from exposure to hazardous substances.  DTSC then

18   issued an Imminent or Substantial Endangerment Determination

19   ("ISED") in 2006, which authorized DTSC to oversee the site

20   directly and provided them access to funding.  DTSC concluded in

21   the ISED that the actual or potential release of hazardous

22   substances threatened public health, and that continued

23   groundwater monitoring was necessary to provide capture of

24   contaminated groundwater and achieve remedial action goals.  DTSC

25   attempted to restart the GWETS but was ultimately unsuccessful;

26   it then began managing the Elmira site as an "orphan site," a

27   site for which no other viable party could be held financially

28   responsible for cleanup efforts.

4

1    DTSC's contractor conducted a Remedial Investigation

2    ("RI") of the site in 2008, in which it recommended: (1)

3    continued groundwater monitoring, and (2) evaluation of the

4    effectiveness, feasibility, and cost of alternative remedial

5    actions, including soil excavation, in situ treatment, and plume

6    control through well extraction.

7    Pursuant to the RI, DTSC evaluated these alternative

8    actions in its 2010 Removal Action Workplan ("RAW"), which

9    comprised in relevant part an Engineering Evaluation and Cost

10   Analysis ("EECA") and a list of six approaches for continued

11   management of the Elmira site contamination.  DTSC decided on the

12   third alternative, a limited soil excavation in the southern area

13   of the site, which it conducted in 2011.  DTSC also continued

14   groundwater monitoring at the site from 2006 to 2023.

15   DTSC now claims recoverable costs in the amount of

16   $3,321,072.33 for its cleanup efforts between 2005 and 2023 in

17   conducting site investigations, attempting to restart the GWETS,

18   conducting soil removal pursuant to the 2011 RAW, and continued

19   groundwater monitoring.  DTSC further claims interest on its

20   unreimbursed costs in the amount of $187,778.09, and attorney's

21   fees in the amount of $905,608.57, incurred by the Attorney

22   General's office in litigating this action, which began in 2014.

23                    Recovery for DTSC's Response Actions

24   "Congress enacted CERCLA, 42 U.S.C. §§ 9601-9675 . . .

25   'to initiate and establish a comprehensive response and financing

26   mechanism to abate and control the vast problems associated with

27   abandoned and inactive hazardous waste disposal sites.'"

28   Washington State Dep't of Transp. v. Washington Nat. Gas Co.,

1 | <u>Pacificorp</u>, 59 F. 3d 793, 799 (9th Cir. 1995) (citing H.R. Rep.

2 | No. 1016(I), 96th Cong., 2d Sess., 22). The intention motivating

3 | CERCLA was to "facilitate the prompt cleanup of hazardous waste

4 | sites by placing the ultimate responsibility for cleanup on those

5 | responsible for hazardous wastes." <u>Id.</u> (citing <u>U.S. v. R.W.</u>

6 | <u>Meyer, Inc.,</u> 889 F. 2d 1497, 1500 (6th Cir. 1989)).

7 | "The national contingency plan ('NCP'), promulgated by

8 | the EPA as required by CERCLA § 105, guides federal and state

9 | response activities," by providing "organizational structure and

10 | procedures for preparing for and responding to . . . releases of

11 | hazardous substances." <u>Washington State</u>, 59 F. 3d, at 799. In

12 | cost recovery actions under CERCLA, the scope of reimbursement

13 | generally depends on the degree to which a party's response

14 | efforts are compliant with the NCP. <u>Id.</u> at 799-800.

15 | CERCLA distinguishes between response costs incurred by

16 | private parties and those incurred by the government. <u>Id.</u>

17 | (citing <u>Wickland Oil Terminals v. Asarco, Inc.,</u> 792 F. 2d 887,

18 | 891 (9th Cir. 1986)). Section 107(a)(4)(B) provides that private

19 | parties may only recover "necessary costs of response . . .

20 | consistent with the national contingency plan." 42 U.S.C. §

21 | 9607(a)(4)(B). But Section 107(a)(4)(A), which concerns

22 | government response actions, is much broader, and provides that

23 | the government may recover "<u>all</u> costs of removal or remedial

24 | action <u>not inconsistent</u> with the national contingency plan." <u>Id.</u>

25 | § 9607(a)(4)(A) (emphasis added). The Ninth Circuit has

26 | interpreted this difference in language to indicate that "when

27 | the United States government [or] a state . . . is seeking

28 | recovery of response costs, consistency with the NCP is

1  presumed." Washington State, 59 F. 3d, at 799-800 (citing United

2  States v. Hardage, 982 F. 2d 1436, 1442 (8th Cir. 1992)); see

3  also United States v. Iron Mountain Mines, 812 F. Supp. 1528,

4  1543 (E.D. Cal. 1992) ("[G]overnments have generally been allowed

5  to recover all response costs, as is permitted by the statute.").

6       The burden is on the party opposing costs to overcome

7  the presumption of consistency with the NCP; to meet this burden,

8  "a defendant must prove that the [government's] response action

9  was arbitrary and capricious." United States v. Chapman, 146 F.

10 3d 1166, 1171 (9th Cir. 1998) (citing 42 U.S.C. § 9613(j)(2)).

11 Arbitrary and capricious review in the CERCLA context is

12 "narrow," and is satisfied "if the agency examine[d] the relevant

13 data and articulate[d] a satisfactory explanation for its action,

14 including a rational connection between the facts found and the

15 choice made." United States v. Newmont USA Ltd., 508 F. Supp. 2d

16 1077, 1082 (E.D. Wash. 2007) (citing Hopi Tribe v. Navajo Tribe,

17 46 F. 3d 908, 914 (9th Cir. 1995)).

18       To satisfy their burden at trial, defendants primarily

19 relied on the testimony of their expert, Alborz Wozniak, founder

20 and principal engineer of Veritas, a consulting services company

21 providing oversight for cleanup of contaminated sites.  Mr.

22 Wozniak's criticisms of DTSC's actions largely echoed

23 intervenors' trial brief and focused on (1) the 2011 soil removal

24 action, including preliminary investigations; (2) DTSC's attempts

25 to restart the GWETS after its abandonment; (3) DTSC's continued

26 groundwater monitoring following the failure to restart the

27 GWETS; (4) DTSC's evaluation of the in-situ pilot study for

28 groundwater mediation; and (5) DTSC's internal cost calculations.

1          Mr. Wozniak did not use the term "arbitrary" for all

2    these actions; in fact, the only activity he characterized as

3    such was the 2011 soil removal action.  When asked why he

4    concluded that the 2011 removal was arbitrary, Mr. Wozniak stated

5    that there was no technical basis for the limited excavation

6    because DTSC had previously certified the 1983 and 1994 remedies

7    as final remedial actions, an argument that intervenors also made

8    in their brief.  (See Docket No. 326 at 17 ("There was no

9    technical basis for DTSC to implement a soil Removal Action in

10   2011 when final remedial actions had already been approved and

11   implemented in 1984 and 1994.").)  In other words, the

12   intervenors reasoned that because DTSC had previously approved

13   implementation of a capping and monitoring remedy, the subsequent

14   decision to excavate was arbitrary and capricious.

15        The court does not agree that approval of one remedy

16   renders approval of a different remedy arbitrary and capricious,

17   and intervenors have provided no authority for that proposition.

18   Moreover, the NCP contemplates conducting removal actions

19   subsequent to remedial actions.  40 C.F.R. § 300.415(b)(5)(ii)

20   (authorizing continued removal action when "otherwise appropriate

21   and consistent with the remedial action to be taken").

22        Intervenors' argument is also undermined by the

23   findings in the 2004 laboratory study, the 2006 ISED, the 2008

24   RI, and the 2010 RAW, all of which corroborate DTSC's conclusion

25   that, although the earlier cap-and-monitoring remedy had been

26   effective at reducing contamination, a renewed cleanup approach

27   was needed to bring the site in line with remedial action goals.

28   DTSC's expert, Natasha DiPietro, a licensed geologist for DTSC,

8

1   confirmed in her testimony that the purpose of DTSC's

2   investigatory activity was to determine which efforts would be

3   appropriate for enhancing -- rather than replacing -- the

4   existing remedy.  That a limited excavation of soil in the most

5   highly contaminated portion of the site was approved, after

6   extensive study and evaluation, strongly suggests that DSTC's

7   decision to conduct a soil removal action was well-informed and

8   was not irreconcilable with its earlier remedy but was intended

9   to improve the effectiveness of that remedy.

10          Moreover, DTSC's actions in undertaking the soil

11  removal were consistent with the statutory language of the NCP.

12  Section 300.415(a)(1) instructs that before conducting a removal

13  action, an agency "shall first review" a removal site evaluation,

14  any previous information available about the site, current site

15  conditions, and determine whether the site poses a threat to

16  public health or the environment.  40 C.F.R. § 300.415(a)(1).

17  Section 300.415(b)(2) then lists the factors to be considered for

18  that determination, including actual or potential exposure to

19  nearby populations, contamination of drinking water, hazardous

20  substances that may pose a threat of release, weather conditions

21  that may cause substances to migrate, availability of

22  alternatives, and other factors which may threaten public health.

23  Id. § 300.415(b)(2).  The RI and RAW both incorporate many of

24  these factors in their listed concerns, and both parties' experts

25  acknowledged the continued threat of exposure and contamination

26  following C&A's bankruptcy.

27          Section 300.415(4)(i) further states that after

28  determining a removal action is appropriate, "[t]he lead agency

1   shall conduct an engineering evaluation/cost analysis (EE/CA) . .
2   . [which is] an analysis of removal alternatives for a site."
3   Id. § 300.415(4)(i).  DTSC's removal action was one of six
4   alternatives proposed by the EECA in the 2010 work plan.  That
5   alternative was chosen after considering and rejecting others;
6   Ms. DiPietro gave the example of one alternative -- demolishing
7   surrounding buildings -- which was not cost-effective and would
8   have threatened release of asbestos.

9        Finally, the NCP lists certain actions that "are, as a
10  general rule, appropriate in the types of situations shown," and
11  explicitly includes "[e]xcavation, consolidation, or removal of
12  highly contaminated soils from drainage or other areas," which is
13  precisely what was done in the 2011 removal action.  Id. §
14  300.415(e)(6).

15       Intervenors have not satisfied their burden to show
16  that DTSC's removal action was arbitrary and capricious.  DTSC
17  "examine[d] the relevant data" in its numerous investigations,
18  "articulate[d] a satisfactory explanation for its action" in
19  establishing a persistent threat to public health despite
20  previously certified remedies, and "includ[ed] a rational
21  connection between the facts found and the choice made" in
22  demonstrating that the site would benefit from additional removal
23  action.  Newmont, 508 F. Supp. 2d, at 1082.  To recover under
24  CERCLA, it is enough for an agency, before conducting a removal
25  action such as this, to "conclude[], after careful investigation
26  and evaluation, that the site posed a threat," and that is what
27  was done.  Chapman, 145 F. 3d, at 1171; see also United States v.
28  Newmont USA Ltd., No. 05-cv-020-JLQ, 2008 WL 4621566, at *56

1    (E.D. Wash. Oct 17, 2008) ("The fact that a particular response

2    action was perhaps not the best or most cost-effective choice in

3    hindsight does not make the response action arbitrary and

4    capricious.").

5         As for DTSC's other actions after 2005 -- their

6    attempts to restart the GWETS, their pilot study, and their

7    groundwater monitoring -- Mr. Wozniak opined that these

8    activities were "unnecessary," "excessive," or "wasteful," terms

9    that are echoed in intervenors' brief.  (See Docket No. 326 at

10   18, 19, 20.)  These opinions, however, do not address the

11   relevant question of whether DTSC's actions were inconsistent

12   with the NCP.

13        As stated above, CERCLA only limits private parties'

14   recovery to costs that are "necessary" and "reasonable," and

15   omits those words when "addressing the government's right to cost

16   recovery."  United States v. Kramer, 913 F. Supp. 848, 863

17   (D.N.J. 1995).  The reimbursement of costs incurred by the United

18   States or a state government agency thus does not turn on whether

19   its actions were necessary, excessive, or effective, but only

20   whether those actions were arbitrary.  Courts have consistently

21   held that criticisms about necessity, efficiency, or cost-

22   effectiveness are irrelevant to the applicable burden and thus

23   "do not state an appropriate challenge to the propriety of the

24   government's response costs."  United States v. Kramer, 757 F.

25   Supp. 397, 436 (D.N.J. 1991); see also, e.g., United States v.

26   Akzo Nobel Coatings, 990 F. Supp. 892, 895 (E.D. Mich. 1998)

27   ("[T]he NCP does not require response cost items to be

28   'reasonable,' 'proper' or 'cost-effective' . . . My inquiry is

1  limited to a determination that the costs arose out of actions

2  that comported with the NCP."); <u>Iron Mountain Mines</u>, 812 F.

3  Supp., at 1543 (holding that government response costs may be

4  "indirect," need not be "reasonable" or "necessary," and that

5  "liability extends to <u>all</u> response costs" (emphasis in original))

6  (collecting cases).

7      Ms. DiPietro seemed to concede on cross-examination

8  that 25% of DTSC's groundwater monitoring between 2015 and 2023

9  may have been excessive, an opinion she had not previously

10  testified to or included in her expert report.  However, she did

11  not go so far as to testify that the monitoring during that

12  period was arbitrary.  To the contrary, upon further questioning,

13  she testified that DTSC was actively working to decrease the

14  frequency of the monitoring during that period.  Notwithstanding

15  Ms. DiPietro's passing remark, the court does not find that the

16  monitoring between 2015 and 2023 was arbitrary.

17  <u>Reasonableness of DTSC's Costs</u>

18      Mr. Wozniak invoked another category of activity --

19  DTSC's calculation of its "internal costs" -- and stated that he

20  reviewed the accounting documents disclosed by DTSC and concluded

21  that individual costs had not been adequately explained.  In

22  closing, intervenors' counsel reiterated the argument that DTSC's

23  documentation of its internal costs was not sufficiently detailed

24  and allowed for excessive costs.

25      Here, too, intervenors have failed to meet their burden

26  of showing that DTSC's costs are unrecoverable.  "As long as the

27  government's choice of response action is not inconsistent with

28  the NCP, its costs are presumed to be reasonable and therefore

1  recoverable." United States v. Hardage, 982 F. 2d 1436, 1443

2  (10th Cir. 1992) (citing United States v. Ne. Pharm. & Chem. Co.,

3  810 F. 2d 726, 748 (8th Cir. 1986); see also Trinity Indus., Inc.

4  v. Greenlease Holding Co., 903 F. 3d 333, 355 n.13 (3rd Cir.

5  2018) ("[I]t is black letter CERCLA law that when a government's

6  actions are not inconsistent with the [NCP], its costs are

7  presumed reasonable."). Regarding documentation of costs, the

8  NCP requires only that "[d]uring all phases of response, the lead

9  agency shall complete and maintain documentation to support all

10  actions taken under the NCP and to form the basis for cost

11  recovery." 40 C.F.R. § 300.160(a)(1).

12      DTSC called its accounting and administrative

13  supervisor, Jason Xiao, who provided detailed information on

14  DTSC's internal accounting system, which tracks labor, overhead,

15  and contractor costs attributable to specific cleanup sites. Mr.

16  Xiao explained that DTSC employees select specific task and

17  activity codes when entering their time, and that all costs

18  reflected in DTSC's Summary by Activity reports were

19  systematically tracked through an internal verification process.

20  The report showed total project costs, after accounting for

21  reimbursements, of $3,321,072.23 from June 2005 to June 2023.

22      The fact Mr. Xiao could not verify the substantive

23  necessity of each cost entry or whether specific activities

24  complied with the NCP does not detract from his testimony that

25  DTSC properly documented its costs. Indeed, "[a] CERCLA

26  defendant cannot challenge the adequacy of the government's cost

27  documentation by raising 'vague challenges to the validity of

28  those costs based on the government's evidence,' but instead must

offer specific evidence to counter the government's documentation of its direct costs." United States v. W.R. Grace & Co., 280 F. Supp. 1149, 1179 (D. Mont. 2003) (citing United States v. R.W. Meyer, Inc., 889 F. 2d 1497, 1508 (6th Cir. 1989)).  Mr. Xiao's testimony established a robust, multi-layered accounting system with built-in verification mechanisms and supervisor review, and intervenors presented no evidence that this system was unreliable or that any costs documented were incorrectly attributed to the Elmira site.

DTSC is entitled to the presumption that costs for response actions consistent with the NCP are reasonable, and intervenors have not overcome that presumption.  The court sees no reason to conclude that DTSC improperly documented its cleanup costs for the Elmira site between June 2005 and June 2023 and will accordingly award DTSC the amount requested.

<u>Interest</u>

DTSC also seeks recover interest on its costs in the amount of $187,778.09.  CERCLA provides that "amounts recoverable in an action under this section shall include interest," and that "[s]uch interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned."  42 U.S.C. § 9607(a).  The court received little to no help from either side, either in their briefs or in oral argument, on the question of if or when interest should accrue in this case.

Here, the original Complaint in this action was filed on March 3, 2014, and contained the allegation that plaintiffs incurred costs related to the site from November 2005 and prayed

1    for interest on the amount to be proven at trial, but at least

2    $2,202,176.92, under 42 U.S.C. § 9607(a).  The court finds that

3    sufficient to establish the date payment of a specified amount

4    was demanded in writing.  For reasons unknown to the court,

5    however, plaintiffs only ask for interest from the date of the

6    First Amended Complaint, which was filed on December 11, 2014.

7           Courts have held that "a complaint that does not

8    specify an exact amount will satisfy [the] requirement" of a

9    written demand under CERCLA.  Dow Chemical Co. v. Sinclair Oil

10   Corp., 3 F. Supp. 2d 1252, 1253 (D. Wyo. 1998) (citing

11   Bancamerica Commercial v. Mosher Steel of Kansas, 100 F. 3d 792,

12   801 (10th Cir. 1996); see also Matter of Bell Petroleum Services,

13   Inc., 3. F. 3d 889 (5th Cir. 1993) (allowing recovery of interest

14   where complaint did not specify an amount); State of Colo. v.

15   Idarado Min. Co., 735 F. Supp. 368, 371 (D. Colo. 1990) ("[T]he

16   State's demand for response costs set forth in its . . .

17   complaint satisfies § 107(a)'s provisions."); Bethelehem Iron

18   Works, Inc. v. Lewis Industries, Inc., No. CIV.A. 94-0752, 1996

19   WL 557592, at *74 (E.D. Pa. Oct. 1, 1996) (holding that CERCLA

20   interest may accrue from filing of complaint requesting response

21   costs) (collecting cases).

22           Absent any suggestion of authority to the contrary, the

23   court will thus award plaintiffs interest on their costs accruing

24   from the date filing of the First Amended Complaint on December

25   11, 2014, to June 30, 2023, which amount, according to the

26   undisputed testimony is $187,778.09.

27                          Attorneys' Fees

28           DTSC also requests attorneys' fees.  The Ninth Circuit

15

1  has concluded that "statutory authority [of CERCLA] permits the

2  government . . . to recovery attorney fees attributable to the

3  litigation as part of its response costs." Chapman, 146 F. 3d

4  1166, 1175.  However, in awarding a fee, the court must "consider

5  the reasonableness of the government's requested litigation

6  expenses." Id. at 1176 (citing Hensley v. Eckerhart, 461 U.S.

7  424 (1983)).

8       The reasonableness inquiry requires consideration of

9  several factors, including the time reasonably expended,

10  complexity of the litigation, and results obtained.  Hensley, 461

11  U.S. at 430, 434.  Here, the litigation has spanned over a decade

12  and involved multiple complex legal issues, including successor

13  liability and substantive CERCLA cost recovery claims against

14  numerous potentially responsible parties.  The case required

15  extensive discovery, motion practice, and ultimately a bench

16  trial.  DTSC has successfully established liability and pursued

17  its claims to judgment.  See Hensley, 461 U.S. at 435-36 (holding

18  degree of success to be a critical factor in fee award); Davis v.

19  City & Cnty. of San Francisco, 976 F. 2d 1536, 1545 (9th Cir.

20  1992) (complexity of case relevant to reasonableness).

21       As with DTSC's internal accounting, the accounting

22  administrative supervisor for the California Attorney General's

23  Office, Cycil Schomer, provided testimony concerning the tracking

24  of legal costs.  Attorneys enter their time entries on the

25  "Prolaw" system which are coordinated with matter identification

26  numbers, and once the entries are certified, they cannot be

27  modified without accounting unit involvement.  Once the

28  attorneys' entries are received by the accounting department, the

1  matter ID number is verified, corroborated with a range of dates,

2  and a PDF report is created which is reflective of employee time

3  and billed costs.  Ms. Schomer established that the Attorney

4  General's Office generated a detailed total report showing costs

5  of $905,608.57 for litigation expenses through June 30, 2023.

6        Intervenors' counsel conceded at trial that attorneys'

7  fees were recoverable subject to reasonableness but offered no

8  evidence challenging the reasonableness of DTSC's requested fees.

9  Without affirmative proof that the fees are unreasonable, and

10 given the complexity and duration of this litigation, the court

11 finds that DTSC's requested attorneys' fees of $905,608.57 should

12 be awarded.  See Gates v. Deukmejian, 987 F. 2d 1392, 1397-98

13 (9th Cir. 1992) ("The party opposing the fee application has a

14 burden of rebuttal that requires submission of evidence to the

15 district court challenging the accuracy and reasonableness of the

16 hours charged.").

17                        Conclusion

18        Plaintiffs are entitled to judgment against defendant

19 Collins & Aikman Products, LLC, in the sum of $3,321,072.23 for

20 unreimbursed response costs incurred through June 30, 2023, plus

21 interest at the lawful federal rate accruing from December 11,

22 2014, through June 30, 2023, in the sum of $187,778.09; and

23 $905,608.57 for attorneys' fees incurred through June 30, 2023 in

24 connection with this litigation.

25        Judgment shall be entered accordingly.

26 Dated:  February 4, 2026

27                        WILLIAM B. SHUBB
                         UNITED STATES DISTRICT JUDGE

28